UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PHAT FASHIONS, LLC,

                  Plaintiff,

     v.

TORNADO IMPORTS (CANADA), INC.

                Defendant.

Case No. 1:07 cv 03278 (PAC)

**AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS OF DEFENDANT TORNADO IMPORTS (CANADA), INC.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TORNADO IMPORTS (CANADA), INC.

           Defendant and Counterclaim
           Plaintiff,

     v.

PHAT FASHIONS, LLC,

           Plaintiff and Counterclaim
           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendant Tornado Imports (Canada), Inc. ("Tornado"), by and through undersigned counsel, hereby files its Amended Answer, Defenses, and Counterclaims in response to the Complaint filed by Plaintiff Phat Fashions LLC ("Phat Fashions"), and admits, denies, and alleges as follows:

# I.
## ANSWER

1.    Answering Paragraph 1, Tornado states that this paragraph sets forth legal conclusions to which no response is required and further states that Tornado denies that there was no extension of the Trademark License Agreement ("Agreement") and denies that the Agreement will expire on December 31, 2007.  To the extent the allegations in this paragraph characterize documents, the documents are in writing and speak for themselves.  Furthermore, no response is required to the extent this paragraph characterizes or summarizes subsequent paragraphs.  To this extent this paragraph contains factual allegations, Tornado denies each and every allegation contained herein.

2.    Answering Paragraph 2, Tornado states that this paragraph sets forth legal conclusions to which no response is required.

3.    Answering Paragraph 3, Tornado states that this paragraph sets forth legal conclusions to which no response is required.  To the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself.

4.    Answering Paragraph 4, Tornado lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies each and every allegation contained herein.

5.    Answering Paragraph 5, Tornado admits the allegations contained herein.

6.    Answering Paragraph 6, Tornado admits only that on or about August 1, 1998, Tornado entered into the Agreement with Phat Fashions, a copy of which was annexed to Phat Fashion's Complaint as Exhibit A.  To the extent this paragraph characterizes a document, the document is in writing and speaks for itself.  Tornado denies each and every remaining allegation contained herein.

7.      Answering Paragraph 7, Tornado admits only that Section Three of the Agreement provided for an initial term ending on December 31, 2001, and two option terms, the first sending on December 31, 2004, and the second ending on December 31, 2007, that could be extended by Tornado.  To the extent this paragraph characterizes a document, the document is in writing and speaks for itself.

8.      Answering Paragraph 8, Tornado states that this paragraph characterizes a document that is in writing and speaks for itself.  Tornado denies each and every remaining allegation contained herein and further states that an amendment to the Agreement, such as the one the parties entered into, could extend the term of the Agreement.

9.      Answering Paragraph 9, Tornado admits only that it exercised both options through letters, on or about March 20, 2001 and on or about March 10, 2004, copies of which were annexed to Phat Fashion's Complaint as Exhibit B.  To the extent this paragraph characterizes a document, the document is in writing and speaks for itself.  Tornado denies each and every remaining allegation contained herein, including the allegation that the Agreement terminates on December 31, 2007.

10.     Answering Paragraph 10, Tornado admits only that on or about March 1, 2006, Issie Wiseman sent an email to Bernt Ullman with an attachment.  A copy of Issie Wiseman's email is among the documents attached to the Complaint as Exhibit C.  To the extent this paragraph characterizes documents, these documents are in writing and speak for themselves.

11.     Answering Paragraph 11, Tornado admits only that discussions took place between Bernt Ullman and Issie Wiseman, during which Bernt Ullman, as President of Phat Fashions, agreed to the extension proposed by Issie Wiseman, and that on or about March 20, 2006, Eli B. Nathanson sent an e-mail with a copy of the written Extension to the Agreement to

Issie Wiseman. (The oral agreement to extend the period of the Agreement and the subsequent memorialization thereof are known as the Extension.) To the extent this paragraph characterizes documents, these documents are in writing and speak for themselves. Tornado denies each and every remaining allegation contained herein.

12.     Answering Paragraph 12, Tornado admits only that Issie Wiseman signed two originals of the written Extension at the request of Eli B. Nathanson, and that Phat Fashions, despite numerous assurances that it would, did not sign the written Extension. To the extent that this paragraph characterizes documents, these documents are in writing and speak for themselves. To this extent this paragraph contains other factual allegations, Tornado denies each and every allegation contained herein.

13.     Answering Paragraph 13, Tornado states this paragraph sets for legal conclusions to which no response is required. Furthermore, to the extent that this paragraph characterizes a document, the document is in writing and speaks for itself. Tornado denies each and every remaining allegation contained herein.

14.     Answering Paragraph 14, Tornado admits that Phat Fashions neither counter-signed nor returned a fully executed Extension to Tornado, but further states that Phat Fashions made clear through its oral statements and actions that it intended to counter-sign the written Extension and that the Extension was in place and never disclosed, prior to on or about February, 2007, that it was going to attempt to breach the Extension. Tornado now understands that Phat Fashions made different arrangements for Canadian distribution to begin January 2008.

15.     Answering Paragraph 15, Tornado denies that they never inquired as to whether Phat Fashions had executed the written Extension, and alleges to the contrary that Tornado repeatedly called Phat Fashions about the Extension, including on or about April, 2006; on or

4

about July or August, 2006; on or about October, 2006; and on or about December, 2006. Tornado further states that during all of these conversations, Phat Fashions, through Bernt Ullman, repeatedly assured Tornado that the Extension was valid and that Phat Fashions intended to sign it. Tornado denies each and every remaining allegation contained herein.

16.    Answering Paragraph 16, Tornado states that to the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself. Tornado further states that it did extend the Agreement through December 1, 2010. Tornado denies that it did not mention the Extension to Phat Fashions until March 19, 2007, and alleges to the contrary that Tornado repeatedly called Phat Fashions about the Extension, including on or about April, 2006; on or about July or August, 2006; on or about October, 2006; and on or about December, 2006. Tornado further states that during all of these conversations, Phat Fashions, through Bernt Ullman, repeatedly assured Tornado that the Extension was valid and that Phat Fashions intended to sign the written Extension. Tornado denies each and every remaining allegation contained herein.

17.    Answering Paragraph 17, Tornado lacks knowledge or information sufficient to form a belief as to when Phat Fashions decided to no longer honor its commitment to extend the license and whether Phat Fashions directed its counsel, Brad D. Rose ("Rose") of Pryor Cashman LLP, to immediately response to Issie Wiseman. Tornado further states that to the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself. Tornado denies each and every remaining allegation contained herein.

18.    Answering Paragraph 18, Tornado admits only that Phat Fashions neither signed nor returned the written Extension but further states that Phat Fashions made clear through its oral statements and actions that the Extension was in place, that it intended to counter-sign the

written Extension and that Phat Fashions had in fact extended the Agreement.  Tornado further states that to the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself.  Tornado denies that weeks went by without any response by Wiseman to Rose's March 21, 2007 letter and alleges to the contrary that Issie Wiseman called Bernt Ullman at least once during that time in an attempt to convince Phat Fashions not to make different arrangements for Canadian distribution to begin January 2008.  Tornado denies each and every remaining allegation contained herein.

19.    Answering Paragraph 19, Tornado denies that Phat Fashions had no choice but to commence this proceeding for a declaratory judgment.  Tornado lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies each and every remaining allegation herein.

## ANSWER TO FIRST CAUSE OF ACTION

20.    Answering Paragraph 20, Tornado repeats and realleges its responses to Paragraphs 1 through 19 as if fully set forth herein.

21.    Answering Paragraph 21, Tornado states that this paragraph sets forth legal conclusions to which no response is required.

22.    Answering Paragraph 22, Tornado states that this paragraph sets forth legal conclusions to which no response is required.

## II.
## SEPARATE AND ADDITIONAL DEFENSES

By alleging the defenses set forth below, Tornado is not in any way agreeing or conceding that it has the burden of proof or the burden of persuasion in any of these issues. In addition, Tornado specifically and expressly reserves the right to amend these defenses, or to add additional defenses, based upon legal theories, facts and circumstances, which may or will be discovered and/or further legal analysis of Phat Fashions' positions in this litigation.

### FIRST SEPARATE AND ADDITIONAL DEFENSE
### (FAILURE TO STATE A CLAIM)

23.    Phat Fashions fails to state a claim upon which relief can be granted.

### SECOND SEPARATE AND ADDITIONAL DEFENSE
### (EQUITABLE ESTOPPEL)

24.    Phat Fashions' claims are barred by the doctrine of equitable estoppel.

### THIRD SEPARATE AND ADDITIONAL DEFENSE
### (PROMISSORY ESTOPPEL)

25.    Phat Fashions' claims are barred by the doctrine of promissory estoppel.

### FOURTH SEPARATE AND ADDITIONAL DEFENSE
### (UNCLEAN HANDS)

26.    Phat Fashions' claims are barred by the doctrine of unclean hands.

### FIFTH SEPARATE AND ADDITIONAL DEFENSE
### (BREACH OF GOOD FAITH AND FAIR DEALING)

27.     Phat Fashions' claims are barred, because Phat Fashions breached the covenant of

good faith and fair dealing.

### SIXTH SEPARATE AND ADDITIONAL DEFENSE
### (PARTIES' CONDUCT)

28.     Phat Fashions' claims are barred, because the parties' conduct manifested an intent

to regularly modify the Agreement through oral representations.

### SEVENTH SEPARATE AND ADDITIONAL DEFENSE
### (ADDITIONAL DEFENSES)

29.     Tornado presently lacks sufficient knowledge and information upon which to

form a belief as to whether it may have additional, unasserted defenses and therefore reserves the

right to assert additional defenses.

### III.
### COUNTERCLAIMS

30.     Defendant-Counterclaim Plaintiff Tornado hereby asserts these Counterclaims

against Plaintiff-Counterclaim Defendant Phat Fashions.  Tornado expressly reserves the right to

amend these Counterclaims, or to add additional Counterclaims, or to add or join additional

parties, based upon legal theories, facts and circumstances, which may or will be discovered,

and/or further legal analysis of Phat Fashions' position in this litigation.

## A.    SUMMARY

31.    Prior to the filing of this lawsuit, Phat Fashions and Tornado had a longstanding, mutually satisfactory business relationship.  On or about August 1, 1998, Phat Fashions and Tornado entered into a Trademark License Agreement, which was subsequently amended and extended through December 31, 2007 (the "Agreement").  Additionally, although the written Agreement called for modifications to be reduced to a writing executed by each party, the parties regularly ignored this requirement.  Indeed, the parties regularly modified the Agreement orally.  Such oral modifications generated millions of dollars in sales.  Significantly, the Agreement was modified to allow the sale of the Baby Phat line of clothing by Tornado.  Tornado made these sales through Vis-à-Vis, a company which was and is run by the same management as Tornado.  Vis-à-Vis is a closely affiliated sister company of Tornado.  Tornado always fully performed its obligations under the Agreement.

32.    On or about February, 2006, Phat Fashions and Tornado negotiated and agreed to another modification to the Agreement, extending it by three years until December 31, 2010, with Tornado given the right to extend the Agreement at its sole option another three years, until December 31, 2013.  Phat Fashions' counsel memorialized the extension in writing and, with Phat Fashions' approval, sent the written Extension to Tornado management.  At the request of Phat Fashions' counsel, Issie Wiseman, Director and CEO of Tornado, signed the written Extension and returned it.  On four occasions over the next several months (during April, August, October, and December, 2006), Phat Fashions assured Tornado that it had a valid extension of the Agreement and that Phat Fashions would execute the written Extension.  At all times, Tornado understood the Extension to apply to all Phat Fashions products being sold by

Tornado directly or being sold by Tornado through affiliates and related companies such as Vis-à-Vis.

33.     Tornado and Vis-à-Vis detrimentally relied on Phat Fashions' assurances that the Agreement had been extended by the Extension by: (a) not canceling a lease for a store dedicated to selling Phat Fashions products; (b) instructing several members of its management team to devote nearly all of their time to Phat Fashions products at the expense of developing potential non-Phat Fashions product lines; (c) choosing not to sue the European Phat Farm shoe licensee for damages for territorial infringement for the sale of Phat Farm shoes in Canada; and (d) not pursuing efforts to replace Phat Fashions so Tornado's and Vis-à-Vis' businesses would not be hurt dramatically on December 31, 2007, when the Agreement would have terminated absent the Extension.

34.     On or about February, 2007, Phat Fashions informed Tornado for the first time that Phat Fashions was in the process of negotiating a new licensing arrangement with a different company, and that it might not honor the Extension. Tornado objected, demanding that Phat Fashions honor the Extension. Phat Fashions subsequently began this lawsuit.

**B.     COUNTERCLAIM PARTIES**

35.     These Counterclaims are asserted by Tornado against Phat Fashions under the Trademark License Agreement. All capitalized terms that are not otherwise defined herein are used as defined in the Agreement.

36.     Upon information and belief, Phat Fashions is the parent company which licenses all Phat products, including Phat Farm and Baby Phat. Upon information and belief, Baby Phat is Phat Fashions' line for women's and children's products. Upon information and belief, Phat

Farm is Phat Fashions' line for men's products. Upon information and belief, Phat Fashions is a New York corporation with its principle place of business in New York.

37.    Tornado is a Canadian corporation, and was incorporated under the Canadian Business Corporation Act in 1997. Tornado's relationship with Phat Fashions began on or around August 1, 1998. Tornado carries Phat Farm products exclusively

## C.    BACKGROUND

38.    Beginning on or around August 1, 1998, Tornado and Phat Fashions entered into a contract allowing Tornado to sell Phat Farm products. Beginning on or around 2000, when the Baby Phat line of products began to be created, Issie Wiseman reached out to Phat Fashions to express Tornado's interest in carrying the Baby Phat line as well. Issie Wiseman indicated that Tornado's sales of the Baby Phat lines would be made through Vis-a-Vis, an affiliated sister company of Tornado. The parties agreed and understood that such sales would occur under the terms and conditions of the Agreement. Vis-à-Vis carried Baby Phat products exclusively. Based solely on this oral modification, Tornado, throughVis-à-Vis, purchased Phat Fashions products directly from Phat Fashions' licensees, paid royalties directly to Phat Fashions, and sent sales reports directly to Phat Fashions.

39.    Tornado and Vis-à-Vis' common management team runs four retail stores, all of which are separately incorporated entities. Of these four retail stores, one is a dedicated "Phat Farm Store" in Montreal that, until a few months ago, sold exclusively Phat products. The other three stores are located in Montreal and Toronto and approximately two-thirds of their business is Phat products.

40.    Tornado always materially performed under the Agreement, exceeding the required Minimum Net Sales and Royalty Minimum as required by the Agreement. By way of

11

example, from January 1, 2005 through December 31, 2005, the Agreement called for minimum

sales of $1,800,000 (U.S.) and a minimum royalty of $126,000; Tornado actually sold

$18,888,597 (U.S.) and paid a royalty to Phat Fashions of $1,322,202.  By way of further

example, from January 1, 2006 through December 31, 2006, the Agreement called for minimum

sales of $2,000,000 (U.S.) and a minimum royalty of $140,000; Tornado actually sold

$15,456,579 (U.S.) and paid a royalty to Phat Fashions of $1,081,960.

     41.    Although the Agreement specifically excluded the licensing of certain products,

Tornado and Phat Fashions later expanded the relationship to include many of these excluded

products, including the sales of lingerie and outwear.  These modifications, which allowed the

sale of items previously expressly excluded by the Agreement, were all made orally; they were

never reduced to a writing.  Furthermore, although the Agreement did not include Baby Phat

Leathers, Baby Phat Handbags, Baby Phat Outerwear, or Baby Phat Shoes, as these types of

products were not in existence when the Agreement was signed, the parties orally subsequently

agreed that Tornado was licensed to sell these types of products.

     42.    Phat Fashions never raised any complaints or issues with Tornado regarding its

performance under the Agreement.  Phat Fashions appeared to be fully satisfied with the

performance of Tornado under the Agreement.

     43.    Following negotiations of the minimum guarantees of sales, Phat Fashions and

Tornado agreed to an extension of the Agreement that would cover the lines Tornado was selling

and paying royalties on, including the lines Tornado was selling through Vis-á-Vis.  This

extension was reduced to writing by Phat Fashions' counsel on or about March, 2006.

12

44.    Until on or about February, 2007, Tornado believed that Phat Fashions intended to fulfill its obligations under the Extension; Phat Fashions did not say or do anything to indicate otherwise.

45.    This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367, as supplemental to the jurisdiction over the underlying action by Phat Fashions.  In addition, the matter in controversy for these Counterclaims exceeds $75,000, exclusive of fees and costs, and, upon information and belief, there is diversity of citizenship between Tornado, on the one hand, and Phat Fashions, on the other.  Therefore, diversity jurisdiction presents an additional and independent basis for this Court's jurisdiction over Tornado Counterclaims.

**D.    TORNADO AND PHAT FASHIONS REGULARLY MODIFIED AND AMENDED THE AGREEMENT ORALLY**

46.    From the very beginning of the relationship, the parties acted informally, rarely adhering to the provision in the Agreement calling for modifications to be in a writing signed by each of the parties.  Indeed, it was very common for the parties to modify the Agreement without a writing, including to allow for the sales of products expressly excluded from the contract.  In fact, the Agreement between Tornado and Phat Fashions was orally modified in 2000 to enable Tornado to sell the Baby Phat line.  Tornado opted to make these sales through a sister company, Vis-à-Vis, under the terms and conditions of the Agreement.  Vis-à-Vis was managed and controlled by Issie Wiseman and others, the same management team that managed and controlled Tornado.

**1.    Tornado and Phat Fashions Regularly Made Oral Modifications to Include the Sales of Products Expressly Excluded from the Agreement**

47.    Schedule C to the Agreement (attached to the Complaint as Exhibit A) listed certain products that were specifically excluded from the Agreement.  The Agreement covered

"All Phat Farm products excluding: (a) men's and boy's underwear, lounge wear, back packs, bags, hipsters and related products; (b) women's and girl's dresses, outerwear, swimwear, coverups, exercise wear, lingerie, slip dresses and plus sizes; (c) home furnishings; (d) fragrances, cosmetics and beauty aids; and (e) luggage." Nonetheless, in spite of these specific exclusions, the parties orally agreed that Tornado could sell many of the excluded lines of products. Tornado would ask Phat Fashions orally for permission to sell such product lines, and Phat Fashions would give permission orally, put the management team in touch with the seller, and accept the royalty. All of this was done without a writing. Tornado often made these sales through Vis-à-Vis.

48.    By way of example, the Agreement specifically excludes the sale of ladies' lingerie and loungewear. However, following telephone negotiations between Issie Wiseman and Phat Fashions representatives, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat lingerie and loungewear. Tornado, through its sister company Vis-à-Vis, subsequently sold approximately $153,402 (U.S.) worth of Baby Phat lingerie and loungewear in 2005 and approximately $648,585 (U.S.) worth of Baby Phat lingerie and loungewear in 2006, of which Phat Fashions received approximately $10,738 (U.S.) in 2005 and approximately $45,401 (U.S.) in 2006. Phat Fashions never complained that there was only an oral modification to the Agreement, which allowed for the sale of lingerie and loungewear and Phat Fashions' receipt of royalty payments, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado specifically excluded the sale of lingerie.

49.    By way of further example, the Agreement specifically excludes the sale of ladies' outerwear. However, following telephone negotiations between Issie Wiseman and Phat

14

Fashions representatives, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat outerwear.  Tornado, through Vis-à-Vis, subsequently sold approximately $640,498 (U.S.) worth of Baby Phat outwear in 2005 and approximately $1,114,132 (U.S.) in 2006, of which Phat Fashions received royalties of approximately $44,835 (U.S.) in 2005 and approximately $77,989 (U.S.) in 2006.  Phat Fashions never complained that there was only an oral modification to the Agreement, which allowed for the sale of Baby Phat outwear and Phat Fashions' receipt of royalty payments, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado specifically excluded the sale of women's and girls outerwear.

### 2.    Tornado and Phat Fashions Regularly Made Oral Modifications to Allow for the Sales of Products Not Covered by the Agreement

50.    By way of further example, the Agreement only included Phat Farm products, and not Baby Phat products, as Baby Phat products did not exist at the time the Agreement was signed.  However, over the course of the next several years, the Agreement was orally modified to enable Tornado to sell Baby Phat products.  All of this was repeatedly done orally; the parties never signed a writing stating that Tornado had the right to sell Baby Phat products.

51.    By way of further example, the Agreement did not call for the sale of Baby Phat shoes, which Phat Fashions did not produce at the time the Agreement was signed.  However, following telephone negotiations between Issie Wiseman and Phat Fashions representatives, on or around the fall of 2004, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat shoes.  Tornado, through Vis-à-Vis, subsequently sold approximately $1,013,524 (U.S.) worth of Baby Phat shoes in 2005 and approximately $2,756,288 (U.S.) in 2006, of which Phat Fashions received royalties of approximately $70,947 (U.S.) in 2005 and approximately $192,940 (U.S.) in 2006).  Phat Fashions never complained that there was only an oral

15

modification of the Agreement which allowed for the sale of Baby Phat shoes, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado only allowed for the sale of Phat Farm shoes, not Baby Phat shoes.

52.    By way of further example, the Agreement did not call for the sale of Baby Phat handbags and accessories, which Phat Fashions did not produce at the time the Agreement was signed. However, following telephone negotiations between Issie Wiseman and Phat Fashions representatives, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat handbags and accessories. Tornado, through Vis-à-Vis, subsequently sold approximately $1,591,683 (U.S.) worth of Baby Phat handbags in 2005 and approximately $2,687,344 (U.S.) in 2006, of which Phat Fashions received royalties of approximately $111,418 (U.S.) in 2005 and approximately $188,144 (U.S.) in 2006. Phat Fashions never complained that there was only an oral modification of the Agreement, which allowed for the sale of Baby Phat handbags and accessories, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado did not call for the sale of Baby Phat handbags and accessories.

53.    By way of further example, the Agreement does not call for the sale of Baby Phat leathers, which Phat Fashions did not produce at the time the Agreement was signed. However, following telephone negotiations between Issie Wiseman and Phat Farm representatives, on or around the spring of 2002, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat leathers. Tornado, through Vis-à-Vis, subsequently sold approximately $200,000 (U.S.) worth of Baby Phat leathers in 2005, of which Phat Fashions received royalties of $14,000 (U.S.) in 2005. Phat Fashions never complained that there was only an oral modification of the Agreement, which allowed for the sale of Baby Phat leathers, despite the fact that the oral

16

modification was never reduced to writing, and despite the fact that the Agreement with Tornado did not call for the sale of Baby Phat leathers.

## E.    THE PARTIES NEGOTIATED AND AGREED TO AN EXTENSION OF THE AGREEMENT WHICH WAS REDUCED TO WRITING

54.    During the second half of 2005, Issie Wiseman and Bernt Ullman discussed the extension of the Agreement. Upon information and belief, Bernt Ullman is the President of Phat Fashions. Although no specific terms were negotiated, Issie Wiseman and Bernt Ullman agreed that they would extend the Agreement, and that they would discuss the details of the extension in a few months.

55.    On or around February, 2006, Issie Wiseman spoke with Bernt Ullman regarding amending the Agreement and extending it past December 31, 2007. Bernt Ullman indicated that Phat Fashions would be interested in extending the Agreement, and suggested that they discuss it during the week of February 20, 2006, at the Magic Show. Bernt Ullman also stated that the minimums would have to be substantially higher.

56.    On or around February, 2006, Issie Wiseman discussed the revised minimums with Barry Segal, the Vice President of Finance of Tornado, and Josh Wiseman, Director of Tornado. They agreed that they would discuss various options for extending the Agreement with Bernt Ullman at the Magic Show.

57.    At the Magic Show, over approximately two or three conversations, Issie Wiseman discussed extending the Agreement with Bernt Ullman. Bernt Ullman told Issie Wiseman that he wanted Issie Wiseman to agree to raise the minimum sale and royalty numbers because Tornado was selling so much more than the then-minimum sale and royalty numbers. After negotiations, Bernt Ullman and Issie Wiseman agreed on new minimum sales and royalty

numbers. Bernt Ullman asked Issie Wiseman to send him a proposal via e-mail after the Magic Show.

58.    On or about March 1, 2006, Issie Wiseman emailed Bernt Ullman a proposal to extend the Agreement. A copy of the email is annexed to the Complaint as Exhibit C.

59.    Issie Wiseman and Bernt Ullman discussed the proposal between March 1, 2006 and March 20, 2006. Between March 1, 2006 and March 20, 2006, Bernt Ullman verbally accepted the proposal in his capacity as President of Phat Farm Fashions. Bernt Ullman informed Issie Wiseman that he would instruct his lawyers to draw up a written Extension.

60.    On or about March 20, 2006, Eli B. Nathanson, the attorney for Phat Fashions, sent Issie Wiseman the written Extension.

61.    Between March 20, 2006 and March 29, 2006, Issie Wiseman spoke with Bernt Ullman, and they both agreed that the written Extension was acceptable to both parties.

62.    On or about March 29, 2006, Barry Segal called Eli B. Nathanson and advised him that Tornado accepted the Extension. Eli B. Nathanson instructed Barry Segal to sign two originals of the written Extension and return them to Eli B. Nathanson.

63.    On or about March 29, 2006, Issie Wiseman signed the two originals of the written Extension and on or about March 30, 2006, Barry Segal returned them to Eli B. Nathanson.

## F.    PHAT FASHIONS REPEATEDLY ASSURED TORNADO THAT THE EXTENSION WAS FINALIZED

64.    On or about April, 2006, Issie Wiseman called Bernt Ullman to confirm that the executed written Extension had been received. Barry Segal was present on this call. Bernt Ullman advised Issie Wiseman that the written Extension had been received, that there was no

problem, and that Bernt Ullman would have the written Extension signed and sent back to Issie Wiseman.

65.     On or about July or August, 2006, Issie Wiseman called Bernt Ullman again. Bernt Ullman reiterated that the written Extension would be signed, and that Issie Wiseman should not worry about the Extension.

66.     On or about October, 2006, Issie Wiseman again called Bernt Ullman. Bernt Ullman again assured Issie Wiseman that there would be no problem with the Extension.

67.     On or about December, 2006, Issie Wiseman and Barry Segal called Bernt Ullman regarding the Extension. Bernt Ullman again stated that there was no problem with the Extension, and that Tornado would have the fully executed written Extension by February, 2007 at the next Magic Show.

68.     During one of these conversations, Bernt Ullman told Issie Wiseman that the delay in Phat Fashions signing the written Extension was caused by the fact that Phat Fashions' in-house lawyer had died, but again reiterated that the written Extension would be signed, and that Tornado should not worry about the Extension.

69.     During one of these conversations, Bernt Ullman told Issie Wiseman that the delay was because large companies move slowly. Bernt Ullman further indicated that he felt that they had plenty of time to sign, and informed Issie Wiseman that the Extension was in place.

70.     During none of these conversations did Bernt Ullman ever indicate that the Extension was not in place.

71.     After all of these repeated assurances, on or about February, 2007, Bernt Ullman stated for the first time that there might be a problem, and that Phat Fashions might not sign the

19

written Extension.  Bernt Ullman also stated at this time that Phat Fashions had not yet signed
with a third party.

72.    Not until Pryor Cashman LLP sent Issie Wiseman a letter dated March 21, 2007,
did Tornado learn for the first time that Phat Fashions had definitely decided not to sign the
written Extension.

## G.    TORNADO DETRIMENTALLY RELIED ON PHAT FASHIONS' REPEATED ASSURANCES THAT PHAT FASHIONS AGREED TO THE EXTENSION

73.    Tornado relied to its detriment on Phat Fashions' repeated assurances that the
parties had extended the Agreement through the Extension.

74.    In reliance on Phat Fashions' repeated assurances that the Agreement had been
extended, Issie Wiseman did not cancel a commercial lease with a third party, Montreal Media
Entertainment Building Inc. ("Montreal Media").   On or about November 15, 2004, Issie
Wiseman had executed a five-year lease with Montreal Media for the Phat Farm store; the
purpose of Issie Wiseman leasing this property was to have a store in which to specifically sell
Phat Fashions products.  The lease provided that Issie Wiseman could cancel the lease until
December 31, 2006 without penalty.  In reliance on Phat Fashions' promises and believing it
would have Phat Fashions products to sell, Issie Wiseman did not cancel the lease by December
31, 2006.

75.    In reliance on Phat Fashions' repeated assurances that the Agreement had been
extended, Tornado instructed its management team, including Issie Wiseman, Director and CEO
of Tornado and Vis-à-Vis, Josh Wiseman, Director of Tornado, Mitchell Maislin, Managing
Director of Shoe Sales of Tornado, and Claudia Michaels, Managing Director of Women's
Clothing of Vis-à-Vis, to spend nearly all of their time and efforts focusing on Phat Fashions

products. By way of example, Mitchell Maislin told Issie Wiseman that he was too focused on the shoe brands of Phat and Baby Phat to spend any time developing other brands of shoes, despite the fact that opportunities with other brands were sometimes presented. Over 90% of Mitchell Maislin's business is Phat Farm shoes. Over 90% of Claudia Michaels' business is Baby Phat products. Over 90% of Josh Wiseman's time was spent working on the Phat Fashions lines. Approximately 70% of Issie Wiseman's working time was spent working on Phat Fashions lines.

76.     In reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Tornado and Vis-à-Vis did not pursue efforts to replace Phat Fashions by researching other companies and product lines or engaging in negotiations with other companies.

77.     In reliance on Phat Fashions' assurance in August 2005 that the Agreement would be extended, Tornado decided not to sue the European Phat Farm shoe licensee for damages for territorial infringement, despite the fact that the licensee had sold a large number of Phat Farm shoes in Canada, violating Tornado's exclusive licensing agreement and hurting Tornado's business. Issie Wiseman argued with Bernt Ullman about how to handle the situation, and Bernt Ullman recognized that Tornado had been damaged by the licensee. Ultimately, however, Tornado chose not to sue the licensee, in light of Tornado's ongoing business relationship with Phat Fashions and Bernt Ullman's assurance that the Agreement would be extended later that winter. In reliance on this statement, Tornado determined that it would make the lost profits back over the course of the 3-6 year Extension to the Agreement, and that it was more important to preserve the business relationship than to sue for the infringement claim.

## H.    TORNADO IS SUFFERING HARM AND WILL CONTINUE TO SUFFER HARM

78.     Upon information and belief, Phat Fashions has entered into a license agreement with a company controlled or affiliated with Gaby Bitton. In light of this, and absent relief from

21

this Court, Tornado and Vis-à-Vis will lose all of their business. Neither Tornado nor Vis-à-Vis currently have any other products.

79.    The Phat Farm store will need to completely change its merchandise and become, in effect, an entirely different store. The other stores that sell approximately two-thirds Phat Farm merchandise will also need to change their merchandise and become, in effect, entirely different stores.

80.    Despite recent efforts to mitigate their losses, Tornado and Vis-à-Vis have no expectation that they will be able to replace this dramatic loss of business. Tornado and Vis-à-Vis are currently looking for new lines of products all over the world, including in Europe, but thus far, they have had only limited success.

81.    Moreover, the harm has already begun. A company which, upon information and belief, is affiliated with Gaby Bitton recently hired two important Tornado and Vis-à-Vis employees.

82.    On or around June 18, 2007, Salvatore Cutrona, the main Montreal sales representative, resigned to work for a company in which, upon information and belief, Gaby Bitton is involved. Salvatore Cutrona primarily sold Phat Farm and Baby Phat shoes for Tornado, and Baby Phat bags for Vis-à-Vis.

83.    On or around June 18, 2007, Vanessa Ferrara, the Assistant Division Head who focused on Baby Phat handbags, resigned from Vis-à-Vis to work for a company in which, upon information and belief, Gaby Bitton is involved.

84.    Upon information and belief, a company in which Gaby Bitton is involved has also attempted to hire two other key Tornado and Vis-à-Vis employees, Mitchell Maislin and Claudia Michaels.

I.      **TORNADO'S CAUSES OF ACTION**

### TORNADO'S FIRST COUNTERCLAIM:
### DECLARATORY JUDGMENT

85.     Tornado incorporates its allegations 30 through 84 above as if fully set forth herein.

86.     On account of the foregoing, there now exists between Tornado, on the one hand, and Phat Fashions, on the other, a present, actual, justiciable and genuine controversy, and Tornado is entitled to have a declaration of its rights and further relief as may be just and proper.

87.     On account of the foregoing, Tornado is entitled to have judgment entered pursuant to 28 U.S.C. § 2201 *et seq.* declaring that:  (a) there was a valid Extension to the Agreement between the parties and Phat Fashions has anticipatorily breached the valid Extension, and/or that Phat Fashions has breached its covenant of good faith and fair dealing, and/or that Phat Fashions should be estopped from breaching the Extension under the doctrine of promissory estoppel; (b) that such Extension continues the Agreement through December 31, 2010 with Tornado able, at its own option, to extend an additional three years, through December 31, 2013; and (c) the Extension authorizes Tornado to continue selling the Phat Farm and Baby Phat product lines it has been selling (directly or through Vis-à-Vis) under the Agreement.

### TORNADO'S SECOND COUNTERCLAIM:
### ANTICIPATORY BREACH OF CONTRACT

88.     Tornado incorporates its allegations 30 through 87 above as if fully set forth herein.

89.     The agreement between Tornado and Phat Fashions to extend the Agreement through the Extension constitutes a valid, binding, and existing contract, complete with negotiated terms regarding the minimum royalties to be paid.

90.     Under the terms of the Extension, Tornado has the right to continue to sell Phat Farm, Baby Phat and related products through December 31, 2010, with an option to renew until December 31, 2013.

91.     On or about February 15, 2007, Phat Fashions indicated in a telephone conversation between Bernt Ullman and Issie Wiseman that it probably would not perform its obligations under the Extension.

92.     On or about March 21, 2007, Phat Fashions stated, through its attorney, Pryor Cashman LLP, that it did not intend to perform its obligations under the Extension.

93.     On or about April 18, 2007, Tornado demanded through its attorney, Lavery, DeBilly, that Phat Fashions reassure Tornado that Phat Fashions would perform its obligations under the Extension.

94.     Despite the existence of the valid Extension, and despite Tornado's requests that Phat Fashions confirm that it will honor the Extension, Phat Fashions has repeatedly stated that it will not perform under the Extension and, upon information and belief, has signed a different contract with a third party that is in direct violation of its Extension with Tornado.

95.     Tornado has at all times indicated that it is able and willing to perform under the Extension. Tornado and Vis-à-Vis continue to sell Phat Fashions' products to this day.

96.     Phat Fashions anticipatorily and materially breached the terms of the Extension by telling Tornado on or around February 15, 2007 that it had made alternate arrangements for licensing its products and filing the Complaint in this action on or around April 24, 2007.

97.     As a result of Phat Fashions' anticipatory breach of contract, Tornado and Vis-à-Vis have suffered damages in an amount to be proven at trial.

## TORNADO'S THIRD COUNTERCLAIM:
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

98.     Tornado incorporates its allegations 30 through 97 above as if fully set forth herein.

99.     By way of the unfair and misleading conduct alleged above, Phat Fashions unfairly interfered with Tornado's rights to receive the benefits of the Extension to the Agreement and to freely, fairly, and lawfully acquire the rights to license certain Phat Fashions products.

100.     Although Phat Fashions had a duty of good faith and fair dealing, Phat Fashions repeatedly assured Tornado that Phat Fashions would sign the written Extension memorializing the oral modification.  All the while, and in violation of its duty, Phat Fashions was negotiating with one or more third parties to form an alternate contract, but Phat Fashions did not inform Tornado of this fact until on or around February, 2007, despite knowing that Phat Fashions had told Tornado repeatedly that it intended to sign the written Extension.

101.     As a result of Phat Fashions' breach of the covenant of good faith and fair dealing, Tornado and Vis-à-Vis have suffered damages in an amount to be proven at trial.

## TORNADO'S FOURTH COUNTERCLAIM:
### PROMISSORY ESTOPPEL

102.     Tornado incorporates its allegations 30 through 101 above as if fully set forth herein.

103.     As stated in paragraphs 64 through 72 above, Phat Fashions made repeated clear and unambiguous promises to Tornado that it would sign the written Extension.

104.     As stated in paragraphs 73 through 77 above, Tornado and Vis-à-Vis relied on Phat Fashions' promises to their detriment.

105.    As a result of Tornado and Vis-à-Vis' reliance on Phat Fashions' repeated promises, Tornado and Vis-à-Vis have suffered injury, as stated in paragraphs 73 through 84 above.

## J.    RELIEF REQUESTED BY TORNADO

WHEREFORE, Tornado demands judgment on its Counterclaims as follows:

1.    On the First Counterclaim, a declaratory judgment declaring that the Extension is valid and that Phat Fashions is required to perform under the Extension;

2.    On the Second, Third, and Fourth Counterclaims, a judgment in an amount to be determined at trial;

3.    On each of the Counterclaims, an award of costs and expenses (including attorneys' fees) related to this dispute; and

4.    Such other relief as the Court deems appropriate.

Dated:  New York, New York
         September 6,  2007

GIBSON, DUNN & CRUTCHER LLP


By:  ___s/ Adam H. Offenhartz
         Adam H. Offenhartz  (AO-0952)
         Laura M. Leitner (LL-4222)
         200 Park Avenue
         New York, New York 10166
         telephone:  (212) 351-4000
         facsimile:  (212) 351-4035

         *Counsel for Tornado Imports*
         *(Canada), Inc.*