ORIGINAL

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------------------ x

4   PHAT FASHIONS,LLC,

5

6                              Plaintiff,

7        -against-

8   TORNADO IMPORTS (CANADA), INC.,

9

                             Defendants.

10

    ------------------------------------------------ x

11

12        DEPOSITION of the Plaintiff, PHAT FASHIONS,

13   LLC, by BERNT ULLMANN, taken by the Defendant

14   pursuant to Notice, held at the offices of Gibson

15   Dunn & Crutcher, 202 Park Avenue, New York, New

16   York 10166, on November 1, 2007, at 9:23 a.m.,

17   before a Notary Public of the State of New York.

18

19

20

21   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

          BARRISTER REPORTING SERVICE, INC.

22            120 Broadway

          New York, N.Y. 10271

23            212-732-8066

24

25

SELECTED
PAGES

1
2    A P P E A R A N C E S:

3
4          PRYOR CASHMAN, LLP
                Attorneys for Plaintiff
5               410 Park Avenue
                New York, New York 10022
6
          BY:    PHILIP R. HOFFMAN, ESQ.
7
8
9
10         GIBSON DUNN & CRUTCHER
                Attorneys for Defendant
11              202 Park Avenue
                New York, New York 10166
12
          BY:    ADAM H. OFFENHARTZ, ESQ.
13                    -and-
                LAURA M. LEITNER, ESQ.
14
15

                        xxxxx
16
17
18
19
20
21
22
23
24
25

1                    B. Ullmann

2    agreement with Tornado.

3              I knew it was set to expire at the

4    end of December 2007.  I also knew that we

5    had had -- or I had had a dialogue with

6    Mr. Wiseman about amending the agreement.

7    It had struck me as strange when Issie

8    originally brought the renewal

9    conversation, and I'm saying renewal

10   conversation because that's how it was

11   framed to me by Issie.

12             I didn't quite understand the

13   timeliness and quite frankly -- and maybe

14   I should have been more diligent at the

15   time, but I simply engaged in what I felt

16   was prudent dialogue with Mr. Wiseman to

17   advance our conversation without

18   necessarily taking complete ownership of

19   the circumstances at the time.

20             In the fall of '06, I was trying to

21   understand better what the dialogue was

22   and it struck me as being odd that,

23   clearly, if this was a renewal attempt, we

24   typically have renewal windows in which an

25   agreement is reviewed and clearly,

1                    B. Ullmann
2    Mr. Wiseman was operating outside of these
3    windows and I didn't understand why.  And
4    I know that that was part of the questions
5    for either Nathanson or Rollins.
6              Furthermore, I did know that a
7    draft had been circulated and I had been
8    told, or was informed at the time that the
9    draft had been signed by Mr. Wiseman and
10   later by Mr. Simmons.
11             I was also, as part of the same
12   dialogue, informed that that's okay; it
13   really does not matter.  Our requirement
14   is that any amendment is done in writing
15   and that it must be signed by Bob Skinner
16   and Russell Simmons and be returned to the
17   licensee in order for the amendment to
18   take effect.  I was, therefore, advised
19   that I was free to conduct negotiations
20   with a potential new licensee.
21   Q.      This is your summary of discussions
22   with either Nathanson or Rollins or
23   perhaps both?
24   A.      Correct.
25   Q.      You think these conversations were

64

```
 1                    B. Ullmann
 2   in roughly fall of 2000 --
 3   A.      Fall of 2006.  I can't say exactly.
 4   Q.      Do you recall how many of these
 5   conversations there may have been?
 6   A.      I do not, but I think they were a
 7   few, which I would say two to three
 8   conversations.
 9   Q.      Did you find it odd that Russell
10   Simmons had executed this document?
11   A.      I did.
12   Q.      Did you inquire why he executed the
13   document?
14   A.      I did.
15   Q.      Do officers of Phat Fashions have a
16   habit of executing documents that Phat
17   Fashions does not intend to live by?
18              MR. HOFFMAN:  Objection to
19              the form.
20   A.      Russell Simmons' signature was
21   viewed as a formality.  So while I will
22   say that it is not common that he would be
23   signing documents as well, it does not
24   speak to the intent of the corporation.
25   In my view, the binding signature was that
```

```
 1                    B. Ullmann
 2   of Mr. Bob Skinner.
 3   Q.      Mr. Simmons was the CEO of Phat
 4   Fashions at the time?
 5   A.      That was his formal title.
 6   Q.      The answer is yes?
 7                  MR. HOFFMAN:  Objection.  To
 8           what question?
 9   Q.      He was not the CEO?
10   A.      What is the question?
11   Q.      Was he the CEO?
12   A.      That was his formal title at the
13   time.
14   Q.      You're hedging the answer by saying
15   "formal title."
16           Was he the CEO or was he not the
17   CEO; it's a simple question?
18                  MR. HOFFMAN:  No.  Objection
19           to the form.  Put an appropriate
20           question.  There is an objection to
21           form and I'm going to state it.
22   A.      His title was CEO.
23   Q.      What was his position at the
24   company?
25   A.      Brand visionary and founder of the
```

```
 1                   B. Ullmann
 2   company and he had the title of CEO.
 3   Q.      Do you know how the agreement got
 4   to Mr. Simmons for his execution?
 5   A.      I don't.
 6   Q.      Who was involved in handling the
 7   Tornado relationship within Phat Fashions?
 8   A.      Can you clarify the question?
 9   Q.      If someone asked you who, at Phat
10   Fashions, dealt with Tornado in 2006, who
11   would you include on that list?
12   A.      In any capacity?
13   Q.      Please tell me -- sure.
14   A.      I would say contractually, it would
15   be myself on the business end; it would be
16   a number of individuals.  So it can be
17   someone from licensing, it could be
18   someone working in product, it could be
19   someone in marketing.
20   Q.      Thank you.  That's a responsive
21   answer.
22           In terms of a dialogue, as you put
23   it, with Tornado, who would have been
24   involved in the dialogue process?
25   A.      Myself.
```

```
 1                    B. Ullmann
 2   Q.      Anyone else?
 3   A.      No.
 4   Q.      Who would have handled, either your
 5   outside Counsel, in-house; who else would
 6   have been involved with any paperwork?
 7   A.      Paperwork could be Eli Nathanson
 8   from Pryor Cashman.  I would say at the
 9   time, either Don Gramke of Kellwood legal
10   and later, Luther Rollins of Kellwood
11   legal and lastly, Peter Morris, our CFE.
12   Q.      Do you recall who handled the
13   document that Mr. Wiseman executed and
14   returned to Phat Fashions?
15              MR. HOFFMAN:  Objection to
16          the form.
17   A.      I honestly don't know.
18   Q.      Your understanding is it would have
19   been, perhaps, Mr. Morris, Mr. Gramke,
20   Mr. Rollins or Mr. Nathanson?
21              MR. HOFFMAN:  Objection to
22          the form.
23   A.      It would have been one of those
24   three and I would say I think it's more
25   likely -- could you restate the question.
```

1                    B. Ullmann

2    Q.    Mr. Ullmann, when did you and Issie

3    Wiseman first discuss the possibility of

4    amending the licensing agreement to extend

5    it?

6    A.    I cannot recall the first time; it

7    was sometime in the spring of '06 -- oh,

8    boy.  Wait.  Let me take that back.

9         It may have been as early as

10   towards the end of '05.  I believe it came

11   up the first time at MAGIC -- at the MAGIC

12   show in February of '06.  But I'm not

13   certain.  This is what I think could have

14   happened.

15   Q.    Can you tell me what you recall of

16   that first discussion?

17   A.    Very casual, very fleeting.  Just

18   Issie saying something along the lines of,

19   Hey, I'd like to renew our agreement and

20   me, just as easily and casually, saying,

21   Sure, why not.  And then I believe we had

22   a brief conversation about it at the MAGIC

23   show.  So I think maybe there was one

24   phone conversation prior and then a very

25   casual conversation at the show.

1                          B. Ullmann

2    Q.      Do you recall if Mr. Wiseman called

3    you or you called Mr. Wiseman, the

4    pre-MAGIC show conversation?

5    A.      I don't recall.

6    Q.      Can you tell me what you recall of

7    the discussions at the MAGIC show?

8    A.      I don't recall a lot; the shows are

9    very, very hectic.  There is never any

10   time to sit down and have formal

11   conversations.  I do recall having said

12   something about him needing to increase

13   minimums, but I can't recall if it's a

14   free memory from the actual conversation

15   or something that has been brought up

16   later.

17   Q.      When you say "later," you mean

18   perhaps in preparation for this deposition

19   or the litigation?

20   A.      Prior to that, but I don't remember

21   when.

22   Q.      Why did you want to raise the

23   minimums?

24   A.      Well, I didn't.  I was perfectly

25   happy minding my own business when Issie

1                    B. Ullmann

2    brought up renewal.  It was not on my mind

3    at all.  As a knee-jerk reaction, I

4    said -- whatever I said; I don't know what

5    I said.

6         But it was something along the

7    lines of, If we are to even consider it,

8    you're going to need to bring up your

9    minimums.

10   Q.    What was the next contact you had

11   with Issie following the MAGIC show?

12   A.    I don't recall.

13   Q.    You may have already spoken of

14   this:  The MAGIC show occurred when in

15   2006?

16   A.    February of 2006.

17   Q.    Do you recall in the early part of

18   the month, the latter part of the month?

19   A.    I want to say it's the latter part

20   of the month, but again --

21              MR. HOFFMAN:  Before or

22        after President's Day?

23              THE WITNESS:  I honestly

24        don't remember.

25   Q.    Where was the MAGIC show held?

1                          B. Ullmann

2     A.      No.

3     Q.      You were the decision maker on

4     minimums?

5     A.      No, the way it would work is that I

6     would handle the dialogue.  Once we had

7     reached a meeting of the minds, I would

8     then have to turn around and take, in this

9     case, the document, the numbers, whatever

10    it was and I make a presentation to Bob

11    Skinner and he was the final decision

12    maker.

13    Q.      Do you recall a discussion with

14    Mr. Wiseman following receipt of what's

15    been marked as Exhibit No. 1?

16    A.      I don't recall in this specific

17    conversation.  If you can frame the

18    question differently, maybe.

19    Q.      Do you recall generally having

20    discussions with Mr. Wiseman or anyone

21    else from Tornado about an amendment?

22    A.      I don't recall having conversations

23    with anyone but Issie.  I do recall having

24    some conversations with Issie; I don't

25    specifically recall the line of detail.

79

B. Ullmann

1
2    Q.     Why don't you tell me about the

3    next conversation that you do recall and

4    tell me as much about that conversation as

5    you are able.

6                     MR. HOFFMAN:  I just object

7               to the form on "next" because he

8               may not remember that it's the next

9               conversation.  You've asked him

10              about conversations he remembers.

11              If he could put it in a context,

12              fine.

13   A.     If you can ask specific questions,

14   it would be helpful.  I have no specific

15   recollection that I can sit here and

16   testify to.

17   Q.     From March of 2006 on, what is the

18   next conversation that you can recall any

19   substance of with Mr. Wiseman?

20                     MR. HOFFMAN:  Objection to

21              the form.  You can answer.

22   A.     The next conversation that I can

23   recall in any great detail -- in detail,

24   is a conversation that takes place much

25   later in the fall and that -- it does not

80

B. Ullmann

1

2 have to do with this, but has to do with

3 our Baby Phat licensee terminating the

4 contract with a designated company that

5 Issie is affiliated with or an owner of or

6 part-owner of and thus causing them to

7 lose Baby Phat for Canada and he was

8 distraught.  I do recall that.  But I

9 don't recall exactly when that was.

10         I understand your line of

11 questioning was what do I recall about

12 this process and I apologize.  I don't

13 recall in great detail.

14                 MR. HOFFMAN:  Off the

15         record.

16                 (Whereupon a discussion was

17         held off the record.)

18 Q.    Just so we're clear, you don't

19 recall any detail whatsoever about any

20 conversations between March of 2006 and a

21 conversation you had in fall of '06

22 regarding a Baby Phat licensee dispute

23 involving Issie?

24         I'm simply trying to get a

25 chronology, if you will.

1                    B. Ullmann

2              MR. HOFFMAN:  I object to

3         the form.  You can answer if you

4         understand it.

5   A.      I do recall having some

6   conversations, but I can't materially

7   recall any type of detail.  I really

8   cannot.

9   Q.      Can you generally recall any

10  detail?

11  A.      No.

12  Q.      Did you discuss baseball?

13  A.      Probably not.

14  Q.      Did you discuss the amendment?

15  A.      I would say it's likely.

16  Q.      What did you discuss about the

17  amendment?

18              MR. HOFFMAN:  Objection to

19         the form on "amendment."  It is

20         what it is.

21  A.      I truly cannot recall specific

22  details.  If you ask specific questions,

23  I'm happy to try, to the best of my

24  ability, to answer.

25  Q.      Can you recall general details?

82

1                         B. Ullmann

2    A.      No, I don't.

3    Q.      You have no recollection of

4    discussing the amendment with Mr. Wiseman?

5               MR. HOFFMAN:  Objection to

6               form.  He said without being

7               refreshed.  If you want to show him

8               documents or ask him questions, he

9               might be able to do so.

10   A.      Right --

11              MR. OFFENHARTZ:  You're

12              answering for the witness and now

13              he's going to repeat your answer.

14              MR. HOFFMAN:  I'm actually

15              repeating his answer that he has

16              given now on two occasions.

17   Q.      Mr. Ullmann, would you please

18   answer my question.

19   A.      Can you repeat the question.

20              MR. OFFENHARTZ:  Read my

21              question back, please.

22              (Whereupon the record was

23              read back by the reporter.)

24   A.      I have no specific recollection.

25   But it speaks to, at the time -- just to

1                     B. Ullmann

2    with Mr. Wiseman after you informed him

3    there would be no amendment or that you

4    were not going to go forward with the

5    amendment that you fully executed?

6                     MR. HOFFMAN:  Objection to

7            the form.

8    A.      Numerous, without being able to say

9    exactly how many.

10   Q.      Again, numerous?

11   A.      More than three or four, but

12   probably less than ten.

13   Q.      I understand that you don't

14   recall -- you have no general recollection

15   of any conversations with Mr. Wiseman from

16   March of '06 through the fall when you

17   discussed with him the Baby Phat licensee

18   dispute.

19          Do you recall how many

20   conversations you had with him, if any?

21                     MR. HOFFMAN:  Objection to

22            the form on the prologue to that

23            question.

24   A.      Can you please restate?

25   Q.      Let me ask it another way:  Did you

88

                              B. Ullmann
1
2    have any discussions with Mr. Wiseman from
3    March of '06 through to December of '06,
4    other than the one you described dealing
5    with the Baby Phat licensee issue?
6    A.       Yes, I believe so.
7    Q.       How many would you say you had?
8    A.       At least a few.
9    Q.       A few being three to five, four to
10   six, five to seven?
11   A.       Two to four; something like that.
12   Q.       Those two to four conversations are
13   the ones you have no general recollection
14   of?
15   A.       Correct.
16                   (Brief recess taken.)
17   Q.       Mr. Ullmann, do you recall
18   Mr. Wiseman reaching out to you at any
19   time from March of 2006 through February
20   of 2007 and asking you where things were
21   regarding the amendment to the license
22   agreement?
23   A.       I don't recall the exact wording.
24   I do recall having conversations.  I mean,
25   I do recall him reaching out to me and

89

```
 1                    B. Ullmann
 2   inquiring, in general, the status maybe.
 3   Q.      How many of those conversations do
 4   you recall taking place?
 5   A.      I don't recall an exact number.
 6   I'm thinking it's a few conversations.
 7   Q.      Three to five, two to four?
 8   A.      Two, three.
 9   Q.      Do you recall when these
10   conversations were?
11   A.      No.
12   Q.      Do you recall, generally, what was
13   discussed?
14   A.      I do recall speaking to
15   Mr. Wiseman; I don't recall specifically
16   or generally.
17   Q.      I'm teaching you how to be a
18   witness.  This is very frustrating for me.
19   I'm sorry.
20   A.      That's okay.
21   Q.      You do recall, in a time period
22   from March of 2006 through February of
23   2007, that Mr. Wiseman and you spoke about
24   the status of the amendment?
25   A.      I remember speaking to him.
```

159

1                B. Ullmann

2    final stage, which involved executive

3    summary initially and then, ultimately,

4    Bob Skinner's signature.

5    Q.        To the best of your recollection,

6    on Saturday, April 22, 2006, did you

7    believe that the Tornado licensee

8    agreement amendment was completely done

9    and all it needed was Bob's signature?

10               MR. HOFFMAN:  Objection to

11          the form.

12   A.        I don't recall.

13   Q.        Let me ask you this way:  Had you

14   read this e-mail on April 22nd, would you

15   have thought that Mr. Morris had made a

16   mistake?

17               MR. HOFFMAN:  Objection to

18          the form.  Mistake about what?

19   Q.        Mr. Ullmann, you can answer the

20   question.

21               MR. HOFFMAN:  Objection to

22          the form.

23   A.        No.  No, it doesn't look like a

24   mistake.

25   Q.        Do you recall any discussions with

160

1                        B. Ullmann

2      Issie Wiseman in April or May regarding

3      the status of the licensee amendment

4      agreement?

5                        MR. HOFFMAN:  Objection.

6              Asked and answered.

7                        MR. OFFENHARTZ:  I'm seeing

8              if perhaps, as time passes --

9                        MR. HOFFMAN:  I know, I'm

10             putting my objection on.  He can

11             answer.

12     A.     No, I do recall having had

13     conversations; I cannot recall,

14     specifically or generally, what was

15     discussed.

16     Q.     Was the amendment discussed in

17     April or May?

18     A.     It's possible.

19     Q.     Do you remember what that

20     conversation was?

21     A.     I'm sorry, I don't.

22     Q.     Do you recall Issie asking you

23     words to the effect of, Bernt, where are

24     we?  Waiting on the signature page; what's

25     going on?