UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PHAT FASHIONS, LLC,                          :
                                             :     Case No.: 1:07 CV 03278 (PAC)
                 Plaintiff,       :
                                             :
      -against-                            :
                                             :     **DECLARATION OF**
TORNADO IMPORTS (CANADA), INC.,              :     **ISSIE WISEMAN**
                                             :
                 Defendant.       :
-------------------------------------------------------x

       ISSIE WISEMAN, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

       1.     My name is Issie Wiseman and I am a resident of Montreal, Canada. I have been in the "garment business" (clothing, footwear and accessories, mostly at the wholesale level and mostly the distribution at wholesale of imported goods) for over 40 years, ever since I graduated from high school. For over 25 years I have operated Tyfoon International, Inc. and a group of related companies; we refer to those related companies as the "Tyfoon Group." Tornado Imports (Canada) Inc. ("Tornado"), the named defendant, is one of the companies in the Tyfoon Group; it holds the license from plaintiff Phat Fashions, LLC, that this lawsuit is about. All of the companies in the Tyfoon Group are owned by my family, in various proportions; two long-term (over 20 years each) employees also have equity interests in some of the companies. I am the chief executive of Tyfoon International, of Tornado, and of most of our active companies. My son, Josh, who owns a large portion of Tornado, is also active in the business with me.

### Our History with Phat Fashions

2.   During the mid-1990s I began doing business with a celebrity entrepreneur from the United States named Russell Simmons. He had developed a brand known as "Phat Farm," and marketing of that brand was focused on what is now called the "men's urbanwear" market. I think Russell started in business under the name Phat Farm and then decided to use licensing to develop the brand, under Phat Fashions as a licensing entity. We did some initial business together on a "handshake" basis. As Phat Farm brand began to gain some prominence in the U.S. market, Russell (we were always on a first-name basis) began to focus on licensing. He and his licensing executive, Ruby Azrak, said that I could have an exclusive "master" license for Canada for Phat Fashions (which at that point was still Phat Farm menswear). Eventually Russell's lawyers prepared a full-blown license agreement for us, and we decided that Tornado would be the company my group would use as the licensee (I don't remember why).

3.   My memory is that Russell and I signed the document when we saw each other in August 1998 at an industry show (known as MAGIC), which is held in Las Vegas. A copy is Exhibit 1 (the "License"). As you can see, the lawyers had gotten the numbers all wrong, and so we had made a number of changes in handwriting, which Russell initialed. Because Ruby and Russell understood that Canadian marketing would have a different cost structure (we would want to carry the same goods that were on sale and advertised in the U.S. and therefore would likely have to pay something to Phat Fashions U.S. licensees in order to buy from or through them), Russell agreed that our royalty rate would be 7% rather that his "standard" 8% and that there would be no required advertising allowance (see Ex. 1, page 5).

4.   I want to point out that our license was a master license for all Phat Fashions brands as these relate to the garment industry with certain exclusions (see Schedule C

2

to Ex. 1). I remember that mens' underwear was excluded because Ruby had a connection to a company in Canada that sold underwear. In fact, over time we sold a lot of different lines that I can see are "excluded" on that schedule. This is important because it relates to how Russell, Ruby, and I went about our business over the years that followed, which is that once this document was signed we went back to handling everything on a verbal "handshake" – we talked, we agreed, we went ahead.

5. The most important examples of this came when Phat Fashions began to develop a second brand, "Baby Phat," which licensed clothing, footwear and accessories for women. This started in 2000 and grew substantially over the years as we began distributing a variety of Baby Phat products in Canada. Even though Schedule C excluded may of these products, whenever we found a ladies line being developed by a Phat licensee that we liked, I would mention it to Russell or Ruby who would say that we could "have" the lines for Canada, and we went ahead (Russell or Ruby also would "introduce" us to that licensee so we could strike a deal to get products from their manufacturers for sale in our territory – the same procedure we followed for Phat Farm products). We used a different company within the Group, Vis-à-Vis Fashions (1997) Inc. ("VIS"), to market these ladies lines, and we used all the "Baby Phat" trademarks and signature marks as part of our merchandising. We could have done this business within Tornado if we had to, but it was convenient for us to separate the mens and ladies lines between two companies, and when I told Phat Fashions we wanted to use the separate company, they had no problem with that. Thereafter, and for many years, VIS did the Baby Phat business, and separate sales reports, royalty checks and audited sales reports went to

Phat Fashions from VIS for these ladies lines.[1] Tornado continued to handle, and pay royalties for, the men's lines. No one ever said a word about making a written amendment to the formal document for these business decisions; we talked, we agreed, we did business. Over the years, VIS and Tornado probably sold quite a few distinct categories (and many, many millions of dollars) of Phat-label products that were excluded under the written Schedule C.

6. To give an example: the Schedule excludes ladies lingerie, but I got oral permission to carry lingerie and loungewear, which were produced under the Baby Phat label. Last year (2006) we sold just under US$650,000 of Baby Phat ladies lingerie and loungewear. In addition, we sold over US$1,100,000 of ladies outerwear in 2006 – another category excluded on the original schedule. In fact, we reached agreements to carry those lines and began selling them <u>after</u> Mr. Ullman joined Phat Fashions as President. No one ever said we needed something in writing, or a formal change to the original document, to do this business. Each side gave its word; each side lived up to its word.

7. Phat Farm and Baby Phat have unique identities tailored to specific "urban" markets (<u>see</u> some sample promotional materials and product placements collected at Exhibit 2). Over the years after 1998, Russell's company and licensees built the Phat labels into

---

[1] There was one significant exception to the way Baby Phat lines were handled. When Russell had licensed certain "ladies sportswear" lines to a company that became known as "BP Clothing," he had granted them (as it was explained to me) "North American" rights (the rights may have been world rights, but I remember hearing "North American," because that was our problem). He later told me this had been an oversight, since we were his Canadian marketer, and he solved the problem by getting BP Clothing to make us their exclusive sublicensee for Canada. When VIS bought products through BP Clothing generally that company (rather than VIS) paid the royalties to Phat Fashions. All of this was worked out orally, although eventually there was a two-page paper that spelled out the procedures (but not the sublicense). We distributed a substantial volume of Baby Phat products that fell within the BP Clothing sublicense, but we also distributed many Baby Phat product lines (like outerwear, footwear and accessories) where the products were outside BP Clothing's license and our licensing royalties went directly to Phat Fashions. Ourm arketing arrangement with BP Clothing ended 2006 because BP Clothing decided to handle their Canadian marketing themselves, and our "oral handshake" arrangement had never had a set term. However, we continued after that to distribute (through VIS) a wide range of Baby Phat lines where we held the license from Phat Fashions. Again, those lines were included within our license whatever the old Schedule C said, and they were distributed and paid for by VIS (rather than Tornado, the named licensee), all on the basis of the oral agreements I made with Russell and other Phat Fashions executives (including Bernt Ullman) over the years.

a major market presence. For our part we built the Phat lines into a substantial business in Canada, from around US$1,500,000 in 1999 to a high point of over US$18,800,000 in 2005.

8. As we and they grew, Phat became the dominant brand for our companies. Because Phat-label products were a relatively high margin business, our sales of these lines supported a great deal of overhead and were critical to our profitability. Phat products sold through VIS and Tornado accounted for about 60% of our total wholesale business from 2004 onward; even if you exclude the Phat products licensed through BP Clothing (see footnote 1 above), Phat Fashions was still over 55% of our total wholesale business as adjusted.

9. If you look specifically at the licensee Tornado, Phat Farm menswear was almost 100% of Tornado's business in those years (hitting a high of over US$14,000,000 in 2004 with over US$1,000,000 in royalties paid that year to Phat Fashions). Although the Phat Farm label has had some market and design problems in more recent years, Phat Fashions has been dedicated to better positioning the brand, and our 2006 Phat Farm sales still exceeded US$8,000,000. Baby Phat, in turn, was almost 100% of the VIS business. Baby Phat business has remained insistently strong, and even excluding BP Clothing merchandise, VIS's Baby Phat sales were over US$7,000,000 last year with over US$500,000 in royalties to Phat Fashions.

10. Although we do distribute other product lines within the Tyfoon Group, it is fair to say that we have been and are dependent on Phat products for our business existence and our major relationships with retailers. Some of our retailers have the "exclusive" on Phat-label products for their areas. We have presented ourselves to retailers for many years as "Phat Farm Canada" and "Baby Phat Canada," including presenting our goods at trade shows under those names (see examples at Ex. 3); we even, at Russell's request, opened our own retail store in Montreal in 2000 under the Phat Farm name and arranged several parties to showcase and

5

promote these lines (see interview with Mr. Simmons and photographs from the opening party at Ex. 3).

11. Simply but truly, we were "Phat Canada" throughout those years, and our reputation as a garment industry distributor in Canada was built on the Phat connection. Our relationship with Phat Fashions over those years was excellent, in my view: problems were rare and quickly solved, and whenever one of its U.S. licensees came up with a new product we thought could be marketed in Canada, Russell or someone else at Phat Fashions would "introduce" us and suggest that they make the product available to us as the Canadian Phat Fashions distributor and licensee (of course on satisfactory business terms), and we would expand our business – with additional royalties to Phat Fashions.

12. I believe it was in 2004 that Kellwood Corporation, a large U.S. public corporation, bought ownership of Phat Fashions from Russell Simmons. Russell continued as Chief Executive Officer, and around the same time Bernt Ullman joined Phat Fashions as its President. I was introduced to Bernt, and he became one of my primary business contacts at Phat Fashions. After he took over, we had a very good relationship, and Bernt was always very complimentary about how we handled the Phat business – he stressed that our business was great for the Canadian market. I do remember that we brought on some new lines – including the lingerie and ladies outerwear I mentioned above – in this later period, again on an oral basis.

Pursuing and Getting an Extension Deal

13. Because Phat product lines were so critical to our business, I was well aware that our license agreement would end at the end of 2007. I wanted to raise this with Bernt Ullman as soon as I reasonably could, since my business, and my family's livelihood, depended on marketing Phat products. The occasion presented itself when we had a problem with some

European-licensed Phat Farm footwear that appeared in a Canadian market without going through us (or through our designated retailer for that market).

14. This was in the late summer of 2005 as I recall, and there were several conversations between myself and Mr. Ullman in that period (as well as some emails because I was in Europe during some of the time) while we discussed whether we would receive compensation from the European licensee, which was called Unioncon. Some time in August or September 2005, when Mr. Ullman was telling me of his difficulty getting compensation for us (Unioncon blamed an intermediary and said that they (Unioncon) had not improperly sold into our territory), I grabbed the opportunity. I said to Bernt, in substance, "listen I'll agree to drop it, not to go after them; just, let's do an extension of our agreement and you'll be off the hook and I'll make up the money I lost from these guys making the profits in the future."

15. Mr. Ullman was very happy to hear this and said it would be wonderful, that we were a very, very important licensee and that they would be pleased to extend our license. He said that it was great that we would be working together for years to come.

16. I remember talking to my son Josh and our V.P. of Finance, Barry Segal, who was closely involved in all our business deals, and telling them that everything had gone very well, that Bernt had agreed.

17. Some time after that Bernt and I were on the telephone about some other subject and he said that while he was very pleased to be going forward with us, he did feel our extension should have larger minimums for sales and royalties (since our royalty rate was 7%, sales and royalties really set the same goals).

18. Our minimums had been set in 1998, when we were in the very early stages of marketing Phat Farm and the business had not yet developed (if you go back to the

handwritten changes on Exhibit 1 you will see the written-in numbers are very, very low). By 2005 our annual sales and royalties were many times the minimums set in 1998, which had not changed. So I understood Bernt's point.

19. In the course of three or so telephone discussions (of course we talked about other business matters as well), we went back and forth about what numbers would be acceptable for Phat Fashions. I believe the term Bernt Ullman used was what "would fly" as minimum numbers. The numbers he proposed were higher, and mine were lower, but we were talking it through. Indeed, we both understood this was not a big issue, since even the potential minimums he mentioned were still well below what we were actually already achieving for Phat Fashions. At some points the length of the extension was discussed (this may have been even in the first discussion), and we agreed that it would be two "terms" (six years in two three year steps), but our focus was on discussing minimums and on the size of the big jump for the first several years. As I recall it, by early February 2006 we had come very close to an exact agreement on the telephone, and he said to me that the last set of numbers we had discussed (basically a royalty minimum of $350,000 for 2008 with $100,000 increases in the next two years thereafter, still well below our current business level) "would work." We also had some discussion about minimums for the later years, but I don't recall whether those were expressly agreed at that point.

20. There was a MAGIC show coming up in Las Vegas in late February 2006. Bernt and I agreed on the telephone that we would put the numbers in place and close the matter with a final conversation when we saw each other in person at that show.

21. Let me say a little bit here about these shows, which occur twice a year. They are huge industry conventions in which many brands display their merchandise, and there

is a great deal of interaction amongst industry participants. In recent years Phat Fashions has scheduled a "mandatory" meeting for its licensees, as a group, during these shows, to talk about current lines and business plans for the coming seasons (see Ex. 4). That's why we often used these shows both as a way to "catch up" in person and as an internal clock for getting things done (as Russell and I had done with the original License).

22. Mr. Ullman and I did talk at the show; we actually met several times during the show (it is a very busy time). We settled on an initial 2008 minimum royalty and on a series of annual increases, the same $350,000 plus increases I have just mentioned for the first term, and smaller increases thereafter. When we were done we had a number for each year. Bernt indicated to me that "it's all done," and we shook hands on it. He told me to send him the numbers in writing, but the numbers I was to send were the ones he and I had just agreed to; his, numbers. We both said we were very pleased to have wrapped up the extension and to go forward with a secure, shared future. It was absolutely clear that we had made a deal at that point.

23. In the days that followed I reported to Barry Segal exactly what had been agreed; he prepared a "proposal" document with the agreed numbers, and we sent it to Mr. Ullman, I think when I got back to Montreal some days later (Ex. 5). Some time later in March I had a phone conversation with Mr. Ullman in which he said he had received the numbers, that they were what we had discussed and were fine with him; he agreed that this was our "deal" as discussed – we were "done."

24. The existing license was going to end at the end of 2007; in these discussions Bernt Ullman and I had made a new agreement for the next six years, with new minimums, an agreement that would carry into those future years the other elements of our

9

existing agreement – terms like the basic license, the 7% royalty and no advertising charge, and the oral changes we had made over the years, like our use of VIS and our right to sell Baby Phat ladies items, including footwear, accessories and any clothing lines that fell outside the BP Clothing license.

25.   As far as I was concerned, the deal with Phat Fashions that we needed for our future was indeed done, and I was very pleased. The Phat lines were critical to our business. Even though the new terms would not start until 2008, sales for 2008 would start to be booked in the middle of 2007, and planning for new Phat lines and projects would start much earlier. It was a great relief to have all this wrapped up early in 2006: our future had a shape and a plan and seemed secure.

26.   I want to make three things very clear about my conversations with Bernt Ullman about an extension as these conversations carried through the MAGIC show and concluded with this follow up. <u>First</u>, Mr. Ullman never, never said to me that he needed anyone else's approval to make a deal. He was the President. At some point, I think it was at the same MAGIC show, I saw Russell, and I did tell him that we were going forward with a new six year deal. Russell said he thought that was great – by then he and I had known each other for quite a while, and we always got on very well.

27.   <u>Second</u>, what Mr. Ullman <u>did</u> say was that we had a "deal," first on the "two terms" or six years and then on the minimums. He did not say "but only when we have a written Amendment." He did say to send him the numbers, and probably he referred at some point to "our lawyers" doing something, and I suppose I expected his company would want some kind of document for its files, but whatever he mentioned he called "paperwork," a corporate

technicality.  He did <u>not</u> say "this isn't valid until our lawyers write it up" or anything like that; he did not say our agreement was conditional in any way – he said the deal was done.

28.     <u>Third</u>, what Mr. Ullman and I were always talking about was continuing to do business as we had in the past.  We didn't mention VIS (as opposed to Tornado); we didn't say anything about changing the Schedule on the old License Agreement to include all the additional products we now handled.  I'm sure I had not looked at the 1998 document in many years, and Mr. Ullman didn't mention it.  We just talked about an "extension," about "continuing our business," and about "working together."  It was obvious that this meant everything we had been doing, as we had been doing it.  He certainly knew that Baby Phat (the ladies lines) had become a very important part of our business and that "working together" included the substantial revenues we were paying to his company for Baby Phat sales.

29.     The next thing I remember is that we received a formal document from the lawyers for Phat Fashions (Ex. 6).  I wasn't surprised that Phat Fashions wanted our deal documented for its files, and I had no problem with that.  Barry checked that the numbers were what we agreed and that nothing else in the document was a problem; Barry talked to the lawyer, and then Barry told me to sign, and we would send it back.

30.     I did sign it (Ex. 7).  As far as I was concerned, Mr. Ullman and I made our deal on all the issues that mattered, but if Phat Fashions wanted some lawyer-language paperwork, I had no objection, because it did contain the terms to which Mr. Ullman and I had already agreed.  I'm not sure how much of it I read once Barry told me everything was okay, but when I look at the document now, I don't see anything there that contradicts what had been covered in our oral negotiations or says our oral deal wasn't good.

31. Barry's job is to keep our finances and our paperwork on track. As I remember it, some time in April I called Mr. Ullman with Barry in the room, just to confirm that Mr. Ullman now had whatever he needed from us. I used a speakerphone and had Barry sit in (this was my common practice when I had phone calls that affected the other people in our office – I would often ask them to come into my office and listen in on the call, and I would use the speakerphone).

32. On that call, Mr. Ullman told me that our document had been received, that it was as we had discussed and everything was fine, that there would be no problem.

33. When I was talking to Mr. Ullman a few months later (this was after a reminder from Barry that our copy had not come back), I asked him about the document; I asked the same question a few months after that. One time Mr. Ullman explained that a lawyer had died (suicide, he actually said), and this had delayed the processing of all sorts of papers. Another time he made some reference to a big corporation, that big corporations were just slow. Both times he told me not to worry, that we already had our deal and there certainly was "no problem" with the documents, which would get signed – the paperwork would get processed. He used the terms "done deal" and "all finished."

34. In these conversations, as with the initial agreement, Mr. Ullman never suggested that our "deal" depended on someone else's review or was conditioned on anything. He and I had made a deal.

35. Earlier on in this affidavit I mentioned that we had a store in Montreal that operated under the Phat Farm name. Barry can give better detail, but as I remember it late in 2006 we got an opportunity to extend the lease for that store which otherwise was going to end (or perhaps we had the right to end it – Barry can explain) at the end of 2007. The rent proposed

was attractive, but our only reason for having this store was to represent the Phat lines, as Russell Simmons had asked. In terms of profit the store was marginal at best, but it was part of the Tyfoon Group's image as "Phat Farm Canada." Because I knew that Mr. Ullman and I had made a deal for the future years after 2007, I authorized the extension of this lease.

36. Because Barry again mentioned to me that the paperwork was not back, in December 2006 I spoke to Mr. Ullman about this yet another time. I remember Barry being there for this one, which was before any change to the lease was signed. I didn't mention the lease; I just asked the usual question about the paperwork as part of whatever business we were discussing. Mr. Ullman repeated that there was no problem, that our deal was our deal, and that everything was ok, "don't worry about it." There was another MAGIC show coming up in February 2007; Mr. Ullman referred to it, and said we'd certainly have our copy by then.

An Upsetting Development

37. In February 2007 I got a call from Mr. Ullman in which he said he was embarrassed and upset – "don't know how to tell you" – but that he had a problem because the parent company was talking to another Canadian company about Canadian rights as part of a package deal in which that new company would open a large number of stores in the U.S. – 20-25, I think he said – and they wanted Canada as a "perk." He said he felt he had to warn me about this before our licensee meetings at MAGIC. I was flabbergasted, dumbfounded.

38. Either in that call, or just a little later after I settled down, I asked Mr. Ullman some questions about what was being considered, and he told me more about this proposal. Although I'm sure he knew how surprised I was, he assured me that "nothing has been signed." Under these circumstances I decided that diplomacy, not threats, was what I should try. In that telephone conversation (there may have been more than one), I began to review our

13

history with Mr. Ullman, and to compare us to this new company – our industry is a small community in Canada, and I knew the people involved. I said "they'll never do the job we do." We talked more about this, but without really getting anywhere. He seemed genuinely upset and said, this had nothing to do with him, this came from higher up. We left it that we would talk again at MAGIC.

39.  I saw Mr. Ullman at that show in later February, and I again tried to persuade him. I did not want to threaten. We had a long history with Phat Fashions, the parent company was a multi-billion dollar corporation with which I did not want a fight, and if I could get things back on track or maybe even work out a compromise without bad blood (like splitting the lines), that was what I wanted. Mr. Ullman told me that I should know that things were moving ahead, getting closer to a deal. I tried to explain why he should not trust the promises he was hearing from this other company, and to compare that to how we had always performed as we promised. He told me how positive our working experience had been and again said this was all coming from over his head.

40.  When I got back after MAGIC I was pretty upset – problems with our core business were at the door when I had been assured over and over again that everything was agreed. After some days' thought, I called Mr. Ullman and said I wanted to talk for myself with the "higher up," Robert Skinner, the man in charge at Kellwood. He said that was fine with him, and I think I got the phone number from him.

Confrontation

41.  I think it was March 7 or 8 that I called Mr. Skinner, and I think he then called me back. I had had some casual discussions with him at trade shows over the years, but I reintroduced myself. Before I could get out much of anything, he interrupted "you're talking to

14

the wrong guy. This is Phat Fashions business, and I have implicit trust in my President of Phat Fashions. He makes all the decisions, and I'll abide by what he decides." That was about what he said, and that was that.

42. That day or the next I called Mr. Ullman, because what Mr. Skinner had said was certainly very different from what I had heard from Bernt Ullman. I reported on the call with Mr. Skinner, and Mr. Ullman laughed – my world is falling apart, and he laughed. He said something like "well what do you know, this is corporate America. I guess I have to be the bad guy." He told me that he was sorry: there was no final deal yet with the other company, but it was at very advanced stages. There was really nothing to discuss about where my company stood.

43. It was at that point that I concluded that Mr. Ullman had been stringing me along in our recent 2007 conversations, by suggesting things might still work out in a way that could salvage the situation. I felt betrayed, personally, and that it was time to assert our legal rights.

44. After discussion with our lawyers, we decided that we had to advise Phat Fashions of our intention to stand on our rights – our business survival was now at stake and the time for pre-selling (booking) orders for early 2008 was only a few months away. We sent the letter attached at Exhibit 8 to Mr. Ullman, hoping that this would prompt Phat Fashions to wake up and recognize that, whatever these other people were offering, our deal had to be honored.

Our Deal Rejected

45. A few days later we got a letter from Brad Rose, another lawyer at Mr. Nathanson's firm (Ex. 9), and I have to admit that we were astonished by what we read. The letter said our deal was no good because we had never signed and sent back the Amendment.

But that was crazy – of course we had, and Bernt Ullman certainly was well aware of that from our conversations. Our lawyers later did point this out to Mr. Rose (I think may be I even called Bernt Ullman myself to say how crazy this was), and we sent proof. I think Mr. Rose acknowledged this in a later letter, but it was clear to me from Mr. Rose's first letter that even if they had their facts wrong, Phat Fashions had decided for certain not to work with us going forward.

46. This lawyer's letter also said that we had no deal because Phat Fashions had never signed the Amendment. But Mr. Ullman had told me we <u>had</u> a deal; he had never said there was no deal until his company signed some document. And once his lawyer sent us their document and I signed it and sent it back, Mr. Ullman repeatedly dismissed it as paperwork that would get signed at his end and returned without a problem. Each time we talked about this in 2006 – several times that I remember – he said some version of the same things: don't worry, you and I have already worked this out; the Amendment document is paperwork, it will get squared away; we have a deal.

<u>Damages</u>

47. I understand that for the Court to decide whether an injunction is necessary the Court needs information about the kind of damage plaintiff has already caused us by taking away the license I was promised, and about what will happen next.

48. The first point I have to make is that our major retail customers <u>are</u> Phat-label retailers. They chose to market that label at retail and have made their own investments in it. Because Phat Fashions has refused to acknowledge our deal, in fall 2007 we did not have samples to show our retail customers for 2008 merchandise. <u>Someone</u> <u>else</u> <u>did</u>. This is not a question of selling our retail customers a different source of "private label" goods. The design

16

concepts and the label do matter, and our long-time customers can still get the labeled products they want to carry – but now from <u>someone else</u>. Indeed, some of our key retail customers got from us an "exclusive" on Phat-labels in their retail areas. Having identified with the brand, they are not going to switch suddenly and buy different labels from us (if we even had such labels yet), instead of Phat products, when Phat products remain available to them.

49.   <u>Second</u>, the problem we face is not "replacing" Phat-label products with our customer base. We can't do that, because these retailers can go to the new distributor and keep retailing Phat products; they don't need "replacements." We also can't sell most of these retailers "alternatives" to Phat, because they're not interested in "alternatives." Our customer base has already expressed their choice for the Phat labels. We can try to build relationships with other brands/lines (and have been working on that since last spring), but we have to expect a difficult time in marketing these to our existing customers, since these retailers may not <u>want</u> additional, different merchandise when they still can get Phat-label merchandise.

50.   The value of the 10 years that we have spent in building retailer connections around Phat labels not only is in danger of being lost, but actually works against us now because <u>someone else</u> gets the benefit of the loyalty to Phat brands which we cultivated. We must truly start from scratch, and it may take years – years of financial losses – before we find a brand that develops the market presence (and sales volume) that Phat Farm and Baby Phat have commanded.

51.   Barry will give you the numbers on our fall 2007 orders "booked" for delivery in the first half of 2008, but while we have begun marketing a few new brands in painfully small volumes, it is obvious to me that our sales results for the first half of 2008 will be a small fraction of what we "booked" in years past. The season is not entirely over, and if we

had access to the product samples and clearance to proceed I believe we could still "book" some Phat-label business for early 2008.

52. <u>Third</u>, there is another, connected problem. Within the Tyfoon Group we do have some other lines (although Phat products are close to 100% of our sales in some areas, like ladies footwear, over all about 40% of our gross revenues do come from other products). However a good portion of our business in these other lines comes from retailers whose primary relationship with us has been their continuing interest in Phat-label products. In practice, we "cross sell" to our Phat-label retailers as much as we can. We get them " in the door" when they agree to meet our salesmen, or they come to our showroom, for the Phat-label product lines, and once we have their attention we try to interest them in other related product lines that might suit their retailing plans. Of the various lines we have carried, only the Phat-labels really draw retailers to us based on product name. That is why we have modeled ourselves as "Phat Fashions Canada."

53. What I'm saying, in short, is that the inability to "show" Phat-label products will also cost us <u>other</u> business from retailers who came to us in the first instance to get access to Phat Farm and Baby Phat products. This is certainly happening in our footwear business, for example.

54. <u>Fourth</u>, the financial consequences for the Tyfoon Group of losing revenues of over US$15,000,000 a year and then facing a market place where it may take many years to build some other brands into that level of business are bleak. Barry Segal is in the best position to provide the numbers, but I can certainly say that most of our staff worked primarily, sometimes almost exclusively, on Phat-label products, and it was the revenue from those Phat-label sales that paid their salaries and our overhead. We maintain a warehouse and shipping

facility adequate to serve the merchandise volumes of recent years, and Phat-related revenues paid much of the cost for that. And then there is the "bottom line." Unless we keep staff despite the lost revenue, there is no way to develop and market new lines. I don't see how our companies can turn a profit under those conditions. In my experience you very often <u>lose</u> money in the first years of a line, while it either falls away or grows to enough volume to be profitable. We are considering drastic remedies – like selling our corporate headquarters or renting much of it out if we can – just to try to keep us afloat.

55. <u>Finally</u>, I also have to say that our reputation, our good name, is suffering in the marketplace. A showroom that suddenly lacks samples for what has been its major lines doesn't look good to retailers. And retailers are not impressed by a sales staff with relatively little to sell, or by a salesman who suddenly lacks the label that was his biggest name.

56. My salesmen tell me that without the Phat-license lines they find it harder to get appointments with customers, that customers are unhappy that we only have a limited number of lines left to sell, and that customers frequently ask "what happened." I personally have had long-time customers ask me what we did to cause Phat Fashions to drop us. They assume that a label would not drop a long-time successful wholesaler unless something very bad had happened – and they certainly don't understand why Phat Fashions would drop us for a company that knows so little about the business that they had to steal our employees. Frankly, I don't understand either.

57. We spent from 1998 to 2006 building the Phat Fashions presence in Canada, and we identified the Wiseman family and the Tyfoon Group with that brand. We built that Phat-label business in Canada from scratch to over US$15,000,000. For us, all of that is now coming apart: we are losing our identity, we are losing our customer relationships; we are

19

losing the business I built with my family and with long-time employees (some of whom are also stockholders) who have become family to me.

58.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 30, 2007

_____
Issie Wiseman