@001

[CANADIAN]
## TRADEMARK LICENSE AGREEMENT

AGREEMENT dated as of August 1, 1998, by and between PHAT FASHIONS LLC ("Licensor"), a New York limited liability company with offices at 180 Varick Street, New York, New York 10014, and Tornado Imports (Canada), Inc. ("Licensee"), with offices at 5540 Rue Ferrier, Montreal, P.Q. Canada H4P 1M2.

### W I T N E S S E T H:

WHEREAS, Licensor is the owner of certain trademarks, which trademarks and the registrations therefor are more particularly described in Schedule A annexed hereto (Licensor's right, title and interest in and to the said Trademarks being hereinafter referred to as the "Property"), and the parties desire to enter into an agreement (the "Agreement") with regard to the licensing to Licensee of the rights to utilize the Property.

In consideration of the mutual covenants and agreements hereinafter contained on the part of each of the parties hereto to be kept, observed and performed, and for such other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto covenant and agree as follows:

1.    Definitions.  As used in this Agreement, the following terms and phrases shall have the following meanings:

"Advance" shall mean an advance payment on account of Royalties payable hereunder in accordance with Sections 4(a) and 4(d).

"Affiliate" shall mean any person, corporation or other entity which directly or indirectly controls, is controlled by, or is under common control with a party.  "Control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of any such person, corporation or entity, whether through ownership of voting securities, by contract or otherwise.

"Annual Period" shall mean the period from the date of execution of this Agreement through December 31, 1999, and each consecutive calendar year thereafter during the Term and any extension of the Term.

"FOB In Sales" shall mean sales of Licensed Products which are shipped by Licensee from a location in the Territory (as hereinafter defined) for delivery to a customer located in the Territory.

"FOB Out Sales" shall mean when Licensee's customer located in the Territory takes title to any Licensed Products outside the Territory and/or bears the risk of loss of Licensed Products manufactured and shipped to the customer from outside the Territory.

"Guaranteed Minimum Royalty(ies)" shall mean the guaranteed minimum royalties payable by Licensee under Section 4 hereof.

TOR 000976

"Initial Marketing Date" shall mean June 30, 1999.

"Landed Cost" shall mean direct manufacturing costs; commissions paid to third parties for production related services, if any; duty, if any; insurance costs for goods in transit to Licensee's warehouse; duty and freight charges above and beyond FOB (freight on board) costs to Licensee's Canadian warehouse.

"Licensed Channels of Distribution" shall mean only those retail stores listed in Schedule B annexed hereto and such other retail stores, if any, as carry similar products and have similar reputation for integrity and quality of merchandise or as may be approved in writing by Licensor in its sole discretion. Licensed Channels of Distribution approved by Licensor, including those set forth in Schedule B, shall remain in effect from June 1st in any annual period through the following May 31st. All Licensed Channels of Distribution for any following period of June 1st through May 31st must be approved in writing by Licensor in its sole discretion.

"Licensed Products" shall mean the item or items of merchandise covered by the license granted under this Agreement, as set forth in Schedule B annexed hereto.

"Manufacturer" shall mean a third party who manufactures or produces for Licensee any Licensed Products or Packaging, advertising or promotional materials for Licensed Products or any components of any of the foregoing.

"Net Sales" shall mean the gross invoice or contract price charged for Licensed Products by Licensee, less (1) refunds, credits and allowances actually made or allowed to customers for returned Licensed Products, but only for returns of defective Licensed Products, (2) customary trade discounts, excluding anticipations afforded to and actually taken by customers in payment for Licensed Products; provided, however, that the aggregate deduction for returns, discounts and allowances in any Annual Period shall in no event exceed ten (10%) percent of sales of Licensed Products in such Annual Period; (3) freight or transportation charges shown as separate charges on Licensee's invoices to its customers; and (4) taxes, including sales taxes, if any, shown as separate charges on Licensee's invoices to its customers. In computing Net Sales, no costs incurred in Licensee manufacturing, selling, advertising or distributing the Licensed Products and no indirect expenses shall be deducted, nor shall there be any deduction for uncollectible accounts.

In the event of sales by Licensee of Licensed Products to a marketing organization or any individual or company in whole or in part controlled by Licensee, or to one or more distributors for ultimate sale to a retailer, or in any transaction other than an arm's length transaction, the invoice price used to determine Net Sales hereunder shall be the invoice price at which the Licensed Products are resold by any such entity to an unrelated retail customer in an arm's length transaction. Licensed Products shall be deemed sold when shipped, sold, distributed, billed or paid for, whichever occurs first.

"Packaging" shall mean all tags, labels, cartons or containers, and packing or wrapping material used or to be used by Licensee in connection with the Licensed Products.

2

TOR 000977

02/11/99  17:21 FAX 212 354 0463                                    ⌀003

"Prime Rate" shall mean the prime rate of interest announced from time to time by The Chase Manhattan Bank, in New York, New York.

"Property" shall mean Licensor's right, title, and interest in and to the Trademarks.

"Royalty(ies)" shall mean the royalties to be paid by Licensee to Licensor for or in connection with the license to use the Property granted under this Agreement, provided for in Section 4 and all other applicable portions of this Agreement.

"Term" shall mean the term provided for and defined in Section 3 of this Agreement.

"Termination Inventory" shall mean the inventory provided for in Section 12(d), consisting of finished products and work in process, Packaging, and advertising and promotional material on hand at the time of the termination of this Agreement.

"Territory" shall mean Canada.

"Trademarks" shall mean only Licensor's trademarks referred to in Schedule A annexed hereto.

2.    Grant of License.

(a)    Subject to the terms and conditions set forth herein, Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, the exclusive license to utilize the Property solely in the Territory described herein during the Term of this Agreement, and solely in connection with the manufacture, importation, distribution and sale of the articles and merchandise described herein as the Licensed Products and solely for sale at retail through the Licensed Channels of Distribution within the Territory. Unless Licensor consents in writing, Licensee shall not sell or otherwise provide Licensed Products for use as premiums (including those in purchase-with-purchase promotions), promotions, give-aways, fund-raisers, or entries in sweepstakes, or by the internet or the world wide web, or to customers for resale by direct mail or other direct marketing methods, including, without limitation, home shopping television programs, or to customers for inclusion in another product, unless such product has been licensed by Licensor. However, Licensee may solicit orders by mail from those retailers which include the Licensed Products in their mail order catalogs, or otherwise sell Licensed Products by direct marketing methods as well as at retail. If Licensee wishes to sell the Licensed Products to other customers for resale through mail order catalogs, Licensee must obtain Licensor's prior written consent in each instance.

(b)    Except for the rights to use the Property in connection with the manufacture, importation and sale of the Licensed Products in the Territory as expressly provided for herein, Licensor reserves all rights to the use of the Trademarks and the Property. The license hereby granted shall be used for the marketing and sale of Licensed Products only in the Territory described herein. Except as provided herein, the Licensee shall not make use of or authorize the use of the Property outside the Territory nor will it manufacture or sell any Licensed Products that bear reference to the Property or Licensor's name in any form to anyone

3

TOR 000978

for resale outside the Territory, or to anyone that Licensee has reason to believe will sell same outside the Territory. Notwithstanding the foregoing, Licensee may, at its own risk, manufacture or cause Licensed Products that bear reference to the Property in any form to be manufactured outside the Territory solely for sale and distribution within the Territory. In connection therewith, Licensee may, at its own risk, develop, manufacture and produce Packaging, advertising or promotional material bearing reference to the Property outside the Territory solely for sale and distribution of the Licensed Products within the Territory. Licensee will use its best efforts to obtain from any manufacturer performing work for Licensee hereunder, a Manufacturer's Agreement in the form substantially identical to that annexed hereto as Schedule E and shall deliver same to Licensor before allowing any such Manufacturer to commence any such work.

(c)     Licensee agrees to sell Licensed Products only in the Licensed Channels of Distribution. Licensor expressly hereby retains all rights to distribute and sell Licensed Products through other means and other channels of distribution, including but not limited to premium offers and sales, combination or give away sales, direct response, direct mail and catalogue sales, the internet, the world wide web, home shopping networks, sales clubs and incentive programs.

(d)     Licensee agrees that it will ship commercially reasonable quantities of Licensed Products not later than the Initial Marketing Date.

(e)     Licensee acknowledges that Licensor has previously granted, and may hereafter grant, licenses to other licensees ("Other Licensed Parties") for use of the Property in connection with the manufacture and sale of various products and merchandise. If Licensee or any Other Licensed Party advises Licensor that there is or may be an existing or potential conflict in the respective definitions of Licensed Products in this agreement and the products or merchandise covered by Licensor's agreement with such Other Licensed Party, or if Licensor determines that any such conflict may exist, Licensor will use reasonable efforts to resolve or cause the affected parties to resolve the conflict; provided, that Licensor may at any time determine to resolve such conflict by written notice of its determination to the affected parties and any such determination made in good faith by Licensor will be binding and controlling upon Licensee.

3.     Term.

(a)     This Agreement shall commence as of the date hereof and shall continue through the period ending December 31, 2001, unless sooner terminated in accordance with the terms of this Agreement (the "Term").

(b)     Provided Licensee shall not be in default with respect to any of its obligations hereunder and provided further that Licensee shall have both paid the GMR (hereinafter defined) and effected Net Sales each year of the Term no less than seventy-five (75%) percent of the Minimum Net Sales (hereinafter defined), Licensee shall be given an option (the "First Option") to extend the term of this Agreement for three additional years to commence January 1, 2002, and to end December 31, 2004 (the "First Option Term"), which First Option

4

TOR 000979

must be exercised in writing in the same manner as notices hereunder and received by Licensor no earlier than March 1, 2001, and no later than June 30, 2001, time being of the essence.

(c)    Provided Licensee shall have exercised the First Option, and provided that Licensee shall not be in default with respect to any of its obligations hereunder and provided further than Licensee shall have both paid the GMR and effected net Sales each year of the First Option Term no less than seventy-five (75%) percent of the Minimum Net Sales, Licensee shall be given an option (the "Second Option") to extend the term of this Agreement for three additional years to commence January 1, 2005, and to end December 31, 2007 (the "Second Option Term"), which Second Option must be exercised in writing in the same manner as notices hereunder and received by Licensor no earlier than March 1, 2004, and no later than June 30, 2004, time being of the essence.

4.    Rate and Terms of Payment; Advances and Reports.

(a)    The Licensee agrees to pay to the Licensor a Royalty payment equal to ~~eight (8%)~~ SEVEN (7%) of all Net Sales (the "Royalty Rate") of all Licensed Products by Licensee during the Term of this Agreement. Licensee will pay to Licensor a non-refundable Advance of U.S.$ ~~$120,000~~ $112,000 to be applied against Royalties payable during the Initial Term, which shall be payable by Licensee upon its execution and delivery of this Agreement.

(b)    Notwithstanding anything to the contrary contained in Section 4(a), Licensee shall not be required to pay to Licensor any Royalty for any Licensed Product that Licensee purchased prior to the date of this Agreement and for which Licensee paid to Licensor a purchase premium ("Exempt Merchandise"), which Exempt Merchandise is sold by Licensor during the Term of this Agreement. Licensee shall, within ten (10) days of execution of this Agreement, provide Licensor with a schedule of all Exempt Merchandise.

(c)    All Royalties provided for under this Agreement shall accrue whenever the respective Licensed Products are shipped, sold, distributed, billed or paid for, whichever occurs first. Royalties shall also be paid by the Licensee to Licensor on all Licensed Products even if not billed, including, but not limited to introductory offers, promotions or distributions, and any sales or distributions to Affiliates of Licensee ("Affiliated Sales"). The Royalties payable on Affiliated Sales of Licensed Products in any quarterly period shall be calculated based upon the Royalty Rate computed on the average Net Sales prices with respect to sales of such Licensed Products to non-affiliated parties during the previous quarterly periods, ~~provided, however, that if an Affiliate of Licensee is a reseller of Licensed Products, the sale to such Affiliate shall not be counted as a sale for Royalty calculation purposes but rather, the relevant sale and selling price for Royalty calculation purposes shall be that of such Affiliate to its customer.~~ FOB Out Sales are permitted hereunder only if a specific FOB Out Sales Royalty rate has been specified in Schedule E. If no such FOB Out Sales Royalty rate has been specified on Schedule E, and if Licensee wishes to make FOB Out Sales, it must obtain Licensor's written approval prior to making any FOB Out Sales, and an appropriate Royalty rate shall be negotiated for such sales.

(d)    Royalties shall be paid within fifteen (15) days following the conclusion of each calendar quarter during the Term hereof, commencing on the fifteenth (15th)

TOR 000980

day of October, 1998, and continuing on the 15th day of each January, April, July, and October, thereafter during the Term hereof. The obligation of Licensee to pay Royalties is absolute notwithstanding any claim which Licensee may assert against Licensor. Licensee shall not have the right to setoff, or to make any deduction from Royalties due pursuant to the provisions hereof for any reason whatsoever. Licensee shall, however, be given credit for the Advance provided in Section 4(a) hereof.

    (e)    (i) During each Annual Period, Licensee shall pay to the Licensor Royalties which are equal to the greater of (A) the Royalties provided by Section 4(a) based on Licensee's Net Sales during each such year, or (B) the minimum amount of Royalties set forth below (the "Guaranteed Minimum Royalties" or "GMR" for each Annual Period).

    (ii) Licensee shall pay to Licensor as an Advance on account of Guaranteed Minimum Royalties due for each Annual Period described below, an amount equal to twenty five (25%) percent of the GMR payable for that Annual Period on the first day of each calendar quarter for that year, except that during the first Annual Period such payment will commence on April 1, 1999. Such quarterly Advances on account of GMR will be payable only to the extent not earned by Royalties otherwise paid to Licensor for that Annual Period. In no event will Royalties payable for any Annual Period which are in excess of the GMR for that Annual Period be applied to reduce the GMR for any other Annual Period.

    (iii) The GMR payable for each Annual Period of the Term will be due and payable in full whether or not this Agreement is hereafter terminated before completion of such Annual Period. ~~The unpaid amount of the GMR payable for each Annual Period of the Term will be due and payable on the date of such termination of this Agreement and Licensor will have no duty to mitigate its damages in the event of any such termination of this Agreement.~~

    (f)    During each Annual Period of the Term and of the Option Terms, if applicable, hereof, Licensee must realize Net Sales of Licensed Products ("Minimum Net Sales"), and pay Guaranteed Minimum Royalties, equal to or in excess of the following:

| Annual Period | Minimum Net Sales (U.S. Dollars) | GMR (U.S. Dollars) |
|---|---|---|
| Initial Term | | |
| August 1, 1998 - December 31, 1999 | $600,000 ~~$6,000,000~~ | 42,000 ~~$480,000~~ |
| January 1, 2000 - December 31, 2000 | 800,000 ~~$8,000,000~~ | 56,000 ~~$640,000~~ |
| January 1, 2001 - December 31, 2001 | 1,000,000 ~~$10,000,000~~ | 70,000 ~~$800,000~~ |

6

TOR 000981

| Annual Period | Minimum Net Sales (U.S. Dollars) | GMR (U.S. Dollars) |
|---|---|---|
| **First Option Term** | | |
| January 1, 2002 - December 31, 2002 | $1,200,000 ~~$12,000,000~~ | $84,000 ~~$960,000~~ |
| January 1, 2003 - December 31, 2003 | $1,400,000 ~~$14,000,000~~ | $98,000 ~~$1,120,000~~ |
| January 1, 2004 - December 31, 2004 | $1,600,000 ~~$16,000,000~~ | 112,000 ~~$1,2800,000~~ |
| **Second Option Term** | | |
| January 1, 2005 - December 31, 2005 | $1,800,000 ~~$18,000,000~~ | $126,000 ~~$1,440,000~~ |
| January 1, 2006 - December 31, 2006 | $2,000,000 ~~$20,000,000~~ | $140,000 ~~$1,600,000~~ |
| January 1, 2007 - December 31, 2007 | $2,200,000 ~~$22,000,000~~ | $154,000 ~~$1,760,000~~ |

Notwithstanding the foregoing, if Licensee's Minimum Net Sales in any Annual Period are not sufficient to provide for the GMR required for that Annual Period, Licensee shall not be deemed to be in default hereunder so long as (i) Licensee's Net Sales shall equal no less than 75% of Minimum Net Sales for the applicable Annual Period and (ii) Licensee makes payment to Licensor of the full GMR required for that Annual Period.

(g)    Licensee shall be required to expend no less than the ~~greater of~~ One Hundred ~~Eighty~~ Thousand ($180,000) Dollars or three (3%) percent of Licensee's Net Sales for each Annual Period to advertise the Licensed Products via television, print media, radio, billboards, or any other form of advertising, ~~including, without limitation,~~ cooperative advertising and in-store advertising. Licensee shall keep accurate account and copies of all documents and records relating to any advertising expenditures and shall ~~be required to send in quarterly reports simultaneously with its quarterly royalty statements describing the nature and amount of such advertising.~~

(h)    Simultaneously with the submission of all payments, and not later than the fifteen (15) days after the end of each calendar quarter, but regardless of whether any payment is due, Licensee shall submit a quarterly report in form requested by Licensor setting forth the number, description and invoice price of each of the Licensed Products sold (by Style Number), the gross sales price, returns actually received, and discounts and allowances actually granted, the Net Sales, names and addresses of customers and quantities sold to each customer and any other information that may be reasonably required by Licensor for any relevant month. Any quarterly Royalty payment ~~or Advertising Payment~~ which is not paid on or before the due

7

TOR 000982

date thereof shall thereafter bear interest at the Prime Rate, plus two (2%) percent, which shall be payable on demand.

    (i)    The receipt or acceptance by Licensor of any Royalty statements furnished pursuant to this Agreement, or the receipt or acceptance of any Royalties, shall not preclude the Licensor from questioning the correctness thereof at any time thereafter for a period of three (3) years after termination of this Agreement.

    (j)    Where tax at the source, such as withholding tax, is payable by Licensee under the taxation laws of any country within the Territory, a sum equivalent to such tax payable shall be paid to Licensor at the same time as the Royalty payments hereunder, unless Licensor receives documentation sufficient for Licensor to recover any taxes deducted. A sum equal to any withholding tax which has been paid by Licensee to Licensor which is subsequently recovered by Licensor will be paid by Licensor to Licensee after such tax has been recovered.

    5.    <u>Licensee's Books and Records</u>.

    (a)    Licensee shall maintain separate and appropriate books of account and records, all in accordance with generally accepted accounting principles (including, without limitation, a sales journal, sales return journal, cash receipt book, general ledger, purchase orders, cutting tickets, and inventory records) and shall make accurate entries concerning all transactions relevant to this Agreement.

    (b)    The Licensed Products shall be assigned style numbers unique from any products other than the Licensed Products which Licensee may manufacture and/or sell. The style number assigned to each Article shall be identical to the style number utilized to identify the Licensed Products in all of Licensee's books and records.

    (c)    All sales of the Licensed Products shall be made on numbered invoices and shall:

    (i)    contain a statement that it shall only be paid to an account credited by Licensee or its assignee; and

    (ii)    be recorded monthly on a computer printout analysis containing sales related only to the Licensed Products so as to easily trace the source of the reported sales.

    (d)    During the Licensed Term and for three (3) years thereafter, Licensor, and its employees, agents and representatives, shall have the right, at its own expense, on reasonable notice to Licensee (but in no event need such notice be more than ten (10) business days) and during regular business hours, to examine, photocopy, and make extracts from such books of account and other records, documents and materials (including, but not limited to, invoices, purchase orders, sales records, and reorders) to the extent needed to confirm sales, Royalties, Advertising Payments and other matters relating to compliance with this Agreement, which shall be maintained and kept by Licensee during the period specified herein.

8

TOR 000983

(e)    All such books of account and records shall be kept available by Licensee at the address referred to herein for three (3) years after the termination, expiration, or mutual release from this Agreement.

(f)    If any examination or audit by Licensor for any period discloses that the actual Net Sales for that period exceeded those reported by more than three percent (3%), Licensee shall pay the cost of such examination or audit in addition to the amount of Royalties and Advertising Payments that such examination or audit discloses is owed to Licensor together with interest on the unreported amount at a rate equivalent to the Prime Rate plus four (4%) percent. If the examination or audit for any period reveals that the actual Net Sales for that period do not exceed those reported by more than three (3%) percent, Licensee shall only pay the unreported amount. All payments due pursuant to this paragraph must be made within fifteen (15) days after Licensee receives notice thereof.

(g)    Within ninety (90) days after the end of each fiscal year of Licensee, Licensee shall furnish Licensor with a copy of Licensee's annual statement of sales for such fiscal year, which shall be certified by an independent certified public accountant.

6.    Exploitation of License.

(a)    During the Term hereof, Licensee agrees to use its best efforts and diligence to continuously sell, distribute, advertise and promote the Licensed Products throughout the entire Territory. Licensee agrees that its policy of sale and distribution of the Licensed Products will be of a high standard and to the best advantage of the Licensed Products. If at any time during the Term Licensee fails to ship Licensed Products in commercially reasonable amounts throughout the Territory for a consecutive period of more than forty-five (45) days, then Licensee shall be deemed to be in material default under this Agreement.

(b)    Licensee shall at all times maintain, or contract for, facilities and personnel adequate to fulfill its obligations under this Agreement.

(c)    During each Annual Period, Licensee shall ship not less than seventy (70%) percent of Licensed Products for which Licensee has accepted and confirmed purchase orders.

(d)    Licensee shall have the exclusive right to establish prices and terms for the sale of Licensed Products. Licensee shall provide Licensor, in advance of each selling season, with line sheets and price lists, and Licensee shall promptly notify Licensor of any change in pricing. Licensee agrees to sell Licensor such quantities of Licensed Products requested by Licensor for sale in stores operated by Licensor or its Affiliates for prices equal to the lesser of (i) Licensee's Landed Cost therefor plus twenty (20%) percent or (ii) Licensee's lowest wholesale price less twenty (20%) percent. Such sales to Licensor affiliates shall not be subject to Royalty or Advertising participation. Such sales shall be subject to Licensee's availability as reasonably determined and shall constitute Net Sales hereunder. Licensor agrees that all Licensed Products sold in stores operated by Licensor or its Affiliates in the Territory shall be sold at retail prices comparable to the retail prices charged by stores in the Licensed Channels of Distribution.

9

TOR 000984

02/11/99   17:23 FAX 212 354 6468                                             ☒010

(e)     Licensee shall provide Licensor, upon request, with the names and addresses of all facilities at which the Licensed Products are manufactured and stored, and Licensee shall make all necessary arrangements to allow Licensor or its representatives to have reasonable access to all such facilities upon reasonable advance notice during regular business hours for the purposes of conducting inspections to insure that Licensee is in compliance with this Agreement.

(f)     To induce Licensor to enter into this Agreement, Licensee covenants and agrees that during the Term hereof neither Licensee nor any of Licensee's Affiliates shall directly or indirectly manufacture, sell or distribute any products or merchandise under any license or label directed to the young urban male consumer market, unless Licensee maintains a separate sales force of qualified salespersons for its marketing of the Licensed Products pursuant to this agreement and a showroom for the display of the Licensed Products which is separate and apart from any showroom maintained by Licensee for other products marketed by it.

(g)     Licensee shall include in all of its written orders for the sale of Licensed Products such language as Licensor may reasonably specify for the purpose of preventing diversion of the Licensed Products from the Licensed Channels of Distribution.

(h)     Licensee shall include in all of its written orders for the purchase of materials and/or finished goods from third parties such language as Licensor may reasonably specify for the purpose of prohibiting the sale or other disposition of any products bearing the Trademarks by such suppliers other than to Licensee.

(i)     Licensee shall cut all labels and hangtags on defective merchandise ("seconds" or "irregulars") prior to shipment and shall disclose on any invoices with respect thereto that such merchandise consists of seconds or irregulars.

(j)     In recognition of Licensor's interest in maintaining a stable and viable market for products utilizing the Property or Trademarks, Licensee agrees to refrain from "dumping" any articles of Licensed Products in the market during the Term and any sell-off period, provided Licensor purchases excess inventory as of the end of any season at Licensee's cost. "Dumping" shall mean the distribution of the Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to the Articles, and at price levels so far below prior sales practices with respect to the Licensed Products as to disparage the Licensed Products.

(k)     Licensee agrees to participate in all major trade shows in the Territory by, among other things, attending such shows and providing an adequate number of samples for display and utilizing booths selected by Licensor.

(l)     Licensee shall attend meetings called by Licensor from time to time to discuss any matters relating to this Agreement. All such meetings will be held at Licensor's offices and may be called by Licensor upon at least thirty (30) days prior written notice to Licensee, but not more frequently than one time in each calendar quarter.

10

TOR 000985

02/11/99  17:24 FAX 212 354 6468                                    ☑011

(m)    Licensee shall cooperate with Licensor and other licensees of Licensor (domestic and international) in connection with the exchange of ideas, design and other information relative to the manufacture, sale and distribution of Licensed Products (including, but not limited to, furnishing a reasonable quantity of samples to be distributed among such other licensees), but nothing shall require Licensee to divulge any of its trade secrets or other confidential information.

(n)    All advertising and promotion is subject to the prior written approval of Licensor as provided herein.

(o)    Licensee shall at all times maintain adequate space at its showroom for the attractive display of the Licensed Products, which shall be separate and distinct from the space allocated to any other products marketed by Licensee. Licensee shall at all times employ at least one full-time employee who shall devote his or her full business time to the sale and marketing of the Licensed Products. Such employee shall be reasonably qualified and experienced to carry out his or her duties.

7.    Quality Control.

Licensee shall cause the Licensed Products to meet and conform to high standards of style, quality and appearance. In order to assure Licensor that it is meeting such standards and other provisions of this Agreement, Licensee shall comply with the following:

(a)    Pre-Productions: Before commercial production and distribution of any product bearing any reference to the Property or Trademarks, Licensee shall submit to Licensor all preliminary and proposed final artwork, prototypes, mock-ups and pre-production samples of each Licensed Product, including all styles, colors and variations, together with its labels, tags, cartons and containers and including Packaging and wrapping materials and all advertising and promotional materials. All Licensee's submissions under this Section 7 shall be accompanied by forms supplied by Licensor, using one (1) form for each submission and filling in all necessary information. Licensor must approve in writing all submissions, in its sole discretion, before Licensee shall be entitled to distribute, advertise, use, produce commercial quantities of or sell any item relating to any such submission. Licensor shall approve or disapprove any submitted item within ten (10) days after receipt by Licensor. If Licensor has not notified Licensee of its approval or disapproval within such ten (10) day period, the item shall be deemed disapproved by Licensor. Approval of an item or Licensed Product which uses particular artwork does not imply approval of such artwork with a different item or Licensed Product or of such item or Licensed Product with different artwork. Licensee acknowledges that Licensor's approval of an item or Licensed Product does not imply approval of, or license to use, any non-Licensor controlled elements contained in any item or Licensed Product. After a sample of an item has been approved, Licensee shall not make any changes without resubmitting the modified item for Licensor's written approval. All decisions by Licensor relating to disapproval of any Licensed Product shall be made in its sole discretion, and shall be final and binding on Licensee and shall not be subject to review in any proceeding.

TOR 000986

(b)    <u>Production Samples</u>: Before selling or distributing any Licensed Product, Licensee shall furnish Licensor with, at no charge, for its permanent use, two (2) complete samples of each such product from the first production run of each Manufacturer of the Licensed Products, including all styles, colors and variations, together with its labels, tags, cartons and containers (including Packaging and wrapping materials). If such samples do not conform to all aspects of the Licensed Product as approved or if the quality of any such sample does not meet the requirements of this Section 7, Licensor shall notify Licensee and such item shall be deemed disapproved and all such items shall be promptly destroyed. Licensee shall also furnish Licensor, upon request and free of charge, with such reasonable number of additional samples of each Licensed Product per Annual Period (in the minimum amount of four (4) additional samples of each Licensed Product) for Licensor's promotional and other purposes, or for comparison with earlier samples.

(c)    <u>Rejections and Non-Compliance</u>: The rights granted under this Agreement do not permit the sale of "seconds" or "irregulars". All submissions or samples not approved by Licensor shall promptly be destroyed by Licensee. Licensee shall advise Licensor regarding the time and place of such destruction (in sufficient time to arrange for a Licensor representative to witness such destruction, if Licensor so desires) and such destruction shall be attested to in a certificate signed by one of Licensee's executive officers and submitted to Licensor within fifteen (15) days of the date on which the sample was not approved.

(d)    <u>Testing</u>: Both before and after Licensed Products are put on the market, Licensee shall follow reasonable and proper procedures for testing the Licensed Products for compliance with laws, regulations, standards and procedures, and shall permit Licensor (upon reasonable notice) to inspect its and its authorized Manufacturer's testing, manufacturing and quality control records, procedures and facilities and to test or sample Licensed Products for compliance with this subsection and the other terms and conditions of this Agreement. Licensed Products found by Licensor at any time not to comply with applicable laws, regulations, standards and procedures shall be deemed disapproved, even if previously approved by Licensor, and shall not be shipped unless and until Licensee can demonstrate to Licensor's satisfaction that such Licensed Products have been brought into full compliance.

(e)    <u>Revocation of Approval</u>: In the event that (i) Licensee uses the Property or Trademarks improperly or violates any term of this Section 7, or (ii) Licensor becomes aware of (x) any material or content in such Licensed Product which is pornographic or promotes or depicts gambling, excessive violence or the use of controlled substances that had not been previously disclosed to Licensor, or (y) any material or content in such Licensed Product that was not presented to Licensor for its approval, or (z) a ruling, decision, finding or other occurrence or factor connected with any such Licensed Product (e.g., an adverse ruling by the Canadian Consumer Product Safety Commission), which, in the opinion of Licensor, reflects unfavorably upon the professional, business or personal reputation of Licensor, then, in any such event, Licensor shall have the right, in its sole discretion, to withdraw its approval of such Licensed Product. In the event of such withdrawal, Licensor shall provide written notice to Licensee and Licensee shall immediately thereupon cease the use of the Property in connection with the manufacture, sale, distribution, advertisement or use of such Licensed Product unless and except if Licensee shall have effected a cure of such problem to Licensor's satisfaction within

TOR 000987

thirty (30) days of such withdrawal, failing which, all Licensee's inventory of such Licensed Product shall be promptly destroyed.

(f) All the Licensed Products shall be manufactured, sold, marketed and advertised in compliance with all applicable laws, rules and regulations (collectively, "Laws"). Licensee shall pretest all proposed and approved Licensed Products and shall cause truthful labeling regarding the care, maintenance, and use to be affixed to the Licensed Products. Licensee shall immediately inform Licensor in writing of any complaint by any governmental or other regulatory or self regulatory body and of any lawsuit by any consumer relevant to the Licensed Products, and the status and resolution thereof. Licensee shall act expeditiously to resolve any such complaint. Without limiting the provisions of this Section 7(g), Licensee covenants on behalf of itself and on behalf of all of Licensee's third party manufacturers and suppliers (collectively, "Manufacturers"), as follows:

(i) Licensee and Manufacturers shall not use child labor in the manufacturing, packaging or distribution of Licensed Products or Packaging or advertising or promotional materials hereunder. The term "child" refers to a person younger than the age for completing compulsory education, but in no case shall any person younger than fourteen (14) years of age be employed in the manufacturing, packaging or distribution of Licensed Products or Packaging or advertising or promotional materials hereunder.

(ii) Licensee and Manufacturers shall provide employees with a safe and healthy workplace in compliance with all applicable Laws. Licensee and the Manufacturers agree to provide Licensor with all information Licensor may request about manufacturing, packaging and distribution facilities for the Licensed Products.

(iii) Licensee and Manufacturers shall only employ persons whose presence is voluntary. Licensee and the Manufacturers shall not use prison labor, or use corporal punishment or other forms of mental or physical coercion as a form of discipline of employees.

(iv) Licensee and Manufacturers shall comply with all applicable wage and hour Laws, including minimum wage, overtime, and maximum hours. Licensee and the Manufacturers agree to utilize fair employment practices as defined by applicable Laws.

(v) Licensee and Manufacturers shall not discriminate in hiring and employment practices on grounds of race, religion, national origin, political affiliation, sexual preference, gender or age.

(vi) Licensee and Manufacturers shall comply with all applicable environmental Law.

(g) Licensee agrees that Licensor may make unannounced on-site inspections of manufacturing, packaging and distribution facilities in order to monitor

13

TOR 000988

compliance with applicable Laws.  Licensee shall obtain an agreement with each third party Manufacturer and supplier to comply with the provisions of Section 7(f).

        (h)     In the event of Licensee's unapproved or unauthorized manufacture, distribution, use or sale of any Licensed Products or any Packaging or materials bearing any reference to the Property, including promotional and advertising materials, or the failure of Licensee to comply with any provisions of this Section 7, Licensor shall have the right to: (i) immediately revoke Licensee's rights with respect to any Licensed Product licensed under this Agreement, (ii) charge Licensee Three Thousand ($3,000.00) Dollars for each instance, i.e., each unit of the Licensed Product involved, of non-compliance with this Section with respect to any article, product or materials, provided, however, that such charge shall not exceed Seventy Five Thousand ($75,000.00) Dollars or the amount of damage to Licensor, whichever is greater, and/or (iii) at Licensee's expense, confiscate or order the destruction of such unapproved, unauthorized or non-complying products, Packaging or materials.  Such right(s) shall be in addition to and without prejudice to any other rights Licensor may have under this Agreement or otherwise.  Notwithstanding the foregoing, Licensee shall have an opportunity to cure an instance of such non-compliance within fifteen (15) days of notice from Licensor if, in Licensor's good faith judgment, such non-compliance (x) was done inadvertently, and (y) is correctable so that there will be no damages caused to Licensor; provided, however, that Licensee shall not have the right to cure any subsequent instances of such noncompliance.

        8.     <u>Trademarks and Trademark Protection</u>.

        (a)     Licensee acknowledges that Licensor is the owner of all right, title and interest in and to the Property in any form or embodiment and is also the owner of the goodwill attached or which shall become attached to the Property in connection with the Licensed Products.  Sales by Licensee shall be deemed to have been made for purposes of trademark registration for the benefit of Licensor, and all uses of the Property by Licensee shall inure to the benefit of Licensor.

        (b)     At Licensor's request and expense, Licensee shall execute any documents, including registered users agreements, reasonably required by Licensor to confirm its ownership of all rights in and to the Property in the Territory and the respective rights of Licensor and Licensee under this Agreement.  Licensee shall cooperate with Licensor at Licensor's expense, in connection with the filing and prosecution by Licensor of applications in Licensor's name relating to the use of the Property for Licensed Products in the Territory.

        (c)     Licensee shall never challenge or encourage anyone to challenge Licensor's ownership of or the validity of the Property or any application for registration thereof or any trademark, copyright or other registration thereof or any rights of Licensor thereto.  The foregoing does not, however, restrict Licensee from prosecuting any claim, exercising any right or seeking any remedy it might have as against Licensor, in the event that Licensor breaches or violates the covenants, representations and warranties made in this Agreement, concerning its ownership of the Property.

        (d)     Licensee shall not, at any time or in any manner, engage in any activity or perform or. permit any act which may in any way adversely affect any rights of

14

TOR 000989

02/11/99  17:26 FAX 212 354 6488                                    ⊠015

Licensor to the Property or any registrations or applications for registration thereof or which may directly or indirectly reduce the value of the Property or derogate or detract from the repute thereof.

(e)     Licensee shall not use any other tradenames, trademarks or other designations including, without limitation, Licensee's own corporate name or tradename in connection with the Property in any consumer advertising and publicity, labeling, packaging or printed matter utilized by Licensee in connection with the Licensed Products. Licensee may, however, use its own corporate name or tradename in connection with the Property in transactions between and among the parties hereto, and with Manufacturers, merchants, wholesale customers and others relating to: the manufacture of Licensed Products; the creation and development of designs, styles, advertising, promotional materials, packaging, printed matter and labeling of the Licensed Products; and the wholesale sale of the Licensed Products. Licensee shall not use the Property in combination with any other names or marks to form a new mark and shall not use the Property as a tradename or in any other manner other than in connection with the manufacture, distribution, sale and promotion of Licensed Products under this Agreement. Licensee will at all times make reference on the Licensed Products and on all packaging and promotional materials used in connection therewith that the Property is under license from the Licensor.

(f)     Licensee recognizes the great value of the goodwill associated with the Trademarks and acknowledges that such goodwill belongs exclusively to Licensor, and that Licensee shall acquire no proprietary rights in the Trademarks or their goodwill by virtue of this Agreement. Licensee further recognizes that the Trademarks have acquired secondary meaning in the mind of the public. Accordingly, Licensee agrees that the breach of its obligations under this Agreement (other than breaches relating to the payment of monetary sums) will cause Licensor irreparable damages which may not be compensable by monetary damages, and that in the event of such breach, in addition to any other rights or remedies which Licensor may have, Licensor may seek and obtain injunctive relief, without the necessity of posting bond (unless otherwise required by law).

(g)     Licensee shall prominently display on all Licensed Products, all Packaging materials, and in all advertising and promotional materials using the Trademarks, such trademark and/or copyright notices as Licensor shall designate.

(h)     Licensee shall promptly notify Licensor if any legal action is instituted against Licensee relating to Licensee's use of the Trademark. Licensee shall also promptly notify Licensor of any counterfeiting or other infringement of the Trademarks, or any diversion of the Licensed Products from the Licensed Channels of Distribution, of which Licensee becomes aware. Licensor shall have the right, but not the obligation, to institute legal action or take any other actions which it deems necessary to protect its interest in the Trademarks, and Licensee shall fully cooperate with Licensor in any such action, provided that any out-of-pocket expenses of Licensee incurred in connection therewith are paid or reimbursed by Licensor. Any monetary recovery resulting from any such action shall belong solely to Licensor. If Licensor declines to institute or continue any legal action, Licensee may, with the consent of Licensor, which will not be unreasonably withheld, institute or continue same in its name, at its sole expense, in which event any monetary recovery resulting therefrom shall belong

TOR 000990

02/11/99  17:28 FAX 212 354 6468                                    ☒016

solely to Licensee. If Licensee shall be enjoined or restrained from using the Trademark by a court of competent jurisdiction and such injunction or restraining order shall not be lifted or stayed within sixty (60) days after written notice to Licensor, then Licensee shall have the right to terminate this Agreement.

9.    Representations and Warranties.

(a)    Licensee warrants and represents that throughout the Term of this Agreement:

(i)  Licensee is and will be a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder. All Licensed Products manufactured, sold and distributed hereunder will be merchantable and fit for the purpose for which they are intended.

(ii)  The Licensed Products will conform at all times to all applicable federal, state and local laws, rules, regulations, ordinances and other enactments provided in the Territory or otherwise applicable, and all applicable industry standards, including but not limited to, those relating to product safety.

(iii)  All Licensed Products will conform in all respects to the samples approved by Licensor and that Licensee will not distribute or sell any Licensed Products which are of a quality or standard inferior to or different from the approved quality or are injurious to the reputation and goodwill associated with the Property.

(b)    Licensor expressly disclaims any liability arising by virtue of any right of consent or approval to, or any act, product or practice of Licensee.

(c)    Licensor represents and warrants that (i) it is a limited liability company duly organized, validly existing and in good standing under the laws of New York and has full right, power and authority to enter into this Agreement and to grant the rights provided hereunder to Licensee;

(ii) Except as otherwise indicated in Schedule A annexed hereto, the Trademarks described in Schedule A annexed hereto are valid and subsisting and Licensor is the Owner of the Trademarks; and

(iii) To the best of Licensor's knowledge, Licensor is the Owner of all unregistered Trademarks.

TOR 000991

10.    Indemnification.

(a)    The Licensee shall indemnify and hold the Licensor, and its subsidiaries and affiliates, and their officers, directors, shareholders, employees, representatives and agents (collectively, "Licensor Indemnitees"), harmless against any and all settlements, claims, demands, causes of action, judgments, damages, losses, costs and expenses (including but not limited to attorney's fees and litigation costs) of any kind whatsoever, other than those resulting from the fraud, illegal acts, gross negligence or wilful misconduct of the Licensor Indemnitees, actually or allegedly suffered by any person, persons, product, customers or property arising in any way out of, or incidental to, the Licensed Products or suffered or incurred by the Licensor in connection with any allegedly unauthorized use of any patent, process, idea, method, or device in connection with the Licensed Products except as authorized by this Agreement, and also from any claims, suits, losses and damages arising out of alleged defects in the Licensed Products or resulting from any failure of Licensee, or any person, firm, or entity acting under or through Licensee, to comply with the provisions of this Agreement or to comply with any applicable Laws including, without limitation of the foregoing, accidental death of, or injury to, persons or damage to property, and claims of infringement of intellectual property rights, including copyrights, trademark, trade dress and/or patent claims.  The Licensee shall obtain, at its own expense, product liability insurance from a recognized insurance company qualified to do business in the State of New York, providing adequate protection with a limit of liability (in addition to costs of defense) of not less than Three Million ($3,000,000.00) Dollars per occurrence, insuring, without limitation, against any claims, suits, losses or damages arising out of any alleged defects in the Licensed Products, including actions for breach of warranty, negligence and strict liability in tort.  Said product liability insurance shall be issued by a company reasonably satisfactory to the Licensor, and a certificate evidencing the paid policy naming the Licensor as an insured party will be submitted to the Licensor by the Licensee within thirty (30) days following the commencement of this Agreement.  Said policy will provide that the insurer may not terminate it or materially modify it without thirty (30) day's prior written notice to the Licensor.  Payment for any indemnification due hereunder will be made on demand

(b)    The Licensor shall indemnify, defend and hold the Licensee and its subsidiaries and affiliates, and their officers, directors, shareholders, employees, representatives and agents (collectively, "Licensor Indemnitees"), harmless against any and all claims, settlements, judgments, damages, losses, costs and expenses (including but not limited to reasonable attorney fees), other than those resulting from the fraud, illegal acts, gross negligence or wilful misconduct of the Licensor Indemnitees, incurred by the Licensee solely as a result of any claim by any person, firm or entity that Licensee's use of the Property strictly in accordance with this Agreement infringes upon any rights granted to such person, firm or entity by Licensor. Licensee shall not, however, be entitled to any recovery for lost profits from the Licensor or any of its affiliates.  Additionally, if by reason of any claims referred to in this subsection Licensee is precluded from selling any stock of Licensed Products or utilizing any materials in its possession or which come into its possession by reason of any required recall, Licensor shall be obligated to purchase such Licensed Products and materials from Licensee at their out-of-pocket cost to Licensee, excluding overhead, but Licensor shall have no other responsibility or liability with respect to such Licensed Product or materials.

TOR 000992

(c)     Any party claiming a right to indemnification under this Section 10 ("indemnitee") shall give prompt written notice to the other party ("indemnitor") of any claim or legal proceeding which may give rise to such right to indemnification (a "Claim"). Without limiting the foregoing, Licensee agrees to give Licensor written notice of any product liability Claim made against Licensee with respect to any Licensed Product within seven (7) days of Licensee's receipt of the Claim. Without limiting the foregoing, Licensee agrees to give Licensor written notice of any product liability Claim made or suit filed with respect to any Licensed Product, any investigations or directives regarding the Licensed Products issued by the Consumer Product Safety Commission ("CPSC") or other federal, state or local consumer safety agency, and any notices sent by Licensee to, or received by Licensor from, the CPSC or other consumer safety agency regarding the Licensed Products within seven (7) days of Licensee's receipt or promulgation of the Claim, suit, investigation, directive, or notice. Without limiting the foregoing, Licensee agrees not to communicate with the press regarding any product liability Claim, and not to confirm or deny any information relating to such Claim without Licensor's prior written consent. The indemnitor shall have the right to defend any Claim or action at its sole cost and expense with counsel of the indemnitor's choice reasonably satisfactory to the indemnitee. The indemnitee will at all times cooperate in all reasonable respects with the indemnitor and counsel in the conduct of the defense of any Claim or action giving rise to indemnification hereunder.

(d)     Notwithstanding any provisions of this Section 10 or any other provisions of this agreement, Licensee will in no event have the right, in any Claim or action or proceeding hereunder, to settle any claims or issues that could in any way adversely affect Trademarks or the rights to ownership or utilization thereof.

11.     Termination by Licensor.

Licensor shall have the right to terminate this Agreement without prejudice to any rights which it may have, whether pursuant to the provisions of this Agreement or at law, or in equity, or otherwise, upon the occurrence of any one or more of the following events:

(a)     Licensor may terminate this Agreement, effective immediately upon giving Licensee written notice of termination, if (i) Licensee knowingly sells Licensed Products outside of the Territory, (ii) Licensee is at any time in default under Section 7 or distributes Licensed Products to non-licensed channels of distribution, (iii) any Transfer takes place or change in the record or beneficial ownership of Licensee or any of its parents or affiliates changes in a manner so as to change the actual control and management of Licensee or an assignment or change of control prohibited by paragraph 15 shall take place, (iv) Licensee defaults on any obligations secured by a security interest in or other lien or encumbrance on any Licensed Products and fails to cure such default prior to the time the secured party acts with respect to such Licensed Products, or (v) Licensee fails to maintain in effect any insurance required by the provisions of Section 10(a).

(b)     Licensor may also terminate this Agreement, effective immediately upon giving Licensee written notice of termination, if (i) Licensee fails to make any payment due to Licensor under this Agreement when such payment is due and fails to cure such default for ten (10) days or more after written notice thereof from Licensor to Licensee, (ii) Licensee fails three

18

TOR 000993

02/11/99   17:27 FAX 212 354 6468                                      ☒019

(3) or more times during any period of one year during the term of this Agreement to make any payment due to Licensor for a period of ten (10) days or more after such payment is due, (iii) the Licensee breaches or fails to perform any other terms or provisions of this Agreement not otherwise provided for above, and such breach or failure is not curable or, if curable, is not cured within twenty (20) days after written notice thereof from Licensor, or (iv) Licensee files a voluntary petition or proceeding in bankruptcy or under any federal or state bankruptcy or insolvency or other law for the relief of debtors; consents to the appointment of a receiver, custodian or liquidator for a portion of its business or property; has filed against it and not dismissed within forty-five (45) days an involuntary proceeding under any federal or state bankruptcy or insolvency or other law for the relief of debtors or for the appointment of a receiver, custodian or liquidator; (v) Licensee makes an assignment for the benefit of its creditors; or (vi) Licensee ceases or admits its intention to cease, the manufacture, sale or distribution of Licensed Products or the conduct of its business in the ordinary course.

12.    Effect of Expiration or Termination.

(a)    Upon the expiration or termination of this Agreement for any reason whatsoever, all rights of Licensee under this Agreement shall terminate and automatically revert to Licensor, except as otherwise provided herein. Upon expiration or termination, Licensee shall immediately discontinue all use of the Property and shall no longer have any right to use the Property or any variation or simulation thereof in any manner or for any purpose whatsoever, except as provided in Section 12(d). Licensee shall transfer to Licensor by such documentation as Licensor may require all registrations, filings, trademarks, copyrights and other rights with regard to the Property which Licensee may have possessed at any time. Subject to the provisions of Section 12(e) concerning the sale of Termination Inventory, Licensee shall deliver to Licensor, at Licensee's expense, all sketches, samples, designs or other matters belonging to Licensor and relating to Licensed Products, and all Licensed Products, packaging materials and advertising and promotional materials bearing reference to the Property in any form.

(b)    Upon termination or expiration of this Agreement for any reason, including termination under Section 11(b)(ii), no trustee in bankruptcy, assignee for the benefit of creditors, custodian, receiver, sheriff or court officer or other successors to Licensee or its assets or business shall have any right to continue this Agreement or to use or exploit the Property in any manner whatsoever.

(c)    Notwithstanding the provisions of Section 11(b), in the event that under the United States Bankruptcy Code or any amendment or successor thereto (collectively the "Bankruptcy Code"), the trustee in bankruptcy of Licensee or Licensee, as bankruptcy debtor, is permitted to and does assume this Agreement and thereafter proposes to assign this Agreement by an assignment which fulfills the applicable requirements of the Bankruptcy Code, the trustee or Licensee shall notify Licensor of the proposed assignment in advance, in writing, setting forth the name and address of the proposed assignee, the proposed consideration for the assignment and all other material terms and conditions of the proposed assignment. Such notice shall be considered an offer to Licensor to have this Agreement assigned to Licensor or its designee for the consideration (or its reasonable equivalent in money) and under the other material terms in the notice. Licensor may exercise the option and accept the offer by giving the trustee or

19

TOR 000994

02/11/99  17:28 FAX 212 354 6468                                              ☒020

Licensee, as appropriate, written notice of exercise and acceptance within twenty (20) days after Licensor receives the notice from the trustee or Licensee. If Licensor fails to give notice and exercise the option within such twenty (20) day period, the trustee or Licensee may complete the proposed assignment, but only to the party and for the consideration and under the terms described in the notice

      (d)    Within twenty (20) days after the expiration or termination of this Agreement, Licensee shall prepare and deliver to Licensor a written statement of Licensed Products and inventory on hand bearing reference to the Property or Licensor's name in any form (the "Termination Inventory"), including a complete and accurate schedule as of the date of expiration or termination of: all completed Licensed Products on hand that bear reference to the Property or Licensor's name in any form; all work in process that bears reference to the Property or Licensor's name in any form relating to Licensed Products on hand, including uncut piece goods and products and materials in the process of manufacture; all Packaging, advertising and promotional materials and other documents or items that bear reference to the Property or Licensor's name in any form in Licensee's possession or control or in the process of manufacture for Licensee and the cost of each item included in such Termination Inventory. Provided that this Agreement has not been terminated by Licensor as a result of (i) Licensee's failure to make payments as agreed, or (ii) failure of the Licensed Products to comply with governmental requirements, or (iii) violation of any provision of this Agreement by Licensee regarding approval as to quality or a violation which could result in jeopardy to Licensor's rights in the Property by the continued sale of Licensed Products, Licensee shall be free to sell Licensed Termination Inventory to Licensor or to third parties for a period of one hundred twenty (120) days after expiration or termination of this Agreement. Any items in the Termination Inventory bearing reference to the Property or Licensor's name in any form that have not been sold and remain after the selling period provided for in this paragraph shall have all uses of the Property removed by Licensee, including but not limited to, all tags and labels bearing any reference to the Property, from the Licensed Products and shall thereafter deliver to Licensor, dispose of or destroy the remainder of the packaging materials in accordance with Licensor's instruction.

      (e)    Immediately upon the expiration or termination of this Agreement for any reason, Licensor shall have the free and unrestricted right to grant other parties one or more licenses to use the Property in connection with the manufacture, sale, distribution or advertising and promotion of Licensed Products in the Territory or to enter into such other transactions as it desires for the use of the Property with Licensed Products or in any other manner, without any obligation of any kind to Licensee. The right of Licensee to sell items of Termination Inventory under Section 12(d) is non-exclusive only and shall not in any manner limit Licensor's right to enter into other licenses or transactions.

      (f)    Notwithstanding any termination of this Agreement, Licensor hereby reserves all rights and remedies which are granted or available to it under this Agreement or applicable law, and termination shall not be deemed to be an exclusive remedy or to limit Licensor in any manner from enforcing any other rights or remedies.

TOR 000995

13.    Submission of Agreement.

Submission of this Agreement to Licensee does not constitute an offer to license; this Agreement, and the license referred to herein, shall become effective only upon the execution thereof by Licensor and delivery to Licensee.

14.    Notices.

Any notices or other communications required or permitted hereunder shall be sufficiently given if delivered in hand to the party addressed, when delivered by express courier or overnight mail, or three (3) days after being sent by certified mail, return receipt requested, postage prepaid, addressed to the parties at the addresses set forth below or at such other address or number as any party entitled to notice hereunder may in a like manner from time to time notify the other parties in writing. Approvals need not be sent to the parties to whom copies are sent.

If to Licensor:

> Phat Fashions LLC
> 180 Varick Street, 10th Floor
> New York, New York 10014
> Attention:    Claude Johnson

*[handwritten annotation: 512 7th Ave 43 ??/?? AT: ???]*

with copies to:

> Schekter Rishty Goldstein & Blumenthal P.C.
> 1500 Broadway, 21st Floor
> New York, New York 10036
> Attention:  Neil S. Goldstein, Esq.

If to Licensee:

> Tornado Imports (Canada), Inc.
> 5540 Rue Ferrier
> Montreal, P.Q.  H4P 1M2
>                 Canada

15.    Assignment.

This Agreement shall be binding upon and inure to the benefit of Licensor, its successors and assigns. This Agreement and the rights hereunder are personal to Licensee and shall not be transferred, assigned, sublicensed, pledged or otherwise encumbered by Licensee, whether voluntarily, involuntarily, by operation of law or otherwise ("Transfer"). Any Transfer shall be void and of no force and effect. Any Transfer of shares of capital stock or other beneficial ownership interest in Licensee held by the present shareholders of Licensee or members of the immediate families of such shareholders (the "Present Control Group"), however accomplished and whether in one or more related or unrelated transactions, shall constitute a

21

TOR 000996

Transfer by Licensee of its interest hereunder if the total ownership of the Present Control Group is at any time less than sixty six and two-thirds (66-2/3%) percent. The term Transfer shall also include any merger, consolidation, reorganization or other transaction or transactions, whether in one or more related or unrelated transactions, involving Licensee or an Affiliate, parent or owners of Licensee, whereby the voting stock interest or beneficial ownership interest in Licensee held by the Present Control Group is reduced below sixty six and two-thirds (66-2/3%) percent. If Licensee is a partnership, a Transfer shall be deemed to have occurred if the profit and loss participation in Licensee by the Present Control Group is reduced below sixty six and two-thirds (66-2/3%) percent or if the same shall occur with respect to any general partner of Licensee. The names and shareholdings of all present beneficial owners of the outstanding shares of Licensee's capital stock are set forth in Schedule G annexed hereto.

16.    No Joint Venture.

Nothing herein contained shall be construed to have the effect of placing the parties hereto in the relationship of partners or joint venturers, or create any agency, or any other relationship other than that of Licensor and Licensee. No party shall have the power to obligate or bind any other party in any manner whatsoever except as expressly provided for herein.

17.    Modifications of Agreement; Previous Agreement.

This Agreement can only be extended, waived or modified by a writing signed by both parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement. This Agreement contains the entire agreement between the parties concerning the subject matter hereof, and supersedes any pre-existing agreement and any oral or written communications between the parties concerning the subject matter hereof.

18.    Enforcement.

Any provisions of this Agreement which are unenforceable in any jurisdiction in which this Agreement is sought to be enforced, or are invalid or contrary to the law of such jurisdiction, or the inclusion of which would affect the validity, legality or enforcement of this Agreement, shall be of no effect, and in such case all remaining terms and provisions of this Agreement shall subsist and be fully effective according to the tenor of this Agreement as though no such invalid portion had ever been included herein. It is the intent of the parties to create a valid license to the Property, and all provisions of this Agreement should be read to give this intent legal force and effect. In any action or proceeding brought by Licensor to enforce any rights under, or pursuant to, this Agreement, Licensor shall be entitled to recover all reasonable costs and expenses incurred in connection therewith, including all legal fees and disbursements, provided that Licensor shall be the prevailing party or that such action or proceeding resulted from Licensee's default or failure to comply with its obligations under this Agreement.

19.    Governing Law.

This Agreement shall be governed by, and construed in accordance with, the law of the State of New York applicable to contracts made and to be performed in the State of New York, without regard to conflicts of law principles.

22

20.    JURISDICTION.

EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY
CONSENTS TO THE JURISDICTION OF THE SUPREME COURT OF THE STATE OF
NEW YORK, NEW YORK COUNTY AND THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK, COURTS LOCATED IN THE STATE OF
NEW YORK IN ANY ACTION TO ENFORCE, INTERPRET OR CONSTRUE ANY
PROVISION OF THIS AGREEMENT, AND ALSO HEREBY IRREVOCABLY WAIVES
ANY DEFENSE OF IMPROPER VENUE OR FORUM NON CONVENIENCE TO ANY
SUCH ACTION BROUGHT IN THOSE COURTS. EACH PARTY HERETO CONSENTS TO
SERVICE OF PROCESS BY CERTIFIED MAIL AT ITS ADDRESS SET FORTH ON THE
FIRST PAGE OF THIS AGREEMENT. EACH PARTY FURTHER IRREVOCABLY
AGREES THAT ANY ACTION TO ENFORCE, INTERPRET OR CONSTRUE ANY
PROVISION OF THIS AGREEMENT WILL BE BROUGHT ONLY IN ONE OF SUCH
COURTS AND NOT IN ANY OTHER COURT.

21.    Equitable Relief.

Licensor and Licensee acknowledge that their performance and obligations
hereunder are unique, of extraordinary value, and that a material breach by either such party of
any material obligation hereunder will cause the other such party irreparable damage which
cannot be compensated with money only. Therefore, each such party agrees that the other such
party, as a matter of right, shall be entitled to an injunction or other equitable relief, in addition to
all other rights at law to prevent the material breach of any material terms or conditions hereof,
and to enforce any rights of the party seeking equitable relief hereunder.

22.    Payments.

All payments hereunder shall (i) be made in the U.S., in U.S. currency or by good
check in U.S. dollars drawn on a bank approved by Licensor, and (ii) be deemed made on the
date of receipt of checks by Licensor at Licensor's address set forth above or at such other
address as Licensor shall specify in writing.

23.    Waiver of Jury Trial.

Licensor and Licensee waive any right to trial by jury in any action, proceedings
or counterclaim concerning this Agreement and any rights thereunder or any other argument
delivered in connection herewith, if any, and agree that any such action, proceedings or
counterclaim shall be tried before a court and not before a jury.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the date first above written

LICENSOR:

PHAT FASHIONS, LLC

TOR 000998

☒024

By: _____

**LICENSEE:**

By: _____

24

TOR 000999

02/11/99  17:29 FAX 212 354 6468                                    ⌀025

## LIST OF SCHEDULES

A      Trademark(s) and Registration(s)

B      Licensed Channels of Distribution

C      Licensed Products

D      Additional Territory (if any)

E      Manufacturers Agreement

F      FOB Out Sales Royalty Rate

G      Shareholders of Licensee's Capital Stock

TOR 001000

02/11/99  17:30 FAX 212 354 6468                                         ⬚026

## SCHEDULE A

### Trademark(s) and Registrations(s)

| | | |
|---|---|---|
| *PHAT FARM | Reg. No. 1,809,325<br>class 25 | (reg. 12/7/93) |
| *PHAT THREADS | Reg. No. 1,819,997<br>class 25 | (reg. 2/8/94) |
| *ALL WORLD<br>ATHLETICS | Reg. No. 1,783.490<br>class 25 | (reg. 7/20/93) |
| *CLASSIC AMERICAN<br>FLAVA | Ser. No. 75-292620<br>class 18, 25 | (use based 5/14/97) |
| *ALL CITY | Ser. No. 75-309955<br>class 25 | (use based 6/17/97) |
| *Design (BULL'S HEAD) | Ser. No. 75/520579<br>class 25 | (use based 7/17/98) |
| | Ser. No. 75/291475<br>class 18 | (use based 5/14/97) |
| *Design (BULL'S HEAD)<br>shaded) | Ser. No. 75/520580<br>class 25 | (use based 7/17/98) |
| | Ser. No. 75/291476<br>class 18 | (use based 5/14/97) |
| *Design (letter "P" and<br>FLAG) | Ser. No. 75/454822<br>class 18, 25 | (ITU 3/23/98)<br>(Appl. Filed) |
| *Design (letter "P") | Ser. No. 75/454821<br>class 18, 25 | (ITU 3/23/98)<br>(Appl. Filed) |
| *PHAT FARM and Design | Ser. No. 175/454820<br>class 18, 25 | (ITU 3/23/98)<br>(Appl. Filed) |
| *PF 129 and Design | Ser. No. 75/309881<br>class 18, 25 | (use based 6/17/97) |
| *PHAT FARM and Design<br>(shaded BULL'S HEAD) | Ser. No. 75/520581<br>class 18, 25 | (use based 7/17/98) |
| | Ser. No. 75/291477<br>class 18 | (use based 5/14/97) |
| *PHAT FARM | Not assigned yet<br>Class 14 | (ITU 9/13/98) |
| **PHAT FARM | No. 859697<br>Class 25 | (Filed 10/24/97) |

26

TOR 001001

02/11/99  17:30 FAX 212 354 6468                                    ☒027

**ALL CITY          887978                    (Filed 8/19/98)
                    Class 18, 25

  *In the United States Patent and Trademark Office Only.
  **In Canada only.

27

TOR 001002

## SCHEDULE B

### Licensed Channels of Distribution

**Department Stores**

Federated Department Stores
Dayton Hudson Department Stores
Mercantile Department Stores
Nordstrom's
May Company
Belk's
Carter Hawley Hale (Dept. Store Division)
Bon Ton
Saks Fifth Avenue
Neiman Marcus
Bonwit Teller
Woodward and Lothrop

(Higher End Specialty Stores subject to approval by Licensor)

TOR 001003

02/11/99  17:30 FAX 212 354 6468                                    ☑029

## SCHEDULE C

### Licensed Products

All Phat Farm products excluding

    (a)    men's and boy's underwear, lounge wear, back packs, bags, hipsters and related products;

    (b)    women's and girl's dresses, outerwear, swimwear, coverups, exercisewear, lingerie, slip dresses and plus sizes;

    (c)    home furnishings;

    (d)    fragrances, cosmetics and beauty aids; and

    (e)    luggage.

TOR 001004

02/11/99  17:30 FAX 212 354 6468                                    ⌀030

## SCHEDULE D

### Additional Territory, if Any

None

TOR 001005

## SCHEDULE E

### Manufacturer's Agreement

ADDRESS OF MANUFACTURER:

TERRITORY OF MANUFACTURE:

Licensor:

Licensee:

EXPIRATION DATE OF LICENSE
(unless Sooner Terminated
or Extended):

AUTHORIZED Licensed Products:

MARKS AND PROPERTY

In order to induce Licensor to consent to the manufacture of the Authorized Licensed Products using _____ Marks by the undersigned, the undersigned agrees that:

It will not manufacture the Authorized Licensed Products to the order of anyone but the Licensee, will invoice only the Licensee, will not ship to anyone other than the Licensee and will not ship after the expiration date of the License.

It will not subcontract production of the Authorized Licensed Products or components which contain the _____ Marks without Licensee's written consent.

It will not (without Licensee's written consent) manufacture merchandise utilizing any of the Marks and/or tradenames owned or otherwise authorized for use by Licensee other than the Authorized Licensed Products.

31

TOR 001006

It will not publish or cause the publication of pictures of the Authorized Licensed Products in any publication or promotional material, nor advertise the fact that it is permitted to manufacture Licensed

Upon expiration or termination of the License Agreement, or upon notification by the Licensee or the Licensor, the undersigned Manufacturer will immediately cease manufacturing the Authorized Licensed Products and deliver to Licensee or its authorized representative that portion of any and all molds, plates, engravings or other devices used to reproduce the copyrighted materials and/or trademarks or will provide Licensee with evidence that the Marks have been erased.

The Manufacturer further agrees as follows:

(i) It shall not use child labor in the manufacturing, packaging or distribution of Licensed Products or Packaging or advertising or promotional materials hereunder. The term "child" refers to a person younger than the age for completing compulsory education, but in no case shall any person younger than fourteen (14) years of age be employed in the manufacturing, packaging or distribution of Licensed Products or Packaging or advertising or promotional materials hereunder.

(ii) The Manufacturer shall provide employees with a safe and healthy workplace in compliance with all applicable laws. The Manufacturer agrees to provide Licensor with all information Licensor may request about manufacturing, packaging and distribution facilities for the Licensed Products.

(iii) The Manufacturer shall only employ persons whose presence is voluntary. The Manufacturer shall not use prison labor, or use corporal punishment or other forms of mental or physical coercion as a form of discipline of employees.

(iv) The Manufacturer shall comply with all applicable wage and hour Laws, including minimum wage, overtime, and maximum hours. The Manufacturer agrees to utilize fair employment practices as defined by applicable laws.

(v) The Manufacturer shall not discriminate in hiring and employment practices on grounds of race, religion, national origin, political affiliation, sexual preference, gender or age.

32

TOR 001007

(vi) The Manufacturer shall comply with all applicable environmental laws.

Dated: _____, 1998

**MANUFACTURER:**


By: _____

TOR 001008

@034

## SCHEDULE F

### FOB Out Sales Royalty Rate

34

TOR 001009

02/11/99   11:31 FAX 212 354 0466                                                  ☒035

## SCHEDULE G

### Shareholders of Licensee's Capital Stock

TOR 001010

## SCHEDULE G

### Shareholders of Licensee's Capital Stock

WP\66614\H271-J01b

TOR 001011