UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
PHAT FASHIONS, LLC,                          :
                                             :     Case No.: 1:07 CV 03278 (PAC)
                      Plaintiff,             :
                                             :
        -against-                             :
                                             :     **DECLARATION OF**
TORNADO IMPORTS (CANADA), INC.,              :     **BARRY SEGAL**
                                             :
                      Defendant.              :
-----------------------------------------------------x

        BARRY SEGAL, pursuant to 28 U.S.C. §1746, declares under penalty of perjury as follows:

        1.    I have worked for Tyfoon International, Inc. ("Tyfoon") for 24 years. I am the Vice President for Finance for that company and for all other companies owned by Issie Wiseman and his family, including defendant ("Tornado") and Vis-à-Vis Fashions (1997) Inc. ("VIS"). I am myself a shareholder in some of these companies, including Tornado. I will refer to Mr. Wiseman as Issie throughout, both because that is what everyone calls him and because his son Josh also works in these businesses.

        2.    These various companies (what we call the "Tyfoon Group") are engaged in the importing and wholesale distribution of clothing, footwear, accessories and the like – what is commonly called the "garment industry." We also operate four retail stores which sell products distributed by our companies. One of these, in Montreal, operated until very recently under the name Phat Farm; we opened that store in 2000 at the urging of Russell Simmons, who founded and built Phat Fashions, as a retail showcase for the Phat Fashions products for which we were the Canadian licensee.

3.  I remember when Issie first began to work with Russell Simmons and his "Phat Farm" label for menswear ("Baby Phat" for ladieswear came a few years later), and I recall when Tornado became licensee under a formal license agreement (the "License," WX 1).[1]

4.  In general, business decisions regarding Phat Fashions and our companies were handled by Issie, but I would know what was going on, and I handled payments and financial reporting. I am therefore, for example, in a position to state that when the Baby Phat lines for women came out we handled these through VIS, and we did that after Issie said he had ok'd this with Phat Fashions. Even though the License clearly was only in the name of Tornado, I know that we routinely sent to Phat Fashions separate sales reports and royalty checks for Tornado sales (SX 1) and for VIS sales (SX 2), as well as audited sales reports by RSM Richter (SX 3). I also know that many of the Baby Phat lines we sold were actually excluded on Schedule C of the License, but Issie got permission from Phat Fashions to carry those lines, and we did business accordingly.[2] All of this was done orally, sometimes in telephone conversations where I was in the room; no one ever mentioned the technicalities of the License document. We just talked with the people at Phat Fashions about what we wanted to do, got their permission (and often their help in making contact with licensees who were designing and manufacturing products for the U.S. market and who would then provide access to products we could sell in Canada), and we went ahead and did business together. The garment business is built on

---

[1] Some of the documents I am going to talk about are exhibits to the Issie Wiseman declaration. Rather than make yet another copy, these will be cross-referenced here as "WX," and "SX" will be used for any documents attached to this declaration.

[2] Phat Fashions did grant worldwide rights for certain Baby Phat clothing lines to BP Clothing, so those lines were bought through BP Clothing, in most circumstances with BP Clothing paying the license royalty to Phat Fashions. However, all other Baby Phat products (footwear, leathers, accessories and clothing lines outside the BP Clothing license) were handled under our license through VIS and with VIS paying royalties to Phat Fashions.

personal relationships and in many cases oral agreements, and that is how we operated much of the time.

### Financial Information

5. As Vice President of Finance I was well aware of how much the Tyfoon Group's resources became devoted to marketing Phat-label products as the volume of that business grew over the years from US$1,499,897 in 1999 to over US$18,888,597 in 2005. As of 2006, much of the time of Josh Wiseman was spent on marketing Phat-label products and Claudia Michaels, Brand Manager of Women's Clothing, spent the vast majority of her time on Baby Phat products in particular. In some product areas, like footwear, the Phat labels are virtually all we sell and until recently we had five staff, including a senior executive, who basically worked full-time on Phat-label footwear. In some other areas, like ladieswear, the staff primarily worked on Phat lines but also used sales of those products as a chance to present other lines. We also maintain a corporate headquarters in Montreal which includes a large 64,000 square foot head office, warehouse and shipping facility. The majority of products stored and shipped there are Phat-label products, and without a high volume of those products we could not economically run a large facility like that.

6. We devoted that much staff (and expense) to sales of Phat products because of the market power of the brand, and over time the business of the Group became dependent on these products. In 2005-06, for example, I estimate such sales were around 60% of our total wholesale business; of course they were virtually 100% of the sales for Tornado and VIS.[3]

---

[3] If you exclude the products sold by VIS under license from BP Clothing this percentage would be about 58%. Within VIS, approximately 31% of sales related to BP Clothing and the balance were other Baby Phat lines.

7.  I am also aware that because Phat-label products sell on relatively high margins (because of the prominence of the brand and the extent to which the brand label drives retail sales), our licensed sales of Phat-label products have been critical to profitability for the Tyfoon Group.[4] The large volume of Phat Fashions business also covers a substantial portion of our overhead (the warehouse, shipping, and staff are examples); you can figure that approximately $2,000,000 of our Phat Fashions revenues goes to pay for overhead). It is absolutely clear to me that if we lose that business going forward, our Group faces large potential losses and layoffs of staff (many of them long-time staff). I have already concluded that without the Phat Fashions businesses we have to sell or substantially lease-out our corporate facility, because the remaining revenues cannot support such an expense.

8.  Of course, I know that our staff will try to find other business for us. But that seems easier said than done, and you never know what lines may catch on or how long it will take to build them up. Without being too gloomy, as the person responsible for finances I have to say that loss of this volume of business threatens to destroy the Group where I have worked most of my life. And of course, shareholders of Tornado, including me, will see the value of their equity completely ruined, since Tornado's only significant business was the Phat Fashions license.

The "Extension" Negotiations

9.  I certainly knew our License was going to end in 2007, and that it was important to our future that an extension be worked out as far in advance as possible. The discussions necessarily were handled by Issie, but he talked to me about them, I did have a role

---

[4] All employees of the companies that comprise the Tyfoon Group are employed and paid by Tyfoon. Costs are then allocated from Tyfoon to the various companies that comprise the Tyfoon Group.

at times, and I was present in the room for some of Issie's speakerphone discussions with Bernt Ullman, President of Phat Fashions. So there are some parts of what happened that I can testify about.

10. First of all, I distinctly remember talking with Issie in the summer of 2005 about a "dumping" problem with a European licensee of Phat Fashions, and Issie discussing his idea of using this concern as an opportunity to address our desire for an extension with Mr. Ullman. I remember Issie happily reporting back some time later that when he had proposed an extension, Mr. Ullman had said something like "great, why would we go with anyone else, sure." My recollection is that Issie also reported that Mr. Ullman had said – I think this was the same conversation but it could have been a few weeks later – that he wanted some minimum numbers "to get firmed" up and brought more in line with current levels of business, but that otherwise an extension was "fine – we had a deal."

11. I also recall that the plan was to get everything understood by the time of the next MAGIC (a trade group that holds semi-annual industry shows in Las Vegas) show, which would be in late February 2006. In January, Issie asked me to pull together some numbers for his discussions with Mr. Ullman, and I did that (SX 4). By then I know Issie had told me that the extension he was discussing with Mr. Ullman was for three years with a three year option. I believe the handwriting on that document is Issie's notes from later talking to Mr. Ullman.

12. I know that Issie had more conversations with Mr. Ullman, but the next event I clearly remember is Issie calling me right after he attended MAGIC and saying that he and "Bernt" had "settled the numbers" and finished the deal. He read off the numbers to me. He said Mr. Ullman wanted us to send something to him with the agreed numbers and told me to prepare a letter for him (Issie) to send.

13. I prepared the letter (SX 5) and we sent it on March 1, 2006. A couple of weeks later we got a legal document from a Mr. Nathanson, the lawyer for Phat Fashions. I looked the document over and saw that the numbers matched what we had sent and that there were no other problems, and I discussed that with Issie. The document seemed to be in a form where we could just sign it. I called Mr. Nathansen and told him that we were fine with the document because it was what the parties had agreed, and I asked what he wanted us to do. He said to print out a second copy and send two signed originals back to him. That's what I did by letter dated March 30, 2006 (SX 6).

14. Some time in April, and so after I had sent the signed document to Mr. Nathanson, I was present in Issie's office when he had a telephone conversation, on speakerphone, with Mr. Ullman. I heard Mr. Ullman say that the paperwork had been received and "everything is great." I heard him say "the deal is done." I remember that because, although Issie had already said we had a deal and the numbers in the Nathanson document matched what we had sent so I believed everything was clear and all set, this was the first time I personally heard someone from Phat Fashions confirm that there was a deal. I also heard Mr. Ullman promise that the "paperwork" would get moved through corporate channels and he would send us a "signed off" copy for our files.

15. I remember sitting in on another call with Mr. Ullman, this shortly before the August 2006 MAGIC show. I remember I had noted that our paperwork had not come back – that's part of my job – and when I mentioned this to Issie he said something like, who cares Bernt said it would come eventually, we have a deal. Still, Issie said he would mention it to Mr. Ullman, and I was in the office when Mr. Ullman was on the line a little later. I heard Mr. Ullman say that ours was "a done deal," and there was nothing to be concerned about, "don't

worry." He explained that the lawyer reviewing the papers had died (suicide was mentioned) and all sorts of paperwork had been delayed. He said words to the effect of "there's no problems, you'll get it back eventually."

16. Finally, I remember being in the room for a call with Mr. Ullman in December 2006. I remember the timing because at Tyfoon we had been discussing whether to extend the lease for the Montreal Phat Farm store (more on this below). You can see from the letter I had sent to the landlord (SX 7) that we were confident our deal with Phat Fashions was all set (without that, there was no reason to extend the lease out several years), but before we concluded anything with the landlord I mentioned the paperwork again to Issie. He got Mr. Ullman on the telephone, and I heard Mr. Ullman say things about the papers having to get passed around corporate channels which took a lot of time, and I heard Mr. Ullman say that there was no reason to worry because we already had "a done deal." I believe it was in that same conversation, perhaps it was another, that I heard Mr. Ullman say "everything is perfect" and that we should have our copy of the document by the next MAGIC show (which would be in February 2007).

17. Thus over time I heard Mr. Ullman say that our extension was a "done deal" several times. I heard him confirm that the "numbers" were all agreed. While he certainly did talk about getting the amendment document, the paperwork, processed and signed at Phat Fashions, he <u>never</u>, never said or even suggested that our "done deal" depended on the document being signed at their end or that someone at the parent company had put our deal "on hold." His message was that we <u>had</u> a deal already, the problem was just in moving the corporate record-keeping through.

### Reliance and Damages

18.    Let me say a few things about the effect on us of believing throughout 2006 that Phat Fashions had committed to extending our license.

19.    I have already mentioned the Montreal store, opened at plaintiff's request. Our lease for that space gave us a right to cancel on 12 months' notice. In later 2006 we told the landlord we would consider extending the lease term by several years and for that we would give up our right to cancel (SX 6). While the rent negotiated was an attractive rate, the only reason we operated this store was to showcase the Phat Fashion products we were distributing. The store didn't make any real money – in 2005 and 2006 it lost money and this year looks the same – but it helped put <u>our</u> brand before the public.

20.    Plaintiff's lawyer asked me at deposition whether our stores could still sell Phat products by buying from the new distributor.[5] It's difficult to imagine doing business with the company that took our license and thereby may destroy our wholesale business – and which has already stolen away three employees (and tried for more), a company which customers I have talked to have said they were told that we lost our connection with Phat Fashions for bad performance, which has led others to believe that we would be forced go out of business. But as to this store, the question misses the point: we only started this store as a showcase for <u>our</u> licensed, wholesale brand, and we would never have changed our lease terms in December 2006 if we had been told our "deal" was not assured or that it was "on hold."

21.    Second, it takes years to develop new lines, and it takes time commitments from existing staff to explore and market those lines. If our Phat lines were going to end in

---

[5] In addition to this store we have three others operating under the name "Illicit" (the Montreal store also very recently changed its name to Illicit, since Phat Fashions has denied our license). As a group these other stores are marginal. The majority of the goods sold at these stores were also Phat-label.

8

2007, we would need to start "booking" <u>large</u> volumes of other products during the second half of 2007 (for 2008 delivery) to keep our business intact. Our sales and marketing people needed to develop that potential business in 2006 – indeed even in 2005 (which is why we were so eager to discuss an extension back then). Instead of exploring and starting to build new product options from the start of 2006, in 2006 our senior marketing staff remained fully committed to developing and marketing the Phat labels.

22.   Footwear is an example. We have a very experienced, long-time brand manager heading up our footwear sales. He had often told me that marketing the Phat-label lines took almost all his time and he had no time to explore other labels that might expand the business. As a result, we remained totally committed to the Phat-label footwear line (it was probably 90% of our entire footwear business), and that is where this executive directed his work in 2006. When we realized in March 2007 that Phat Fashions was going to deny that we had a deal and cut us off, we had no other significant channels for footwear and had to scramble from scratch. As a result, when the selling season for 2008 started (showing products and booking orders in August – December 2007 for early 2008 delivery), we had almost nothing to show retailers who had been our customers for years. I would estimate our footwear business in the first half of 2007 I would estimate at over US$3,000,000, but based on bookings to date, I would expect footwear business to be less than US$600,000 in the first half of 2008 (and this includes selling off old Phat-label inventory).

23.   Although our executives are exploring other possible lines, we will be trying to sell to retailers which favored the Phat-label lines, and which can still get those products – from someone else. They still have access to the brand they want (the brand we built) and may not have room in their budget or on their shelves for the new lines we can offer.

Whether we can make headway with these former customers once we have a substantial line is anybody's guess.

24.     To get back to financial information I gave in the beginning, it is apparent to me that without Phat-label products we will lose nearly all of the $15,000,000 or more in volume that those products historically represented – perhaps more if our former Phat customers don't want to take time now to look at our other lines, as they ordinarily would when called on by our sales staff or visiting our showroom.  That kind of lost revenue means not just the loss of profits I mentioned before, but a loss of dollar revenues that were paying for staff, marketing, and overhead.  What is supposed to pay the salaries of our marketing executives while they search for new lines, or of our warehouse and shipping staff when there is so much less merchandise to store and ship?  Without Phat, we simply will not have the revenues to support existing staff levels.  As I mentioned, it is also the case that absent some major, and unexpected, development with another brand with very large volume (and nothing like that is on the horizon), if we do not get the Phat-lines back I believe we must sell (or lease out a very substantial portion of) our corporate facility – if we can.

25.     Thus, I have to say that the loss of the Phat Fashions business, both directly through its larger impact, certainly will destroy VIS and Tornado and may permanently and severely damage the Tyfoon Group as a whole.  I hate to say "destroy the business" but I think that is what we are facing -- without the Phat revenues we could run out of money for overhead before we develop the new lines of business that could keep us solvent.

26. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 30, 2007

_____
Barry Segal