James A. Beha II (JB-9591)
Cornelius P. McCarthy (CM-3544)
Ronald Busloff (RB-1791)
ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
PHAT FASHIONS, LLC,                          :
                                             :
                        Plaintiff,           :          Case No.: 1:07 CV 03278 (PAC)
                                             :
            -against-                        :
                                             :
TORNADO IMPORTS (CANADA), INC.,              :
                                             :
                        Defendant.           :
------------------------------------------------------x


## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction.................................................................................................2

Background................................................................................................3

    1.   The Tyfoon Group and the Phat Labels...........................................4

    2.   The Extension Agreement...........................................................5

    3.   The Repudiation........................................................................8

    4.   The Damage Threatened and Done..............................................10

Standard for Relief.....................................................................................11

Argument...................................................................................................12

POINT I:  DEFENDANT WILL PREVAIL ON THE MERITS, ESTABLISHING
AN ENFORCEABLE AGREEMENT TO EXTEND ITS PHAT FASHIONS
LICENSE AS PREVIOUSLY MODIFIED BY THE PARTIES. ...................................12

    1.   The Parties Reached an Oral Agreement. ...................................12

    2.   Under New York's G.O.L. § 15-301(1) the Oral Agreement is
        Effective Notwithstanding License ¶ 17. ...................................14

    3.   Were a "Writing Signed by Both Parties" Required Exactly as
        License ¶ 17 Provides, the Short Answer is that it Exists.................17

    4.   Equitable Estoppel Would Also Apply, Because Plaintiff's
        Conduct and Defendant's Reliance Estopps Plaintiff from Invoking
        License ¶ 17. ........................................................................18

POINT II:  DEFENDANT IS THREATENED WITH, AND IS ALREADY
SUFFERING, IRREPARABLE INJURY. ......................................................20

Conclusion.................................................................................................25

Appendix....................................................................................................26

i

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x

PHAT FASHIONS, LLC,                      :
                                         :          Case No.: 1:07 CV 03278 (PAC)
                 Plaintiff,              :
                                         :
        -against-                        :
                                         :
TORNADO IMPORTS (CANADA), INC.,          :
                                         :
                 Defendant.              :
----------------------------------------------------x

### MEMORANDUM IN SUPPORT OF DEFENDANT'S
### MOTION FOR A PRELIMINARY INJUNCTION

Defendant seeks injunctive relief to preserve the value, perhaps the very existence, of both defendant itself and the Wiseman family's Tyfoon Group of Canadian garment businesses (of which defendant is a key element) and to preserve as well the good will and business reputation that has developed from defendant's ten-year investment in its role as Canadian licensee and wholesale distributor for clothing, footwear, accessories and related products sold under plaintiff's "Phat Farm" and "Baby Phat" labels. These labels were developed by Russell Simmons, a prominent celebrity and media figure, and have unique visibility in specialized market sectors within the garment industry. During this decade defendant has developed Canadian sales of Phat label products into a substantial business. In recent years such sales have represented virtually 100% of defendant's business, as well as some 55-60% of the total wholesale business of the family's Tyfoon Group. Defendant contends that it obtained a valid extension of its rights as exclusive Canadian licensee for most Phat-label products (which otherwise would expire at the end of December 2007), and defendant seeks a preliminary injunction to preserve its license rights and prevent destruction of the family's business.

## Introduction

Plaintiff and defendant have a written licensing agreement that goes back to 1998 (the "License").[1]  This agreement was orally modified from time to time over the years as the Phat-label business evolved – much garment industry business being done on an "oral handshake" basis.[2]  The original License was scheduled to expire at the end of this year, but in a series of conversations concluding in February 2006, plaintiff and defendant entered into an oral agreement to extend defendant's license for up to six years past 2007.  Defendant very recently learned in discovery that there is a signed memorandum of that agreement, a formal Amendment document prepared by plaintiff's lawyers after the oral bargain was fully struck which is signed by the party to be charged (plaintiff), in the person of its C.E.O. and founder, Russell Simmons.

Plaintiff has repudiated its oral agreement and asserts that because plaintiff internally put the Amendment document "on hold" after both defendant and Mr. Simmons had signed it and plaintiff then did not deliver the document back to defendant, there is no extension of the License.  Plaintiff therefore refuses to continue to deal with defendant, and is doing business with another company for products to be shipped within Canada in 2008, a result which will cripple or destroy defendant and the related Tyfoon Group companies.

While defendant does contend that the Amendment document as signed by Mr. Simmons and defendant could itself be enforced as a binding extension under the terms of the License, defendant's fundamental claim is that (i) by late February or early March 2006 an oral

---

[1] Evidentiary support for this motion is provided by the accompanying declarations of Issie Wiseman, President of defendant ("Wiseman Decl."), and of Barry Segal, Vice President – Finance of defendant ("Segal Decl.").  The 1998 License Agreement is Wiseman Decl. Ex. 1.  Defendant also submits a declaration of James A. Beha II which collects certain documents and deposition excerpts and also reports certain stipulations of the parties.  Exhibits are hereafter referred to as WX, SX and BX to indicate to which declaration they are attached.

[2] The injunctive relief sought would preserve the License defendant received, as orally modified over time to add product lines outside the expressed terms of the 1998 License (Wiseman Decl. ¶¶ 5-6).  These "excluded" but later orally included lines are a significant portion of the total sales under the License – and of the total royalties paid to plaintiff, which have exceeded $1,000,000 annually (Id. ¶¶ 8-9).

agreement, complete as to terms, had been made and confirmed between Issie Wiseman,

President of defendant, and Bernt Ullman, President of plaintiff, and (ii) the document that was

signed by Mr. Simmons, the Chief Executive Officer of plaintiff, is sufficient to satisfy both the

general New York Statute of Frauds (G.O.L. § 5-701) and G.O.L. § 15-301(1), which applies

because the original 1998 license agreement has a clause requiring that modifications be in

writing and signed.[3]

        G.O.L. § 15-301(1) governs the extent to which License ¶ 17 is enforceable, and

because the document signed by Mr. Simmons (and by defendant) does suffice to make the oral

agreement enforceable, defendant is entitled to continue its business as a Phat Fashions licensee.

However, unless this Court provides preliminary injunctive relief, defendant will be irreparably

harmed before justice prevails.  During this decade the Tyfoon Group has built its Phat-label

business from virtually zero to annual wholesale sales regularly well in excess of $10,000,000.

That business is now disappearing, and defendant and the rest of the Tyfoon Group as now

constituted may disappear with it.

## **Background**

        Issie Wiseman has been in the garment industry in Canada all of his adult life,

over 40 years, and with his family he operates a number of related corporations that do business

as the "Tyfoon Group" (Wiseman Decl. ¶ 1).  Defendant Tornado Imports (Canada) Inc.

("Tornado") is one of these companies, and it is the entity which received the License from

plaintiff which this lawsuit addresses (id., WX 1).  Tornado distributes plaintiff's "Phat Farm"

---

[3] "This Agreement can only be extended, waived or modified by a writing signed by both parties.  There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement.  This agreement contains the entire agreement between the parties concerning the subject matter thereof, and supersedes any pre-existing agreement and any oral or written communications between the parties concerning the subject matter thereof."  (License ¶ 17).

menswear-label products in Canada; when plaintiff later began to develop a label directed to the

ladies market ("Baby Phat"), the parties orally agreed over the course of several years that many

lines of Baby Phat products could also be sold under the License (even though many women's

product lines were originally excluded from the License under the terms of its Exhibit C) (id., ¶

5). The parties also orally agreed that sales of these ladies' lines could be processed through

another Tyfoon Group company, Vis-à-Vis Fashions (1997) ("VIS") (id.; Segal Decl. ¶ 4). In

principle there was no reason why such sales could not have been made through Tornado, as

named licensee, or why that cannot occur now if necessary. But plaintiff agreed to this

arrangement as early as 2001; plaintiff thereafter regularly received and accepted separate

royalty checks for sales by VIS, at the royalty rate set in the License, and received separate

reports for Tornado and VIS sales (Segal Decl. ¶ 4).[4] Whatever paragraph 17 of the 1998

License may have said about requiring writings for modifications, in practice over the years the

parties, as Mr. Wiseman puts it, "talked, agreed and did business."

    1.      The Tyfoon Group and the Phat Labels

        Tyfoon has invested a great deal of time and money developing and maintaining

the Canadian market for Phat-label products. In the late 1990's when Mr. Simmons shifted the

business plan of Phat Fashions to a purely licensing model, he made Tornado the "master

licensee" for Canada (Wiseman Decl. ¶ 2). Thereafter, Phat Fashions and Tyfoon worked

together to increase sales of Phat-label products from approximately US$ 1,500,000 in 1999 to

over US$18,000,000 in 2005 (Segal Decl. ¶ 5). During that time, Tyfoon, at the request of Mr.

---

[4] Although defendant sold many Baby Phat lines under direct license from plaintiff, plaintiff had granted a North American license for certain womens clothing to BP Clothing. Defendant therefore sold those lines in Canada by sub-license from BP Clothing, which paid the royalties to plaintiff (Wiseman Decl. ¶ 5). (That sub-license has since been discontinued and is not at issue here.) VIS paid royalties on all other Baby Phat products to plaintiff Phat Fashions and continued to sell those lines until plaintiff repudiated its agreement (Segal Decl. ¶ 4).

Simmons, opened up a Phat Farm store in Montreal to feature Phat-label products and arranged several parties to further market the Phat Fashions brands (Wiseman Decl. ¶ 10). Indeed, within the apparel industry, the Wiseman family business has become nearly synonymous with Phat Farm and Baby Phat in Canada (Wiseman Decl. ¶ 11).

2. The Extension Agreement

Because the "Phat" labels had become so critical to the Wiseman family's business, Issie Wiseman raised the question of a post-2007 extension of the License with plaintiff as early as the late summer/early fall of 2005, in conversations with Bernt Ullman, who had become President of plaintiff in 2004 after it was acquired by Kellwood Corporation (Mr. Simmons remained with the company as Chief Executive Officer) (Wiseman Decl. ¶ 13). These conversations, described in detail in Mr. Wiseman's Declaration, continued over several months, and upon their conclusion in February 2006 the parties had reached a complete oral agreement that: (i) after 2007 the parties would continue doing business as they had for a further three years, with Tornado to have an option for another three years (six years in all); (ii) the royalty rate of 7% (which was lower than most Phat licenses) would remain the same, but the annual "minimums" would be increased to reflect current conditions. The last step in this oral process was taken when, after further discussions and exchanges of numbers over the telephone, in face-to-face meetings at a trade show in February 2006 Mr. Wiseman and Mr. Ullman agreed on the precise numbers for the minimums (Wiseman Decl. ¶¶ 19-22; Segal Decl. ¶¶ 11-12). After the numbers were settled, Mr. Ullman said to Mr. Wiseman "we're all done," and they shook hands and told Mr. Simmons they were set for another six years (Wiseman Decl. ¶ 22).

As Mr. Ullman had instructed at the meeting, a short time later Tornado sent plaintiff a very short "proposal" with the pre-agreed numbers (Wiseman Decl. ¶¶ 22-23; Segal

Decl. ¶¶ 12-13).  After that Mr. Wiseman talked to Mr. Ullman, who confirmed that these were the numbers previously agreed, and that "it's a done deal" (Wiseman Decl. ¶ 23).

A few weeks later Tornado received from plaintiff's lawyers a form of formal Amendment to the License (Segal Decl. ¶ 13; WX 6); the cover email called the document a "draft," but the document itself was in clean, executable form.[5]  When Barry Segal, Vice President of Finance, confirmed that the numbers in the document were the same as what Mr. Wiseman had reported to him as "settled" in February (and that he, in turn, had put in the "proposal"), Mr. Segal called the lawyer (Eli Nathanson) to say that the document was fine with Tornado, because it was "what the parties had agreed," and the lawyer told him to have two copies signed and sent back to him (id.).  This was done (id.; SX 4).

This amendment document had been sent by Mr. Nathanson to Mr. Ullman for review before it went out to defendant (BX 4).  When Mr. Nathanson received the originals back from defendant, he sent them on to Mr. Morris, the Chief Financial Officer at Phat Fashions, with a copy to Mr. Ullman (BX 5).  Thereafter Mr. Morris processed the document internally (e.g., BX 8), and around April 12, 2006, both copies were signed by Mr. Simmons, the C.E.O. and company founder (Beha Decl. ¶ 6(a); BX 5-6).

Meanwhile, also some time in April 2006, Mr. Wiseman spoke with Mr. Ullman on the telephone, with Barry Segal present, and Mr. Ullman confirmed that the Amendment document had been received back and that everything was "as we discussed" – "the deal is done."  Mr. Ullman also promised that the paperwork would be "no problem" at his end – "everything is great" (Wiseman Decl. ¶¶ 31-32; Segal Decl. ¶ 14).

---

[5] It is an indicator of the extent to which the parties had done business orally that the form of Amendment made no express mention of VIS or of the women's lines that had been sold through VIS for many years even though originally excluded by Schedule C.  By 2006 women's lines sold through VIS accounted for more than a third of the total royalties being paid to plaintiff for Tyfoon Group sales, and plaintiff had for many years received quarterly and annual reports for these sales under the VIS name (Segal Decl. ¶ 4; Wiseman Decl. ¶ 9).

At no time during their discussions did either party mention License ¶ 17, and at no point did Mr. Ullman indicate in any way that the assent he had given was conditioned either on approval from others or upon the signing of a formal document (Wiseman Decl. ¶¶ 26-27).

Mr. Wiseman is clear in his testimony that his "deal was done" as of the time he settled the numbers with Mr. Ullman in February, reconfirming them for assurance (Wiseman Decl. ¶¶ 22-24). While Mr. Wiseman was not surprised that plaintiff, as part of a big public corporation, would want some confirmatory paperwork, Mr. Wiseman viewed the Amendment document as just that (Wiseman Decl. ¶ 24).[6] Mr. Ullman's comments in April and in subsequent months confirmed this assessment of the document (Wiseman Decl. ¶¶ 33-34, 36; Segal Decl. ¶¶ 14-16).

At the prodding of Barry Segal, Mr. Wiseman periodically checked in with Mr. Ullman about the status of the paperwork. Mr. Ullman offered various explanations for the delay in returning a copy, including the death of a colleague, but he repeatedly promised that the document would be signed and returned. He reassured Mr. Wiseman that there was no reason to worry, using words like "we have our deal done" and calling the process "no problem" (id.).[7]

Secure in the belief that its future with Phat Fashions was settled, the Tyfoon Group extended the lease on its Montreal "Phat Farm" store, devoted exclusively to Phat Fashion products and kept in existence primarily because Mr. Simmons had wanted a branded store in Canada (Wiseman Decl. ¶ 10; Segal Decl. ¶ 2). Tyfoon employees remained devoted to developing and marketing Phat label products throughout 2006 and did not search for alternate

---

[6] It should be noted that whatever the original License said about modifications and oral agreements (supra, note 3), this new document did not say it superseded oral agreements; this document did say it could be signed in counterparts (WX 1, ¶7), but it did not say continuation of the license would only take effect when a signed copy was delivered back to defendant (compare License ¶13); this document did not contain any language like, or any express reference to, License ¶17.

[7] In fact, in May 2007 Mr. Skinner, the Chief Executive of Kellwood, had instructed Mr. Ullman to put processing of Tornado's license document "on hold" (BX 9), and there it remained.

lines to market (such lines take years to develop into substantial business – as indeed had been the case with the Phat labels) (Segal Decl. ¶¶ 21-22).[8] Tyfoon continued to identify itself as "Phat Fashions Canada" at trade shows and to focus its marketing attention on retailers interested in carrying Phat products directed to "urban" markets (Wiseman Decl. ¶ 10).

        3.     <u>The Repudiation</u>

In December 2006 Mr. Ullman had promised Mr. Wiseman that the outstanding paperwork would be taken care of by the time of an important trade show in later February 2007 (Wiseman Decl. ¶ 36; Segal Decl. ¶ 16) (these trade shows are known as MAGIC and held semi-annually in Las Vegas (Wiseman Decl. ¶¶ 20-21)).  Out of nowhere, and to the astonishment of Mr. Wiseman, shortly before that show a clearly embarrassed Mr. Ullman told Mr. Wiseman on the telephone that Kellwood (the parent corporation owning Phat Fashions) was negotiating with a Canadian company about that company opening 20 or more stores in the U.S., that the Canadian company wanted the Phat distribution rights for Canada "as a perk," and that such a deal was being considered, although no decision had been made (Wiseman Decl. ¶ 37).

Rather than immediately start a "fight" and risk what had been a long term, positive working relationship, Mr. Wiseman spent several weeks trying to convince and cajole Mr. Ullman into recognizing that Phat Fashions should not take this course (Wiseman Decl. ¶¶ 38-40).  After a series of telephone discussions in March 2006, Mr. Wiseman concluded that he had been misled and that no one was listening to his arguments about why Phat Fashions would be better served by his companies.  He decided that the future of the family's business required that he insists on its legal rights, however much he did not want to "go to war" with a large public corporation (<u>id</u>., ¶¶ 41-43).  After consulting with counsel, defendant sent a letter

---

[8] All the staff (including those operating Tornado and VIS) were employed and paid by Tyfoon International as the management company for the various operating entities (Segal Decl. ¶ 7).

exercising its agreed rights to continue as licensee for the next three years after the end of 2007 (id., ¶ 44; WX 8).

The lawyers for Phat Fashions responded with a truly amazing letter (WX 9) which first asserted that there was no new license because Tornado had never sent back a signed copy. This was an astonishing position: the copy certainly had been sent back to the lawyers (SX 4), and there had been numerous discussions about it with Mr. Ullman.[9] The lawyers' letter also asserted that there was no binding agreement because Phat Fashions had not signed the Amendment and the original License required a signed writing for amendments. The letter then baldly asserted that "Licensor has, most assuredly, **not** signed the proposed Amendment" (emphasis in original). In fact, although then not known to defendant, Mr. Simmons (the Chief Executive of Phat Fashions) had signed the Amendment (Beha Decl. ¶ 4; BX 5, 6).[10]

Apparently the truth was Mr. Ullman, the person who had made the very deal that the Amendment document reflected, had been sitting on the document since some time in May 2007 at the instruction of the head of the parent company (BX 9), doing so while placing the blame on others whenever he spoke to Mr. Wiseman – even blaming the delay on the suicide of a colleague.

---

[9] Plaintiff no longer makes this argument. Compare Complaint ¶12, acknowledging such receipt. Because the signed document remained at plaintiff's offices, it is instructive to compare License ¶13 which provides (as to the original license grant) "the license shall become effective only upon the execution thereof by Licensor and delivery to Licensee" (emphasis added) with License ¶17 which allows extensions or modifications "by a writing signed by both parties" and makes no mention of delivery.

[10] Until this document was produced in discovery in very late October 2007 defendant's counsel was unaware of it – and given the legal positions taken, so too, we suspect, was plaintiff's counsel (compare 9/12/2007 Joint Submission at page 4: "Tornado is attempting to unilaterally extend the Agreement without the benefit of a writing signed by Phat Fashions"). Until that document was discovered defendant recognized that it had very much an uphill battle in enforcing the agreement defendant was convinced had been reached. However, discovery of that document in late October plus Mr. Ullman's deposition at the start of November sufficiently changed the calculus for obtaining preliminary injunctive relief (which Tornado had already warned plaintiff it might seek, see 9/12/2007 Joint Submission at page 7) that defendant informed plaintiff and then the Court that it was ready to move for such relief. Defendant has not delayed in applying for preliminary injunctive relief – what delayed that application were plaintiff's repeated denials that such a document existed (see both 9/12/2007 Joint Submission at page 4 and the earlier letter of plaintiff's counsel (WX 9)).

Shortly after the parties' lawyers exchanged some additional letters, plaintiff commenced this declaratory judgment action; defendant counterclaimed for anticipatory breach of contract and for a declaratory judgment enforcing the license as extended by the parties.

4.    The Damage Threatened and Done

The parties to the License were well aware that brands can develop unique niches and that the rights conferred by the License were difficult to quantify but potentially of great importance to each others' business.[11] They expressly provided in Paragraph 21 of the License:

> Licensor and Licensee acknowledge that their performance and obligations hereunder are unique, of extraordinary value, and that a material breach by either such party of any material obligation hereunder will cause the other party irreparable damage which cannot be compensated with money only.

In recent months the period for "booking" products for delivery in 2008 has been under way and Tornado (and VIS) have been unable to book Phat-label business going forward (Wiseman Decl. ¶ 48). The "new suitor," Algo Corporation, has been taking orders for Phat-label products, and Algo has lured away three Tyfoon Group employees who had worked on these lines – and has tried to hire two additional top-level employees whose work has been focused almost entirely with Phat Fashion products (Segal Decl. ¶ 20). As "bookings" turn into sales in 2008, defendant faces a catastrophic loss of revenues (id., ¶ 22).

While the Tyfoon Group has been trying to pursue alternative lines, it so far has made only a few connections, and these cannot be expected to make up for more than a small portion of Phat revenues in the immediate years to come (Segal Decl. ¶¶ 24-25).

The extent and variety of the injury with which defendant is threatened is described in the accompanying declarations and in the Argument below (infra, pp. 22-24). In

---

[11] At a hearing or trial on this matter defendant anticipate calling Mr. Ullman, plaintiff's President, to testify about the Phat Farm and Baby Phat brands and their market position.

sum, with 55-60% of the business of the Tyfoon Group (and essentially 100% of the business of Tornado and VIS) about to be lost, with reputation being damaged and customer good will at risk, and without the high-profile brands that brought retailers "in the door," the Wiseman family's business is in danger of collapse and financial devastation, and defendant and the rest of the Tyfoon Group truly face "irreparable injury" that can only be prevented by injunctive relief.

## **Standard for Relief**

Defendant is seeking what is in large measure a mandatory injunction, and to obtain such relief in a preliminary injunction context a party must show (i) a "clear" or "substantial" likelihood of success on the merits and (ii) the real threat of irreparable injury absent an injunction. See Tom Doherty Assocs. v. Saban Entertainment, Inc., 60 F.3d 27, 33-35 (2d Cir. 1995). Where unique goods and licenses are involved, mandatory preliminary relief is appropriate when the case shows substantial merit. See, e.g., Roso-Lino Beverage Distrib., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124 (2d Cir. 1984); Givenchy S.A. v. William Stuart Indus., 1986 WL 3358 (S.D.N.Y. Mar. 10, 1986) (Leisure, J.); cases cited infra, page 21. See generally 11A Wright, Miller & Kane Federal Practice and Procedure § 2948.2 (2007) (on sufficient facts, "mandatory injunctions seem to be granted readily").

Defendant is prepared to meet this standard at a preliminary injunction hearing, but given the circumstances and the nature of the relief sought defendant urges the Court to take the step of consolidating that hearing with trial of this nonjury case on the merits (other than as to damages), Fed. R. Civ. P. 65(a)(2). See 11A Wright, Miller & Kane, Federal Practice & Procedure §2950 (2007) ("several advantages in addition to eliminating unnecessary delay").[12]

---

[12] On November 26, 2007, defendant's counsel told plaintiff's counsel that defendant would be making this suggestion to the Court. The parties had previously informed the Court that the case was to be tried without a jury (see, 9/12/07 Joint Submission at page 7.); cf. License ¶ 23 (jury trial waived in favor of trial "before a court").

Indeed, since the key witnesses to the agreement at issue here have all been deposed and will be available at the preliminary injunction hearing, and since Mr. Simmons' signing of the Amendment document as C.E.O. of Phat Fashions is not disputed, this is precisely the sort of case where such a step is warranted. Cf. Advisory Committee Notes to 1960 Amendments to Rule 65(a)(2) ("the authority can be exercised with particular profit when it appears that a substantial part of the evidence offered on the application will be relevant to the merits . . .").

## Argument

### POINT I

### DEFENDANT WILL PREVAIL ON THE MERITS, ESTABLISHING AN ENFORCEABLE AGREEMENT TO EXTEND ITS PHAT FASHIONS LICENSE AS PREVIOUSLY MODIFIED BY THE PARTIES.

1.    The Parties Reached an Oral Agreement.

In New York parties are bound by their "expressed intentions, the word and acts which constitute objective signs in a given set of circumstances," R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984) (parties may expressly insist their oral discussions will have no effect without a final signed legal document, but this is not required and "expressed intent" is what governs).[13] As the treatise puts it, "the law of contract is concerned with the parties' objective intent . . . the law accords to individuals an intention that corresponds with the reasonable meaning of their words and conduct," 1 Williston on Contracts § 3:5 (4th ed.).[14]

---

[13] Unspoken reservations and "secret intentions" are not part of the objective bargain. Rule v. Brine, 85 F.3d 1002, 1014 (2d Cir. 1996) (plaintiff's "belief . . . would not result in the contract he contends existed if that belief was an unexpressed secret intention").

[14] Hence, if the parties reach a complete agreement orally but intend that there later will be a written memorial of their agreement "the contract is effective at the time the oral agreement is made, although the contract is never reduced to writing and signed." Church of God v. Fourth Church of Christ, Scientist, 76 A.D.2d 712, 715, 431 N.Y.S.2d 834, 837 (2d Dep't 1980) (agreement approved at church meeting but not signed was valid); V'Soske v. Barwick, 404 F.2d 495, 499 (2d Cir. 1968) ("mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event."). Cf. Municipal Consultants & Publishers, Inc. v. Town of Ramapo, 47 N.Y. 2d 144, 149, 417 N.Y.S.2d 218, 220 (1979) (contract authorized by town was binding even though Town Supervisor changed his mind and never signed it).

Mr. Wiseman's Declaration contains, and he would provide at any hearing or trial, a clear and credible history of the decade-long relationship of the parties, of their periodic oral modifications of the literal terms of the License and of the manner in which he and Mr. Ullman, the President of plaintiff, worked through and reached full agreement on a post-2007 extension of the License on revised financial terms, saying that they had concluded a "deal." Mr. Segal is able to confirm that on several subsequent occasions he was present when Mr. Ullman told Mr. Wiseman that they had achieved a "done deal."

Over the course of the two days of depositions Mr. Ullman conceded that he had discussed extension of the License with Mr. Wiseman on several occasions and that "minimums" had been discussed. Otherwise, although Tornado and VIS were among the largest sources of his company's royalty revenues, at every turn Mr. Ullman retreated to an unconvincing series of "I don't recall" answers about his conversations with Mr. Wiseman (see pages 62-67, 73-75, 78-82, 87-89, and 159-60 of Mr. Ullman's deposition [BX 1]. One example of the double-talk to be expected from Mr. Ullman at trial is this response to a question about his initial discussions with Mr. Wiseman about extending the License, recorded at page 62 of his deposition transcript:

> . . . I simply engaged in what I thought was prudent dialogue with
> Mr. Wiseman to advance our conversation without necessarily
> taking complete ownership of the circumstances at the time.

The extent of Mr. Ullman's constant failures of recollection (both about his negotiations with Mr. Wiseman and about his subsequent reassurances) are well illustrated by the excerpts from pages 78-81 and 87-89 of his deposition which accompany this Memorandum as an Appendix.

Any attempt by Mr. Ullman to deny that, judging his objective conduct, he reached a full and binding agreement with Mr. Wiseman simply will not be credible.

In addition to the clear trail to what happened that will be provided by defendant's witnesses, it will also be apparent from documentary evidence at trial that the financial terms in

the Amendment document (WX 7) carry forward those in the March 1, 2007 letter sent by Mr.

Wiseman (WX 5).[15] Defendant will also be able to introduce documents from plaintiff's files

that distinguish the Tornado license document from other license renewals still in "negotiation."

(BX 8). Finally, as already noted defendant will be able to introduce an original of the

Amendment document signed by the Chief Executive Officer of plaintiff (actually, like Mr.

Wiseman, Mr. Simmons signed two originals [see BX 5-6]).

Thus, the credible evidence will clearly establish that plaintiff and defendant,

consistent with prior practice about modifications, reached a complete oral agreement on the

terms of an extension, and that, while it was to be expected that some paperwork would be

prepared for the files, their oral agreement was not contingent on such paperwork or its signing.[16]

Defendant next turns to the enforceability of such oral agreement given License ¶ 17 and the

New York Statute of Frauds,[17] but the existence of that agreement will be clearly established by

the weight of the credible evidence.

    2.    Under New York's G.O.L. § 15-301(1) the Oral Agreement is Effective
                Notwithstanding License ¶ 17.

The general rule of contract law is that parties are free to contract orally as well as

in writing so long as their agreement, however expressed, contains the essential terms of their

contract. See, e.g., Dzek v. Desco Vitroglaze of Schenectady Inc., 285 A.D.2d 926, 727

N.Y.S.2d 814 (3d Dep't 2001) (oral agreement); Brown Bros. Elec. Contractors, Inc. v. Beam

---

[15] Recalling that royalties are 7% of sales, the minimum royalty figures in WX 5 (which match WX 7) arithmetically also result in the minimum sales figures in WX 7.

[16] New York law clearly recognizes the distinction between an understanding that is expressly conditioned on a later formal document and an oral agreement which is intended to be memorialized. See supra note 16. The evidence will be clear that no reservation about requiring a formal Amendment was ever expressed by Mr. Ullman and that neither party mentioned License ¶ 17. While reference may have made to "lawyers" or to some document, nothing was said about the agreement being conditioned on having that written record. Moreover, the Amendment later sent conveys no such message: unlike the earlier License it has no mention of superseding prior oral agreements (compare License ¶ 17 and WX ¶ 7).

[17] The License and the Amendment document both call for application of New York law.

Construction Corp., 41 N.Y.2d 397, 399-40, 393 N.Y.S.2d 350, 352 (1977) (applying "objective"
standard to oral statements and course of conduct).  However, many written contracts do add a
provision like License ¶ 17 in an effort to control later oral changes; the effect given to such
clauses if the principals nonetheless later do make oral agreements of sufficient specificity varies
from state to state.[18]  New York's G.O.L. §15-301(1) directly sets the rule for this case:

> A written agreement or other written instrument which contains a
> provision to the effect that it cannot be changed orally, cannot be
> changed by an executory agreement unless such executory
> agreement is in writing and signed by the party against whom
> enforcement of the change is sought or by his agent.

While this rule is subject to equitable exceptions (infra, pages 18-20), it essentially adopts a
modified version of the common law standard of the statute of frauds, that enforcement of certain
oral agreements depends on proof of a "memorandum signed by the party to be charged."[19]

Such a memorandum plainly exists here in the form of the Amendment document
signed by the Phat Fashions Chief Executive (BX 5).  This document contains all the essential
elements of the prior oral agreement.  Indeed, the evidence will show that the document was sent
to Mr. Ullman at least twice before it was signed by Mr. Simmons, and that no changes to were
made (see BX 3, 4 (copy to Mr. Ullman)).  As noted, the cases under G.O.L. § 15-301(1) do
require a signed "writing," but they do not require a full, complete contract document.

---

[18] Thus in Connecticut a contract with such a provision can still be amended orally if that is what the parties intend.
See Blakeslee v. Board of Water Comm'rs, 121 Conn. 163, 182 A. 887, 894-95 (1936).

[19] The relatively few cases applying G.O.L. § 15-301 to circumstances where some form of a "writing" does exist
apply the general statute of frauds analysis but require "more than a simple note or memorandum," although a full-
blown legal document is still not necessary; these cases also give more emphasis to the requirement that the
document be signed.  See Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 121 (2d Cir. 1998); DFI
Communications, Inc. v. Greenberg, 41 N.Y.2d 602, 606-7, 394 N.Y.S.2d 586, 589-90 (1977) (section "should not
be read to require an amendatory writing prepared and executed in precisely the same manner as the original," so
long as the writing is "signed" and reflects the intended amendment).  Compare Bellen v. Weiser, 2007 WL
2979827 (S.D.N.Y. Oct. 11, 2007) (Leisure, J.) (Statute of Frauds requirements are: (i) the memorandum is signed
by the party to be charged; (ii) it designates the parties; (iii) it identifies and describes the subject matter; and (iv) it
embodies all the essential terms).

Nonetheless, in this case we have exactly what G.O.L. § 15-301(1) describes:  an agreement that "is in writing and signed by the party against whom enforcement of the change is sought."

This case might be analogized to <u>Transit Advertisers, Inc. v. New York, New Haven & Hartford R.R. Co.</u>, 194 F.2d 987 (2d Cir. 1952), although that case involved only the more general Statute of Frauds (G.O.L. § 5-701).  There the evidence showed that the parties orally agreed to renew their existing written contract for a five-year term.  Defendant's lawyers were then instructed to put the agreement in writing.  After some changes to drafts, plaintiff's president signed two copies of the document and sent them back.  A vice president at defendant then also signed the extension agreement, but soon was told to cross out his signature and not to send the document on, because new management did not want a five-year contract.  The cross-out was made, and the document was filed away.  The Second Circuit affirmed a verdict for plaintiff, concluding that despite the cross-out the agreement satisfied the Statute of Frauds ("As soon as he did sign under such circumstances, written evidence of the oral contract came into existence which took the contract out of the Statute of Frauds").  194 F.2d at 910.[20]

The Second Circuit directly addressed the potential significance of the fact that the document was filed away, rather than delivered to plaintiff, and concluded that "non-delivery does not affect the probative value of the signed memorandum to satisfy the Statute of Frauds":

> Delivery of the signed memorandum is not necessary to make it effective as evidence of the previous oral contract unless, by its terms, the oral contract is not to be consummated until a memorandum has been delivered.  (<u>Id</u>.)

---

[20] The Statute of Frauds had to be satisfied for the oral agreement to be enforceable in <u>Transit Advertisers</u> because the agreement's term exceeded one year.  G.O.L. § 5-701(a)(1).  That is also the case here.  In practice the requirements of G.O.L. § 5-701 and G.O.L. § 15-301(1) appears to be quite similar but, as stated above (note 21, <u>supra</u>), something more than a "note" and something definitely "signed" are required under the latter.  In this case the document signed by Mr. Simmons appears to satisfy even the most literal reading of G.O.L. § 15-301(1).

3.   Were a "Writing Signed by Both Parties" Required Exactly as License ¶ 17 Provides, the Short Answer is that it Exists.

While defendant does contend that an enforceable oral agreement was reached, defendant also submits, in the alternative, that the Amendment document itself became an enforceable "extension" within the meaning of License ¶ 17 when, having already been signed by defendant, that document was signed by Mr. Simmons in early April 2006.

Plaintiff has made much of the arguments that the Amendment document had space for a second signature from Phat Fashions, and that the document was not delivered back to Tornado. But License ¶ 17 simply does not make <u>any</u> of this a <u>condition</u> to a valid extension agreement. License ¶ 17 requires a writing (which was prepared) that is signed by both parties (Tornado signed, and we now know that Mr. Simmons did too). Neither the License nor the Amendment document says that two signatures are <u>required</u> for Phat Fashions (although there is room for two on the latter). Neither document says that any signature by a Phat Fashions senior executive must thereafter also be approved by someone at the parent company. If a second signature were required, however, it would only be equitable to give effect to the repeated promises of Mr. Ullman, the President of the company and the man who reached agreement with defendant, that the document <u>would</u> be signed. Every muscle of the same equity principles discussed in the next section of this Memorandum would support the conclusion that, given what Mr. Ullman said and did, plaintiff should be estopped from relying on the absence of Mr. Ullman's own signature as President!

Plaintiff's lawyers drafted the License, and plaintiff's lawyers drafted the Amendment document. We see no unfairness to plaintiff in holding plaintiff to the literal terms of its documents, especially when plaintiff's position hinges on these same literal terms. In that regard, we again note plaintiff's argument that delivery of the document back to Tornado was a

condition to its effectiveness. Neither the Amendment document nor License ¶ 17 contain such a

requirement. Although License ¶ 13 <u>did</u> require delivery of the 1998 License Agreement before

the license <u>initially</u> became effective, no such requirement is posited for extensions or

modifications in License ¶ 17, and nothing to such effect is contained within the Amendment

document.

       4.     <u>Equitable Estoppel Would Also Apply, Because Plaintiff's Conduct and Defendant's Reliance Estopps Plaintiff from Invoking License ¶ 17.</u>

      New York law applies the doctrines of equitable and promissory estoppel to

protect the interests of a party that has been induced to rely on the assurances of the other party.

<u>Towers Charter & Marine Corp. v. Cadillac Ins. Co.</u>, 894 F.2d 516, 522 (2d Cir. 1990) (noting

that "when one party has induced the other party to rely on an oral modification, the first party

may be equitably estopped from invoking the requirement that any modification be in

writing").[21] Given the credible evidence of the series of statements made by Mr. Ullman <u>before</u>

<u>and after</u> he and Mr. Wiseman reached agreement on an extension, such equitable principles

should bar plaintiff from invoking License ¶ 17 at all.

      Mr. Ullman was happy with defendant's performance and felt that defendant had

performed well in Canada (Wiseman Decl. ¶ 12). Mr. Ullman would have had no desire to have

defendant pursuing alternative lines of business until, and unless, plaintiff had decided to

"dump" defendant for a new suitor. Rather than telling Mr. Wiseman that his documents had

been put "on hold" as early as May 2006, rather than tell him he had competition for the license

---

[21]  <u>See also</u> <u>Rose v. Spa Realty Assoc.</u>, 42 N.Y.2d 338, 349, 397 N.Y.S.2d 922, 927 (1977) ("Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute [N.Y. Gen. Obl. Law §15-301] to bar proof of that oral modification"); <u>Readco, Inc. v. Marine Midland Bank</u>, 81 F.3d 295, 301-02 (2d Cir. 1996) (promissory estoppel can apply where plaintiff has proved "a clear and unambiguous promise").

(or even provide an inkling that the extension had come under a cloud), Mr. Ullman kept up a series of reassuring responses and repeated promises that misrepresented the situation within Phat Fashions. Mr. Ullman did not break the news until almost a year after he had concluded his negotiations with Mr. Wiseman with a handshake on a "done" deal. He finally changed his lullaby tune only when the first major industry trade show for 2007 was about to start (Wiseman Decl. ¶ 37), no doubt realizing he could put Mr. Wiseman off no longer when his company began to preview plans for 2008 with its distributors.

Application of principles equitable estoppel require evidence that a party was induced to rely on the oral statements, and there is evidence aplenty of that here. While Mr. Ullman kept defendant's written agreement "on hold" internally and negotiated with others, defendant's management was building its future around Mr. Ullman's commitment (Wiseman Decl. ¶ 54; Segal Decl. ¶¶ 19, 21-22).

There are obvious steps that a licensee-distributor would take to prepare for a new future if it believed its existing license was coming to an end. Instead of taking these steps, Tyfoon Group management and staff continued to work throughout 2006 on building their future with Phat-labels (and, not incidentally, on maximizing royalty revenues for Mr. Ullman's company) (id.). The lease for the Montreal Phat Farm store was extended, plainly in reliance on a future Phat Fashions relationship (Segal Decl. ¶ 19; SX 6, 7), and no effort was made to reposition the Tyfoon Group's image as "Phat Farm Canada," because defendant fully, and reasonably, expected to continue in that role (Wiseman Decl. ¶ 52).

POINT II

DEFENDANT IS THREATENED WITH, AND IS
ALREADY SUFFERING, IRREPARABLE INJURY.

Plaintiff has refused to allow defendant to continue to use its licensed labels for products to be shipped in 2008, and hence defendant is unable to order goods from the various licensees and manufacturers which make and distribute the Phat Farm and Baby Phat product lines that had previously fallen within the License (as orally modified over time). Defendant is unable to "show" or offer Phat-label goods to its customers or to "book" orders for 2008 delivery. Moreover, it appears that plaintiff has entered into a Canadian licensing agreement with Algo Corporation. Plaintiff apparently closed this new arrangement only <u>after</u> (i) plaintiff had commenced this declaratory judgment action acknowledging the existence of a dispute, (ii) defendant had counterclaimed seeking a specific enforcement of its extension, and (iii) defendant had expressly warned that it contemplated making a motion for a preliminary injunction (9/12/2007 Joint Submission at 7).[22]

Algo has approached a number of defendant's employees (and has already snared three who marketed Phat lines for defendant) (Segal Decl. ¶ 20); it is Algo (not defendant) that has the samples for 2008 Phat-label merchandise; and Algo has begun booking orders with defendant's existing customers for Phat-label product lines to be delivered in 2008.

An imminent threat of "irreparable injury" is a prerequisite to preliminary injunctive relief, and such threat is certainly present here.

---

[22] The License Agreement (BX 11) for Algo obtained in discovery is dated "as of" May 23, 2007, but a transmittal letter (BX 12) establishes (and plaintiff's counsel will stipulate (Beha Decl. ¶ 6(b)) that the transaction was not closed until late September 2007. (Because plaintiff has classified the Algo License Agreement as highly confidential, it is not being submitted with these motion papers, but will be available at trial.) While plaintiff may have to answer to Algo for actions it took with full knowledge of defendant's claims and the risks involved, plaintiff could not validly give Algo what was already granted to another, and it cannot thereby avoid its obligation to defendant.

In the first place, while some of the damage defendant will soon suffer is financial in nature (the loss of millions of dollars of gross revenue, overhead support and net income), such financial damage is a basis for injunctive relief where (a) survival of a business is threatened or (b) calculation of such damages is difficult because they depend on future events. See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970) (termination threatened to "obliterate" family auto dealership); Roso-Lino, 749 F.2d at 125-26 (on-going business built over many years threatened); Travelers Int'l AG v. Transworld Airlines, Inc., 684 F. Supp. 1206, 1216 (S.D.N.Y. 1988) (Sweet, J.) (loss of a business constitutes irreparable injury); Givenchy S.A., supra page 11 (same); Janmort Leasing, Inc. v. Econo-Car Int'l, Inc., 475 F. Supp. 1282, 1294-98 (E.D.N.Y. 1979) (Neaher, J.) ("firmly settled that loss or destruction of going business constitutes irreparable harm").[23]

This case is very different from that of the software distributor considered by this Court a few months ago. Helios & Matheson North America, Inc. v. Vegasoft OY, 2007 WL 1541204 (S.D.N.Y. May 24, 2007) (Crotty, J.) ("Helios"). There the lost revenues were a "tiny fraction of . . . total revenue" for Helios, and "the Vegasoft contribution to Helios' bottom line is still very small." The loss did not "threaten Helios' existence as a business." Here, Tornado and VIS are themselves totally dependent on Phat-label business, but even if one focuses on the full range of the Weisman family's wholesale business, the Tyfoon Group, it is apparent that the Phat-label business has been around 55-60% of the Group's business in recent years and that,

---

[23] The Second Circuit has also made the point that damages that may accrue over a period of time and which depend on the efforts of others and on other events may prove difficult to quantify and hence require that injunctive relief be imposed. Cf. Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) ("it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that could produce an indeterminate amount of business in years to come"). How is defendant to know now what Phat-label products will be available in years to come and how much demand retailers (and consumers) will have? Only performance of the contract will answer that question with assurance. As the Second Circuit had said in Doherty, injunctive relief must be available "to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at trial on the merits with the rule that damages must be based on more than speculation." 60 F.3d at 38.

because of its higher margins as a distinct brand for a distinct market, such business is the

dominant support of the group's profitability. Loss of this business puts the family's entire

business group in peril, because the revenue to support staff and operations will dry up.

(Wiseman Decl. ¶¶ 54, 57; Segal Decl. ¶¶ 7, 25).

       The "governing principle" as to when injunction relief is appropriate in these

cases was stated by the Second Circuit as follows in <u>Doherty</u>:

> Where the availability of a product is essential to the life of the
> business *or* increases business of the plaintiff beyond sales of that
> product-for example, by attracting customers who make purchases
> of other goods while buying the product in question, the damages
> caused by loss of the product will be far more difficult to quantify
> than where sales of one of many products is the sole loss. In such
> cases, injunctive relief is appropriate.

<u>Doherty</u>, 60 F.3d at 38 (italics in original). Defendant's predicament meets both legs of this test.

       The Phat Farm and Baby Phat labels are well recognized and directed to specific

market niches (Wiseman Decl. ¶ 7). Customers do not need to "replace" their Phat-label lines

merely because defendant is no longer the licensee – they can now get the product lines from the

Algo entity. While defendant can try to reinvent its business, it as yet has no access to well-

known competitive lines that would fill the same niche (<u>id.</u>, ¶¶ 48-49), and, in effect, defendant

must compete against the very brand loyalty <u>defendant</u> has helped to build over the past years

(<u>id.</u>). Compounding the situation, defendant has lost the valuable ability to use these high profile

brands to attract retailers which, once "in the door," would consider other Tyfoon Group

merchandise as well. (Wiseman Decl. ¶¶ 52-53). <u>Cf</u>. <u>Supermarket Services, Inc. v. Hartz</u>

<u>Mountain Corp.</u>, 382 F.Supp. 1248, 1256 (E.D.N.Y. 1974) (Werker, J.) (brand loyalty among

retailers and importance of brand presence for attracting other sales both are evidence of

irreparable injury). Essentially defendant not only must "start from scratch" in finding product

lines to interest retailers – and it may take years before any such product line catches on, if it

22

does (Wiseman Decl. ¶ 50; Segal Decl. ¶¶ 21-23).

Defendant has already lost part of one "booking" season, for early 2008 deliveries, but some sales for that period likely could still be made (Wiseman Decl. ¶ 51). If defendant also loses the next Phat-label sales cycle, however, the financial impact for 2008 will be disastrous, the long-developed relationships with retailers founded on Tyfoon's showcasing of its Phat lines will be lost, and the valuable brand identity of defendant with Phat Fashions will have been shattered (Wiseman Decl., ¶¶ 48-57; Segal Decl., ¶¶ 19-25). Defendant Tornado will likely be out of business, the equity held by family members and long-time employees will be eradicated, and the Tyfoon Group, as a family company, will be in financial peril (id.).

The elements of the current and prospective injury faced by defendant are discussed in detail in the accompanying declarations and only briefly summarized here:

- The loss of 55-60% of the group's business base will be crippling to profits, to overhead, and to market presence.

- Defendant has lost the high profile label, which was the entry "hook" for getting retailers "in the door" to consider other product lines.

- Tyfoon is facing the necessity of attempting to sell or lease out a very substantial portion of the corporate headquarters that served all the companies, including defendant Tornado and VIS, and will either have to cut staff (which makes it harder to rebuild the business) or incur substantial financial losses.

- Because defendant and its affiliated companies have built the Phat-label business over a decade and have so closely allied their marketing to retailers to that label, defendant is losing retailer good will by being unable to "book" the Phat-label business the retailers want.

- The Tyfoon Group is even committed to a lease on a store for which it has no real use – and "Phat Farm" has now been removed from the store name; the store, intended as a flagship for defendant's merchandising of Phat-label products, has lost the merchandise it was designed to showcase.

- Mr. Wiseman and his sales staff are in the difficult position of explaining to retailers and to potential suppliers <u>why</u> after years as "Phat Fashion Canada" they have lost the line for which they were predominately known.

These parties acknowledged from the outset that their "performance and obligations hereunder are unique, of extraordinary value" and that "a material breach by either such party of any mutual obligation hereunder will cause the other such party irreparable damage which cannot be compensated with money only" (License ¶ 21). The uniqueness of the line as it gained market recognition, the special character of those markets, the long-term relationship-building implied by a long-term license and then a long-term renewal – these are all the sorts of factors the parties considered in committing to each other in 1997-98, and again in 2006. While their stipulation is of course not binding on the Court (and for that reason substantial evidence of irreparable injury has been presented) it is an admission by plaintiff, and a final "factor" to weigh in Tornado's favor.[24] At the very least, this admission should preclude plaintiff from arguing now that its attempt to walk away from its President's agreement to extend defendant's license is not threatening "irreparable injury" to defendant.

---

[24] See North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm on basis of both contractual provision and impossibility of measuring harm in monetary terms); Ticor Title, 173 F.3d at 68-69 (finding irreparable harm on basis of both contractual provision [which "might arguably be viewed as an admission"] and difficulty in calculating monetary damages).

### Conclusion

Pending further order of this Court plaintiff should be ordered to do business with defendant on the same terms and conditions, and following the same practices with respect to defendant's dealings with suppliers of Phat-label merchandise, as prevailed under the existing License as orally modified by the parties, entering the injunctive relief set out in Exhibit A to the Notice of Motion.

Defendant respectfully suggests that once the Court has concluded that defendant is entitled to injunctive relief it permit the parties a very brief adjournment of the hearing (or trial) to attempt jointly to construct the elements of an appropriate injunction. Failing such agreement, the hearing (or trial) can resume.

Dated: New York, New York
      November 30, 2007

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP

By: _____
    James A. Beha II (JB-9591)
    Cornelius P. McCarthy (CM-3544)
    Ronald Busloff (RB-1791)

    111 Broadway, 20th Floor
    New York, New York 10006
    (212) 571-0550

    *Attorneys for Defendant*

Of Counsel:

Adam H. Offenhartz (AO-0952)
Gibson, Dunn & Crutcher
200 Park Avenue
New York, New York 10166
(212) 351-4000

25

**Appendix**

Selected passages from the deposition of Bernt Ullman (transcript pages are Exhibit 1 to the Beha Declaration):

Q.   Do you recall generally having discussions with Mr. Wiseman or anyone else from Tornado about an amendment?

A.   I don't recall having conversations with anyone but Issie.  I do recall having some conversations with Issie; I don't specifically recall the line of detail.

[Ullman Dep. p. 78, l. 19-25]

                    *                *                *

A.   I do recall having some conversations, but I can't materially recall any type of detail.  I really cannot.

[Ullman Dep. p. 81, l. 5-8]

                    *                *                *

Q.   Did you discuss the amendment?
A.   I would say it's likely.

Q.   What did you discuss about the amendment?
     MR. HOFFMAN:  Objection to the form on "amendment."
     It is what it is.
A.   I truly cannot recall specific details.  If you ask specific questions, I'm happy to try, to the best of my ability, to answer.

[Ullman Dep. p. 81, l. 14-24]

                    *                *                *

Q.   Let me ask it another way:  Did you have any discussions with Mr. Wiseman from March of '06 through December of '06, other than the one you described dealing with the Baby Phat licensee issue?
A.   Yes, I believe so.

Q.   How many would you say you had?

26

A.      At least a few.

Q.      A few being three to five, four to six, five to seven?

A.      Two to four; something like that.

Q.      Those two to four conversations are the ones you have no general recollection of?

A.      Correct.

Q.      Mr. Ullman, do you recall Mr. Wiseman reaching out to you at any time from March of 2006 through February of 2007 and asking you where things were regarding the amendment to the license agreement?

A.      I don't recall the exact wording. I do recall having conversations. I mean, I do recall him reaching out to me and inquiring, in general, the status maybe.

Q.      How many of those conversations do you recall taking place?

A.      I don't recall an exact number. I'm thinking it's a few conversations.

Q.      Three to five, two to four?

A.      Two, three.

Q.      Do you recall when these conversations were?

A.      No.

Q.      Do you recall, generally, what was discussed?

A.      I do recall speaking to Mr. Wiseman; I don't recall specifically or generally.

[Ullman Dep. p. 87, l. 25 – 89, l. 16].