UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

PHAT FASHIONS LLC,                                    :        07 Civ. 03278 (PAC)

                                    Plaintiff,        :        **DECLARATION OF**
                                                               **PHILIP R. HOFFMAN**
        - against -                                   :        **IN OPPOSITION TO**
                                                               **DEFENDANT'S MOTION**
TORNADO IMPORTS (CANADA), INC.,                       :        **FOR A PRELIMINARY**
                                                               **INJUNCTION**
                                    Defendant.        :

-------------------------------------------------------------------------x

        PHILIP R. HOFFMAN, pursuant to 28 U.S.C. §1746, declares under penalty of perjury

as follows:

        1.      I am a member of the firm of Pryor Cashman LLP, attorneys for plaintiff Phat

Fashions LLC ("Phat Fashions"). I submit this declaration in opposition to the motion of

defendant Tornado Imports (Canada), Inc. ("Tornado") for a preliminary injunction pursuant to

Fed. R. Civ. P. 65(a). For the reasons set forth herein and in Phat Fashions' Memorandum of

Law in Opposition, Tornado's motion should be denied in its entirety.

        2.      The facts set forth herein are derived exclusively from: (a) documents produced

by the parties in discovery; (b) admissions made by Tornado at the depositions of President Issie

Wiseman ("Wiseman") on November 15-16, 2007 ("Wiseman dep.") and Vice President of Fi-

nance Barry Segal ("Segal") on November 20, 2007 ("Segal dep."), as well as in their November

30, 2007 declarations ("Wiseman dec." and "Segal dec."); (c) testimony given at their deposit-

ions by Phat Fashions President Bernt Ullmann ("Ullmann") on November 1-2, 2007 ("Ullmann

dep.") and outside counsel Eli Nathanson ("Nathanson") on November 8, 2007 ("Nathanson

dep."); and (d) admissions contained in Tornado's Amended Answer, Defenses, and Counter-

claims dated September 6, 2007 ("Answer"), the Pre-Conference Letter submitted to the Court

on September 12, 2007 ("Pre-Conference Letter"), Tornado's Initial Disclosures dated October

1, 2007, and its Memorandum of Law ("D.Mem.") dated November 30, 2007.   True and correct

copies of all exhibits referred to herein ("PX") are made a part hereof and are included in the

accompanying Plaintiff's Binder of Exhibits to Hoffman Declaration ("PX Binder"). [1]

     3.    By its Complaint dated April 24, 2007, Phat Fashions seeks a declaratory judg-

ment that the Trademark License Agreement ("Agreement") entered into between Phat Fashions

and Tornado on August 1, 1998 (PX 1) which provides that "[t]his Agreement can only be ex-

tended … by a writing signed by both parties," shall expire pursuant to its terms on December

31, 2007 and was not extended by a draft amendment which:  (a) was sent to Tornado by Phat

Fashions with a cover e-mail reserving its right to modify it; (b) specifically stated that it was to

be "executed and delivered" and contained two signature lines for Phat Fashions and one for

Tornado; (c) although a draft, was nevertheless signed by Tornado and delivered to Phat Fash-

ions; (d) was subsequently signed by only one of the Phat Fashions officers whose signatures are

necessary to bind the company; and (e) was never delivered by Phat Fashions to Tornado.

**A.    The Tyfoon Group, Which Consists Of Fourteen (14) Different Active
Corporations, Is Not The "Mom & Pop" Business Which Defendant Suggests**

     4.    For over 25 years, Issie Wiseman has operated Tyfoon International, Inc.

("Tyfoon") and acted as the Chief Executive of the "group of related companies" known as the

"Tyfoon Group."  Although he seeks to portray himself as a naïve and trusting business person

who has been taken advantage of here, Wiseman has over 40 years experience in the "garment

---

[1] The PX Binder contains copies of the cited pages from the deposition transcripts of Wiseman (PX 52), Segal (PX 53), Ullmann (PX 54) and Nathanson (PX 55).  Copies of the Answer, Pre-Conference Letter and Initial Disclosures are included as PX 49, 50 and 51, respectively.  Wiseman and Segal both admit that they read the Answer and Tornado's section of the Pre-Conference Letter before they were served and approved of their contents.  (Wiseman dep. 60-61, 119-21; Segal dep. 31-32, 78-79).

business" as a successful distributor.  (Wiseman dec. ¶1; Wiseman dep. 8-11).

5.     Barry Segal, Wiseman's right-hand man, has been Vice President of Finance for Tyfoon (and each of the 19 companies under Tyfoon umbrella) for 24 years and prior to that was a C.P.A. at Richter, Usher, & Vineberg in Montreal, one of the largest accounting firms in Canada (and Tyfoon's accountants).  (Segal dec. ¶1; Segal dep. 6-9; Wiseman dep. 372).  Segal, although not an attorney, functions like an "in-house counsel" and is responsible for reviewing contracts for the Tyfoon Group.  (Segal dep. 109-10).  Wiseman admitted that Segal is responsible for getting things put into writing, i.e., "the way it operates in my business, you know, we agree on the numbers, I said, Barry, write it up, he does and that's it" and Segal's "job is to keep our finances and paperwork on track."  (Wiseman dep. 155; Wiseman dec. ¶31).

6.     Although Tornado in its moving papers goes to great lengths to make it appear that the Tyfoon Group is just a "family business" (Wiseman dec. ¶¶ 1, 13, 57; Segal dec. ¶1; D.Mem. 1-3, 5, 8, 11, 23), the group actually includes 15 different active corporations, all of which are in the garment industry and which had combined sales of $42.9 million in 2005:  (1) Tornado; (2) Modes Vis-a-Vis Fashions 1997, Inc. ("VIS"); (3) Via Satellite; (4) 2978130 Canada; (5) Modes Studio 1 Fashions; (6) 410765 Canada Inc.; (7) Dot.Com Style, Inc.; (8) Issie Fashions; (9) Basis Femmes, Inc.; (10) Catalyst Fashion; (11) 3892387 Canada Inc.; (12) Confreres; (13) Tour de Force; (14) Market Place Clothing; and (15) Incell Group.  (PX 48; Wiseman dep. 11-16; Segal dep. 9-10, 14-17, 22-23; Segal dec. ¶2).[2]  In addition, Tyfoon operates four separately incorporated retail stores which sell the many different lines of products distributed by the 15 different Tyfoon Group companies.  (Segal dec. ¶2).

---

[2] Wiseman explained that he has 19 different corporations because "if you incorporate a different corporation, there's some tax benefits for a low rate of tax for every different corporation."  (Wiseman dep. 13-14, 18).  Segal states that "[a]ll employees of the companies that comprise the Tyfoon Group are employed and paid by Tyfoon.  Costs are then allocated from Tyfoon to the various companies."  (Segal dec. ¶7, n. 4; Segal dep. 9].

7.        Wiseman admits that <u>Tornado and VIS</u>, both of which were formed in 1997, are <u>entirely separate companies</u> (Tornado sells menswear, VIS sells ladies' wear), which have separate financial statements and file separate tax returns.  (Wiseman dep. 16-19).  The caption of this case and the language of the Agreement (PX 1) make it clear that Phat Fashions and Tornado are the <u>only</u> two parties to this litigation and the Agreement.  The Answer (¶35) states that "[t]hese Counterclaims are asserted by Tornado against Phat Fashions under the Trademark License Agreement."  Wiseman admits that only "one of the companies in the Tyfoon Group," <u>i.e.</u>, Tornado, "holds the license from plaintiff Phat Fashions LLC, that this lawsuit is about" and is "the named defendant."  (Wiseman dec. ¶1; D.Mem. 3).  Segal concedes that "the License clearly was only in the name of Tornado."  (Segal dec. ¶4).

8.        Notwithstanding the above, <u>Tornado in this litigation and in its moving papers, and clearly for purposes of attempting to bolster its irreparable harm argument and to expand the scope of the license granted to Tornado, has sought to treat VIS as a party to both this litigation and the Agreement, when it clearly is not.</u>[3]  Thus, Wiseman throughout his declaration talks about instances where he claims that the Agreement was orally amended to allow Tornado to sell products which were either excluded or not mentioned in the Agreement, including a ladies' line of products known as "Baby Phat."  (Wiseman dec. ¶5).  Wiseman admits that the Tyfoon Group decided to use VIS, <u>i.e.</u>, "a different company within the Group," rather than Tornado to market these lines "because it was convenient for us to separate the mens and ladies lines between two companies" and, although he claims to have told Phat Fashions what he was doing and that VIS sent separate sales reports and royalty checks to Phat Fashions, Wiseman does <u>not</u> contend that

---

[3] Wiseman admits that where the Answer (¶40) states that Tornado sold $18,888,597 worth of product in 2005 and $15,456,579 in 2006, such figures include substantial sales by VIS. (Wiseman dep. 351-52).  Similarly, a substantial portion of the Tornado sales referred to in the Pre-Conference Letter were made by VIS.  (Segal dep. 79-81).  Segal admits that Tornado and VIS send separate sales reports and royalty checks to Phat Fashions.  (Segal dec. ¶4).

the Agreement was ever formally amended to include VIS as a party. (<u>Id</u>. ¶5).

9.      In this litigation and on its motion, however, Tornado pretends that it and VIS are the same corporation, combining the sales of the two companies and repeatedly stating that sales of Phat products "accounted for about 60% of our total wholesale business from 2004 onward" and that if the Agreement is not extended "Tornado and Vis-à-Vis will lose all of their business." (Answer ¶78; Wiseman dec. ¶¶ 8, 25, 52; Wiseman dep. 259, 272, 282, 303, 342; Segal dec. ¶6; D.Mem. 1, 10-11, 21-23).  In fact, <u>the only relevant sales figure here is that of Tornado, and that figure is 17.69%</u>.

10.      A document disclosed last week by Tornado (PX 48) reveals that for 2006, more than half of the constantly repeated 60% figure was comprised of sales made by VIS, with the Tornado figure being only 28.29%.  <u>For 2007, the total business of Tornado and VIS comprises 55.23% of the Tyfoon Group's business, with only 17.69% of that amount being done by Tornado</u>.  (Segal dep. 11-14).  In reality, Tornado's sales (in Canadian dollars) have plummeted since 2005 (the Tyfoon Group's fiscal year runs from October 1st through September 30th):

| | | |
|---|---|---|
| **2005**: | $17,580,537 | (40.95% of Tyfoon Group business) |
| **2006**: | $10,498,251 | (<u>a drop of $7,082,286, i.e., over 40%</u>, with the new total now representing only **28.29% of Tyfoon Group business**) |
| **2007**: | $4,800,636 | (<u>a drop of $5,697,614, i.e., over 54%</u>, with the new total now representing only **17.69% of Tyfoon Group business**) |

Even if one looks at the combined sales of Tornado and VIS, it is clear that the situation is far from the 2005 figures referred to by Wiseman and Segal in their declarations (Wiseman dec. ¶7; Segal dec. ¶5):  As revealed by PX 48, combined sales of Tornado and VIS dropped from $27,027,653 in 2005 to $22,282,642 in 2006 (<u>a decline of $4,745,011, i.e., 17.6%</u>).  In 2007, that figure has further dropped to $14,987,053 (<u>a decline of $7,295,589, i.e., 32.7%</u>).

**B.**    **The Trademark License Agreement dated August 1, 1998**

11.    Although Wiseman claims that the Tyfoon Group did business with Phat Fashions on an oral basis during the mid-1990's, he admits that "[e]ventually Russell's [Simmons] lawyers prepared a full-blown license agreement for us, and we decided that Tornado would be the company my group would use as the licensee." (Wiseman dec. ¶2). And that is precisely what occurred, i.e., "Tornado became licensee under a formal license agreement." (Segal dec. ¶3).

12.    On August 1, 1998, the parties entered into a Trademark License Agreement pursuant to which Phat Fashions granted Tornado an exclusive license in Canada to manufacture, import, distribute and sell "all Phat Farm products" with the exception of certain limited categories. (PX 1). Wiseman and Segal were responsible for negotiating the Agreement with Phat Fashions and both concede that it is this Agreement which currently governs the relationship between Phat Fashions and Tornado and, further, that the Agreement does not mention VIS, even though that company was in existence in 1997. (Wiseman dep. 22-23, 69-70; Segal dep. 25-26).

13.    The Agreement (¶3) provided for an initial term ending on December 31, 2001, and two option terms, the first ending on December 31, 2004 and the second ending on December 31, 2007, both of which could be exercised by Tornado provided that certain conditions were met. As no further options were provided for in the Agreement, the maximum date through which the Agreement could run was December 31, 2007. Wiseman and Segal both understood this paragraph to mean that there was no option on the part of Tornado to extend the agreement beyond December 31, 2007 and that the Agreement was over on December 31, 2007 unless "we negotiated a new agreement." (Segal dep. 26; Wiseman dep. 28-30).

14.    The Agreement (¶3) was very specific about how and when Tornado could exercise its two options. Paragraphs 3(b) and (3(c) provided, in relevant part, that the:

First Option must be exercised in <u>writing in the same manner as notices hereunder</u> and received by Licensor <u>no earlier than March 1, 2001, and no later than June 30, 2001, time being of the essence.</u>  (¶3(b)).  (emphasis supplied).

Second Option must be exercised in <u>writing in the same manner as notices hereunder</u> and received by Licensor <u>no earlier than March 1, 2004, and no later than June 30, 2004, time being of the essence.</u>  (¶3(c)).  (emphasis supplied).

As can be seen, in addition to providing that the options must be exercised in writing and delivered (as per the Notice requirement in ¶14), the Agreement provided that they had to be exercised between March 1ˢᵗ and June 30ᵗʰ of the year that the Agreement would expire if not otherwise extended, <u>i.e.</u>, two to six months prior to expiration.  By their agreement to this provision, <u>both parties acknowledged that six months notice provided them with adequate time to find a replacement licensor or licensee, as the case may, should the Agreement expire at the end of the year.</u>  As Wiseman admitted at his deposition:

Q.    Now, in terms of the exercise date of the option, do you see that it provides that the options were to be exercised between March 1st and June 30th in the same year that the contract would expire?

A.    Yes.

Q.    <u>Would you agree that if the option was not exercised, that Tornado and Phat Fashion had agreed that six months was a sufficient time to locate a replacement licensor or licensee for the following year?</u>

A.    <u>Based on this contract, yes.</u>  [Wiseman dep. 30(5-20)] (emphasis supplied).

In his declaration, Wiseman confirms this fact when he notes that "sales for 2008 would start to be booked in the middle of 2007" (Wiseman dec. ¶25), <u>i.e.</u>, six months prior to the end of 2007.

15.    In order for the Agreement to be extended beyond December 31, 2007, an amendment was necessary.  Paragraph 17 of the Agreement unequivocally provides that "[t]his <u>Agreement can only be extended,</u> waived or modified <u>by a writing signed by both parties.</u>"  (emphasis supplied).  Wiseman admits and understands that pursuant to ¶17, the Agreement can not be ex-

tended without a writing signed by both parties, i.e., it means "[e]xactly that, that both parties have to sign to change the agreement or whatever." (Wiseman dep. 39-40). Segal, one of the negotiators of the Agreement, admits that he saw ¶17 in drafts of the Agreement that he review- ed, did not object to it, and was clearly aware of its existence. (Segal dep. 26-30).

**C.    Tornado Carefully Exercises Its First Option In A Writing Signed By Tornado And Delivered To Phat Fashions In 2001**

16.    Tornado's moving papers and Answer (¶¶ 28, 31, 38, 41, 46-53) are replete with allegations that the Agreement was orally amended or modified on numerous occasions, starting as early as 2000, to allow VIS or Tornado to sell additional Phat Farm or Baby Phat products. Wiseman claims that (a) "No one ever said we needed something in writing, or a formal change to the original document, to do this business" and (b) "once this document [the Agreement] was signed we went back to handling everything on a verbal 'handshake' – we talked, we agreed, we went ahead;" and (c) "[n]o one ever said a word about making a written amendment to the for- mal document for these business decisions; we talked, we agreed, we did business." (Wiseman dec. ¶¶ 4-6). [4] Segal echoes Wiseman, claiming that "no one ever mentioned the technicalities of the License document" and that the "garment business is built on personal relationships and in many cases oral agreements, and that is how we operated much of the time." (Segal dec. ¶4).

17.    In fact, and as Wiseman and Segal well know, "everything" was not handled on a verbal "handshake" or "oral agreement" and there was one thing that was always handled in writing and never "went ahead" without a writing that, following the "technicalities of the License document," was both signed and delivered, and that was the extension of the Agreement. It is an undeniable fact that when it came time to extend the Agreement by the exercise of the op- tions in 2001 and 2004, Tornado knew that the only way the Agreement could be properly and

---

[4] These statements should be contrasted with Wiseman's admission that "the way it operates in my business, you know, we agree on the numbers, I said, Barry, write it up, he does and that's it." (Wiseman dep. 155).

validly extended was in a writing signed by Tornado and delivered to Phat Fashions and it followed the Agreement to the letter. Thus, although Segal claims the parties did many things orally, when asked "[w]ere there things that you didn't do orally?, his immediate response was: "Well, we would -- I sent letters for continuations," (Segal dep. 33-34).

18.     As the initial term of the Agreement was set to expire on December 31, 2001, Segal drafted a March 20, 2001 option exercise, which is "the letter that serves to confirm our election of the license agreement for another three years." (Segal dep. 41-43). With respect to preparing a written exercise of the option, Segal admitted: "I just knew it had to get done and one of the things I just had to do." (Segal dep. 47-51) (emphasis supplied). Wiseman admitted that the March 20, 2001 option exercise was drafted by Segal "[b]ecause we wanted to continue our relationship based on the contract" and Segal "came to me and said, listen, we have to send this letter for the option year." (Wiseman dep. 90-92) (emphasis supplied).

19.     Thus, on or about March 20, 2001 and as required by the Agreement, Wiseman executed and delivered a written option exercise to Rick Slomovitz ("Slomovitz"), Phat Fashions' Chief Financial Officer, with, as required by the Agreement's notice provision (¶14), a copy to Phat Fashions' outside counsel, Neil S. Goldstein, Esq. ("Goldstein"), which stated:

> As required by our licensing agreement dated August 1, 1998, this letter will serve to confirm our election to renew for the "First Option Term" which commences January 1, 2002 and terminates December 31, 2004. (PX 2) (emphasis supplied).

Tornado not only maintained a copy of this document in its files, but also retained the Federal Express proof of delivery showing that Phat Fashions had received the written option exercise so that there could be no dispute that it had been delivered to Phat Fashions. (PX 2; Segal dep. 46-47; Wiseman dep. 92-94).

**D.    Tornado Carefully Exercises Its Second Option In A Writing**
**Signed By Tornado And Delivered To Phat Fashions In 2004**

20.    Tornado was similarly careful when it decided to exercise the second option in

March 2004.  Segal took a copy of the March 20, 2001 exercise and marked it up so that it could

be utilized for the 2004 renewal.  (PX 3; Segal dep. 58-62).  Segal admitted that "there was a

particular, in my head, that I -- just something that I had to do" and "I just followed it up, I just

wrote it up as part of my tasks.  (Segal dep. 62) (emphasis supplied).  Wiseman confirmed that

Segal drafted the option exercise and "Barry would tell me this is the renewal for the thing, you

have to sign here, and I'd sign here, and that's the way we did business," noting that Segal

"wanted to get it signed."  (Wiseman dep. 109) (emphasis supplied).

21.    Thus, on March 10, 2004 and as required by the Agreement, Wiseman signed the

option exercise and delivered it to Slomovitz, with a copy to Goldstein.  The exercise stated:

> As required by our licensing agreement dated August 1, 1998, this letter will
> serve to confirm our election to renew for the "Second Option Term" which
> commences January 1, 2005 and terminates December 31, 2007.  (PX 4)
> (emphasis supplied).

Once again, Tornado not only maintained a copy of the document in its files, but also retained

the Federal Express proof of delivery and an e-mail from Slomovitz confirming delivery of

written option exercise to Phat Fashions.  (PX 4; Segal dep. 62-63).

22.    Tornado, realizing that the regular and exclusive practice of extending the Agree-

ment in writing is fatal to its oral modification argument, astonishingly does not even mention

the written option exercises in its moving papers.  At his deposition, Segal was similarly defens-

ive about his own very clear actions in 2001 and 2004, not to mention 2006:

> Q.    Now, when it came time to extend the agreement for an additional period
> covering the years 2002 through 2004 -- ... That was something that you
> did in writing, correct?

A.    Correct.

Q.    Why?

A.    Because I had to do it, it's part of my job that I would have to send something in writing.  I read the agreement and I sent it out, but had it not been done -- that's just what I get paid for, but that's part of my job but it was -- had it not been sent, everything would have probably been going on just the same one way or the other.

Q.    When you say probably going on, why was it part of your job to send out a written exercise option?

A.    Well, I remember reading it in the license agreement at some point in time when it came time for renewal, it was at our option and that I would exer- cise -- or that we would exercise our option, which was -- which we did.

Q.    But why didn't you do it orally, I guess is my question?

A.    It may well have been orally or it could have been done orally, that's just the way I am, I just saw it and I just took care of it.

Q.    Because that's what the contract required?

A.    That's what the contract said, but also because, you know, that's the way I normally operate because if there was something that I read, that I had seen, then I would take care of it in that manner.

Q.    Would it be your responsibility, and I'm going back now specifically to 2001, to bring it to the attention of Issie Wiseman that right now it's time, we have to exercise this option, or would you just do it on your own?

A.    I probably just would have done it on my own and brought it to him for signature.

Q.    You also did a written exercise of the option in 2004, I guess to cover the years 2005, '6 and '7?

A.    Yes, I did.

Q.    Do you have a recollection of doing that?

A.    Yes, I did.

Q.    And why did you do that in writing?

A.    For the same reason as I did the previous one. …

Q.    Would it be fair to state that between 1998 and 2001 -- … that as far as you're concerned, that there were oral modifications to the agreement?

A.    Correct.

Q.    And it would also be fair to state that after those oral modifications were made in 2001, you did exercise the option in writing?

A.    Yes.

Q.    And would it be fair to state that there were oral modifications that took place between 2001 and 2004 as far as you're concerned?

A.    I'm not particularly sure about the time frame, but I believe that there was modifications right through.  Whether it was in 2000 -- in 2004, in 2005, I think it was constant modifications that would have been done in an oral manner.

Q.    But with all these oral modifications going on -- … -- in 2004, when it came time to exercise the option, that was still something that you did in a writing signed by Issie Wiseman; is that correct?

A.    That is correct.

Q.    And in 2007 -- … -- when there was a discussion of the amendment, do you recall that? …

A.    Yes.

Q.    That was also something that was in writing and that Issie Wiseman actually signed, correct?

A.    That is correct, that was sent by Phat Fashions to us, yes.  [Segal dep. 36(5)-41(4)] (emphasis supplied).

23.    It is also worth noting that in neither written option exercise is there any mention or indication that the Agreement had been previously amended or modified in any way (e.g., there is no reference to the "Agreement as amended" or "Agreement as modified"), although Tornado alleges that such amendments and modifications had occurred as early as 2000.

**E.   Kellwood Acquires Phat Fashions In 2004 and Institutes A Policy Requiring Two Signatures from Phat Fashions On All License Agreements and Amendments**

24.     In 2004, Kellwood Company ("Kellwood") purchased Phat Fashions and became responsible for the operation of the company.  Ullmann was named President of Phat Fashions, Simmons remained Chief Executive Officer, and both Ullmann and Simmons reported to Robert Skinner ("Skinner"), who was Kellwood's President and Phat Fashion's most senior officer. (Ullmann dep. 5-10).  At this time, Phat Fashions instituted a policy that all license agreements and amendments going forward would now have to be signed not only by Simmons, but also by Skinner, who, as demonstrated by the Phat Fashions LLC Annual Minutes of Annual Meeting of Board of Managers from both 2005 and 2006, held the offices at Phat Fashions of both Chairman of the Board and Manager.  (PX 5).

25.     On March 19, 2004, Donald Gramke ("Gramke"), Kellwood's General Counsel, sent an e-mail to Eli Nathanson ("Nathanson"), the attorney at our firm who is primarily responsible for drafting Phat Fashions license agreements, instructing Nathanson that going forward, all license agreements would have to be signed by two people for Phat Fashions to be effective and that each agreement should have two signature lines for Phat Fashions:

> I meant to mention yesterday that on all licenses going forward – Bob would like to have 2 signature lines for Phat Fashions, 1 for Russell [Simmons] and 1 for either Bob or Hal [Hal J. Upbin, Skinner's predecessor as Kellwood's Chairman of the Board].  So if you could please add another signature line to the Phat signature block on the term sheet.  (PX 6) (emphasis supplied).

26.     On November 1, 2004, Phat Fashions' Chief Financial Officer, Peter Morris ("Morris"), sent an e-mail to Gramke, Nathanson, Simmons' representatives and Ullmann in which he detailed the requirements of the two signature policy and made it clear that all agreements would first be signed by Simmons and then by Skinner, and that such agreements would only be deemed executed when both signatures were in place.  As Morris wrote:

From time to time there will be new licensing agreements requiring signatures. Please follow the process below for quickly signing the new agreements:

1.  After appropriate review, Eli [Nathanson] will give me the licenses for Russell's [Simmons] signature. Eli will also give me any advance royalty or advertising payments to hold in escrow.

2.  I will give the agreements to Simone [Reyes] or Christina [Pal] for Russell's signature.

3.  After Russell has signed the agreements, Simone or Christina will over-night the agreements to the attention of:

    > Mr. Don Gramke
    > Kellwood Company
    > 600 Kellwood Parkway
    > Chesterfield, MO 63017

    > Don's phone number is 314-576-3203. His e-mail is don.gramke@ kellwood.com. Please notify him when the agreements are sent to his attention.

4.  Don will obtain the required signatures in St. Louis [Kellwood's corporate headquarters] and forward the signed agreements to Eli.

5.  Eli will forward a fully executed copy of the license agreement to my attention.

6.  I will deposit any advance payments of royalty and advertising.  (PX 7) (emphasis supplied).

27.    An example of the practice in operation may be found in an exchange of e-mails in early January 2006, prior to the events at issue in this case.  (PX 8).   On January 4, 2006, a licensee who had signed a revised agreement and forwarded it back to Phat Fashions for counter-signature wrote to Ullmann: "I have not received back the executed new agreement that we came to.  Is it still at the lawyers?  Please advise the status."  Ullmann forwarded this e-mail to Gramke, Nathan and Morris and asked for the status.  Nathanson responded:  "I believe Peter [Morris] has the amendment no. 1 to the Aquarius license and is in the process of getting signa-ture on behalf of Phat.  It has already been signed by Aquarius."  Morris responded:  "Correct. It

has also been signed by Russell [Simmons]. Don [Gramke], is a legal summary necessary for an amendment?" On January 5, 2006, Gramke responded to all:

> Peter – no , not for such a short amendment. <u>Since we are changing the mini-mums, Bob Skinner will need to sign. Please send the amendment to me once Russell signs and I will get to Bob to be signed</u>. I suggest that Bernt send Bob a note indicating that the minimums are changing and that we will be providing an amendment for him to sign. Thx. (PX 8) (emphasis supplied).

28.   As can be seen from the above, all license agreements and amendments (including ones where, like here, minimum guarantees were changing) required the signatures of <u>both</u> Simmons and Skinner. Ullmann was clear that since his arrival at Phat Fashions in 2004, every single agreement that Simmons signed required the additional signature of Skinner to become effective. (Ullmann dep. 12-13, 134-35).

**F.   The Parties Did Not Reach An Agreement In 2005 To Extend The Agreement**

29.   In late summer 2005, Wiseman "had a problem with some European-licensed Phat Farm footwear that appeared in the Canadian market without going through us (or through our designated retailer for that market)." (Wiseman dec. ¶13). Numerous e-mails were exchang-ed between Wiseman, Ullmann and the foreign licensee (Unioncon) about the situation, with Wiseman writing Ullmann that he believed that Tyfoon was entitled to compensation from Unioncon, which disagreed and refused to pay anything. (PX 9).

30.   Although there was no further correspondence about the issue after August 11, 2005, Wiseman now claims that he proposed to Ullmann that they deal with the situation by simply extending Tornado's agreement with Phat Fashions beyond 2007 (which would result in Tornado's making up any money lost as a result of the Unioncon situation) and that Ullmann agreed, although Wiseman concedes that there was no discussion at that time of royalties, mini-mum sales or any terms at all. (Wiseman dec. ¶¶ 13-16; Wiseman dep. 121-25, 129-32, 313-16).

Segal echoed Wiseman's testimony and admitted that he did not suggest that the alleged agreement be put in writing at this time because "Issie had mentioned to me that as far as the numbers, we would discuss it later in the year." (Segal dep. 82-87; Segal dec. ¶10).

31.     Ullmann testified about the steps he took to try and assist Wiseman in dealing with the Unioncon situation, including his attempt to get the licensee to make a payment to Wiseman. (Ullmann dep. 242-50). Ullmann was clear, however, that he <u>never</u> indicated to Wiseman that Wiseman should not worry about receiving payment from the licensee because he would more than make that up by amending the agreement to extend the renewal period:

> I absolutely do not recall that and clearly could not have said it because, as we have discussed, the agreements need to be signed by Russell Simmons, by Bob Skinner. There is no way, ever, that I would know how they would ultimately act and if they were both going to sign, so I couldn't have made such statements. (Ullmann dep. 250-51).

As is typical of Tornado's entire case, there is not a single e-mail, letter, handwritten note or any writing at all confirming any of these statements allegedly made by Ullmann to Wiseman.

**G.     The Conversations Between December 2005 and February 2006**

32.     In late 2005 and early 2006, Tornado alleges that Wiseman and Ullmann had conversations about the possibility of extending the Agreement beyond 2007, although no terms, financial or otherwise, were discussed. (Answer ¶¶ 54-57). Ullman recalls that he and Wiseman first casually discussed the possibility of extending the Agreement at or about this time, and then again at the MAGIC Show in February 2006, with Ullmann telling Wiseman that the minimum guaranteed royalties would have to be increased as part of any extension. (Ullmann dep. 73-75, 296-97, 325-26).

33.     Wiseman states that while there may have been conversations between August/ September 2005 and MAGIC in February 2006 in which the extension of the Agreement was

16

mentioned, no agreement on the numbers was reached and concedes that it was sometime during this period that Ullmann said to him that "your minimums are so down low, you're exceeding them by so much, you have to raise your minimums a little bit." (Wiseman dep. 130-38; Wiseman dec. ¶¶ 17-18).[5]  Wiseman claims that he had telephone discussions with Ullmann about what would be reasonable minimum guarantee figures and that, after they each put forward numbers, they reached an oral agreement on an extension at MAGIC in February 2006:

> We settled on an initial 2008 minimum royalty and on a series of annual increases, the same $350,000 plus increases I just mentioned for the first term, and smaller increases thereafter.  When we were done we had a number for each year. Bernt indicated to me that "it's all done," and we shook hands on it.  He told me to send him the numbers in writing, but the numbers I was to send were the one he and I had just agreed to; his, numbers.  We both said we were very pleased to have wrapped up the extension and to go forward with a secure, shared future.  It was absolutely clear that we had made a deal at that point.  (Wiseman dec. ¶22, 19-20; Wiseman dep. 131-33).

34.     Wiseman's testimony and his actions after MAGIC belie his assertion that an agreement was reached at MAGIC.  Wiseman admits that Ullmann told him at the end of those conversations at MAGIC to "send me your proposal" and "I drafted up an agreement based on our conversation … and we put that to paper." (Wiseman dep. 132-34, 138-42).  Although Wiseman claims that Ullmann did not say to him that their deal would be valid "only when we have a written amendment", he admits that Ullmann:  (a) "did say to send him the numbers;" (b) referred "to 'our lawyers' doing something;" and (c) "I expected his company would want some kind of document for its files" or "paperwork." (Wiseman dec. ¶27).  Segal stated that Wiseman told him that an agreement had been reached on the numbers but that Ullmann wanted it in writing, and that Segal should take care of that.  (Segal dep. 91-92; Segal dec. ¶12).

---

[5] The sales made by Tornado alone (i.e., not including VIS) over the course of the license agreement from 1998 through 2006 met and exceeded the minimums that were set forth in the Agreement.  (Segal dep. 96).

**H.**    **Wiseman Sends Ullman A Proposal To Extend The Agreement On March 1, 2006**

35.    It was not until March 1, 2006 that the possibility of an extension was first put into writing.  On that date, Wiseman sent Ullmann an e-mail which stated:  "Please see attached proposal for the continuation of our distribution agreement" (emphasis supplied) and attached to which was a document which stated, in full:

> It was a pleasure seeing you at Magic.  Please find the proposal for the Phat Farm and related products Canadian contract renewal minimums;-
>
> | Initial Term | | |
> | --- | --- | --- |
> | | January 1, 2008 – December 31, 2008 | 350,000 |
> | | January 1, 2009 – December 31, 2009 | 450,000 |
> | | January 1, 2010 – December 31, 2010 | 550,000 |
> | 1st Option Period | | |
> | | January 1, 2011 – December 31, 2011 | 600,000 |
> | | January 1, 2012 – December 31, 2012 | 650,000 |
> | | January 1, 2013 – December 31, 2013 | 700,000 |
>
> Please contact me once you have had a chance to review.  (PX 10) (emphasis supplied).

Wiseman claims that he reported to Segal "exactly what had been agreed" and Segal, rather than preparing a draft agreement, prepared a "proposal" which Ullmann was asked to "review," not sign. (Wiseman dec. ¶23; Wiseman dep. 158-61; Segal dec. ¶13; Segal dep. 96-99).[6]

36.    In his declaration, Wiseman claims that after he sent the proposal to Ullmann, he called Ullmann who told him that this was their "deal" and they were "done."  (Wiseman dec. ¶¶ 23-27).  At his deposition, however, Wiseman admitted that Ullmann in that conversation made it clear that a formal document would be necessary, telling Wiseman:  "I got the document and it's in -- I've given it in -- to the lawyers."  (Wiseman dep. 161-62).  Wiseman knew that a

---

[6] Moreover, although Wiseman claims that the extended agreement would also include "the oral changes we had made over the years, like our use of VIS and our right to sell Baby Phat Ladies items, including footwear, accessories and any clothing lines that fell outside the BP Clothing license" (Wiseman dec. ¶24), these items are not mentioned at all in the "proposal" drafted by Segal, despite the fact that this represented the perfect opportunity for Wiseman and Segal to get the alleged oral changes put in writing as required by the Agreement.  Wiseman admitted in his declaration that during these alleged discussions:  "We didn't mention VIS (as opposed to Tornado); we didn't say anything about changing the Schedule on the old License Agreement to include all the additional products we now handle." (Wiseman dec. ¶28) (emphasis supplied).

writing would be needed to extend the Agreement:

> Q.  Was it your position that you didn't need anything in writing in order to extend this contract beyond the December 31, 2007 date?
>
> A.  No, I think we needed to extend it.
>
> Q.  Do you think you needed a writing to extend it?
>
> A.  Yes.
>
> Q.  Why?
>
> A.  Because it was clear that the end of the contract was ... 2007.  [Wiseman dep. 65(7-22)].

37.   Ullmann received Wiseman's e-mailed proposal and forwarded it to Morris, Gramke and Nathanson (PX 11), explaining that that was "standard operating procedure in the process of any type of negotiation or discussion." (Ullmann dep. 90-92).  Ullmann was not the final decision maker on whether the minimums proposed by Wiseman would be acceptable:

> No, the way it would work is that I would handle the dialogue.  Once we had reached a meeting of the minds, I would then have to turn around and take, in this case, the document, the numbers, whatever it was and I make a presentation to Bob Skinner and he was the final decision maker.  (Ullmann dep. 78).

Ullmann was clear that he "would be presenting the numbers to Bob Skinner and he was the ultimate decision maker as to whether any deal made sense to us." (Ullmann dep. 94).

## I.   Ullmann Directs Nathanson To Prepare A Draft Amendment

38.   Ullmann instructed Nathanson to prepare a draft amendment to the Agreement, which Nathanson did.  (Ullmann dep. 96-101, 105; Nathanson dep. 33-37).  On March 20, 2006, Nathanson forwarded the draft amendment to Ullmann, with copies to Gramke and Morris, via an e-mail which stated, in full:

> Bernt – attached hereto please find the draft amendment no 1 to the license agreement with Tornado.  Couple of notes:

- I backed the numbers out from the GMR figures we were given to come up with GMNS based on the 7% royalty rate.

- their current agreement allows them to 'buy up' by paying 100% GMR so long as they hit at least 75% of the GMNS. I did not amend this at this time. <u>Please advise if you would like me to amend this to our current standard language</u>.

- although my understanding is that Tornado does not manufacture anything, they do have the right under the agreement so to the extent they ever do, <u>I added the new provision regarding sales to us for our stores</u>.

<u>Please let me know if you would like me to send on to Issie directly and I will be happy to do so</u>. Thanks. (PX 12)(emphasis supplied).

39.     Nathanson, who was solely responsible for drafting the amendment, testified that before drafting it, he reviewed the Agreement and was familiar with the requirements of ¶17 that the Agreement can only be extended by a writing signed by both parties, in this case, Phat Fashions and Tornado. (Nathanson dep. 12-18). The draft amendment prepared by Nathanson had two signature lines for Phat Fashions and one for Tornado. When asked who would have given "Nathanson instructions on who needs to sign an amendment or review an amendment within your company," Ullmann responded:

<u>No instruction needed. Standard operating procedure would be that every single agreement, amendment, renewal required two signatures at the time; the signa-tures of Bob Skinner and Russell Simmons</u>. (Ullmann dep. 111-14) (emphasis supplied).

Nathanson also testified about the Phat Fashions/Kellwood requirement that every license agree-ment or amendment be signed by both Simmons and Skinner:

Q.     Do you recall who was to sign on behalf of Phat Fashions? …

A.     It would have been Bob Skinner and Russell Simmons.

Q.     When you say "it would have been," what is that based on?

A.     <u>Based on the policy; ever since the purchase by Phat Fashions from Kellwood that Bob Skinner and Russell Simmons were both required to sign any agreements for them to be effective</u>.

20

> Q.    That's not based on your specific recollection of these documents that you drafted? …
>
> A.    <u>This was in every single deal, every single license that was done that had material terms or changes in numbers, but which is virtually every deal.</u> [Nathanson dep. 79(5)-80(4)] (emphasis supplied).

40.    Although Nathanson sent the draft amendment to Ullmann on March 20, 2006 with a cover e-mail that posed certain questions (PX 12; Nathanson dep. 39-41), Ullmann, before he reviewed the draft amendment, sent Nathanson an e-mail from his Blackberry which, rather than responding to the questions, stated, in full:  "<u>Pls send to Issie directly with the standard disclaimer that the contract has yet to be reviewed by your client</u>.  Thx."  (PX 13) (emphasis supplied).    Ullmann considered the draft amendment to be just that – a draft that the parties would continue to discuss and negotiate and either move forward with or not.  (Ullmann dep. 47).

**J.    <u>Nathanson Sends Wiseman A Draft Amendment, Not An Execution Copy</u>**

41.    On that same night, March 20, 2006, Nathanson send the draft amendment to Wiseman with the reservation of rights language that he was specifically instructed to include by Ullmann.  (Nathanson dep. 38, 40-41).  Nathanson's e-mail to Wiseman stated, in full:

> Issie – at the request of Bernt Ullmann, <u>I am attaching for your review a draft Amendment No. 1 to the License Agreement among the above referenced parties</u>.
>
> <u>I am simultaneously transmitting the attached to our client and must therefore reserve the right to modify same as directed</u>.
>
> <u>Please contact us to discuss any comments you have</u>.  Best regards.  (PX 14) (emphasis supplied).

As the Agreement had <u>never</u> been amended before, the attached draft amendment was entitled "<u>Amendment No. 1 To Trademark License Agreement</u>."  (PX 14) (emphasis supplied).[7]

---

[7] As was the case with the exercise of the options contained in the Agreement, the draft amendment provided that the "Third Option must be exercised in writing in the same manner as notices hereunder and received by Licensor no earlier than March 1, 2007, and no later than June 30, 2007, time being of the essence," <u>once again acknowledging</u>

42.    The draft amendment also proposed changing the Notice provision (¶14) by making it clear that, unlike in the Agreement, <u>proper written notice now had to be given to both Phat Fashions and Kellwood</u>, as well as counsel.  Also included was a provision (¶6) that "<u>[e]xcept as modified by this Amendment, all terms and conditions of the License Agreement shall remain in full force and effect</u>," i.e., there were no further amendments to the Agreement as it existed on August 1, 1998 when it was first entered into by Phat Fashions and Tornado.

43.    In accordance with the Kellwood/Phat Fashions policy that all license agreements must be signed by both Simmons and Skinner, the signature page of the draft amendment (PX 14) contained three signature blocks and required delivery as follows:

**IN WITNESS WHEREOF**, this Amendment has been executed and delivered by the parties hereto as of the date first above written.

PHAT FASHIONS, LLC

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

Tornado Imports (Canada), Inc.

By:_____
   Name:
   Title:

As can be seen, the amendment, in order to be valid, had to be "<u>executed and delivered</u>." (emphasis supplied).

---

that if the option were not or could not be exercised, that six months was an adequate period of time for Tornado and Phat Fashions to find replacement licensors or licensees for 2008, as the case may be.

**I.**    **Wiseman Signs The Draft Amendment And Segal Returns It To Nathanson**

44.    Wiseman received Nathanson's e-mail and draft amendment and forwarded it to

Segal for his review on March 24, 2006 (PX 15) because:

> Anything to do that I have an E-mail of or anything that I have to do with that has
> to do with any kind of contractual arrangement or anything pertaining to financial
> or whatever it is, I always forward it to the person involved here, and this particu-
> lar case, I forwarded it from my E-mail address to Barry's in case he didn't have a
> copy. (Wiseman dep. 183-84) (emphasis supplied).

Wiseman had known that he would eventually have to sign a document relating to the extension.

(Wiseman dep. 164-65, 168). As Wiseman admits in his declaration, "we received a formal

document from the lawyers for Phat Fashions" and "I wasn't surprised that Phat Fashions wanted

our deal documented for its files." (Wiseman dec. ¶29; D.Mem. 6).[8]

45.    Wiseman claims that when he received the draft amendment he did not under-

stand that it was a draft and does not believe he read either the e-mail (which specifically stated

that Phat Fashions reserved its rights to modify it) or the draft amendment itself. (Wiseman dep.

173-78; Wiseman dec. ¶30). Although the e-mail did not request a signature on the draft,

Wiseman testified "As far as I was concerned, this is just a confirmation of the deal we had, I

have to sign here and send it back to them" and "I guess Barry gave it to me and told me to sign

it here" and Wiseman did so. (Wiseman dep. 175-76; Wiseman dec. ¶¶ 29-30). As for not read-

ing the document, Wiseman testified that when he received it, he forwarded it to Segal because

"I expect these things to be read by our CFO and I expect him to tell me if there's something

wrong or not." (Wiseman dep. 176-77) (emphasis supplied).

46.    Segal saw the draft amendment when Nathanson sent it to Wiseman, recognized

that it was a "legal document," knew that Phat Fashions wanted it to be signed and returned

---

[8] Although Wiseman tries to dismiss the importance of the document by referring to it as "lawyer-language paper-
work" (Wiseman dec. ¶30), it was the 1998 Agreement, which was also "lawyer-language paperwork" that had
allowed Tornado to sell Phat Fashions products for nearly a decade.

(Segal dec. ¶13; Segal dep. 117), and testified that he was the person at Tyfoon who had the responsibility to review the document and make sure that it was acceptable before it was signed and delivered to Phat Fashions:

> Q.    Whose responsibility was it at Tyfoon, if anyone's, to review a document such as this, an Amendment No. 1 to trademark license agreement and to make sure that it was acceptable?
>
> A.    It would be myself.
>
> Q.    Did you -- you're not an attorney, right?
>
> A.    No, I'm not.
>
> Q.    But did you kind of act like the in-house counsel?
>
> A.    In some cases, yes.  In some cases, I sent things to my lawyers.  In some cases, I take care of it myself.  [Segal dep. 108(14)-10(11)].

Segal understood from the reservation of rights language contained in Nathanson's e-mail that there might be a problem on Ullmann's side with what was being sent out and thus that the draft amendment might not be acceptable to Phat Fashions:

> Q.    What did you understand the second line of this E-mail to mean, the one that says, I am simultaneously transmitting the attached to our client and must therefore reserve the right to modify same as directed?
>
> A.    Okay.  I'm taking it that here's an agreement that I'm doing, I'm sending it to you, if there's any problem by you or Ullmann, tell me and I'll change it.  That's what I meant that to understand. … [Segal dep. 111(19)-12(4)].

47.    Wiseman and Segal admit that the draft amendment contained two signature lines for Phat Fashions which were visible to them when Wiseman signed the draft amendment. (Wiseman dep. 178; Segal dep. 114).  Segal, who claims that the Agreement had been previously amended orally, also saw that the draft was labeled "Amendment No. 1" at the top, did not object, printed out two copies for signature (so that one could be signed and returned by Phat Fashions) and told Wiseman it was okay to sign them.  (Segal dep. 112-16; Segal dec. ¶13).

48.    After Wiseman signed two copies of the draft amendment, Segal called Nathanson on March 29, 2006, told him that Wiseman had signed, and asked him what to do with them, Nathanson responded that signed documents go through him and that Segal should send them to him. (Segal dep. 118-20; Segal dec. ¶13; Nathanson dep. 42-45). Segal did so on March 30, 2006 with a cover letter which stated, in full:

> It was a pleasure speaking with you yesterday. As discussed, please find two signed originals of the amendment to the Phat Farm license agreement. If you should require further originals, please do not hesitate to call. (PX 16).

Wiseman and Segal clearly understood that merely signing the amendment was not enough – it also had to be sent back to Phat Fashions, which it did, again retaining the Fed-Ex receipt showing delivery to Phat Fashions. (PX 16).

**J.    Nathanson Receives The Draft Amendment Signed By Wiseman and Forwards It To Morris At Phat Fashions To Begin The Formal Review Process**

49.    Nathanson received the signed documents from Segal and forwarded them to Morris on April 5, 2006, with cc's to Ullmann and Gramke, with a letter which stated, in full:

> Enclosed please find two (2) partially executed originals of the Amendment No. 1 to the License Agreement among the above referenced parties.
>
> Please arrange to have countersigned where indicated and return one (1) fully executed original to me. Please keep one (1) original for your records. Thanks.
>
> Please be sure to call me with questions.   (PX 17).

Nathanson explained that he was forwarding the partially-executed documents to Morris for internal review and handling, "[m]eaning he starts the process internally at Kellwood of reviewing, approving any documents before Kellwood signs." (Nathanson dep. 46, 48-49). Nathanson did not in his letter ask Morris to have the documents "reviewed and approved in accordance with the typical policy" because "[t]here is no reason to; that was done every time." (Id. 50). He did not telephone Morris because "there was "[n]o need to. The policy was the same every time."

(Id. 50). When questioned about the language asking Morris to return fully-executed copies of the amendment to him, Nathanson responded that he would have only expected a fully-executed copy of the document to be returned to him from Kellwood if "[it] was reviewed and approved in accordance with the typical policy" (Id. 49-50), noting that "[w]hen [Morris] gets signatures for me, he typically then sends it to general Counsel who starts the review process, the legal review process, which is summarizing terms for the people who need to approve and sign." (Id. 58). Nathanson would only expect to get back an executed copy of the document if "it was reviewed, approved and signed by all of the required parties and they released it to me." (Id. 58-59).

50.    Ullmann noted that after Nathanson forwarded the documents to Morris, "Peter would physically be responsible for getting the first signature, which is Russell Simmons" and then explained what steps that would follow after Simmons signed the document:

> Whenever we are preparing to fully execute an agreement, Kellwood legal would prepare an executive summary. The executive summary is then prepared back to me. I initial it to say that it's okay and then I will have to, after an executive summary is done, present the full set of circumstances to Bob Skinner and, most likely, then Kellwood legal would present the document to Bob for signature thereafter. So there are many steps between this cover letter and a fully-executed agreement. (Ullmann dep. 121-24).

51.    At some point between April 6-12, 2006, the documents executed by Wiseman were given to Simmons, who provided one of the two Phat Fashions signatures necessary to bind Phat Fashions. (PX 18). On April 12, 2006, Morris send an e-mail to Gramke which stated:

> I have this amendment signed by the licensee, Tornado, and by Russell. One more signature is required on behalf of Phat Fashions. There is no legal initial on the document. Can Bernt [Ullmann] sign this. (PX 19) (emphasis supplied).

On April 21, 2006, Gramke responded to Morris that Ullmann could not sign and that Skinner's signature was required:

> Peter – since the numbers are changing, this will need to be signed by Bob. I am preparing a summary of the amendment. Please forward the amendments to me

and I will get Bob to sign.  Thx.  (PX 19) (emphasis supplied).[9]

52.    Before the amendments could be presented to Skinner for signature, they had to be approved and initialed by Gramke, who would also have to prepare a summary of the amendment.  On April 22, 2006, Morris sent the amendment (and two others relating to different licensees) to Gramke, stating that "I have three signed licensee agreement amendments for your initials and Bob's signature" and asking that Gramke "[p]lease return all executed copies to my attention."  (PX 20) (emphasis supplied).

**K.    In late May 2006, Skinner Directs Ullmann To Hold Off On Canada**

53.    After receiving information about the underlying Agreement from Ullmann (PX 21), Gramke, as part of the review process, sent Ullmann on May 23, 2006 a "Tornado – Amendment Summary for your Review and Approval" with a cover e-mail which stated:

> Bernt - please see the attached.   If you and Peter are OK as it is written, please initial the first page and return to me so I can submit the final amendments to Bob Skinner for signature.
>
> I am also attaching the current license summary (dated 7-1-04) for reference. Thanks.  (PX 22) (emphasis supplied).

54.    At this point, however, Skinner, without saying why, had directed Ullmann to

---

[9] There is no dispute that Simmons played absolutely no role in and had no knowledge of the negotiations which, both parties admit, took place exclusively between Wiseman and Ullmann.  Simmons' act of signing the amendment was nothing more than a ministerial act required by Phat Fashions and Kellwood before the proposed amendment could be reviewed by legal and, if appropriate, presented to Skinner for signature.

Although Ullmann was copied on these e-mails, he did not recall becoming aware that Simmons had signed the draft amendment until sometime in Fall 2006.  (Ullmann dep. 53-57, 60-64, 401).  It did not concern him because "Russell Simmons' signature was viewed as a formality. ... [I]t does not speak to the intent of the corporation. In my view, the binding signature was that of Mr. Bob Skinner." (Id. 64-65).  What Ullmann did know was that Skinner, the Chairman of Phat Fashions, had not signed: "I knew anyway that all our agreements required two signatures and since I hadn't presented anything to Bob Skinner, Bob Skinner obviously hadn't executed anything; hence, it's not a legally-binding document." (Id. 131-34).  In the end, Skinner never signed the proposed amendment and, for that reason, it was never delivered back to Tornado.  (Id. 46, 55-57, 60-64).

As for Tornado's argument that Phat Fashions "should be estopped from relying on the absence of Mr. Ullman's [sic] own signature as President" (D.Mem. 17), the simple fact was, as Gramke made clear in his response to Morris, that Ullmann was not authorized to sign it.

hold off on entering into any agreements with respect to Canada. (Ullmann dep. 161-64).

Ullmann understood this to mean that Phat Fashions was not moving forward with Tornado <u>at that point</u>, but might do so later, with that decision being up to Skinner. (Ullmann dep. 173-75, 182-83). When asked whether Ullmann had been prepared to move forward on Canada at the time Skinner directed him not to do so, he responded:

> <u>I had been engaging in a dialogue in good faith with Issie Wiseman and Tornado and I was preparing to move forward.</u> I think I want to -- I need to kind of clarify some process here. I hadn't, at this point, fully wrapped my hands around it yet. So it's true that <u>I had advanced it to this stage in good faith. I was now going to prepare to actually take on all the facts and go and present it to Bob Skinner, my boss, the chairman of the company. I hadn't fully done that yet.</u> So I would say that through this process, I acted in good faith; I advanced the process through. I can't say that I had full ownership yet because I hadn't gone in front of him to present it. ...
>
> <u>The process is such that it is taken to an executive summary and then it's present- ed to Bob and then a decision is made as to how we proceed. So I was, indeed, proceeding toward that stage, knowing full-well that at that stage, the final decis- ion regarding how we would be proceeding would be made. It could be that we proceeded and concluded or we had to go back and revisit or it could be rejected.</u> (Ullmann dep. 164-66) (emphasis supplied).

Ullmann was clear that once he presented the proposal to Skinner, the decision was Skinner's:

> I knew exactly what the process was. My expectation was simply to advance this so I can present it to Bob and that was my only expectation. <u>I could not speak to what Bob Skinner might decide to do and hence, I didn't have expectation as to how anything would end up. I mean, I presented deals to him that were executed, completely unchanged. I have had deals where I had to go back and revisit numbers and I have had deals, at this stage, that were outright rejected and never moved forward. All three happened.</u> (Ullmann dep. 166-67) (emphasis supplied).

55.    Based upon Skinner's instructions, Ullman responded to Gramke's e-mail on May 23, 2006 that "Bob has asked me to hold off on Canada. I will review the summary and then discuss with Bob." (PX 22). Gramke forwarded Ullmann's response to Nathanson, informing him that "Bernt is holding off on this extension for now." (PX 23; Nathanson dep. 65).

**L.    Tornado Completely Fails To Follows Up With Phat Fashions In
Writing About The Status Of The Proposed Amendment In 2006**

56.    At no time after March 30, 2006, when Segal sent the signed documents to Nath-
anson, did Tornado ever make any written inquiries to Phat Fashions as to whether Phat Fashions
had executed the draft amendment or give any indication to Phat Fashions that Tornado consider-
ed the Agreement to have been validly extended by the partially-executed draft amendment
which had neither been fully signed by Phat Fashions nor delivered back to Tornado.

57.    The only person at Tornado with whom Ullmann discussed the possibility of
extending the Agreement was Wiseman.  (Ullmann dep. 50-51, 66-67).  Tornado claims that on
four separate occasions in 2006 (in April, July or August, October and December), Wiseman
telephoned Ullmann, who assured him that the amendment was valid and that Phat Fashions
intended to sign it and send it back.  (Answer ¶¶ 15-16, 32, 64-70, 100, 103).  Ullmann, however,
has no recollection of Wiseman ever inquiring about the status of the proposed amendment or
asking when Phat Fashions was going to sign and return it, and states that he could never have
committed to Wiseman that Skinner would sign the amendment.  (Ullmann dep. 88-90, 159-61,
250-51).  Ullmann testified that there might have been discussions where the proposed amend-
ment came up, but noted that "it was still just a dialogue.  I wasn't in a serious negotiation at the
time, which is why I didn't emerge myself in it."  (Ullmann dep. 82-84, 87-88).  <u>What is not
disputed is that there is not a single writing in existence evidencing that these conversations
actually took place, i.e., Tornado never sent any e-mails or other correspondence to Phat Fash-
ions confirming these conversations and there are no notes of any of these allegedly crucial
conversations</u>.

58.    Although Wiseman testified about the four conversations he claims to have had
with Ullmann in 2006 in which Ullmann assured him that Phat Fashions would sign and return

the draft amendment to Tornado (Wiseman dep. 192-95, 198-201), Segal knew that for the draft

amendment to be effective, it had to be signed by Phat Fashions and returned to Tornado, and

that oral assurances were not enough.  As Wiseman admitted:

> Q.    How many conversations did you have with Bernt Ullmann after March
> 30 of 2006 where he said to you that Phat Fashions was going to sign the
> written? ...

> A.    There were several conversations, I remember every couple months, Barry
> Segal would come to me and say, hey, we didn't get the document back
> from them.  I said, what document?  He said, there was a document that
> they were supposed to get back to us, you know, you better ask Bernt
> about it, that's what I'd ask him.  [Wiseman dep. 193(11-24)] (emphasis
> supplied).

> \* \* \* \* \*

> Q.    Would it be accurate to state that Barry Segal had expressed concern to
> you that the signed agreement had not been returned?

> A.    Not concern, he just brought it up to me on occasion where, hey, you
> know, like we signed something, we are supposed to get something back, I
> didn't get it yet, that's my job.

> Q.    How many occasions did he mention that to you on?

> A.    Could have been twice, I don't know.

> Q.    Was it usually the case that when he brought that to your attention, that
> that's when you would call Bernt Ullmann and say, where's the agree-
> ment?

> A.    Yeah, a couple of times I did, yeah. Other time, it could have been on my
> own.  [Wiseman dep. 195(6-22)] (emphasis supplied).

59.    Wiseman and Segal admit that there was never any discussion of sending an

e-mail to Ullmann confirming that they understood that everything was okay and that Phat

Fashions was going to eventually be signing and returning the amendment.  (Segal dep. 106-07).

This failure came despite Wiseman's admission that Ullmann was accessible to him via e-mail

and that, when Wiseman had problems or issues, he would communicate with Ullman via e-mail

and Ullman would respond.  (Wiseman dep. 118, 195-96, 231).  Wiseman tried to excuse this

failure by claiming that the parties always did things verbally.  (Wiseman dep. 195-96).  When it

was pointed out that here there was a <u>written</u> amendment, not an <u>oral</u> one, Wiseman responded:

> <u>Well, they sent it to us, so my CFO would say, hey, you know, we are waiting for</u>
> <u>something back, that's his job, so he'd come to me</u> and I'd say, stop bugging me, a
> guy died in their place, or stop bothering me, there's -- it's all corporate crap.
> (Wiseman dep. 197) (emphasis supplied).

Wiseman also testified that he never left Ullmann any voice mails asking him when he was going

to sign and return the draft amendment (Wiseman dep. 197) and never had Segal call Nathanson

to find out where the signed amendments were:

> Q.    Barry Segal had conversations and correspondence from time to time with
>       Phat Fashions and Kellwood; is that correct?
>
> A.    Yeah.
>
> Q.    <u>Did you ever say to Barry Segal, look, Barry, in words or substance, if</u>
>       <u>you're so concerned or if you're asking about this, why don't you send him</u>
>       <u>an E-mail and find out where the signed copy is</u>?
>
> A.    <u>No</u>, he would never send that, it was my -- my relationship with Bernt.  I
>       don't know if he ever had any dialogue with Bernt.
>
> Q.    Well, not even to Bernt, for instance, <u>Barry Segal and Ely Nathanson had</u>
>       <u>had some communications</u>?
>
> A.    <u>Yes</u>.
>
> Q.    <u>Was there anything stopping Barry Segal from contacting Ely Nathanson</u>
>       <u>and saying in words or substance, well, we sent you back the agreements,</u>
>       <u>when are we getting them signed</u>?
>
> A.    <u>I think he would have adhered to what I told him, and I said, leave it</u>
>       <u>alone, it's a done deal, Bernt assured me it's a done deal, don't bother, you</u>
>       <u>know, like we didn't want to irritate anybody</u>.  [Wiseman dep. 197(23)-
>       98(24)] (emphasis supplied).

Segal admits that he never called Nathanson to ask him when Tornado was going to get the

signed amendment back from Phat Fashions.  (Segal dep. 106).

60.     Wiseman testified that on some of those conversations where Segal "had asked me to call Bernt concerning getting the document back," he would put Ullmann on speakerphone and, without telling Ullmann that he was doing so, would let Segal, who would remain silent, secretly listen in. (Wiseman dep. 201-07; Wiseman dec. ¶¶ 31-32; Segal dep. 99, 105-06; Segal dec. ¶9). After those conversations, Wiseman would say to Segal, who would still persist in the need to get the amendment signed by Phat Fashions and returned to Tornado:

> I recall getting on the phone and saying, see, everything is okay, what you bug-ging me, just don't worry these things, you know, it is a done deal, it's a done deal, it's a done deal, a done deal, you know.  He's like a corporate kind of guy too, so he likes to have his T's crossed and his I's dotted, you know, type of thing.  (Wise-man dep. 203).

Segal admits that in these conversations that he was secretly listening in on, Ullmann "certainly did talk about getting the amendment document, the paperwork, processed and signed at Phat Fashions."  (Segal dec. ¶17).

61.     Segal claims to recall one telephone conversation about the amendment that took place between Ullmann and Wiseman in April 2006 and on which he secretly listened in:

> A.     Yes, what you call Amendment No. 1. I remember that this was sent back on March the 30th, and I believe that two weeks later, we called Bernt where I was present at – with Issie, and I said, why don't we give Bernt a call because we got this amendment and, you know, I had signed it -- you had signed it off and, you know, and the lawyers sometimes, you know, used to tell me to send it to me, it gets way late, so let's make sure that Bernt had received from Mr. Nathanson the agreements.

> Q.     Why did that matter to you?

> A.     Only to the fact like everything else, when I signed something, when something emanates from me, you know, I like to -- I'd just like to follow up, you know, even though I knew there was -- the agreement had been reached, but I had seen a piece of paper, I had sent it out, so I wanted to see what – where it was.

> Q.     Would it be fair to say that what you were looking to do is find out whether or not Bernt Ullmann or anyone from Phat Fashions had signed it

and if they were going to be returning it to you?

A.     <u>I just wanted to make sure he received. That was the only reason for my calling, was to make sure that he -- that, A, that he received it at that point in time.</u> [Segal dep. 99(14)-101(11)] (emphasis supplied).

Wiseman called Ullmann on his speakerphone, while Segal, who was in the room, said nothing and claims Ullmann said that "we are just going to get it signed off." (Segal dep. 101-02). In his declaration, prepared just ten days <u>after</u> his deposition, Segal remembered even more and that Ullmann said that the amendment "<u>would get moved through corporate channels and he would send us a 'signed off' copy for our files.</u>" (Segal dec. ¶14) (emphasis supplied).

62.     Segal was secretly on another phone call between Ullmann and Wiseman in August 2006 and admitted that he wanted to get the contract signed and delivered back to Tornado:

> There was another case in point whereby Issie had called Bernt, <u>I may have asked him, you know, it was my regular tasks or whatever having to do this, you know, something went out, you know, I'd like to get it back</u> and whatever, and I think this was, I believe, in August, I said, you know, the MAGIC show is coming up or whatever, <u>speak to Bernt, maybe he'll bring the agreement with him, okay, to the MAGIC show.</u> (Segal dep. 102-03).

Once again, Segal was far more specific in his declaration, stating that in August 2006, "<u>I remember that I noted that our paperwork had not come back – that's part of my job</u> – and when I mentioned this to Issie he said something like, who cares, <u>Bernt said it would come eventually.</u>" (Segal dec. ¶15) (emphasis supplied). Segal recalls that Wiseman said he would mention it to Ullmann, which he did on another telephone conversation which Segal secretly listened in on, and claims he heard Ullmann say "<u>you'll get it back eventually.</u>" (Segal dec. ¶15) (emphasis supplied).

63.     Segal was constantly pushing Wiseman to get the agreement back signed, but testified that Wiseman was resistant:

> <u>I remember I think I had mentioned to Issie on another occasion, I may not have</u>

been at that conversation, but that he had told me, that basically I mentioned to him again, again, in October maybe or September or October about it, and I think he gave him [Ullmann] a call. And he told me afterwards, I don't believe I was at that one, he said, well, what do you keep bugging me about this business about, I said, I know it's a done deal, I'm just telling you, you know, it's part of my tasks, I have it on my to-do list, it's a time line, I go through my to-do list, I see that, I said, okay, let's, you know, whatever. He told me, he said, hey, listen, you know, it's -- this is big, it's corporate, it's, you know, sitting on somebody's desk, but don't worry, it's a done deal, and that was what he told me on that occasion. (Segal dep. 104-05).

Segal does not deny that he was persistent about wanting to get the signed amendment back and that "was on my to-do list" for several months. (Segal dep. 106). As he testified:

Q.     But it is fair to state that after Issie Wiseman signed the document, that on a fairly routine basis, you would ask Issie Wiseman when -- where is the signed document, when are we getting it back?

A.     Correct. I did make a mention to him about three or four times over the six months, or the year, yeah, basically almost a year, where is the document, yes.

Q.     Well, actually it would be between April and December of '06, right?

A.     Yeah, so nine months. ... Three times maybe, three maybe, possibly four, but I would think probably around three times. Well, the first time was only to make sure that he got the document.

Q.     That's April?

A.     Yeah, so I may have said to him, in August, I know maybe in December, and October maybe he took it upon himself to call him up by himself and whatever and just discussing other topics that came up into his mind, maybe Bernt said something, but I don't know, but I wasn't at that conversation, only to the fact that Bernt told me, hey, everything is okay, the contract is okay, it's on somebody's desk, it's corporate and everything is a go. [Segal dep. 107(10)-08(13)] (emphasis supplied).

64.     In his November 30, 2006 declaration, prepared after his November 16-17 deposition, Wiseman tries to make it appear that it was not important to get back the signed copy of the amendment from Phat Fashions, but cannot help but acknowledge that signature and delivery were critical here. For example, Wiseman admits that:

a.  It was Segal's "job to keep our finances and our paperwork on track" and it was for that reason that he brought Segal into the room in April 2006, and called Ullmann on speakerphone to confirm that Ullmann had received the signed amendment from Tornado. (Wiseman dec. ¶¶ 31-32) (emphasis supplied).

b.  "[A] few months later," he received "a reminder from [Segal] that our copy had not come back," which prompted him to call Ullmann on two separate occasions to confirm that the amendment "would get signed" and "the paperwork would get processed" by Phat Fashions, which assurances he claims he received. (Wiseman dec. ¶¶ 33-34) (emphasis supplied).

c.  "Because [Segal] again mentioned to me that the paperwork was not back," he again called Ullmann to get confirmation that Tornado would "have our copy by" MAGIC in February 2007. (Wiseman dec. ¶36) (emphasis supplied).

d.  Ullmann repeatedly told him that amendment "would get signed at his end and returned without a problem." (Wiseman dec. ¶46) (emphasis supplied).

Clearly, Wiseman and Segal understood that signature and delivery of the amendment by Phat Fashions were necessary for the amendment to be valid.

**M.    In October 2006, BP Clothing Notifies VIS That It Is Terminating Its Agreement With VIS; The Agreement Is Terminated In December 2006**

65.    Although Tornado relegates it to footnotes in its papers, Wiseman and Segal both acknowledge that "[t]here was one significant exception to the way Baby Phat lines were handled," which involved the fact that: (a) Phat Fashions had granted worldwide rights for certain Baby Phat clothing lines to BP Clothing LLC ("BP Clothing"); (b) BP Clothing made VIS its exclusive sublicensee for Canada; and (c) VIS did not pay royalties to Phat Fashions on these sales. (Wiseman dec. ¶5, n. 1; Segal dec. ¶4, n. 2; D.Mem. n. 4). Wiseman admitted that VIS "distributed a substantial volume of Baby Phat products that fell within the BP Clothing sublicense" (Wiseman dec. ¶5, n. 1) and while Tornado claims that the "sub-license has since been discontinued and is not at issue here" (D.Mem. 4, n. 4), that is simply not true.

66.    Wiseman states that VIS's "marketing agreement with BP Clothing ended in late 2006 because BP Clothing decided to handle their Canadian marketing themselves, and our 'oral

handshake' arrangement had never had a set term." (Wiseman dec. ¶5, n. 1) (emphasis supplied). In fact, on October 26, 2006, after eighteen months of complaints by BP Clothing's President, Steve Feiner ("Feiner"), to Wiseman about VIS's poor sales and performance, notice was given by BP Clothing to VIS that it was terminating its relationship with VIS, resulting in litigation between the parties. (PX 24; Wiseman dep. 217-22, 382-83, 389-90, 397-99; Segal dep. 195).[10] At his deposition, Wiseman was taken through the Complaint filed by BP Clothing against VIS in this Court (PX 28) and admitted that:

    a.    VIS was a distributor of Baby Phat clothing in Canada, although there was no and has never been any written distribution agreement between the parties;

    b.    BP Clothing received periodic purchase order from VIS and delivered the Baby Phat clothes pursuant to such purchase orders;

    c.    BP Clothing was always unhappy with VIS performance in Canada;

    d.    BP Clothing notified VIS on or about October 2, 2006 that that it desired to terminate VIS as a distributor in Canada;

    e.    VIS has an unpaid balance from several of these deliveries dating back to November 2006 and VIS has failed and refused to pay the invoices despite repeated demands for payment;

    f.    VIS withheld payment because it believed that BP Clothing had improperly terminated its distribution rights for Canada; and

    g.    VIS cancelled its orders for Baby Phat products for February and March 2007. (Wiseman dep. 249-58) (emphasis supplied).

    67.    Wiseman received a formal letter of termination from BP Clothing on December 12, 2006. (PX 25; Wiseman dep. 397). On December 21, 2006, VIS caused it counsel to send

---

[10] Wiseman recalls telephoning Ullmann on multiple occasions after the termination of VIS by BP Clothing and telling him that he was going to fight BP Clothing. (Wiseman dep. 222-23, 226-27). Ullmann remembers Wiseman telling him about "our Baby Phat licensee terminating the contract with a designated company that Issie is affiliated with or an owner of or part-owner of and thus causing them to lose Baby Phat for Canada and he was distraught." (Ullmann dep. 78-85, 325-26, 342). Ullmann and Wiseman had a conversation in which they discussed the belief of Steven Feiner, BP Clothing's President, that with a new distributor, BP Clothing "could more than double the turnover for his brand -- for their brand, Baby Phat in Canada, while actually improving the presentation and integrity of the brand in the market." (Ullmann dep. 317-19).

correspondence to BP Clothing objecting to the termination and demanding $1.5 million in compensation. (PX 26). BP Clothing's counsel responded to that letter on January 24, 2007 (PX 27) and BP Clothing filed a Complaint against VIS on March 14, 2007 (PX 28). A settlement agreement was entered into on March 22, 2007 pursuant to which VIS paid BP Clothing $278,124 on an admitted balance due of $403,124, i.e., VIS received $125,000 as compensation for being terminated (PX 29), and BP Clothing is now distributing Baby Phat product on its own in Canada. (Wiseman dep. 83-89, 411, 413; Segal dep. 204-07).

68.    It must be emphasized that VIS did not seek a preliminary injunction to stop the termination by BP Clothing of VIS right to distribute Baby Phat product in Canada and, by accepting $125,000 in return for the loss of 7.63% of the Tyfoon Group's business, acknowledged that any harm it suffered was compensable in money damages. As testified to by Segal at his deposition, and as confirmed by a document produced last week by Tornado, between 24% and 37.5% of VIS's sales of Baby Phat products were of products that VIS obtained from BP Clothing. (PX 48; Segal dep. 207-08; Segal dec. ¶6, n. 3). As shown by the chart below, and in contrast to the statements in their declarations (Wiseman dec. ¶8; Segal dec. ¶6, n. 3), sales of product purchased by VIS from BP Clothing in 2006 (the last full year of sales prior to BP Clothing's termination of VIS) equate to 7.63% of the Tyfoon Group's overall sales:

| Year | VIS Sales | BPC Portion | BPC % of VIS Sales | Tyfoon Group Sales | BPC % of Tyfoon Sales |
|------|-----------|-------------|--------------------|--------------------|-----------------------|
| 2005 | $ 9,447,116 | $3,544,947 | 37.52% | $42,932,532 | 8.25% |
| 2006 | $11,784,391 | $2,831,874 | 24.03% | $37,112,679 | 7.63% |
| 2007 | $10,186,417 | $1,557,112 | 15.00% | $27,135,658 | 5.74% |

69.    Wiseman admits that as a result of the termination of VIS by BP Clothing, Tyfoon had to lay off employees and terminate relationships with sales people. (Wiseman dep. 402-03). Amazingly, Wiseman conceded that BP Clothing "has every right to take over and do it on his

own, I don't know how well they're doing, but he's got that right, that's okay, we didn't have an agreement, we had a verbal agreement." (Wiseman dep. 255-56).

**N.    Facing Termination By BP Clothing, The Tyfoon Group
Extends Its Lease On The Phat Farm Store From 2010 To 2013**

70.    In support of its alleged claim of detrimental reliance, Tornado made allegations at ¶74 of its Answer that were entirely untrue:

> In reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Issie Wiseman did not cancel a commercial lease with a third party, Montreal Media Entertainment Building Inc. ("Montreal Media").   On or about November 15, 2004, Issie Wiseman had executed a five-year lease with Montreal Media for the Phat Farm store; the purpose of Issie Wiseman leasing this property was to have a store in which to specifically sell Phat Fashions products.  The lease provided that Issie Wiseman could cancel the lease until December 31, 2006 without penalty.  In reliance on Phat Fashions' promises and believing it would have Phat Fashions products to sell, Issie Wiseman did not cancel the lease by December 31, 2006.  (Answer ¶74; Wiseman dep. 283-84).

Even in his declaration, Wiseman states that "we got an opportunity to extend the lease for that store which otherwise was going to end." (Wiseman dec. ¶35).

71.    The truth was far different.  On November 5, 2004, before the second renewal term of the Agreement had even commenced, the Tyfoon Group corporation which owned the Phat Farm store in Montreal and is not a party to this litigation, i.e., 3702669 Canada Inc. ("3702669"), renewed its lease with Montreal Media Entertainment Building Inc. ("MMEB") for an additional five year period running through March 1, 2010.  (PX 30).  Wiseman and Segal concede that, pursuant to ¶(i) of the amendment, 3702669 could cancel the lease without penalty on 12 months notice commencing March 1, 2007.  (Wiseman dep. 289-91; Segal dec. ¶19).

72.    In November 2006, Wiseman and Segal learned the "very positive" news that the city was going to take the area in which the store was located, beautify it and turn it into a pedestrian mall without vehicles, and that the landlord was willing to extend the current lease for three

years from 2010 to 2003 (and not "several years" as stated by Segal) at a very "beneficial" and

"attractive rate." (Wiseman dep. 284-85, 292-93; Wiseman dec. ¶35; Segal dec. ¶¶ 16, 19).

Segal told Wiseman that they should extend the lease (Wiseman dep. 291-93) and explained his

involvement in the lease renewal in late 2006:

> My involvement was I had earlier -- we are on -- our store is located on St.
> Catherine's Street just east of a street called Phillips -- just east of Phillips Square,
> so the main part of downtown, okay, the busier part of downtown, not to say the
> other part is not busy, is further west of where we are, okay.
>
> It came to our knowledge that the City of Montreal was trying to reinvigorate the
> entire area from just west of where we were all the way going east, okay, and
> when I say that, I say that they were going to make it into a pedestrian mall.
>
> In Montreal the bulk of our business is done in the summer and fall when the
> weather is nicer, and we -- Montreal is a city of festivals in the summertime.  We
> had the jazz festival, we have the comedy festival and whatever, and that whole
> area, even though it's busy, it could be a lot busier because there is a lot of cars
> and a lot of noise.
>
> So what the city was thinking of doing, and this is what we were told, is they were
> going to do that whole area into a pedestrian mall area, which would increase the
> traffic tremendously in the summer months, and right behind where we are is a
> large parking area, so basically they would park and have to go around, really
> right by our store.  So it was going to increase the traffic tremendously.  (Segal
> dep. 122-24) (emphasis supplied).

73.     Although it was at this same time that BP Clothing was terminating its distri-

bution arrangement with VIS, Segal on November 28, 2006 informed MMEB that 3702669 was

willing to give up its right to terminate the lease as of March 1, 2008 (12 months notice being

required) in return for MMEB's extending the lease for another three years through February 28,

2013. (PX 31).  MMEB agreed and sent a Lease Amendment to Wiseman which, although pro-

viding that Wiseman had until December 31, 2006 to sign it, he apparently signed on December

11, 2006, nearly three weeks earlier, and without having received back from Phat Fashions the

signed amendment.  (PX 32; Wiseman dep. 295-300; Segal dep. 125-26).  Astonishingly, Wise-

man admits that he signed the lease extension without informing Ullmann that he was doing so:

> Q.   Near the end of the day we were looking at documents having to do with a lease amendment which was Plaintiff's Exhibit 83. It was signed some time on or after December 11th of 2007. <u>Before you actually signed that document at or about that time, did you call Bernt Ullmann and tell him look, in words or substance, I'm going to sign this agreement, I need to hear back from you that you will send me that signed extension?</u>

> A.   <u>No.</u>

> Q.   <u>Did Bernt Ullmann know that you were entering into this lease amendment</u>?

> A.   <u>I don't believe so.</u>  [Wiseman dep. 324(10-25)].

74.     In his declaration, Wiseman expands upon the above, admitting that: (a) in late 2006, the Tyfoon Group got an opportunity to extend the lease on the Montreal store for three years through 2013 at an attractive rent; (b) "<u>before any change to the lease was signed,</u>" Segal "<u>again mentioned to me that the paperwork was not back;</u>" (c) as a result of that reminder by Segal, Wiseman called Ullmann in December 2006, but "<u>I didn't mention the lease; I just asked the usual question about the paperwork;</u>" and (d) although Ullmann told him that <u>Tornado would</u> likely not get back a copy of the signed amendment until the MAGIC show in February 2007, Wiseman extended the lease in December 2006. (Wiseman dec. ¶¶ 35-36) (emphasis supplied). Segal echoed Wiseman's declaration, admitting that: (a) "<u>before we concluded anything with the landlord I mentioned the paperwork again to Issie;</u>" and (b) he was in the room when Wiseman called Ullman and heard Ullman says "that <u>we should have our copy of the document by the next MAGIC show</u> (which would be in February 2007)." (Segal dec. ¶16) (emphasis supplied).[11]

75.     When Wiseman was asked whether he had any recollection of Ullmann telling

---

[11] Segal's statement that "we would never have changed our lease terms in December 2006 if we had been told our 'deal' was not assured or that it was on 'hold'" (Segal dec. ¶20) only demonstrates that Wiseman and Segal should have at least told Ullmann their plans before entering into the lease extension and made sure they got back the signed amendment before extending the lease.

him in that December 2006 call that he would have the fully executed written extension at the

next MAGIC show, Wiseman responded:

> I do recall something like that, that it would be all resolved by the next MAGIC show or something like that, something like that. I don't know in what the exact phraseology was, but I do recall that, that he said something like that to me, but don't worry about it, next MAGIC, the document, you'll have it back or something like that, but I don't recall the exact phraseology. Again, assured me -- but to me, it didn't matter about the document because we had an agreement, so I didn't care, you know, Barry wanted his -- the T's crossed and the I's dotted, but to me, it was inconsequential. (Wiseman dep. 208) (emphasis supplied).

76.     Although Wiseman tried to pretend that getting the signed amendment back was

not important, he admitted that he made numerous calls about it:

> Q.     But you still made phone calls about it?
>
> A.     Uh-huh.
>
> Q.     According to your answer in April, July?
>
> A.     Sure, every few months, yeah.
>
> Q.     So it was at least in the back of your mind?
>
> A.     Well, it was in the back of Barry's mind, he kept asking me to make the call.
>
> Q.     Did there ever come a time when you said to Barry, Barry, in words or substance, just call Ely Nathanson and find out what the hell is going on?
>
> A.     Never. I had nothing to do with Ely Nathanson, I had nothing to do with Ely Nathanson.
>
> Q.     Well, only reason I mentioned Ely Nathanson is that since he was the one that sent you the document in the first place and that once you signed it, it went back to him.
>
> A.     The agreement I had was with Bernt Ullmann, nothing to do with Ely Nathanson. Ely maybe wrote the document, but I had nothing to do with him. I had to do with the president of Phat Fashions. I don't care if he thinks he signed it or didn't think he signed it, it had nothing to do with Ely, it had to do with Bernt Ullmann and myself. [Wiseman dep. 208(24)-10(4)].

This is apparently the last phone Wiseman claims to have made to Ullmann about Phat Fashions'

signing and returning the amendment to Tornado.

**O.     At The Same Time As BP Clothing Is Terminating VIS, Phat Fashions
        Begins To Explore Alternative Distribution For Canada And Decides
        <u>In Early 2007 That It Will Not Be Going Forward With Tornado In 2008</u>**

77.     Gaby Bitton ("Bitton"), one of the owners of Buffalo Jeans, a company affiliated

with Algo Corporation ("Algo"), was first brought to Ullmann's attention in fall 2006 by

Skinner, who had had an exploratory meeting with Bitton in Canada and had been impressed by

Bitton's operation and infrastructure. (Ullmann dep. 16-19). Ullmann telephoned Bitton to in-

troduce himself and, as discussions evolved, they talked about the possibility of a license agree-

ment in Canada between Phat Fashions and an Algo subsidiary. (Ullmann dep. 19-22). Algo did

not make a written proposal until October 2006 and Nathanson did not start to draft agreements

until November 2006. (Ullmann dep. 221-22; Nathanson dep. 78; PX 33).

78.     By the time January 2007 arrived, Phat Fashions was still negotiating with Algo,

but no agreements had been finalized or executed. (Nathanson dep. 82-84). Tornado continued

in its failure to make any written inquiries to Phat Fashions as to whether Phat Fashions had

executed the draft amendment or to give any indication to Phat Fashions that Tornado considered

the Agreement to have been validly extended by the partially-executed draft amendment which

Phat Fashions had neither fully signed nor returned to Tornado.

79.     In early 2007, Ullmann recommended to Skinner that Phat Fashions <u>not</u> go

forward with Tornado beyond 2007. (Ullmann dep. 183-85, 189). As Ullmann testified:

> I cannot recall the specific reasons. I will say we had, by then, received a lot of
> information about how our brand was being managed in the territory and it was
> unfavorable information. <u>The proposed minimums in the agreement, while higher
> than what had previously been done, are not impressive at all by any business
> standard. All our standard agreements go off at a royalty of 8 percent; this</u>

agreement was grandfathering 7 percent.

> By then, there had been a falling-out with our Baby Phat licensee and there was a major feud going on between Baby Phat, our largest licensee bar none -- it's our largest licensee by far and there is, at this point, a vicious feud between Baby Phat and Issie and some separate entity that he's involved with. So there were a number of reasons that were unfavorable and it changed the climate. (Ullmann dep. 185-86) (emphasis supplied).

When asked whether the amount of sales Tornado had been making was one factor that caused

Ullmann to recommend to Skinner that Phat Fashions not go forward with Tornado, he replied:

> It could have been one factor and that would be the future promised sales, the guaranteed minimum net sales and the guaranteed minimum net royalties could have been a factor. A factor could have been that Tornado's royalty percentage was 7; Bitton royalty percentage is 8. A factor could have been that Bitton, along with the distribution, or rather the wholesale agreement, also offered the opening of three flagship stores in Canada.

> A factor could have been that there was a conversation with Bitton about opening of a number of freestanding stores in the United States. But factors would probably also have been that we were having increasingly difficult relations with Tornado: he's had a major falling out with BP Clothing, our largest licensee.

> During Bitton's due diligence process, they went out to every single one of Tornado's customers, they have a huge report available, very unfavorable to Mr. Wiseman and Tornado and their conduct in the market. I had also received independently, because I do recognize that Mr. Bitton and his group was obviously a party in the process, that they're not necessarily at neutral in the business, but there were also independent conversations from other operators in the market that were not favorable towards Tornado.

> So there are a lot of things that come into play and I can't recall to which extent either one of them, and maybe more that I'm not mentioning now, played into the final decision. (Ullmann dep. 297-99) (emphasis supplied).

80.    Ullmann understood that the report prepared by Bitton with respect to its discussions with Tornado's customers (which report Ullmann has never seen), "is very damaging to Issie and Tornado and speaks to a certain level of negligent, poor service, lack of customer follow-through, lack of delivery, focus or consolidation on sales only to a limited number of retailers that were not necessarily strong or good for the image of the brand." (Ullmann dep. 310-11).

**P.      Ullmann Informs Wiseman In February 2007 That Phat Fashions Will Not
          Be Signing The Amendment And Going Forward With Tornado Beyond 2007**

81.      It was in either late January or early February 2007, prior to the MAGIC show,

that Ullmann informed Wiseman that Phat Fashions would not be extending the Agreement.

(Ullmann dep. 37, 176-78, 180-81).  <u>In informing Wiseman when he did, Ullmann was actually</u>

<u>giving Wiseman at least four months more notice than was provided for in the Agreement.</u>  As

Ullmann testified when asked whether Phat Fashions had simply kept Tornado on hold until it

could finalize another deal (which Phat Fashions had not yet done by February 2007):

> No, I disagree.  I don't think that's accurate at all.  <u>Tornado has an agreement that</u>
> <u>still is in effect today.  It runs all the way to the end of this year.  The notice</u>
> <u>period in that agreement, each and every time when it was reviewed, I believe,</u>
> <u>and it's our standard language, any licensee that is renewing -- and it's different</u>
> <u>than amending -- has to give notice not sooner than nine months before expiration</u>
> <u>and not later than six months prior to expiration.  So if I'm having a conversation</u>
> <u>with Issie Wiseman in January or February, I'm well outside of that window pro-</u>
> <u>viding ample time either way</u> and I don't think it's particularly linked to any-
> thing."  (Ullmann dep. 179-80) (emphasis supplied).

82.      Wiseman, upon learning from Ullman that the Agreement was not going to be

extended, responded first by sharing his negative views of Bitton and pleading with Ullman not

to go forward with them and then by recognizing that the Agreement would end at the end of

December 2007.  (Ullmann dep. 84-86).  <u>At no time during that discussion did Wiseman say to</u>

<u>Ullmann that he understood the Agreement to have been extended by an amendment in 2006,</u>

<u>orally or otherwise.</u>  (Ullmann dep. 398-99).

83.      Tornado concedes that it was on or about February 15, 2007 that Ullmann told

Wiseman that Phat Fashions was negotiating with Algo and making alternate arrangements for

licensing its products in Canada and informed Wiseman that Phat Fashions likely would not be

executing the proposed amendment.  (Answer ¶¶ 14, 34, 44, 71, 91, 96, 100).  Wiseman admits

that he received a call from Ullmann in February 2007, prior to MAGIC, in which Ullmann in-

formed him that Kellwood and Phat Fashions were talking to another Canadian company about distributing the line in 2008. (Wiseman dec. ¶37; Wiseman dep. 231-33). According to Wiseman, he pressed Ullmann about the competing proposal and, remarkably, <u>claims that he took comfort from Ullmann's statement that, with respect to the other potential licensee, "nothing has been signed."</u> (Wiseman dec. ¶38) (emphasis supplied).

84.    Remarkably, although Wiseman claims that he believed that the parties had agreed in 2006 to amend the Agreement to extend it, Wiseman admits that in this critical conversation with Ullman, "<u>I don't recall bringing up the amendment.</u>" (Wiseman dep. 234) (emphasis supplied). Rather, Wiseman tried to convince Ullmann that Tornado could do a better job than Bitton. (Wiseman dec. ¶38; Wiseman dep. 234-37). Wiseman expanded on his testimony, conceding again that he did not say to Ullmann that he thought that an oral agreement had been reached between them in 2006:

> There came a time when I learned that they may not go forward with us even though we had a deal. So I spoke to Bernt and I, you know, I decided to -- it was a very peculiar situation because <u>I decided to try to win them over in a nice way because it would be really not good for us to go to war with them immediately and say to them, hey, you can't do that, we had a deal going forward, what are you talking to other people for. You can't talk like that to a corporation that does $3 billion or, you know, a big company like that</u>. And we had to have an ongoing relationship going forward. So I tried to win them over and tried to tell them, listen, I'm going to try to change your mind, you didn't do a deal with these people, right, so I am going to try to convince you to stick with us and have a good relationship going forward, so that was my attitude when, you know, when it first sunk in in February right after -- at MAGIC, again, I met with Bernt and I had -- he had told me that, yeah, they're having conversation with these other guys and it's coming close to deal, but we haven't done anything yet. Telling me that they're still, you know, like saying to me like they're still not a done deal, okay. (Wiseman dep. 237-38) (emphasis supplied).

85.    Wiseman admits in his declaration that at MAGIC in February 2007, rather than referring to the amendment and demanding that Phat Fashions live up to the alleged agreement, he suggested that they "work out a compromise" such as "splitting the lines," <u>i.e.</u>, "I said, look,

they [Bitton] have no proficiency in footwear, they don't know anything about handbags." (Wiseman dec. ¶39; Wiseman dep. 270-73, 278-79). Ullman recalls that Wiseman conceded to him in these conversations that the Agreement had expired, acknowledged that Phat Fashions had a new Canadian licensee, and asked if there were perhaps some products, such as footwear or handbags, that Wiseman's company could continue to distribute if the new licensee was not interested in doing so. (Ullmann dep. 35-37, 84-87, 398-99). [12]

86.     Wiseman claims that on March 7 or 8, 2007, after MAGIC and after learning that Phat Fashions was going forward with a new distributor, he telephoned Skinner, Phat Fashions' Chairman, and that Skinner told him, "listen, you're talking to the wrong guy, I have the utmost confidence in my president Bernt Ullmann and I abide by his decision." (Wiseman dep. 126-28, 239; Wiseman dec. ¶¶ 40-41). Wiseman claims that he then called Ullmann and that after that conversation, "I decided that there's no use to continue with trying to win them over" and "that it was time to assert our legal rights" and to also start trying to find a license(s) to replace Phat Fashions. (Wiseman dep. 239-41, 258; Wiseman dec. ¶¶ 42-43).

**Q.     Wiseman, With Knowledge That Phat Fashions Is Not Going Forward With The Amendment, Still Seeks To Exercise The Non-Existent Option Leading To The Commencement Of This Litigation By Phat Fashions**

87.     In his declaration, Wiseman makes a statement which leaves no doubt that if Tornado were going to move for injunctive relief, it should have done so in March 2007. Wiseman states that after his conversations with Skinner and Ullmann during the first or second week of March and "[a]fter discussions with our lawyers":

---

[12]   It was also in February 2007 that Algo executed agreements sent to it by Nathanson and returned them to him for counter-signature on February 8, 2007. When Phat Fashions did not immediately sign the agreements, Algo's representative, Robert Halickman ("Halickman"), repeatedly sent e-mails to Nathanson asking that the agreements be signed and returned, the first two arriving on February 22 and 28, 2007. (PX 34). In fact, and months later, prior to any signature by Phat Fashions, the agreement was revised. Algo's dilligence should be contrasted with that of Tornado here, which never made any written request that the amendment be signed or returned to it.

[W]e decided that we had to advise Phat Fashions of our intention to stand on our rights – our business survival was now at stake and the time for pre-selling (booking) orders for early 2008 was only a few months away. (Wiseman dec. ¶44) (emphasis supplied).

88.     Wiseman and Segal met with Tyfoon's attorneys and, on March 19, 2007, Segal

drafted and sent a letter (signed by Wiseman) to Ullmann (Wiseman dep. 263-69; Wiseman dec.

¶44; Segal dep. 134-37), which stated, in full:

> You will recall that in March 2006 Phat Fashions and Tornado Imports agreed to the amendment of the License Agreement and we returned to Eli B. Nathanson two signed originals for signing by Phat Fashions which has always been forthcoming.
>
> In virtue of the terms of the Amended License Agreement, we are obliged to give notice between March 1 and June 30, 2007 of our intention to exercise the Third Option covering the period of January 1, 2008 to December 1, 2010. The present letter constitutes a notice of exercise of the Third Option.
>
> We are also transmitting a copy of this notice to Kellwood Company and Pryor Cashman as required under the Amended License Agreement.
>
> Trusting all is satisfactory, we remain. (PX 35) (emphasis supplied).

89.     My partner, Brad Rose (whose client is Phat Fashions), responded to Wiseman's

letter immediately, sending a letter to Wiseman on March 21, 2007 which stated, in relevant part:

> [P]ursuant to Section 17 of the Agreement, the Agreement "can only be extended, waived or modified by a writing signed by both parties." Notwithstanding your claim to have executed and returned the amendment, given that Licensor has, most assuredly, not signed the proposed Amendment, your attempt to exercise a renewal option that is unavailable to you under the Agreement is hereby rejected.
>
> Accordingly, pursuant to Section 3 of the Agreement, the Term of the Agreement shall expire on December 31, 2007. (PX 36) (emphasis in original).[13]

90.     Tornado claims that once it received the March 21, 2007 letter from Rose, it knew

with certainty that Phat Fashions had decided not to move forward with the extension. (Answer

---

[13] There is no dispute in this case that the statement in Rose's letter that Tornado had neither signed nor delivered back to Phat Fashions the amendment was an error based upon the fact that Nathanson had not retained copies in his files of the documents or his transmittal letter to Morris.

¶¶ 72, 92; Wiseman dec. ¶¶ 45-46; Wiseman dep. 268-69, 302; Segal dep. 134, 137-39). Despite such definite knowledge on March 21, 2007, it was not until April 18, 2007, nearly one month later, that Richard A. Hinse ("Hinse") of Lavery, DeBilly, counsel for Tornado (who had also acted for VIS in its dispute with BP Clothing), sent a letter to Rose contending that the Agreement had been extended. (PX 37).    Nowhere in the April 18, 2007 letter was there any claim of any oral amendment (in February 2006, March 2006 or otherwise) or that Tornado had been given or had relied upon any assurances from Ullmann that the amendment would be signed by Phat Fashions.  Indeed, the letter admitted that:  (a) the amendments "were transmitted to your firm (att. Eli B. Nathanson) for signing by Phat Fashions;" and (b) "[t]he two originals signed by Tornado Imports were to be signed by Phat Fashions and one returned to Tornado Imports."  Tornado's counsel closed his letter by confirming that the delivery of an executed amendment by Phat Fashions was critical for the amendment to be binding upon Phat Fashions:

> Tornado Imports requests that Phat Fashions confirm to the undersigned within seven (7) days of receipt of the present letter that it will respect the Amended License Agreement and the exercise of the Third Option and that it also return one signed original.  (emphasis supplied)

Significantly, there is no mention whatsoever of the devastation which the Tyfoon Group now claims that it may suffer if the amendment is declared to be invalid.  Both Wiseman and Segal read and approved this letter before it went out.  (Wiseman dep. 226; Segal dep. 139-40).

91.    I responded to Hinse's letter (PX 38) on April 24, 2007, attaching a copy of the Complaint for a declaratory judgment which his letter caused Phat Fashions to file that same day.

**R.    Phat Fashions Continues To Negotiate With Algo While Tornado Takes Over Five Months To Serve Its Current Answer And Does Not Move For Preliminary Relief**

92.    It was not until June 26, 2007 that Tornado filed its original Answer and Counterclaims in this case, which, after extending the time for Phat Fashions to respond, it amended on

September 6, 2007. Tornado did not move for a preliminary injunction and the claims of possible devastating harm made by it on this motion are nowhere to be found in its Answer.

93.    During this period, Phat Fashions continued to negotiate with Algo. (Nathanson dep. 82-84). It was not until late Spring 2007 that the parties reached a meeting of the minds (Ullmann dep. 229). On May 23, 2007, Algo executed copies of the license agreements and sent them to Phat Fashions for counter-signature. (PX 39).[14] On September 28, 2007, Phat Fashions counter-signed [i.e., both Skinner and Simmons] and returned the agreements to Algo. (PX 41; Ullmann dep. 22-24, 196-97, 226). In Nathanson's e-mail to Ullmann and others on October 4, 2007 in which he was reporting the "Phat current deal list and status," the Algo license was noted as "signed and delivered back to Algo. Closed." (PX 42) (emphasis supplied).[15]

## S.    Tornado Neither Reasonably Nor Actually Relied Upon Any Alleged Assurances Give By Ullmann

94.    At ¶33 of its Answer, Tornado sets forth how it, as well as VIS and other non-parties to this litigation, allegedly relied upon the assurances given by Ullmann to Wiseman:

> Tornado and Vis-à-Vis detrimentally relied on Phat Fashions' assurances that the Agreement had been extended by the Extension by: (a) not canceling a lease for a store dedicated to selling Phat Fashions products; (b) instructing several members of its management team to devote nearly all of their time to Phat Fashions products at the expense of developing potential non-Phat Fashions product lines; (c) choosing not to sue the European Phat Farm shoe licensee for damages for territorial infringement for the sale of Phat Farm shoes in Canada; and (d) not pursuing efforts to replace Phat Fashions so Tornado's and Vis-à-Vis' businesses would not be hurt dramatically on December 31, 2007, when the Agreement would have terminated absent the Extension. (See also Answer ¶¶ 73, 104).

---

[14] Unlike the situation with Tornado, Algo's Halickman was vigilant in attempting to get back signed copies of the agreement from Phat Fashions, writing Phat Fashions' counsel seeking the return of fully-executed copies on numerous occasions, including May 31; June 11, 13, 14, 21; July 10 and August 16, 23, 2007. (PX 40).

[15] Tornado claims that it will "be able to introduce documents from plaintiff's files that distinguish the Tornado license document from other license renewals still in "negotiation." (D.Mem. 14). That document, attached as Exhibit 8 to the Beha declaration, is a status e-mail from Nathanson that refers to the Tornado amendment as being in "execution phase." That designation should be contrasted with how Nathanson describes an agreement that is actually signed by both Phat Fashions officers and then returned, i.e., "signed and delivered back to Algo. Closed."

95.     At their depositions, Wiseman and Segal confirmed that the above allegations (which constituted the first time that Tornado had ever alleged any reliance) accurately sets forth how they allegedly relied upon Ullmann's alleged assurances.  (Wiseman dep. 280-81; Segal dep. 142-43).  However, an examination of the facts reveals that the alleged actions taken or not taken by Tornado and non-parties to this litigation had nothing to do with any assurances which Ullmann allegedly gave to Wiseman and, furthermore, that to the extent that there was any actual reliance, such reliance was entirely unreasonable.

(i)     **The Extension Of The Montreal Store Lease From 2010 Through 2013**

96.     The beneficial factors that led to favorable extension by 3702669 (not Tornado) of a lease (from 2010 to 2013) in December 2006, a time when the Tyfoon Group knew that it was going to lose 7.63% of its business as a result of the termination by BP Clothing of its distribu-torship agreement with VIS, have already been discussed.  (See, ¶¶ 73-77, supra).  There was clearly no reliance on any statements allegedly made by Ullmann and, even if there were, the actions in reliance were not taken by Tornado, but by 3702669, a non-party.  Indeed, the Tyfoon Group's stores are completely irrelevant to this litigation for numerous reasons.

97.     Tornado alleges that the Tyfoon Group "runs four retail stores, all of which are separately incorporated entities.  Of these four retail stores, one is a dedicated 'Phat Farm Store' in Montreal that, until a few months ago, sold exclusively Phat products.  The other three stores are located in Montreal and Toronto and approximately two-thirds of their business is Phat products."  (Answer ¶39).  The Montreal store owned by 3702669 is no longer known as Phat Farm, having changed its name in November 2007 to Illicit, the same name as the other three stores owned by the Tyfoon Group, and like those stores, now sells, in addition to its inventory of Phat Fashions products, products from other sources.  (Wiseman dep. 50-52, 200, 299; Segal

dec. ¶¶ 2, 20, n. 5).  The Montreal store and the other three Illicit stores are all separately incor-

porated, file separate tax returns and are not owned by Tornado.  (Wiseman dep. 285-86; Segal

dep. 24-25, 175-76; Answer ¶39).  There are no contracts between any of the corporate entities

owning the stores and Phat Fashions.  (Wiseman dep. 366-67 ; Segal dep. 175-76).

98.    Tornado alleges that if the Agreement is not extended, the four stores "will need

to change their merchandise and become, in effect, entirely different stores" (Answer ¶79), That

is simply untrue because, as Wiseman admitted, the stores sell, in addition to Phat Farm or Baby

Phat products, other brands that the Tyfoon Group distributes.  (Wiseman dep. 36, 299).  Segal

admits that:  (a) Tyfoon does have an inventory of Phat Farm and Baby Phat products; (b) the

stores are still selling Phat Farm and Baby Phat products; and (c) he expects the stores to con-

tinue selling such products into 2008.  (Segal dep. 162-63, 167-69).  Indeed, what has not been

mentioned is the fact that there is absolutely nothing stopping the Tyfoon Group from stocking

the Montreal store, or any of its other three Illicit stores, with Phat Farm and Baby Phat products

in 2008 and beyond, which products it can acquire from the new licensee and others, including

BP Clothing.  Wiseman conceded this fact at his deposition, but made it clear that, as a matter of

personal choice, he was refusing to do business with these entities, i.e., "it goes beyond money at

this point in time" and "I don't care how meaningful it would be to us, we chose not to purchase

the goods after we terminated our arrangements, after our arrangements expired."  (Wiseman

dep. 286-88, 293-99).  Segal similarly admitted that the only thing stopping the Tyfoon Group

from obtaining Phat Farm and Baby Phat products for the Montreal and other stores was "per-

sonal preference" and that no attempts had been made by the Tyfoon Group to obtain such pro-

duct from these sources.  (Segal dep. 128-30; Segal dec. ¶20).  Thus, any damage being inflicted

on these stores owned by the Tyfoon Group is self-inflicted and has no place in this litigation,

even if the stores were parties (and they clearly are not).[16]

### (ii)    Tornado Did Not Give Any Instructions To Its Management Team

99.    In support of its claim of detrimental reliance, Tornado made another allegation at

¶75 of its Answer that turned out to be entirely untrue:

> In reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Tornado instructed its management team, including Issie Wiseman, Director and CEO of Tornado and Vis-à-Vis, Josh Wiseman, Director of Tornado, Mitchell Maislin, Managing Director of Shoe Sales of Tornado, and Claudia Michaels, Managing Director of Women's Clothing of Vis-à-Vis, to spend nearly all of their time and efforts focusing on Phat Fashions products.  (Answer ¶75) (emphasis supplied).

At his deposition, however, Wiseman admitted that no such instructions had been given:

> Q.    Would it be accurate to state that rather than them being given instructions to devote their time exclusively to the product, that they just be doing what they did before, which was working on those products?

> A.    Correct.  [Wiseman dep. 303(2-7)].

100.    In short, it was simply business as usual for these individuals and the Tyfoon

Group simply kept doing what it had done in the past, i.e., "we were doing a lot of business with

it, so we concentrated on those products, …we didn't change the modus operandi of how we

worked with Phat Farm and Baby Phat." (Wiseman dep. 300-03) (emphasis supplied).

Moreover, it was clearly in Tyfoon's best interest to spend as much of their time and effort

focusing on Phat Fashions products in 2006 because it clearly did have the license through the

end of 2007 and thus it made sense for Tornado to do everything in its power to maximize its

revenues and perhaps convince Phat Fashions to extend the license beyond 2007.[17]

---

[16] In addition, the four stores account for a small percentage of the total sales of the Tyfoon Group and none of them, including the Montreal store, were profitable in 2006 or 2007, and only some (not the Montreal store) were marginally profitable in 2005.  (Segal dep. 17-18, 20-22, 176-78; Segal dec. ¶¶ 19-20; Wiseman dec. ¶35).

[17] Tornado claims that "Tyfoon Group management and staff continued to work throughout 2006 on building their future with Phat-labels (and, not incidentally, on maximizing royalty revenues for Mr. Ullman's [sic] company)"

**(iii)**     **Tornado Had Adequate Time To And Did Successfully Pursue New Licenses**

101.     Tornado also alleges that "[i]n reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Tornado and Vis-à-Vis did not pursue efforts to replace Phat Fashions by researching other companies and product lines or engaging in negotiations with other companies." (Answer ¶76). Even if such allegations were true for 2006 (although there would be no reason for Tornado to pursue such other licensees for 2007 if it had Phat Fashions' products through the end of 2007), the truth is, and as demonstrated <u>infra</u> (¶¶ 107-18), that the Tyfoon Group had more than enough time in 2007 to pursue such efforts and successfully did so, nearly doubling its amount of licensors and picking up at least one major new license. (PX 43). Indeed, as made clear in the Agreement (and even the draft amendment), the parties agreed that . in the event the Agreement was not going to be extended, <u>six months prior to such expiration was adequate time to find either a replacement licensor or licensee going forward for the following year</u>. Wiseman confirms this fact when he notes that "sales for 2008 would start to be booked in the middle of 2007" (Wiseman dec. ¶25), which is precisely what the Tyfoon Group did.

**(iv)**     **Tornado Can Still Sue The Foreign Licensee**

102.     Although not mentioned in the moving affidavits, Tornado in its Answer, in support of its claim of detrimental reliance, alleges that it did not sue Unioncon, the foreign licensee:

> In reliance on Phat Fashions' assurance in August 2005 that the Agreement would be extended, <u>Tornado decided not to sue the European Phat Farm shoe licensee for damages for territorial infringement</u>, despite the fact that the licensee had sold a large number of Phat Farm shoes in Canada, violating Tornado's exclusive licensing agreement and hurting Tornado's business. Issie Wiseman argued with Bernt Ullmann about how to handle the situation, and Bernt Ullmann recognized that Tornado had been damaged by the licensee. Ultimately, however, <u>Tornado chose not to sue the licensee, in light of Tornado's ongoing business relationship with Phat Fashions and Bernt Ullmann's assurance that the Agreement would be extended later that winter</u>. In reliance on this statement, Tornado determined that

---

(D.Mem. 19), ignoring the obvious fact that the Tyfoon Group was also maximizing its own sales and profits at the same time.

it would make the lost profits back over the course of the 3-6 year Extension to the Agreement, and that <u>it was more important to preserve the business relationship than to sue for the infringement claim</u>.  (Answer ¶77) (emphasis supplied).

103.    The simple fact, however, is that there is nothing whatsoever stopping Tornado or whichever other Tyfoon entity was impacted by the alleged territorial infringement from instituting an action today (or any time before the expiration of whatever statutes of limitation are applicable) for these events which took place in summer 2005, a fact admitted by both Wiseman and Segal.  (Wiseman dep. 281-82; Segal dep. 154-56).

**(v)    Any Reliance By Tornado Was Unreasonable<br>Considering The Alleged Stakes For The Tyfoon Group**

104.    In their declarations, Wiseman and Segal claim that it was absolutely critical to the survival of the Tyfoon Group that it extend the Agreement beyond 2007 and into the future. Wiseman described the amendment at issue in this case as "the deal with Phat Fashions that we needed for our future" and made such future "secure."  (Wiseman dec. ¶25).  Wiseman states:

> <u>Because Phat product lines were so critical to our business, I was well aware that our license agreement would end at the end of 2007.</u>  I wanted to raise this with Bernt Ullman [sic] as soon as I reasonably could, since <u>my business, and my family's livelihood, depended on marketing Phat products</u>.  (Wiseman dec. ¶13; D.Mem. 5) (emphasis supplied).

Segal echoes Wiseman, stating that "<u>I certainly knew that our License was going to end in 2007, and that it was important to our future that an extension be worked out as far in advance as possible</u>."  (Segal dec. ¶9) (emphasis supplied).

105.    The extended discussion by Wiseman and Segal in their declarations of the harm which may be suffered by the Tyfoon Group (Wiseman dec. ¶¶ 8, 10-11, 25, 47-57; Segal dec. ¶¶ 5-8, 18-25; D.Mem. 20-24), serves only to demonstrate that Tornado was negligent in not following up on obtaining the necessary signatures and delivery of the amendment and that its alleged reliance upon oral assurances was entirely unreasonable.  If the statements made by

Wiseman and Segal are true, it is beyond comprehension that Tornado did not move heaven and earth to get Phat Fashions to sign the amendment and return it to Tornado as quickly as possible. For Tornado to say that it relied upon Ullmann's alleged oral assurances here is simply unbelievable and there is not a single writing in existence (either an e-mail, letter, handwritten note or anything else) confirming these alleged oral assurances.

**T.      Tornado's Claims of Irreparable Harm Are Without Merit As The**
**Tyfoon Group Is Moving Forward Into 2008 With Several New Licensees**

106.    Tornado's claims of irreparable harm, most of which concern non-parties to this litigation, are replete with admissions that such harm is either compensable in money damages and/or speculative.   For example, Wiseman states that "it <u>may</u> take years – <u>years of financial losses</u> – before we find a brand that develops the market presence (and sales volume) that Phat Farm and Baby Phat have commanded." (Wiseman dec. ¶50) (emphasis supplied).  Wiseman also claims that without Phat-label products, the Tyfoon Group's customers <u>might</u> not purchase other product from it (Wiseman dec. ¶¶ 48-49, 52-53), although <u>no customer affidavits are submitted by Tornado in support of its motion</u>.[18]

107.    Segal, rather than denying that the Tyfoon Group will be able to "make headway with" customers who are now buying Phat Fashions and Baby Phat product from other sources," admits that it is "<u>anybody's guess</u>" as to whether it will be able to do so and, rather than stating with certainty that such customers will not buy from Tyfoon, merely says that they "<u>may not</u> have room in their budget or on their shelves for the new lines we can offer." (Segal dec. ¶23) (emphasis supplied).  Similarly, he refers only to "potential losses and layoffs of staff" (Segal

---

[18] Instead, Wiseman claims that "my salesmen tell me … that customers are unhappy" and that customers have asked Wiseman "what we did to cause Phat Fashions to drop us." (Wiseman dec. ¶56).  What Wiseman does not say is that any of these customers have stopped doing business with the Tyfoon Group.  As for Tornado's claim that it needs Phat Fashions products to attract customers for its other products (D.Mem. 22-23), no evidence has been provided that any of the other Tyfoon Group companies were even selling Phat Fashions products.

dec. ¶7) and states that "the loss of Phat Fashion business ... <u>may</u> permanently and severely damage the Tyfoon Group as a whole" and "without the Phat revenues we <u>could</u> run out of money for overhead before we develop the new lines of business that could keep us solvent." (Segal dec. ¶25) (emphasis supplied).[19]

108.    In its Answer, Tornado alleges that "[d]espite recent efforts to mitigate their loss-es, Tornado and Vis-à-Vis have no expectation that they will be able to replace this dramatic loss of business" and claims that "Tornado and Vis-à-Vis are currently looking for new lines of prod-ucts all over the world, including in Europe, but thus far, they have had only limited success." (Answer ¶80).  Similarly, Tornado claims on this motion that the Tyfoon Group has "no access to well known competitive lines that would fill the same niche." (D.Mem. 22).  This is untrue. <u>Wiseman admitted at his deposition, as opposed to his carefully-crafted declaration, that he can replace the lost business and has already started to do so</u>:

Q.    <u>What is your expectation if any that you will be able to replace going forward the Phat Farm and Baby Phat business that you have done through 2007?</u>

A.    I don't understand the gist of the question.  <u>Do you mean do I think we'll be able to replace it?</u>

Q.    Yes.

A.    <u>I think eventually we will. We're going out there to get other products. We're putting all our energy into trying to get products that replace that business.</u>

Q.    Have you been successful so far?

A.    <u>We've had some success, yes.  We've achieved getting a couple of new products on line</u>, but, you know, you work so far in advance, until we feel the effect from the work that we're putting in now could be a couple of years because, you know, a new product line -- you know, when you ask me when we started with Phat Farm, we did -- I had a minimum of

---

[19] Even in its memorandum, Tornado only states that "<u>perhaps</u>" the existence of the Tyfoon Group is at stake and that its business "<u>may</u> disappear."  (D.Mem. 3) (emphasis supplied).

$50,000 a year and I couldn't achieve it.  Not 50,000 in sales, but in royalties to Russell Simmons and I couldn't achieve it.  I couldn't pay him that amount and now we're paying a million four in one year so what transpired with that was that it took a while to build the brand and to get customers.  You know, initial stages they test, they this, they that and it takes years to rebuild that business.  That's what happens.  [Wiseman dep. 325(2)-26(10)] (emphasis supplied).

109.    Wiseman testified that Tyfoon took immediate action to replace the lost business: "[W]e went to the shows, we went to all the shows in Barcelona, in Munich, we went to every show here in the United States, the Coterie, the MAGIC show, everywhere.  We started looking for other product because we are going to be in business going forward." (Wiseman dep. 258-59) (emphasis supplied).  Segal testified that Tyfoon was "actively going out to trade shows" and actively going to Europe, they're actively going to shows in New York and Los Angeles and making phone calls to prospective – to prospects who they feel, you know, whose line they feel can generate some revenues and some profits for the company." (Segal dep. 145).

110.    Wiseman testified about how successful Tyfoon has been in its efforts to replace Phat Fashions, discussing at his deposition the many new licenses that the Tyfoon Group had signed up.  (Wiseman dep. 259-63, 334-35, 343-44, 436).  Indeed, although Tornado would have this Court believe that the loss of Phat Fashions' products for 2008 will irreparably harm it, the chart set forth below (with new licenses in bold) demonstrates that the Tyfoon Group is thriving and has nearly twice as many licensees as of November 2007 than it did in March 2007 when it learned that Phat Fashions was going forward with another licensee for 2008 (PX 43):

| **MARCH 2, 2007 (17)** | |
| --- | --- |
| A La Carte | Design Options |
| Akademiks Products | Detney |
| Allen Schwartz Products | G1 |
| Baby Phat Products | J41 |
| LS – Black Sheep Shoes | Kinross Products |
| Cezer | Marisa Christina |
| David Brooks Products | Miskeen Products |
| | Pelle Pelle |

Phat Farm Products
Sharon Young

**NOVEMBER 16, 2007 (33)**
A La Carte
Akademiks Products
Allen Schwartz Products
**Azure (new)**
Baby Phat Products
**Brantex (new)**
Black Sheep Shoes
Cezer
**Coogi Products (new)**
**Crown Holder (new)**
David Brooks Products
Design Options
**Frank Walder (new)**
G1
J41

Heatherette (new)
**Honee (new)**
**Inkslingers (new)**
Kinross Products
**Levi's Shoes (new)**
Miskeen Products
**NH – Nienhaus (new)**
**Paper Boy (new)**
**Parrish (new)**
Pelle Pelle
Phat Farm Products
Sharon Young
**SM – Smack (new)**
**Southpole Bags (new)**
**Southpole Shoes (new)**
**Stash House (new)**
**Triko (new)**
**UB – UBU (new)**

The above information comes from a list prepared by Segal setting forth the lines that Tyfoon had as of January 1st, March 1st and mid-November 2007. (Segal dep. 147-48). Segal acknowledged that as of November 2007, Tyfoon's licensee list now stretched to two pages and included several new licensees, including Parrish and Coogi, and that many of these lines consist of products that are similar to Phat Fashions and Baby Phat products. (Segal dep. 151-53).

111.    Although asked in discovery to provide all documents showing any efforts made by Tyfoon to replace Phat Fashion products, Tornado did not originally produce its new license agreement with Coogi Partners LLC. (PX 44). Ullmann, however, then testified at his deposition about a conversation he had with Wiseman after BP Clothing had terminated VIS in which Wiseman asked for his help in getting a new license for Coogi. (Ullmann dep. 83-84, 325-26).[20]

---

[20] Wiseman admits that when he saw an opportunity with Coogi, he knew that Ullmann had been CEO of Coogi prior to coming to Phat Fashions and "I had asked him if he knew these individuals and all that kind of stuff and what do you think of the line and that kind of thing, and he told me, yeah, that's a good idea." (Wiseman dep. 242-44, 246-247). Wiseman testified:

> I have a recollection of having a conversation with Bernt Ullmann about Coogi, if he thought it
> was a good idea for -- not if it was a good idea, if he knew the people because I remembered that

It was only after Ullmann's testimony and a specific request by Phat Fashions' counsel that the document was produced by Tornado.

112.    The Trademark License and Distribution Agreement between COOGI Partners LLC and another Tyfoon Group entity, 4107675 Canada Inc (and guaranteed by VIS) is dated as of April 1, 2007 and runs through August 30, 2010, with one three-year renewal term through September 30, 2013.  (PX 44; Wiseman dep. 415-16).  It covers urban goods substantially similar to those that Phat Fashions carries, i.e., men's sportswear apparel, women's apparel, headwear and belt accessories, although higher priced.  (Wiseman dep. 244).  It is clear that Tyfoon anticipated that its sales of Coogi products would eventually exceed those of Phat Fashions over the initial term of the agreement because, while the ineffective amendment at issue in this case called for Tornado to make minimum net sales of $7.9 million in Phat Fashions products in 2010 (the last year of the first 3-year term), the Coogi agreement calls for Tyfoon to make minimum net sales of $12 million for the same year. [21]  A comparison of the minimum sales under both agreements reveals:

| Year | Phat Fashions Amendment Minimum Sales | Coogi License Agreement Minimum Sales |
|------|---------------------------------------|---------------------------------------|
| 2008 | $5,000,000 | $ 4,000,000 |
| 2009 | $6,430,000 | $ 7,000,000 |
| 2010 | $7,858,000 | $12,000,000 |

he used to work for these people.  Bernt Ullmann used to work for Coogi and Fubu, remember as I explained to you before when he entertained the thought of giving us the line for Canada years back so I had asked him at the time I believe we had a conversation concerning Coogi and I had asked him at the time if he knew the people, were they nice people or good to deal with, are they honorable people, something of that nature.  (Wiseman dep. 425).

Segal recalls that Ullmann spoke to Wiseman about the Coogi license and Ullmann told him that "it was a good company, and yeah, he said, you know, absolutely, that's a good line to have."  (Segal dep. 144-45).
[21] Wiseman admits that "[i]f you look specifically at the licensee Tornado," which we submit is all the Court should be looking at here, Tornado's sales dropped from over $14 million in 2004 to over $8 million in 2006, partly due to the fact that "the Phat Farm label has had some market and design problems in recent years."  (Wiseman dec. ¶9).  Actually, the figures show that such sales dropped from $17,580,537 in 2005 to $10,498,251 in 2006 and then $4,800,636 in 2007.  (PX 48).

As can be seen, the Tyfoon Group expects its minimum sales of Coogi products to exceed its minimum sales of Phat Fashions products. The Tyfoon Group has already started making sales of Coogi and two other companies (Heatherette and Crown Holder) related to Coogi (Wiseman dep. 417-18) [22] and Wiseman expects the Coogi deal to be profitable:

> We are hoping to make it profitable, it takes a while, you know, it doesn't happen overnight. ... No, so you work at it, you work at it, it could take a couple of years until we get the message across, until we get the customers to appreciate it and understand it and all that kind of stuff, so is it profitable, not yet. (Wiseman dep. 244-45) (emphasis supplied).

113. In short, although Wiseman claims that the Tyfoon Group's reputation is suffering because its sales staff has "relatively little to sell" and have "only a limited number of lines left to sell" (Wiseman dec. ¶¶55-56), the fact is that the Tyfoon Group now has twice the amount of lines it had before it lost the Phat line of products and a major new license, a fact which it has not hesitated to trumpet in the promotional literature it created in March 2007 (after it learned that it was not going forward with Phat Fashions in 2008) to show potential licensors how strong and diverse the Tyfoon Group is. (Wiseman dep. 274-75, 328-29). For example, Tyfoon's Claudia Michaels sent a company profile to potential licensor in May 2007 which stated, in relevant part:

> We strive to maintain high standards of business ethics and are considered in the industry to be a respected firm of importers specializing in men's and women's wear, as well as accessories and footwear. We service over a thousand accounts across the country between all of our various products.

> Our lines include, Phat Farm and Baby Phat (clothing, footwear, accessories, jewellery, outerwear, leathers, lingerie, loungewear and kids), Akademiks (men's and ladies and children's clothing and outerwear as well as handbags & jewellery), G1, Kinross Cashmere, Heatherette, Coogi, ABS dresses by Allen Schwartz, UBU, Cezer, Prohibit, and Inkslingers to name a few. ...

> Our firm has been in existence for the past twenty-seven years and our financial statement bears out a profitable and constantly expanding operation. (PX 45) (emphasis supplied).

---

[22] The first contract year in the Coogi Agreement runs from April 1, 2007 through September 30, 2008, while the second and third years run from October 1st through September 30th. (¶¶ 1.1, 2.5).

114.     Tyfoon also prepared a promotional DVD in Spring 2007 (after it knew that Phat Fashions was not going to extend the Agreement) to present to potential licensors.  (PX 46; Wiseman dep. 433-35).  The DVD case states:

> Tyfoon is a multi-brand distributor for Canada, responsible for launching and establishing brands throughout the country.  For over 25 years, we have provided full import/distribution services, sales and marketing to build successful labels in the Canadian market.
>
> Tyfoon's goal is to serve as an extension of a brand within Canada.  Specializing in men's and women's ready-to-wear, accessories, footwear, lingerie and hand-bags, we service over 1000 accounts across the country.
>
> Currently, we work with brands which include Phat Farm and Baby Phat (cloth-ing, footwear, accessories, jewelry, outerwear, leathers and kids), Akademiks (men's and ladies), Miskeen Originals, Cezer, Ink Slingers, Prohibit, G1 and A.B.S. dresses (Allen B. Schwartz), Kinross Cashmere and UBU Clothing.
>
> Each individual collection represented by Tyfoon is led by its own division head and supported by sufficient staff to fully operate and monitor the merchandising, selling marketing, and eventual shipping of the collection in Canada.  We work closely with the Licensor to ensure that correct planning and strategies are im-plemented.  Each brand is differentiated by its own distinctive styling, pricing strategy, distribution channel and target consumer.
>
> Tyfoon will work with the brand to formulate the most beneficial plan possible, with the goal of building long-term relationships between the Licensor and top retailers. (PX 46) (emphasis supplied).

115.     More recently, on September 26, 2007, at which point the Tyfoon Group had stopped taking orders for Phat Fashions products, Josh Wiseman sent a company profile to a potential licensor which highlighted Coogi (it was the first line listed) and stated, in relevant part:

> We strive to maintain high standards of business ethics and are considered in the industry to be a respected firm of importers specializing in men's and women's wear, as well as accessories and footwear.  We service over a thousand accounts across the country between all of our various products.
>
> Our lines include Coogi, Crown Holder, Heatherette, Akademiks (men's and ladies), Stash House, Miskeen Originals and Inkslingers to name a few.  We also carry footwear for Azzure, Pastry, Shmack, Black Sheep, and Levis.  (PX 47)

(emphasis supplied).

Wiseman acknowledged the accuracy of the statements in all of these profiles. (Wiseman dep.
428-31, 438-41)

116.    Tornado has been careful in its motion papers to avoid giving the Court true 2007
and 2008 financial data.  For example, while Wiseman states that Segal "will give you the num-
bers on our fall 2007 orders 'booked' for delivery in the first half of 2008" (Wiseman dec. ¶51),
Segal only provides some numbers for footwear and none of the other many product categories
carried by the Tyfoon Group.  (Segal dec. ¶22).  Although Wiseman claims that "the sales results
for the first half of 2008 will be a small fraction of what we 'booked' in years past," he produces
no data to support this claim and concedes that "[t]he season is not entirely over."  (Wiseman
dec. ¶51).

117.    Segal claims that "[i]f our Phat lines were going to end in 2007, we would need to
start 'booking' large volumes of other products during the second half of 2007 (for 2008 deliv-
ery) to keep our business intact.  Our sales and marketing people needed to develop that potential
business back in 2006."  (Segal dec. ¶21).  There are two responses to this point, the first being
that as the Tyfoon Group knew well before the second half of 2007 that it was not going forward
with Phat Fashions in 2008 and therefore had time to start booking sales for 2008 delivery.
Second, based on Segal's timetable and his concession that the Tyfoon Group's sales and mar-
keting people have been working hard and successfully to develop potential business since at
least as early as March 2007, there is no reason why the Tyfoon Group should not be able to
book large volumes of other products for fall 2008 delivery.

**U.    Tornado's Unconscionable Delay In Moving For A Mandatory Injunction**

118.    Tornado admits that it knew as early as February 15, 2007 that Phat Fashions

might not sign the extension and further that it was absolutely certain of that fact as of March 21, 2007. (Answer ¶¶ 14, 34, 44, 71-72, 91-92, 96, 100). Despite such knowledge, Tornado neither sued nor moved for preliminary relief.

119.    On April 24, 2007, Phat Fashions commenced this litigation. Tornado waited two months (until June 26, 2007) to file its Answer and then, over two months later (on September 6, 2007) amended that Answer, <u>failing to move on either occasion for a preliminary injunction</u>. It was not until September 12, 2007, in its pre-conference letter to the Court, that it indicated that:

> <u>As discovery proceeds, Tornado will contemplate making a motion for a prelimin-ary injunction maintaining the status quo</u> (i.e., allowing the Agreement to remain operative past December 31, 2007) <u>based in part on §21 of the Agreement</u>, which states, "Licensor and Licensee acknowledge that their performance and obligat-ions hereunder are unique, of extraordinary value, and that a material breach by either such party of any material obligation hereunder will cause the other such party irreparable damage which cannot be compensated with money only. There-fore, each such party agrees that the other such party, as a matter of right, shall be entitled to an injunction or other equitable relief ..." (emphasis supplied). [23]

No mention whatsoever was made about any <u>actual</u> irreparable harm being suffered by Tornado, let alone the potential destruction of the Tyfoon Group. If the Tyfoon Group were suffering or were about to suffer the utter devastation portrayed by Tornado in its motion, it is absolutely incomprehensible that it did not given any indication of that whatsoever and instead stated that "as discovery proceeds," it would "contemplate" seeking an injunction. One must presume that Tornado did not need discovery to determine whether it was suffering irreparable harm.

120.    In its Initial Disclosures served nearly three weeks later on October 1, 2007, Tornado stated again that it was "contemplating making a motion for interim injunctive relief/

---

[23] Tornado cut off its quote at a critical portion of ¶21, which makes it clear that the other party is only entitled to such equitable relief "to prevent the material breach of any material terms or conditions hereof, and to enforce any rights of the party seeking equitable relief hereunder." Here, of course, rather than seeking to enforce rights under the Agreement, Tornado is seeking to extend the Agreement, an entirely different situation. Acknowledging its lack of true irreparable harm, Tornado again cites this provision in its motion papers, but concedes that it "is of course not binding on the Court." (D.Mem. 24).

specific performance (i.e., allowing the Agreement to remain operative past December 31, 2007), based in part on §21 of the Agreement" (emphasis supplied), but no such motion was made and no mention whatsoever was made about any actual irreparable harm being suffered by Tornado. As for Tornado's suggestion that Phat Fashions at this point should not have gone forward with Algo because Tornado "had expressly warned it that it contemplated making a motion for preliminary injunction" (D.Mem. 20), the fact is that no such motion was made.

121.    It was not until November 19, 2007 at the pre-trial conference, over nine months after it learned that Phat Fashions was negotiating with another party and over eight months after Tornado knew with certainty that Phat Fashions was not going forward with Tornado in 2008, that Tornado announced, for the first time, that it was going to move for a mandatory preliminary injunction (and actually asked  the Court at the pre-trial conference if it could have another three weeks until December 11th to do so).

122.    This nine month delay on the part of Tornado to seek equitable relief took place in the face of admissions by Wiseman and Segal that they were aware that Algo had been out sell-ing the Spring 2008 Phat Fashions line, which orders get taken between September and Decem-ber 2007 and get shipped to the customer between February and April 2008.  (Segal dep. 160-61; Wiseman dec. ¶48).  While all this was going on, the Tyfoon Group sat by, watched Algo take the orders, and took no orders of its own for Spring 2008 for Phat Farm or Baby Phat.  (Segal dep. 161; Wiseman dep. 245).[24]  Simply put, Tornado's unconscionable delay in seeking injunct-ive relief belies its claim of irreparable harm and its motion for an all-encompassing mandatory preliminary injunction impacting two countries should be denied.

---

[24] Although Tornado alleges that Phat Fashions' new licensee has allegedly hired employees of Tyfoon and solicited others (Answer ¶¶ 81-84; Wiseman dec. ¶56; Segal dec. ¶20; D.Mem. 20), Tyfoon and Tornado have also sat back, choosing not to litigate or even write a cease and desist letter, to Algo about this issue.  (Segal dep. 158-60).  These allegations are clearly irrelevant to this case.

* * * * *

For the reasons stated herein and in the accompanying memorandum of law, Tornado's motion should be denied in its entirety and Phat Fashions, in accordance with the Agreement (¶18), should be awarded its costs and attorney's fees on this motion.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  New York, New York
        December 10, 2007

                                    _____
                                    PHILIP R. HOFFMAN