# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 44

# TRADEMARK LICENSE AND DISTRIBUTION AGREEMENT

00354436.7



PLAINTIFF'S
EXHIBIT
44

<u>TABLE OF CONTENTS</u>

PREAMBLE ................................................................................................................1
ARTICLE I ................................................................................................................2
   1.   Scope ................................................................................................................2
ARTICLE II ................................................................................................................8
   2.   Royalties and Records ................................................................................8
ARTICLE III ................................................................................................................15
   3.   Purchases of Licensed Products and Control of Intellectual Property ...........15
ARTICLE IV ................................................................................................................19
   4.   Advertising ................................................................................................19
ARTICLE V ................................................................................................................20
   5.   Indemnification and Insurance ................................................................20
ARTICLE VI ................................................................................................................22
   6.   Default and Initial Termination ................................................................22
ARTICLE VII ................................................................................................................29
   7.   Notices ................................................................................................29
ARTICLE VIII ................................................................................................................30
   8.   Enforcement of the Agreement ................................................................30
ARTICLE IX ................................................................................................................32
   9.   Confidentiality ................................................................................................32
ARTICLE X ................................................................................................................33
   10.   Miscellaneous ................................................................................................33
ARTICLE XI ................................................................................................................34
   11.   Renewal ................................................................................................34

TOR 001664

## TRADEMARK LICENSE AND DISTRIBUTION AGREEMENT

### PREAMBLE

**AGREEMENT** made as of the 1st day of April, 2007, by and between COOGI Partners, LLC ("Licensor"), a New York Limited Liability Licensor having an office at 350 Fifth Avenue, New York, New York 10118, and 4107675 Canada Inc. ("Licensee"), a Canadian corporation, with an address at 5540 Ferrier Street, Montreal, Quebec, H4P 1M2, Canada.

### W I T N E S S E T H:

**WHEREAS,** Licensor is the owner in class 25 of registrations in the U.S. of the trademark "COOGI" and related trademarks specified in **Exhibit A** hereto (collectively, the "Trademark");

**WHEREAS,** Licensor has extensively promoted the Trademark and widely distributed apparel under the Trademark in the U.S.;

**WHEREAS,** the Trademark as a result has acquired a substantial reputation and goodwill; and

**WHEREAS,** Licensee is desirous of receiving the right to be the exclusive distributor of the Licensed Products (as defined below) in the Territory and to receive an exclusive license to use the Trademark in the Territory pursuant to the terms and conditions of this Agreement, and Licensor wishes to grant such rights pursuant to the terms and conditions of this Agreement.

**NOW, THEREFORE,** in consideration of the promises set forth below, it is agreed as follows:

00354436.7

TOR 001665

# ARTICLE I

1.     Scope

1.1     The Term of this Agreement shall commence as of this date, and expire automatically on August 30, 2010, unless sooner terminated pursuant to the terms and conditions hereof (the "Initial Term"). The term "Contract Year" as used in this Agreement means (a) for the first Contract Year, the period beginning on the date on which this Agreement commences and ending September 30, 2008, and (b) for each Contract Year thereafter, each successive twelve (12) month period ended September 30th. "Term" means the Initial Term and any Renewal Term that comes about in accordance with paragraph 11.1 below.

1.2     The territory of the license granted hereunder is hereby defined as Canada (the "Territory"). Licensee shall not sell Licensed Products to any customer outside the Territory, or to any person or entity Licensee knows or has reason to know will sell Licensed Products outside the Territory. Licensor shall not sell Licensed Products to any customer in the Territory or to any person or entity Licensor knows or has reason to know will sell Licensed Products in the Territory.

1.3     The goods to which this Agreement relates are hereby defined as and limited solely to the following goods bearing the Trademark: (a) men's sportswear apparel products in the same items and styles offered by Licensor in the U.S. ("Men's Licensed Products"), (b) women's apparel products in the same items and styles offered by Licensor's women's sportswear apparel licensee in the U.S. ("Women's Licensed Products") and (c) headwear and belt accessories (collectively "Accessory Licensed Products") (all of which are

2

00354436.7

collectively hereinafter referred to as "Licensed Products"), but no other goods and expressly excluding, among other categories not within Licensed Products, the following product categories: junior's/women's outerwear in non-leather fabrications, headwear, footwear, tailored clothing, intimate apparel, loungewear accessories and children's outerwear. If there is any dispute between Licensee and another licensee as to whether a particular product comes within the definition of Licensed Products under this Agreement or another license agreement, Licensor shall resolve such dispute in a final manner.

1.4    (a)    Licensor hereby grants to Licensee, subject to all the terms and conditions of this Agreement, a non-transferable, non-assignable, non-sublicensable, exclusive license to use the Trademark during the Initial Term, solely within the Territory, and solely in association with the promotion, advertising and selling of Licensed Products in Authorized Distribution Channels (as such term is defined in paragraph 1.4(b) below). Licensee may not manufacture any Licensed Products. Licensee shall purchase (a) all Men's Licensed Products from Licensor, (b) all Women's Licensed Products from Licensor's U.S. women's apparel sportswear licensee and (c) all Accessory Licensed Products from Licensor's U.S. accessory licensees. All rights in the Trademark not expressly granted herein to Licensee are reserved by Licensor. Notwithstanding anything contained in this Agreement, Licensor may, in respect of the last six months of the Initial Term, use the Trademark, or grant a third party the right to use the Trademark for the manufacture of Licensed Products anywhere in the world, and for the promotion, advertising and offer for sale of Licensed Products in the Territory, solely for Licensed Products to be shipped after the Initial Term.

3

00354436.7

(d)    . Licensor hereby grants Licensee, subject to all the terms and conditions of this Agreement, the non-transferable, non-assignable, exclusive right to serve as the distributor in the Territory of the Licensed Products during the Initial Term.   Licensee accepts such appointment.  All rights in the Trademark not expressly granted herein to Licensee are reserved by, and belong to, Licensor and its Licensor.  Licensee shall have no right to appoint subdistributors.  All Licensed Products shall be purchased from Licensor and may not be altered in any manner by Licensee or its agents.  Licensee agrees that it shall only sell the Products to first-class, "high-end" retail stores and specialty stores (the "Authorized Distribution Channels"). Licensee agrees to provide a list of twenty (20) Authorized Distribution Channels purchasing the Products once per season if requested by Licensor in writing after receipt of a purchase order by Licensor from Licensee for that season.  In no event may Licensee sell Licensed Products to Wal-Mart, Zellers, Winners or other mass-market retailers or discount retailers, except to Winners and the Bay as provided in paragraph 1.6 below.  Licensor shall be entitled to delete from Authorized Distribution Channels any retailer that sells counterfeit or gray good merchandise of any brand or that displays, promotes or sells Licensed Products in a manner that Licensor, in its sole discretion, determines is not suitable for the Licensed Products (hereinafter an "Excluded Retailer") in which event Licensee may fulfill any binding orders placed by an Excluded Retailer, prior to its deletion from Authorized Distribution Channels, but may not accept further orders from such Excluded Retailer.  Licensee shall not sell or distribute Licensed Products to retailers for their use as premiums, prizes or giveaways, nor shall Licensee use Licensed Products as premiums, prizes or giveaways.  Licensee shall use its best efforts to promote, advertise and sell Licensed Products, and shall at all times maintain at least one

4

00354436.7

showroom located in Montreal, Canada and an independent sales staff in the Territory devoted to promote such sales.

    1.5    (a)    Licensor represents and warrants to Licensee that Licensor is the owner in the Canadian Trademark Office of registrations of the Trademark in class 25 as shown in **Exhibit A.** Licensor makes no representations or warranties concerning Licensor's rights as to the Trademark, except as set forth above.

    (b)    Licensee hereby warrants to Licensor that (i) Licensee has all requisite corporate power to consummate the transactions contemplated hereby; (ii) this Agreement constitutes the valid and binding agreement, enforceable against Licensee in accordance with its terms and (iii) the execution, delivery and performance of this Agreement does not and will not conflict with any agreement or instrument to which Licensee is a party or is otherwise bound. Licensee makes no representations or warranties about the aforesaid subjects except as expressly provided above.

    1.6    Licensee shall use reasonable commercial efforts to sell all Licensed Products at its standard list prices therefor, which list prices shall be approved by Licensor, in advance in writing, with such approval granted or denied in Licensor's reasonable discretion. After such list prices are adopted by Licensee and approved by Licensor, they shall be furnished to Licensor in writing, and may not be changed except on Licensor's advance written approval, which approval may be granted or denied in Licensor's reasonable discretion ("Licensee's Approved List Prices"). Notwithstanding anything contained above, Licensee shall not be entitled to sell Licensed Products as Close-outs which account for more than ten (10%) percent of the units of Licensed Products sold in any Contract Year (a "Close-out" being defined for all

00354436.7

TOR 001669

purposes under this Agreement as a sale at a price at more than twenty (20%) percent below the then existing list price for the item). Close-outs may only be sold to Winners and the Bay, *as well as all Cost customers* Licensee may sell close-outs only at the end of a season. In no event may Licensee sell special make-up orders of Licensed Products to Winners and the Bay or otherwise sell such customers Licensed Products before the end of the season. If Licensee breaches any obligation contained in the fourth, fifth or sixth sentences set forth above in this paragraph 1.6, Licensor, at its option, in lieu of the termination remedy provided by paragraphs 6.1(j) and 6.2 below, shall be entitled to receive as liquidated damages, but not as a penalty, for such breach, the sum of One Hundred Thousand ($100,000.00) Dollars. Such liquidated damage sum shall be payable within ten (10) business days after Licensor's written demand therefor. Upon Licensor's timely receipt of such One Hundred Thousand ($100,000.00) Dollars, Licensor shall be deemed immediately and automatically to have waived its right to terminate this Agreement based on the breach of this paragraph 1.6 which gave rise to such liquidated damages. If such liquidated damage sum is not received timely, Licensor shall not be deemed to have waived its termination rights with respect to the subject breach. The waiver of a breach of this paragraph 1.6 pursuant to the aforesaid terms shall not be deemed a waiver of any subsequent breach of this paragraph 1.6 and Licensor shall retain all its rights and remedies under this Agreement with respect to any such subsequent breach, including, without limitation, all rights and remedies pursuant to paragraphs 6.1 and 6.2 below.

      1.7    Licensee shall not directly, or through any affiliate or principal thereof, during the Initial Term or any sell-off period specified pursuant to paragraph 6.4 below, (i) enter into a license agreement, or any other agreement, with any person or entity, granting Licensee

6

00354436.7

TOR 001670

the right to sell products within any product category within the product categories comprising Licensed Products under a brand/trademark Competitive (as such term is defined below) with that of the Trademark or (ii) otherwise sell, or render services in connection with products within the product categories comprising Licensed Products which bear a brand/trademark which is Competitive with the Trademark to a wholesaler, distributor or retailer. Brands/trademarks which are Competitive presently include, but are not limited to: 8732, 5ive Jungle, A Tiziano, Artful Dodger, AZZURE, Basic Essentials, Carlucci, Di Corleone, DKNY Jeans, Ecko, Ed Hardy, Enyce, Evisu, Exact Science, FiveFour, G-Unit, Girbaud, Graf-X Gallery, Gravis, IMI, Kangol, Koman, Lacoste, Live Mechanics, LRG, Madsoul, Makavelli, Massive Revolution, New Era, Nexx, Notorious B.I.G., Parish, Pepe Jeans, Rocawear, Rockers- It's Dangerous, Ruff Ryders, Scarface, Scifen, Sean John, Sedgwick & Cedar, Stacy Adams, The Avenue, The North Face, Timberland, Tribal Gear, Triple 5 Soul, Yak Pak, Johnny Blaze, Outkast and Zoo York and any brand owned or licensed by, or associated with Sean "P Diddy" Combs. A corporate affiliate shall be deemed any entity which controls, is controlled by, or is under common control with Licensee. In addition to, but not in limitation of the brands/trademarks specifically identified above, a brand/trademark shall be deemed "Competitive" if it is a brand/trademark which is now, or in the future, known in the marketplace as competitive with the Trademark and is sold in any channels of distribution in which the Licensed Products are sold. Notwithstanding anything contained above to the contrary, none of Akademiks, Pelle Pelle or Phat Farm shall be deemed a Competitive brand. An "Affiliate" means any entity which controls, is controlled by, or is under common control with, Licensee (including any family member of any shareholder, principal, member, director or officer of Licensee or Affiliate). Further, notwithstanding

7

TOR 001671

anything contained above to the contrary, Licensee and its Affiliates may engage in any activity proscribed by this paragraph 1.7 during the last six months of the Initial Term provided neither Licensee nor any Affiliate ships any products bearing a Competitive Brand within such six month period.

## ARTICLE II

2.    Royalties and Records

2.1    Licensee shall keep complete and accurate separate records of all sales of Licensed Products (regardless of to whom the Licensed Products are sold), including, without limitation, all invoices to its customers, purchase orders from its customers, and all other records of sales of Licensed Products, including, without limitation, all records specifying the types of Licensed Products sold, the quantities sold, the dates of shipment, the dates of invoices, the customers to whom sold, the invoice prices and terms, returns, allowances and discounts granted to customers and the Net Sales therefor.  Licensee shall use in such records different style numbers for Licensed Products from those Licensee uses in connection with items or lines sold without use of the Trademark.  Licensee shall prepare and maintain records for the Licensed Products totally separate and distinct from those prepared and maintained for items or lines sold without use of the Trademark.  The aforesaid records, including all underlying documents and other documents required by Licensor to perform a full audit of the sale of Licensed Products, shall be open to inspection and duplication by Licensor, and/or its designated representative(s), at all reasonable times, upon not less than five (5) business days prior notice, during business hours and shall be maintained and preserved by Licensee for at least two (2) years after the expiration or termination of this Agreement.  If as a result of any audit of Licensee's books and

8

00354436.7

records hereunder, it is shown (a) that Licensee's Net Sales of Licensed Products were intentionally understated by Licensee, or (b) unintentionally understated by three (3%) percent or more, Licensee shall reimburse Licensor for the reasonable cost of such audit and if there is any understatement, regardless of amount or intent, Licensee shall make all payments required to be made to eliminate any discrepancy revealed by said audit within ten (10) days after Licensor's demand therefor.   If the aforesaid audit is not disputed with thirty (30) days after receipt by Licensee, it shall be deemed binding.  If the audit is disputed timely, Licensee shall be entitled to dispute the audit, but shall pay the discrepancy revealed by the audit as specified above.

2.2    Licensee shall pay Licensor a royalty equal to ten (10%) per cent (the "Percentage Royalty") of the Net Sales (as defined below) of Licensed Products.   Such Percentage Royalties shall be paid by the thirtieth day after the end of each Quarter for the Net Sales of Licensed Products obtained during the preceding quarter.  "Quarter" means each three-month period ended September 30, December 31, March 31 and June 30.   Along with each payment of Percentage Royalties, Licensee shall transmit to Licensor a written sales report signed by an officer of Licensee covering the preceding Quarter.  Said report shall set forth the gross sales of Licensed Products by Licensee, by customer, and the computation of Net Sales of Licensed Products by Licensee, by customer and sku, including, all discounts, allowances and returns deducted in computing such Net Sales.  The foregoing reports are required even if no sales have been made.  All invoices showing sales of Licensed Products by Licensee, on a customer-by-customer and sku basis, shall be provided to Licensor within ten (10) days after Licensor's written request therefor.  In no event shall Licensor's acceptance of Licensee's reports, or of payments made pursuant thereto, be deemed a waiver of Licensor's right to

00354436.7

TOR 001673

challenge the accuracy of any report or the amount of any payment due from Licensee. Licensed Products are deemed "sold" on the earlier of the date when shipped or the date when invoiced. Licensee's "Net Sales" is defined as the invoice price billed by Licensee to its customers for Licensed Products sold, less only amounts payable for sales taxes billed to and paid by the customer, if any, and for reimbursement of freight charges actually incurred by Licensee billed as separate items to the customer, and credits allowed on returns of merchandise and customary trade discounts and allowances actually granted to the customer ("Deductions"). Deductions may not exceed ten (10%) percent of Net Sales in any Contract Year. Notwithstanding the foregoing, "Net Sales" for purposes of sales of Licensed Products made by Licensee as a retailer or to any Affiliate of Licensee, whether for sale in free-standing stores, shop-in-shops or otherwise, shall mean sales at Licensee's Approved List Prices, regardless of the actual sales price obtained therefor. Salesmen's commissions and royalties payable hereunder shall not be subtracted in determining Net Sales. Notwithstanding anything contained above or otherwise in this Agreement to the contrary, neither Licensee nor any Affiliate thereof is licensed or authorized to operate any retail store, shop-in-shop or other retail establishment under the Trademark.

      2.3    Licensee shall pay Licensor as irrevocable, non-refundable minimum guaranteed royalties ("Minimum Guaranteed Royalties") during the Initial Term, regardless of the amount of Net Sales of Licensed Products, in addition to Percentage Royalties, but subject to the crediting specified in paragraph 2.4 below, the total sum of Two Million Three Hundred Thousand ($2,300,000.00) Dollars as provided below :

              On signing          $ 100,000.00

10

00354436.7

| | |
|---|---|
| October 1, 2007 | $ 75,000.00 |
| January 1, 2008 | $ 75,000.00 |
| April 1, 2008 | $ 75,000.00 |
| July 1, 2008 | $ 75,000.00 |
| | |
| October 1, 2008 | $ 175,000.00 |
| January 1, 2009 | $ 175,000.00 |
| April 1, 2009 | $ 175,000.00 |
| July 1, 2009 | $ 175,000.00 |
| | |
| October 1, 2009 | $ 300,000.00 |
| January 1, 2010 | $ 300,000.00 |
| April 1, 2010 | $ 300,000.00 |
| July 1, 2010 | $ 300,000.00 |

All references to dollars in this Agreement are to U.S. Dollars.

2.4     Licensee shall be entitled to take as a credit, only during the same Contract Year, (a) against Percentage Royalties payable by Licensee to Licensor, the Minimum Guaranteed Royalties paid by Licensee and (b) as against the Minimum Guaranteed Royalties payable by Licensee to Licensor, the Percentage Royalties paid to Licensor, all to the extent not previously credited.  To amplify this paragraph 2.4, if Licensee were required to pay Percentage Royalties of $600,000.00 in the Second Contract Year and Licensee's Minimum Guaranteed Royalties payable for such Contract Year of $700,000.00 thus exceeded Percentage Royalties by $100,000.00, and Licensee had applied $600,000.00 of Minimum Guaranteed Royalties against such Percentage Royalties in the Second Contract Year, Licensee could not apply the remaining $100,000.00 of paid Minimum Guaranteed Royalties against Percentage Royalties due after the Second Contract Year.   Similarly, if Licensee's Percentage Royalties payable in the Second Contract Year, e.g. $850,000.00, exceeded Minimum Guaranteed Royalties payable of $700,000.00 therein by $150,000.00, Licensee may not credit the excess Percentage Royalties of

11

00354436.7

TOR 001675

$150,000.00 paid in excess of the Minimum Guaranteed Royalties against Minimum Guaranteed Royalties or Percentage Royalties in the succeeding Contract Year. After all crediting is applied in any Contract Year, Licensee shall be required to have paid Licensor for the Contract Year the greater of the sums payable for such Contact Year: (a) as Percentage Royalties or (b) as Minimum Guaranteed Royalties, but no more than such amount. If Licensee pays Licensor in any Contract Year royalties in excess of the amount specified in the preceding sentence, whether that fact is determined by an audit or otherwise, Licensor shall credit such excess against the royalty payable in the next quarter, or if such overpayment occurs at the end of the Initial Term, and no further royalties are payable to Licensor, whether for sell off or otherwise, such excess payment shall be paid to Licensee within ten (10) business days after demand therefor.

2.5     (a)     Licensee shall accurately report in respect of each Contract Year of this Agreement at least the following minimum total Net Sales of Licensed Products (other than Accessory Licensed Products)(each an "Annual MNS"):

|       |                |                 |
|-------|----------------|-----------------|
| (i)   | Contract Year 1 | $ 4,000,000.00  |
| (ii)  | Contract Year 2 | $ 7,000,000.00  |
| (iii) | Contract Year 3 | $ 12,000,000.00 |

If Licensee fails to report accurately for any Contract Year the applicable Annual MNS, Licensor, at its option, may terminate this Agreement immediately on notice to Licensor, transmitted within forty-five (45) days after Licensor's receipt of all sales reports for the Contract Year in question.

(b)     Notwithstanding anything contained in this Agreement to the contrary, and without limiting Licensor's other rights under this Agreement, whether contained in paragraph 2.5(a) or otherwise, Licensor may, immediately on notice to Licensee, terminate

12

00354436.7

Men's Licensed Products and Accessory Licensed Products from the definition of Licensed Products in the event that Licensee shall not accurately report at least the following total Minimum Net Sales of Men's Licensed Products in any Contract Year:

| | | | |
|---|---|---|---|
| (i) | Contract Year 1 | $ | 3,000,000.00 |
| (ii) | Contract Year 2 | $ | 5,000,000.00 |
| (iii) | Contract Year 3 | $ | 9,000,000.00 |

(c)     Notwithstanding anything contained in this Agreement to the contrary, and without limiting Licensor's other rights under this Agreement, whether contained in paragraph 2.5(a) or otherwise, Licensor may, immediately on notice to Licensee, terminate Women's Licensed Products from the definition of Licensed Products in the event that Licensee shall not accurately report at least the following total Minimum Net Sales of Women's Licensed Products in any Contract Year:

| | | | |
|---|---|---|---|
| (i) | Contract Year 1 | $ | 1,000,000.00 |
| (ii) | Contract Year 2 | $ | 2,000,000.00 |
| (iii) | Contract Year 3 | $ | 3,000,000.00 |

(d)     Any category of Licensed Products terminated pursuant to this paragraph 2.5 is hereinafter referred to as a ("Initial Terminated Category"). The termination of either Men's Licensed Products or Women's Licensed Products shall thereafter result in the reduction of Minimum Guaranteed Royalties payable under this Agreement. The aforesaid reduction in Minimum Guaranteed Royalties shall be equal to the sum obtained by multiplying (a) the minimum sales set forth in paragraph 2.5(b) or (c) applicable to the Initial Terminated Category by (b) 10%. Notice of termination under paragraph 2.5(a), (b) or (c) will be transmitted following Licensor's receipt of all sales reports for the Contract Year in question. In the event of termination of Men's Licensed Products or Women's Licensed Products, from this

00354436.8

13

TOR 001677

Agreement, Licensee shall make no further use of the Trademark for such Initial Terminated Category except to sell off for a period of one hundred (120) days after the date of termination on a non-exclusive basis, all Licensed Products in its inventory of Licensed Products and in process or in transit, which sales must comply with all terms and conditions of this Agreement. Licensee shall provide Licensor with an inventory of such Licensed Products within fifteen (15) days after such termination pursuant to paragraph 6.3 below. Licensor shall immediately after any such termination be free to exercise all rights in the Trademark as to such Initial Terminated Category and to license any and all such rights to one or more third parties.

2.6     Licensor's acceptance of royalties and any other monies due under this Agreement shall never be deemed an acceptance or waiver of any breaches of this Agreement by Licensee.

2.7     Without limiting Licensor's rights with respect to a non-payment default pursuant to Article VI below, any payment of royalties not made to Licensor by the due date therefor shall bear interest at the rate of twelve (12%) percent per annum.

2.8     Licensee shall be entitled to withhold from royalty payments due to Licensor hereunder any amount which is legally required to be withheld and paid to the appropriate fiscal authority having jurisdiction in the Territory. Whenever any such amount is withheld, Licensee shall immediately deliver to Licensor a statement disclosing the amount withheld, the date of payment thereof, the royalties with respect to which such amount was paid a two-sided check therefor and all documents necessary for Licensor to obtain a tax credit in the U.S. for such amount paid.

14

00354436.7

# ARTICLE III

3.    <u>Purchases of Licensed Products and Control of Intellectual Property</u>

3.1    Licensee shall pay a purchase price equal to the following to the seller of the particular Licensed Products:  (a) to Licensor for Men's Licensed Products, a price equal to the f.o.b. price charged to Licensor for the item of Men's Licensed Products plus twelve (12%) percent, (b) to Licensor's U.S. women's sportswear licensee, a price equal to the f.o.b. price charged to such company for the item of Women's Licensed Products plus twelve (12%) percent, (c) to Licensor's U.S. accessory licensee, a price equal to the f.o.b. price charged to such company for the item of Accessory Licensed Products plus twelve (12%) percent (collectively, the "Purchase Price").  Payments of Purchase Prices to Licensor for all Licensed Products shall be made in U.S. Dollars and, at Licensee's option, shall be paid by Licensee via one of the two following methods:

(i) (a) Licensee shall pay fifty (50%) percent of the Purchase Price on placement of the order and (b) the balance of the Purchase Price on the date which is five (5) days from the date that Licensee is notified that the Licensed Products are ready for shipment F.O.B. Licensor's designated factory; or,

(ii) Licensee shall give Licensor, within fifteen (15) days after delivery of a pro forma invoice for the subject Licensed Products, an irrevocable sight letter of covering the pro forma invoice sum, in form acceptable to Licensor in its sole discretion, which letter of credit shall be confirmed by a major U.S. bank acceptable to Licensor in its sole discretion..  The Purchase Price for Licensee's purchase of Licensed Products from Licensor pursuant to the

15

00354436.7

aforementioned letter of credit shall be paid on net thirty (30) days terms from the "on-board" bill of lading date (the "On Board Date") for the subject Licensed Products.

3.2    If Licensee does not pay the sums referred to in 3.1(i) or 3.1 (ii) timely, it shall pay a late fee to Licensor on any part of the Purchase Price not paid within such time period equal to (a) one (1%) percent of such unpaid sum that remains unpaid thirty-one (31) days or more after the On-Board Date ("First Late Fee") and (b) an additional one (1%) percent of any such amount that remains unpaid upon the sixty-first day after the On-Board Date (the "Second Late Fee") (the First Late Fee and Second Late Fee are hereinafter collectively referred to as "Late Fees"). The First Late Fee, if due, shall be paid Licensor no later than thirty-five (35) days after the On-Board Date. The Second Late Fee, if due, shall be paid Licensor not later than sixty-five (65) days after the On-Board Date. If by the date ninety (90) days after the On-Board Date in question, Licensee has not paid Licensor all Purchase Prices and Late Fees, if any, due for the Licensed Products purchased, such default shall be a breach of this Agreement entitling Licensor to terminate this Agreement and all of Licensee's rights hereunder.

3.3    All sales of Licensed Products are made F.O.B. Licensor's designated factory, with Licensee exclusively responsible for the arrangement of and all costs for shipping, freight, insurance, duty, quota, taxes, costs and other similar charges. Licensee shall be exclusively responsible for payment of (a) all charges for freight, insurance and shipping for the Licensed Products, and (b) all duties, taxes and other charges payable in connection with the importation of the Licensed Products into or within the Territory, or the sale therein.

3.4    Licensee shall be entitled to cancel any order accepted by Licensor which is not delivered to Licensee, F.O.B., within ten (10) business days after the last date for delivery

16

00354436.7

TOR 001680

(the "Cancellation Date"), provided notice of same is transmitted to Licensor no later than five (5) days after the Cancellation Date.

3.5    Licensee acknowledges that Licensor is the owner of the Trademark and all goodwill connected thereto. Licensee shall never (a) seek to register anywhere in the world (i) the Trademark or (ii) any component thereof or mark confusingly similar to the Trademark (collectively, "Related Mark"), (b) dispute Licensor's ownership of the Trademark or a Related Mark, or (c) oppose Licensor's registration of the Trademark or a Related Mark in any jurisdiction. Licensee shall never take any action which shall reflect adversely on the reputation enjoyed by the Trademark.

3.6    The use of the Trademark by Licensee shall inure to the exclusive benefit of Licensor and Licensor shall have the exclusive right to obtain registrations of the Trademark for the Licensed Products in the United States, the Territory and elsewhere throughout the world. Licensee acknowledges that the Trademark enjoys secondary meaning with the consuming public. The copyright for all designs originated for the Licensed Products and for all advertising or promotional materials or other materials specified in paragraph 3.3 below made by or for Licensee which are associated with the Trademark shall vest exclusively in Licensor. Licensee shall not use any such design or material, or component part thereof, except in connection with Licensed Products. Licensee shall, upon the request of Licensor, execute all such documents, including Registered User Agreements, as Licensor may deem necessary to secure and maintain title to and registrations of the Trademark and the aforesaid copyrights in the name of Licensor. This Agreement does not constitute Licensee the legal representative or agent of Licensor for any purpose (other than to establish and maintain rights in and claims to the Trademark in Licensor),

17

00354436.7

and Licensee shall suffer no act which might convey that impression to anyone. Licensee is granted no right or authority to assume or create any obligation or representation, express or implied, on behalf of or in the name of Licensor or to bind Licensor in any manner whatsoever and Licensor is not granted any right or authority to assume or create any obligation or representation, express or implied, on behalf of or in the name of Licensee or to bind Licensee in any manner whatsoever.

      3.7    All packaging, labels, tags, signs, documents, stationery and other objects bearing the Trademark, and all advertising and sales promotion materials and press releases relating to Licensed Products or this license, made by or for Licensee shall be submitted to Licensor for its prior written approval. No use of the foregoing materials may be made without Licensor's prior written approval. The foregoing materials shall contain the language "the COOGI trademark is licensed from COOGI Partners LLC". Licensee shall submit fair and representative samples of such materials and items to Licensor and seek approval of same, which approval to be granted or denied in Licensor's sole discretion. If Licensor does not reject any such material or item within fifteen (15) days after receipt of same, the item shall be deemed approved.

      3.8    Licensee shall use and display the Trademark in such form and manner in compliance with law, and as is specifically approved in writing, in advance, by Licensor. Licensee shall not join any other names or trademarks with the Trademark, except to specify that the Licensed Products are manufactured by Licensee. The Trademark shall appear with a ®.

18

00354436.7

TOR 001682

# ARTICLE IV

4.    Advertising

       4.1    Without limiting Licensee's other obligations under paragraph 4.1 above, Licensee shall engage in in-store and trade promotional activities.  Without limiting Licensee's other obligations above in paragraph 4.1, or above in this paragraph 4.2, Licensee shall expend on Advertising (as such term is defined below), each Contract Year, a sum equal to the greater of three (3%) percent of (a) Licensee's Net Sales of Licensed Products during the Contract Year or (b) the Annual MNS for the Contract Year (with each such amount referred to in the "Required Advertising Sum)." If Licensee fails to spend, or fails to properly and timely report, the expenditure of the Required Advertising Sum in any Contract Year, it shall pay Licensor a sum within thirty (30) days after the end of the Contract Year, equal to the shortfall not so reported or spent (an "Advertising Shortfall").  Within thirty (30) days of the close of each Contract Year, Licensee shall submit to Licensor a report signed by Licensee's President, certifying as accurate Licensee's expenditures of Advertising, supported by reasonable written evidence demonstrating the amount to expended. "Advertising" means amounts actually spent by Licensee for consumer advertising of the Licensed Products in newspapers, magazines, billboards, poster, television and radio advertising, and in-store visual promotional materials.  Amounts spent on (a) trade shows, (b) advertising production costs expenses not paid by Licensee and (c) co-op advertising, except as otherwise permitted by the next sentence, shall not count as Advertising.  Notwithstanding anything contained above, Licensee may, each Contract Year spend up to 25% of the Required Advertising Sum on co-op Advertising.    Licensee shall promptly furnish to Licensor, at no

19

00354436.7

expense to Licensor, copies of all print advertisements, videos, and editorial press coverage obtained through Licensee's public relations and advertising activities.

4.2    All promotional and advertising materials and media placement, to be used by Licensee, shall be submitted to Licensor for its prior written approval, which approval shall be granted or denied in Licensor's sole discretion. No promotional or advertising materials may be used unless so approved by Licensor.

4.3    The use of any celebrity or other person as a spokesperson for Licensee in connection with advertising or promotion of the Licensed Products must be approved in advance in writing by Licensor, which approval may be granted or denied in Licensor's sole discretion.

## ARTICLE V

5.    Indemnification and Insurance

5.1    Licensor shall defend, indemnify, and hold Licensee, its parent, affiliates and their respective employees, officers, directors, shareholders and agents (the "Licensee Indemnitees") harmless from and against (a) all third party claims instituted arising from the breach of this Agreement by Licensor and (b) all third party claims instituted against a Licensee Indemnitee by a third party in which it is established by a non-appealable court judgment that Licensee's use of a Trademark in the Territory, for which Trademark Licensor owns a registration of the Trademark in the Territory in trademark Class 25, strictly in accordance with this Agreement, infringed the trademark rights of such party. For any matter indemnifiable hereunder, Licensor shall indemnify Licensee Indemnitees against all out-of-pocket losses, including the payment of any and all claims, damages (but excluding consequential damages and lost profits), expenses (including reasonable attorneys' fees and disbursements), cost, liabilities,

20

00354436.7

settlements, fines or judgments actually suffered by Licensee. This indemnity shall be paid within thirty days after the submission of a statement to Licensor of the amount due to Licensee. Statements may be rendered "on account" for ongoing indemnifiable expenses such as attorneys' fees. Licensee shall give Licensor prompt written notice of any claim indemnifiable hereunder. Licensee shall give Licensor full control over the defense against any claim indemnifiable hereunder, including, but not limited to, the right to choose Licensee's attorneys, direct their conduct and Licensee's conduct, and to settle any such claims, provided any settlement results in a general release for such Licensee Indemnitees as have been sued.

5.2    In the event that Licensee learns of any infringement of the Trademark, act of unfair competition, imitation of the Trademarks, use by any person or entity of a trademark similar to the Trademarks, or infringement of copyright, it shall immediately notify Licensor thereof. Licensor thereupon shall take such action, or no action, as it deems advisable in its complete discretion for the protection of its rights, at its sole cost. If requested by Licensor, Licensee shall fully cooperate with Licensor in all respects, including without limitation, being a plaintiff or a co-plaintiff and by causing its officers and employees to devote appropriate time to the litigation; it is understood that Licensee's officers and employees will not be compensated for their time and effort. In no event shall Licensor be required to take any action it deems inadvisable and Licensee shall have no right to take any action with respect to the Trademarks. Licensor shall have full control over any action in its sole discretion. Any recovery as a result of such action shall belong solely to Licensor.

5.3    Licensee shall defend Licensor, its affiliates and their respective employees, officers, directors, members, shareholders and agents ("Licensor Indemnitees") by

21

00354436.7

counsel reasonably acceptable to Licensor, and indemnify and hold Licensor Indemnitees harmless from and against (a) any and all actions, claims and proceedings, whether groundless or not, which may be instituted against a Licensor Indemnitee by a third party arising out of any act, omission or conduct of Licensee, its agents and employees relating to the performance or implementation of this Agreement, including without limitation, out of the offer, sale, advertising or promotion of the Licensed Products by or for Licensee (including, without limitation, Licensee's use of Additional IP), including without limitation in connection with property damage, personal injury or death and (b) relating to the breach of this Agreement and/or any exhibit thereto by Licensee. For any matter indemnifiable hereunder, Licensee shall indemnify and hold Licensor Indemnitees harmless from and against all out-of-pocket losses, including the payment of any and all claims, damages (but excluding consequential damages and lost profits), expenses (including reasonable attorneys' fees and disbursements), costs, liabilities, settlements, fines or judgments relating to the above. This indemnity does not extend to claims that Licensee's use of the Trademark in connection with the Licensed Products, strictly in accordance with this Agreement, violates the rights of a third party. This indemnity shall be paid within thirty (30) days after the submission of a statement to Licensee of the amount due to Licensor, or its payees. Statements may be rendered "on account" for ongoing indemnifiable expenses such as attorneys' fees.

## ARTICLE VI

6.    Default and Initial Termination

      6.1    The following conditions and occurrences shall each constitute an "Event of Default", with time "being of the essence" as to all such matters:

22

00354436.7

(a)    Licensee's failure to pay Licensor the full amount due Licensor under any of the provisions of this Agreement, including, without limitation, pursuant to paragraphs 2.2, 2.3, 2.7, 3.1 and 3.2, by the prescribed date for such payment, not cured within fifteen (15) days after notice to Licensee;

(b)    Licensee's failure to deliver full and accurate reports pursuant to this Agreement by the prescribed due date therefor, not cured within fifteen (15) days after notice to Licensee;

(c)    Licensee's knowingly making or furnishing a false statement in connection with or as part of any report rendered pursuant to this Agreement;

(d)    Licensee's attempted or actual assignment, transfer or sublicense of any of Licensee's rights under this Agreement without Licensor's prior written consent;

(e)    Licensee's use of the Trademark in an unauthorized or unapproved manner, not cured within ten (10) days after notice to Licensee;

(f)    Licensee's use of other trademarks on or in association with Licensed Products bearing the Trademark, without the prior written consent of Licensor;

(g)    the failure of Licensee to indemnify Licensor Indemnitees pursuant to paragraph 5.3, not cured within fifteen (15) days after notice to Licensee;

(h)    the failure of Licensee to comply with any obligation set forth in paragraphs 1.4(b), 1.6, 2.1 (if not cured within fifteen (15) days after notice), 3.5, 3.6 (if not cured within fifteen (15) days after notice), 3.7 (if not cured within fifteen (15) days after notice) or 4.3 above;

00354436.7

TOR 001687

(i)      the commencement by or against Licensee or Vis-a-Vis (1997), Inc. ("Guarantor") of any proceeding in bankruptcy, or similar law, seeking reorganization, liquidation, dissolution, arrangement, readjustment, discharge of debt, or seeking the appointment of a receiver, trustee or custodian of all or any substantial part of Licensee's or Guarantor's property, or Licensee's or Guarantor's making of an assignment for the benefit of creditors, or Licensee's or Guarantor's acknowledgment of its insolvency or inability to pay debts, or the commencement of involuntary bankruptcy proceedings against Licensee or either Guarantor, except where any of the foregoing are commenced by third parties and are dismissed within sixty (60) days thereafter;

(j)      Licensee's sale of Close-outs of Licensed Products in any Contract Year in excess of the amount permitted pursuant to paragraph 1.6 above;

(k)      (A) a shareholder of Licensee holding more than ten (10%) percent of the voting stock thereof being convicted of a felony or (B) the sale of all or substantially all of Licensee's assets or the Guarantor's assets.

(l)      the sale of any Licensed Products to any customer which is not within Authorized Distribution Channels;

(m)      Issie Wiseman owning less than sixty (60%) percent of the voting equity of Licensee;

(n)      Licensee's sale of Licensed Products outside the Territory or to a person Licensor knows or has good reason to know will sell Licensed Products outside the Territory;

24

00354436.7

TOR 001688

(o)    Licensee's failure to obtain and accurately report at least eighty-five (85%) percent of the Annual MNS for any Contract Year provided a termination notice is transmitted to Licensee within the period specified in paragraph 2.5;

(p)    Licensor's breach of paragraph 4.2 above not cured within thirty (30) days after notice to Licensee; or

(q)    the breach by Licensee of any other material obligation made herein not cured within thirty (30) days after notice to Licensee.

(A breach by any Affiliate of Licensee shall be deemed a breach of this Agreement by Licensee for purposes of this paragraph).

6.2    Upon the occurrence of any Event of Default, this Agreement shall upon transmittal of a notice from Licensor to Licensee be deemed automatically and immediately to have terminated, and all rights granted to Licensee under this Agreement shall immediately and automatically revert to Licensor and the parties shall remain liable for all obligations which were incurred before termination or which survive termination. Upon any such termination the lesser of (a) all Minimum Guaranteed Royalties payable through the remainder of the Initial Term and (b) the Minimum Guaranteed Royalties due for the next four quarters following the date of termination, shall, as liquidated damages, but not as a penalty, accelerate and become immediately due and payable to Licensor. The termination of this Agreement shall be without prejudice to any other right of Licensor, including the right to damages and/or equitable relief. Licensee acknowledges that Licensor shall be entitled to the granting of preliminary and permanent injunctive relief, without the necessity of posting a bond, to restrain Licensee from

25

00354436.7

TOR 001689

further using the Trademark, upon the termination of this Agreement pursuant to this paragraph 6.2, without limiting Licensor's right to other relief, including, without limitation, the right to damages. Initial Termination of this Agreement pursuant to this paragraph 6.2 shall be without prejudice to any other right of Licensor, including the right to damages and/or equitable relief for any breach of any obligation incurred prior to termination or expressly surviving termination.

      6.3     Sixty (60) days prior to the expiration of this Agreement or within ten (10) days after termination of this Agreement, Licensee shall provide Licensor with a written inventory of all fully-manufactured Licensed Products in Licensee's possession or in warehouses owned, leased or used by Licensee, and all work in progress. (The requirement of Licensee providing Licensor with such inventory post-termination shall not afford Licensee any post-termination sell-off rights.) Such inventory shall specify for each location (name and address) in which Licensed Products and work in progress are maintained, the quantities by style number of each item of Licensed Products possessed by Licensee, and the direct costs to Licensee of such Licensed Products. Licensor and/or their representatives shall upon three (3) business day's notice, be entitled to perform an audit of such Licensed Products of each such location. If such audit reveals an under-counting of the inventory by more than three (3%) percent, Licensee shall pay the full cost of the audit. Licensee shall be entitled to sell Licensed Products following expiration of the Agreement pursuant to paragraph 6.4 below, only to the extent such Licensed Products were included within the inventory timely provided Licensor under this paragraph 6.3 and were actually in possession of Licensee at such time, or were work-in-process located at a factory used by Licensor.

00354436.7

TOR 001690

6.4    Upon the effective date of termination of this Agreement, or expiration of this Agreement, Licensee, except as specified below, will immediately discontinue use of the Trademark, whether in connection with the sale, advertisement or manufacture of Licensed Products or otherwise, and will not resume the use thereof or adopt any colorable imitation of the Trademark or any of its parts or designs incorporated therein or material parts thereof, and will, at Licensor's option, (a) promptly destroy, or (b) sell and convey to Licensor (at a price equal to Licensee's direct cost therefor) and free of all liens and encumbrances, all plates, engravings, silkscreens, computer tapes, molds, stitching patterns or the like used to make or reproduce the Trademark in Licensee's possession, and all items affixed with likenesses or reproductions of the Trademark in Licensee's possession, whether signage, labels, posters, bags, boxes, tags or otherwise, and, upon request by Licensor, will assign to Licensor, at no cost to Licensor, such rights as Licensee may have acquired in the Trademark.  Any other provision in this Agreement to the contrary notwithstanding, except as otherwise provided below, Licensee shall be entitled for a period of one hundred twenty (120) days after expiration of this Agreement, and after termination of this Agreement pursuant to paragraph 6.2, but not after any termination based on an Event of Default specified in any of paragraphs 6.1(a), (b), (c), (d), (g) or (h) (in the case of (h) relating to paragraphs 1.4(b) (involving sales outside Authorized Distribution Channels) or 3.5), or involving any other breach of this Agreement by Licensee which materially damaged the Trademark or the business operated thereunder (in any of which events no sell-off shall be permitted) to sell Licensed Products on a non-exclusive basis provided (a) the Licensed Products have been approved in accordance with Article III above and are not in any way non-conforming as to style or quality, (b) Licensee makes no advertising or promotional use of the Trademark

27

00354436.7

TOR 001691

during such sell-off period, (c) Licensee pays Licensor timely Percentage Royalties, as specified below, and (d) Licensee complies with all provisions of this Agreement, including, without limitation, paragraph 1.4, above during the one hundred twenty (120) day sell-off period. Licensee shall pay to Licensor the Percentage Royalties on such sales of Licensed Products within ten (10) days after the end of each thirty (30) day period within the one hundred twenty (120) day sell-off period, accompanied by the reports required under paragraph 2.1 above.  If during the 120-day sell-off period Licensee breaches any obligation under this paragraph 6.4, Licensor shall be entitled to terminate all sell-off rights immediately on written notice to Licensee upon the breach of this Agreement by Licensee (i) if such breach is specified in 6.1 as a breach for which no cure is permitted or (ii) for any other breach, the breach is not cured within ten (10) days after Licensee's receipt of notice of breach.  Notwithstanding anything contained above to the contrary, Licensor shall, at its option, be entitled to purchase from Licensee within thirty (30) days after receipt of the Inventory specified in paragraph 6.3 above, any or all of Licensee's Licensed Products at a price equal to the lower of (a) thirty (30%) percent off Licensee's then standard list price for such Licensed Products or (b) or the most favorable price Licensee charged for the item.  In the event of termination of this Agreement, pursuant to paragraph 6.2, the price payable for such Licensed Products shall be the landed duty price therefor.  Licensee shall promptly provide all list price and landed duty paid price information requested by Licensor about Licensed Products.  In the event (a) Licensor does not purchase all of the aforesaid Licensed Products, (b) no sell-off rights are provided hereunder due to a termination of this Agreement or (c) all sell-off rights provided have expired, in any such event, Licensor shall be entitled to cause all Licensed Products in the possession of Licensee to be

28

00354436.7

destroyed on an agreed date, time and place, with Licensor and/or its representative entitled to be present at such destruction. No later than the earlier of (a) thirty (30) days prior to the expiration of the 120-day sell-off period or (b) within fifteen (15) days after the termination by Licensor of any sell-off period pursuant to the fourth sentence of this paragraph 6.4, Licensee shall provide Licensor an inventory of all Licensed Products bearing the Trademark, in its possession or in warehouses. Licensor shall have the same audit rights as to such items as provided in paragraph 6.3.

6.5    The terms and conditions set forth in paragraphs 2.1, 2.2, 2.3, 2.4, 2.5, 2.7, 4.1, 5.1, 5.3, 5.4, 5.5, 6.1, 6.2, 6.3, 6.4 (and all terms and conditions of this Agreement during the sell-off period provided therein), 7.1, 8.1, 8.2, 8.3, 9.1, 9.2, 9.3 and 10.1 (and 11.1 should this Agreement be renewed in accordance therewith), shall survive the expiration or termination of this Agreement, without limiting the rights and remedies of the parties with respect to any breach of the Agreement pre-dating expiration or termination.

## ARTICLE VII

7.    Notices

7.1    Any notices to be given under this Agreement shall be in writing and shall for all purposes be deemed to be fully given by a party when sent by certified mail, postage prepaid, return receipt requested, or reputable overnight carrier that provides a receipt, to the other party at the respective address set forth below. The date of mailing shall be deemed to be the date on which such notice is received. Either party may change its address for the purposes of this Agreement by giving the other party written notice of its new address.

The address of Licensor is designated as:

29

00354436.7

TOR 001693

COOGI Partners, LLC
350 Fifth Avenue
New York, New York  10118
Attention:     Mr. Bruce Weisfeld
                    Lawrence Blenden, Esq.

With a copy to:

Davidoff Malito & Hutcher LLP
605 Third Avenue
New York, New York  10158
Attention:  Charles Klein, Esq.

The address of Licensee is designated as:

4107675 Canada Inc.
5540 Ferrier Street
Montreal, Quebec, H4P 1M2, Canada.
Attention:  Issie Wiseman, President

With a copy to:

Levine Frishman
300 Boulevard de Maisonneuve
Quest, Bureau 1600
Westmount, Quebec H3Z 3C1
Canada
Attention:  Samuel Frishman, Esq.

## ARTICLE VIII

8.    Enforcement of the Agreement

8.1    This Agreement shall be governed by, and interpreted under, the laws of the State of New York without reference to principles of conflict of laws.  Any controversy arising out of this Agreement, shall be resolved without a jury in a federal or state court of competent jurisdiction located in the State of New York, County of New York.  The parties consent to jurisdiction in such courts, waive any objection to such venue and waive trial by jury.

30

TOR 001694

The parties stipulate and agree that any judgment relating to this Agreement which is entered in a federal or state court of competent jurisdiction located within the City of New York shall be binding throughout the world and may be sued upon, docketed, entered and/or enforced, without challenge or opposition on their part and without re-trial of any of the issues which gave rise to such judgment, in any state, country, province, commonwealth or territory having jurisdiction over their respective persons or properties.  Legal Process may be served on either party by Certified Mail, Return Receipt Requested, or Registered Mail, Return Receipt Requested, or any other method permitted by the rules of the Court in which an action is commenced.

8.2    In the event any provision of this Agreement shall be held invalid or unenforceable, it shall be deemed modified, but only to the extent necessary to make it lawful. To effect such modification, the said provision shall be deemed deleted, added to and/or rewritten, whichever shall most fully preserve the intentions of the parties as originally expressed herein.

8.3    The obligations of the parties under this Agreement shall be binding upon their legal assigns and successors, but this Agreement may not be assigned by Licensee whether through a merger, assets sale, stock sale or otherwise, except with the prior written consent of Licensor. Licensor may assign its rights and obligations under this Agreement on written notice to Licensee.

8.4    No party shall be liable to the other party for any delay caused by fire, war, flood, or other disaster or Act of God, or other cause beyond the reasonable control of the party.  Notwithstanding anything contained above, this paragraph 8.4 shall not in any respect

31

00354436.7

TOR 001695

excuse, release or limit Licensee's obligation to make timely any payment of monies due Licensor under this Agreement.

## ARTICLE IX

9.    Confidentiality

9.1    During the Initial Term of this Agreement and any renewal thereof, both Licensor and Licensee acknowledge that they may be exposed to certain information concerning the other party's products and/or business which is confidential and proprietary information of such other party and not generally known to the public, including, without limitation, the terms and conditions contained in this Agreement, but not the making thereof ("Confidential Information"). Both Licensor and Licensee agree that during and after the Initial Term of this Agreement, neither will use or disclose to any third party any Confidential Information of the other without the prior written consent of such other party. Notwithstanding the foregoing, this Article IX shall not apply (a) to any Confidential Information which becomes known to the public through no fault of the receiving party (Licensor or Licensee as the case may be) or which was already known by the receiving party and same can be demonstrated or (b) to any Confidential Information required to be used or disclosed in connection with the enforcement of this Agreement or pursuant to a court order or governmental directive. Notwithstanding anything contained above, the terms and conditions of this Agreement may be disclosed (a) to a party's professional representatives, on a need to know basis, subject to their holding all such information in confidence pursuant to this paragraph 9.1 and (b) in connection with the prosecution and/or defense of any claim relating to this Agreement.

32

00354436.7

9.2     Any violation by Licensor or Licensee of its obligations pursuant to this Article IX shall not be adequately compensable by monetary damages and the non-violating party shall be entitled to an injunction or other appropriate decree specifically enforcing such party's obligations pursuant to this Article IX.

9.3     Upon termination of this Agreement, each party will return the other party's Confidential Information which is under its control or in its possession.

## ARTICLE X

10.    Miscellaneous

(a)    This document constitutes the entire agreement of the parties concerning the subject hereof. No representation, warranty, covenant, promise or agreement, even if previously or contemporaneously made, shall survive the signing of this document unless it be expressly stated herein. Except as provided in paragraph 8.2 above, this Agreement may not be altered, modified, terminated or discharged except by a writing signed by both parties. Any party's failure, for any reason, to take action against a breach or default under this Agreement shall not be construed as a waiver of the right to take action against any such breach or default, similar breach or default, it being understood that no waiver shall be effective unless it be made in a writing signed by the party to be charged with it.

(b)    This Agreement does not make the parties joint venturers and neither party shall have the right to bind the other.

(c)    This Agreement may be signed in counterparts.

(d)    The prevailing party in any dispute, as determined by the trier of fact, shall be entitled to receive from the non-prevailing party an amount equal to the reasonable

33

00354436.7

TOR 001697

attorneys' fees, costs and expenses incurred by the prevailing party in connection with such

dispute, and in any action or proceeding to collect such fees, costs and expenses.

(e)    The remedies under this Agreement are cumulative.

(f)    The parties acknowledge that this Agreement has been the subject

of negotiations and shall not be construed against either party.

(g)    The submission by Licensor of this Agreement to Licensee and the

actual execution thereof by Licensee and delivery to Licensor shall have no binding force and

effect whatsoever unless and until Licensor shall have executed this Agreement and a fully

executed counterpart thereof shall have been delivered by Licensor to Licensee.

## ARTICLE XI

11.    Renewal

11.1    Provided (a) Licensee is in compliance with all the terms and conditions of

this Agreement as of both the date Notice of Renewal (as defined below) is transmitted and the

day before the Renewal Term (as defined below) is to commence; and (b) Licensee has satisfied

the Annual MNS for each of Contract Years 2 and 3, Licensee may, by notice transmitted to

Licensor no later than March 30, 2010, renew this Agreement for one three (3) year old renewal

term commencing on October 1, 2010, and expiring on September 30, 2013, or such earlier date

this Agreement is terminated in accordance with its terms (the "Renewal Term"). The terms and

conditions applicable to the Renewal Term shall be the same as applicable to the Initial Term

except as set forth below:

34

00354436.7

(a)    Licensee shall pay Licensor as irrevocable, non-refundable Minimum Guaranteed Royalties pursuant to paragraph 2.3, the total sum of Four Million Eight Hundred Thousand ($4,800,000.00) Dollars, payable as follows:

| | |
|---|---|
| October 1, 2010 | $350,000.00 |
| January 1, 2011 | $350,000.00 |
| April 1, 2011 | $350,000.00 |
| July 1, 2011 | $350,000.00 |
| October 1, 2011 | $400,000.00 |
| January 1, 2012 | $400,000.00 |
| April 1, 2012 | $400,000.00 |
| July 1, 2012 | $400,000.00 |
| October 1, 2012 | $450,000.00 |
| January 1, 2013 | $450,000.00 |
| April 1, 2013 | $450,000.00 |
| July 1, 2013 | $450,000.00 |

(b)    The Annual MNS pursuant to paragraph 2.5(a) shall be as follows:

| | | |
|---|---|---|
| (i) | Contract Year 4 | $14,000,000.00 |
| (ii) | Contract Year 5 | $16,000,000.00 |
| (iii) | Contract Year 6 | $18,000,000.00 |

(c)    The amounts applicable to paragraph 2.5(b) shall be as follows:

| | | |
|---|---|---|
| (i) | Contract Year 4 | $10,500,000.00 |
| (ii) | Contract Year 5 | $12,000,000.00 |
| (iii) | Contract Year 6 | $13,500,000.00 |

(d)    The amounts applicable to paragraph 2.5(c) shall be as follows:

| | | |
|---|---|---|
| (i) | Contract Year 4 | $ 3,500,000.00 |
| (ii) | Contract Year 5 | $ 4,000,000.00 |
| (iii) | Contract Year 6 | $ 4,500,000.00 |

35

00354436.7

·and

(e)    all references to "Initial Term" in this Agreement shall read "Renewal Term".

**IN WITNESS WHEREOF,** the parties have signed and entered into this Agreement as of the day and year first set forth above.

COOGI PARTNERS, LLC (Licensor)

By: _____

Bruce Weisfeld, President

4107675 CANADA INC. (Licensee)

By: _____

Issie Wiseman, President

36

00354436.7

## Guaranty of Payment and Performance

In order to induce COOGI Partners, LLC ("Licensor") to enter into the above Trademark License Agreement ("License Agreement") dated as of April 1, 2007 with 4107675 Canada Inc.("Licensee") Vis-a-Vis (1997) Inc. ("Guarantor") hereby irrevocably and unconditionally guarantees to Licensor the full, faithful and timely payment and performance of all obligations of Licensee under the License Agreement and all exhibits thereto and all amendments thereto, owed to Licensor thereunder, including, without limitation, all obligations arising before and after the date of the aforesaid assignment. This Guaranty shall be governed by, and interpreted under, the laws of the State of New York without reference to principles of conflicts of laws. Any controversy arising out of this Agreement, shall be resolved without a jury in a court located in the State of New York, County of New York. Guarantor consents to jurisdiction in such courts, waives any objection to such venue and waives trial by jury. Guarantor agrees that any judgment relating to this Guaranty which is entered in a court located within the City of New York shall be binding throughout the world and may be sued upon, docketed, entered and/or enforced, without challenge or opposition on their part and without re-trial of any of the issues which gave rise to such judgment, in any state, country, province, commonwealth or territory having jurisdiction over the Guarantor. In the event any provision of this Guaranty shall be held invalid or unenforceable, it shall be deemed modified, but only to the extent necessary to make it lawful. To effect such modification, the said provision shall be deemed deleted, added to and/or written, whichever shall most fully preserve the intentions of the parties as originally expressed herein.

The obligations of Guarantor under this Guaranty shall be binding upon its legal assigns and successors, but this Guaranty may not be assigned by Guarantor except with the prior written consent of Licensor, which consent may be denied by Licensor in its sole discretion. Licensor

00354436.7

37

may assign its rights under this Guaranty to any person or entity to which it has properly assigned its rights and obligations under the License Agreement.

This Guaranty may not be altered, modified, terminated or discharged except by a writing signed by Guarantor and Licensor  The failure of Licensor for any reason, to take action against a breach or default under this Guaranty shall not be construed as a waiver of the right to take action against any such breach or default, similar breach or default.

The prevailing party in any dispute concerning this Guaranty, as determined by the trier of fact, shall be entitled to receive from the non-prevailing party an amount equal to the reasonable attorneys' fees, costs, and expenses incurred by the prevailing party in connection with such dispute, and in any action or proceeding to collect such fees, costs and expenses.

Guarantor acknowledges that Licensor would not enter into the License Agreement in the absence of this Guaranty.  This Guaranty is a guaranty of payment and performance and not of collection.  The obligations of the Guarantor under this guaranty are primary and unconditional and shall be enforceable against Guarantor before or after proceeding against the Guarantor and before or after the expiration or termination of the License Agreement, and regardless of any insolvency of Licensee, or any defense Licensee possesses as to the validity of the License Agreement or any exhibits or amendments thereto.  No notice of default under the License Agreement need be given to Guarantor, which notice is expressly waived by Guarantor. Guarantor need not receive copies of amendments to the License Agreement and waives the right to receive any such amendments.

00354436.7

38

Service of process may be made on Guarantor by Certified Mail, Return Receipt Requested and by any other method in satisfaction of the rules of the Court in question.

GUARANTOR:

VIS-A-VIS (1997) INC.

By: _____
       Issie Wiseman, President

TOR 001703

EXHIBIT A

TOR 001704

CIPO – Canadian Trade-marks Database                                    Page 1 of 3

 Canadian Intellectual                Office de la propriété              Canada
Property Office                     intellectuelle du Canada

Français      Contact Us     Help          Search        Canada Site
strategis.gc.ca              Stratégis     Site Map       What's New     About Us       Registration

CIPO ⚙ OPIC                          Canadian Intellectual Property Office

CIPO Home                    ⇨ Search Page
Patents Database
Decisions of the
Commissioner of            CANADIAN TRADE-MARK DATA
Patents                    *** Note Data on trade-marks is shown in the official language in which it was
Trade-marks Main            submitted
Page
TRADE-MARKS                The database was last updated on: 2007-05-29
DATABASE
Help                       APPLICATION NUMBER:                    REGISTRATION NUMBER:
Tutorial                   0650541                                          TMA436040
Disclaimer                 STATUS:                    REGISTERED
                           FILED:                     1990-02-08
Copyrights Database        FORMALIZED:                1990-04-04
Industrial Designs         ADVERTISED:                1991-07-03
Database                   REGISTERED:                1994-11-25
                           REGISTRANT:
                           COOGI AUSTRALIA, INC.,
                           SUITE A594,
                           110 EAST 9TH STREET,
                           LOS ANGELES, CALIFORNIA 90079,
                           UNITED STATES OF AMERICA
                                 REPRESENTATIVE FOR SERVICE:
                                 SMART & BIGGAR
                                 SUITE 900, 55 METCALFE STREET
                                 P.O. BOX 2999, STATION D
                                 OTTAWA
                                 ONTARIO K1P 5Y6
                           CURRENT OWNER:
                           Coogi Partners LLC
                           (a New York limited liability company)
                           112 Windsor Gate
                           Lake Success
                           New York, NY 11020
                           UNITED STATES OF AMERICA
                                 REPRESENTATIVE FOR SERVICE:
                                 GOWLING LAFLEUR HENDERSON LLP
                                 SUITE 2600, 160 ELGIN STREET
                                 OTTAWA
                                 ONTARIO K1P 1C3
                           INTERESTED PARTIES:
                                 OLD OWNER
                                 Coogi IP Pty Ltd.
                                 452 Johnston Street,
                                 Abbotsford, Victoria 3067,
                                 AUSTRALIA

TOR 001705

TRADE-MARK:

# COOGI

INDEX HEADINGS:

COOGI

OOGI, C

WARES:

(1) Wearing apparel, namely, sweaters.
(2) Linens, bedding, pillowcases, wearing apparel, namely, socks, hosiery, ties, cravats, dresses, skirts, shirts, scarves, sweater skirts, sweater coats, pants and trousers.
(3) Clothing, namely, sweaters.

CLAIMS:

Used in CANADA since at least as early as November 03, 1987 on wares (1).
Used in UNITED STATES OF AMERICA on wares (3).
Registered in or for UNITED STATES OF AMERICA on August 09, 1988 under
No. 1,499,662 on wares (3).
Declaration of Use filed October 24, 1994 on wares (2).

| ACTION | DATE | BF | COMMENTS |
|---|---|---|---|
| Filed | 08 February 1990 | | |
| Created | 08 February 1990 | | |
| Formalized | 04 April 1990 | | |
| Search Recorded | 24 May 1990 | | |
| Correspondence Created | 10 July 1990 | | |
| Correspondence Created | 01 March 1991 | | |
| Approved | 20 March 1991 | | |
| Advertised | 03 July 1991 | | Vol.38 Issue 1914 |
| Allowed | 30 August 1991 | | |
| Allowance Notice Sent | 30 August 1991 | 28 February 1995 | |
| Registered | 25 November 1994 | | |
| Rep for Service Changed | 18 October 2001 | | From: 2502 To: 12 / Voir Preuve au dossier/See evidence on File No. 650541 |
| Change in Title Registered | 16 January 2002 | | Assignment / Voir Preuve au dossier/See evidence on File No. 650541 |
| Assignment Correspondence Created | 06 January 2003 | 06 July 2003 | |
| Rep for Service Changed | 23 January 2003 | | From: 12 To: 8390 / Voir Preuve au dossier/See evidence on File No. 650541 |
| Agent Changed | 23 January 2003 | | From: 12 To: 8390 / Voir Preuve au dossier/See |

TOR 001706

| | | evidence on File No. 650541 |
|---|---|---|
| Change in Title | 23 January | Assignment / Voir Preuve au |
| Registered | 2003 | dossier/See evidence on File |
| | | No. 650541 |

FOOTNOTES:

*CHANGE IN TITLE/CHANGEMENT EN TITRE:*
TYPE OF CHANGE/GENRE DE CHANGEMENT: Assignment/Cession
DATE REGISTERED/DATE DE L'ENREGISTREMENT: 16 janv/Jan 2002
DATE OF CHANGE/DATE DE CHANGEMENT: 06 nov/Nov 2001
COMMENTS/COMMENTAIRES: FROM: COOGI AUSTRALIA, INC.,
TO: Coogi IP Pty Ltd.
Voir Preuve au dossier/See evidence on File No. 650541

*CHANGE IN TITLE/CHANGEMENT EN TITRE:*
TYPE OF CHANGE/GENRE DE CHANGEMENT: Assignment/Cession
DATE REGISTERED/DATE DE L'ENREGISTREMENT: 23 janv/Jan 2003
DATE OF CHANGE/DATE DE CHANGEMENT: 31 oct/Oct 2002
COMMENTS/COMMENTAIRES: FROM: Coogi IP Pty Ltd.
TO: Coogi Partners LLC
(a New York limited liability company)
Voir Preuve au dossier/See evidence on File No. 650541

Back to search    Back

Last updated: 2007-05-29    ▲    Important Notices

TOR 001707

# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 45

**Claudia Michaels**

| | |
|---|---|
| From: | Claudia Michaels [cc@tyfoon.com] |
| Sent: | Wednesday, May 02, 2007 12:56 PM |
| To: | caryn@suryausa.net |
| Cc: | cc@tyfoon.com |
| Subject: | Distribution of Joyous & Free in Canada |



Tyfoon Company
Profile.doc (40...

Hi Cary,
Hope all is well, my name is Claudia and I saw your line: Joyous & Free at the Product
showroom in NY.I was very impressed with your product and we would love the chance to
distribute your brand in Canada. We believe that your brand will do extremely well since
we have all the necessary tools in order for it to be a great success.
We are one of the largest distribution firms in the country carrying over 15 different
brands.
We do diversified products such as: women's, mens & children apparel, jewellery, handbags,
shoes & outerwear.
Please see attached for our company profile.
Hoping to hear from you soon & seeing you at Intermezzo.
Best Regards,
Claudia Michaels

1


PLAINTIFF'S
EXHIBIT
45



TYFOON INTERNATIONAL INC.

May 2nd, 2007

Dear Cary,

RE: WORKING PROPOSAL FOR "JOYOUS & FREE"
-------------------------------------------------------------------

Below I have taken the liberty of setting out some pertinent details concerning our business operations, which I hope you will find informative.

We strive to maintain high standards of business ethics and are considered in the industry to be a respected firm of importers specializing in men's and women's wear, as well as accessories and footwear. We service over a thousand accounts across the country between all of our various products.

Our lines include, Phat Farm and Baby Phat (clothing, footwear, accessories, jewellery, outerwear, leathers, lingerie, loungewear and kids), Akademiks (men's and ladies and children's clothing and outerwear as well as handbags & jewellery), G1, Kinross Cashmere, Heatherette, Coogi, ABS dresses by Allen Schwartz, UBU, Cezer, Prohibit, and Inkslingers to name a few.

Each individual line represented by this firm is lead by its own "Division Head" and supported by sufficient staff to fully operate and monitor the merchandising, selling, marketing, and eventual shipping of the collection in Canada, all the while working closely with upper management and the U.S. Licensor to ensure that correct planning and strategies are implemented. We are able to run an operation, which is mutually profitable for our tie-ups and ourselves.

5540 Ferrier street Montreal, Qc H4P 1M2
Phone: 514-731-7070 Fax: 514-733-8533
Email: cc@tyfoon.com



Below are some of the different arrangements we have with our tie-ups.

1. Tyfoon will pay a percentage commission on merchandise to your firm to be calculated on true factory F.O.B. prices. These commission charges are "clean" in as much as they are easily monitored, in this manner your firm does not become encumbered with any calculation representing percentage of sales, markdowns, clearings, damages etc. The only figure relevant vis-a-vis the commission charge is the F.O.B. price from the factory.

2. Tyfoon receives a discount off of the US wholesale price when goods are manufactured in U.S.A. The discount varies depending on the product.

3. Sample lines are imperative so that the same can be forwarded to our sales representatives throughout Canada and therefore, at least a minimum of two (2) sample lines are essential.

4. Our purchases are usually made at the same time and on the same buying cycle as our Licensor. Tyfoon will open a Letter of Credit to you or directly to an agent or contractor appointed by you to cover all merchandise put into production on our behalf.

Our corporate attorneys are Messrs. Levine Frishman, the senior being Mr. Samuel J. Frishman, 3400 De Maisonneuve St. W., Suite 1200, Montreal, Que. H3Z 3B8  (514) 939-3355.

Our corporate auditors and chartered accountants are Messrs. Richter, Usher and Vineberg, the senior being Mr. Marvin Corber, 2 Place Alexis Nihon Plaza, Montreal, Que. H3Z 3C2 (514) 934-3400

Our corporate account is with the Toronto Dominion Bank -Mr. Bruno Cioffe, the manager of our branch at 433 Chabanel St. West, Montreal, Que. H2N 2J3 (514) 289-1555

5540 Ferrier street Montreal, Qc H4P 1M2
Phone: 514-731-7070 Fax: 514-733-8533
Email: cc@tyfoon.com



Our firm has been in existence for the past twenty-seven years and our financial statement bears out a profitable and constantly expanding operation.

We are prepared and able to distribute the line in Canada. I am confident that we can certainly promulgate your line throughout Canada in a manner, which is financially rewarding to us both all the while maintaining the integrity of the brand.

I look forward to hearing from you to further discuss distribution of "JOYOUS & FREE" in Canada. If you need any additional information, please feel free to contact me at any time.

Best Regards,
Claudia Micheals

Tel: (514) 731-7070
Email: cc@tyfoon.com
Cell: (514) 919-3499

# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
## Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 46



PLAINTIFF'S
EXHIBIT
46



Tyfoon is a multi-brand distributor for Canada, responsible for launching and establishing brands throughout the country. For over 25 years, we have provided full import/distribution services, sales and marketing to build successful labels in the Canadian market.

Tyfoon's goal is to serve as an extension of a brand within Canada. Specializing in men's and women's ready-to-wear, accessories, footwear, lingerie and handbags, we service over 1000 accounts across the country.

Currently, we work with brands which include Phat Farm and Baby Phat (clothing, footwear, accessories, jewelry, outerwear, leathers and kids), Akademiks (men's and ladies), Miskeen Originals, Cezer, Ink Slingers, Prohibit, G1 and A.B.S. dresses (Allen B. Schwartz), Kinross Cashmere and UBU Clothing.

Each individual collection represented by Tyfoon is led by its own division head and supported by sufficient staff to fully operate and monitor the merchandising, selling, marketing, and eventual shipping of the collection in Canada. We work closely with the Licensor to ensure that correct planning and strategies are implemented. Each brand is differentiated by its own distinctive styling, pricing strategy, distribution channel and target consumer.

Tyfoon will work with the brand to formulate the most beneficial plan possible, with the goal of building long-term relationships between the Licensor and top retailers.

TYFOON INTERNATIONAL INC.  P 514.731.7070  F 514.733.8533  hello@tyfoon.com
www.tyfoon.com



# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 47

Message                                                                 Page 1 of 1

## Josh Wiseman

| | |
|---|---|
| From: | Josh Wiseman [josh@tyfoon.com] |
| Sent: | Wednesday, September 26, 2007 5:18 PM |
| To: | 'john_ackerman@comcast.net' |
| Cc: | 'barry segal'; 'Issie Wiseman' |
| Subject: | FW: Blac Label Canada |

Hello John,

Please see attached for a more detailed proposal. Question: Is all the production made in China? If not please specify.

The following is a three year proposal:

Year 1- 1 Million
Year 2- 1.5 Million
Year 3- 2 Million.

Best Regards,
Josh Wiseman

cc: Issie Wiseman


**Josh Wiseman**
**Tel-** (514) 731-7070
**Fax-** (514) 733-8533
**Email-** josh@tyfoon.com

11/14/2007

PLAINTIFF'S
EXHIBIT
47

TOR 001716



September 24, 2007


Dear John,


RE: WORKING PROPOSAL FOR "BLAC LABEL"
-----------------------------------------------------------------

Pursuant to our telephone conversation, let me begin by saying how impressed I am with not only your collection but with your fashion and marketing concepts. I thank you for taking the time to speak with me.

I feel strongly that there is a definite opportunity in Canada for the "BLAC LABEL" collection.

Below I have taken the liberty of setting out some pertinent details concerning our business operations, which I hope you will find informative.

We strive to maintain high standards of business ethics and are considered in the industry to be a respected firm of importers specializing in men's and women's wear, as well as accessories and footwear. We service over a thousand accounts across the country between all of our various products.

Our lines include, Coogi, Crown Holder, Heatherette, Akademiks (men's and ladies), Stash House, Miskeen Originals and Inkslingers to name a few. We also carry footwear for Azzure, Pastry, Shmack, Black Sheep, and Levis.

Each individual line represented by this firm is lead by its own "Division Head" and supported by sufficient staff to fully operate and monitor the merchandising, selling, marketing, and eventual shipping of the collection in Canada, all the while working closely with upper management and the U.S. Licensor to ensure that correct planning and strategies are implemented. We are able to run an operation, which is mutually profitable for our tie-ups and ourselves.

Below are some of the different arrangements we have with our tie-ups.

5540 Ferrier street Montreal, Qc H4P 1M2
Phone: 514-731-7070 Fax: 514-733-8533
Email: cc@tyfoon.com

TOR 001714



TYFOON INTERNATIONAL INC.

Best Regards,
Issie Wiseman

Tel: (514) 731-7070
Email: iwiseman@tyfoon.com

5540 Ferrier street Montreal, Qe H4P 1M2
Phone: 514-731-7070 Fax: 514-733-8533
Email: cc@tyfoon.com

TOR 001715

# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 48

CONFIDENTIAL
ATTORNEYS EYES
ONLY

CONFIDENTIAL
ATTORNEYS EYES
ONLY

Sales in Canadian Dollars with BP Clothing

| Company | 2005 Sales | | 2006 Sales | | 2007 Sales | |
|---|---|---|---|---|---|---|
| Via Satellite | | 11.07% | | 5.84% | | 3.85% |
| 2978130 Canada | | 0.22% | | 0.02% | | 0.00% |
| Studio 1 Fash (1997) | | 0.10% | | 0.31% | | 1.20% |
| Vis-à-Vis Fash (1997) | 9,447,116.00 | 21.60% | 11,784,391.00 | 32.00% | 10,386,417.00 | 38.00% |
| Tornado Imports | 17,580,537.00 | 40.20% | 10,527,965.00 | 28.59% | 4,800,636.00 | 17.56% |
| 4107675 Canada Inc | | 0.39% | | 0.11% | | 1.49% |
| Dot.Com Style CA | | 1.54% | | 0.12% | | 0.00% |
| Isse Fashions | | 5.15% | | 7.22% | | 8.16% |
| Basis Femmes | | 0.00% | | 0.68% | | 2.28% |
| Catalyst Fashion | | 0.67% | | 1.18% | | 0.85% |
| 3892387 Canada Inc | | 1.35% | | 0.73% | | 2.07% |
| Confreres | | 1.35% | | 1.30% | | 1.52% |
| Tour de Force (1995) | | 3.82% | | 2.02% | | 2.60% |
| Market Place Clothing | | 12.52% | | 19.86% | | 20.20% |
| Total | 43,730,951.75 | 100.00% | 36,821,021.00 | 100.00% | 27,330,980.00 | 100.00% |



PLAINTIFF'S
EXHIBIT
48

TOR 1727

CONFIDENTIAL
ATTORNEYS EYES
ONLY

Sales in Canadian Dollars

**without BP Clothing**

| Company | 2005 Sales | | 2006 Sales | | 2007 Sales | |
|---|---|---|---|---|---|---|
| Via Satellite | | 11.89% | | 6.33% | | 4.09% |
| 2978130 Canada | | 0.24% | | 0.03% | | 0.00% |
| Studio 1 Fash (1997) | | 0.11% | | 0.34% | | 1.27% |
| Vis-à-Vis Fash (1997) | 6,447,116.00 | 15.83% | 8,962,517.00 | 26.34% | 8,829,305.00 | 34.26% |
| Tornado Imports | 17,580,537.00 | 43.16% | 10,527,965.00 | 30.97% | 4,800,636.00 | 18.63% |
| 4107675 Canada Inc | | 0.42% | | 0.12% | | 1.58% |
| DotCom Style CA | | 1.65% | | 0.12% | | 0.00% |
| Isse Fashions | | 5.53% | | 7.82% | | 8.65% |
| Basis Femmes | | 0.00% | | 0.74% | | 2.42% |
| Catalyst Fashion | | 0.72% | | 1.27% | | 0.91% |
| 3892387 Canada Inc | | 1.45% | | 0.80% | | 2.19% |
| Confreres | | 1.45% | | 1.41% | | 1.62% |
| Tour de Force (1995) | | 4.10% | | 2.19% | | 2.97% |
| Market Place Clothing | | 13.45% | | 21.52% | | 21.42% |
| Total | 40,730,951.75 | 100.00% | 33,989,147.00 | 100.00% | 25,773,868.00 | 100.00% |

CONFIDENTIAL
ATTORNEYS EYES
ONLY

TOR 1728

Tyfoon Group                               % of sales comparison

CONFIDENTIAL
ATTORNEYS EYES
ONLY

| Company | % of sales with BP Clothing | | % of sales without BP Clothing | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Via Satellite | 11.07% | 5.84% | 11.89% | 6.33% |
| 2978130 Canada | 0.22% | 0.02% | 0.24% | 0.03% |
| Studio 1 Fash (1997) | 0.10% | 0.31% | 0.11% | 0.34% |
| Vis-à-Vis Fash (1997) | 21.60% | 32.00% | 15.83% | 26.34% |
| Tornado Imports | 40.20% | 28.59% | 43.16% | 30.97% |
| 4107675 Canada Inc | 0.39% | 0.11% | 0.42% | 0.12% |
| Dot.Com Style CA | 1.54% | 0.12% | 1.65% | 0.12% |
| Isse Fashions | 5.15% | 7.22% | 5.53% | 7.82% |
| Basis Femmes | 0.00% | 0.68% | 0.00% | 0.74% |
| Catalyst Fashion | 0.67% | 1.18% | 0.72% | 1.27% |
| 3892387 Canada Inc | 1.35% | 0.73% | 1.45% | 0.80% |
| Confreres | 1.35% | 1.30% | 1.45% | 1.41% |
| Tour de Force (1995) | 3.82% | 2.02% | 4.10% | 2.19% |
| Market Place Clothing | 12.52% | 19.86% | 13.45% | 21.52% |
| **Total** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |