# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## <u>PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.</u>
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 49

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

PHAT FASHIONS, LLC,                        :    Case No. 1:07 cv 03278 (PAC)

                    Plaintiff,             :    **AMENDED ANSWER,**
                                                **DEFENSES, AND**
          v.                               :    **COUNTERCLAIMS OF**
                                                **DEFENDANT TORNADO**
TORNADO IMPORTS (CANADA), INC.             :    **IMPORTS (CANADA), INC.**

                    Defendant.             :

------------------------------------------x
------------------------------------------x

TORNADO IMPORTS (CANADA), INC.             :

          Defendant and Counterclaim       :
          Plaintiff,

                                           :
          v.
                                           :
PHAT FASHIONS, LLC,
                                           :
          Plaintiff and Counterclaim
          Defendant.                       x

------------------------------------------x

          Defendant Tornado Imports (Canada), Inc. ("Tornado"), by and through undersigned

counsel, hereby files its Amended Answer, Defenses, and Counterclaims in response to the

Complaint filed by Plaintiff Phat Fashions LLC ("Phat Fashions"), and admits, denies, and

alleges as follows:



PLAINTIFF'S
EXHIBIT
49

# I.
## ANSWER

1.    Answering Paragraph 1, Tornado states that this paragraph sets forth legal conclusions to which no response is required and further states that Tornado denies that there was no extension of the Trademark License Agreement ("Agreement") and denies that the Agreement will expire on December 31, 2007.  To the extent the allegations in this paragraph characterize documents, the documents are in writing and speak for themselves.  Furthermore, no response is required to the extent this paragraph characterizes or summarizes subsequent paragraphs.  To this extent this paragraph contains factual allegations, Tornado denies each and every allegation contained herein.

2.    Answering Paragraph 2, Tornado states that this paragraph sets forth legal conclusions to which no response is required.

3.    Answering Paragraph 3, Tornado states that this paragraph sets forth legal conclusions to which no response is required.  To the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself.

4.    Answering Paragraph 4, Tornado lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies each and every allegation contained herein.

5.    Answering Paragraph 5, Tornado admits the allegations contained herein.

6.    Answering Paragraph 6, Tornado admits only that on or about August 1, 1998, Tornado entered into the Agreement with Phat Fashions, a copy of which was annexed to Phat Fashion's Complaint as Exhibit A.  To the extent this paragraph characterizes a document, the document is in writing and speaks for itself.  Tornado denies each and every remaining allegation contained herein.

7.    Answering Paragraph 7, Tornado admits only that Section Three of the
Agreement provided for an initial term ending on December 31, 2001, and two option terms, the
first sending on December 31, 2004, and the second ending on December 31, 2007, that could be
extended by Tornado.  To the extent this paragraph characterizes a document, the document is in
writing and speaks for itself.

8.    Answering Paragraph 8, Tornado states that this paragraph characterizes a
document that is in writing and speaks for itself.  Tornado denies each and every remaining
allegation contained herein and further states that an amendment to the Agreement, such as the
one the parties entered into, could extend the term of the Agreement.

9.    Answering Paragraph 9, Tornado admits only that it exercised both options
through letters, on or about March 20, 2001 and on or about March 10, 2004, copies of which
were annexed to Phat Fashion's Complaint as Exhibit B.  To the extent this paragraph
characterizes a document, the document is in writing and speaks for itself.  Tornado denies each
and every remaining allegation contained herein, including the allegation that the Agreement
terminates on December 31, 2007.

10.    Answering Paragraph 10, Tornado admits only that on or about March 1, 2006,
Issie Wiseman sent an email to Bernt Ullman with an attachment.  A copy of Issie Wiseman's
email is among the documents attached to the Complaint as Exhibit C.  To the extent this
paragraph characterizes documents, these documents are in writing and speak for themselves.

11.    Answering Paragraph 11, Tornado admits only that discussions took place
between Bernt Ullman and Issie Wiseman, during which Bernt Ullman, as President of Phat
Fashions, agreed to the extension proposed by Issie Wiseman, and that on or about March 20,
2006, Eli B. Nathanson sent an e-mail with a copy of the written Extension to the Agreement to

3

Issie Wiseman. (The oral agreement to extend the period of the Agreement and the subsequent memorialization thereof are known as the Extension.) To the extent this paragraph characterizes documents, these documents are in writing and speak for themselves. Tornado denies each and every remaining allegation contained herein.

12.    Answering Paragraph 12, Tornado admits only that Issie Wiseman signed two originals of the written Extension at the request of Eli B. Nathanson, and that Phat Fashions, despite numerous assurances that it would, did not sign the written Extension. To the extent that this paragraph characterizes documents, these documents are in writing and speak for themselves. To this extent this paragraph contains other factual allegations, Tornado denies each and every allegation contained herein.

13.    Answering Paragraph 13, Tornado states this paragraph sets for legal conclusions to which no response is required. Furthermore, to the extent that this paragraph characterizes a document, the document is in writing and speaks for itself. Tornado denies each and every remaining allegation contained herein.

14.    Answering Paragraph 14, Tornado admits that Phat Fashions neither counter-signed nor returned a fully executed Extension to Tornado, but further states that Phat Fashions made clear through its oral statements and actions that it intended to counter-sign the written Extension and that the Extension was in place and never disclosed, prior to on or about February, 2007, that it was going to attempt to breach the Extension. Tornado now understands that Phat Fashions made different arrangements for Canadian distribution to begin January 2008.

15.    Answering Paragraph 15, Tornado denies that they never inquired as to whether Phat Fashions had executed the written Extension, and alleges to the contrary that Tornado repeatedly called Phat Fashions about the Extension, including on or about April, 2006; on or

about July or August, 2006; on or about October, 2006; and on or about December, 2006. Tornado further states that during all of these conversations, Phat Fashions, through Bernt Ullman, repeatedly assured Tornado that the Extension was valid and that Phat Fashions intended to sign it. Tornado denies each and every remaining allegation contained herein.

16.    Answering Paragraph 16, Tornado states that to the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself. Tornado further states that it did extend the Agreement through December 1, 2010. Tornado denies that it did not mention the Extension to Phat Fashions until March 19, 2007, and alleges to the contrary that Tornado repeatedly called Phat Fashions about the Extension, including on or about April, 2006; on or about July or August, 2006; on or about October, 2006; and on or about December, 2006. Tornado further states that during all of these conversations, Phat Fashions, through Bernt Ullman, repeatedly assured Tornado that the Extension was valid and that Phat Fashions intended to sign the written Extension. Tornado denies each and every remaining allegation contained herein.

17.    Answering Paragraph 17, Tornado lacks knowledge or information sufficient to form a belief as to when Phat Fashions decided to no longer honor its commitment to extend the license and whether Phat Fashions directed its counsel, Brad D. Rose ("Rose") of Pryor Cashman LLP, to immediately response to Issie Wiseman. Tornado further states that to the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself. Tornado denies each and every remaining allegation contained herein.

18.    Answering Paragraph 18, Tornado admits only that Phat Fashions neither signed nor returned the written Extension but further states that Phat Fashions made clear through its oral statements and actions that the Extension was in place, that it intended to counter-sign the

written Extension and that Phat Fashions had in fact extended the Agreement. Tornado further states that to the extent the allegations in this paragraph characterize a document, the document is in writing and speaks for itself. Tornado denies that weeks went by without any response by Wiseman to Rose's March 21, 2007 letter and alleges to the contrary that Issie Wiseman called Bernt Ullman at least once during that time in an attempt to convince Phat Fashions not to make different arrangements for Canadian distribution to begin January 2008. Tornado denies each and every remaining allegation contained herein.

19.    Answering Paragraph 19, Tornado denies that Phat Fashions had no choice but to commence this proceeding for a declaratory judgment. Tornado lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies each and every remaining allegation herein.

## ANSWER TO FIRST CAUSE OF ACTION

20.    Answering Paragraph 20, Tornado repeats and realleges its responses to Paragraphs 1 through 19 as if fully set forth herein.

21.    Answering Paragraph 21, Tornado states that this paragraph sets forth legal conclusions to which no response is required.

22.    Answering Paragraph 22, Tornado states that this paragraph sets forth legal conclusions to which no response is required.

## II.
## SEPARATE AND ADDITIONAL DEFENSES

By alleging the defenses set forth below, Tornado is not in any way agreeing or conceding that it has the burden of proof or the burden of persuasion in any of these issues. In addition, Tornado specifically and expressly reserves the right to amend these defenses, or to add additional defenses, based upon legal theories, facts and circumstances, which may or will be discovered and/or further legal analysis of Phat Fashions' positions in this litigation.

### FIRST SEPARATE AND ADDITIONAL DEFENSE
### (FAILURE TO STATE A CLAIM)

23.    Phat Fashions fails to state a claim upon which relief can be granted.

### SECOND SEPARATE AND ADDITIONAL DEFENSE
### (EQUITABLE ESTOPPEL)

24.    Phat Fashions' claims are barred by the doctrine of equitable estoppel.

### THIRD SEPARATE AND ADDITIONAL DEFENSE
### (PROMISSORY ESTOPPEL)

25.    Phat Fashions' claims are barred by the doctrine of promissory estoppel.

### FOURTH SEPARATE AND ADDITIONAL DEFENSE
### (UNCLEAN HANDS)

26.    Phat Fashions' claims are barred by the doctrine of unclean hands.

### FIFTH SEPARATE AND ADDITIONAL DEFENSE
### (BREACH OF GOOD FAITH AND FAIR DEALING)

27.     Phat Fashions' claims are barred, because Phat Fashions breached the covenant of

good faith and fair dealing.

### SIXTH SEPARATE AND ADDITIONAL DEFENSE
### (PARTIES' CONDUCT)

28.     Phat Fashions' claims are barred, because the parties' conduct manifested an intent

to regularly modify the Agreement through oral representations.

### SEVENTH SEPARATE AND ADDITIONAL DEFENSE
### (ADDITIONAL DEFENSES)

29.     Tornado presently lacks sufficient knowledge and information upon which to

form a belief as to whether it may have additional, unasserted defenses and therefore reserves the

right to assert additional defenses.

### III.
### COUNTERCLAIMS

30.     Defendant-Counterclaim Plaintiff Tornado hereby asserts these Counterclaims

against Plaintiff-Counterclaim Defendant Phat Fashions.  Tornado expressly reserves the right to

amend these Counterclaims, or to add additional Counterclaims, or to add or join additional

parties, based upon legal theories, facts and circumstances, which may or will be discovered,

and/or further legal analysis of Phat Fashions' position in this litigation.

## A.    SUMMARY

31.     Prior to the filing of this lawsuit, Phat Fashions and Tornado had a longstanding, mutually satisfactory business relationship. On or about August 1, 1998, Phat Fashions and Tornado entered into a Trademark License Agreement, which was subsequently amended and extended through December 31, 2007 (the "Agreement"). Additionally, although the written Agreement called for modifications to be reduced to a writing executed by each party, the parties regularly ignored this requirement. Indeed, the parties regularly modified the Agreement orally. Such oral modifications generated millions of dollars in sales. Significantly, the Agreement was modified to allow the sale of the Baby Phat line of clothing by Tornado. Tornado made these sales through Vis-à-Vis, a company which was and is run by the same management as Tornado. Vis-à-Vis is a closely affiliated sister company of Tornado. Tornado always fully performed its obligations under the Agreement.

32.     On or about February, 2006, Phat Fashions and Tornado negotiated and agreed to another modification to the Agreement, extending it by three years until December 31, 2010, with Tornado given the right to extend the Agreement at its sole option another three years, until December 31, 2013. Phat Fashions' counsel memorialized the extension in writing and, with Phat Fashions' approval, sent the written Extension to Tornado management. At the request of Phat Fashions' counsel, Issie Wiseman, Director and CEO of Tornado, signed the written Extension and returned it. On four occasions over the next several months (during April, August, October, and December, 2006), Phat Fashions assured Tornado that it had a valid extension of the Agreement and that Phat Fashions would execute the written Extension. At all times, Tornado understood the Extension to apply to all Phat Fashions products being sold by

Tornado directly or being sold by Tornado through affiliates and related companies such as Vis-à-Vis.

33.     Tornado and Vis-à-Vis detrimentally relied on Phat Fashions' assurances that the Agreement had been extended by the Extension by: (a) not canceling a lease for a store dedicated to selling Phat Fashions products; (b) instructing several members of its management team to devote nearly all of their time to Phat Fashions products at the expense of developing potential non-Phat Fashions product lines; (c) choosing not to sue the European Phat Farm shoe licensee for damages for territorial infringement for the sale of Phat Farm shoes in Canada; and (d) not pursuing efforts to replace Phat Fashions so Tornado's and Vis-à-Vis' businesses would not be hurt dramatically on December 31, 2007, when the Agreement would have terminated absent the Extension.

34.     On or about February, 2007, Phat Fashions informed Tornado for the first time that Phat Fashions was in the process of negotiating a new licensing arrangement with a different company, and that it might not honor the Extension. Tornado objected, demanding that Phat Fashions honor the Extension. Phat Fashions subsequently began this lawsuit.

**B.     COUNTERCLAIM PARTIES**

35.     These Counterclaims are asserted by Tornado against Phat Fashions under the Trademark License Agreement. All capitalized terms that are not otherwise defined herein are used as defined in the Agreement.

36.     Upon information and belief, Phat Fashions is the parent company which licenses all Phat products, including Phat Farm and Baby Phat. Upon information and belief, Baby Phat is Phat Fashions' line for women's and children's products. Upon information and belief, Phat

Farm is Phat Fashions' line for men's products. Upon information and belief, Phat Fashions is a New York corporation with its principle place of business in New York.

37.    Tornado is a Canadian corporation, and was incorporated under the Canadian Business Corporation Act in 1997. Tornado's relationship with Phat Fashions began on or around August 1, 1998. Tornado carries Phat Farm products exclusively

## C.    BACKGROUND

38.    Beginning on or around August 1, 1998, Tornado and Phat Fashions entered into a contract allowing Tornado to sell Phat Farm products. Beginning on or around 2000, when the Baby Phat line of products began to be created, Issie Wiseman reached out to Phat Fashions to express Tornado's interest in carrying the Baby Phat line as well. Issie Wiseman indicated that Tornado's sales of the Baby Phat lines would be made through Vis-a-Vis, an affiliated sister company of Tornado. The parties agreed and understood that such sales would occur under the terms and conditions of the Agreement. Vis-à-Vis carried Baby Phat products exclusively. Based solely on this oral modification, Tornado, through Vis-à-Vis, purchased Phat Fashions products directly from Phat Fashions' licensees, paid royalties directly to Phat Fashions, and sent sales reports directly to Phat Fashions.

39.    Tornado and Vis-à-Vis' common management team runs four retail stores, all of which are separately incorporated entities. Of these four retail stores, one is a dedicated "Phat Farm Store" in Montreal that, until a few months ago, sold exclusively Phat products. The other three stores are located in Montreal and Toronto and approximately two-thirds of their business is Phat products.

40.    Tornado always materially performed under the Agreement, exceeding the required Minimum Net Sales and Royalty Minimum as required by the Agreement. By way of

11

example, from January 1, 2005 through December 31, 2005, the Agreement called for minimum sales of $1,800,000 (U.S.) and a minimum royalty of $126,000; Tornado actually sold $18,888,597 (U.S.) and paid a royalty to Phat Fashions of $1,322,202. By way of further example, from January 1, 2006 through December 31, 2006, the Agreement called for minimum sales of $2,000,000 (U.S.) and a minimum royalty of $140,000; Tornado actually sold $15,456,579 (U.S.) and paid a royalty to Phat Fashions of $1,081,960.

41.    Although the Agreement specifically excluded the licensing of certain products, Tornado and Phat Fashions later expanded the relationship to include many of these excluded products, including the sales of lingerie and outwear. These modifications, which allowed the sale of items previously expressly excluded by the Agreement, were all made orally; they were never reduced to a writing. Furthermore, although the Agreement did not include Baby Phat Leathers, Baby Phat Handbags, Baby Phat Outerwear, or Baby Phat Shoes, as these types of products were not in existence when the Agreement was signed, the parties orally subsequently agreed that Tornado was licensed to sell these types of products.

42.    Phat Fashions never raised any complaints or issues with Tornado regarding its performance under the Agreement. Phat Fashions appeared to be fully satisfied with the performance of Tornado under the Agreement.

43.    Following negotiations of the minimum guarantees of sales, Phat Fashions and Tornado agreed to an extension of the Agreement that would cover the lines Tornado was selling and paying royalties on, including the lines Tornado was selling through Vis-á-Vis. This extension was reduced to writing by Phat Fashions' counsel on or about March, 2006.

44.    Until on or about February, 2007, Tornado believed that Phat Fashions intended to fulfill its obligations under the Extension; Phat Fashions did not say or do anything to indicate otherwise.

45.    This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367, as supplemental to the jurisdiction over the underlying action by Phat Fashions. In addition, the matter in controversy for these Counterclaims exceeds $75,000, exclusive of fees and costs, and, upon information and belief, there is diversity of citizenship between Tornado, on the one hand, and Phat Fashions, on the other. Therefore, diversity jurisdiction presents an additional and independent basis for this Court's jurisdiction over Tornado Counterclaims.

## D.    TORNADO AND PHAT FASHIONS REGULARLY MODIFIED AND AMENDED THE AGREEMENT ORALLY

46.    From the very beginning of the relationship, the parties acted informally, rarely adhering to the provision in the Agreement calling for modifications to be in a writing signed by each of the parties. Indeed, it was very common for the parties to modify the Agreement without a writing, including to allow for the sales of products expressly excluded from the contract. In fact, the Agreement between Tornado and Phat Fashions was orally modified in 2000 to enable Tornado to sell the Baby Phat line. Tornado opted to make these sales through a sister company, Vis-à-Vis, under the terms and conditions of the Agreement. Vis-à-Vis was managed and controlled by Issie Wiseman and others, the same management team that managed and controlled Tornado.

### 1.    Tornado and Phat Fashions Regularly Made Oral Modifications to Include the Sales of Products Expressly Excluded from the Agreement

47.    Schedule C to the Agreement (attached to the Complaint as Exhibit A) listed certain products that were specifically excluded from the Agreement. The Agreement covered

"All Phat Farm products excluding: (a) men's and boy's underwear, lounge wear, back packs, bags, hipsters and related products; (b) women's and girl's dresses, outerwear, swimwear, coverups, exercise wear, lingerie, slip dresses and plus sizes; (c) home furnishings; (d) fragrances, cosmetics and beauty aids; and (e) luggage." Nonetheless, in spite of these specific exclusions, the parties orally agreed that Tornado could sell many of the excluded lines of products. Tornado would ask Phat Fashions orally for permission to sell such product lines, and Phat Fashions would give permission orally, put the management team in touch with the seller, and accept the royalty. All of this was done without a writing. Tornado often made these sales through Vis-à-Vis.

48.    By way of example, the Agreement specifically excludes the sale of ladies' lingerie and loungewear. However, following telephone negotiations between Issie Wiseman and Phat Fashions representatives, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat lingerie and loungewear. Tornado, through its sister company Vis-à-Vis, subsequently sold approximately $153,402 (U.S.) worth of Baby Phat lingerie and loungewear in 2005 and approximately $648,585 (U.S.) worth of Baby Phat lingerie and loungewear in 2006, of which Phat Fashions received approximately $10,738 (U.S.) in 2005 and approximately $45,401 (U.S.) in 2006. Phat Fashions never complained that there was only an oral modification to the Agreement, which allowed for the sale of lingerie and loungewear and Phat Fashions' receipt of royalty payments, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado specifically excluded the sale of lingerie.

49.    By way of further example, the Agreement specifically excludes the sale of ladies' outerwear. However, following telephone negotiations between Issie Wiseman and Phat

14

Fashions representatives, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat outerwear. Tornado, through Vis-à-Vis, subsequently sold approximately $640,498 (U.S.) worth of Baby Phat outwear in 2005 and approximately $1,114,132 (U.S.) in 2006, of which Phat Fashions received royalties of approximately $44,835 (U.S.) in 2005 and approximately $77,989 (U.S.) in 2006. Phat Fashions never complained that there was only an oral modification to the Agreement, which allowed for the sale of Baby Phat outwear and Phat Fashions' receipt of royalty payments, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado specifically excluded the sale of women's and girls outerwear.

2.  **Tornado and Phat Fashions Regularly Made Oral Modifications to Allow for the Sales of Products Not Covered by the Agreement**

50.  By way of further example, the Agreement only included Phat Farm products, and not Baby Phat products, as Baby Phat products did not exist at the time the Agreement was signed. However, over the course of the next several years, the Agreement was orally modified to enable Tornado to sell Baby Phat products. All of this was repeatedly done orally; the parties never signed a writing stating that Tornado had the right to sell Baby Phat products.

51.  By way of further example, the Agreement did not call for the sale of Baby Phat shoes, which Phat Fashions did not produce at the time the Agreement was signed. However, following telephone negotiations between Issie Wiseman and Phat Fashions representatives, on or around the fall of 2004, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat shoes. Tornado, through Vis-à-Vis, subsequently sold approximately $1,013,524 (U.S.) worth of Baby Phat shoes in 2005 and approximately $2,756,288 (U.S.) in 2006, of which Phat Fashions received royalties of approximately $70,947 (U.S.) in 2005 and approximately $192,940 (U.S.) in 2006). Phat Fashions never complained that there was only an oral

modification of the Agreement which allowed for the sale of Baby Phat shoes, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado only allowed for the sale of Phat Farm shoes, not Baby Phat shoes.

52.     By way of further example, the Agreement did not call for the sale of Baby Phat handbags and accessories, which Phat Fashions did not produce at the time the Agreement was signed. However, following telephone negotiations between Issie Wiseman and Phat Fashions representatives, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat handbags and accessories. Tornado, through Vis-à-Vis, subsequently sold approximately $1,591,683 (U.S.) worth of Baby Phat handbags in 2005 and approximately $2,687,344 (U.S.) in 2006, of which Phat Fashions received royalties of approximately $111,418 (U.S.) in 2005 and approximately $188,144 (U.S.) in 2006. Phat Fashions never complained that there was only an oral modification of the Agreement, which allowed for the sale of Baby Phat handbags and accessories, despite the fact that the oral modification was never reduced to writing, and despite the fact that the Agreement with Tornado did not call for the sale of Baby Phat handbags and accessories.

53.     By way of further example, the Agreement does not call for the sale of Baby Phat leathers, which Phat Fashions did not produce at the time the Agreement was signed. However, following telephone negotiations between Issie Wiseman and Phat Farm representatives, on or around the spring of 2002, Phat Fashions orally modified the Agreement to enable Tornado to sell Baby Phat leathers. Tornado, through Vis-à-Vis, subsequently sold approximately $200,000 (U.S.) worth of Baby Phat leathers in 2005, of which Phat Fashions received royalties of $14,000 (U.S.) in 2005. Phat Fashions never complained that there was only an oral modification of the Agreement, which allowed for the sale of Baby Phat leathers, despite the fact that the oral

modification was never reduced to writing, and despite the fact that the Agreement with Tornado did not call for the sale of Baby Phat leathers.

**E.    THE PARTIES NEGOTIATED AND AGREED TO AN EXTENSION OF THE AGREEMENT WHICH WAS REDUCED TO WRITING**

54.    During the second half of 2005, Issie Wiseman and Bernt Ullman discussed the extension of the Agreement.  Upon information and belief, Bernt Ullman is the President of Phat Fashions.  Although no specific terms were negotiated, Issie Wiseman and Bernt Ullman agreed that they would extend the Agreement, and that they would discuss the details of the extension in a few months.

55.    On or around February, 2006, Issie Wiseman spoke with Bernt Ullman regarding amending the Agreement and extending it past December 31, 2007.  Bernt Ullman indicated that Phat Fashions would be interested in extending the Agreement, and suggested that they discuss it during the week of February 20, 2006, at the Magic Show.  Bernt Ullman also stated that the minimums would have to be substantially higher.

56.    On or around February, 2006, Issie Wiseman discussed the revised minimums with Barry Segal, the Vice President of Finance of Tornado, and Josh Wiseman, Director of Tornado.  They agreed that they would discuss various options for extending the Agreement with Bernt Ullman at the Magic Show.

57.    At the Magic Show, over approximately two or three conversations, Issie Wiseman discussed extending the Agreement with Bernt Ullman.  Bernt Ullman told Issie Wiseman that he wanted Issie Wiseman to agree to raise the minimum sale and royalty numbers because Tornado was selling so much more than the then-minimum sale and royalty numbers. After negotiations, Bernt Ullman and Issie Wiseman agreed on new minimum sales and royalty

numbers. Bernt Ullman asked Issie Wiseman to send him a proposal via e-mail after the Magic Show.

58.    On or about March 1, 2006, Issie Wiseman emailed Bernt Ullman a proposal to extend the Agreement. A copy of the email is annexed to the Complaint as Exhibit C.

59.    Issie Wiseman and Bernt Ullman discussed the proposal between March 1, 2006 and March 20, 2006. Between March 1, 2006 and March 20, 2006, Bernt Ullman verbally accepted the proposal in his capacity as President of Phat Farm Fashions. Bernt Ullman informed Issie Wiseman that he would instruct his lawyers to draw up a written Extension.

60.    On or about March 20, 2006, Eli B. Nathanson, the attorney for Phat Fashions, sent Issie Wiseman the written Extension.

61.    Between March 20, 2006 and March 29, 2006, Issie Wiseman spoke with Bernt Ullman, and they both agreed that the written Extension was acceptable to both parties.

62.    On or about March 29, 2006, Barry Segal called Eli B. Nathanson and advised him that Tornado accepted the Extension. Eli B. Nathanson instructed Barry Segal to sign two originals of the written Extension and return them to Eli B. Nathanson.

63.    On or about March 29, 2006, Issie Wiseman signed the two originals of the written Extension and on or about March 30, 2006, Barry Segal returned them to Eli B. Nathanson.

**F.    PHAT FASHIONS REPEATEDLY ASSURED TORNADO THAT THE EXTENSION WAS FINALIZED**

64.    On or about April, 2006, Issie Wiseman called Bernt Ullman to confirm that the executed written Extension had been received. Barry Segal was present on this call. Bernt Ullman advised Issie Wiseman that the written Extension had been received, that there was no

problem, and that Bernt Ullman would have the written Extension signed and sent back to Issie Wiseman.

65.     On or about July or August, 2006, Issie Wiseman called Bernt Ullman again. Bernt Ullman reiterated that the written Extension would be signed, and that Issie Wiseman should not worry about the Extension.

66.     On or about October, 2006, Issie Wiseman again called Bernt Ullman.  Bernt Ullman again assured Issie Wiseman that there would be no problem with the Extension.

67.     On or about December, 2006, Issie Wiseman and Barry Segal called Bernt Ullman regarding the Extension.  Bernt Ullman again stated that there was no problem with the Extension, and that Tornado would have the fully executed written Extension by February, 2007 at the next Magic Show.

68.     During one of these conversations, Bernt Ullman told Issie Wiseman that the delay in Phat Fashions signing the written Extension was caused by the fact that Phat Fashions' in-house lawyer had died, but again reiterated that the written Extension would be signed, and that Tornado should not worry about the Extension.

69.     During one of these conversations, Bernt Ullman told Issie Wiseman that the delay was because large companies move slowly.  Bernt Ullman further indicated that he felt that they had plenty of time to sign, and informed Issie Wiseman that the Extension was in place.

70.     During none of these conversations did Bernt Ullman ever indicate that the Extension was not in place.

71.     After all of these repeated assurances, on or about February, 2007, Bernt Ullman stated for the first time that there might be a problem, and that Phat Fashions might not sign the

written Extension. Bernt Ullman also stated at this time that Phat Fashions had not yet signed with a third party.

72.    Not until Pryor Cashman LLP sent Issie Wiseman a letter dated March 21, 2007, did Tornado learn for the first time that Phat Fashions had definitely decided not to sign the written Extension.

## G.    TORNADO DETRIMENTALLY RELIED ON PHAT FASHIONS' REPEATED ASSURANCES THAT PHAT FASHIONS AGREED TO THE EXTENSION

73.    Tornado relied to its detriment on Phat Fashions' repeated assurances that the parties had extended the Agreement through the Extension.

74.    In reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Issie Wiseman did not cancel a commercial lease with a third party, Montreal Media Entertainment Building Inc. ("Montreal Media").  On or about November 15, 2004, Issie Wiseman had executed a five-year lease with Montreal Media for the Phat Farm store; the purpose of Issie Wiseman leasing this property was to have a store in which to specifically sell Phat Fashions products.  The lease provided that Issie Wiseman could cancel the lease until December 31, 2006 without penalty.  In reliance on Phat Fashions' promises and believing it would have Phat Fashions products to sell, Issie Wiseman did not cancel the lease by December 31, 2006.

75.    In reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Tornado instructed its management team, including Issie Wiseman, Director and CEO of Tornado and Vis-à-Vis, Josh Wiseman, Director of Tornado, Mitchell Maislin, Managing Director of Shoe Sales of Tornado, and Claudia Michaels, Managing Director of Women's Clothing of Vis-à-Vis, to spend nearly all of their time and efforts focusing on Phat Fashions

products. By way of example, Mitchell Maislin told Issie Wiseman that he was too focused on the shoe brands of Phat and Baby Phat to spend any time developing other brands of shoes, despite the fact that opportunities with other brands were sometimes presented. Over 90% of Mitchell Maislin's business is Phat Farm shoes. Over 90% of Claudia Michaels' business is Baby Phat products. Over 90% of Josh Wiseman's time was spent working on the Phat Fashions lines. Approximately 70% of Issie Wiseman's working time was spent working on Phat Fashions lines.

76.    In reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Tornado and Vis-à-Vis did not pursue efforts to replace Phat Fashions by researching other companies and product lines or engaging in negotiations with other companies.

77.    In reliance on Phat Fashions' assurance in August 2005 that the Agreement would be extended, Tornado decided not to sue the European Phat Farm shoe licensee for damages for territorial infringement, despite the fact that the licensee had sold a large number of Phat Farm shoes in Canada, violating Tornado's exclusive licensing agreement and hurting Tornado's business. Issie Wiseman argued with Bernt Ullman about how to handle the situation, and Bernt Ullman recognized that Tornado had been damaged by the licensee. Ultimately, however, Tornado chose not to sue the licensee, in light of Tornado's ongoing business relationship with Phat Fashions and Bernt Ullman's assurance that the Agreement would be extended later that winter. In reliance on this statement, Tornado determined that it would make the lost profits back over the course of the 3-6 year Extension to the Agreement, and that it was more important to preserve the business relationship than to sue for the infringement claim.

**H.    TORNADO IS SUFFERING HARM AND WILL CONTINUE TO SUFFER HARM**

78.    Upon information and belief, Phat Fashions has entered into a license agreement with a company controlled or affiliated with Gaby Bitton. In light of this, and absent relief from

this Court, Tornado and Vis-à-Vis will lose all of their business. Neither Tornado nor Vis-à-Vis currently have any other products.

79.     The Phat Farm store will need to completely change its merchandise and become, in effect, an entirely different store. The other stores that sell approximately two-thirds Phat Farm merchandise will also need to change their merchandise and become, in effect, entirely different stores.

80.     Despite recent efforts to mitigate their losses, Tornado and Vis-à-Vis have no expectation that they will be able to replace this dramatic loss of business. Tornado and Vis-à-Vis are currently looking for new lines of products all over the world, including in Europe, but thus far, they have had only limited success.

81.     Moreover, the harm has already begun. A company which, upon information and belief, is affiliated with Gaby Bitton recently hired two important Tornado and Vis-à-Vis employees.

82.     On or around June 18, 2007, Salvatore Cutrona, the main Montreal sales representative, resigned to work for a company in which, upon information and belief, Gaby Bitton is involved. Salvatore Cutrona primarily sold Phat Farm and Baby Phat shoes for Tornado, and Baby Phat bags for Vis-à-Vis.

83.     On or around June 18, 2007, Vanessa Ferrara, the Assistant Division Head who focused on Baby Phat handbags, resigned from Vis-à-Vis to work for a company in which, upon information and belief, Gaby Bitton is involved.

84.     Upon information and belief, a company in which Gaby Bitton is involved has also attempted to hire two other key Tornado and Vis-à-Vis employees, Mitchell Maislin and Claudia Michaels.

I.     **TORNADO'S CAUSES OF ACTION**

### TORNADO'S FIRST COUNTERCLAIM:<br>DECLARATORY JUDGMENT

85.     Tornado incorporates its allegations 30 through 84 above as if fully set forth herein.

86.     On account of the foregoing, there now exists between Tornado, on the one hand, and Phat Fashions, on the other, a present, actual, justiciable and genuine controversy, and Tornado is entitled to have a declaration of its rights and further relief as may be just and proper.

87.     On account of the foregoing, Tornado is entitled to have judgment entered pursuant to 28 U.S.C. § 2201 *et seq.* declaring that: (a) there was a valid Extension to the Agreement between the parties and Phat Fashions has anticipatorily breached the valid Extension, and/or that Phat Fashions has breached its covenant of good faith and fair dealing, and/or that Phat Fashions should be estopped from breaching the Extension under the doctrine of promissory estoppel; (b) that such Extension continues the Agreement through December 31, 2010 with Tornado able, at its own option, to extend an additional three years, through December 31, 2013; and (c) the Extension authorizes Tornado to continue selling the Phat Farm and Baby Phat product lines it has been selling (directly or through Vis-à-Vis) under the Agreement.

### TORNADO'S SECOND COUNTERCLAIM:<br>ANTICIPATORY BREACH OF CONTRACT

88.     Tornado incorporates its allegations 30 through 87 above as if fully set forth herein.

89.     The agreement between Tornado and Phat Fashions to extend the Agreement through the Extension constitutes a valid, binding, and existing contract, complete with negotiated terms regarding the minimum royalties to be paid.

90.    Under the terms of the Extension, Tornado has the right to continue to sell Phat Farm, Baby Phat and related products through December 31, 2010, with an option to renew until December 31, 2013.

91.    On or about February 15, 2007, Phat Fashions indicated in a telephone conversation between Bernt Ullman and Issie Wiseman that it probably would not perform its obligations under the Extension.

92.    On or about March 21, 2007, Phat Fashions stated, through its attorney, Pryor Cashman LLP, that it did not intend to perform its obligations under the Extension.

93.    On or about April 18, 2007, Tornado demanded through its attorney, Lavery, DeBilly, that Phat Fashions reassure Tornado that Phat Fashions would perform its obligations under the Extension.

94.    Despite the existence of the valid Extension, and despite Tornado's requests that Phat Fashions confirm that it will honor the Extension, Phat Fashions has repeatedly stated that it will not perform under the Extension and, upon information and belief, has signed a different contract with a third party that is in direct violation of its Extension with Tornado.

95.    Tornado has at all times indicated that it is able and willing to perform under the Extension. Tornado and Vis-à-Vis continue to sell Phat Fashions' products to this day.

96.    Phat Fashions anticipatorily and materially breached the terms of the Extension by telling Tornado on or around February 15, 2007 that it had made alternate arrangements for licensing its products and filing the Complaint in this action on or around April 24, 2007.

97.    As a result of Phat Fashions' anticipatory breach of contract, Tornado and Vis-à-Vis have suffered damages in an amount to be proven at trial.

## TORNADO'S THIRD COUNTERCLAIM:
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

98.    Tornado incorporates its allegations 30 through 97 above as if fully set forth

herein.

99.    By way of the unfair and misleading conduct alleged above, Phat Fashions

unfairly interfered with Tornado's rights to receive the benefits of the Extension to the

Agreement and to freely, fairly, and lawfully acquire the rights to license certain Phat Fashions

products.

100.    Although Phat Fashions had a duty of good faith and fair dealing, Phat Fashions

repeatedly assured Tornado that Phat Fashions would sign the written Extension memorializing

the oral modification.  All the while, and in violation of its duty, Phat Fashions was negotiating

with one or more third parties to form an alternate contract, but Phat Fashions did not inform

Tornado of this fact until on or around February, 2007, despite knowing that Phat Fashions had

told Tornado repeatedly that it intended to sign the written Extension.

101.    As a result of Phat Fashions' breach of the covenant of good faith and fair dealing,

Tornado and Vis-à-Vis have suffered damages in an amount to be proven at trial.

## TORNADO'S FOURTH COUNTERCLAIM:
### PROMISSORY ESTOPPEL

102.    Tornado incorporates its allegations 30 through 101 above as if fully set forth

herein.

103.    As stated in paragraphs 64 through 72 above, Phat Fashions made repeated clear

and unambiguous promises to Tornado that it would sign the written Extension.

104.    As stated in paragraphs 73 through 77 above, Tornado and Vis-à-Vis relied on

Phat Fashions' promises to their detriment.

105.    As a result of Tornado and Vis-à-Vis' reliance on Phat Fashions' repeated promises, Tornado and Vis-à-Vis have suffered injury, as stated in paragraphs 73 through 84 above.

## J.    RELIEF REQUESTED BY TORNADO

WHEREFORE, Tornado demands judgment on its Counterclaims as follows:

1.    On the First Counterclaim, a declaratory judgment declaring that the Extension is valid and that Phat Fashions is required to perform under the Extension;

2.    On the Second, Third, and Fourth Counterclaims, a judgment in an amount to be determined at trial;

3.    On each of the Counterclaims, an award of costs and expenses (including attorneys' fees) related to this dispute; and

4.    Such other relief as the Court deems appropriate.

Dated: New York, New York
      September 6, 2007

GIBSON, DUNN & CRUTCHER LLP

By:    s/ Adam H. Offenhartz
     Adam H. Offenhartz (AO-0952)
     Laura M. Leitner (LL-4222)
     200 Park Avenue
     New York, New York 10166
     telephone: (212) 351-4000
     facsimile: (212) 351-4035

     *Counsel for Tornado Imports
     (Canada), Inc.*

# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
## Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 50

 **PRYOR CASHMAN LLP**

New York | Los Angeles

410 Park Avenue, New York, NY 10022  Tel: 212-421-4100  Fax: 212-326-0806          www.pryorcashman.com

**Philip R. Hoffman**
Partner

Direct Tel: 212-326-0192
Direct Fax:  212-798-6386
phoffman@pryorcashman.com

September 12, 2007

<u>**VIA E-MAIL**</u>

Honorable Paul A. Crotty
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 735
New York, New York  10007

       Re:    <u>**Phat Fashions LLC v. Tornado Imports (Canada), Inc., 07 Civ. 3278 (PAC)**</u>

Dear Judge Crotty:

      We represent plaintiff Phat Fashions LLC ("Phat Fashions").  In accordance with Rule 6.D. of Your Honor's Individual Practices, and in anticipation of the Initial Pretrial Conference to be held on September 17, 2007 at 2:30 p.m., we are writing jointly with counsel for defendant Tornado Imports (Canada), Inc. ("Tornado") to address paragraphs 1-7 thereof.  In addition, enclosed herein is a jointly-proposed Civil Case Management Plan for Your Honor's consideration.

1.     **The names, addresses (including firm names), e-mail addresses, telephone, and fax numbers of trial counsel are:**

      **For Plaintiff Phat Fashions:**
      Philip R. Hoffman
      Pryor Cashman LLP
      410 Park Avenue
      New York, NY 10022
      Telephone:  (212) 326-0192
      Fax:      (212) 798-6386
      E-mail:  phoffman@pryorcashman.com



PLAINTIFF'S EXHIBIT 50

# PRYOR CASHMAN LLP

Honorable Paul A. Crotty
September 12, 2007
Page 2

**For Defendant Tornado:**
Adam Offenhartz
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166
Telephone:  (212) 351-3808
Fax:          (212) 351-5272
E-mail:  aoffenhartz@gibsondunn.com

2.     **A brief description of the case, including the factual and legal bases for the claim(s) and defense(s).**

<u>**Description by Plaintiff Phat Fashions**</u>

By its Complaint dated April 24, 2007, Phat Fashions seeks a declaratory judgment that the Trademark License Agreement ("Agreement") entered into between Phat Fashions and defendant Tornado Imports (Canada), Inc. ("Tornado") on August 1, 1998:  (a) shall expire pursuant to its terms on December 31, 2007; and (b) was not extended by a draft amendment to the Agreement which was signed only by Tornado and not by Phat Fashions as required by §17 of the Agreement, which provides that "[t]his Agreement can only be extended ... by a writing signed by both parties."

Pursuant to the Agreement, Phat Fashions granted Tornado an exclusive license to utilize certain "Phat Farm" trademarks on certain Phat Farm products in certain channels of distribution in Canada.  The Agreement (¶3) provided for an initial term ending on December 31, 2001, and two option terms, the first ending on December 31, 2004 and the second ending on December 31, 2007, both of which could be exercised by Tornado provided that certain conditions were met. As no further options were provided for in the Agreement, the maximum date through which the Agreement could run was December 31, 2007.  In order for the term of the Agreement to be extended beyond that date, an amendment to the Agreement would be necessary.  Section 17 of the Agreement provides that "[t]his Agreement can only be extended, waived or modified by a writing signed by both parties."

Tornado exercised both options in writing on March 20, 2001 and March 10, 2004, respectively and, as a result, the term of the Agreement was extended to December 31, 2007, on which date the Agreement shall expire.

# PRYOR CASHMAN LLP

Honorable Paul A. Crotty
September 12, 2007
Page 3


In March 2006, discussions took place between the parties relating to extending the Agreement for an additional three-year period, with a three-year option on top of that. Counsel for Phat Fashions sent a draft amendment to the Agreement with a cover e-mail to Tornado's president, Issie Wiseman ("Wiseman") which stated: "I am attaching for your review a draft Amendment No. 1 to the License Agreement among the above referenced parties. I am simultaneously transmitting the attached to our client and must therefore reserve the right to modify same as directed." Notwithstanding the clear language of the e-mail, Tornado on March 30, 2006 sent to Phat Fashion's counsel two copies of the draft amendment signed by Wiseman. The two signature lines for Phat Fashions, LLC were blank. Phat Fashions neither counter-signed nor returned the draft amendment to Tornado and, in fact, decided that it would make different arrangements for Canadian distribution starting in January 2008.

At no time during the remainder of 2006 or the first two months of 2007 did Tornado ever inquire as to whether Phat Fashions had executed the draft amendment or give any indication to Phat Fashions that Tornado considered the Agreement to have been validly extended by the partially-executed draft amendment. It was not until March 19, 2007 that Tornado, in an attempt to totally bypass the contractual requirement that any amendment to the Agreement be signed by both parties, sent a letter to Phat Fashions pursuant to which Tornado sought to exercise a non-existent option for the years 2008 through 2010. That attempt was totally rebuffed by Phat Fashion's counsel on March 21, 2007.

On April 18, 2007, nearly one month later, Canadian counsel for Tornado sent a letter to Phat Fashion's counsel contending that the Agreement had been extended. As Phat Fashions disputed each and every statement contained in the above letter, it had no choice but to commence this proceeding for a declaratory judgment that the Agreement (a) shall expire pursuant to its terms on December 31, 2007; and (b) was not extended by a draft amendment to the Agreement which was signed only by Tornado and not by Phat Fashions as required by §17 of the Agreement, which provides that "[t]his Agreement can only be extended ... by a writing signed by both parties."

The legal basis for the relief sought by Tornado is §15-301(1) of the New York General Obligations Law, which provides:

> A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

**PRYOR CASHMAN LLP**

Honorable Paul A. Crotty
September 12, 2007
Page 4

Here, although the Agreement contains such a provision, Tornado is attempting to unilaterally extend the Agreement without the benefit of a writing signed by Phat Fashions. The law is clear that under these circumstances, where a proposed amendment is signed by only one party, the amendment is ineffective. See, e.g., Merryl Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 121-24 (2nd Cir. 1998); Long v. Shore & Reich, Ltd., 25 F.3d 94, 96-97 (2nd Cir. 1994); Scheck v. Francis, 26 N.Y.2d 466, 469-72, 311 N.Y.S.2d 841, 843-45 (1970).

In an attempt to avoid the requirements of N.Y. General Obligations Law §15-301(1), Tornado argues that: (a) the parties previously amended the Agreement without a writing; and (b) Tornado relied to its detriment on representations allegedly made by Phat Fashions that the Agreement would be renewed. Neither of these arguments have any merit.

First, the Agreement was never amended without a writing but, even if Phat Fashion's allowing Tornado to sell additional products could be construed as an oral modification (and it was not), the law is clear that such oral modifications do not act as a waiver of a provision requiring that an agreement can only be extended in writing, which was precisely how the Agreement at issue was extended on the only two occasions in which extensions occurred. See, e.g., RBFC One, LLC. v. Zeeks, Inc., 367 F. Supp. 2d 604, 611-12 (S.D.N.Y. 2005).

Second, Tornado did not rely on any alleged representations by Phat Fashions in any way. Although Tornado admits that it knew at least as early as February 2007 that the Agreement was not going to be extended, and its President and counsel sent letters to Tornado in March and April 2007 objecting to Phat Fashion's position, the first time that any reliance, detrimental or otherwise, was alleged was when Tornado's counsel filed its Answer five months later on June 26, 2007. Tornado's claim of reliance is nothing more than an afterthought created by its lawyers.

**Description by Defendant Tornado**

For the approximately nine years prior to the filing of this lawsuit, Tornado and Phat Fashions have had a mutually satisfactory business relationship. On or about August 1, 1998, the parties entered into a Trademark License Agreement, which was subsequently amended and extended through December 31, 2007 (the "Agreement"). Despite the fact that the written Agreement called for modifications to the Agreement to be in writing, the parties regularly ignored this requirement, and such oral modifications resulted in millions of dollars in sales. Notably, the parties regularly agreed orally to allow Tornado to sell products either not covered by the Agreement, or which were specifically excluded from the Agreement. For example, although the Agreement specifically excluded the licensing of ladies' lingerie and outerwear, the parties orally modified the Agreement to allow such sales. Tornado sold approximately $153,402 worth of

# PRYOR CASHMAN LLP

Honorable Paul A. Crotty
September 12, 2007
Page 5

lingerie in 2005 and approximately $648,585 in 2006 for which Phat Fashions received royalties of approximately $10,738 in 2005 and approximately $45,401 in 2006. Similarly, Tornado sold approximately $640,498 worth of outerwear in 2005 and $1,114,132 in 2006 for which Phat Fashions received royalties of approximately $44,835 in 2005 and $77,989 in 2006. Phat Fashions did not object to any of these oral modifications or state at any time that such modifications should be in writing.

Moreover, contrary to the facts alleged by plaintiff, Tornado and Phat Fashions negotiated and agreed to an extension of the Agreement which was reduced to a writing by plaintiff. On or about February 2006, Tornado and Phat Fashions orally agreed to an extension of the Agreement. Following this oral agreement, Tornado emailed a proposal to Phat Fashions. Phat Fashions orally accepted, and instructed its counsel to draw up a written Extension to the Agreement on or about March 2006. After Tornado and Phat Fashions had agreed that the written Extension was acceptable to both parties, on or about March 29, 2006, Tornado's president signed the written Extension and returned it to Phat Fashions' counsel.

Over the following months, in at least four separate phone conversations that took place on or about April 2006, July or August 2006, October 2006, and December 2006, Tornado followed up with Phat Fashions regarding the signed Extension. Phat Fashions repeatedly reassured Tornado that the written Extension would be signed and that there was no problem with the Agreement; it had been validly extended. Over these months, Tornado organized its business accordingly and entered into a multi-year lease for a store, all in reliance on these promises. Apparently at the same time it was reassuring Tornado that the Extension was in place, Phat Fashions was secretly negotiating with another company to replace Tornado. Tornado did not realize that there was a potential problem with the extension until on or about February 2007, when it learned for the first time that Phat Fashions was considering signing a new agreement with a third party.

Plaintiff cites to three cases in support of its position; however, these cases are not applicable to this dispute. Indeed, New York law regularly recognizes the doctrines of equitable and promissory estoppel to protect the interests of a party that has been induced to rely on the assurances of the other party. *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (noting that "when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing"); *Rose v. Spa Realty Assoc.*, 366 N.E.2d 1279, 1283 (N.Y. 1977) ("Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute [N.Y. Gen. Obl. Law § 15-301] to bar proof of that oral modification); *Readco, Inc. v. Marine Midland*

**PRYOR CASHMAN LLP**

Honorable Paul A. Crotty
September 12, 2007
Page 6

*Bank*, 81 F.3d 295, 301-02 (2d Cir. 1996) (noting that promissory estoppel applies where
plaintiff has proved "a clear and unambiguous promise").

Estoppel is particularly appropriate here, where the parties have repeatedly engaged in
oral modifications and rarely put any modification to the Agreement in writing; where Phat
Fashions repeatedly assured Tornado that it had a valid Extension, and where Tornado relied on
such promises to its detriment. The cases plaintiff cites are easily distinguished, as they do not
present instances in which the parties' course of conduct was so informal and the parties regu-
larly engaged in oral modifications without reducing modifications to writing. *See Merryl Lynch
Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121-24 (2d Cir. 1998) (examining a case in which all
previous amendments to the agreement had been in writing); *Long v. Shore & Reich, Ltd.*, 25
F.3d 94, 96-97 (2d Cir. 1994) (holding that an oral employment contract was not valid where
appellant did not raise the issue of estoppel, the parties had no history of oral modifications to the
written agreement, and there was no history of repeated reassurances by appellees, but finding
that plaintiff was still entitled to damages under *quantum meruit*); *Scheck v. Francis*, 260 N.E.2d
493 (N.Y. 1970) (where there was no history of repeated reassurances or repeated oral
agreements, the court found that an oral employment contract was not valid).

Thus, in accordance with its counterclaims, Tornado seeks a declaratory judgment stating
that: (a) there was a valid Extension to the Agreement between the parties and Phat Fashions has
anticipatorily breached the valid Extension, and/or that Phat Fashions has breached its covenant
of good faith and fair dealing, and/or that Phat Fashions should be estopped from breaching the
Extension under the doctrines of equitable and promissory estoppel; (b) that such Extension
continues the Agreement through December 31, 2010 with Tornado able, at its option, to extend
an additional three years, through December 31, 2013; and (c) the Extension authorizes Tornado
to continue selling the Phat Farm and Baby Phat product lines it has been selling (directly or
through Vis-à-Vis) under the Agreement. Tornado also seeks judgment on its anticipatory breach
of contract, breach of duty of good faith and fair dealing, and promissory estoppel claims.

3.    **A brief statement by plaintiff as to the basis of subject-matter jurisdiction and a
      brief statement by each other party as to the presence or absence of subject-matter
      jurisdiction. Such statements shall include citations to all statutes relied on and
      relevant facts as to citizenship and jurisdictional amount.**

The parties agree that jurisdiction is conferred upon this Court pursuant to 28 U.S.C.
§1332 in that: (a) the matter in controversy exceeds the sum or value of $75,000, exclusive of
interest and costs, i.e., the alleged contract renewal minimums are in excess of $75,000; and (b)

 **PRYOR CASHMAN LLP**

Honorable Paul A. Crotty
September 12, 2007
Page 7

is between a citizen of a State, i.e., Phat Fashions, which is a New York LLC, and a citizen of a foreign state, i.e., Tornado, which is a Canadian corporation.

**4.    A brief summary by each party of the claim(s) and defense(s) that party has asserted which remain to be tried, without recital of evidentiary matter but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted which are not to be tried.**

At the present time, all of the parties' claims and defenses as set forth in paragraph 2 hereof remain to be tried.

**5.    Any contemplated motions.**

Phat Fashions anticipates making a motion after discovery is completed for order granting it summary judgment on the claims asserted in its Complaint and dismissing Tornado's counterclaims.

As discovery proceeds, Tornado will contemplate making a motion for a preliminary injunction maintaining the status quo (i.e., allowing the Agreement to remain operative past December 31, 2007) based in part on § 21 of the Agreement, which states, "Licensor and Licensee acknowledge that their performance and obligations hereunder are unique, of extraordinary value, and that a material breach by either such party of any material obligation hereunder will cause the other such party irreparable damage which cannot be compensated with money only. Therefore, each such party agrees that the other such party, as a matter of right, shall be entitled to an injunction or other equitable relief . . . ."

**6.    A statement by each party as to whether the case is to be tried with or without a jury, and the number of trial days needed.**

The parties agree that the case is to be tried without a jury and expect that approximately five trial days will be needed.

# PRYOR CASHMAN LLP

Honorable Paul A. Crotty
September 12, 2007
Page 8

7.    **A statement as to whether or not all parties have consented to trial of the case by a magistrate judge (without identifying which parties have or have not so consented).**

Both parties have not consented to the trial of a case by a magistrate judge.

Respectfully submitted,

Philip R. Hoffman
Pryor Cashman LLP
Attorneys for Plaintiff Phat Fashions

/s/ AHO

Adam H. Offenhartz
Gibson, Dunn & Crutcher LLP
Attorneys for Defendant Tornado

Encl.

# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## <u>PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.</u>
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 51

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
                           :

PHAT FASHIONS, LLC,               :

                Plaintiff,     :     Case No. 1:07 cv 03278 (PAC)

                           :     **TORNADO'S INITIAL**

     v.                      :     **DISCLOSURES**

TORNADO IMPORTS (CANADA), INC.   :

               Defendant.     :

                           :
------------------------------------- x

**RULE 26(a)(1) INITIAL DISCLOSURES OF TORNADO IMPORTS (CANADA), INC.**

Defendant Tornado Imports (Canada), inc. ("Tornado"), by and through its undersigned

counsel, respectfully submits these initial disclosures pursuant to Rule 26(a)(1) of the Federal

Rules of Civil Procedure.

This case is in its early stages, and these disclosures are based upon information

reasonably available to Tornado at the present time. These disclosures are provided without

waiver of the attorney-client privilege, attorney work product doctrine, or any other applicable

privilege or doctrine. Tornado reserves the right to object to the production and/or introduction

into evidence of any document or evidence within the categories described herein or testimony

by any of the disclosed witnesses on the basis of privilege, relevance or otherwise, as

appropriate. Tornado reserves the right to add to, or to amend, this disclosure as appropriate and

necessary.

     A.     **Individuals Likely to Have Discoverable Information**

The following individuals are likely to have discoverable information that the Tornado

may use to support its Counterclaims. Plaintiff's counsel may contact employees of Tornado and



PLAINTIFF'S EXHIBIT 51

its corporate affiliates, including the following persons, only through Tornado's counsel, Gibson, Dunn & Crutcher LLP, to the extent such contacts may be appropriate.

       1.     Issie Wiseman - Director and CEO of Tornado; 5540 Rue Ferrier, Montreal, Quebec, H4P 1M2, Canada.  Mr. Wiseman may be contacted through Tornado's counsel.  Mr. Wiseman is likely to have information regarding the relationship between the parties, the negotiation of the Trademark Licensing Agreement ("Agreement"), the Extension of the Agreement, amendments and modifications to the Agreement, actions Tornado took in reliance on Phat Fashions' assurances that the Agreement had been extended, and harm Tornado has suffered from Phat Fashions' actions.

       2.     Barry Segal – Vice President of Finance of Tornado; 5540 Rue Ferrier, Montreal, Quebec, H4P 1M2, Canada.  Mr. Segal may be contacted through Tornado's counsel.  Mr. Segal is likely to have information regarding the relationship between the parties, the negotiation of the Agreement, the Extension of the Agreement, amendments and modifications to the Agreement, actions Tornado took in reliance on Phat Fashions' assurances that the Agreement had been extended, and harm Tornado has suffered from Phat Fashions' actions.

       3.     Josh Wiseman – Director of Tornado; 5540 Rue Ferrier, Montreal, Quebec, H4P 1M2, Canada.  Mr. Wiseman may be contacted through Tornado's counsel.  Mr. Wiseman is likely to have information regarding the relationship between the parties, the negotiation of the Agreement, the Extension of the Agreement, and actions Tornado took in reliance on Phat Fashions' assurances that the Agreement had been extended.

       4.     Mitchell Maislin – Managing Director of Shoe Sales of Tornado; 5540 Rue Ferrier, Montreal, Quebec H4P 1M2, Canada.  Mr. Maislin may be contacted through Tornado's counsel.  Mr. Maislin is likely to have information regarding the actions Tornado took in reliance

on Phat Fashions' assurances that the Agreement had been extended and information regarding the harm Tornado has suffered from Phat Fashions' actions.

5.    Claudia Michaels – Managing Director of Women's Clothing; 5540 Rue Ferrier, Montreal, Quebec H4P 1M2, Canada. Ms. Michaels may be contacted through Tornado's counsel. Ms. Michaels is likely to have information regarding the actions Tornado took in reliance on Phat Fashions' assurances that the Agreement had been extended and information regarding the harm Tornado has suffered from Phat Fashions' actions.

6.    Nancy Cafaro, former Sales Representative for Tornado. Ms. Cafaro's last known address is: 11869 27th Avenue, Montreal, Quebec, H1E 6R9, Canada. Ms. Cafaro is likely to have information regarding the actions of Gaby Bitton and Phat Fashions that harmed Tornado.

7.    Salvatore Cutrona, former Salesman for Tornado. Mr. Cutrona's last known address is: 1045 D'Auteuil Blvd, Laval, Quebec, H7E 3H9, Canada. Mr. Cutrona is likely to have information regarding the actions of Gaby Bitton and Phat Fashions that harmed Tornado.

8.    Vanessa Ferrara, former Sales Representative for Tornado. Ms. Ferrara's last known address is: 11585 Narcisse, Dionne, Montreal, Quebec, H1E 4H4, Canada. Ms. Ferrara is likely to have information regarding the actions of Gaby Bitton and Phat Fashions that harmed Tornado.

9.    Bernt Ullman, President, Phat Fashions, LLC; 512 Seventh Avenue, New York, NY 10018. Mr. Ullman is likely to have information regarding the relationship between the parties, the negotiation of, and various amendments to and modifications of, the Agreement, the Extension of the Agreement, and the efforts of Phat Fashions to replace Tornado.

10.    Robert C. Skinner, President and CEO, Kellwood; 420 Fifth Avenue, 28th Floor, New York, NY 10018. Mr. Skinner is likely to have information regarding the relationship

3

between the parties, the negotiation of, and various amendments to and modifications of, the

Agreement, the Extension of the Agreement, and the efforts of Phat Fashions to replace Tornado.

11.    Eli B. Nathanson, Esquire, Pryor Cashman; 410 Park Avenue, New York, NY

10022. Mr. Nathanson is likely to have information regarding the relationship between the

parties, the negotiation of, and various amendments to and modifications of, the Agreement, the

Extension of the Agreement, and the efforts of Phat Fashions to replace Tornado.

12.    Gaby Bitton, Buffalo Jeans, 400 Sauve West, Montreal, Quebec, OCH3L, 128,

Canada. Mr. Bitton is likely to have information regarding harm Tornado has suffered from Phat

Fashions' and Mr. Bitton's actions and the timing of Phat Fashions' efforts to replace Tornado.

**B.    Documents**

Documents that are in Tornado's possession, custody, or control and that may be used to

support Tornado's Counterclaims, including documents concerning the Trademark Licensing

Agreement ("Agreement"), the amendments and modifications to the Agreement, the Extension

of the Agreement, actions Tornado took in reliance on Phat Fashions' assurances that the

Agreement had been extended, and harm Tornado suffered from Phat Fashions' actions. These

and other discoverable non-privileged documents will be produced to Plaintiff.

**C.    Damages**

Tornado is contemplating making a motion for interim injunctive relief/specific

performance (i.e., allowing the Agreement to remain operative past December 31, 2007), based

in part on § 21 of the Agreement, which states, "Licensor and Licensee acknowledge that their

performance and obligations hereunder are unique, of extraordinary value, and that a material

breach by either such party of any material obligation hereunder will cause the other such party

irreparable damage which cannot be compensated with money only. Therefore, each such party

4

agrees that the other such party, as a matter of right, shall be entitled to an injunction or other

equitable relief . . . ."

**D.    Insurance**

Not applicable.

Dated: New York, New York
       October 1,  2007

                                        **GIBSON, DUNN & CRUTCHER LLP**

                                        By: _____
                                            Adam H. Offenhartz
                                            Laura M. Leitner
                                            200 Park Avenue
                                            New York, New York 10166
                                            telephone:  (212) 351-4000
                                            facsimile:  (212) 351-4035

                                            *Counsel for Tornado Imports
                                            (Canada), Inc.*