# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
### Case No.:  07 Civ. 3278 (PAC)

## Part 1

## EXHIBIT 52

PHAT FASHIONS, LLC VS. TORNADO IMPORTS

ISSIE WISEMAN - 11/15/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM



PLAINTIFF'S
EXHIBIT
52

## Page 1

(1)  IN THE UNITED STATES DISTRICT COURT
(2)  SOUTHERN DISTRICT OF NEW YORK
     ----------------------------------------X
(3)  PHAT FASHIONS, LLC,
(4)                      Plaintiff,
(5)           - against -
(6)  TORNADO IMPORTS (CANADA), INC.,
(7)                      Defendant.
(8)  Case No. 1:07 cv 03278 (PAC)
     ----------------------------------------X
(9)
(10)                    410 Park Avenue
                        New York, New York
(11)
(12)
                        November 15, 2007
(13)                    9:50 a.m.
(14)
(15)        Deposition of Defendant, ISSIE WISEMAN,
(16)  taken pursuant to Notice and Agreement, before Rita
(17)  Persichetty, a Notary Public of the State of New
(18)  York.
(19)
(20)
(21)
(22)
(23)       ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
(24)          New York, New York 10022
                   212-750-6434
(25)               REF: 85934

## Page 2

(1)  A P P E A R A N C E S :
(2)
(3)  PRYOR CASHMAN LLP
(4)  Attorneys for Plaintiffs
(5)      410 Park Avenue
(6)      New York, New York  10022
(7)  BY:  PHILIP R. HOFFMAN, ESQ.
(8)     PHONE:  212.326.0192
(9)     EMAIL:  Phoffman@pryorcashman.com
(10)
(11)
(12)  ALLEGAERT BERGER & VOGEL LLP
(13)  Attorneys for Defendant
(14)      111 Broadway
(15)      New York, New York  10006
(16)  BY:  JAMES A. BEHA II, ESQ.
(17)     PHONE:  212.571.0550
(18)     EMAIL:  Jbeha@abv.com
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)  ------------------ I N D E X ------------------
(2)  WITNESS            EXAMINATION BY        PAGE
(3)  ISSIE WISEMAN      MR. HOFFMAN            7
(4)
(5)
(6)  ---------------- E X H I B I T S ----------------
(7)  PLTF'S    DESCRIPTION                    FOR I.D.
(8)  Exh. 1    Canadian Trademark License        20
(9)            Agreement
(10) Exh. 2    Fax dated 9/15/99                 45
(11) Exh. 3    Series of documents               49
(12) Exh. 4    Fax dated 10/13/00 with attachment 54
(13) Exh. 5    Amended Answer                    60
(14) Exh. 6    Letter from Mr. Slomovitz dated
(15)           12/11/00                          89
(16) Exh. 7    Letter from Mr. Wiseman dated     90
(17)           3/20/01
(18) Exh. 8    Federal Express receipts          93
(19) Exh. 9    Memo dated 6/11/01                96
(20) Exh. 10   E-mail dated 1/17/02             100
(21) Exh. 11   Document dated 7/8/02            102
(22) Exh. 12   Draft letter                     107
(23) Exh. 13   Letter dated 3/10/04            108
(24) Exh. 14   Letter dated 3/10/04            109
(25) Exh. 15   Federal Express receipts        110

## Page 4

(1)  ------------ E X H I B I T S (Cont'd) ------------
(2)  PLTF'S    DESCRIPTION                    FOR I.D.
(3)  Exh. 16   Two copies of an E-mail dated    111
(4)            3/11/04
(5)  Exh. 17   Fax dated 8/25/04               113
(6)  Exh. 18   A document                      114
(7)  Exh. 19   Canadian custom's statement of
(8)            amounts  paid                   116
(9)  Exh. 20   Letter dated 3/1/06             118
(10) Exh. 21   E-mail dated 10/17/05           120
(11) Exh. 22   Preconference letter            151
(12) Exh. 23   Document with Nos. 914-916      158
(13) Exh. 24   Document dated 3/1/06           168
(14) Exh. 25   E-mail dated 3/20               182
(15) Exh. 26   A document                      186
(16) Exh. 27   Letter dated 3/30/06            187
(17) Exh. 28   A document                      212
(18) Exh. 29   Three E-mails                   213
(19) Exh. 30   E-mail dated 9/11/06            227
(20) Exh. 31   E-mail dated 12/8               229
(21) Exh. 32   Canadian customs statement      229
(22) Exh. 33   E-mail dated 1/29/07            248
(23) Exh. 34   A document                      260
(24) Exh. 35   A document                      263
(25)

Page 5

(1) ----------- E X H I B I T S (Cont'd) -----------
(2) PLTF'S  DESCRIPTION              FOR I.D.
(3) Exh. 36  Letter from Mr. Wiseman to
(4)          Phat Fashions            269
(5) Exh. 37  A document               .274
(6) Exh. 38  E-mail                   276
(7) Exh. 39  Letter dated 4/18/07     280
(8) Exh. 40  E-mail dated 4/24/07     288
(9) Exh. 41  A document               288
(10) Exh. 42  A document              292
(11) Exh. 43  A document              295
(12) Exh. 44  A document              296
(13) Exh. 45  A document              311
(14) Exh. 46  A document              311
(15) Exh. 75  E-mail dated 7/26/05    311
(16) Exh. 81  Letter            311
(17) Exh. 82  Letter dated 12/7/06    312
(18) Exh. 83  Lease agreement         313
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 6

S T I P U L A T I O N S

(3)      IT IS STIPULATED AND AGREED by and
(4) between the attorneys for the respective parties
(5) herein that the filing, sealing, and certification
(6) of the within deposition be waived.
(7)      IT IS FURTHER STIPULATED AND AGREED that
(8) all objections, except as to the form of the
(9) question, shall be reserved to the time of the
(10) trial.
(11)      IT IS FURTHER STIPULATED AND AGREED that
(12) the within deposition may be sworn to and signed
(13) before any officer authorized to administer an
(14) oath, with the same force and effect as if signed
(15) to before the court.
(16)
(17)
(18)          - oOo -
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 7

(1) I S S I E   W I S E M A N,
(2) called as a witness, having been sworn
(3) by the Notary Public, was examined and
(4) testified as follows:
(5)
(6) EXAMINATION BY
(7) MR. HOFFMAN:
(8)      Q.  Can you just state your name and
(9) address for the record, please?
(10)     A.  Issie Wiseman, 205 Edgehill Road,
(11) Montreal, Quebec, Canada.
(12)     Q.  My name is Philip Hoffman.  I'm an
(13) attorney who is representing the Plaintiff in
(14) this case, Phat Fashions.
(15)      Have you ever been deposed before?
(16)     A.  I think once I was deposed in Canada.
(17)     Q.  About how long ago was that?
(18)     A.  Quite a while.
(19)     Q.  If during the course of the
(20) deposition, if I ask you any question and you
(21) don't understand it, just let me know and I'll
(22) try to clarify it.
(23)     A.  Okay.
(24)     Q.  If you need to take a break for any
(25) reason, just say so and we'll take a break.

Page 8

(2) I'll ask you not to do that if there's a
(3) question that's pending.  When you give
(4) answers, if you can give audible answers, like
(5) a yes or no or whatever as opposed to a nod or
(6) an uh-huh so that that can be picked up.
(7)     A.  I'm not used to it, so if I go like
(8) this (nodding), I'll say yes.
(9)     Q.  If you go like (nodding), all of us
(10) here will point it out to you, and that's
(11) absolutely fine.
(12)     MR. BEHA:  If you're giving an answer
(13) and you don't feel that you're finished
(14) and Mr. Hoffman interrupts, which will
(15) only happen by accident, I'm sure, you are
(16) entitled to let him know.
(17)     THE WITNESS:  Thank you.
(18)     Q.  Similarly, if you've already given an
(19) answer and we are on to the next question and
(20) you decide there is something you'd like to
(21) clarify, you can say that as well, and we'll
(22) stop and we'll go back and give you the
(23) opportunity to do that.
(24)      So let's begin.
(25)      What business are you in?

Page 9

(1)
(2)    A.  I'm in the garment business.
(3)    Q.  How long have you been in the garment
(4) business?
(5)    A.  Thirty-five years.
(6)    Q.  In what year did you start?
(7)    A.  1970.
(8)    Q.  And were you in any business prior to
(9) being in the garment business?
(10)   A.  No.
(11)   Q.  If you can just give me a brief
(12) synopsis of your career in the garment business
(13) starting with, where did you start?
(14)   A.  I started working for a salesman
(15) traveling on the road in the province of
(16) Quebec, assisting him in learning the business
(17) and for a very nominal salary and I learned the
(18) business in that manner, and that continued,
(19) and I grew up -- I mean, I continued in that
(20) particular category, then I became a salesman
(21) on my own carrying my own product lines.
(22)   Q.  All garments?
(23)   A.  Yes, always in the garment business.
(24)   Q.  Okay.
(25)   A.  And then I met a friend who was also

Page 10

(1)
(2) a salesperson and we decided to go into
(3) business together when we saw the change
(4) happening in the fashion industry.  We decided
(5) to go into importing.  We were working for
(6) manufacturing, we had no money.
(7)        We went to a third guy and he -- a
(8) manufacturer, and we told him we have this idea
(9) to import sweaters and we want to make them in
(10) the Far East, and that's really how it all
(11) started.
(12)   Q.  So let's stop there for a second.
(13) About year was that?
(14)   A.  Well, I first went into business in
(15) 1975.
(16)   Q.  With your own company?
(17)   A.  Yes.
(18)   Q.  With this other person?
(19)   A.  And a third partner.
(20)   Q.  And what were the names of those two
(21) folks?
(22)   A.  Alan Lande and Kermit Kitman.
(23)   Q.  What is the name of the business that
(24) you formed?
(25)   A.  Diffusion DBIL.

Page 11

(1)
(2)    Q.  Is that company still around today?
(3)    A.  No, sir.
(4)    Q.  So you started Fusion (sic) now in
(5) 1975?
(6)       MR. BEHA:  Maybe -- just off the
(7)    record.
(8)       (Discussion held off the record.)
(9)    Q.  So tell me about your career once you
(10) started Diffusion.
(11)   A.  Well, when we started Diffusion, we
(12) started importing sweaters, and we started
(13) doing quite well, and we took in a few other
(14) partners -- some other partners that had a good
(15) idea as well in garments and, we spun off a
(16) company called International Tyfoon.
(17)   Q.  When was that?
(18)   A.  That was probably in 1978, I'm not
(19) 100 percent sure of the dates, but I would say
(20) three years onwards in our relationship.
(21) Everything was going very well until about
(22) 1980, '81 when the partners decided to split,
(23) so one of my partners took the Diffusion DBLI
(24) name and I took the International Tyfoon name
(25) and went on our own.

Page 12

(1)
(2)    Q.  Have you been operating under that
(3) name among others since 1981?
(4)    A.  As the umbrella company for our
(5) different categories of merchandise, yes.
(6)    Q.  Is International Tyfoon the same
(7) company as Tyfoon International Inc.?
(8)    A.  Correct, yes.
(9)    Q.  And I'll ask questions like that a
(10) couple of times because it appears on
(11) documents.
(12)   A.  I will tell you why.  The name
(13) appears that way because in English it's
(14) International Typhoon Incorporated, in French
(15) it's Typhoon Internationale Incompante, so
(16) in -- being a company incorporated in the
(17) province of Quebec, the French comes first.
(18)       Subsequently, we changed the name to
(19) Tyfoon Group, you know, so you'll find it in
(20) different manners, but it's all the same
(21) company.
(22)   Q.  Is Tyfoon Group a separate
(23) corporation?
(24)   A.  No.
(25)   Q.  Is Tyfoon Group made up of a group of

Page 13

(1)
(2) different companies?
(3)     A. Yes.
(4)     Q. Can you tell me which companies make
(5) up that group?
(6)     A. We have several, there's four or five
(7) different corporations, one is via satellite,
(8) one is Tornado, one is Vis-a-Vis and some
(9) numbered companies as well. They're not
(10) necessarily in that order, by the way.
(11)     Q. You mentioned a couple of numbered
(12) companies.
(13)     A. Yes.
(14)     Q. Would 3702669 Canada, Inc. be one of
(15) those?
(16)     A. I'm not sure.
(17)     Q. How about 4107675 Canada, Inc.?
(18)     A. I'm not sure. Perhaps.
(19)     Q. Can you tell me why companies have
(20) names like this in Canada with the numbers in
(21) front?
(22)     A. I'm not proficient enough to tell you
(23) why, but we form different corporations, if we
(24) take in a different partner, if we want to do
(25) some profit sharing in a different manner. In

Page 14

(1)
(2) the province of Quebec -- I'm not an
(3) accountant, but in the province of Quebec or in
(4) Canada, if you incorporate a different
(5) corporation, there's some tax benefits for a
(6) low rate of tax for every different
(7) corporation, something of that nature, that is
(8) why we have different corporations.
(9)     Q. My question was a little different,
(10) it was why in terms of naming a corporation
(11) you'd name a corporation 3702669?
(12)     A. I believe that the -- all the
(13) corporations are a numbered company at first
(14) and then I think you can apply a name to it
(15) being the same corporation. I believe, I'm not
(16) sure, I may be talking silly.
(17)     Q. Did you have a company at one time
(18) called Modes Studio One Fashions?
(19)     A. Yes.
(20)     Q. Is that company still in existence?
(21)     A. Yes.
(22)     Q. Did you have a company called Items
(23) Unlimited?
(24)     A. Yes.
(25)     Q. Still in existence?

Page 15

(1)
(2)     A. It's -- I don't know if it's in
(3) existence or not, but we are not -- we are
(4) not -- I don't know if we are doing anything
(5) through that company right now.
(6)     Q. Are you doing any business through
(7) Modes Studio One?
(8)     A. I'm not sure.
(9)     Q. Are you doing any business through
(10) companies named Basis Femmes, Inc. or Basis
(11) Homes, Inc.?
(12)     A. I believe so, but I am not sure.
(13)     Q. A company called Isse Fashions?
(14)     A. Isse Fashions. Yes, I believe so.
(15)     Q. And you're doing business?
(16)     A. Yes.
(17)     Q. A company called Dot.Com Style, Inc.?
(18)     A. I don't know if that company's
(19) dormant now, I'm not sure.
(20)     Q. Would it be accurate to state that
(21) all of these companies were in business or as they're in business now were in
(22) business or as they're in business now were in
(23) the garment business?
(24)     A. Well, garment and garment related.
(25) Some of them, like Items Unlimited was in the

Page 16

(1)
(2) accessory business, that's not garments, could
(3) be handbags, jewelry, but fashion related.
(4)     Q. Do you know when -- well, Tornado is
(5) the company you mentioned, I believe, in your
(6) answer?
(7)     A. Yes.
(8)     Q. Is that company known as Importations
(9) Tornado Imports Canada?
(10)     A. Yes, and that's because of the French
(11) again, importazione Tornado or Tornado Imports.
(12)     Q. And how long has Tornado, we'll call
(13) it, been in business?
(14)     A. I don't know the exact dates.
(15)     Q. Approximately?
(16)     A. Ten years.
(17)     Q. And what about -- you mentioned
(18) Vis-a-Vis?
(19)     A. Yes.
(20)     Q. Is that the company that's known as
(21) Modes Vis-a-Vis Fashions 1997, Inc.?
(22)     A. I believe so.
(23)     Q. Does the 1997 indicate when it
(24) started doing business?
(25)     A. Correct, I believe so.

PHAT FASHIONS, LLC                                                              VS. TORNADO IMPORTS

ISSIE WISEMAN - 11/15/07

## Page 17

(1)
(2)    MR. BEHA:  If I could just -- before
(3)    when you gave an answer, you sort of gave
(4)    a shrug.  I just want you to understand
(5)    the shrug doesn't come out on the record,
(6)    so if you're not sure, you need to say,
(7)    I'm not sure, but -- and if you are sure,
(8)    that's how the answer is going to read,
(9)    and it's entirely up to your memory, but
(10)   don't think, you know, or if you change
(11)   your tone of voice, that also doesn't come
(12)   out on the record.
(13)      Q.   I thought you actually followed up
(14)   the shrug with an "I don't know," but that's
(15)   certainly good advice from your attorney.
(16)      A.   Thank you.
(17)      Q.   Do these companies file separate tax
(18)   returns in Canada?
(19)      A.   I don't know.
(20)      Q.   Do you know if they have separate
(21)   financial statements?
(22)      A.   I believe so.
(23)      Q.   Why is that, if you know?
(24)      A.   Because I sign -- I take a look from
(25)   our auditors, the financial statements, and I

## Page 18

(1)
(2)   see the different names at the end of every
(3)   year.
(4)      MR. BEHA:  I think he was asking you
(5)   not why is it that you know that they do
(6)   separate ones, but do you know why they do
(7)   separate ones.
(8)      Is that fair?
(9)      MR. HOFFMAN:  It's really both, but
(10)  right.
(11)     A.   I believe I mentioned that in the
(12)  beginning, the different corporations,
(13)  different partnership structures, different tax
(14)  benefits, things of that nature, which our CFO
(15)  could explain a lot better than I could.
(16)     Q.   And the CFO would be Barry Segal?
(17)     A.   Correct.
(18)     Q.   Do you know whether the partners in
(19)  Tornado are the same as the partners in
(20)  Vis-a-Vis?
(21)     A.   Yes.
(22)     Q.   Are they?
(23)     A.   Yes.
(24)     Q.   And who are the partners in those
(25)  companies?

## Page 19

(1)
(2)      A.   Myself, Barry, Josh, I'm not 100
(3)   percent positive of every single partner there,
(4)   there could be Earl Veinish, there could be a
(5)   Julie Wiseman, there could be a Marta Wiseman.
(6)   There's several different individuals, but I
(7)   think I've named all of the individuals.
(8)      Q.   Are there also companies that are
(9)   partners in those other companies?
(10)     A.   I don't know.
(11)     Q.   Do you know what the relationship, if
(12)  any, is between Tornado and Vis-a-Vis?
(13)     MR. BEHA:  Are you asking in a
(14)  business sense or legal sense, just so he
(15)  understands?
(16)     Q.   Let's start with business sense.
(17)     A.   Yes, there's certainly a relationship
(18)  in a business sense.
(19)     Q.   What would that relationship be?
(20)     A.   Tornado predominantly sells men's
(21)  wear, Vis-a-Vis predominantly sells ladies'
(22)  wear.
(23)     Q.   What is your educational background,
(24)  what's the highest level of education you
(25)  achieved?

## Page 20

(1)
(2)      A.   High school.
(3)      Q.   And when did you graduate?
(4)      A.   I would say '65.
(5)      MR. BEHA:  Again, that's going to be
(6)   one of those where all of the uncertainty
(7)   you put into your answer in tone isn't
(8)   coming across in the record, but "I would
(9)   say '65," I think, sounds uncertain
(10)  enough.
(11)     MR. HOFFMAN:  I don't think it's
(12)  going to be a critical issue in the case.
(13)     A.   Okay.
(14)     Q.   We have a lot of different exhibits
(15)  we are going to show you today.  I've had
(16)  everything premarked so we can kind of just
(17)  move along.
(18)     MR. BEHA:  Great.
(19)     Q.   I'm going to hand you what we've
(20)  marked as Plaintiff's Exhibit 1, which says up
(21)  at the top, Canadian Trademark License
(22)  Agreement.
(23)     (Plaintiff's Exhibit 1, Canadian
(24)  Trademark License Agreement, marked for
(25)  identification.)

Page 21

(1)
(2)   Q.   You can skim through it if you like.
(3)   The first question I'm going to ask you on it
(4)   when you're ready is, can you identify it?
(5)   A.   Yes.
(6)        MR. BEHA:   What I'm going to -- just
(7)   so we are clear on the record, this
(8)   happens to be a copy with a fax legend at
(9)   the top.  I assume that as to what the
(10)  question of identifying it, you're asking
(11)  about the substantive document with or
(12)  without whatever the fax may signify.
(13)       MR. HOFFMAN:   That is exactly
(14)  correct.
(15)       MR. BEHA:   Fair enough.  Go ahead.
(16)  A.   I believe I can identify it by my
(17)  initials.  I can see that I've initialed.
(18)  Q.   And if you look at Page 24.
(19)  A.   24.
(20)  Q.   Is that your signature there?
(21)  A.   Yes.
(22)  Q.   And the other signature?
(23)  A.   Russell Simmons.
(24)  Q.   Is this, to the best of your
(25)  knowledge, the trademark license agreement

Page 22

(1)
(2)   between Tornado and Phat Fashions, LLC?
(3)   A.   Without reading the whole thing, I
(4)   would say, yes.
(5)   Q.   Do you know how it was decided that
(6)   of the different entities that are under the
(7)   Tyfoon Group, that Tornado would be the one to
(8)   enter into this agreement with Phat Fashions?
(9)   A.   I can't recall.
(10)  Q.   Do you have any recollection of any
(11)  discussion about Tyfoon being a party?
(12)  A.   I can't recall.
(13)  Q.   Do you have any recollection of a
(14)  discussion about Vis-a-Vis being a party?
(15)  A.   I can't recall.
(16)  Q.   As far as you understand it, is this
(17)  the agreement that currently governs the
(18)  relationship between Phat Fashions and Tornado?
(19)  A.   Without reading the whole thing, I
(20)  believe so.
(21)  Q.   Have you ever seen any written
(22)  amendments to this agreement?
(23)  A.   I don't know if I've seen a written
(24)  amendment, I've seen a document that was sent
(25)  to me from an attorney here at Pryor Cashman.

Page 23

(1)
(2)   Q.   Have you ever seen a written
(3)   amendment to this agreement that has been
(4)   signed by the parties for Tornado and for Phat
(5)   Fashions?
(6)   A.   I can't recall.
(7)   Q.   Were you and Russell Simmons in the
(8)   same room when this agreement was signed?
(9)   A.   Yes.
(10)  Q.   What do you recall about that, if
(11)  anything?
(12)  A.   I recall that it was at -- I believe
(13)  it was at a MAGIC show in Las Vegas, and I --
(14)  we looked at the document very quickly and he
(15)  signed it.
(16)  Q.   Do you know who was responsible for
(17)  the negotiation of this agreement on behalf of
(18)  Tornado?
(19)  A.   I believe it was myself and maybe
(20)  Barry Segal.
(21)  Q.   And who was on the other side of the
(22)  table for Phat Fashions?
(23)  A.   Russell Simmons and Ruby Azrak.
(24)  Q.   And who was Ruby Azrak?
(25)  A.   Ruby Azrak was the head of licensing

Page 24

(1)
(2)   for Phat Fashions or Phat Farm at that time
(3)   when this occurred.
(4)   Q.   But at the time that this occurred,
(5)   it was Phat Fashions, right, because that's the
(6)   party to the agreement?
(7)   A.   Yes, if that's the party, that is
(8)   what it was.
(9)   Q.   Had you been doing business with
(10)  either Phat Fashions or Phat Farm prior to
(11)  entering into this agreement on or about
(12)  August 1st of 1998?
(13)  A.   Yes.
(14)  Q.   What had you been doing?
(15)  A.   Basically the same thing with Phat
(16)  Farm in Canada being the distributor and
(17)  exclusive distributor in Canada.
(18)  Q.   Is it your position that you were an
(19)  exclusive distributor working without a written
(20)  agreement at that time?
(21)  A.   Yes.
(22)  Q.   You mentioned you believe you may
(23)  have signed this at the MAGIC show.  Are there
(24)  two MAGIC shows each year?
(25)  A.   Yes.

PHAT FASHIONS, LLC

BSA XMAX(7/7)

ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

## Page 25

(1)
(2)    Q. And they're held when, generally?
(3)    **A. Generally in February and in August.**
(4)    Q. Are they both in Vegas?
(5)    **A. Yes.**
(6)    Q. Take a look, if you would, at
(7)  Plaintiff's Exhibit 1. I'd like you to look at
(8)  Paragraph 2A, which you'll find on the third
(9)  page.
(10)   **A. Yes.**
(11)   Q. And that paragraph is entitled Grant
(12) of License.
(13)       What was your understanding of what
(14) Phat Fashions was granting to Tornado pursuant
(15) to this agreement?
(16)     MR. BEHA: I have an objection to
(17)   form as to the question. Again, that
(18)   means I have a problem with the way he
(19)   asked the question, but you go ahead and
(20)   think about it and give the best answer
(21)   you can. I'm not telling you not to
(22)   answer, that's not how this works.
(23)   **A. Can I read it?**
(24)   Q. Absolutely.
(25)   **A. 2A?**

## Page 26

(1)
(2)    Q. 2A, correct.
(3)       The question that I believe I asked
(4)  you was, what was your understanding of what
(5)  Phat Fashions was granting to Tornado pursuant
(6)  to that paragraph?
(7)    **A. The right to sell Phat Farm product**
(8)  **or Phat Fashion products in Canada.**
(9)    Q. And was it your understanding you
(10) were being granted an exclusive license?
(11)   **A. Yes.**
(12)   Q. And what does that mean to you to
(13) have an exclusive license?
(14)   **A. That means that no other entity in**
(15) **Canada can sell any Phat Fashion products in**
(16) **that country.**
(17)   Q. So Tornado would be the only company
(18) that can sell Phat Fashion product, was your
(19) understanding?
(20)   **A. That is correct.**
(21)     MR. BEHA: In Canada.
(22)   Q. In Canada.
(23)   **A. That's correct.**
(24)   Q. At the time you signed this
(25) agreement, Plaintiff's Exhibit 1, did you have

## Page 27

(1)
(2)  any knowledge as to whether there were any
(3)  other companies in Canada that were selling the
(4)  products covered by this agreement?
(5)    **A. Can you repeat that?**
(6)    Q. Sure. At the time that you signed
(7)  this exclusive license agreement --
(8)    **A. Yes.**
(9)    Q. -- August 1, 1998, did you have any
(10) knowledge as to whether there were any other
(11) entities in Canada that were selling Phat
(12) Fashions products that were now going to be
(13) your exclusive domain?
(14)   **A. I had no knowledge of anyone selling**
(15) **any Phat Farm product -- Phat Fashion products**
(16) **in Canada.**
(17)   Q. Do you recall how long it took to
(18) negotiate this agreement?
(19)     MR. BEHA: Could we just be clear,
(20)   are you talking about now the physical
(21)   legal document, because I suspect that he
(22)   doesn't even know about the physical legal
(23)   document as distinguished from whatever he
(24)   may have done? Ask him what you want, I
(25)   just want it to be clear.

## Page 28

(1)
(2)     MR. HOFFMAN: It's a good point.
(3)    Q. When did you first start having
(4)  discussions with anyone from Phat Fashions
(5)  about actually entering into a formal written
(6)  agreement?
(7)    **A. I don't recall the exact date, but I**
(8)  **had discussions with Russell Simmons and Ruby**
(9)  **Azrak pertaining to our license agreement, and**
(10) **I would say mostly with Ruby because he was**
(11) **head of licensing.**
(12)   Q. Between the time that you had those
(13) initials discussions --
(14)   **A. Yes.**
(15)   Q. -- and the time that this agreement
(16) was signed at MAGIC in August of 1998, do you
(17) know how much time passed in between?
(18)   **A. I don't know.**
(19)   Q. Was it more than six months?
(20)   **A. Oh, no, I don't think so. Perhaps**
(21) **more, I don't know. I don't know when it**
(22) **started, and I know it concluded on that date**
(23) **in 1998, but I don't know when it started, but**
(24) **I don't think it was six months.**
(25)   Q. Take a look, if you would, at

## Page 29

(1)

(2) Paragraph 3 of the agreement, which it's the

(3) bottom of Page 4.

(4)    **A. Yes.**

(5)    Q. And you're certainly welcome to read

(6) it and then -- why don't you do that and then

(7) let me ask you a couple of questions, please.

(8)    **A. Okay.**

(9)    Q. What was your understanding of how

(10) long the trademark license agreement

(11) Plaintiff's Exhibit 1 was to run?

(12)    **A. With the options or without the**

(13) **option?**

(14)    Q. Why don't we start without the

(15) options and then with the options. What was

(16) the initial term, as far as you understood it,

(17) and then how long could it be extended?

(18)    **A. Well, I believe the initial term was**

(19) **until June 30, 2001, and then it was extended**

(20) **to 2005, and then until December 31, 2007 with**

(21) **the two option years.**

(22)    Q. You said in your answer, I believe,

(23) extended to December 2005, did you mean 2004?

(24)    **2004, excuse me.**

(25)    Q. Would you agree that there was no

## Page 30

(1)

(2) option on the part of Tornado to extend the

(3) agreement beyond December 31st of 2007?

(4)    **A. Yes, I believe so.**

(5)    Q. Now, in terms of the exercise date of

(6) the option, do you see that it provides that

(7) the options were to be exercised between

(8) March 1st and June 30th in the same year that

(9) the contract would expire?

(10)    **A. Yes.**

(11)    Q. Would you agree that if the option

(12) was not exercised, that Tornado and Phat

(13) Fashion had agreed that six months was a

(14) sufficient time to locate a replacement

(15) licensor or licensee for the following year?

(16)    **MR. BEHA:** Objection to form and

(17) foundation.

(18)    But go ahead, that's just lawyer

(19) talk.

(20)    **A. Based on this contract, yes.**

(21)    Q. Take a look at Paragraph 4.

(22)    **A. Uh-huh.**

(23)    Q. Which is the next page, I think

(24) you're there, rate in terms of payments and

(25) advances. If you take a look in the very first

## Page 31

(1)

(2) paragraph, 4A.

(3)    **A. Yes.**

(4)    Q. Typed in, it says 8 percent?

(5)    **A. Yes.**

(6)    Q. Handwritten in, it says 7?

(7)    **A. Yes.**

(8)    Q. Do you have any recollection of how

(9) this agreement went from having 8 percent typed

(10) to 7 percent handwritten in?

(11)    **A. Yes, I had a negotiation with Russell**

(12) **and Ruby and expressed to them that what we**

(13) **were doing for Canada was representing or**

(14) **distributing some of their licensees' product**

(15) **in the Canadian market, and by doing that, we**

(16) **would have to pay another royalty or a**

(17) **commission to their licensee for allowing us to**

(18) **distribute their product line, their Phat**

(19) **Fashions product line in Canada as sort of a**

(20) **sublicense or a distributor.**

(21)    Q. I'm going to ask you if you can

(22) explain that a little bit.

(23)    **A. Therefore -- okay, I understand.**

(24) **Therefore, I explained to Ruby and Russell that**

(25) **I can't be forced -- I shouldn't be forced to**

## Page 32

(1)

(2) **pay the same royalty rate as their American**

(3) **licensees because my expense would be much**

(4) **greater than their licensee because their**

(5) **licensee would do business with me and I would**

(6) **have to pay them a commission or royalty above**

(7) **the 8 percent that was on here, so they agreed,**

(8) **they understood and they lowered my royalty to**

(9) **7 percent.**

(10)    Q. And did that happen spontaneously at

(11) the time the document was being signed?

(12)    **A. No, I think this was negotiated**

(13) **afterwards. I mean, it didn't -- it wasn't**

(14) **spontaneous, it was negotiated before.**

(15)    Q. My only -- the reason I asked the

(16) question was because, do you have any

(17) understanding as to why it was that the

(18) 7 percent wasn't just typed in the agreement

(19) that was given to you as opposed to being

(20) handwritten in and initialed later?

(21)    **A. I believe they used a standard type**

(22) **contract that they had with others, and when we**

(23) **read it in, we saw that it didn't make sense**

(24) **according to what we had discussed, they**

(25) **agreed, and this is what transpired.**

PHAT FASHIONS, LLC                                                                                    VS. TORNADO IMPORTS

Page 33

(1)
(2)    **Q.**  Now, going back to your previous
(3)  answer, just to see if I understand it, with
(4)  respect to some of the product that Tornado was
(5)  going to be selling in Canada, you were going
(6)  to be buying them from Phat's U.S. licensees?
(7)    **A.  Yes.**
(8)    **Q.**  And those U.S. licensees on their own
(9)  would have no right to sell the products in
(10)  Canada directly, was that your understanding?
(11)    **A.  Correct.**
(12)    **Q.**  That was because you were exclusive?
(13)    **A.  At that point in time, some of the**
(14)  **licensees wouldn't be able to sell that product**
(15)  **into the country because it was our right to**
(16)  **sell those particular products.**
(17)    **Q.**  And if those licensees, as far as you
(18)  understood it, sold the product to you --
(19)    **A.  Yes.**
(20)    **Q.**  -- and you paid them for the
(21)  products --
(22)    **A.  Yes.**
(23)    **Q.**  -- was it your understanding that
(24)  those licensees were going to be paying a
(25)  royalty directly to Phat Fashions?

Page 34

(1)
(2)    **A.  No.  We would be paying the royalty**
(3)  **to Phat Fashions and we would be paying another**
(4)  **commission to them for allowing us to use their**
(5)  **product.**
(6)    **MR. BEHA:**  Just so it is clear
(7)  then --
(8)    **MR. HOFFMAN:**  I was just going to ask
(9)  that.
(10)    **MR. BEHA:**  Go ahead, sorry.
(11)    **Q.**  When you say commissions, who is
(12)  "them"?
(13)    **A.  The licensee, their licensee.**
(14)    **Q.**  So let's just -- as an example, let's
(15)  assume the licensee is XYZ Company.
(16)    **A.  Okay.**
(17)    **Q.**  Tell me if anything I say here is
(18)  wrong, Tornado would buy the product from XYZ
(19)  Company; am I right so far?
(20)    **A.  No.**
(21)    **Q.**  No?  That didn't take long.
(22)    **A.  Tornado would buy the product from**
(23)  **the supplier that XYZ Company was buying the**
(24)  **product from or manufacturing the product at.**
(25)  **Would you like me to give you an example?**

Page 35

(1)
(2)    **Q.**  Yes, please.
(3)    **A.  XYZ Company is in the footwear**
(4)  **business, they buy or manufacture their**
(5)  **footwear in the Far East.  The Far East factory**
(6)  **would sell the product to XYZ Company, and XYZ**
(7)  **Company would distribute it in the United**
(8)  **States of America.**
(9)    **The same company, the manufacturer in**
(10)  **China would sell the product to us directly**
(11)  **under the supervision of XYZ Company, and we**
(12)  **would pay the royalty direct to Phat Fashions,**
(13)  **and we would also pay XYZ Company a commission**
(14)  **or royalty, whichever you'd like to call it,**
(15)  **for allowing us to use their styling and their**
(16)  **facilities.**
(17)    **Q.**  Now I understand.
(18)    **A.  Okay.**
(19)    **Q.**  So then I have one more question,
(20)  though.
(21)    **MR. BEHA:**  Any time he says he
(22)  understands, trouble is going to follow.
(23)    **MR. HOFFMAN:**  Feels like we've known
(24)  each other for a long time.
(25)    **MR. BEHA:**  I think in some ways we

Page 36

(1)
(2)  have, we'll get along just fine.
(3)    **Q.**  Tornado was paying the royalty to
(4)  Phat Fashions, correct?
(5)    **A.  On sales of the merchandise in**
(6)  **Canada.**
(7)    **Q.**  What was your understanding, if any,
(8)  as to whether or not the licensee -- well,
(9)  withdrawn.
(10)    What was the licensee paying to Phat
(11)  Fashions, if anything?
(12)    **MR. BEHA:**  On the same product?
(13)    **Q.**  On the same product.  With respect to
(14)  Canadian sales.
(15)    **A.  The licensee was paid on their sales**
(16)  **in the United States of America.**
(17)    **Q.**  But not Canadian sales that you would
(18)  be making?
(19)    **A.  Correct, not in all instances.**
(20)    **Q.**  What were the exceptions to that
(21)  rule?
(22)    **A.  Exceptions to the rule would be if a**
(23)  **licensee would manufacture in the United States**
(24)  **of America, they would sell the product to us**
(25)  **at a discounted rate, and they would pay the**

## Page 37

(2) royalty to -- the sales to us, to Phat
(3) Fashions.
(4)     Q.   And on those products that were just
(5) mentioned in your last answer --
(6)     A.   Yes.
(7)     Q.   -- would Tornado pay any royalties to
(8) Phat Fashions?
(9)     A.   No.
(10)     Q.   Even if those products were covered
(11) by the trademark license agreement?
(12)     A.   I don't believe those products were
(13) covered by the trademark license agreement.
(14)     Q.   Staying with Paragraph 4A.
(15)     A.   Yes.
(16)     Q.   We just talked about the handwritten
(17) change on the percentage?
(18)     A.   Yes.
(19)     Q.   How did the advance change from
(20) $120,000 to 12,000?
(21)     A.   I believe it was always 12,000, it
(22) was an incorrect -- an incorrect amount typed
(23) in there.
(24)     Q.   Would your answer then be the same --
(25) if you turn the page, if you look at all of the

## Page 38

(2) minimum net sales figures, you'll see that they
(3) have all been reduced by 90 percent?
(4)     A.   Correct.
(5)     Q.   Do you know how that came to pass?
(6)     A.   As I said, I really don't recall, but
(7) I would have to say that they're incorrectly
(8) put in and then they were adjusted or corrected
(9) by all parties.
(10)     Q.   Did you have any reason to believe
(11) that these were the standard numbers that Phat
(12) Fashions was charging its other licensees and
(13) their standard agreement?
(14)     A.   I wouldn't know.
(15)     Q.   If you turn to Page 74G.
(16)     A.   Yes.
(17)     Q.   There's a paragraph there about
(18) advertising expenditures that has been crossed
(19) out.
(20)     Do you see that?
(21)     A.   Yes.
(22)     Q.   Do you know how that paragraph came
(23) to be eliminated?
(24)     A.   Yes, this is part and parcel of the
(25) 7 percent negotiation we had. We were going to

## Page 39

(2) pay 7 percent and no 3 percent advertising.
(3)     Q.   Let's turn to Paragraph 17, which
(4) you'll find on Page 22. It is entitled
(5) Modifications Agreement; Previous Agreement.
(6)     If you can just read that to yourself
(7) for a second, please.
(8)     A.   Yes.
(9)     Q.   Do you recall -- do you recall
(10) reading this paragraph before you signed the
(11) trademark license agreement?
(12)     A.   No.
(13)     Q.   Did there come a time when you did
(14) read it after you signed the agreement?
(15)     A.   I don't believe so.
(16)     Q.   Sitting here today, is this the first
(17) time you've ever read that paragraph?
(18)     A.   I don't know. I can't recall reading
(19) it.
(20)     Q.   Do you understand the paragraph
(21) sitting here today, now that you've read it?
(22)     A.   Absolutely.
(23)     Q.   And do you understand that it says
(24) that this agreement can only be extended,
(25) waived or modified by a writing signed by both

## Page 40

(2) parties?
(3)     A.   Yes.
(4)     Q.   And sitting here today, having read
(5) that paragraph, what do you understand that to
(6) mean?
(7)     A.   Exactly that, that both parties have
(8) to sign to change the agreement or whatever.
(9)     Q.   Take a look, if you would, at
(10) Paragraph 18.
(11)     A.   Yes.
(12)     Q.   And there's -- if you go down to the
(13) five lines from the bottom?
(14)     A.   Yes.
(15)     Q.   It says, in any action or proceeding
(16) brought by licensor to enforce any right under
(17) or pursuant to this agreement, licensor shall
(18) be entitled to recover all reasonable costs and
(19) expenses incurred therewith including all legal
(20) fees and disbursements provided that licensor
(21) shall be the prevailing party or that such
(22) action or proceeding is altered from licensee's
(23) default or failure to comply with its
(24) obligations under this agreement.
(25)     Do you have any recollection of

## Page 49

(1)
(2) Q. If Phat Fashion had so desired, would
(3) you agree that it could have allowed someone
(4) else in Canada to sell bags?
(5) A. Yes.
(6) MR. BEHA: Or at least men's bags.
(7) MR. HOFFMAN: At least men's bags.
(8) Q. Plaintiff's Exhibit 3 is a series of
(9) documents, two actually attached to each other.
(10) I'll just ask if you can take a look at them
(11) and identify them.
(12) (Plaintiff's Exhibit 3, Series of
(13) documents, marked for identification.)
(14) A. Okay.
(15) Q. Have you ever seen these documents
(16) before?
(17) A. Yes, I must have seen them because I
(18) signed them.
(19) Q. What is -- you'll see in the second
(20) page, the one that has at the bottom the number
(21) 1113, that letter says, this letter will serve
(22) to confirm -- and just also to further let you
(23) know, when you see numbers at the bottom --
(24) A. Yes.
(25) Q. -- if there's a TOR in front of it,

## Page 50

(1)
(2) that means that Tornado produced it. If
(3) there's a PF, that means that Phat Fashions
(4) produced it.
(5) It says, this letter will serve to
(6) confirm that 3702669 Canada, Inc. has the right
(7) to utilize the Phat Farm name for Visa,
(8) MasterCard and American Express billing
(9) purposes for its retail store.
(10) Do you see that?
(11) A. Yes.
(12) Q. Can you now tell me what that company
(13) was there that we've just mentioned, 3702669
(14) Canada, Inc.?
(15) A. I can't tell you. It's probably our
(16) store in Montreal.
(17) Q. And when you say our store, tell me
(18) about that store, what's the name of it?
(19) A. Phat Farm.
(20) Q. And when did that store start
(21) operations?
(22) A. I believe 2000. I can't give you an
(23) exact date.
(24) Q. Is it still in existence today?
(25) A. Yes.

## Page 51

(1)
(2) Q. Is it still called Phat Farm store?
(3) A. We just changed the name I believe
(4) this month.
(5) Q. And what's the name now?
(6) A. Illicit.
(7) Q. Do you own other stores in addition
(8) to the Montreal store you just mentioned?
(9) MR. BEHA: By you, you mean anywhere
(10) in the group?
(11) Q. Anywhere in the group, and then we'll
(12) get to specifics.
(13) A. Yes, I am involved in some stores we
(14) own -- we own in Toronto and in Montreal.
(15) Q. How many?
(16) A. At this point in time, we have four.
(17) Q. Four counting the Montreal one?
(18) A. Yes.
(19) Q. And are the other three stores also
(20) named Illicit?
(21) A. Yes.
(22) Q. And were they named Illicit prior to
(23) the time you changed the Phat Farm store to
(24) Illicit?
(25) MR. BEHA: In other words, prior to

## Page 52

(1)
(2) the last month or so.
(3) A. Yes.
(4) Q. Do you have a recollection as to why
(5) you were making this request of Phat Farm?
(6) A. Yeah, I would imagine that -- I would
(7) imagine we had to report to them what our sales
(8) were in the store and we needed to -- people
(9) want to pay with credit cards, so we needed
(10) their permission to pay by credit card, I
(11) guess.
(12) MR. BEHA: Just so you're clear, you
(13) started with, I wonder, he's asking you if
(14) you have some information. He's entitled
(15) to all the information that you have,
(16) anything that you remember, but he's not
(17) asking you as you sit here today, can you
(18) think of something.
(19) THE WITNESS: Okay.
(20) MR. BEHA: So if you know anything at
(21) all about it, tell him everything you
(22) know.
(23) A. I don't --
(24) MR. BEHA: If you're just guessing
(25) and he wants your guess, he can ask for it

PHAT FASHIONS, LLC

BSA XMAX(15/15)

ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

---

Page 57

(1)
(2)    A.  Yes.
(3)    Q.  To the best of your knowledge, is
(4) that an accurate recitation of the products
(5) that were being sold by, I guess, Tyfoon
(6) International, Phat Farm at the time that this
(7) was sent to Miss Aarons?
(8)    A.  I believe so, there could be others
(9) as well.
(10)    Q.  Would you agree that many of the
(11) items that are set forth on this list were
(12) among the excluded products in the trademark
(13) license agreement?
(14)    MR. BEHA:  Meaning they're on the
(15)    list on Schedule C?
(16)    MR. HOFFMAN:  Yes.
(17)    MR. BEHA:  Fair.
(18)    MR. HOFFMAN:  We both used "list"
(19)    there.
(20)    Q.  There's two different lists, we have
(21) one list that is attached to Plaintiff's
(22) Exhibit 4 that has a list of product?
(23)    A.  Yes.
(24)    Q.  Then we have another list on
(25) Schedule C saying which products are excluded?

---

Page 58

(1)
(2)    A.  Correct.
(3)    MR. BEHA:  And he's asking you
(4)    whether some of the things in this
(5)    exhibit --
(6)    THE WITNESS:  That are excluded.
(7)    MR. BEHA:  -- would be on the list of
(8)    things excluded back in Exhibit 1.
(9)    A.  Yes, there are.
(10)    Q.  And do you know how it came to be
(11) that Tyfoon was selling those items?
(12)    A.  We had -- we had a very good
(13) relationship with Russell and Ruby, and we
(14) would discuss selling certain product and it
(15) could be orally communicated that we can sell
(16) these products.
(17)    Q.  When you had those oral
(18) communications about selling the excluded
(19) product --
(20)    A.  Yes.
(21)    Q.  -- was there any discussion as to
(22) whether you would be selling those excluded
(23) products exclusively?
(24)    A.  It was always an understanding that
(25) anything we did in Canada was exclusive to us.

---

Page 59

(1)
(2)    Q.  Explain what you mean by that.
(3)    A.  That nobody else would do the product
(4) in Canada except for underwear, which was
(5) excluded, underwear being men's undergarments.
(6)    Q.  Well, even underwear --
(7)    A.  Yes.
(8)    Q.  -- is one of the products listed in
(9) Plaintiff's Exhibit 4, both men's and women's?
(10)    A.  Yes.
(11)    Q.  So were you selling underwear in --
(12)    A.  For a short period of time, we did.
(13) It wasn't our forte and we allowed and agreed
(14) that somebody else could do it.
(15)    Q.  Now, as all of these different
(16) products were now being sold by Tyfoon
(17) International --
(18)    A.  Group.
(19)    Q.  Tyfoon Group, did there come a time
(20) when it was agreed that the minimum guaranteed
(21) sales provided for in the trademark license
(22) agreement would be increased because of all the
(23) additional products that were being sold?
(24)    A.  I don't think we had a discussion,
(25) the minimums never came into consideration

---

Page 60

(1)
(2) until sometime in 2005 when we started
(3) negotiating a continuance.
(4)    Q.  To the best of your knowledge, was
(5) Tyfoon paying Phat Fashions royalties on the
(6) sales of all of the product listed on the
(7) second page of Exhibit 4?
(8)    A.  Yes.
(9)    Q.  I'm going to show you Exhibit 5,
(10) which is the amended answer in this case then.
(11)    (Plaintiff's Exhibit 5, Amended
(12)    Answer marked for identification.)
(13)    Q.  Have you ever seen this document
(14) before?
(15)    A.  I don't recall.  I think so.
(16)    Q.  Do you have a recollection of
(17) approving it before it was filed?
(18)    A.  This document?
(19)    Q.  Yes, sir.
(20)    A.  Yes, this is what we talked about
(21) before we answered.
(22)    Q.  Okay.  And you shouldn't tell me
(23) about any discussions you've had with your
(24) attorneys, but then is it accurate to state
(25) that you read and approved the amended answer

---

Page 61

(1)
(2) before it was filed in this case?
(3)     MR. BEHA:  Understand what he's
(4) asking, he's not asking whether you told
(5) the people the stuff that is in this, he's
(6) asking you when it was all typed up and in
(7) final form or close to final form, you got
(8) it and someone said, do you approve, and
(9) you said yes; is that fair?
(10)     MR. HOFFMAN:  That's exactly fair.
(11)     MR. BEHA:  Okay.
(12)     A.  Yes.
(13)     Q.  Let's keep that in front of you.  If
(14) you turn to Paragraph 28.
(15)     A.  What page is that?
(16)     Q.  It's on Page 8.
(17)     A.  Yes.
(18)     Q.  You'll see there's a statement there,
(19) as an affirmative defense or an additional
(20) defense, that Phat Fashions' claims are barred
(21) because the parties' conduct manifested an
(22) intent to regularly modify the agreement
(23) through oral representations.
(24)     Do you see that?
(25)     A.  Yes.

Page 62

(1)
(2)     Q.  And is that an accurate statement, to
(3) the best of your knowledge?
(4)     A.  Yes.
(5)     Q.  If that's the case, do you know why
(6) the parties were seeking to extend the
(7) agreement with a written amendment, and when I
(8) talk about extending the agreement, I'm talking
(9) about beyond December 31, 2007?
(10)     MR. BEHA:  I have an objection to
(11) form, but again, do your best to answer
(12) the question he asked.
(13)     A.  Can you repeat that question, I
(14) didn't fully comprehend?
(15)     MR. BEHA:  Do you want to read it
(16) back or ask it anew?
(17)     MR. HOFFMAN:  I'll say it again.  I
(18) have no problem with that.
(19)     Q.  Is it your position that the parties
(20) regularly modified the agreement through oral
(21) representations?
(22)     A.  Yes.
(23)     Q.  There also came a time when there
(24) was -- there were discussions about extending
(25) the agreement beyond December 31, 2007,

Page 63

(1)
(2) correct?
(3)     A.  Yes.
(4)     Q.  And in order to do that, the
(5) agreement would have to be amended, correct?
(6)     MR. BEHA:  Objection to form, asking
(7) for a legal opinion.
(8)     A.  I don't know if it would have to be
(9) amended.  I knew we had a relationship and
(10) everything we did was orally, so we had an oral
(11) agreement to continue going forward, and if
(12) there was a document coming later to notarize
(13) that, then that was the document, but I didn't
(14) need a document.  We renegotiated it, we had a
(15) deal.
(16)     Q.  Having looked at the paragraph I
(17) showed you and the trademark license agreement
(18) this morning, Paragraph 17 --
(19)     A.  Yes.
(20)     Q.  -- about modifications having to be
(21) in a writing signed by both parties?
(22)     A.  Yes.
(23)     Q.  Having seen that now?
(24)     A.  Yes.
(25)     Q.  Does that change your belief as to

Page 64

(1)
(2) whether or not there had to be a written
(3) amendment?
(4)     A.  It really doesn't change my belief,
(5) it specifies that there, but we never acted in
(6) that manner.  During the whole course of our
(7) relationship, everything was always orally
(8) done.  I've never looked at this contract since
(9) day one.  You're pointing it out to me now, but
(10) I've never looked at it.  That's the agreement
(11) we had, that's the relationship we had.
(12)     Q.  So were you surprised then when a
(13) written amendment was sent to you in March of
(14) 2006?
(15)     A.  I wasn't surprised.  If Phat Fashions
(16) wants to document the terms of an ongoing -- on
(17) an ongoing basis of our deal, sobeit.  I didn't
(18) need it.  If they felt they needed it, that's
(19) fine.
(20)     Q.  When we looked at the trademark
(21) license agreement before, and I think we agreed
(22) that there were no -- the contract did not run
(23) beyond December 31st of 2007; would you agree
(24) with that?
(25)     A.  That particular contract, yes.

## Page 65

(1)
(2)    **Q.** And is it your position that you
(3) didn't need anything in writing for this
(4) agreement to go beyond that date?
(5)    **A. I can't really answer that. Say that**
(6) **again, repeat it.**
(7)    **Q.** Sure. Was it your position that you
(8) didn't need anything in writing in order to
(9) extend this contract beyond the December 31,
(10) 2007 date?
(11)    **A. No, I think we needed to extend it.**
(12)    **Q.** Do you think you needed a writing to
(13) extend it?
(14)    **A. Yes.**
(15)    **Q.** Why?
(16)    **A. Because it was clear that the end of**
(17) **the contract was 2010.**
(18)    **Q.** You needed the writing to make clear
(19) that the end of the contract was 2010 or you
(20) needed a writing because it was pitted that the
(21) contract ended in 2007?
(22)    **A. Excuse me, 2007, I meant 2007.**
(23)    **Q.** And now going back --
(24)    **A. Yes.**
(25)    **Q.** -- it is your position, I believe,

## Page 66

(1)
(2) that this agreement, the trademark license
(3) agreement, has been orally amended from time to
(4) time since it was entered into in 1998?
(5)    **A. Orally amended meaning what?**
(6)    **Q.** That the -- well, I'm actually using
(7) language from your answer.
(8)    **MR. BEHA:** You're using language from
(9) the lawyer's answer, not the client's.
(10)    **Q.** Well, it's an answer --
(11)    **MR. BEHA:** Between you and I, it's
(12) lawyer words. The client can tell you in
(13) the client's words what he understands the
(14) situation to be, but we are not going to
(15) start asking him about res ipsa loc or
(16) anything like that, it's not there but...
(17)    **MR. HOFFMAN:** If it was, we might,
(18) but we won't.
(19)    **Q.** How do you believe the terms of the
(20) trademark license agreement have been changed
(21) between the time you entered into it over the
(22) course of its life?
(23)    **A. Well, we would be doing additional**
(24) **product lines that were not in the contract, we**
(25) **didn't adhere to the contract. We orally**

## Page 67

(1)
(2) **changed certain things, we did other product**
(3) **lines that were excluded from the contract,**
(4) **with, of course, oral permission and with, of**
(5) **course, the knowledge of Phat Fashions. And I**
(6) **don't believe Phat Fashions or ourselves looked**
(7) **at the contract ever. We just continued on an**
(8) **oral and good relationship.**
(9)    **Q.** Would you agree that the contract was
(10) between Tornado and Phat Fashions, LLC?
(11)    **A. Yes.**
(12)    **Q.** If Vis-a-Vis --
(13)    **A. Yes.**
(14)    **Q.** -- were selling product?
(15)    **A. Yes.**
(16)    **Q.** Was it your understanding that those
(17) products were even covered by the trademark
(18) license agreement?
(19)    **A. Absolutely, verbally, they were**
(20) **covered.**
(21)    **Q.** But how did Vis-a-Vis become a party
(22) to the agreement?
(23)    **A. I believe that we put ladies'**
(24) **category merchandise into Vis-a-Vis, and when**
(25) **we discussed how we were going to handle it,**

## Page 68

(1)
(2) **everything was fine with Phat Fashions.**
(3)    **Q.** I'm asking a slightly different
(4) question. If, for example, the trademark
(5) license agreement had never existed --
(6)    **A. Uh-huh.**
(7)    **Q.** -- and Vis-a-Vis -- the principals of
(8) Vis-a-Vis went to Phat Fashions and said, we'd
(9) like to sell Baby Phat Clothing --
(10)    **A. Okay.**
(11)    **Q.** -- and they said, sure, you can sell
(12) it, and you'll pay us a royalty.
(13)    **A. Yes.**
(14)    **Q.** Are you with me so far?
(15)    **A. Yes.**
(16)    **Q.** That agreement -- would you agree
(17) that that will be an agreement between Phat
(18) Fashions and Vis-a-Vis?
(19)    **A. No, I would agree it would be part of**
(20) **this agreement. There was no Baby Phat when**
(21) **this agreement was signed. We all understood**
(22) **that. And when we had an oral discussion, it**
(23) **became the same part of this agreement, whether**
(24) **it's Vis-a-Vis or Tornado, it was**
(25) **insignificant. It was all part of the Tyfoon**

Page 69

(1)
(2) Group, in fact, and, you know, it doesn't
(3) really matter, it's the same people, the same
(4) everything, Tornado, Vis-a-Vis, it was just for
(5) our own purposes, we put it in a corporation
(6) column Vis-a-Vis.
(7)     Q.   But you'd agree that Vis-a-Vis is not
(8) a party to the trademark license agreement?
(9)     MR. BEHA:  Objection to form. You
(10)     structured it as a legal question.  Do you
(11)     mean they signed or something else?
(12)    Q.   Can you answer the question as --
(13)    MR. BEHA:  Answer again.  I make
(14)     these things for the record.  You give him
(15)     the best answer you can.
(16)    A.   Repeat it again.  Is it part of this
(17) particular contract Vis-a-Vis?
(18)    Q.   Yes, sir.
(19)    A.   Vis-a-Vis is not mentioned in this
(20) contract.
(21)    Q.   And Vis-a-Vis was in existence in
(22) 1997 when this contract was drawn up, correct?
(23)    A.   I don't recall.
(24)    Q.   But if you recall, we said the name
(25) of the company was Vis-a-Vis 1997, Inc.?

Page 70

(1)
(2)    A.   Yes, yes, okay.
(3)    Q.   So they would have been in existence
(4) at that time?
(5)    A.   Yes.
(6)    Q.   In the answer --
(7)    A.   Yes.
(8)    Q.   -- the language that is used
(9) sometimes talks about oral modifications and
(10) sometimes talks about oral amendments.
(11)       Do you have any understanding as to
(12) whether there is a difference between an oral
(13) modification and an oral amendment?
(14)    A.   No, I don't.
(15)    Q.   To the best of your knowledge, were
(16) any of these oral modifications that we've been
(17) talking about or that you've been talking about
(18) earlier today, were any of them ever confirmed
(19) in writing?
(20)    A.   I don't recall.
(21)    Q.   Do you have any specific recollection
(22) of any of the conversations that took place
(23) between you on the one side and anyone from
(24) Phat Fashions on the other as to any of these
(25) different product lines that were excluded from

Page 71

(1)
(2) the trademark license agreement now being sold
(3) by the Tyfoon Group?
(4)    A.   Yes, of course.
(5)    Q.   Tell me what you recall.
(6)    A.   I recall having discussions
(7) concerning a lot of the Baby Phat product, I
(8) recall having discussions concerning luggage
(9) bags, I recall having discussions concerning
(10) footwear, concerning outerwear, concerning
(11) lingerie, a lot of the product lines that were,
(12) I believe, excluded from our contract.
(13)    Q.   But taking a look at Schedule C.
(14)    A.   Yes.
(15)    Q.   For instance, is footwear excluded
(16) under Schedule C?
(17)    A.   No, it's not.
(18)    Q.   And are Baby Phat products excluded?
(19)    A.   Well, it says all Phat Farm products
(20) excluding.
(21)    Q.   Did you consider Baby Phat
(22) products --
(23)    A.   Yes.
(24)    Q.   -- to be Phat Farm products?
(25)    A.   Yes.

Page 72

(1)
(2)    Q.   So since there was nothing excluding
(3) Baby Phat products under Schedule C --
(4)    A.   Yeah.
(5)    Q.   -- was there any reason why you
(6) couldn't sell them?
(7)    A.   Well, I couldn't sell lingerie here,
(8) I couldn't sell luggage here, I couldn't sell
(9) fragrance, we did fragrance as well.  I
(10) couldn't sell cosmetic bags and beauty aids, we
(11) did those as well.  I couldn't sell outerwear.
(12) We did that as well.  I couldn't sell
(13) backpacks, we did that as well, bags, I mean,
(14) 60 percent of the products that were excluded
(15) we did.
(16)    Q.   Let me ask you, Mr. Wiseman --
(17)    A.   Yes, sir.
(18)    Q.   Schedule C, these are the products,
(19) right, Schedule C, those are the products that
(20) you didn't have?
(21)    A.   In the contract.
(22)    Q.   An exclusive on, correct?
(23)    A.   Yes.
(24)    Q.   In the contract?
(25)    A.   Yes.

## Page 81

(1)
(2)   it in Canada?
(3)      A.  Yes.
(4)      Q.  And you paid commissions or royalties
(5)   to the licensee and you paid royalties to Phat
(6)   Fashions?
(7)      A.  Correct.
(8)      Q.  BP Products?
(9)      A.  Yes.
(10)     Q.  BP Clothing?
(11)     A.  Yes.
(12)     Q.  Was one of those licensees, correct?
(13)     A.  Yes, but as I expressed to you
(14)  before, this was one of the different ones.  We
(15)  would be paying them a discounted price after
(16)  U.S. manufactured merchandise, and they would
(17)  be paying the royalty to Phat Fashions for
(18)  sales to us.
(19)     Q.  And sales that you made, you being
(20)  the Tyfoon Group, just to use the -- would you
(21)  be making royalty payments to Phat Fashions on
(22)  those sales?
(23)     A.  No.
(24)     Q.  And BP Clothing, you said, was
(25)  ladies' sportswear?

## Page 82

(1)
(2)      A.  Yes, ladies' sportswear.
(3)      Q.  Do you recall what the royalties or
(4)   commissions were that you were paying to BP
(5)   Clothing?
(6)         MR. BEHA:  Objection to form,
(7)      mischaracterizes what he said about it,
(8)      but go ahead, tell him what the deal was.
(9)      A.  The deal was they would give me a
(10)  discounted price from the U.S. wholesale,
(11)  25 percent off, and we -- and they would be
(12)  paying the royalty to Phat Fashions.
(13)        In the other instances where we
(14)  worked with other licensees, we would be
(15)  purchasing the merchandise from overseas at
(16)  first cost.  So when the merchandise landed in
(17)  Canada, just like the merchandise landed in the
(18)  U.S.A, we would be at a similar cost factor,
(19)  we'd be able to work on higher margins, in this
(20)  particular instance, Baby Phat would give us a
(21)  discount, he was making a profit on sales to
(22)  us, so it was clear that they would be paying
(23)  the royalties to Phat Fashions.
(24)     Q.  Sitting here today, do you have any
(25)  recollection of ever paying royalties to Phat

## Page 83

(1)
(2)   Fashions on your sales of BP Clothing items?
(3)      A.  Yes.
(4)      Q.  When did that happen?
(5)      A.  There was other merchandise that we
(6)   were able to purchase at FOB from the Far East.
(7)   On that merchandise, we paid a royalty to Phat
(8)   Fashions and another commission to Baby Phat
(9)   Clothing.
(10)     Q.  So you'd be paying a royalty to Phat
(11)  Fashions when you purchased the materials from
(12)  overseas?
(13)     A.  No, we'd be paying a royalty to Phat
(14)  Fashions on our sales, wholesale sales in
(15)  Canada.
(16)     Q.  Of items purchased from overseas?
(17)     A.  Yes.
(18)     A.  That's what I meant.
(19)     A.  Yes.
(20)     Q.  What's the current --
(21)        MR. HOFFMAN:  By the way, it's 11:15.
(22)        MR. BEHA:  It would be a good time to
(23)     take a break.
(24)        (Short recess taken.)
(25)     Q.  I think when we took our break, we

## Page 84

(1)
(2)   were talking about BP Clothing in general.
(3)   What is the current status of your relationship
(4)   with BP Clothing?
(5)      A.  We have no relationship currently.
(6)      Q.  Was there a litigation with BP
(7)   Clothing?
(8)      A.  Yes.
(9)      Q.  And what happened in that litigation?
(10)     A.  In my own words?
(11)     Q.  In your own words.
(12)     A.  I'll give you what transpired up to
(13)  the time we terminated.
(14)     Q.  Sure.
(15)     A.  We were doing the line in Canada
(16)  exclusively, and BP Clothing felt that they
(17)  could do better on their own, and they decided
(18)  that they would pursue doing it on their own in
(19)  Canada.  Being together for five, six years, we
(20)  had felt that we -- we, as I speak, I'm
(21)  speaking for our company, felt that we should
(22)  have gotten some kind of a couple of seasons'
(23)  notice so that we could do, you know, take the
(24)  proper measures, and they felt that they just
(25)  wanted to go into it immediately after this

PHAT FASHIONS, LLC

BSA XMAX(22/22)
ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

Page 85

(1)
(2) season's delivery. We told them that was
(3) unfair, we got into an altercation, and we
(4) settled the matter. And we didn't continue
(5) after that. They're doing it on their own in
(6) Canada at present.
(7)     Q. Was Phat Fashions involved at all in
(8) that altercation?
(9)     A. They were aware of it, yes.
(10)    Q. But you mentioned that you reached a
(11) settlement, I believe, with BP Clothing?
(12)    A. Yes.
(13)    Q. Was Phat Fashions a party to that
(14) settlement?
(15)    MR. BEHA: Do you mean in some legal
(16) document sense or something else, just
(17) whichever you want but:..
(18)    Q. In a general sense, and then I think
(19) in a legal document sense, we know that there
(20) was no legal document?
(21)    A. Correct.
(22)    MR. BEHA: Sorry, for the settlement,
(23) there was a legal document for the
(24) settlement.
(25)    MR. HOFFMAN: There was a legal

Page 86

(1)
(2) document but not with Phat Fashions.
(3)    MR. BEHA: Agreed, absolutely, right.
(4)    Q. So how, if at all, was Phat Fashions
(5) a party to any settlement that was reached
(6) between PB Clothing?
(7)    A. I was always advising Phat Fashions
(8) of what we were doing at all times because, you
(9) know, we had a very good relationship and they
(10) were a very important part of our business, so
(11) it was, you know, my fiduciary responsibility
(12) to keep them aware of what's going on, even to
(13) the point when I told them, look, this is
(14) what's happening and I'm going to go after them
(15) legally.
(16)    And this was with Bernt Ullmann, and
(17) I told Bernt, I'm going after them legally, and
(18) they said, you gotta do what you gotta do. To
(19) me, that was, you know, if Phat Fashions would
(20) have directed me in another direction, we would
(21) have had some dialogue about it or whatever,
(22) because I never wanted to be off side with them
(23) truthfully because they were such an important
(24) part of our business, but when he said do what
(25) you gotta do, I took legal measures to, you

Page 87

(1)
(2) know, to go into litigation with them, and we
(3) did.
(4)    And that was the only thing that they
(5) were party to except at the time when we did
(6) settle the matter, Bernt had told me, he said,
(7) you know, Issie, it's not doing you a lot of
(8) good, Steve Feiner, the president of Baby Phat
(9) Clothing --
(10)    Q. BP Clothing?
(11)    A. BP Clothing, not doing a lot of good,
(12) him saying these things about you, you know,
(13) and all that kind of stuff, and as a friend,
(14) you know, I had a very nice relationship with
(15) Bernt Ullmann, and he told me, you know, it's
(16) not so good that he's going around saying
(17) things, so I instituted a relatively quick
(18) settlement, you know, where if I would have
(19) held out, I think we could have gotten a lot
(20) more, but I figured let's settle the matter.
(21)    Q. The litigation that was started, that
(22) was litigation that was actually commenced in
(23) federal court by BP Clothing against Modes
(24) Vis-a-Vis?
(25)    A. To me, I don't know particulars about

Page 88

(1)
(2) federal court and document. We sent them a
(3) letter and told them that he's off base, my
(4) lawyer. When you say legally, I'm not that
(5) cognizant, I went to my attorney and I said,
(6) here's what transpired, send them a letter that
(7) we are going to hold them responsible. So if
(8) you talk about instituting legal action, I
(9) think we instituted legal action. They
(10) subsequently, I believe, went to federal court,
(11) but we instituted the action.
(12)    Q. Okay. I think it's just a matter --
(13)    MR. BEHA: Off the record.
(14)    (Discussion held off the record.)
(15)    Q. Just in terms of semantics, so we are
(16) clear, the legal action that you're discussing
(17) is the sending of some type of legal letter
(18) setting forth your objections to what was
(19) happening, et cetera?
(20)    A. Correct.
(21)    Q. When we talk about a litigation, what
(22) I'm talking about is an actual formal
(23) proceeding commenced in a court.
(24)    A. Okay.
(25)    Q. And I think in your answer, you

## Page 89

(1)
(2) indicated that you started the legal action
(3) first, as you understood it, and then there was
(4) a lawsuit later; is that fair?
(5)    A. Yes.
(6)    Q. Let me show you Plaintiff's
(7) Exhibit 6, which is a December 11, 2000 letter
(8) from Richard Slomovitz to you.
(9)       (Plaintiff's Exhibit 6, Letter from
(10)    Mr. Slomovitz dated 12/11/00, marked for
(11)    identification.)
(12)    A. Okay.
(13)    Q. Have you seen this document before?
(14)    A. I don't recall.
(15)    Q. Do you know who Richard Slomovitz
(16) was?
(17)    A. Yes.
(18)    Q. Who was he?
(19)    A. He was the chief financial officer of
(20) Phat Fashions.
(21)    Q. Had you dealt with him prior to this
(22) letter?
(23)    A. I believe we did, yes.
(24)    Q. Any recollection of what those
(25) dealings might have been?

## Page 90

(1)
(2)    A. Yes, every time we policed our
(3) territory, for instance, and there was
(4) imitation Phat Farm product in the country, we
(5) would deal with him and tell them, look, we
(6) have attorneys on file and we are going to have
(7) to spend this much and collecting that much,
(8) and we talked about financial matters with him
(9) in that respect, but everything else, our CFO,
(10) Barry Segal, usually dealt with Richard.
(11)    Q. Plaintiff's Exhibit 8 -- sorry, 7 is
(12) a March 20, 2001 letter from you to
(13) Mr. Slomovitz, and there are two copies of this
(14) letter in the various forms it was produced to
(15) us behind it.
(16)       (Plaintiff's Exhibit 7, Letter from
(17)    Mr. Wiseman dated 3/20/01, marked for
(18)    identification.)
(19)    Q. I'm just going to ask you if you can
(20) take a look at that and tell me what it is?
(21)    A. This is the letter to renew our
(22) option year, our option to our contract.
(23)    Q. Do you know who drafted this
(24) document?
(25)    A. I believe Barry Segal would have done

## Page 91

(1)
(2) that in our organization.
(3)    Q. Is Barry Segal an attorney?
(4)    A. No, he's a chartered accountant, a
(5) CA, so maybe -- I don't know, maybe perhaps our
(6) attorney drafted the document, perhaps. I
(7) don't know, it doesn't say here.
(8)    Q. Why did you send this letter to Rick
(9) Slomovitz?
(10)    A. Because we wanted to continue our
(11) relationship based on the contract.
(12)    Q. Was there any reason why you couldn't
(13) exercise the option orally?
(14)    A. To me, no, we could have exercised it
(15) orally, I suppose the people who document
(16) things don't have to have it documented, I
(17) could have continued orally, I was very happy
(18) to continue orally.
(19)    Q. But did you send this on your own or
(20) did somebody tell you that you had to send this
(21) letter?
(22)    MR. BEHA: Objection to form,
(23)    incomplete alternatives.
(24)    Q. You can answer if you can understand
(25) it.

## Page 92

(1)
(2)    MR. BEHA: Or if you can understand
(3) my objection too, the question is, why did
(4) you send the letter, it isn't a choice
(5) between two incomplete alternatives.
(6)    MR. HOFFMAN: Right.
(7)    A. I was -- I guess my CFO came to me
(8) and said, listen, we have to send this letter
(9) for the option year, and I would have imagined
(10) that I said, okay, let's go.
(11)    Q. And did you know why Neil Goldstein
(12) is copied on this letter?
(13)    A. No.
(14)    Q. Do you have a recollection of
(15) actually exercising the option on or about the
(16) date of this letter, March 20th of 2001?
(17)    A. Not really.
(18)    Q. Do you have a recollection that you
(19) didn't send in the written exercise and that
(20) somebody contact you -- contacted you and said
(21) you needed to do that?
(22)    A. No.
(23)    Q. You can hold that in front of you for
(24) just a second. Let me show you what we've
(25) marked as Plaintiff's Exhibit 8.

Page 93

(1)
(2)     (Plaintiff's Exhibit 8, Federal
(3)     Express receipts, marked for
(4)     identification.)
(5)     Q.   These appear to be Federal Express
(6)  receipts, but I'll ask you, can you identify
(7)  these?
(8)     MR. BEHA:  I think this is one of
(9)     those instances where you better tell him
(10)    what you mean by identify because he can
(11)    certainly tell you what the piece of paper
(12)    looks like and he may be able to tell you
(13)    who certain people are, but if you mean do
(14)    you know something about this, that would
(15)    be kind of different.
(16)    Q.   Well, let me direct your attention to
(17) these documents.  If you look on page -- the
(18) second page, 1019.
(19)    A.   Yes, sir.
(20)    Q.   You'll see there that it is a FedEx
(21) receipt going to Rick Slomovitz.
(22)    A.   Yeah.
(23)    Q.   All right.  And do you see the date
(24) on that that it was mailed, April 11, 2001, up
(25) in the top left-hand corner?

Page 94

(1)
(2)     A.   Yes.
(3)     Q.   And then when you turn two more pages
(4)  in, there's an indication that the document is
(5)  being sent to Neil Goldstein also on April 11,
(6)  2001.
(7)     Do you see that?
(8)     A.   Yes.
(9)     Q.   Looking at this document, do you have
(10) any idea what it was that Tyfoon was sending to
(11) Slomovitz and Goldstein on April 11 of 2001?
(12)    MR. BEHA:  Can we go off the record a
(13)    second.
(14)    (Discussion held off the record.)
(15)    A.   You want me to surmise what I think
(16) this is?
(17)    Q.   Yes.
(18)    A.   I would have to say this is proof
(19) that this letter went to them at a certain
(20) date.
(21)    MR. BEHA:  And this letter, because
(22)    you have to use the lingo.
(23)    A.   Sorry, T O -- Exhibit 7 went on the
(24) particular date mentioned here, because Evelyn
(25) is our -- works for us in our shipping area,

Page 95

(1)
(2)  and she would be the one that would handle all
(3)  FedEx shipments.
(4)     Q.   And the date on Exhibit 8 shows that
(5)  the document, whatever was being sent, was
(6)  being sent on April 11th?
(7)     A.   Correct.
(8)     Q.   And the letter is dated March 20?
(9)     A.   Okay.
(10)    Q.   And my only question is:  Having
(11) looked at these two documents now, 7 and 8,
(12) does that help refresh your recollection as to
(13) why Exhibit 7 might have been sent out 21 days
(14) after it was actually dated?
(15)    A.   No.
(16)    Q.   Do you know why Tornado maintained
(17) copies of the Federal Express receipts going
(18) back to 2001?
(19)    A.   Absolutely not.
(20)    Q.   Is that something that's customarily
(21) done?
(22)    A.   I don't know.  That's all office
(23) stuff, that's all stuff that Barry Segal and
(24) all our interior -- I'm the outside guy, I
(25) mean, you know...

Page 96

(1)
(2)     Q.   You're just --
(3)     A.   I'm the businessman.  You know, and
(4)  when it comes to business decisions, I'm
(5)  involved, when it comes to putting a paper away
(6)  for a certain amount of years, I really have no
(7)  recollection of any of that.
(8)     Q.   That will save us some questions
(9)  later on.
(10)    A.   Thank you.
(11)    Q.   Plaintiff's Exhibit 9 is -- the top
(12) sheet is a memo from Mimi Reisner to Barry
(13) Segal dated June 11th of 2001.
(14)    (Plaintiff's Exhibit 9, Memo dated
(15)    6/11/01, marked for identification.)
(16)    Q.   You can take a look at these
(17) documents and let me know if they're familiar
(18) to you.
(19)    A.   I've never heard of Mimi Reisner.
(20)    Q.   Have you ever heard of a company
(21) called West End Capital?
(22)    A.   West End Capital?
(23)    Q.   Yes, sir.
(24)    A.   No.
(25)    Q.   If you just turn the pages, you'll

Page 109

(1)
(2)       3/10/04, marked for identification.)
(3)       Q.   Have you ever seen this document
(4)   before?
(5)       MR. BEHA:  Specifically unsigned?
(6)       Q.   Unsigned.
(7)       A.   I don't recall.
(8)       Q.   Plaintiff's Exhibit 14 will be two
(9)   copies of a March 10, 2004 letter which is
(10)  signed.
(11)      (Plaintiff's Exhibit 14, Letter dated
(12)      3/10/04, marked for identification.)
(13)      Q.   Have you seen this one before?
(14)      A.   If I signed it, I believe I saw it.
(15)  Whether I digested it at the time, the way we
(16)  work, Counselor, was Barry would tell me this
(17)  is the renewal for the thing, you have to sign
(18)  here, and I'd sign here, and that's the way we
(19)  did business.
(20)      Q.   Was there any reason why the option
(21)  wasn't exercised orally?
(22)      A.   As far as I'm concerned, it could
(23)  have been exercised orally.  As far as perhaps
(24)  Barry is concerned, he wanted to get it signed.
(25)      Q.   Do you have any recollection of ever

Page 110

(1)
(2)   having a conversation with Barry Segal where
(3)   you said to him in words or substance, why do
(4)   we have to do this, sign this document?
(5)       MR. BEHA:  You're speaking about any
(6)       document or one of the option letters?
(7)       MR. HOFFMAN:  One of the option
(8)       letters.
(9)       A.   No.
(10)      Q.   Plaintiff's Exhibit 15.
(11)      (Plaintiff's Exhibit 15, Federal
(12)      Express receipts, marked for
(13)      identification.)
(14)      Q.   Appears to be Federal Express
(15)  receipts?
(16)      A.   Yes, sir.
(17)      Q.   Have you ever seen these before?
(18)      A.   No, I don't think so.
(19)      MR. HOFFMAN:  Off the record.
(20)      (Discussion held off the record.)
(21)      Q.   Exhibit 16.
(22)      (Plaintiff's Exhibit 16, Two copies
(23)      of an E-mail dated 3/11/04, marked for
(24)      identification.)
(25)      Q.   Is two copies of a March 11, 2004

Page 111

(1)
(2)   E-mail?
(3)       A.   Yes.
(4)       Q.   Have you ever seen this E-mail before
(5)   from Rich Slomovitz to Barry Segal?
(6)       A.   I don't believe so.
(7)       Q.   Do you have any recollection of Barry
(8)   Segal asking Slomovitz for confirmation that he
(9)   had actually received the option exercise?
(10)      A.   No, sir.
(11)      Q.   Plaintiff's Exhibit 17 is an
(12)  August 25, 2004 fax with an attachment to it.
(13)  The attachment is some handwritten notes on a
(14)  page.
(15)      (Plaintiff's Exhibit 17, Fax dated
(16)      8/25/04, marked for identification.)
(17)      Q.   Have you ever seen this document
(18)  before?
(19)      A.   I don't believe so.
(20)      Q.   Do you know who TJ Johnson was?
(21)      A.   I don't recall.
(22)      Q.   Do you know what relationship, if
(23)  any, Vis-a-Vis Fashion had with Sun Trust?
(24)      A.   I don't recall.
(25)      Q.   Do any of the Tyfoon entities, to the

Page 112

(1)
(2)   best of your knowledge, have any relationship
(3)   with Sun Trust?
(4)       A.   I can't answer that.  I really don't
(5)   know.
(6)       Q.   Do you have any recollection of ever
(7)   causing Vis-a-Vis financial statements back in
(8)   2004 or so to be sent out to any entity?
(9)       A.   No, but it says 1997 there -- oh,
(10)  that's Vis-a-Vis 1997.
(11)      Q.   It's Vis-a-Vis 1997, but the document
(12)  itself is dated August 25, 2004.
(13)      A.   This could be a document -- I
(14)  don't -- Johnson maybe rings a bell, that went
(15)  out to Baby Phat Clothing, that could be a
(16)  document that went out to Baby Phat Clothing at
(17)  that time, I believe, because Johnson rings a
(18)  bell.  I believe it has to do with when Arnie
(19)  Simon owned the company.  I think this lady
(20)  Mrs. Johnson worked for Arnie Simon in Baby
(21)  Phat Clothing, I'm not sure.
(22)      Q.   Was Sun Trust -- you don't know what
(23)  Sun Trust was?
(24)      A.   No.
(25)      Q.   Let me show you -- keep that one in

Page 117

(2) Q. And if you look at the documents that
(3) follow, 358, 359, 360, 361, 362 and 363, do
(4) those appear to be examples of invoices
(5) received from Baby Phat?
(6) A. Yes.
(7) Q. And then in B he says, copy of
(8) agreement between Baby Phat and Vis-a-Vis?
(9) A. Okay.
(10) Q. And we have a document there that's
(11) dated April 4, 2005?
(12) A. Yes.
(13) Q. Is that the contract between Baby
(14) Phat and Vis-a-Vis, as far as you understand?
(15) A. This is not a contract, this is a
(16) letter, and it states that they're going to
(17) give us 30 percent off of their wholesale price
(18) as a discount instead of 25 percent off.
(19) Q. So if this was described as a copy of
(20) the agreement between Baby Phat and Vis-a-Vis
(21) by Barry, would you say that would be
(22) incorrect?
(23) A. If you call this an agreement.
(24) Q. If Barry called this an agreement?
(25) A. If he calls it an agreement, it's an

Page 118

(2) agreement, it's agreed to, that I remember
(3) negotiating the further discount because we
(4) weren't working on any reasonable margins and
(5) we wanted to lower the price of the garments.
(6) Q. Plaintiff's Exhibit 21 is an
(7) October 17, 2005 E-mail. Just take a look at
(8) that. See if you're familiar with it.
(9) (Plaintiff's Exhibit 21, E-mail dated
(10) 10/17/05, marked for identification.)
(11) A. Okay.
(12) Q. Were you concerned about the
(13) counterfeiting situation in Canada with respect
(14) to Baby Phat or Phat Farm?
(15) A. Yes.
(16) Q. And was that why you and Josh sent an
(17) E-mail to Bernt Ullmann?
(18) A. Yes.
(19) Q. Was Bernt Ullmann generally
(20) accessible to you via E-mail?
(21) A. Yes.
(22) Q. And if you had a problem, you would
(23) be able to communicate with him via E-mail and
(24) he would respond?
(25) A. Yes, via E-mail, via telephone.

Page 119

(2) MR. BEHA: This is no doubt
(3) unimportant, but I think the way you were
(4) characterizing this was that it included
(5) E-mails from the witness to Ullmann.
(6) MR. HOFFMAN: It does.
(7) MR. BEHA: Just, again, I'm sorry if
(8) I'm having a problem with it, which is the
(9) E-mail from the witness?
(10) MR. HOFFMAN: If you look at the last
(11) page, it's signed by Issie and Josh.
(12) MR. BEHA: But the E-mail is from
(13) Josh, correct?
(14) MR. HOFFMAN: The E-mail was sent by
(15) Josh.
(16) MR. BEHA: Yes, I got you. A letter
(17) was sent under their joint name, yes,
(18) okay, fine.
(19) MR. HOFFMAN: Right.
(20) Q. Plaintiff's Exhibit 22, this is the
(21) preconference letter that was sent to Judge
(22) Crotty by the parties in this case. I'm going
(23) to direct your attention to the fourth page,
(24) and starting at the bottom of the fourth page
(25) and running through the fifth page and then two

Page 120

(2) full paragraphs onto the sixth page, there's a
(3) description of the case which was written by
(4) Tornado's attorney.
(5) (Plaintiff's Exhibit 22,
(6) Preconference letter, marked for
(7) identification.)
(8) Q. Did you read this document -- were
(9) you given the opportunity to read this document
(10) before it was filed with the court?
(11) A. I believe so.
(12) Q. Did you approve of it being filed
(13) with the court, and when I say "it," once
(14) again, I'm only referring to the description by
(15) Defendant Tornado?
(16) MR. BEHA: He showed you the
(17) counterclaim before, this is the letter
(18) that Adam -- that Mr. Hoffman wrote to the
(19) judge, and in the section of the letter --
(20) and the way the judge's procedures worked,
(21) Adam got to write part of the letter
(22) putting in -- to say what your side's
(23) contentions were, and he wants to know
(24) whether you actually read in advance the
(25) part of this that's in here.

PHAT FASHIONS, LLC

BSA XMAX(31/31)
ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

## Page 121

(1)
(2)     THE WITNESS:  Yes, the part that's
(3)  the description by Defendant.
(4)     MR. BEHA:  Your contentions and
(5)  whether you did something to indicate
(6)  approval?
(7)     THE WITNESS:  Yes.
(8)     MR. BEHA:  Right.
(9)     Q.  And you did?
(10)    A.  Yes.
(11)    Q.  If there was anything that was
(12)  inaccurate time, would you have told your
(13)  attorney about it?
(14)    A.  I believe so.
(15)    Q.  Do you have any recollection of
(16)  indicating that there were any inaccuracies in
(17)  the letter?
(18)    A.  I have no recollection, I have to
(19)  read it again because --
(20)    MR. BEHA:  He's not asking you that,
(21)  he's asking you whether -- do you remember
(22)  telling Adam or whoever there's something
(23)  wrong.
(24)    A.  No, I don't.
(25)    Q.  When is the first time prior to

## Page 122

(1)
(2)  March 1st of 2006 that you had any discussions
(3)  with anyone from Phat Fashions about extending
(4)  the trademark license agreement beyond
(5)  December 31st of 2007 that you recall?
(6)    A.  I recall mid 2005 discussing it with
(7)  Bernt Ullmann.
(8)    Q.  And where did those discussions take
(9)  place, in what form, were they in person?
(10)    A.  Telephone.
(11)    Q.  Telephone?
(12)    A.  Yeah.
(13)    Q.  Then when you say mid 2005?
(14)    A.  August 2005.
(15)    Q.  And what do you recall?
(16)    A.  September 2005.  I recall there was
(17)  an incident that precipitated me speaking to
(18)  Bernt about an ongoing relationship.
(19)    Q.  And what was the answer?
(20)    A.  There was a European license called
(21)  Unioncon who had somehow sold some Phat Farm
(22)  footwear into Canada.  We found the footwear at
(23)  a retailer that we did not sell.  We looked
(24)  into the matter and found out that it was the
(25)  European guys' shoes, we complained because we

## Page 123

(1)
(2)  had the exclusive rights on footwear.  We
(3)  complained to Bernt.  Bernt looked into the
(4)  matter and indeed found out that it was their
(5)  footwear and they sold it through a third
(6)  party.
(7)     We wanted to be compensated for it
(8)  because it impacted our business, and we felt
(9)  it wasn't fair, we are not selling footwear
(10)  into Europe for them to sell footwear into
(11)  Canada.  Bernt agreed and tried to settle the
(12)  matter by a monetary amount.  The European guy
(13)  refused, and it dawned on me, I guess, at that
(14)  time, I believe something transpired, and I
(15)  said, you know what, Bernt, instead of -- he
(16)  was caught between -- I felt Bernt was caught
(17)  between a rock and a hard spot.  I was going to
(18)  Bernt telling them how upset I was with these
(19)  people, these people were -- he was copying me
(20)  on the faxes from them, I was copying him on
(21)  the -- excuse me, the E-mails from us, we
(22)  were -- I believe we settled the matter by
(23)  saying at the end -- I'm giving you the quick
(24)  rendition.
(25)     At the end we said, listen, Bernt, I

## Page 124

(1)
(2)  am not going to go after them, I'm not going to
(3)  go after you, let's continue the relationship
(4)  for another two terms through 20 -- for another
(5)  six years, and I'll make up the money that I
(6)  lost from these guys by making the profits in
(7)  the following two terms.
(8)    Q.  That's what you said to him?
(9)    A.  Yup, and great, wonderful, it's a
(10)  beautiful thing, and that's what transpired.
(11)  That's why before that date March 2006, that's
(12)  when that whole thing -- the ongoing entity was
(13)  started.
(14)    Q.  When you first found out about the
(15)  situation with the European licensee?
(16)    A.  Yes.
(17)    Q.  And you said you wanted to be
(18)  compensated?
(19)    A.  Yes.
(20)    Q.  Whom did you expect to be compensated
(21)  by?
(22)    A.  I have the license from Phat
(23)  Fashions, not my business who compensates me,
(24)  it's either the European guy, Phat Fashions,
(25)  but they have to compensate me, that's

## Page 125

(1)

(2) business. You can't come into my territory and

(3) sell to where I have the exclusive rights, so

(4) it didn't matter to me who compensated me, I

(5) felt that we should be compensated.

(6)    Q.   But if you were going to sue

(7) somebody --

(8)    A.   Yeah.

(9)    Q.   Let's say it couldn't be resolved,

(10) whom would you sue?

(11)    A.   I don't know. I would have to look

(12) into -- I'd have to speak to our legal people

(13) and they would tell me who to sue, I don't

(14) know.

(15)    Q.   Now, did -- this discussion you had

(16) was with Bernt Ullmann?

(17)    A.   Yes, sir.

(18)    Q.   Was anybody else from Phat Fashions

(19) involved in that discussion?

(20)    A.   No.

(21)    Q.   Have you ever had any discussions

(22) about extending the trademark license agreement

(23) beyond 2007 at any time with Russell Simmons?

(24)    A.   I believe so.

(25)    Q.   What do you recall about that

## Page 126

(1)

(2) conversation?

(3)    A.   I recall speaking to Russell at a

(4) MAGIC show telling him that we are going to be

(5) extending our -- I think February 2006 when we

(6) were -- when we were agreeing to numbers, Bernt

(7) and I, Russell was there, not at the table

(8) where, but I don't -- looks like we are going

(9) to be going forward and with, I think I did,

(10) everything is very like, you know, with

(11) Russell, it's like we are family, you know,

(12) like we are partners, you know, this is our

(13) Canadian partner, you know, hugs and kisses and

(14) I love you and I love you, and that's the way

(15) it is, you know, so I believe I mentioned it to

(16) him.

(17)    Q.   Any recollection of any discussions

(18) with Russell Simmons beyond possibly mentioning

(19) it to him at MAGIC?

(20)    A.   Concerning the contract?

(21)    Q.   Yes, sir, extending the contract.

(22)    A.   I don't recall.

(23)    Q.   Have you ever had any conversations

(24) with Robert Skinner about extending the

(25) contract?

## Page 127

(1)

(2)    A.   I tried to have one conversation with

(3) Robert Skinner, and when I had found out what

(4) was transpiring with them dealing with a new

(5) person in Canada, I called Bob Skinner. He

(6) called me back and he said to me -- basically

(7) when I wanted to tell him to understand that we

(8) have an agreement going forward, he said to

(9) me -- before I even said anything, he says,

(10) listen, you're talking to the wrong guy, I have

(11) the utmost confidence in my president Bernt

(12) Ullmann and I abide by his decision, that were

(13) his exact words.

(14)    Q.   Was that the extent of the

(15) conversation?

(16)    A.   Yes.

(17)    Q.   How long did that conversation last?

(18)    A.   Maybe a minute.

(19)    Q.   Any recollection as to when that

(20) conversation took place?

(21)    A.   Yes.

(22)    Q.   When was that?

(23)    A.   I would say first or second week of

(24) March.

(25)    Q.   Of '07?

## Page 128

(1)

(2)    A.   '07.

(3)    Q.   Any further conversations with Robert

(4) Skinner you recall?

(5)    A.   No.

(6)    Q.   How about --

(7)    MR. BEHA:  About the extension?

(8)    Q.   Right. All of these questions have

(9) to do with about the extension.

(10)    MR. BEHA:  Once in a while we have to

(11)    put it in the record so it's clear.

(12)    MR. HOFFMAN:  You bring up a good

(13)    point.

(14)    Q.   Have you had any discussions with

(15) Robert Skinner ever other than that one?

(16)    A.   Yeah, just informal hellos, how are

(17) you, and that's it.

(18)    Q.   Have you ever had any discussions

(19) about extending the agreement with Peter

(20) Morris?

(21)    A.   No.

(22)    Q.   How about Ely Nathanson?

(23)    A.   Discussions?

(24)    Q.   Yes, sir.

(25)    A.   No.

PHAT FASHIONS, LLC

BSA XMAX(33/33)

ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

## Page 129

(2) **Q.** Did you have discussions -- let me
(3) back up.
(4) The discussion that you had with
(5) Bernt Ullmann --
(6) **A.** Yes.
(7) **Q.** -- back in, I guess, mid 2005 that
(8) you testified to, did you discuss that
(9) conversation with anyone from the Tyfoon Group?
(10) **A.** Yes.
(11) **Q.** Who did you discuss?
(12) **A.** Barry and Josh.
(13) **Q.** And what did you say to them?
(14) **A.** I said we are going forward for
(15) another six years. I don't know if I said we
(16) are going forward for another six years, I said
(17) we are going forward, we agreed to -- at one
(18) point because in the beginning --
(19) MR. BEHA: Just -- he asked you about
(20) whether you discussed the conversation
(21) that you had had with Ullmann that was
(22) about -- never mind about this Unioncon,
(23) we'll just make it up in the future,
(24) that's all he's asking about. He'll ask
(25) you about all the other stuff, but let him

## Page 130

(2) do his job too.
(3) **A.** Yes, I had a discussion with the boys
(4) about --
(5) **Q.** The boys being Josh and Barry?
(6) **A.** Correct. About an agreement that we
(7) came to that we would be going forward, that
(8) these very, very much for us going forward.
(9) **Q.** Anything beyond that that you recall?
(10) **A.** I don't know what the exact timing
(11) was, but he did mention that, you know, at one
(12) point in time, I don't whether it was that
(13) conversation or a later conversation where he
(14) mentioned that, you know, your minimums are so
(15) down low, you're exceeding them by so much, you
(16) have to raise your minimums a little bit.
(17) **Q.** When you say he, you're now talking
(18) about Bernt Ullmann?
(19) **A.** Correct.
(20) **Q.** My question is going to any further
(21) conversations that you recall with Josh and
(22) Barry about your conversation with Bernt
(23) Ullmann in mid 2005?
(24) MR. BEHA: About this one
(25) conversation. He -- I'm sure he knows

## Page 131

(2) that you had more conversations and you
(3) talked to them about the others, he wants
(4) to know about this one.
(5) **A.** This one conversation with Bernt
(6) concerning Unioncon and the extension?
(7) **Q.** Yes, sir.
(8) **A.** Yes, I had that conversation with the
(9) boys.
(10) **Q.** Any further conversations beyond that
(11) about that one conversation?
(12) MR. BEHA: About that.
(13) **A.** I don't believe so.
(14) **Q.** When you had your conversation with
(15) Bernt Ullmann in mid 2005, was there any
(16) discussion of royalties or minimum sales or any
(17) terms at all?
(18) **A.** I don't believe so. That one
(19) discussion was a general conversation about
(20) going forward and there was certainly no
(21) objection on anybody's part.
(22) **Q.** Did you, after that discussion,
(23) direct anybody on the Tyfoon side of the table
(24) to perhaps start drafting something to
(25) memorialize going forward beyond 2007?

## Page 132

(2) **A.** Not at that point.
(3) **Q.** Did there come a point when you did
(4) that?
(5) **A.** Yes.
(6) **Q.** When was that?
(7) **A.** Subsequent to that conversation, we
(8) had further dialogue on the phone, and that's
(9) when the minimum issue came up and I had asked
(10) him, you know, because we had a very good
(11) relationship, what would fly with, what would
(12) fly means what would be acceptable, an
(13) acceptable minimum for going forward.
(14) So he came back with a number, I
(15) don't recall what that number was. I discussed
(16) with him other numbers that were lower, and we
(17) came to a mutual understanding about numbers,
(18) which we would dialogue, I remember, okay,
(19) sounds okay, let's talk about it. At MAGIC in
(20) 2006 of -- February 2006 MAGIC show, that's
(21) when we really finalized the numbers. I
(22) drafted up an agreement based on our
(23) conversation saying to him, you know, I think
(24) this number would be fair, da, da, da, da, you
(25) know, that I thought would be fair, and he

Page 133

(2) agreed verbally, and I came back after the
(3) MAGIC show and we put that to paper.
(4)     Q.  Is it accurate to state that he
(5) proposed one number and then you proposed a
(6) number or was it the other way around?
(7)     MR. BEHA:  At the start?
(8)     Q.  At the start.
(9)     A.  I don't know who proposed what first,
(10) but I think it was him that made the first
(11) proposition.
(12)     Q.  Would it be accurate to state that
(13) the numbers that you contend were eventually
(14) agreed upon were less than the numbers he
(15) proposed and more than the numbers you
(16) proposed?
(17)     A.  Yes, I think so.
(18)     Q.  Now, you've jumped ahead in the
(19) chronology, which is good, but is it your
(20) testimony that the next conversation you
(21) remember with Bernt Ullmann about extending the
(22) agreement after the Unioncon conversation was
(23) one that took place shortly before MAGIC which
(24) took place in February of 2006?
(25)     A.  I don't think so.  I think we've had

Page 134

(2) some other conversations between that Unioncon
(3) incident and February 2006, I think we had
(4) probably numerous conversations, three, four,
(5) not exactly pertaining to only the ongoing
(6) relationship but that came up in the
(7) conversations.
(8)     Q.  When was the first time you recall
(9) discussing possible terms for an extension with
(10) Bernt Ullmann?
(11)     A.  I would say probably in September --
(12) August, September, October of 2005.
(13)     Q.  Was there any discussion with Bernt
(14) Ullmann about -- in the event that you did
(15) reach an agreement, about putting that
(16) agreement in writing?
(17)     A.  Yeah, there was.  We had mentioned to
(18) send him the numbers in.  After MAGIC, he told
(19) me, okay, that's agreeable, send me your
(20) proposal.
(21)     Q.  Do you recall having telephone
(22) conversations with Bernt Ullmann?
(23)     A.  Yes.
(24)     Q.  About extending the agreement in
(25) January of 2006?

Page 135

(2)     A.  I think so.
(3)     Q.  What, if anything, do you recall
(4) about that conversation?
(5)     A.  Nothing more than I've said before,
(6) which was the agreement upon the numbers or
(7) that kind of a thing.  There was always -- it
(8) was taken for granted that it was only -- there
(9) was no problem with going forward, it's like
(10) everybody was happy, everybody was very happy
(11) with the arrangement and the -- as I said to
(12) you before, we were considered, honestly
(13) speaking, I mean, we have a lot of
(14) relationships with different people in the
(15) United States of America, we were like family.
(16)     Q.  If I were to tell you that your phone
(17) records indicate that on January 31 at
(18) 3:12 p.m., you had a 2.4 minute telephone
(19) conversation with somebody at Bernt Ullmann's
(20) number, would that help refresh your
(21) recollection as to the content of any
(22) conversation that might have taken place?
(23)     A.  No.
(24)     Q.  What, if anything, do you recall
(25) about conversations with Bernt Ullmann about

Page 136

(2) extending the agreement in February 2006 prior
(3) to the MAGIC show?
(4)     A.  I think we discussed about putting
(5) the -- meeting at MAGIC, we discussed meeting
(6) at MAGIC to finalize the numbers, I believe to
(7) come up with the numbers that would be
(8) satisfactory to all parties.
(9)     Q.  At that time prior to MAGIC in
(10) February of 2006, had there been writings
(11) exchanged?
(12)     A.  I don't believe so.
(13)     Q.  Had there been oral conversations
(14) about the numbers, what the numbers might be?
(15)     A.  Yes.
(16)     Q.  Was there a discussion -- well, prior
(17) to MAGIC, did you have discussions with Barry
(18) or Josh about new minimums for an agreement
(19) going forward beyond 2007?
(20)     A.  I believe so, yes.
(21)     Q.  What do you recall about those
(22) discussions?
(23)     A.  I recall telling him that Bernt wants
(24) a higher minimum and we got to come up with
(25) some higher numbers that are going to be

Page 137

(1)
(2)  palatable for Phat Fashions and for us.
(3)     Q.  And do you have a recollection of
(4)  actually having discussions with Josh and Barry
(5)  about that?
(6)     A.  Yes.
(7)     Q.  What do you recall about that?  Do
(8)  you recall specific numbers that were bandied
(9)  about?
(10)    A.  No, I don't recall the numbers, but I
(11) remember bandying about numbers.
(12)    Q.  Is it fair to say that prior to the
(13) MAGIC show, that you had not reached an oral
(14) agreement with Bernt Ullmann as to what the
(15) numbers would be in a number agreement going
(16) forward -- an amended agreement going forward?
(17)    A.  No, that wouldn't be fair.  I think
(18) we did reach an agreement on the numbers.  He
(19) had made it clear to me what would work, and I
(20) was agreeable.
(21)    Q.  So you believe that the numbers were
(22) agreed upon prior to MAGIC?
(23)    A.  It was agreed upon, I don't have my
(24) timing down, but it was -- if it -- we had
(25) discussed the numbers, we had surmised what

Page 138

(1)
(2)  would work, and at MAGIC, we finalized that.
(3)     Q.  Let me just read to you from
(4)  Paragraph 56 of your answer.
(5)     A.  Okay.
(6)     Q.  And you can tell me if this is
(7)  accurate.
(8)     A.  Okay.
(9)     Q.  It says, on or around February of
(10) 2006, Issie Wiseman discussed the revised
(11) minimums with Barry Segal, the vice president
(12) of finance of Tornado, and Josh Wiseman,
(13) director of Tornado.  They agreed that they
(14) would discuss various options for extending the
(15) agreement with Bernt Ullmann at the MAGIC show.
(16)    A.  Okay.
(17)    Q.  Is that an accurate statement?
(18)    A.  Well, I guess it is so, but I believe
(19) we had conversations about what numbers would
(20) be the right numbers.
(21)    Q.  But you don't have a specific
(22) recollection of what those numbers were at the
(23) time?
(24)    A.  No.
(25)    Q.  Am I correct in assuming that

Page 139

(1)
(2)  conversations took place at MAGIC about
(3)  extending the agreement?
(4)     A.  Yes.
(5)     Q.  What do you recall about those
(6)  discussions?
(7)     A.  They were very informal discussions
(8)  on a one-to-one basis that, yeah, we love it,
(9)  everything is good, we'll go forward and just
(10) to send us -- send me the paper.
(11)    Q.  Who was president when those
(12) discussions took place?
(13)    A.  Josh was with me at MAGIC and Bernt.
(14)    Q.  Was Barry Segal there?
(15)    A.  No.
(16)    Q.  Let me just read to you from your
(17) answer at Paragraph 57.
(18)    A.  Yeah.
(19)    Q.  At the MAGIC show, over approximately
(20) two or three conversations, Issie Wiseman
(21) discussed the extended agreement with Bernt
(22) Ullmann.  Bernt Ullmann told Issie Wiseman that
(23) he wanted Issie Wiseman to raise the minimum
(24) sale and royalty numbers because Tornado was
(25) selling so much more than the then minimum sale

Page 140

(1)
(2)  and royalty numbers.  After negotiations, Bernt
(3)  Ullmann and Issie Wiseman agreed on new minimum
(4)  sales and royal numbers.  Bernt Ullmann asked
(5)  Issie Wiseman to send him a proposal via E-mail
(6)  after the MAGIC show.
(7)     A.  Okay.
(8)     Q.  Is that an accurate statement?
(9)     A.  Yes.
(10)    Q.  Does that refresh your recollection
(11) as to when the first discussions might have
(12) taken place with respect to the minimum sales
(13) and royalty numbers being too low?
(14)    A.  No, we had those conversations
(15) earlier as well, I think it was just finalized.
(16) The way it worked, it was very difficult for me
(17) to -- at the MAGIC show, it was very difficult
(18) to meet because there's a lot of things going
(19) on at the same time with sales and people and
(20) there's a big hullabaloo going on, so we had
(21) numerous conversations that were like quick
(22) conversations about going forward, yeah, I'm
(23) going to get to it, we are going to sit down.
(24) And is that a conversation?
(25)    Q.  I think any time one person says --

## Page 141

(1)
(2)      A.   So we had a lot of those kind of
(3)  conversations during the course of the MAGIC
(4)  shows, but at one point in time, we agreed
(5)  that -- he agreed and said, yeah, send me the
(6)  proposal, it's a done deal.
(7)      Q.   Do you remember an actual negotiation
(8)  taking place at the MAGIC show where you put
(9)  forward one set of numbers and he put forward
(10)  another set of numbers and the parties came to
(11)  an agreement?
(12)      A.   I don't recall.  I recall discussing
(13)  it, but I don't recall me putting forward
(14)  numbers, he putting forward numbers, but the
(15)  numbers were agreed upon and finalized at
(16)  MAGIC.
(17)      Q.   Had Tornado been exceeding the
(18)  minimum sales and royalty numbers?
(19)      A.   Yes.
(20)      Q.   By how much?
(21)      A.   Tenfold, eightfold.
(22)      MR. BEHA:   Off the record.
(23)      (Discussion held off the record.)
(24)      Q.   I think the last thing we had spoken
(25)  about was about your exceeding the minimum

## Page 142

(1)
(2)  sales and royalties.
(3)      Just to close off the MAGIC show, is
(4)  it your understanding that at the time you left
(5)  the MAGIC show, that you and Bernt Ullmann had
(6)  agreed on the numbers?
(7)      A.   Absolutely, he told me these are the
(8)  numbers, send me these numbers, that's the
(9)  numbers.
(10)      Q.   When he said to you -- or did he say
(11)  to you to send him a proposal?
(12)      A.   I believe so, yes.
(13)      Q.   Do you have any understanding as to
(14)  why he would have said, "send me a proposal,"
(15)  if an agreement had already been reached?
(16)      A.   I don't know if he used the word
(17)  "proposal."  He said, send me the numbers as we
(18)  agreed and then I'm going to give it in to get
(19)  it done, I said, okay.
(20)      Q.   And is it your understanding that an
(21)  agreement had also been reached at MAGIC as to
(22)  how long the extension would run for?
(23)      A.   That, I don't recall, but an
(24)  agreement had been reached.
(25)      Q.   Now, was there any discussion prior

## Page 143

(1)
(2)  to the time you sent a written proposal about
(3)  amending the agreement to specifically include
(4)  Baby Phat products?
(5)      A.   I don't believe so.
(6)      Q.   Was there any discussion about
(7)  amending the agreement to specifically.mention
(8)  Vis-a-Vis?
(9)      A.   I don't believe so.
(10)      Q.   I'm going to read to you from Page 4,
(11)  Paragraph 43 of the answer, following
(12)  negotiations of the minimum guarantees of
(13)  sales, Phat Fashions and Tornado agreed to an
(14)  extension of the agreement that would cover the
(15)  lines Tornado was selling and paying royalties
(16)  on including the lines Tornado was selling
(17)  through Vis-a-Vis.
(18)      Is that an accurate statement?
(19)      A.   Yes.
(20)      Q.   Was there any specific discussion
(21)  that you remember at all with respect to the
(22)  extension of the agreement where Vis-a-Vis was
(23)  ever mentioned?
(24)      A.   During that particular discussion or
(25)  discussions?

## Page 144

(1)
(2)      Q.   During any discussion prior to the
(3)  time that you sent the written proposal to
(4)  Bernt Ullmann, do you ever recall having a
(5)  discussion where the words "extension" and
(6)  "Vis-a-Vis" took place in the same discussion?
(7)      A.   I don't recall.
(8)      Q.   Was there any -- ever any discussion
(9)  of extending the agreement to making it clear
(10)  that the lines that Vis-a-Vis was selling were
(11)  also covered by the extended agreement?
(12)      A.   It was taken for granted, you know,
(13)  to me, Vis-a-Vis, Tornado, it's the same thing.
(14)      Q.   I understand that.
(15)      A.   So you ask me, we never talked about
(16)  Tornado, we never talked about Vis-a-Vis, we
(17)  talked about Baby Phat and Phat Farm, I mean,
(18)  that's the way it worked.
(19)      Q.   So is your answer to the question
(20)  that I just asked, no, that there was never a
(21)  mention of Vis-a-Vis?
(22)      A.   I don't recall, there could have
(23)  been.
(24)      Q.   When you talked about the extension,
(25)  did you specifically talk about the products

Page 153

(1)
(2)    A.  No.
(3)    Q.  With respect to B, it says, since
(4) 1998, there has been no minimum advertising,
(5) and there's a question mark there.
(6)        What do you know about that?
(7)    A.  Nothing.
(8)    Q.  What do you recall about any
(9) conversations you would have had with Barry
(10) about the proposal after MAGIC and before you
(11) sent it to Bernt Ullmann?
(12)    A.  We had a conversation concerning what
(13) those numbers -- the final numbers were, and
(14) that was it.
(15)    Q.  When it says on the first page here,
(16) consider the following options, do you know
(17) what was meant by the word "options"?
(18)    A.  I think he means option one and
(19) option two, which is the first -- the first
(20) three years, and then the option two would be
(21) second three years.
(22)    Q.  If you take a look here, there is GMR
(23) option A and GMR option B?
(24)    A.  Where is that?
(25)        MR. BEHA:  Across the top.

Page 154

(1)
(2)    Q.  Across the top.
(3)    A.  Oh, yeah.
(4)    Q.  It looks like two different sets of
(5) numbers; is that correct?
(6)    A.  Yeah.
(7)    Q.  Do you know where those numbers came
(8) from?
(9)    A.  Maybe those were the proposed numbers
(10) that we proposed.
(11)    Q.  Well, would you have proposed both A
(12) and B?
(13)        MR. BEHA:  Objection to form.
(14)    Q.  Meaning the two different options
(15) that are here?
(16)    A.  I don't know why there's two options.
(17)    Q.  Do you have any understanding as to
(18) the significance, if any, of the handwritten
(19) numbers that are next to the GMR option A, U.S.
(20) dollar numbers?
(21)    A.  Yes, I believe that the handwritten
(22) number's the one that we agreed upon finally.
(23)    Q.  Once again, you're not sure if that's
(24) your handwriting or Barry's?
(25)    A.  Correct, I'm not sure.

Page 155

(1)
(2)    Q.  Turn to the second page, if you
(3) would.
(4)    A.  Yes.
(5)    Q.  Whose handwriting is that?
(6)    A.  I think it's Barry's handwriting with
(7) my dictating to him.
(8)    Q.  Now, you see where it says, Dear
(9) Bernt, B U R N T, somebody wrote next to that
(10) Bernt, B E R N T, is that your handwriting or
(11) Barry's or somebody else's?
(12)    A.  It's not mine.  I don't make my B's
(13) like that, so it -- maybe somebody corrected
(14) it, maybe my -- it may be his secretary.
(15)    Q.  Have you ever seen this document with
(16) 914 at the bottom prior to my showing it to you
(17) today?
(18)    A.  I don't believe so, you know, the way
(19) it operates in my business, you know, we agree
(20) on the numbers, I said, Barry, write it up, he
(21) does and that's it.
(22)    Q.  Take a look at the third page which
(23) has 915 on the bottom.
(24)    A.  Yes.
(25)    Q.  Have you ever seen that before, that

Page 156

(1)
(2) document?
(3)    A.  I could have, I'm not sure.
(4)    Q.  Is that your handwriting?
(5)    A.  Nope.
(6)    Q.  Looking at it, it appears to match up
(7) with what's typed on the first page, 916.  Do
(8) you have any recollection of having any
(9) discussions with anybody at -- in the Tyfoon
(10) Group about the numbers that are contained on
(11) either the last or first page of this exhibit?
(12)        MR. BEHA:  And not to unduly
(13)    interrupt, but to be clear, you had led
(14)    into this in the context of conversations
(15)    between MAGIC and the sending of a written
(16)    document, are you now -- because I don't
(17)    know that -- the assumption about that
(18)    first page that it's post MAGIC is or is
(19)    not correct, and I'm not commenting on
(20)    that because I don't know, but when you're
(21)    asking him about conversations about
(22)    numbers, do you mean only in that post
(23)    MAGIC period or do you mean in a broader
(24)    sense?
(25)        MR. HOFFMAN:  It's a good point.

## Page 157

(1)

(2) **Q.** Looking at the numbers in the first

(3) and last pages of this exhibit, do you know

(4) whether those documents were created before or

(5) after MAGIC?

(6) **A.** I don't.

(7) **Q.** Looking at them, does it help refresh

(8) your recollection in any way as to the numbers

(9) that would have been or that were discussed at

(10) MAGIC?

(11) **A.** I believe that the agreed-upon

(12) **numbers were 350, 450 and 550, you know, so I**

(13) **recall that, I believe, you know, but I don't**

(14) **really recall 100 percent what an actual**

(15) **numbers we proposed and what he proposed and --**

(16) **I don't recall.**

(17) **Q.** On the first page, C says, royalties

(18) paid to Kellwood for the period January 1, 2005

(19) to December 31, 2005 amounted to approximately

(20) U.S. 1 million 322, based on U.S. sales of

(21) 18,888,594.

(22) MR. BEHA: So it's clear, U.S. dollar

(23) sales, not U.S. sales.

(24) MR. HOFFMAN: Right.

(25) MR. BEHA: Meaning sales measured in

## Page 158

(1)

(2) U.S. dollars, not sales in the U.S.

(3) MR. HOFFMAN: Exactly, right, thanks

(4) for that clarification.

(5) **Q.** Do you know whether or not the sales

(6) that are referred to here are sales made solely

(7) by Tornado or sales made by Tornado and

(8) Vis-a-Vis?

(9) **A.** I would have to say that these are a

(10) **combination of both sales, and first of all, I**

(11) **don't even know why they put -- royalties put**

(12) **to Kellwood, I think they're Phat Fashions or**

(13) **are they paid to Kellwood, I don't know, so**

(14) **it's...**

(15) **Q.** We know they go somewhere in the U.S.

(16) and that's about it?

(17) **A.** And they get it.

(18) **Q.** Plaintiff's Exhibit 24 has a March 1,

(19) 2006 date up on the top.

(20) (Plaintiff's Exhibit 24, Document

(21) dated 3/1/06, marked for identification.)

(22) **A.** Yes.

(23) **Q.** And just directing your attention to

(24) the E-mail that's being forwarded here, the one

(25) from Issie Wiseman to Bernt Ullmann.

## Page 159

(1)

(2) **A.** Yup.

(3) **Q.** There's an attachment, have you seen

(4) that document before?

(5) **A.** Yes.

(6) **Q.** What is this?

(7) **A.** What is what?

(8) **Q.** The document you're looking at.

(9) **A.** This is my E-mail to Bernt.

(10) **Q.** And is attached to that E-mail the

(11) proposal?

(12) **A.** Yes.

(13) **Q.** And do you know when it was -- well,

(14) let me back up.

(15) Who drafted the language in the

(16) proposal on the second page, please find the

(17) proposal for the Phat Farm and --

(18) **A.** I don't have that, please find the**

(19) **proposal.**

(20) MR. BEHA: Yes, you do, right there.

(21) **A.** Oh, yeah, okay. Who drafted it.**

(22) **Q.** Right. In other words, who drafted

(23) the document? Let's take it a broader question

(24) that is attached hereto as March 1, 2006?

(25) **A.** I dictated it and my secretary wrote

## Page 160

(1)

(2) it up, I believe.

(3) **Q.** Looking -- going back in exhibit to

(4) 23 and looking at the send page.

(5) **A.** Yes.

(6) **Q.** Does that help refresh your

(7) recollection as to how those words may have

(8) found their way into the March 1, 2006

(9) proposal?

(10) **A.** Yeah, maybe I -- maybe I dictated it**

(11) **to Barry and he wrote it.**

(12) **Q.** Now, it says here, please find the

(13) proposal. Was there any particular reason why

(14) you didn't say, this is to confirm the

(15) agreement that has been reached?

(16) **A.** No, it's just selection of words. I**

(17) **could very easily said, please see the numbers**

(18) **we agreed upon so...**

(19) **Q.** You could have said that?

(20) **A.** Yes.

(21) **Q.** But that's not what you said?

(22) **A.** I don't know if I said that, this is**

(23) **not the way it was written maybe, but that's**

(24) **what I meant.**

(25) **Q.** All right.

Page 161

(1)
(2)    A.  You know, so I mean, I don't know if
(3)  this is like better English or whatever.
(4)    Q.  Where you say at the end of this
(5)  March 1, 2006 proposal, please contact me once
(6)  you have had a chance to review --
(7)    A.  Okay.
(8)    Q.  -- what did you mean by that?
(9)    A.  That you received the E-mail, that
(10) you -- that you got it.
(11)   Q.  Well, what was it that he, he being
(12) Bernt Ullmann, was supposed to be reviewing?
(13)   A.  It's just a format, you know, just,
(14) you know, please contact me after you receive.
(15)   Q.  Did he contact you after he received
(16) it?
(17)   A.  I don't know if I contacted him or he
(18) contacted me, I'm not sure.
(19)   Q.  Any specific recollection of having a
(20) conversation after Bernt Ullmann received this?
(21)   A.  Yeah, I think I called some time
(22) after this here proposal, and he said to me,
(23) yeah, it's in the works, everything is fine.  I
(24) got the document and it's in -- I've given it
(25) in -- to the lawyers, I believe he said, I'm

Page 162

(1)
(2)  not sure.
(3)    Q.  In your answer on Paragraph 59, it
(4)  says, Issie Wiseman and Bernt Ullmann discussed
(5)  the proposal between March 1, 2006 and March 20
(6)  of 2006?
(7)    A.  Okay.
(8)    Q.  Between March 1, 2006 and March 20,
(9)  2006, Bernt Ullmann verbally accepted the
(10) proposal in his capacity as president of Phat
(11) Farm Fashions?
(12)   A.  Okay.
(13)   Q.  Is that an accurate statement, to the
(14) best of your knowledge?
(15)   A.  Yes.
(16)   Q.  Is it your testimony that the
(17) proposal had not been accepted prior to
(18) March 1st?
(19)   A.  No, I'm saying that those are the
(20) numbers that really we agreed upon that he told
(21) me would work for him, so I wrote down those
(22) numbers, they would work for me, and so it was
(23) like agreed before we sent it out to him.
(24)   Q.  So prior to March 2006, you believe
(25) there was an oral agreement?

Page 163

(1)
(2)    A.  Correct, and we just formalized it,
(3)  you know, documented it March 1st.
(4)    Q.  Now, once you sent Plaintiff's
(5)  Exhibit 24 to Bernt Ullmann, right, the
(6)  March 1, 2006?
(7)    A.  Yeah.
(8)    Q.  How did it come to pass that a
(9)  further writing was going to be created with
(10) respect to the extension of the agreement?
(11)   MR. BEHA:  With all respect, I don't
(12) think that's a proper question.  I'm sure
(13) you can just rephrase it slightly.  He's
(14) not going to know necessarily how it came
(15) to pass particularly not in the broad
(16) sense.  You can ask him what happened.
(17)   Q.  Let's -- that's fine.
(18)   MR. BEHA:  Mostly I like your
(19) questions, but once in a while...
(20)   MR. HOFFMAN:  Believe me, I do
(21) appreciate the help, we might as well get
(22) good questions and good answers.
(23)   Q.  Subsequent to March 1, 2006, you have
(24) a recollection of seeing a draft amendment to
(25) the contract; is that correct?

Page 164

(1)
(2)    MR. BEHA:  Objection to form.
(3)    Q.  Do you have a recollection subsequent
(4)  to March 1, 2006?
(5)    A.  Subsequent means after March 1st?
(6)    Q.  Yes.
(7)    A.  Yes.
(8)    Q.  That was the same questions Bernt
(9)  Ullmann asked.
(10)   Do you have a recollection of seeing
(11) a draft amendment to the agreement?
(12)   MR. BEHA:  Objection to form,
(13) mischaracterization.
(14)   A.  I do recall seeing a document that
(15) came from Ely B. Nathanson with those numbers
(16) to sign.
(17)   Q.  When you saw that document, was that
(18) the first time that you knew that a written
(19) document was going to be coming from Phat
(20) Fashions regarding the extension?
(21)   A.  No, I didn't know there was a written
(22) document coming.  I mean, I know there's an
(23) accepted agreed-upon scenario for going
(24) forward.  The documents that come later,
(25) before, after, during, it doesn't -- it's

## Page 165

(1)
(2) meaningless to me because we had an agreement.
(3)   Q.   When you sent the March 1, 2006
(4) proposal to Bernt Ullmann and then had a
(5) discussion with him about it --
(6)   A.   Yes.
(7)   Q.   -- what, if anything, did you expect
(8) to happen next regarding a writing?
(9)   A.   Oh, I would have expected him to --
(10) Kellwood being a public company that owns Phat
(11) Fashions, they have to go through their
(12) mechanisms to satisfy public corporations.
(13)     I would have assumed, you know, it's
(14) not like we are like a little company, you
(15) know, the left hand knows what the right hand
(16) is doing, we are talking about a big
(17) corporations, and I would imagine it's going
(18) through all the formats that a public
(19) corporation needs to go through to appease the
(20) SEC and all that kind of stuff.
(21)   Q.   And would you expect that Kellwood
(22) would want to see a signed amendment executed
(23) by the parties to the amendment?
(24)   A.   I would.
(25)   MR. BEHA:   Objection to form, but go

## Page 166

(1)
(2) ahead.
(3)   A.   I would have expected Kellwood to
(4) adhere to what their president tells them,
(5) their president tells them we have a deal with
(6) Issie in Canada for six more years, get this
(7) done, that's what I would expect. I don't know
(8) what the company like Kellwood would do with
(9) that information, you know.
(10)   Q.   Did you expect Kellwood to allow Phat
(11) Fashions to have oral agreements with parties
(12) with whom it was contracted?
(13)   A.   I don't expect Kellwood, I don't know
(14) how they act and I don't know how they do
(15) things, so I -- you can't expect me to answer
(16) that question because I don't know how it works
(17) internally and public corporations.
(18)   Q.   With respect to telephone calls with
(19) Bernt Ullmann --
(20)   A.   Yes.
(21)   Q.   -- after March 1st and prior to
(22) March 20 of 2006, do you have any specific
(23) recollection of such conversations, and if so,
(24) the content of such conversations?
(25)   MR. BEHA:   Could we, just to give the

## Page 167

(1)
(2) witness a break on this, is March 20 a
(3) date for the signature on the document, is
(4) that why you're using that date?
(5)   MR. HOFFMAN:   No, but it's close,
(6) March 20th is the date that the written
(7) amendment of the draft is sent.
(8)   MR. BEHA:   Because, I mean, my wife's
(9) birthday is the 21st, so I remember when
(10) the 20th is because that's when I'm going
(11) shopping, but for the witness, if you can
(12) say, you know, between the letter and
(13) between when you first found out about
(14) this amendment document, whenever that
(15) was.
(16)   MR. HOFFMAN:   I have no problem with
(17) doing that. I'm dealing with a different
(18) kettle of fish before your arrival in the
(19) case.
(20)   Q.   So to get our time line, we have the
(21) Exhibit 24, the March 1st proposal?
(22)   A.   Yeah.
(23)   Q.   And I'll represent to you, and I'll
(24) show it to you shortly, that on March 20 -- in
(25) fact, let's just jump ahead.

## Page 168

(1)
(2)   MR. BEHA:   He may or may not have
(3) seen it on the 20th. You can set a date
(4) in there and then you have an anchor.
(5)   Q.   I'm going to ask you about this
(6) agreement in a few minutes, but I'm going to
(7) have some questions beforehand, but I'm just
(8) giving you this to set up the parameters.
(9)   (Plaintiff's Exhibit 25, E-mail dated
(10) 3/20, marked for identification.)
(11)   Q.   Do you recall receiving that
(12) E-mail -- the March 20 E-mail which has been
(13) marked as 25?
(14)   A.   Yeah.
(15)   Q.   So between the time you received
(16) Plaintiff's Exhibit 25 and the time you sent
(17) off Plaintiff's Exhibit 24 --
(18)   MR. BEHA:   The earlier time.
(19)   Q.   The earlier time, do you have a
(20) recollection of having any conversations with
(21) Bernt Ullman about the proposed amendment?
(22)   MR. BEHA:   He already testified to
(23) one.
(24)   MR. HOFFMAN:   Right, but now I'm
(25) going to try to narrow it down.

Page 173

(1)
(2) your testimony about things you might have
(3) said.
(4)     A.  I have a specific recall that I
(5) followed up us sending this document back to
(6) him, if they -- or that document, if they've
(7) received it and if everything was okay.
(8)     Q.  That document is 24.
(9)     MR. BEHA:  Right.
(10)    MR. HOFFMAN:  I'm just doing it for
(11)    the record.
(12)    A.  And I have a definite recollection of
(13) that, and the answer was, yes, I got it and
(14) it's in the works, don't worry about it.
(15)    Q.  Did Bernt Ullmann in that
(16) conversation indicate to you in any way that he
(17) would be sending out a document for you to
(18) review and sign?
(19)    A.  No.
(20)    Q.  So now we turn to Plaintiff's
(21) Exhibit 25.
(22)    A.  Yeah, this one.
(23)    Q.  Right.
(24)    A.  Okay.
(25)    Q.  When you received that document --

Page 174

(1)
(2)    A.  Yeah.
(3)    Q.  -- what was your understanding, if
(4) any, as to what it was?
(5)    A.  It was a confirmation of the
(6) conversation that we had with the numbers that
(7) we agreed upon to extend the contract for six
(8) years, and it was just a piece of -- a document
(9) confirming that.
(10)   Q.  Did you understand that what you were
(11) being sent was a draft?
(12)   A.  What do you mean a draft?
(13)   Q.  A draft document, not a final
(14) document.
(15)   A.  No, I didn't understand that.
(16)   Q.  Just the first paragraph of the cover
(17) E-mail says, Issie, at the request of Bernt
(18) Ullmann, I am attaching for your review a draft
(19) amendment No. 1 to the license agreement among
(20) the above referenced parts.  I am
(21) simultaneously transmitting the attached to our
(22) client and must therefore reserve the right to
(23) modify same as directed.  Please contact us to
(24) discuss any comments.  You have best regards,
(25) signed Ely Nathanson.

Page 175

(1)
(2)    Do you recall reading that when you
(3) received the E-mail?
(4)    A.  I don't really recall reading it, no.
(5)    Q.  Do you recall reviewing the draft
(6) amendment?
(7)    A.  No.
(8)    Q.  Do you have a recollection of seeing
(9) that, the title of the document was Amendment
(10) No. 1 to trademark license agreement?
(11)   A.  No.
(12)   Q.  Was it your understanding as of
(13) March 20, 2006 that the trademark license
(14) agreement had ever been previously amended?
(15)    MR. BEHA:  Objection to form, calling
(16)    for -- seems to be calling for a legal
(17)    opinion.
(18)   Q.  You can answer.
(19)   A.  I don't know.  I don't know, you
(20) know, to me, this is all like just, you know,
(21) legalese that are specific to what their
(22) requirements are.  As far as I was concerned,
(23) this is just a confirmation of the deal we had,
(24) I have to sign here and send it back to them.
(25)   Q.  Well, where did it say in the E-mail

Page 176

(1)
(2) that was sent to you to sign here and send it
(3) back to them?
(4)    A.  I don't know.  I guess Barry gave it
(5) to me and told me to sign it here.
(6)    Q.  When you say --
(7)    A.  I don't know.
(8)    Q.  When you say Barry gave it to you,
(9) this actually came to you?
(10)   A.  Correct.
(11)   Q.  And you then forwarded it to Barry at
(12) some time, I assume?
(13)   A.  Yeah, I forward everything that I
(14) sent with anything of this kind of thing to
(15) Barry.
(16)   Q.  Did you ever read --
(17)   A.  No.
(18)    MR. BEHA:  Wait --
(19)   A.  Sorry.
(20)   Q.  We are on the same wavelength.
(21)    Did you ever -- prior to signing
(22) Amendment No. 1, the trademark license
(23) agreement, did you read it?
(24)   A.  No, I expect these things to be read
(25) by our CFO and I expect him to tell me if

PHAT FASHIONS, LLC

BSA XMAX(45/45)
ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

## Page 177

(1)
(2) there's something wrong or not.
(3)     Q. Did you -- do you have a recollection
(4) of having a discussion with your CFO, Barry
(5) Segal, prior to signing this document?
(6)     A. Yeah.
(7)     Q. What do you recall about that
(8) discussion?
(9)     A. He said, this is the amendment, these
(10) are the numbers that we agreed upon, and that's
(11) it, sign the document. And we just checked --
(12) I just checked to see if the numbers were the
(13) exact numbers that we had agreed upon, and they
(14) were, and that was it.
(15)     Q. Did Barry have any discussion with
(16) you about the fact that there's no specific
(17) reference to Baby Phat product in the
(18) amendment?
(19)     A. No.
(20)     Q. Did he have any discussion with you
(21) about the fact that nothing was stated in the
(22) amendment about amending Schedule C of the
(23) trademark license agreement?
(24)     A. No.
(25)     Q. Was there any discussion about the

## Page 178

(1)
(2) fact that Vis-a-Vis is not mentioned in the
(3) amendment?
(4)     A. No.
(5)     Q. When you signed the amendment, did
(6) you notice on the last page that there were two
(7) signature lines for Phat Fashions?
(8)     A. Not really.
(9)     Q. When you say not really?
(10)     A. I see there's two lines now, but I
(11) didn't really pay attention to how many lines
(12) there were for them. I knew for us there was,
(13) I had to sign there, you know, I look at it.
(14)     Q. Just so we are clear, you don't have
(15) a recollection at the time that you signed this
(16) document of looking at it, seeing that there
(17) were two signature lines for Phat Fashions and
(18) discussing that with anybody?
(19)     A. No.
(20)     Q. Other than Barry Segal?
(21)     A. Yes.
(22)     Q. Did you show this document,
(23) Plaintiff's Exhibit 25, to anyone after you
(24) received it?
(25)     A. I don't recall. I think I --

## Page 179

(1)
(2) supposedly I would have showed it to all the
(3) partners, you know, we had the amendment and --
(4) but I don't think I showed it to her, I said we
(5) agreed on the numbers.
(6)     Q. Do you have a recollection of showing
(7) it to Josh?
(8)     A. Yeah, I would have shown it to Josh,
(9) I think.
(10)     MR. BEHA: That's -- and I apologize
(11) for intruding but -- he can ask you what
(12) your practice has been and what you
(13) expect you would have done, and you can
(14) answer those questions. Right now that's
(15) not the question. The question is, do you
(16) remember showing it to Josh.
(17)     THE WITNESS: Specifically?
(18)     MR. BEHA: And if the answer is yes,
(19) it's yes. If it's no, it's no, and if he
(20) wants to find out in the ordinary course
(21) what you would have done, he will ask it
(22) with those magic words.
(23)     Q. And you can also -- if your answer is
(24) no, but that's something I would have done,
(25) that's all fine as long as it's -- we are

## Page 180

(1)
(2) getting actual memory and something that
(3) happened and your general practice as well, at
(4) least we can both distinguish what that is.
(5)     A. Okay, this particular case, no, I
(6) don't remember specifically showing him the
(7) document.
(8)     Q. After receiving this document,
(9) Plaintiff's Exhibit 25 --
(10)     A. Yes.
(11)     Q. -- do you have a recollection of
(12) having a discussion with Bernt Ullmann about
(13) it?
(14)     A. I have no recollection of that.
(15)     Q. In your answer at 61, Paragraph 61,
(16) it says, between March 20, 2006 and March 29,
(17) 2006, Issie Wiseman spoke with Bernt Ullmann,
(18) and they both agreed that the written extension
(19) was acceptable to both parties.
(20)     Having read that from your answer,
(21) does that help refresh your recollection as to
(22) whether or not such a discussion actually took
(23) place?
(24)     A. The discussion that took place was
(25) that I got this document, I signed it and I

Page 181

(1)
(2) sent it back to you.
(3)    Q.   So are you saying that you don't
(4) recall a discussion with Bernt Ullmann?
(5)    A.   No, I do recall discussing the
(6) specifics of which -- I do recall discussing
(7) the specifics of which were, I got the
(8) amendment, I looked at the numbers, they are
(9) correct, and I signed it, and I sent it back to
(10) you.   That's what I recall discussing.
(11)    Q.   Okay.   So then is it your testimony
(12) that that discussion with Bernt Ullmann would
(13) have taken place after you had signed the
(14) agreement and sent it back?
(15)    A.   I don't recall.   Probably, I don't
(16) recall if it was after or -- I signed the paper
(17) after I spoke to him or I sign the paper before
(18) I spoke to him, but I don't recall.
(19)    Q.   All I'm trying to find out is the
(20) answer you previously gave --
(21)    A.   Yes.
(22)    Q.   -- 30 seconds ago --
(23)    A.   Okay.
(24)    Q.   -- was very specific as to what you
(25) remembered saying to Bernt Ullmann, and it

Page 182

(1)
(2) included in word or substance, I signed the
(3) agreement and I sent it back to you.
(4)    A.   Okay.
(5)    Q.   Which would lead me to believe,
(6) hearing that answer, that the conversation took
(7) place after those acts had occurred, so I'm
(8) just trying here, for clarity purposes, to pin
(9) down when you're stating that conversation took
(10) place, rather than give it a date, it can be
(11) before or after you signed the agreement, if
(12) that helps?
(13)    A.   I don't recall.   I mean, like I said,
(14) this was just a formality that they required,
(15) so I don't remember the specific time I signed
(16) the paper.   I called them to let him know that
(17) I could have signed it an hour after I spoke to
(18) him or I could have signed it an hour before I
(19) spoke to him, I don't know.
(20)    Q.   If you had called him after you
(21) received the March 20 document, there would be
(22) a telephone record of that, correct?
(23)    A.   I would imagine.
(24)    Q.   Plaintiff's 26.
(25)       (Plaintiff's Exhibit 26, A document,

Page 183

(1)
(2)    marked for identification.)
(3)    A.   It's the same thing, is it not?
(4)    Q.   What this document is --
(5)    MR. BEHA:   Wait.
(6)    Q.   I will indicate to you that the only
(7) change between this and the document that I
(8) gave you previously, is that this indicates
(9) that you forwarded the document to Barry Segal
(10) on March 24 of 2006.
(11)    A.   Okay.
(12)    Q.   Is that a fair characterization
(13) looking at Plaintiff's Exhibit 26?
(14)    MR. BEHA:   I'm sorry, could you just
(15)    read back what he said.
(16)    (Record read.)
(17)    A.   Yes.
(18)    Q.   Would that have been the first time
(19) that you gave the document to Barry Segal to
(20) review?
(21)    MR. BEHA:   Objection to form.
(22)    A.   I don't recall.
(23)    Q.   Why did you forward this to Barry
(24) Segal?
(25)    A.   Anything to do that I have an E-mail

Page 184

(1)
(2) of or anything that I have to do with that has
(3) to do with any kind of contractual arrangement
(4) or anything pertaining to financial or whatever
(5) it is, I always forward it to the person
(6) involved here, and this particular case, I
(7) forwarded it from my E-mail address to Barry's
(8) in case he didn't have a copy.
(9)    Q.   Do you know if Barry Segal had any
(10) telephone conversations with anyone from Phat
(11) Fashions or their representatives between
(12) March 20 of 2006 and the time that this
(13) document was signed and returned to Ely
(14) Nathanson?
(15)    A.   He may have had a conversation with
(16) Ely Nathanson, I don't know specifically when
(17) or what, but I do recall him mentioning that he
(18) had called Ely Nathanson to advise him that he
(19) was sending him -- or this came from Ely
(20) Nathanson, right?
(21)    Q.   This document came from Ely Nathanson
(22) to you?
(23)    A.   Right.   So he must have called Ely
(24) and told Ely -- I believe he told me that he
(25) told Ely that he's sending the document back to