# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## <u>PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.</u>
### Case No.: 07 Civ. 3278 (PAC)

## Part 2

# EXHIBIT 52

Page 189

(1)
(2) it differently, you'll tell me, is where one
(3) party sends to another contracts and says,
(4) please sign these documents and return them to
(5) me?
(6)     A.   What is the question again, before
(7) you explained execution copy, what was the
(8) question before that?
(9)     Q.   Was there any reason why you didn't
(10) wait for execution copies to be sent to you?
(11)     MR. BEHA:   Again, objection to form
(12) and foundation as to what this was or
(13) wasn't.
(14)     A.   To me, this was an executable copy
(15) and I signed it.   I don't know what the
(16) legalese with executable or nonexecutable.
(17) This was a document outlining the extent of our
(18) conversation.   I checked the numbers, it was
(19) agreeable and that was the number we had
(20) discussed.   These are the numbers that they
(21) had -- Bernt had wanted me to sign off on, and
(22) I did.
(23)     Q.   In all your time in business, do you
(24) have any recollection of someone sending you a
(25) document that they've sent as a draft and your

Page 190

(1)
(2) taking that document and signing it and
(3) returning it to the party who sent it to you?
(4)     A.   I sent a lot of documents that are
(5) like two-page letters and drafts -- yeah.
(6)     Q.   Well, two-page letters is one thing,
(7) but I'm specifically talking about --
(8)     A.   This is a two-page letter to me.
(9) It's three pages.
(10)     Q.   Not to be picky, it's actually a
(11) four-page --
(12)     MR. BEHA:   Let's go off the record.
(13)     (Discussion held off the record.)
(14)     Q.   Do you have a specific recollection
(15) of anyone ever sending you a document which in
(16) the cover letter or E-mail indicated that the
(17) document was a draft, your getting that
(18) document and signing it and returning it to the
(19) party who sent it to you?
(20)     A.   I don't have any specific
(21) recollection.
(22)     Q.   Now, in Paragraph 32 of your answer,
(23) it states that at all times Tornado understood
(24) the extension to apply to all Phat Fashions
(25) products being sold by Tornado directly or

Page 191

(1)
(2) being sold by Tornado through affiliates and
(3) related companies such as Vis-a-Vis.
(4)     What is the basis of that
(5) understanding?
(6)     A.   The basis is that we sold Baby Phat
(7) products out of Vis-a-Vis and it was part and
(8) parcel of this contract.
(9)     Q.   Was there any reason why language to
(10) that effect was not added to the draft
(11) amendment?
(12)     A.   I can't tell you what the language
(13) was like in the draft amendment, I really don't
(14) recall.
(15)     Q.   Well, you didn't read the draft
(16) amendment other than the numbers in it,
(17) correct?
(18)     A.   Correct.
(19)     Q.   In Paragraph 12 of its answer,
(20) Tornado alleges that Phat Fashions, despite
(21) numerous assurances that it would, did not sign
(22) the written extension.
(23)     Is that an accurate statement?
(24)     MR. BEHA:   Objection to form as to
(25) his actual knowledge as to what Phat did.

Page 192

(1)
(2)     Q.   Well, is it your position although --
(3) let me back up.
(4)     MR. BEHA:   We know something that
(5) happened that we didn't know then, but if
(6) you're asking him what his perception at
(7) the time was, then we don't have that
(8) problem.
(9)     MR. HOFFMAN:   Right, and as to what
(10) happened then, that's for debate.
(11)     Q.   Did Phat Fashions provide you with
(12) numerous assurances that it would sign the
(13) written extension?
(14)     A.   Phat Fashions assured me several
(15) times that it is a done deal, that we were in
(16) business together and those were the numbers,
(17) and that's it, that it was being executed.   I
(18) don't know, to me, this was the execution.
(19)     Q.   I'm referring now specifically to the
(20) document that says on it Amendment No. 1, the
(21) trademark license agreement.
(22)     A.   This one?
(23)     Q.   Right, that particular document, is
(24) it your testimony that Phat Fashions assured
(25) you that it was going to sign that document?

Page 193

(1)
(2)    A. Yes.
(3)    Q. Who at Phat Fashions?
(4)    A. Bernt Ullmann.
(5)    Q. Anyone other than Bernt Ullmann?
(6)    A. No, I had no conversations about it
(7) with anyone at Phat Fashions except Bernt
(8) Ullmann.
(9)    Q. So that will shorten a lot of
(10) questions as we go forward.
(11)        How many conversations did you have
(12) with Bernt Ullmann after March 30 of 2006 where
(13) he said to you that Phat Fashions was going to
(14) sign the written?
(15)        MR. BEHA: In substance?
(16)    Q. Yes, in substance.
(17)    A. There were several conversations, I
(18) remember every couple months, Barry Segal would
(19) come to me and say, hey, we didn't get the
(20) document back from them. I said, what
(21) document? He said, there was a document that
(22) they were supposed to get back to us, you know,
(23) you better ask Bernt about it, that's what I'd
(24) ask him.
(25)    Q. Do you have any specific recollection

Page 194

(1)
(2) of any of those phone conversations?
(3)    A. Yes, I have several recollections,
(4) one -- at one point in time, the recollection
(5) that I have was he told me that the lawyer at,
(6) I don't know if it is your firm or Phat
(7) Fashions', passed away, or Kellwood, the lawyer
(8) at Kellwood committed suicide, there was a
(9) tragedy, and this is a terrible time, and I
(10) said, wow, I'm not going to ask any more
(11) questions, I'm sorry to hear that. That was
(12) one of the indications.
(13)        The other time was, it was I recall a
(14) conversation where he tells me that, you know,
(15) it is a big corporation, there's a lot of time,
(16) don't worry, it's all getting done, it's a done
(17) deal, it's just big corporations, public
(18) companies, they worked out. I said, okay, you
(19) know, and that I recall those two things, two
(20) times, three times, the same thing. Don't
(21) worry, it's getting done, it's a done deal, all
(22) that kind of stuff, so, okay.
(23)    Q. Were you concerned at all that
(24) despite these conversations you were having
(25) with Bernt Ullmann, that the signed extension

Page 195

(1)
(2) was not coming back to you?
(3)    A. Never ever was I ever, there was no
(4) indication, no nothing ever about, there was
(5) business as usual.
(6)    Q. Would it be accurate to state that
(7) Barry Segal had expressed concern to you that
(8) the signed agreement had not been returned?
(9)    A. Not concern, he just brought it up to
(10) me on occasion where, hey, you know, like we
(11) signed something, we are supposed to get
(12) something back, I didn't get it yet, that's my
(13) job.
(14)    Q. How many occasions did he mention
(15) that to you on?
(16)    A. Could have been twice, I don't know.
(17)    Q. Was it usually the case that when he
(18) brought that to your attention, that that's
(19) when you would call Bernt Ullmann and say,
(20) where's the agreement?
(21)    A. Yeah, a couple of times I did, yeah.
(22) Other time, it could have been on my own.
(23)    Q. Was there any particular reason why
(24) you never sent an E-mail to Bernt Ullmann or
(25) Barry Segal never sent an E-mail to Bernt

Page 196

(1)
(2) Ullmann --
(3)    A. That's not the way --
(4)    Q. Let me finish the question.
(5)    A. Sorry.
(6)    Q. Saying where is the signed agreement,
(7) you said you were going to sign it, in words or
(8) substance?
(9)    A. That's not the way we operated. We
(10) always -- everything was -- with me and Bernt
(11) was always like vocalized. If Bernt wanted me
(12) to state something on an E-mail, he'd say
(13) E-mail it to me, like when I spoke to him about
(14) that Unioncon, I happened to be in Europe at
(15) the time.
(16)        So I E-mailed him from my BlackBerry,
(17) you know, because, you know, it was a long
(18) conversation to have a conversation from Europe
(19) to him, but normally all our dealings were
(20) verbally, I'd call him up, Bernt, there's a
(21) problem with the line, you need a new designer
(22) in men's wear, you know, it's really trending
(23) downwards, stuff like that, normal business
(24) dialogue. So everything I would do to him
(25) would be vocalized, verbalized rather.

Page 197

(1)
(2) **Q.** But here you had a written amendment
(3) that was in writing, correct?
(4) **A.** Well, they sent it to us, so my CFO
(5) would say, hey, you know, we are waiting for
(6) something back, that's his job, so he'd come to
(7) me and I'd say, stop bugging me, a guy died in
(8) their place, or stop bothering me, there's --
(9) it's all corporate crap.
(10) **Q.** Do you have any recollection as to
(11) when it was that the in-house counsel died?
(12) **A.** It was in 2006. When, I don't recall
(13) which -- it could have been July, I don't know.
(14) **Q.** Do you have a recollection of leaving
(15) any voice mails for Bernt Ullmann in which you
(16) said in words or substance, when are you going
(17) to sign the agreement?
(18) **A.** I don't have no recollection of that.
(19) Normally when I leave a voice mail, I'd say,
(20) hi, Bernt, it's Issie, I'd like to talk to you,
(21) please call me back. That's my voice mails
(22) usually.
(23) **Q.** Barry Segal had conversations and
(24) correspondence from time to time with Phat
(25) Fashions and Kellwood; is that correct?

Page 198

(1)
(2) **A.** Yeah.
(3) **Q.** Did you ever say to Barry Segal,
(4) look, Barry, in words or substance, if you're
(5) so concerned or if you're asking about this,
(6) why don't you send him an E-mail and find out
(7) where the signed copy is?
(8) **A.** No, he would never send that, it was
(9) my -- my relationship with Bernt. I don't know
(10) if he ever had any dialogue with Bernt.
(11) **Q.** Well, not even to Bernt, for
(12) instance, Barry Segal and Ely Nathanson had had
(13) some communications?
(14) **A.** Yes.
(15) **Q.** Was there anything stopping Barry
(16) Segal from contacting Ely Nathanson and saying
(17) in words or substance, well, we sent you back
(18) the agreements, when are we getting them
(19) signed?
(20) **A.** I think he would have adhered to what
(21) I told him, and I said, leave it alone, it's a
(22) done deal, Bernt assured me it's a done deal,
(23) don't bother, you know, like we didn't want to
(24) irritate anybody.
(25) **Q.** In your answer --

Page 199

(1)
(2) **A.** Yes.
(3) **Q.** -- there's references to certain
(4) months that these conversations that you
(5) testified to took place --
(6) **A.** Yeah.
(7) **Q.** -- with Bernt Ullmann.
(8) I'm just going to give you the months
(9) that they are and all I'm going to ask you to
(10) do is, if you can tell me whether or not you
(11) have a specific recollection of the
(12) conversation that took place in that month, or
(13) if not, whether or not the conversations that
(14) you spoke to -- about generally would be one
(15) that is included or any other options --
(16) options is probably not the right word to use
(17) but any other permutation.
(18) **MR. BEHA:** Just so we are clear, I
(19) think that the answer tends to use phrases
(20) like on or about and things like that in
(21) referring to months or referring to months
(22) whether he refers to months in a pair, I
(23) assume you're going to give him that.
(24) **MR. HOFFMAN:** What I'll do to
(25) short-cut this a little bit, the months

Page 200

(1)
(2) that are referred to in the answer as well
(3) as in that letter that we looked at to the
(4) judge talk about conversations taking
(5) place on or about the months of April,
(6) July, August, October and December of
(7) 2006.
(8) **Q.** Do you have any specific
(9) recollections of conversations that took place
(10) in those given months other than what you've
(11) already testified to?
(12) **A.** I can't recollect what the dialogue
(13) was, but I do recall the specific things we
(14) discussed. I don't know what I could put
(15) together with the date, though. Did I discuss
(16) about the -- or did we discuss about the
(17) unfortunate fella that passed away, I don't
(18) know if that was in April, it could have been
(19) in July, I don't recall, but I do recall
(20) discussing that.
(21) You know, those, you know, everything
(22) that I was concerned or everything that I said,
(23) was actual fact of the things that we
(24) discussed. I don't know if Bernt told me in
(25) August that it's being done, it's corporate,

Page 201

(1)
(2)    you know, corporate red tape, I don't know, you
(3)    know, so...
(4)        Q.   Your testimony is, and correct me if
(5)    I'm wrong, that you recall such a conversation
(6)    taking place, you just can't put it into a
(7)    particular month?
(8)        A.   Correct.
(9)        Q.   Do you have a recollection of having
(10)   one of these phone calls with Bernt Ullmann
(11)   where Barry Segal was on the phone as well?
(12)       A.   Not on the phone, he wasn't on the
(13)   phone, he was listening to my conversation in
(14)   my office.  I have several recollections of
(15)   that.  I think there were two of them where he
(16)   sits in my office and I'm on the phone on a
(17)   speaker phone and I'm talking to Bernt and he's
(18)   listening to the conversation.
(19)       I do that quite a bit in general
(20)   because if I'm dealing with a product that one
(21)   of my associates that handles that particular
(22)   product and I'm talking to Bernt Ullmann about,
(23)   let's say, Phat Fashions designer, I call Josh
(24)   in, Josh, come to my office or come to my
(25)   office, I'm talking to Bernt about something

Page 202

(1)
(2)    specific that Josh should know about, so he
(3)    listens in on the conversation so he can
(4)    understand totally what goes on.
(5)        If it had to do with Baby Phat
(6)    footwear, I would call in my footwear guy to
(7)    come and sit and listen to the conversation,
(8)    and that way it is firsthand instead of me
(9)    repeating something thirdhand after I have a
(10)   discussion, because two minutes, I forget what
(11)   I said to this guy.
(12)       So I try as much as possible in the
(13)   way I operate, I try to have the division head
(14)   come in and listen to the conversation I'm
(15)   having so it's clear to both of us.  That is
(16)   why Barry would be in my office when I had a
(17)   conversation with -- pertaining to if he had
(18)   asked me to call Bernt concerning getting the
(19)   document back.
(20)       Q.   Sitting here today, do you have a
(21)   specific recollection of a conversation with
(22)   Bernt Ullmann where he talks to you about,
(23)   don't worry, we are going to sign the
(24)   agreement, where Barry is present?
(25)       A.   Yes.

Page 203

(1)
(2)        Q.   Which conversation or how many
(3)    conversations is that?
(4)        A.   It's one or two because I recall -- I
(5)    recall getting on the phone and saying, see,
(6)    everything is okay, what you bugging me, just
(7)    don't worry these things, you know, it is a
(8)    done deal, it's a done deal, it's a done deal,
(9)    a done deal, you know.  He's like a corporate
(10)   kind of guy too, so he likes to have his T's
(11)   crossed and his I's dotted, you know, type of
(12)   thing.
(13)       So I assured him, and from the
(14)   conversation that he was aware of or was part
(15)   of, it wasn't part of, he was listening where
(16)   he assured us it is a done deal, forget about
(17)   it, it's just the guy passed away or the
(18)   corporate bullshit, the corporate bull.
(19)       Q.   In April of 2006, according to your
(20)   answer, that was one of the telephone
(21)   conversations that Barry Segal was present on?
(22)       A.   Okay.
(23)       Q.   Does that help refresh your
(24)   recollection as to --
(25)       A.   Yeah.

Page 204

(1)
(2)        Q.   As to when he was present?
(3)        A.   Yes, because I, you know, listen,
(4)    when we talked about this, we discussed about
(5)    what -- when these things transpired, and he
(6)    recalled and he reminded me that it was on this
(7)    and this date, okay, perfect, April.
(8)        Q.   If I were to tell you that the
(9)    in-house counsel -- do you recall his name?
(10)       A.   Who is the in-house counsel?
(11)       A.   Who died.
(12)       A.   It's going to come to me in a minute.
(13)       MR. BEHA:  It isn't a contest, you
(14)   know who it is?
(15)       A.   Graham.
(16)       Q.   I was going to help.  Don Gramke?
(17)       A.   Gramke, I know the Graham part.
(18)       Q.   Now, if I were tell you that he was
(19)   still alive in May of 2006.
(20)       A.   Okay, that means we didn't have the
(21)   discussion until after.
(22)       MR. BEHA:  That discussion?
(23)       A.   This discussion.
(24)       A.   Correct.
(25)       Q.   Right.  So having told you that and

Page 205

(1)
(2) realizing that April 2006 is likely right
(3) around the same time that the amendments signed
(4) by you had been received, does that refresh
(5) your recollection in any way as to what the
(6) conversation in April of 2006 might have been
(7) between you and Bernt Ullmann with Barry Segal
(8) on the call?
(9)    A.   Could have been that -- do I recall
(10) the specific words, no, I don't, but what I
(11) surmise would have been discussed is that
(12) everything okay with the contract and all that
(13) kind of stuff, is it all being signed on
(14) because he would say to me, yeah, it went in,
(15) don't worry about it, our lawyers have it, it's
(16) being done, that could have been that
(17) conversation in December 2006 by which point I
(18) guess Phat Fashions is have the agreement for
(19) over eight months.
(20)    Q.   Do you recall having a conversation
(21) in December 2006 with Bernt Ullmann with Barry
(22) Segal on the phone, again, about the signing of
(23) the extension?
(24)    A.   Barry wasn't on the phone, he was
(25) sitting there listening to the conversation, he

Page 206

(1)
(2) was not on the phone.
(3)    Q.   But if you wrote in your answer that
(4) on or about December 2006, Issie Wiseman and
(5) Barry Segal called Bernt Ullmann regarding the
(6) extension, when I say you, your attorneys, are
(7) you saying that that's incorrect?
(8)    A.   What attorneys?
(9)    MR. BEHA:   Give me a second, I'll be
(10) very brief.  He's just saying in the
(11) document that the lawyers sent that you
(12) read.
(13)    THE WITNESS:   Yes.
(14)    MR. BEHA:   The words that it uses is
(15) that you and Barry called, are you saying
(16) it's wrong that you and Barry didn't call
(17) or are you just saying you called speaker
(18) phone, Barry is there, but he's not part
(19) of the conversation or are you saying
(20) something else?
(21)    A.   Let us clarify, I called with Barry
(22) present in the room.
(23)    Q.   When you say -- or when in the answer
(24) it says that Barry Segal was present on this
(25) call --

Page 207

(1)
(2)    A.   Yes.
(3)    Q.   -- which is what it says for the
(4) April 2006 conversation, what is your
(5) understanding of what that means?
(6)    A.   I'm on --
(7)    MR. BEHA:   Objection, he can't
(8) construe what the document says, he can
(9) tell you what he remembers.
(10)    MR. HOFFMAN:   That is a much better
(11) question.
(12)    Q.   What do you remember?
(13)    A.   I'm on a speaker phone with Bernt,
(14) Barry is in the room listening to the
(15) conversation.
(16)    Q.   Does Bernt know that Barry is
(17) listening?
(18)    A.   I don't really know.  I don't tell
(19) him that I have other people in the room maybe,
(20) I don't think so.  I don't know.
(21)    Q.   Does Barry participate in the call at
(22) all?
(23)    A.   No, I don't think so, but no, he
(24) doesn't -- maybe, I don't know, I'm on a
(25) speaker phone, he knows I'm on a speaker phone.

Page 208

(1)
(2)    Q.   For the December 2006 call, what, if
(3) anything, do you remember about that call?
(4)    A.   I don't recall anything specific
(5) about that call.
(6)    Q.   Do you have any recollection of Bernt
(7) Ullmann telling you in that call that you would
(8) have the fully executed written extension at
(9) the next MAGIC show?
(10)    A.   I do recall something like that, that
(11) it would be all resolved by the next MAGIC show
(12) or something like that, something like that.  I
(13) don't know in what the exact phraseology was,
(14) but I do recall that, that he said something
(15) like that to me, but don't worry about it, next
(16) MAGIC, the document, you'll have it back or
(17) something like that, but I don't recall the
(18) exact phraseology.
(19)    Again, assured me -- but to me, it
(20) didn't matter about the document because we had
(21) an agreement, so I didn't care, you know, Barry
(22) wanted his -- the T's crossed and the I's
(23) dotted, but to me, it was inconsequential.
(24)    Q.   But you still made phone calls about
(25) it?

## Page 209

(2)  A. Uh-huh.

(3)  Q. According to your answer in April,
(4) July?

(5)  A. Sure, every few months, yeah.

(6)  Q. So it was at least in the back of
(7) your mind?

(8)  A. Well, it was in the back of Barry's
(9) mind, he kept asking me to make the call.

(10)  Q. Did there ever come a time when you
(11) said to Barry, Barry, in words or substance,
(12) just call Ely Nathanson and find out what the
(13) hell is going on?

(14)  A. Never. I had nothing to do with Ely
(15) Nathanson, I had nothing to do with Ely
(16) Nathanson.

(17)  Q. Well, only reason I mentioned Ely
(18) Nathanson is that since he was the one that
(19) sent you the document in the first place and
(20) that once you signed it, it went back to him.

(21)  A. The agreement I had was with Bernt
(22) Ullmann, nothing to do with Ely Nathanson. Ely
(23) maybe wrote the document, but I had nothing to
(24) do with him. I had to do with the president of
(25) Phat Fashions. I don't care if he thinks he

## Page 210

(2) signed it or didn't think he signed it, it had
(3) nothing to do with Ely, it had to do with Bernt
(4) Ullmann and myself.

(5)  Q. Just for purposes of clarity now, I'm
(6) going to ask you some questions about these
(7) very conversations giving you dates and times
(8) as indicated on your telephone records.

(9)  A. Okay.

(10)  Q. If by me giving you those dates and
(11) times, it helps refresh your recollection as to
(12) any specifics, fine.

(13)  MR. BEHA: But the specifics right
(14)  now are just about the document, they're
(15)  not -- you're not asking him for
(16)  everything because you haven't given him a
(17)  context for other things that might have
(18)  been under discussion. I'm not being
(19)  specific.

(20)  Q. Right, but here in this particular
(21) case, it's not like we have a long list of
(22) telephone conversations between April and
(23) December of 2006, so my question will be, with
(24) respect to each one, is whether or not you have
(25) a specific recollection of what was discussed

## Page 211

(2) in that conversation, it could be the
(3) extension, it could be something else, because
(4) there are other events going on throughout the
(5) course of the year. If you have a specific
(6) recollection, share it with me, please. If you
(7) don't, just tell me that you don't.

(8)  So we are going to start with
(9) April 5th, I have two telephone calls, one at
(10) 12:37, one at 12:38. The first one is .5
(11) minutes, the second one is .7 minutes, and when
(12) I say telephone calls, what I'm saying is, I
(13) mean a call from your office to Bernt Ullmann's
(14) office direct.

(15)  A. Okay.

(16)  Q. Does that refresh your recollection
(17) as to what was discussed in those
(18) conversations?

(19)  A. No, sir.

(20)  Q. Do you have a recollection of what
(21) was discussed during an April 10th conversation
(22) at 12:05 p.m. that lasted .5 minutes?

(23)  A. No.

(24)  Q. May 9th at 4:50 p.m., .7 minutes?

(25)  A. Nope.

## Page 212

(2)  Q. June 8 at 1:50 p.m., 1 minute?

(3)  A. Nope.

(4)  Q. June 13 at 4:47 p.m., .7 minutes?

(5)  A. No.

(6)  Q. August 24 at 10:10 a.m., .6 minutes?

(7)  A. No.

(8)  Q. We'll get to the other calls later.
(9) Let me interrupt you with a document,
(10) Plaintiff's Exhibit 29.

(11)  (Plaintiff's Exhibit 29, Three
(12)  E-mails, marked for identification.)

(13)  MR. BEHA: There are two E-mails
(14)  there at least.

(15)  MR. HOFFMAN: Actually three.

(16)  A. The one below, all right.

(17)  Q. Have you ever seen this document
(18) before?

(19)  A. Yes.

(20)  Q. Can you tell me if you understand
(21) what was it that Tyfoon was trying to
(22) accomplish here?

(23)  A. Yes, this was a deal we had with a
(24) new licensee they had that got a Phat Farm, it
(25) was like a little trinkets that you sell at --

## Page 217

(1)
(2) A. The customer base that we cater to in
(3) the urban area was the customer that was buying
(4) Phat Farm, Baby Phat.
(5) Q. Would somebody with those customers
(6) not be interested in FUBU sportswear?
(7) A. No.
(8) Q. Why?
(9) A. Because FUBU was like yesterday's
(10) news from -- it had been bastardized all over
(11) the place, nobody is interested in FUBU. I
(12) shouldn't say nobody, they've taken it --
(13) Q. Your customers.
(14) A. They've taken it to a much lower
(15) level.
(16) MR. BEHA: Off the record.
(17) (Short recess taken.)
(18) Q. Did there come a time when BP
(19) Clothing notified Vis-a-Vis that it desired to
(20) terminate Vis-a-Vis as a distributor in Canada?
(21) A. Yes.
(22) Q. Do you recall when that occurred?
(23) A. Not the specific date.
(24) Q. Do you recall how it occurred?
(25) A. Yes, it was a phone call to me from

## Page 218

(1)
(2) Steve Feiner and he told me that, listen,
(3) it's -- I am going to do it on my own, that's
(4) it.
(5) Q. What was your reaction in that phone
(6) call?
(7) A. Wait a minute, like I was stunned by
(8) it, but there's a lot of instances that led up
(9) to that because for about a year and a half
(10) previous to that, you know, he was telling us
(11) you're not doing enough business, I'm doing so
(12) much business in the United States and you're
(13) Mickey Mouse in Canada, and I don't understand,
(14) you know, why you're not doing more business,
(15) and we gave you better prices and we did this
(16) and we did that, you know, and then we have a
(17) dialogue about it.
(18) And I put like a Band-Aid on a
(19) cancer, to use the phraseology and, you know,
(20) we continue going forward another six months.
(21) Then he would then call again and saying, it's
(22) not working, and we kept trying, trying,
(23) trying, and then I realized we couldn't appease
(24) him. He was on radar and he wanted to continue
(25) and go forward on his own.

## Page 219

(1)
(2) Q. With respect to the date you'd been
(3) given notice --
(4) MR. BEHA: This is notice in a casual
(5) way or are you talking about some formal
(6) legal thing, the date when Feiner told him
(7) or something else?
(8) MR. HOFFMAN: I'm going to read a
(9) statement because I don't -- I've never
(10) seen a formal document.
(11) MR. BEHA: That's fine.
(12) Q. In the complaint that was filed in BP
(13) Clothing versus Vis-a-Vis Fashions, in
(14) Paragraph 13 --
(15) MR. BEHA: So this is what BP
(16) Clothing says?
(17) MR. HOFFMAN: Right. I'm going to
(18) ask him if it's accurate or help refresh
(19) his recollection.
(20) Q. It says on or about October 26 of
(21) 2006, BP Clothing notified Vis-a-Vis that it
(22) desired to terminate Vis-a-Vis as a distributor
(23) in Canada. The termination notice offered
(24) Vis-a-Vis a transition period of six months.
(25) Having heard that, does it help

## Page 220

(1)
(2) refresh your recollection as to when it was
(3) that you learned that BP was terminating
(4) Vis-a-Vis?
(5) A. I don't recall that at all because
(6) that's not what transpired. What transpired
(7) was the reason -- what transpired was he called
(8) me and he told me that that's it, I'm going
(9) forward without you, we are not going to -- we
(10) are not going to continue. I said okay. I
(11) didn't say okay in that manner, I just, okay,
(12) however, you know, let me think about this, let
(13) me get back to you.
(14) Got back to him a couple days later,
(15) and I said, well, you know, you want to go on
(16) your own, its A-OK, but you have to give me
(17) reasonable notice because we have -- even
(18) though we don't have an agreement, we have a
(19) verbal agreement, and I don't think it's fair
(20) for you to continue the month we stopped, the
(21) next month you begin, so he said that's what
(22) I'm doing, and if you don't like it, I'll cut
(23) you a check, this is his words, I'll cut you a
(24) check if there's -- okay. Cut me a check.
(25) Subsequent conversation after that, he uses a

Page 221

(1)
(2)  lot of four-letter words and he says, I'm not
(3)  cutting you no check, and this is what we are
(4)  doing.
(5)       So I said, well, if you're going to
(6)  go forward with that kind of attitude, we are
(7)  going to have a problem, and that was it.  And
(8)  that's when we wrote him a letter that I forget
(9)  what it was, that's why I call it legal action,
(10)  but it wasn't legal action.  We wrote him a
(11)  letter from my lawyer stating that we felt that
(12)  it was wrong for him to do that and we needed
(13)  more notification, something to that effect.
(14)       Q.   Later on here in the deposition, I'll
(15)  show you the letter that was sent by your
(16)  attorney --
(17)       A.   Okay.
(18)       Q.   -- to Feiner.  Just to help you now
(19)  datewise, I'm going to tell you the date of
(20)  that letter was December 21, 2006.
(21)       A.   Okay.
(22)       Q.   All right.
(23)       MR. BEHA:  Is that the first letter?
(24)       MR. HOFFMAN:  Yes, the first letter
(25)  by the attorney.

Page 222

(1)
(2)       A.   Okay.
(3)       MR. HOFFMAN:  If there's another one,
(4)  it wasn't given to me.
(5)       MR. BEHA:  I'm sorry, can you just --
(6)  would you mind letting me see it for a
(7)  second, I'm having a memory -- off the
(8)  record.
(9)       (Discussion held off the record.)
(10)       Q.   But having said all that, what I'm
(11)  trying to pinpoint here, if I can, is that
(12)  first phone call from Feiner, if you can even
(13)  give me the month you think it may have
(14)  occurred?
(15)       A.   The first phone call when he was
(16)  unhappy.
(17)       Q.   No, the first phone call where Feiner
(18)  says this is it.
(19)       A.   Could be October, it could be.
(20)       Q.   Do you have a recollection after
(21)  having that first phone call with Feiner?
(22)       A.   Yes.
(23)       Q.   Of getting in touch with Bernt
(24)  Ullmann?
(25)       A.   Yes.

Page 223

(1)
(2)       Q.   What do you recall about that?
(3)       A.   I recall phoning Bernt and telling
(4)  him, I have this problem with Feiner, and I
(5)  think we discussed this before, and I said
(6)  that, you know, listen, I'm not going to put up
(7)  with that kind of bull and, you know, like I
(8)  may sue him, so I recall Bernt telling me do
(9)  what you gotta do, not, you know, like in other
(10)  words, I wanted to be on side with Phat
(11)  Fashions before I, you know, this is like a
(12)  squabble internally, and he said, do what you
(13)  gotta do.  Sort of giving me a green light to
(14)  sue him.
(15)       Q.   Did you have more than one phone
(16)  conversation with Bernt Ullmann about the BP
(17)  Clothing situation?
(18)       A.   I would have to say yes.  I don't
(19)  recall how many, I don't recall when they were,
(20)  but I had a couple of conversations with him
(21)  concerning Steve Feiner.
(22)       Q.   So now what I'm going to do is I'm
(23)  going to go back to the questions I was asking
(24)  about your phone records before, and ask if you
(25)  have any specific recollection of the

Page 224

(1)
(2)  conversation, and I just wanted to give you the
(3)  BP Clothing time frame.
(4)       MR. BEHA:  Of the conversation on
(5)  that particular day and that particular
(6)  time segment, okay.
(7)       MR. HOFFMAN:  Right.
(8)       Q.   To see if -- go ahead.
(9)       A.   Can I interject?
(10)       Q.   Sure.
(11)       A.   The phone call I got from Steve
(12)  Feiner I got on my cellphone in Miami.
(13)       Q.   I wouldn't have -- just so you know,
(14)  the phone records that have been given to us
(15)  are only phone calls made from either your
(16)  cellphone or from your company phone to Bernt
(17)  Ullmann and nothing else.
(18)       A.   Okay.  But I'm just telling you, I
(19)  got the call from Steve Feiner on my U.S.
(20)  cellphone in Miami, so I could have been there,
(21)  I would have had to be in Miami because I
(22)  recall getting the call at the pool, so it is
(23)  clear to me.
(24)       Q.   Were you on vacation?
(25)       A.   Yeah.

## Page 225

(1)
(2)    Q.  Does that help put a time to --
(3)    A.  No, because realistically speaking,
(4) in the winter months, I'm on a vacation a lot,
(5) I have a home in south Florida, and I'm there
(6) much more than I am in Montreal.
(7)    Q.  So going back to the phone calls, the
(8) last phone call that I'd asked you about, and
(9) I've been doing it in the order of the records,
(10) is August 24, the next call I have is
(11) October 31.
(12)    A.  Okay.
(13)    Q.  Took place at 4:04 p.m., 15.2 minutes
(14) to Bernt Ullmann's office.
(15)    A.  From my office?
(16)    Q.  From your office to Bernt Ullmann's
(17) office.
(18)    A.  Okay.  On --
(19)    Q.  On that date.
(20)    A.  Okay.
(21)    Q.  Do you have any specific recollection
(22) as to the specific details of what was
(23) discussed in that conversation at that time on
(24) that date?
(25)    A.  No.

## Page 226

(1)
(2)    Q.  November 3, 4:02 p.m. .4 minutes?
(3)    A.  No.
(4)    Q.  No recollection?
(5)    A.  No.
(6)    Q.  November 6, 2:31 p.m., and I'm
(7) looking -- I don't have the exact amount of
(8) time.
(9)    MR. BEHA:  So far, that has been such
(10)    an effective prod.
(11)    MR. HOFFMAN:  I know, but I'm giving
(12)    you the date anyway.
(13)    Q.  Do you have any recollection of a
(14) call on that day?
(15)    A.  No.
(16)    Q.  November 7th, 2:39 p.m., .1 minutes?
(17)    A.  No.
(18)    Q.  November 8, 3:20 p.m., .3 minutes?
(19)    A.  No.
(20)    Q.  Now, before I asked you about these
(21) calls, the last one we had a record of was
(22) August 24, right?
(23)    A.  Right.
(24)    Q.  Now, I've just gone through a series
(25) of calls on October 31, November 3rd,

## Page 227

(1)
(2) November 6th, November 7th and November 8th.
(3)    Having now given you those calls all
(4) together --
(5)    A.  Yes.
(6)    Q.  -- does that help you recall why you
(7) would have made that many calls to Bernt
(8) Ullmann during that period?
(9)    A.  Yes, I believe I was keeping him up
(10) to date as to what was transpiring with our
(11) situation with Steve Feiner and Baby Phat
(12) Clothing.
(13)    (Plaintiff's Exhibit 31, E-mail dated
(14)    12/8, marked for identification.)
(15)    Q.  Plaintiff's Exhibit 31 is a
(16) December 6th -- actually December 8th E-mail up
(17) at the top.
(18)    Have you seen this document before?
(19)    A.  Yeah.
(20)    Q.  Does this relate to the termination
(21) of the arrangement between BP Jeans and
(22) Vis-a-Vis?
(23)    A.  BP Clothing.
(24)    Q.  Sorry, BP Clothing?
(25)    A.  Yes.

## Page 228

(1)
(2)    Q.  As of December 8, 2006, had that
(3) arrangement terminated or were you still
(4) selling BP Clothing items?
(5)    MR. BEHA:  Wait, wait, wait, I just
(6)    think that's ambiguous, BP Clothing items,
(7)    you mean items obtained through BP
(8)    Clothing?
(9)    MR. HOFFMAN:  Sure.
(10)    A.  Yeah, we were still selling the
(11) clothing, according to this.
(12)    MR. BEHA:  Well, he's not asking
(13)    according to this, because he can do that,
(14)    he's saying do you have a memory.
(15)    A.  Yes, we were selling the clothing.
(16)    Q.  When did you last sell items acquired
(17) from BP Clothing?
(18)    A.  I think through March or April '06.
(19)    Q.  Back to the telephone calls, we are
(20) now going to move into December.
(21)    A.  Okay.
(22)    Q.  December 6th at 3:12 p.m., .5
(23) minutes, any recollection specifically?
(24)    A.  No.
(25)    Q.  How about December 7th at 10:21 a.m.,

Page 229

(1)
(2)  13 minutes?
(3)       A.  I don't recall.
(4)       Q.  Plaintiff's Exhibit 32 is another
(5)  Canadian customs statement from 2006 like the
(6)  one I showed you before.
(7)          (Plaintiff's Exhibit 32, Canadian
(8)       customs statement, marked for
(9)       identification.)
(10)      A.  Yes.
(11)      Q.  Have you ever seen this one before?
(12)      A.  No.
(13)      Q.  Do you happen to know if one was
(14)  filed in 2005 since we've only received one for
(15)  2004?
(16)      A.  I do not, no.
(17)      Q.  Plaintiff's Exhibit 33.
(18)          (Plaintiff's Exhibit 33, E-mail dated
(19)      1/29/07, marked for identification.)
(20)      Q.  Is an E-mail with many attachments
(21)  dated January 29 of 2007 from Bernt Ullmann to
(22)  Josh Wiseman with a cc to you.
(23)          Have you seen that before?
(24)      A.  Yes.
(25)      Q.  Can you tell me what the situation

Page 230

(1)
(2)  there was that was causing some problems?
(3)       A.  This is a situation where Josh was
(4)  informing Bernt of the problems we were having
(5)  with getting -- I'd have to read the whole
(6)  thing.
(7)          MR. BEHA:  I think that would be fine
(8)       with him because if you start at the back
(9)       and figure it out, he wants to know what
(10)      the situation was.
(11)      Q.  Let me see if I can help refresh your
(12)  recollection.
(13)      A.  Please, that would be saving me a lot
(14)  of time.
(15)      Q.  Do you recall a situation where, for
(16)  spring '07, you needed a thousand pieces of
(17)  basic denim for immediate delivery?
(18)      A.  Okay.
(19)      Q.  Does that sound familiar to you?
(20)      A.  I think it sounds familiar to me.  I
(21)  don't know what the specifics were.
(22)      Q.  But just in general --
(23)      A.  Okay.
(24)      Q.  -- because I'm not going to go into
(25)  the specifics of the E-mail.  Do you recall

Page 231

(1)
(2)  another situation at or about this time where
(3)  you needed sufficient samples to seek customers
(4)  for summer of '07 meaning summer '07 samples,
(5)  no?
(6)       A.  No.
(7)       Q.  Did Josh send this E-mail to Bernt
(8)  Ullmann at your direction?
(9)       A.  Yes.
(10)      Q.  Why did you tell him to send an
(11)  E-mail to Bernt Ullmann, if you recall?
(12)      A.  I recall having a discussion with
(13)  Bernt telling him about the problems that we
(14)  are having, and he told me to outline what they
(15)  were and E-mail them to him and he would look
(16)  into it, he would look after it, in other
(17)  words, he would address these problems with
(18)  some of the people that weren't -- we weren't
(19)  getting satisfactory answers from.
(20)      Q.  Did you give any thought at the time
(21)  to telling Josh to also throw in a line there
(22)  about, hey, by the way, where is the signed
(23)  amendment?
(24)      A.  No.
(25)      Q.  Did there come a time when you

Page 232

(1)
(2)  learned that Phat Fashions was considering
(3)  making different arrangements for Canadian
(4)  distribution starting in January 2008?
(5)       A.  Yes.
(6)       Q.  When was that?
(7)       A.  In 2006, I believe the month was
(8)  February.
(9)       Q.  You said 2006.
(10)      A.  Excuse me, 2000 --
(11)          MR. BEHA:  Thank you for your
(12)       courtesy on that.
(13)      A.  2007, in February, just previous to
(14)  the MAGIC show in February, I was informed by
(15)  Bernt that there's new suitor that they were
(16)  talking to about opening up 20 to 25 retail
(17)  stores in the United States of America, they
(18)  were Canadians and they wanted to have the line
(19)  as a perk in Canada, that they wanted to have
(20)  the distribution rates for Canada.
(21)          He told me, I don't know how to tell
(22)  you this, you know, we started off with a very
(23)  like sorrowful type of way saying, you know, I
(24)  don't know how to tell you this, but I was
(25)  flabbergasted.

Page 233

(1)
(2)  Q.  This is a phone conversation?
(3)  A.  Yes.
(4)  Q.  And it's prior to MAGIC in 2007?
(5)  A.  Correct.
(6)  Q.  Can you give me a month, is it
(7)  January or February of 2007?
(8)  A.  I believe it was close to the MAGIC
(9)  show, so I think it would have been in
(10)  February.
(11)  Q.  What else, if anything, do you
(12)  remember about that phone conversation?
(13)  A.  When he first said that to me, I
(14)  don't remember anything after that, I was like
(15)  dumbfounded, I was like dumbfounded, I was
(16)  startled, I was shocked.  It was like the air
(17)  ran out of my lungs, so I don't recall any
(18)  other thing.
(19)      I do recall -- I do recall saying,
(20)  who are these people, what is it all about.  I
(21)  don't know if it was that particular
(22)  conversation or I called him back after I
(23)  settled down a little and said, who are these
(24)  people and what, you know, that's what I
(25)  recall.

Page 234

(1)
(2)  Q.  Do you recall any conversation --
(3)  anything said in that conversation you just
(4)  testified -- withdrawn.
(5)      In the conversation you just
(6)  testified about, do you have any recollection
(7)  of bringing up the amendment?
(8)  A.  What I do recall is during one of
(9)  these conversations, I don't recall bringing up
(10)  the amendment, I asked who the people are and
(11)  that I don't understand what this is all about,
(12)  we have a deal and this is like out of left
(13)  field.
(14)      I mean, I don't know if it was the
(15)  first conversation or the second conversation
(16)  or the third conversation for that matter, but
(17)  I do recall asking, is this a done deal, and he
(18)  tells me, no, it's not a done deal, but I'm
(19)  just telling you that we have a suitor, not the
(20)  word "suitor," I forget what he said.  We are
(21)  talking to other people in Canada that are
(22)  going to be opening 20, 25 retails stores, but
(23)  it's not a done deal.
(24)  Q.  Did he identify the people?
(25)  A.  Yes.

Page 235

(1)
(2)  Q.  Who did he say it was?
(3)  A.  Gaby Bitton.
(4)  Q.  Was that a company you were familiar
(5)  with?
(6)  A.  Yes.
(7)  Q.  How?
(8)  A.  Because they have a company called
(9)  Buffalo Jeans and, you know, I tried to put
(10)  together where do they come to Kellwood or
(11)  where do they come to, so I recall they were up
(12)  for sale, Buffalo Jeans were up for sale, I
(13)  heard about this I guess about several months
(14)  or a year earlier than this transpiring in the
(15)  2006, and I would have imagined that maybe
(16)  Kellwood was trying to buy them, and this is
(17)  how they met.  I don't know.
(18)      Subsequently, I know that Buffalo had
(19)  a deal with a guy in LA, this is off, I mean
(20)  not -- it's something else, but I know they had
(21)  a deal with a guy in LA, and that deal fell
(22)  through because that guy did his due diligence
(23)  and found out there was a whole -- the whole
(24)  scenario of Buffalo Jeans was all made up,
(25)  phoney numbers and, you know, cost him -- I

Page 236

(1)
(2)  think this is what I heard, it cost him 400,000
(3)  to go through the due diligence to find out
(4)  that everything was not there and that deal
(5)  fell apart.  So I knew the people there,
(6)  they're from Montreal.
(7)  Q.  Did you have any relationship with
(8)  Gaby Bitton or Buffalo Jeans?
(9)  A.  None.
(10)  Q.  Were you competitors in any way?
(11)  A.  Everybody is in the garment business
(12)  as a competitor, you know.
(13)  Q.  Was there any bad blood prior to this
(14)  time between the Tyfoon Group and Gaby Bitton's
(15)  companies?
(16)  A.  I wouldn't call it bad blood.  As a
(17)  matter of fact, Gaby Bitton's brother David and
(18)  his mother live in the same building that I
(19)  live in Florida, you know, so I wouldn't
(20)  call it bad blood, you know, we have dialogue
(21)  and things of that nature.
(22)      I do -- I do recall there was a
(23)  situation where we subletted a store, I
(24)  believe, from Buffalo Jeans in a town in
(25)  Ontario somewhere, and it was their lease and,

Page 237

(1)
(2) you know, they told us it was a great store and
(3) was wonderful and everything was great.
(4)      We had to pay him some money to take
(5) over their store because they had done some
(6) furniture and fixtures, but at the end of the
(7) day, it was totally incorrect what they told us
(8) and we had to close that store, so there could
(9) have been some bad blood because of that, but
(10) no dialogue or anything like that, but I know
(11) these individuals and I did not paint a very
(12) rosie picture of them to Bernt Ullmann when he
(13) told me who they were and I told him that I do
(14) not believe that they will open any stores. I
(15) think it's -- this is a pack of lies that
(16) they're telling you, they'll never open a store
(17) and they'll never do the job we do and all that
(18) kind of stuff so...
(19)      Q.  Did there come a time when you
(20) learned that Phat Fashions might not sign the
(21) amendment?
(22)      A.  There came a time when I learned that
(23) they may not go forward with us even though we
(24) had a deal.  So I spoke to Bernt and I, you
(25) know, I decided to -- it was a very peculiar

Page 238

(1)
(2) situation because I decided to try to win them
(3) over in a nice way because it would be really
(4) not good for us to go to war with them
(5) immediately and say to them, hey, you can't do
(6) that, we had a deal going forward, what are you
(7) talking to other people for.  You can't talk
(8) like that to a corporation that does $3 billion
(9) or, you know, a big company like that.  And we
(10) had to have an ongoing relationship going
(11) forward.
(12)      So I tried to win them over and tried
(13) to tell them, listen, I'm going to try to
(14) change your mind, you didn't do a deal with
(15) these people, right, so I am going to try to
(16) convince you to stick with us and have a good
(17) relationship going forward, so that was my
(18) attitude when, you know, when it first sunk in
(19) in February right after -- at MAGIC, again, I
(20) met with Bernt and I had -- he had told me
(21) that, yeah, they're having conversation with
(22) these other guys and it's coming close to deal,
(23) but we haven't done anything yet.  Telling me
(24) that they're still, you know, like saying to me
(25) like they're still not a done deal, okay.

Page 239

(1)
(2)      And only when -- really when it came
(3) to pass that after MAGIC, I took the liberty of
(4) calling Bernt and saying, listen, Bernt --
(5) Bernt indicated to me that this was coming from
(6) Bob Skinner, so I said, Bernt, I'm going to
(7) call Bob Skinner.  He said, go ahead and call.
(8) So I called Bob Skinner in early March.
(9)      Q.  This is the call you testified to
(10) earlier?
(11)      A.  Yeah, but that was the one call I
(12) think I called him about, so I called Bob and I
(13) tried to speak to him.  He was not there.  He
(14) called me back a day later or a couple days
(15) later, I don't recall the exact timing, and
(16) before I had a chance to tell him, listen, we
(17) have a deal going forward and I don't
(18) understand why you're doing this and trying to
(19) pitch him, so to speak, he said to me, look, I
(20) have to tell you, honestly, you're talking to
(21) the wrong guy.  I have implicit trust in my
(22) president of Phat Fashions.  He makes all the
(23) decisions, and I'll abide by what he decides,
(24) and that was the extent of the conversation.
(25)      Then I called back Bernt Ullmann and

Page 240

(1)
(2) I said, Bernt, this is what Bob Skinner told me
(3) and it's completely different from what you
(4) told me, and he started laughing and saying,
(5) you know, this is corporate America and, you
(6) know, like I'm the bad guy type of thing.  I
(7) got the message right away.  And I saw at that
(8) point in time that I'm being played here, and
(9) that's when I decided that there's no use to
(10) continue with trying to win them over.
(11)      You know, at this point in time, we
(12) wanted to exercise our rights because we had an
(13) agreement and we always had an agreement going
(14) forward, and it was terrible that they should
(15) do something like that, I have to tell you, to
(16) act in that kind of manner.
(17)      Q.  You said at that time you decided to
(18) exercise your rights, what did you mean by
(19) that?
(20)      A.  To go forward, I mean to get them to
(21) understand that we are going to go to -- we are
(22) going to -- we have a deal going forward and
(23) that's now -- I'm telling you, we have a deal
(24) going forward and now it's hardball because
(25) basically I didn't want to fight with them,

Page 241

(2) but, you know, at one point in time, you have
(3) to say, listen, I'm trying to win them over,
(4) but it ain't happening, so I knew at that point
(5) in time that futile for me to try to win them
(6) over anymore.
(7)      Q.  Can you put a month on when you
(8) thought it was now futile for you to try to win
(9) them over?
(10)     A.  I would say second week of March
(11) after I had a conversation with Bob Skinner and
(12) Bernt Ullmann, 2007.
(13)     Q.  When you were having discussions with
(14) Bernt Ullmann, did he mention to you the
(15) possibility of the Tyfoon Group getting a
(16) license with Coogi, C O O G I?
(17)     A.  No.
(18)     MR. BEHA:  I think you need to put
(19) some time frame on this for the witness to
(20) understand what you're asking about.  You
(21) said conversations, I mean that takes
(22) you --
(23)     MR. HOFFMAN:  Well, I was referring
(24) to the conversations he just testified to
(25) that he had with Bernt Ullmann where he's

Page 242

(2) trying to convince Bernt Ullmann, you
(3) know, to let us go forward.
(4)      Q.  So the conversations I'm talking
(5) about, let's say, are going to be February,
(6) March of 2007.
(7)      A.  I don't recall that conversation
(8) being in that month.  I recall sometime -- I
(9) don't know exactly when, I could check my
(10) records, I could try to find out when I had
(11) these conversations, but I recall telling Bernt
(12) that I have an opportunity here to talk to
(13) these guys from Coogi.  It doesn't really
(14) compete with the Phat Farm product, and
(15) because, you know, in our contract, it states
(16) that, you know, we can't -- we can't do certain
(17) product lines that are competitive, so I was
(18) always, you know, want to be on side, so when I
(19) spoke to Bernt -- what I'd like to reflect on,
(20) before Bernt had the job at Phat Fashions, he
(21) worked for Coogi.
(22)     Q.  C O O G I?
(23)     A.  Yes, it's a company called Coogi.  He
(24) was working there, he was running Coogi, which
(25) was part of another firm.  As a matter of fact,

Page 243

(2) FUBU is also part of that corporation that owns
(3) Coogi, FUBU and all that kind of stuff.  And
(4) when we were in Vegas, I would have to say,
(5) previous to 2004 -- when did they hire Bernt,
(6) can you enlighten me?
(7)      Q.  I believe Bernt came on board
(8) sometime in 2004.
(9)      A.  Sometime in 2002 or 2003, I had a
(10) conversation with Bernt about Coogi.  He showed
(11) me the product line at MAGIC in Las Vegas, not
(12) at MAGIC, but in a hotel in Las Vegas during
(13) the MAGIC show.  And he was the, you know, CEO
(14) or whatever of Coogi, and he showed me the line
(15) and he was interested in us doing it for
(16) Canada.
(17)      At that point in time, I told him I
(18) felt that it was a little bit too high priced,
(19) it was an unknown entity in Canada, they were
(20) just starting it or restarting it in the United
(21) States and I didn't have an interest, and
(22) that's how I knew that Coogi and Bernt Ullmann
(23) had a relationship, so when I started -- I
(24) started speaking to these fellows from Coogi,
(25) it dawned on me that Bernt Ullmann was a -- one

Page 244

(2) of the individuals involved in Coogi and from
(3) years ago and I had asked him if he knew these
(4) individuals and all that kind of stuff and what
(5) do you think of the line and that kind of
(6) thing, and he told me, yeah, that's a good
(7) idea.
(8)      Q.  What kind of line does Coogi have?
(9)      A.  Men's urban sportswear, higher
(10) priced.
(11)     Q.  Higher priced than Phat Fashions
(12) sportswear?
(13)     A.  Yes.
(14)     Q.  Do you eventually make a deal with
(15) Coogi?
(16)     A.  Yes.
(17)     Q.  Is that deal ongoing today?
(18)     A.  Yes.
(19)     Q.  Is it profitable?
(20)     A.  Not yet.  We are hoping to make it
(21) profitable, it takes a while, you know, it
(22) doesn't happen overnight.
(23)     Q.  Nothing does.
(24)     A.  No, so you work at it, you work at
(25) it, it could take a couple of years until we

Page 245

(2) get the message across, until we get the
(3) customers to appreciate it and understand it
(4) and all that kind of stuff, so is it
(5) profitable, not yet.
(6)     Q.  If you had been selling -- well, are
(7) you selling Coogi products now?
(8)     A.  Yes.
(9)     Q.  And you're selling Phat Fashions
(10) product at the same time?
(11)     A.  We stopped selling Phat -- don't
(12) forget, we were six months in advance, we are
(13) finished selling and there is no Phat Fashions
(14) line even for spring from what I'm given to
(15) understand, but our relationship terminates,
(16) according to them, December 30.
(17)     We sell December 30 goods -- or
(18) November -- October, November, December which
(19) is holiday, we sell that some time in May and
(20) April is when our selling period is for
(21) delivery in November and December.
(22)     Q.  I got it.
(23)     A.  So we are -- would go like six months
(24) ahead, so we are not selling anything.
(25)     MR. BEHA:  You're not talking about

Page 246

(2)     the store, you're talking about the
(3) wholesale?
(4)     THE WITNESS:  Correct.
(5)     MR. HOFFMAN:  We'll get to stores.
(6)     Q.  Are the Coogi -- is Coogi a
(7) competitor of Phat Fashions, as far as you
(8) understand it?
(9)     A.  No, everybody is a competitor, but do
(10) they go head on, no.  Phat Fashions is
(11) completely different, cater to a different
(12) customer base than Coogi is.
(13)     Q.  Under the trademark license agreement
(14) which you referred to before?
(15)     A.  Yes.
(16)     Q.  Assuming that you were still going
(17) forward with Phat Fashions through 2008?
(18)     A.  Yeah.
(19)     Q.  Would you still be able to sell Coogi
(20) as well?
(21)     A.  If I got a verbal okay from them,
(22) which I did from Bernt, there was no problem.
(23)     Q.  But when did you ask Bernt for the
(24) verbal okay, when?
(25)     A.  Not for a verbal okay, you know, if

Page 247

(2) he knew -- he said it's a good idea for you to
(3) do it.
(4)     Q.  When did he say that to you?
(5)     A.  I don't recall the exact date.  I
(6) have to tell you, honestly, Counselor, I could
(7) find it for you, I would imagine, but I don't
(8) have the exact date right now.
(9)     Q.  Is it possible that that conversation
(10) with Bernt where he said it was a good idea
(11) took place after he had already told you that
(12) Phat Fashions was making other arrangements for
(13) Canada?
(14)     A.  I don't know.  I don't think so, but
(15) I don't know.  I don't know.  I can't remember.
(16)     Q.  Back to the telephone calls.
(17)     A.  Yes.
(18)     Q.  See if you have specific
(19) recollections.  February 2, 2007, we have a
(20) call at 2:22 p.m. that lasted .4 minutes.  Any
(21) recollection of what that call was about?
(22)     A.  No.
(23)     Q.  The same day, 3:48 p.m., 12.2
(24) minutes.  Any recollection of what that call
(25) was about?

Page 248

(2)     A.  No.
(3)     Q.  February 9, a week later at
(4) 3:52 p.m., a call for .5 minutes.  Any
(5) recollection about what that was about?
(6)     A.  No.  Is this me calling him or him
(7) calling me?
(8)     Q.  This is you calling him.
(9)     A.  Okay.
(10)     Q.  I'll show you Plaintiff's Exhibit 34.
(11)     (Plaintiff's Exhibit 34, A document,
(12) marked for identification.)
(13)     Q.  Have you ever seen this document
(14) before?
(15)     A.  I don't think so.  I don't think so.
(16)     Q.  What I want to do is, there are a
(17) couple of statements in here which --
(18)     MR. HOFFMAN:  Did you want to say
(19) something helpful?
(20)     MR. BEHA:  I wanted to ask a question
(21) because, as you know, I'm still catching
(22) up on some of this that I can ask you
(23) about off the record.
(24)     MR. HOFFMAN:  You can ask it on.
(25)     MR. BEHA:  I'm getting now a little

Page 249

(2) bit confused which line is which. The
(3) baby -- the BP Clothing, is that male or
(4) female?
(5)     THE WITNESS: Female.
(6)     MR. BEHA: That's what I thought.
(7) Never mind. Okay.
(8)     MR. HOFFMAN: Okay.
(9)     Q. There are some statements in here
(10) that are made in the complaint, understanding
(11) that these are statements that are made by BP
(12) Clothing's lawyers.
(13)     A. Okay.
(14)     Q. I'm going to read the statements to
(15) you, they're short, and I'm just going to ask
(16) you if, to the best of your knowledge, they're
(17) true, not true or you don't know or you don't
(18) recall or any other answer you might give me.
(19) It starts at Page 2.
(20)     A. Yeah.
(21)     Q. No. 5, BP Clothing is the exclusive
(22) worldwide licensee of all rights to the famous
(23) Baby Phat trademark for clothing?
(24)     A. I wouldn't know that.
(25)     Q. No. 6, since 1999, Defendant

Page 250

(2) Vis-a-Vis has been a nonexclusive distributor
(3) of Baby Phat clothes in Canada?
(4)     A. I disagree with that statement.
(5)     Q. Why do you disagree?
(6)     A. Because we were an exclusive
(7) distributor of Baby Phat clothing in Canada.
(8)     Q. No. 7, there is no and has never been
(9) any written distribution agreement between the
(10) parties?
(11)     A. I agree.
(12)     Q. Eight, BP Clothing receives periodic
(13) purchase order from Vis-a-Vis and delivered the
(14) Baby Phat clothes pursuant to such purchase
(15) orders?
(16)     A. Correct.
(17)     Q. No. 9, BP Clothing has performed on
(18) every accepted purchase order it has received
(19) from Vis-a-Vis?
(20)     A. They forgot one word in there,
(21) poorly, performed poorly.
(22)     Q. No. 10, Vis-a-Vis has an unpaid
(23) balance from several of these deliveries dating
(24) back to November 2006. Vis-a-Vis has failed
(25) and refused to pay the invoices despite

Page 251

(2) repeated demands for payment?
(3)     A. I think that's true.
(4)     Q. Eleven, Defendant's only rationale
(5) for nonpayment is the irrelevant allegation
(6) that Plaintiff improperly terminated its
(7) distribution rights for Canada?
(8)     MR. BEHA: Without regard to whether
(9) it's relevant or not, was that the reason
(10) for nonpayment?
(11)     THE WITNESS: At the end of the day,
(12) I would have to say yes. The reason for
(13) nonpayment was a discussion we had with
(14) our attorney.
(15)     MR. HOFFMAN: And we need -- as soon as
(16) you get to that, we need to be careful
(17) about how we do this. May I speak to him
(18) for just a moment. I think he can tell
(19) you what you need without accidentally
(20) striking into privilege.
(21)     MR. HOFFMAN: Sure.
(22)     (Discussion held off the record.)
(23)     Q. Did you have anything you needed to
(24) add to your answer?
(25)     MR. BEHA: I don't think he had

Page 252

(2) really answered it, but anyway...
(3)     Q. You want to answer it?
(4)     A. No, as a result of the discussions I
(5) had with my attorney, I decided to withhold
(6) payments to Baby Phat.
(7)     Q. No. 12, BP Clothing was unhappy with
(8) Vis-a-Vis performance in Canada. BP Clothing
(9) informed Vis-a-Vis of its dissatisfaction in
(10) mid 2006 particularly with the fact that
(11) Vis-a-Vis never supplied weekly or monthly
(12) sales reports. As early as January 2006, BP
(13) Clothing informed Vis-a-Vis that it was
(14) considering hiring a sales agent for Canada.
(15)     With respect to any of those
(16) statements, any comments that you'd like to
(17) make?
(18)     A. I don't recall this. I mean, I
(19) recall them being unhappy all the time. There
(20) was nothing that would make them happy, but,
(21) you know, so I agree with the fact that they
(22) weren't happy. I don't agree with the fact
(23) that they notified me they were hiring an
(24) agent.
(25)     Q. Okay. Do you recall there being an

Page 253

(1)
(2)    issue as to sales reports, weekly or monthly?
(3)    A.  Yeah, but I do recall they wanted
(4)    them and we supplied them, you know, when they
(5)    complained about it, we supplied them.
(6)    Q.  Thirteen, this is something I asked
(7)    you about before, on or about October 26, 2006,
(8)    BP Clothing notified Vis-a-Vis that it desired
(9)    to terminate Vis-a-Vis as a distributor in
(10)   Canada.  Is that accurate, to the best of your
(11)   knowledge?
(12)   A.  Could be accurate, yes, I don't have
(13)   an exact date.  Maybe if they're saying that
(14)   date, I'll agree to it.  The only thing that is
(15)   ambiguous here is the termination notice
(16)   offered Vis-a-Vis a transition period of six
(17)   months, I don't agree with that.
(18)   Q.  Do you recall being offered any type
(19)   of transition period by BP Clothing?
(20)   A.  No, there was no transition period
(21)   because -- I can try to explain this for you if
(22)   you want, it's a lot of typing, but I could
(23)   explain this to you.
(24)        What it was is that I told you we
(25)   worked six months ahead, so what do you recall

Page 254

(1)
(2)    a transition period.  We now sold goods in
(3)    October, we sold goods for April, right, is
(4)    that six months ahead, no, we are delivering in
(5)    April.  We are not given the opportunity now to
(6)    get six months of selling time through until
(7)    end of December -- or end of September 2007.
(8)        Do you understand what I'm saying?
(9)    Q.  I do.
(10)   A.  So he's saying it's a six months'
(11)   notice, there was no notice.  He said
(12)   effective -- what we had already finished
(13)   selling effective April 1, I'm taking it over.
(14)   I said, you can't do that, that's not giving me
(15)   notice.  I've already done all the work through
(16)   until April, until March 30, what do you mean
(17)   you're taking over April 1, that was the whole
(18)   basis of the problem we had.  In his mind, it
(19)   was fair.  In my mind, it was absolutely
(20)   unfair.
(21)   MR. BEHA:  Can I just, we are not
(22)   using -- for my -- by taking over April 1,
(23)   you mean taking over for deliveries?
(24)   THE WITNESS:  The selling, April 1 we
(25)   delivered everything.

Page 255

(1)
(2)    MR. BEHA:  The selling now for what
(3)    would be delivered in April or taking over
(4)    selling?
(5)    THE WITNESS:  Correct, no deliveries
(6)    in April.
(7)    MR. BEHA:  I don't understand it.
(8)    MR. HOFFMAN:  I have had a lot of
(9)    cases in this area, so I get it.
(10)   A.  I had already sold by this date, I
(11)   had already -- we had the samples and we had
(12)   already sold the deliveries through March 30,
(13)   right.
(14)   Q.  Right.
(15)   A.  He says to me, okay, I'm taking over
(16)   the selling now in November 1 for deliveries in
(17)   April.  I said, that's not giving me six
(18)   months.  He says, look, it's October now,
(19)   November, December, January, February, March,
(20)   it's five months.  I said, no, you're counting
(21)   wrong, it should be from April until
(22)   September 30, right.  That's where the
(23)   disagreement was, that's all.
(24)        He has every right to take over and
(25)   do it on his own, I don't know how well they're

Page 256

(1)
(2)    doing, but he's got that right, that's okay, we
(3)    didn't have an agreement, we had a verbal
(4)    agreement.  What's fair in a verbal agreement
(5)    depending on how many years you're together and
(6)    all that kind of stuff, you know, so okay, we
(7)    decided that no problem, we'll go to court and
(8)    let a judge decide what's fair, you know.
(9)    Q.  In 15 where it says, at the time of
(10)   the termination notice, Vis-a-Vis had already
(11)   placed purchase orders for collections
(12)   available on February 15, 2007 and March 15,
(13)   2007 which BP Clothing had accepted, was that
(14)   accurate?
(15)   A.  Yeah, this is until March -- end of
(16)   March deliveries that would go through
(17)   deliveries March of '07.
(18)   Q.  And in 17, Vis-a-Vis unilaterally
(19)   decided to and did cancel its order for
(20)   February 15, 2007 and March 15, 2007; was that
(21)   true?
(22)   A.  No, we had a dialogue -- you have to
(23)   understand the background here.  What happened
(24)   was that he now — Feiner hired his own
(25)   personnel, went out and told the whole market

Page 257

(1)
(2) in November we are taking it over, the prices
(3) are going to be 20 percent less, so destroyed
(4) my sales for February and March.
(5)      So I called him up and I said, you
(6) should have never done that because you're
(7) telling people it's going to be 20 percent
(8) cheaper, now they don't want to buy from me, so
(9) I'd like you to cancel my orders for February
(10) and March, you keep the goods because my
(11) customers don't want to accept it.  Because
(12) you're telling them that story.  So
(13) unilaterally is not the right word.  He
(14) accepted, he said, okay, send me back the
(15) samples, that's that letter.
(16)      Q.   The one we just looked at?
(17)      A.   Correct.  Send me back the samples,
(18) that's the letter.
(19)      Q.   Right, which would be Plaintiff's
(20) Exhibit 31?
(21)      A.   Correct.
(22)      Q.   Question on 25 which is on Page 4.
(23)      A.   Yes.
(24)      Q.   Defendant is not, you're the
(25) Defendant, and never has been the exclusive

Page 258

(1)
(2) distributor of BP Clothing in Canada; is that
(3) correct?
(4)      A.   No, that is incorrect.
(5)      Q.   What is incorrect?
(6)      A.   We are the exclusive distributor of
(7) BP Clothing in Canada.  There were no direct
(8) sales from him into Canada anywhere else except
(9) through us.
(10)      MR. BEHA:  You're saying you were?
(11)      THE WITNESS:  Yes.
(12)      A.   I'm saying no to this point,
(13) Defendant is not, I'm saying Defendant was.
(14)      Q.   You're denying what they're saying?
(15)      A.   Correct.
(16)      Q.   When was the first time after you had
(17) your discussions with Bernt Ullmann where you
(18) knew that it was over that you started trying
(19) to find a license or licenses to replace Phat
(20) Farm?
(21)      A.   Only after I had the discussions with
(22) Bernt and Skinner in that time period, this was
(23) sometime, I guess, in March.
(24)      Q.   And what do you recall about the
(25) efforts that were made generally to find a new

Page 259

(1)
(2) license?
(3)      A.   Well, we went to the shows, we went
(4) to all the shows in Barcelona, in Munich, we
(5) went to every show here in the United States,
(6) the Coterie, the MAGIC show, everywhere.
(7)      We started looking for other product
(8) because we are going to be in business going
(9) forward, and this was 60 percent of our
(10) business we had to replace, that it caused us a
(11) lot of harm, a lot of harm, and it's not going
(12) to replace -- you don't just replace 60 percent
(13) of your business in five minutes.
(14)      Q.   Do you recall some of the different
(15) licenses that you looked at?
(16)      A.   Yeah.
(17)      Q.   Can you give me some names?
(18)      A.   We have licenses, we have two new
(19) product that we picked up in Germany we are
(20) doing, ABS is a line out of -- I don't know if
(21) that was subsequent or before the termination
(22) part, we are doing a line called Parrish.
(23)      Q.   These are companies that you now have
(24) license agreements with?
(25)      A.   Well, license agreement we have, most

Page 260

(1)
(2) of them are oral agreements, license
(3) agreements, yeah.
(4)      Q.   You're carrying their product?
(5)      A.   Yeah.
(6)      Q.   ABS, and what type of products are
(7) ABS?
(8)      A.   ABS is ladies', Parrish is men's, we
(9) have --
(10)      Q.   Urban, are these both urban?
(11)      A.   Parrish is urbanesque, it's urban,
(12) that's a dirty word now, because the market for
(13) urban like died.  I mean, Phat Farm can attest
(14) to that because they're, you know, they don't
(15) even have a line in men's, given what I am to
(16) understand, but it's been a tough grind, so
(17) it's like urbanesque on a different level, a
(18) higher level.
(19)      Q.   And what is Parrish?
(20)      A.   That's Parrish.  ABS is ladies'.
(21)      Q.   Bandolera, is that a company that you
(22) looked at?
(23)      A.   No, I don't know what Bandolera is.
(24)      Q.   I'll show you Plaintiff's Exhibit 35.
(25)      (Plaintiff's Exhibit 35, A document,

Page 261

(1)

(2)     marked for identification.)

(3)     **Q.** And going forward, let me tell you

(4) what I've done, because it will clearly speed

(5) up the deposition, we've been given a series of

(6) documents.

(7)     **A.** From us.

(8)     **Q.** All from you, showing parties that

(9) were contacted beginning in March of 2007.

(10)    **A.** Okay.

(11)    **Q.** What I've done is rather than ask you

(12) about every single document, I have grouped

(13) together all the documents pertaining to a

(14) specific company. So, and I will make that

(15) representation to you for each and every one,

(16) these are all E-mails between Claudia, I assume

(17) it's Claudia Michaels, I believe.

(18)    **A.** She runs our -- she ran our Baby Phat

(19) **business. She is my associate, yeah, and I**

(20) **guess Bandolera is one of the companies she**

(21) **wrote an E-mail to.**

(22)    **Q.** And I can tell you that there are

(23) E-mails here that are dated March 5th, 13, 14.

(24)    **A.** Correct.

(25)    **Q.** I'll just -- I mean, they run all the

Page 262

(1)

(2) way through May 30 and they end with a meeting

(3) being cancelled and there seems to be nothing

(4) further than that.

(5)     **A.** Okay.

(6)     **Q.** Sitting here today, is it your

(7) testimony that an agreement was not entered

(8) into with Bandolera?

(9)     **A.** Yes.

(10)    **Q.** Did you have any discussions with

(11) anyone within Tyfoon Group as to why that was?

(12)    **A.** We went out to acquire other product

(13) **lines, we had acquired some, but, you know, a**

(14) **deal has to work for everyone, you know, so I**

(15) **would have imagined that some of these here**

(16) **deals weren't structured properly or that at**

(17) **the end of the day, we couldn't make any money**

(18) **doing it so...**

(19)    **Q.** And the product lines that you've

(20) mentioned you've acquired, are those the two

(21) that you've talked about, ABS and Parrish?

(22)    **A.** There's also Frank Walder.

(23)    **Q.** Okay.

(24)    **A.** Nine House.

(25)    **Q.** Any others you recall?

Page 263

(1)

(2)     **A.** I don't recall. There are probably

(3) some others.

(4)     **MR. HOFFMAN:** I'll just note to

(5) counsel, because I know you haven't been

(6) involved in the document production up

(7) until now, but we have not received any

(8) documents having to do with ABS or Parrish

(9) or Frank Walder or Nine House, and as we

(10) go through these, I'm -- we'll find out

(11) that all that we've received may be

(12) companies that you didn't make a deal

(13) with. As we get through them, we'll ask.

(14)    **Q.** If during the course of the

(15) deposition, you have a recollection of some

(16) other product line you've acquired, please let

(17) me know.

(18)    **A.** Okay.

(19)    (Plaintiff's Exhibit 36, Letter from

(20) Mr. Wiseman to Phat Fashions, marked for

(21) identification.)

(22)    **Q.** Plaintiff's Exhibit 36 is a letter

(23) from you to Phat Fashions. I take it you've

(24) seen this document before?

(25)    **A.** Yes.

Page 264

(1)

(2)     **Q.** Now, by this point, March 19 of 2007,

(3) you'd already had your conversation with

(4) Skinner?

(5)     **A.** Yes.

(6)     **Q.** And you pretty much knew that the

(7) agreement was over or that you weren't going

(8) forward in 2008?

(9)     **A.** No, we were going forward, they

(10) **weren't going forward.**

(11)    **Q.** You knew that they weren't going

(12) forward?

(13)    **A.** That was pretty much, but we only

(14) **knew that they weren't -- that they didn't want**

(15) to go forward and we want to go forward, it's

(16) not that they didn't want to go.

(17)    **Q.** Why did you send this document to

(18) Bernt Ullmann?

(19)    **A.** Because Bernt Ullmann is the guy that

(20) **we made the deal with to go forward, as**

(21) **president of Phat Fashions.**

(22)    **Q.** Okay. But in this document, you are

(23) purporting to exercise an option, correct?

(24)    **A.** Yes.

(25)    **Q.** Had you been told at that time that

Page 265

(1)
(2) Phat Fashions was not going to assign the
(3) amendment to the license agreement?
(4)     MR. BEHA:  Can you just read it back.
(5)     (Record read.)
(6)     MR. BEHA:  You don't mean assign.
(7)     MR. HOFFMAN:  Actually, I said hadn't
(8) you been told by this time that Phat
(9) Fashions was not going to sign the
(10) amendment.
(11)     A.  We didn't talk about signing an
(12) amendment, we talked about going forward.  They
(13) had intended to go forward with another party.
(14) We had been informed not -- we have never been
(15) informed that they were -- that they signed off
(16) on anything.  They hadn't told me anything
(17) except verbally, he told me, Bernt, that they
(18) were negotiating with another party.  He never
(19) told me that they are going forward with
(20) another party, that's absolutely untrue.
(21)     Q.  I think what my question was, did you
(22) know as of March 19 of 2007 that Phat Fashions
(23) was not going to sign the written amendment?
(24)     A.  No, I did not know that.  I knew that
(25) they were negotiating with others and that they

Page 266

(1)
(2) were close to making a deal, is the words that
(3) Bernt told me, but there was no deal.  He told
(4) me we have not signed, we have -- he told me
(5) these words, we have their proposal, we have
(6) not signed.
(7)     Q.  This is what I'm trying to figure
(8) out.
(9)     A.  That's why I was trying to win them
(10) over.
(11)     Q.  But I had thought, maybe I
(12) misunderstood you, that your testimony was that
(13) as of some time in mid February --
(14)     A.  Yup.
(15)     Q.  -- when you had your discussion with
(16) Skinner?
(17)     A.  Yes.
(18)     Q.  And then --
(19)     A.  No, no, Skinner was in March, not in
(20) February.
(21)     Q.  March, okay.
(22)     A.  Not February.  February I had
(23) discussions with Bernt Ullmann before and
(24) during MAGIC.
(25)     Q.  Okay.  So the discussion with Skinner

Page 267

(1)
(2) in March, do you know if it's before or after
(3) the date of this letter?
(4)     A.  I know for sure it's before.
(5)     Q.  Okay.  How soon before?
(6)     A.  I don't know how soon before because
(7) nobody writes this letter with my signature
(8) until I had that discussion and I saw where we
(9) were.
(10)     Q.  Who drafted this letter?
(11)     A.  I believe my attorney and myself.
(12)     Q.  Was there any reason why you didn't
(13) exercise the option orally at this time?
(14)     A.  What do you mean by that?
(15)     Q.  I mean calling up Bernt Ullmann and
(16) saying, you know that amendment, well, it
(17) provides that we have to exercise the option to
(18) go forward for three years, we're exercising
(19) the option, have a nice day.
(20)     A.  We had a lot of oral discussions, and
(21) I saw that after trying to win them over, that
(22) wasn't getting me anywhere, and I said now it's
(23) time to advise them of what my intention is
(24) because they were not telling me that they were
(25) signing with anybody else, they were telling me

Page 268

(1)
(2) they're negotiating, and they kept leaving me
(3) with a little bit of hope, but I could see by
(4) the end of -- the middle of March, after having
(5) discussions with Skinner and Bernt, that some
(6) reason, something is not forthcoming.  They're
(7) not being very -- they're being coy with me.
(8)     And I just felt that that was enough
(9) at that point in time, let's write this letter,
(10) because now I want to let you know that we do
(11) have an agreement, we had always had an
(12) agreement and we are going forward with the
(13) agreement.
(14)     Q.  And this was a letter, I believe you
(15) testified, that you wrote after consultation
(16) with your attorney?
(17)     A.  Not consultation.  After having
(18) dialogue with internally ourselves, myself,
(19) Barry and Josh, and I guess to draft the
(20) wording properly, we must have consulted with
(21) an attorney.
(22)     Q.  That's all I meant.  I didn't mean it
(23) was a bad thing that you had a consultation.
(24)     A.  No, no, yeah.
(25)     Q.  Handing you Plaintiff's Exhibit 37.

Page 269

(1)
(2)     Have you seen this document before?
(3)     **(Plaintiff's Exhibit 37, A document,**
(4)     **marked for identification.)**
(5)     **A.  Yes.**
(6)     **Q.  What is this?**
(7)     **A.  This is information telling me that**
(8)     **they have no intention of proceeding with us,**
(9)     **that -- a matter of fact, they're terminating**
(10)    **the relationship with us.**
(11)    **Q.**  Prior to this time -- let me rephrase
(12)    that.
(13)        When was the first time that you knew
(14)    for certain that Phat Fashions was not going to
(15)    go forward with anyone from the Tyfoon Group?
(16)    **A.  This is the letter.**
(17)    **Q.**  The March 21 letter?
(18)    **A.  This is the only letter that we have**
(19)    **where they say they're not going forward with**
(20)    **us, this is the first time, March 21.**
(21)    **Q.**  What did you do when you received
(22)    this letter?
(23)    **A.  Well, we had meetings together and I**
(24)    **called my attorney and that's -- I said,**
(25)    **listen, we have a problem here and we are going**

Page 270

(1)
(2)     **forward.**
(3)     **Q.**  Putting aside the attorney, who did
(4)     you have the meetings with?
(5)     **A.  With Josh and Barry and my internal**
(6)     **people.**
(7)     **Q.**  Are there other internal people that
(8)     you rely on for things like this other than
(9)     Josh and Barry?
(10)    **A.  What do you mean rely on?**
(11)    **Q.**  If a situation comes up where a major
(12)    licensor is now telling you that they're not
(13)    going to go forward, that those people are
(14)    important enough in your organization that you
(15)    would talk to them about it and perhaps seek
(16)    their advice?
(17)    **A.  No, I don't think we would seek their**
(18)    **advice.  We had -- between the three of us and**
(19)    **maybe Earl, we have some dialogues and**
(20)    **meetings, Claudia, we have some meetings, but**
(21)    **we just informed -- we just, you know, we were**
(22)    **going to go forward, that's all.**
(23)    **Q.**  When you received this letter, did
(24)    you telephone Brad Rose?
(25)    **A.  Did I, no.**

Page 271

(1)
(2)     **Q.**  Did you telephone Bernt Ullmann?
(3)     **A.  No.**
(4)     **Q.**  Did you telephone Bernt Ullmann at
(5)     any time after receiving this March 21, 2000
(6)     letter?
(7)     **A.  I don't think so.  I don't recall.**
(8)     **Q.**  In your answer at Paragraph 18, it
(9)     says, Tornado denies that weeks went by without
(10)    any response by Wiseman to Rose's March 21,
(11)    2007 letter and alleges to the contrary that
(12)    Issie Wiseman called Bernt Ullmann at least
(13)    once during that time in an attempt to convince
(14)    Phat Fashions not to have different
(15)    arrangements for Canadian distribution to begin
(16)    January 2008?
(17)    **A.  Yes, that could have been.**
(18)    **Q.**  Having read that statement to you,
(19)    does that refresh your recollection as to
(20)    whether such a conversation or conversations
(21)    actually took place?
(22)    **A.  That could have been, yes, because if**
(23)    **I said it, then it was, but I don't really**
(24)    **recall.  If I said there was a conversation**
(25)    **afterwards, then it was, I tell you the truth,**

Page 272

(1)
(2)     **I was very upset at the time, you know, you**
(3)     **losing 60 percent of your business, you tend to**
(4)     **be a little bit upset.  So I was upset.**
(5)         **I don't recall the conversation, but**
(6)     **yes, I did call him if that's the case, because**
(7)     **I believe that at this point in time, they**
(8)     **notified us that they weren't going forward**
(9)     **with us, but they hadn't signed off with the**
(10)    **other guys because they have never -- Bernt**
(11)    **never, ever told me that they signed off.**
(12)    **Q.**  Just so we are clear, what I read to
(13)    you was from your answer.
(14)    **A.  Okay.**
(15)    **Q.**  Are you saying that you believe that
(16)    that's an accurate statement as to those
(17)    conversations with Bernt Ullmann after
(18)    receiving the letter, do you have a specific
(19)    recollection of those conversations?
(20)    **MR. BEHA:**  Those are at least two
(21)    different questions now.
(22)    **MR. HOFFMAN:**  They are.
(23)    **MR. BEHA:**  Do you believe that what
(24)    your lawyers put in that document was
(25)    accurate at the time?

Page 273

(1)
(2)   A.  In my document?
(3)   Q.  Into what I just read you which
(4) talked about you on at least one occasion
(5) calling Bernt.
(6)   A.  I believe so.
(7)       MR. BEHA:  Do you remember it now?
(8)   A.  I can't really fully remember it, but
(9) I recall, you know, trying to salvage as much
(10) as I could even after the letter, I believe.  I
(11) do recall talking to Bernt about splitting the
(12) lines with -- as one of the things to win them
(13) over at the time, I don't know if it was before
(14) or after.  I thought I said, look, they have no
(15) proficiency in footwear, they don't know
(16) anything about handbags, why don't you give
(17) them, trying to always, you know...
(18)   Q.  Have you read Bernt Ullmann's
(19) deposition transcript?
(20)   A.  Nope.
(21)   Q.  Did you or anybody on your behalf
(22) respond to this letter, the March 21, 2000
(23) letter, Plaintiff's 37?
(24)   A.  I don't recall.
(25)   Q.  Back to other licenses, do you have a

Page 274

(1)
(2) recollection of having any discussions with a
(3) company called Sisters Knit?
(4)   A.  Not me personally, but I have a
(5) recollection that my people --
(6)   Q.  I just handed you Plaintiff's 38,
(7) which is the only document we have received.
(8)   A.  Yeah, but nothing ever transpired
(9) with it.
(10)       (Plaintiff's Exhibit 38, E-mail,
(11)   marked for identification.)
(12)   Q.  If you take a look at this E-mail
(13) that I've given you and -- in fact, this was
(14) the case in some of the other E-mails with
(15) Bandolera?
(16)   A.  Yes.
(17)   Q.  There were references to attached is
(18) a business -- a Tyfoon business plan, attached
(19) is a Tyfoon business profile that was sent to
(20) Bandolera.  In this case, there's a reference
(21) to an attachment to a brief business plan.
(22) We've asked for copies of all these documents,
(23) but they have not been produced.  Can you tell
(24) me anything at all about them?
(25)   A.  Well, we tell the prospective

Page 275

(1)
(2) licensor that what we do and who we are and how
(3) much business, how we perform our business and
(4) how -- what would it take to make a deal and
(5) just the basics of how we would represent them
(6) in Canada.
(7)   Q.  Do you basically tell them about what
(8) your company does and the different licensors
(9) that you represent and work with?
(10)   A.  We do tell them sometimes, you know,
(11) the brands that we have represented or do
(12) represent in Canada and how we worked with
(13) them.
(14)   Q.  To the best of your knowledge, are
(15) these documents, business plans and profiles
(16) still in existence?
(17)   A.  Yes.
(18)       MR. BEHA:  We'll try to find them.
(19)   It just came up yesterday, we are trying
(20)   to find them.
(21)       MR. HOFFMAN:  Just so you know -- off
(22)   the record.
(23)       (Discussion held off the record.)
(24)   Q.  Will Tyfoon be doing any business
(25) with Sisters Knit in 2008?

Page 276

(1)
(2)   A.  I don't know.  I don't think so.  We
(3) are not doing any business with them now, we
(4) don't have the line.
(5)   Q.  Thirty-nine.
(6)       (Plaintiff's Exhibit 39, Letter dated
(7)   4/18/07, marked for identification.)
(8)   Q.  Is an April 18, 2007 letter from
(9) Richard Hinse, H I N S E.
(10)       Have you ever seen this document
(11) before?
(12)   A.  I believe so.
(13)   Q.  Did you review this letter before it
(14) went out?
(15)   A.  I think I read it, yes.
(16)   Q.  Do you recall whether you approved
(17) it?
(18)   A.  Yes, I think I did.
(19)   Q.  Do you know why it took almost a
(20) month to respond to the March 21, 2007 letter
(21) that Brad Rose sent to you?
(22)   A.  When did we receive Brad Rose's
(23) letter?
(24)   Q.  April 21st -- sorry, March 21.
(25)   A.  We received it on that day?

## Page 277

(2) Q. You received it the next day,
(3) March 22, I assume.
(4) A. Maybe it's March 25, I don't know.
(5) No, it's sent by Federal Express.
(6) A. Okay. I could have been out of town,
(7) I really don't know. I'm not sure. And maybe
(8) why did we do this way -- why did we wait
(9) three weeks, I don't know.
(10) Q. Either you do or you don't, that's
(11) all I'm asking.
(12) A. I don't recall why, I don't know if I
(13) got that letter later or I wasn't made
(14) cognizant of it until I came back from vacation
(15) or whatever, I don't remember.
(16) Q. In the fourth paragraph of this
(17) letter on the first page --
(18) A. Yes.
(19) Q. -- it says, in the middle there, both
(20) Phat Fashions and Tornado Imports agree to and
(21) accepted the final version of the amended
(22) license agreement and the signing thereof.
(23) Do you have an understanding of what
(24) your attorney was stating there?
(25) A. Yeah.

## Page 278

(2) Q. Can you tell me, please?
(3) A. That Phat Fashions and us agree on
(4) the numbers going forward for six years, two
(5) options.
(6) Q. Do you know what he means when he
(7) says that the parties accepted the signing
(8) thereof?
(9) A. I don't know what that means, that's
(10) legalese.
(11) MR. BEHA: That doesn't sound like a
(12) compliment, for the record, it's Canadian
(13) legalese.
(14) THE WITNESS: Yes, of course, that's
(15) what I'm talking about.
(16) Q. To the best of your knowledge, what
(17) actions, if any, did you take between March 22
(18) of 2007 and April 18 of 2007 with respect to
(19) your desire to extend the trademark license
(20) agreement other than the call to Bernt Ullmann?
(21) A. You mean to win him over again?
(22) Q. Yes.
(23) A. I think that's what it was, it was a
(24) call to Bernt Ullmann and just to try to keep
(25) telling him that we would be the better of the

## Page 279

(2) two choices, we would be a much better choice
(3) to go with in Canada.
(4) Q. Do you know why there's no reference
(5) to Vis-a-Vis in this letter?
(6) A. No.
(7) Q. Mr. Hinse was aware of Vis-a-Vis,
(8) correct?
(9) A. Yes.
(10) Q. He's the one who sent the letter to
(11) BP Clothing?
(12) A. Correct.
(13) Q. Do you have any understanding as to
(14) why Baby Phat products are not mentioned at all
(15) in this letter?
(16) A. Does it mention anything about Phat
(17) Farm products?
(18) Q. I don't believe it does.
(19) A. So that's why there's no Baby Phat
(20) mention.
(21) Q. Do you know why there's no reference
(22) to any previous amendment or modification of
(23) the agreement?
(24) A. No.
(25) Q. Plaintiff's Exhibit 40 is an E-mail

## Page 280

(2) with an attached letter from me to Mr. Hinse
(3) dated April 24 of 2007.
(4) Have you ever seen that document
(5) before?
(6) (Plaintiff's Exhibit 40, E-mail dated
(7) 4/24/07, marked for identification.)
(8) A. I don't recall.
(9) Q. In your answer to Paragraphs 33 and
(10) 73, you claim that Tornado and Vis-a-Vis
(11) detrimentally relied on Phat Fashions'
(12) assurances that the agreement had been extended
(13) by the extension and that Tornado relied, to
(14) its detriment, on Phat Fashions' repeated
(15) assurances that the parties had extended the
(16) agreement through the extension.
(17) Is that an accurate statement of your
(18) position?
(19) A. Yes.
(20) Q. Can you explain how Tornado relied to
(21) its detriment on these assurances?
(22) A. We could have done a lot of different
(23) things during the course of this agreement,
(24) that we had -- when we felt that we were going
(25) forward, we had all my people -- to make a

PHAT FASHIONS, LLC

BSA XMAX(71/71)
ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

### Page 281

(1)
(2) business work that's doing 18 million or -- 15
(3) or 18 million in Canada, is like doing
(4) 180 million in the U.S.
(5)     I want you to understand that,
(6) because we are 10 percent of your population.
(7) In a country bigger than the United States, we
(8) did $18 million with the line. To do that,
(9) takes a lot of work. All my people's energies
(10) and all their drive was focused strictly on
(11) Phat Farm and Baby Phat product. All my key
(12) executives we are paying 100 percent attention,
(13) 90 percent to Phat Farm and Baby Phat product.
(14) We also went into a -- we extended our lease
(15) with our Phat Farm store through another
(16) several years. We could have been focused --
(17) we didn't sue that guy in Europe for --
(18)     Q.  Unioncon?
(19)     A.  Unioncon for disrupting our market
(20) because we had an agreement going forward, we
(21) were going to make up the difference, so all of
(22) this stuff really, really harmed us, and to
(23) replace the business, go out and try to find
(24) product lines and try to focus on that.
(25)     Q.  You could still sue Unioncon today.

### Page 282

(1)
(2)     A.  I don't know. I mean, it's water
(3) under the bridge now. I don't know, maybe we
(4) could. I don't know how to go about doing
(5) that. I don't know if we have to sue Unioncon
(6) or sue Phat Farm or Phat Fashions, I don't know
(7) who we would sue.
(8)     Q.  You have lawyers that could give you
(9) that advice, I assume?
(10)     A.  I guess we do.
(11)     Q.  Have you spoken with any lawyers
(12) about the possibility of bringing a lawsuit
(13) against Unioncon?
(14)     A.  Not yet.
(15)     Q.  You've indicated, I think, a couple
(16) of times today, that 60 percent of your
(17) business was Phat Fashions and Baby Phat?
(18)     A.  Yes.
(19)     Q.  What is the other 40 percent?
(20)     A.  Other brands.
(21)     Q.  And how long has that been the case
(22) for?
(23)     A.  I don't know. I would say the last
(24) few years.
(25)     Q.  So in 2005, which is when, I guess,

### Page 283

(1)
(2) the second extension started?
(3)     A.  Correct.
(4)     Q.  Was the balance about 60/40 at that
(5) time?
(6)     A.  Yes.
(7)     Q.  And it just stayed that way for 2006
(8) and I guess the --
(9)     A.  Roughly, roughly.
(10)     Q.  Are the people who were devoting time
(11) to the 40 percent --
(12)     A.  Yes.
(13)     Q.  -- the same people who were devoting
(14) time to the 60 percent?
(15)     A.  No.
(16)     Q.  Were the people who were devoting
(17) time to the Phat Fashions, Baby Pharm products,
(18) devoting their time exclusively?
(19)     A.  Some were and some weren't. I mean,
(20) some focused on Baby Phat and Phat Farm and had
(21) maybe another smaller product line that they
(22) also had in the mix.
(23)     (Short recess taken.)
(24)     Q.  Now, one of the allegations in your
(25) answer is that Tornado and Vis-a-Vis

### Page 284

(1)
(2) detrimentally relied on Phat Fashions'
(3) assurances that the agreement had been extended
(4) by the extension by not canceling the lease for
(5) a store dedicated to selling Phat Fashions
(6) product; is that correct?
(7)     A.  Correct.
(8)     Q.  And what is the lease you're
(9) referring to?
(10)     A.  Our store lease for our Phat Farm
(11) store.
(12)     Q.  The one in Montreal?
(13)     A.  Correct, there's only one Phat Farm
(14) store, the one in Montreal.
(15)     Q.  And the others are the illicit
(16) stores?
(17)     A.  Correct.
(18)     Q.  Why didn't you cancel the lease?
(19)     A.  We had gotten -- I believe Barry
(20) negotiated -- negotiates the leases and stuff
(21) like that, so he -- we got wind of them doing
(22) something in -- where the Phat Farm store is,
(23) the city is now dedicating it to a pedestrian
(24) area, you know, where no more cars, no more
(25) vehicles and making it, like beautifying it and

Page 285

(1)
(2) all that kind of stuff, so that was very
(3) positive.
(4)     So we felt Russel Simmons always
(5) wanted us to have a Phat Farm store because
(6) that was his showroom on the street, and he was
(7) very insistent on us having that particular
(8) store. He came to make personal appearances,
(9) we'd have parties there, and it was one of the
(10) focuses for having our distribution license in
(11) Canada, was us having a Phat Farm store, so we
(12) felt we had a deal going forward, so we
(13) extended the lease, I mean, you know...
(14)     Q. Now, the store was owned by an entity
(15) other than Tornado, correct?
(16)     A. Yes, they're all separate.
(17)     MR. BEHA: You mean the lease?
(18)     MR. HOFFMAN: Sorry?
(19)     MR. BEHA: The store was leased by an
(20) entity.
(21)     MR. HOFFMAN: Well, actually that's a
(22) little bit different.
(23)     MR. BEHA: Sorry.
(24)     Q. The store was incorporated
(25) separately?

Page 286

(1)
(2)     A. Yes, all our stores are incorporated
(3) separately.
(4)     Q. And it's that store that entered into
(5) the lease, not Tornado, correct?
(6)     A. I don't know. That's -- again, it's
(7) like legalese, which maybe Barry knows or you
(8) know, I don't know who owns what, but we
(9) control it.
(10)     Q. When you say we control it, you mean
(11) Tyfoon Group?
(12)     A. Yeah.
(13)     Q. Now, with respect to the Phat Farm
(14) store.
(15)     A. Yes, sir.
(16)     Q. The Phat Farm store was getting its
(17) product from whom?
(18)     A. Tornado.
(19)     Q. Tornado?
(20)     A. From Phat Farm Canada.
(21)     Q. Now, somebody else is going to be,
(22) depending on how this lawsuit --
(23)     A. And Vis-a-Vis.
(24)     Q. And Vis-a-Vis. So at least as things
(25) now stand, going forward to 2008, someone other

Page 287

(1)
(2) than Tornado and Vis-a-Vis could be
(3) distributing those products in Canada, correct?
(4)     A. Correct.
(5)     Q. Is there any reason why the Montreal
(6) store could not buy product from these other
(7) distributors and sell them in the Phat Farm
(8) store?
(9)     A. You know, when things like this
(10) happen, I mean, you know, I have to tell you,
(11) quite frankly, you know, I don't have anything
(12) to do with those other guys. I don't want to
(13) have anything to do with them at all, you know,
(14) it's a question of -- it's just -- it's just
(15) rubs me the wrong way.
(16)     I wouldn't, you know, I don't care
(17) how much money we'd make. It's now, you know,
(18) it's now -- it's goes beyond money at this
(19) point in time. Vis-a-Vis, that particular
(20) store, we are not going to be -- going to do
(21) any business with those particular fellows.
(22)     Q. But putting aside your personal
(23) feelings with respect to those other fellas, if
(24) that Phat Farm store wanted to sell Phat Farm
(25) product and Baby Phat product, there are places

Page 288

(1)
(2) that it could get it from to sell it?
(3)     A. Phat Farm product?
(4)     Q. Right.
(5)     A. Well, I think if they have the
(6) exclusive distribution rights in Canada, we'd
(7) have to get it from them.
(8)     Q. Them being Buffalo Jeans?
(9)     A. Whoever the new distributors are.
(10) I'm not cognizant of how they have it set up.
(11) I have some kind of knowledge about who the
(12) parties are, but I don't know what their setup
(13) is.
(14)     Q. Is there any reason to believe that
(15) you wouldn't be able to get it from them if you
(16) so desired?
(17)     A. I have never entertained the thought
(18) of getting it, to tell you honestly, it just
(19) doesn't sit right with me to do that.
(20)     Q. With respect to the lease, I'm going
(21) to hand you what's Plaintiff's Exhibit 41.
(22)     (Plaintiff's Exhibit 41, A document,
(23) marked for identification.)
(24)     Q. In this litigation, documents have
(25) been produced to us by Tornado, we've asked

Page 289

(1)
(2) specifically for documents relating to the
(3) lease and we've received a series of documents,
(4) some just arrived yesterday.
(5)     A.  Okay.
(6)     Q.  I'm going to ask you about the
(7) documents we received first.
(8)     A.  Very good.
(9)     Q.  And then the documents we received
(10) afterwards, just to put everything in
(11) perspective.
(12)     A.  Very good.
(13)     Q.  The first document I've given you,
(14) Plaintiff's Exhibit 41, is called Lease Renewal
(15) for 482-488 St. Catherine's Street?
(16)     A.  Yes.
(17)     Q.  Is that document signed by you on the
(18) second page?
(19)     A.  Yes.
(20)     Q.  And is this the lease for the Phat
(21) Farm store in Montreal?
(22)     A.  I believe so.
(23)     Q.  And this lease renewal was entered
(24) into in or about November -- actually
(25) November 15 of 2004, according to where you

Page 290

(1)
(2) signed it.
(3)     Do you see that?
(4)     A.  Yup.
(5)     Q.  And November 15 of 2004 would have
(6) been in the first year of the second renewal?
(7)     A.  Okay.
(8)     Q.  Okay?
(9)     A.  Yup.
(10)     Q.  And this lease was to run through
(11) 2010?
(12)     A.  Okay.
(13)     Q.  Under this lease, if you take a look
(14) at Paragraph I.
(15)     A.  Yes.
(16)     Q.  It says that after 24 months into
(17) this renewal term, the tenant may elect to
(18) issue a letter notifying the landlord that it
(19) wishes to resiliate, which is spelled R E S I L
(20) I A T E, the lease at the expiration of any
(21) 12-month period following the issuance of the
(22) tenant notice.
(23)     Do you see that?
(24)     A.  Yes.
(25)     Q.  And 24 months into the renewal term,

Page 291

(1)
(2) do you see that the renewal term started on
(3) March 1 of 2005, looking on the first page
(4) under A where the periods are covered?
(5)     A.  Where is that, March 1, 2005 to 2006,
(6) yeah.
(7)     Q.  So that 24 months into the renewal
(8) term, would you agree that that would be
(9) March 1st of 2000?
(10)     A.  Yeah.
(11)     Q.  So would you agree that insofar as
(12) this document, Defendant's Exhibit 41, as it
(13) now stands or as we are looking at it now, as
(14) of that date, that commencing on March 1st of
(15) 2007, that if you wanted to terminate the
(16) lease, you could do so by giving 12 months'
(17) notice?
(18)     A.  Yes.
(19)     Q.  Now, to get a complete picture, we
(20) are going to go a little bit out of order.  Do
(21) you recall a time when you further amended this
(22) lease?
(23)     MR. BEHA:  That's '04, this is back
(24) in 2004, does there come a time?
(25)     A.  Yes, I do recall a time when Barry

Page 292

(1)
(2) came to me and said, we are amending the lease.
(3)     Q.  I hate to get things out of order,
(4) but I'm going to give you Exhibit 81 now.
(5)     (Plaintiff's Exhibit 81, Letter,
(6)     marked for identification.)
(7)     A.  I can see how organized you are.
(8)     MR. BEHA:  As long as it's not
(9) Exhibit 281.
(10)     MR. HOFFMAN:  I didn't crack 100 on
(11) this, don't worry.
(12)     A.  Yeah, okay.
(13)     Q.  So would you agree that in this
(14) letter, basically what Mr. Segal is proposing
(15) to do on behalf of 3702669 Canada Inc. --
(16)     A.  The Phat Farm store.
(17)     Q.  The Phat Farm store, is to extend the
(18) lease?
(19)     A.  Yes.
(20)     Q.  Was he doing this with your
(21) permission?
(22)     A.  Yes.
(23)     Q.  Why was he seeking to extend the
(24) lease at this time?
(25)     A.  As I expressed to you before, I

Page 293

(1)
(2) believe that we got wind of it being -- I don't
(3) know why, I think it maybe had to do with them
(4) making beautifying and there was a beneficial
(5) rate or something, I think Barry could explain
(6) a lot better than I can, but he felt that, you
(7) know, we should extend the lease at that
(8) particular time, I don't know why.
(9)      Q.  Putting this into context, I believe
(10) we've established that it was in October of
(11) 2006 that BP Clothing said to you that they
(12) were cutting you off from Baby Phat product?
(13)      A.  No, you're missing the point here, my
(14) friend, they didn't say they're cutting us off,
(15) they actually told us, I don't know what that
(16) document said, that we would be able to
(17) purchase for all our stores the merchandise
(18) from Baby Phat at 40 percent off -- or at the
(19) same amount off of the U.S. wholesale price for
(20) our own stores that was an ongoing entity with
(21) them, they told us that.
(22)      Not that we would have purchased the
(23) goods, but they did indicate to us, and you can
(24) ask Steve Feiner, that when they terminated
(25) with us, they would sell us for our own stores

Page 294

(1)
(2) the goods at the same discount as before.
(3)      Q.  Okay.  Is that still the case today?
(4)      A.  No, we haven't bought it, I'm very,
(5) you know, like I'm a very, you know, you cross
(6) me once, it's like over, you know, so we chose
(7) not to purchase the goods.  I don't care how
(8) meaningful it would be to us, we chose not to
(9) purchase the goods after we terminated our
(10) arrangements, after our arrangements expired.
(11)      Q.  But in -- but is your position -- is
(12) it your position that this November 28, 2006
(13) document, Exhibit 1 -- 81, that you made this
(14) proposal because you believed that you were
(15) going forward with Phat Fashions?
(16)      A.  Yes, absolutely.  It's a Phat Farm --
(17) it's a Phat Fashions store.  The biggest items
(18) that we were selling at the time was really our
(19) footwear, Baby Phat footwear and Phat Farm
(20) footwear.  Our handbag business was on fire, we
(21) do much more business in handbags than we were
(22) in clothing.
(23)      Our, you know, we had a lot of good
(24) product in Phat Fashions and, you know, other
(25) product in Phat Fashions that was very, very

Page 295

(1)
(2) good, the clothing was not a major entity with
(3) us at that time, unfortunately.
(4)      Q.  But I guess all I'm trying to figure
(5) out is that there's nothing stopping you from
(6) getting the product you need to sell in that
(7) store for -- that's covered by this lease for
(8) the period going throughout the end of the
(9) lease other than the fact that you don't want
(10) to deal with these people?
(11)      A.  I don't know if there's nothing
(12) stopping us, I don't know if they would sell
(13) us, I don't know if we'd buy from them, I don't
(14) know those things.  It's kind of leaves a
(15) terrible taste in your mouth when you've just
(16) been like terminated type of thing and then go
(17) back to doing business with those people, I
(18) mean, it's like, you know...
(19)      Q.  I understand, I'm just trying to --
(20)      A.  Okay, so...
(21)      Q.  Now take a look at Exhibit 82.
(22)      (Plaintiff's Exhibit 82, Letter dated
(23)      12/7/06, marked for identification.)
(24)      Q.  Do you recall seeing a copy of this
(25) December 7, 2006 letter?

Page 296

(1)
(2)      A.  I don't really recall.
(3)      Q.  Do you agree that the landlord had
(4) said, yes, we are willing to enter into an
(5) extension?
(6)      A.  Yeah, I believe Barry told me that,
(7) yes.
(8)      Q.  And at the time that Barry told you
(9) that, was there any concern on your part --
(10)      MR. HOFFMAN:  I'm handing you 83 as
(11) well.
(12)      (Plaintiff's Exhibit 83, Lease
(13)      agreement, marked for identification.)
(14)      Q.  Do you recognize this as the lease
(15) amendment, this is Exhibit 83, signed by you?
(16)      A.  Yes.
(17)      Q.  And is it your testimony that at the
(18) time that you entered into this lease
(19) amendment, that there were no concerns about
(20) having Baby Phat product to sell?
(21)      A.  Yes.
(22)      Q.  That is correct?
(23)      A.  Yes, there's no concerns, we were
(24) doing very well with lingerie, outerwear,
(25) handbags, accessories, footwear.  There was a

PHAT FASHIONS, LLC

BSA XMAX(75/75)

ISSIE WISEMAN - 11/15/07

VS. TORNADO IMPORTS

Page 297

(1)
(2)   lot of product in just Baby Phat apart from
(3)   Phat Farm.
(4)        MR. BEHA:  One second, please.
(5)        MR. HOFFMAN:  Sure.
(6)        (Discussion held off the record.)
(7)        Q.  Is there something that you'd like to
(8)   clarify now?
(9)        A.  Yes, in Baby Phat Clothing was only
(10)  the sportswear part.  Baby Phat --
(11)       MR. BEHA:  Baby Phat Clothing with a
(12)  capital C.
(13)       A.  Yes, Baby Phat footwear was nothing
(14)  to do with that, Baby Phat handbags, Baby Phat
(15)  lingerie, Baby Phat outerwear were all not part
(16)  of Clothing.
(17)       Q.  There were sold by --
(18)       A.  Different licensees.
(19)       Q.  Okay.
(20)       A.  So I was doing more business in Baby
(21)  Phat handbags, which was not part of Baby Phat
(22)  Clothing.  I was doing more business with Baby
(23)  Phat footwear, which was not part of Baby Phat
(24)  Clothing.  I was doing business in Baby Phat
(25)  lingerie, which was not part of Baby Phat

Page 298

(1)
(2)   Clothing.  I was doing business with Baby Phat
(3)   outerwear, which was not part of Baby Phat
(4)   Clothing.  So do you understand?
(5)        Q.  I do, so -- but it's a good point.
(6)   All we want here is a clear record.
(7)        A.  Okay.
(8)        Q.  So with respect to all of these
(9)   different product that you've mentioned now --
(10)       A.  Yes.
(11)       Q.  -- which let's just say these are the
(12)  products that you don't get from BP Clothing?
(13)       A.  Correct.
(14)       Q.  All right.  Do you still have the
(15)  ability to obtain these products to sell in the
(16)  Montreal store?
(17)       A.  I don't know if we have the ability,
(18)  we've never entertained the thought of doing
(19)  that because we are going through this
(20)  situation right now, you know what I'm saying.
(21)       I mean, I don't know, I still have
(22)  the product now through -- until December 30,
(23)  2007, we still own that product, we still
(24)  control that product, so everything in the
(25)  stores is through December 2007, so you're

Page 299

(1)
(2)   asking me a question about something going
(3)   forward.  Do you understand what I'm saying?
(4)        Q.  I do.
(5)        And the Montreal store now is called
(6)   Illicit?
(7)        A.  We just changed the name I think the
(8)   last two weeks.
(9)        Q.  Do you sell any of these other
(10)  products of different licensors that we've
(11)  discussed in that store?
(12)       A.  Yes, just in the last two weeks when
(13)  we took the Phat Farm name off, the name was
(14)  Phat Farm on the store, the billboard was Phat
(15)  Farm, the sign -- now the sign is Illicit, so
(16)  we put in other products as well as Phat Farm.
(17)       Q.  Has there been any noticeable change
(18)  in the business in the store over the last
(19)  couple of weeks?
(20)       A.  No, I mean, the business has dropped
(21)  off a bit because we are having less and less
(22)  Baby Phat and Phat Farm product in the store,
(23)  but it's, you know, we are concerned about Phat
(24)  product going forward.
(25)       Q.  In this lease we looked at in

Page 300

(1)
(2)   Exhibit 83, it said this document shall only be
(3)   binding and enforceable upon the landlord if
(4)   countersigned and returned to the landlord
(5)   before December 31, 2006, failing which the
(6)   document shall be of no binding effect.
(7)        Do you see that there?
(8)        A.  I see it.  If you're telling me it's
(9)   there, it's there.
(10)       Q.  Was there any reason -- well, do you
(11)  know when it was that you actually signed and
(12)  returned this document to the landlord?
(13)       A.  It says the 11th day of December.
(14)       Q.  Well, I think the 11th is typed in
(15)  and it was sent to you that date, do you have a
(16)  recollection as to when you would have signed
(17)  this?
(18)       A.  No, sir.
(19)       Q.  Going back to the reliance issue, you
(20)  have in your answer -- well, is it your
(21)  position that Tyfoon or Tornado detrimentally
(22)  relied on Phat Fashions' assurances that the
(23)  agreement had been extended by the extension by
(24)  instructing several members of its management
(25)  team to devote nearly all of their time to Phat

Page 301

(2) Fashions products at the expense of developing
(3) potential non-Phat Fashions product lines?
(4)    A. Absolutely.
(5)    Q. In what way?
(6)    A. As I expressed to you before, they
(7) were spending 90 or 100 percent of their time
(8) concentrating on Baby Phat and Phat Farm sales
(9) and product management when they could have
(10) been going out to acquire other product.
(11)    If we knew where our arrangement were
(12) gone, coming to an end, we are not going to be
(13) busy spending time on these product that we are
(14) not going to be doing going forward, but we
(15) were doing a lot of business with it, so we
(16) concentrated on those products, so we relied on
(17) the assurances that we are going forward. We
(18) spent time, we didn't change the modus operandi
(19) of how we worked with Phat Farm and Baby Phat.
(20)    We tried to increase our sales, we
(21) were motivated and, you know, kept going the
(22) way we were instead of spending time -- if I
(23) know I'm not going to be doing this tomorrow,
(24) I'm not going to spend no time with this. I'm
(25) going to go get something that I'm going to be

Page 302

(2) doing.
(3)    Q. And you knew that you weren't going
(4) to be doing this tomorrow, to use your words,
(5) as of the March 21, 2007 letter from Brad Rose;
(6) is that correct?
(7)    A. Around that time. It could have been
(8) like, as I said, you know, few weeks later than
(9) that because I was still trying to -- I was
(10) still trying to win them over.
(11)    Q. Who was it that instructed the
(12) several members of the management team to
(13) devote nearly all of their time to Phat
(14) Fashions products?
(15)    A. I guess it's me, but it's not -- it's
(16) not as cut and dry as that, you know.
(17)    Q. I'm just reading what is in the
(18) answer so...
(19)    A. You know, because they were spending
(20) their time working on these particular
(21) products, you know, you work in a company and
(22) they didn't have any other product to work
(23) with, they only focused on those product, so
(24) they're spending all their time working on
(25) those product.

Page 303

(2)    Q. Would it be accurate to state that
(3) rather than them being given instructions to
(4) devote their time exclusively to the product,
(5) that they just be doing what they did before,
(6) which was working on those products?
(7)    A. Correct.
(8)    Q. Who were the several members of the
(9) management team that were devoting their almost
(10) exclusive time at least to those products?
(11)    A. Josh, Claudia.
(12)    Q. When you say Claudia, Michaels?
(13)    A. Claudia Michaels, yeah, they were the
(14) majors. Then there was, you know, assistants
(15) to them that spent their time on that, like
(16) their assistants. Barry spent a lot of his
(17) time -- when I talk about the major people,
(18) those are my major people. Barry spent a lot
(19) of his time, I spent a lot of my time. This
(20) was 60 percent of our business, so we were
(21) spending a lot of time focusing on that
(22) business.
(23)    Q. When you weren't spending -- you
(24) personally, when you weren't spending your time
(25) on the Phat Farm, Baby Phat business, what

Page 304

(2) would you be spending your time doing,
(3) workwise, I'm not talking about your leisure
(4) time?
(5)    A. Yeah, no, looking at some of the
(6) other brands, looking at some other businesses.
(7)    Q. Did Josh or Claudia have
(8) responsibilities for developing product lines?
(9)    A. Their main responsibilities were
(10) running the product lines that we had, the Phat
(11) Farm, Baby Phat product lines, they were
(12) generating a lot of business with them.
(13)    Q. Who, if anyone, at the Tyfoon Group
(14) would be responsible for trying to bring in new
(15) product lines?
(16)    A. We weren't concentrating on bringing
(17) in new product lines, we haven't brought in a
(18) lot of new product lines during that course of
(19) time. It is probably a little bit of my time
(20) not by actively pursuing but by getting a phone
(21) call and saying, hey, what's going and I have
(22) something that may be of interest to you.
(23)    You know, we didn't actively go out.
(24) If somebody would, you know, call us to, you
(25) know; that just recommended through a

Page 313

(2) number there.
(3)    A.  Okay.
(4)    Q.  Now, it wasn't until yesterday --
(5)    A.  That you got attached.
(6)    Q.  No, that I noticed that there was no
(7) attachment.
(8)    A.  Okay.
(9)    Q.  But then I received Plaintiff's
(10) Exhibit 75.
(11)        (Plaintiff's Exhibit 75, E-mail dated
(12)    7/26/05, marked for identification.)
(13)    A.  Is that the attachment?
(14)    Q.  I don't believe so.  What Plaintiff's
(15) Exhibit 75 does, is there appears to be -- it
(16) is an E-mail dated July 26, 2005 which is the
(17) same date as Plaintiff's Exhibit 44?
(18)    A.  Yes.
(19)    Q.  And it talks about language to be
(20) inserted, a last paragraph to be inserted into
(21) I assume what is a draft of a document that's
(22) going to be sent to Phat Fashions and Bernt
(23) Ullmann, and this is all supposition on my
(24) part.
(25)    A.  Okay.  This is from Mitchell to us --

Page 314

(2) to Barry and Josh, rather.
(3)    Q.  Correct.
(4)    A.  Okay.
(5)    Q.  Looking at this E-mail, 75.
(6)    A.  Yes.
(7)    Q.  Do you have a recollection of ever
(8) quantifying the damages that you believe you
(9) suffered as a result of the Unioncon situation?
(10)    A.  Yes, that's what this is.
(11)    Q.  In $108,000?
(12)    A.  He says here that he is aware of 70
(13) to 100 pairs, but he think it was in excess of
(14) 10,000 pairs.  I guess the retailer told him
(15) they only got 7200, so that's exact, and he
(16) figures the profit on those 7200 pairs would
(17) have been $15 a pair, comes out to $108,000 in
(18) compensation.
(19)    Q.  Do you have a recollection -- and as
(20) I just indicated to your counsel, I've not seen
(21) a document that was sent to Bernt Ullmann
(22) making any dollar claim like this, so I'd ask
(23) you to check your records.
(24)        Do you have a recollection of ever
(25) telling Bernt Ullmann that you believe that the

Page 315

(2) number is $108,000?
(3)    A.  I do not have that recollection.
(4)    Q.  Do you recall Bernt Ullmann telling
(5) you at one time that he was going to try to
(6) work something out to resolve this for $25,000?
(7)    A.  Yes.
(8)    Q.  And that would be in Plaintiff's
(9) Exhibit 46.
(10)    A.  Okay.
(11)    Q.  What was your reaction to seeing the
(12) $25,000 number?
(13)    A.  I wasn't very happy with the 25,000.
(14) I would have rather this whole incident didn't
(15) happen, but it impacted us more than 108,000
(16) because our biggest customer -- our biggest
(17) customer's competitor got the goods and our
(18) biggest customer had exclusive in those type of
(19) stores, which were athletic stores, he had an
(20) exclusive with that Baby Phat, Phat Farm
(21) product.  It really impacted us.
(22)        We apologized to the guy, he forgave
(23) us, but it impacted our business a lot.  What
(24) could I do, I said to him, well, you know, I
(25) didn't answer him about the 25,000.

Page 316

(2)    Q.  Is it your testimony that some time
(3) after that E-mail that mentions the 25,000 is
(4) when you had discussions with Bernt Ullmann
(5) about extending the agreement?
(6)    A.  When was this E-mail?
(7)    Q.  August 10 and 11 of 2005.
(8)    A.  Yes, it would have been around that.
(9) This is what precipitated my going to Bernt
(10) saying, you know, Bernt, $25,000 is going to
(11) mean not that much to me.  What means much to
(12) me is we have a deal going forward, why don't
(13) we -- he was having trouble with these guys,
(14) they didn't want to pay anything, never mind
(15) 25,000, they didn't want to pay anything, so,
(16) and I didn't want to get into a lawsuit.
(17)        I don't like this stuff, you know,
(18) it's not good when, you know, you have a
(19) rapport with, you know, you have a mutual
(20) rapport with a big company like Phat Fashions
(21) and, you know what, you don't want to start
(22) getting into litigation.  It is the furthest
(23) thing from my mind, so I felt that that was
(24) really a good venue for getting out of this
(25) problem with Unioncon.

PHAT FASHIONS, LLC VS. TORNADO IMPORTS

ISSIE WISEMAN - 11/16/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

## Page 321

(1) IN THE UNITED STATES DISTRICT COURT
(2) SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
(3) PHAT FASHIONS, LLC,
(4)           Plaintiff,
(5)     - against -
(6) TORNADO IMPORTS (CANADA), INC.,
(7)           Defendant.
(8) Case No. 1:07 cv 03278 (PAC)
------------------------------------------X
(9)
(10)        410 Park Avenue
         New York, New York
(11)
(12)
         November 16, 2007
(13)        10:00 a.m.
(14)
(15)     Continued Deposition of
(16) ISSIE WISEMAN, before Shari Cohen, a Notary
(17) Public of the State of New York.
(18)
(19)
(20)
(21)
(22)
(23)  ELLEN GRAUER COURT REPORTING CO. LLC
(24)    126 East 56th Street, Fifth Floor
         New York, New York 10022
         212-750-6434
(25)        REF: 85935

## Page 322

(1) A P P E A R A N C E S :
(2)
(3) PRYOR CASHMAN LLP
(4)  Attorneys for Plaintiff
(5)    410 Park Avenue
(6)    New York, New York  10022
(7)  BY:  PHILIP R. HOFFMAN, ESQ.
(8)    PHONE  212-326-0192
(9)    FAX   212-798-6386
(10)   EMAIL  phoffman@pryorcashman.com
(11)
(12)
(13) ALLEGAERT BERGER & VOGEL LLP
(14)  Attorneys for Defendant
(15)    111 Broadway
(16)    New York, New York  10006
(17)  BY:  JAMES A. BEHA II, ESQ.
(18)    PHONE  212-571-0550
(19)    FAX   212-571-0555
(20)    EMAIL  jbeha@abv.com
(21)
(22)
(23)
(24)
(25)

## Page 323

(1) ------------- I N D E X -------------
(2) WITNESS        EXAMINATION BY        PAGE
(3) ISSIE WISEMAN     MR. HOFFMAN         324
(4)
(5)
(6) ------------- DOCUMENT REQUESTS -------------
(7) PAGE  330   Company profile
(8)      335   Communications between Tyfoon
(9)            and Akademics and Stash House
(10)     441   List of companies you
(11)           represent
(12)
(13)
(14) ------------- E X H I B I T S -------------
(15) PLTF'S   DESCRIPTION          FOR I.D.
(16)      (NO EXHIBITS MARKED)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 324

(1) I S S I E  W I S E M A N, resumed as a
(2)   witness, having been previously sworn
(3)   by a notary public, was examined and
(4)   testified as follows:
(5)
(6) EXAMINATION BY
(7) MR. HOFFMAN:
(8)   Q.  Good morning.
(9)   A.  Good morning.
(10)   Q.  Just one little piece of
(11) housekeeping from yesterday. Near the end of
(12) the day we were looking at documents having
(13) to do with a lease amendment which was
(14) Plaintiff's Exhibit 83. It was signed some
(15) time on or after December 11th of 2007.
(16) Before you actually signed that document at
(17) or about that time, did you call Bernt
(18) Ullmann and tell him look, in words or
(19) substance, I'm going to sign this agreement,
(20) I need to hear back from you that you will
(21) send me that signed extension?
(22)   A.  No.
(23)   Q.  Did Bernt Ullmann know that you
(24) were entering into this lease amendment?
(25)   A.  I don't believe so.

Page 325

(1)
(2)     Q.    What is your expectation if any
(3)   that you will be able to replace going
(4)   forward the Phat Farm and Baby Phat business
(5)   that you have done through 2007?
(6)     A.    I don't understand the gist of
(7)   the question. Do you mean do I think we'll
(8)   be able to replace it?
(9)     Q.    Yes.
(10)    A.    I think eventually we will.
(11)  We're going out there to get other products.
(12)  We're putting all our energy into trying to
(13)  get products that replace that business.
(14)    Q.    Have you been successful so
(15)  far?
(16)    A.    We've had some success, yes.
(17)  We've achieved getting a couple of new
(18)  products on line, but, you know, you work so
(19)  far in advance, until we feel the effect from
(20)  the work that we're putting in now could be a
(21)  couple of years because, you know, a new
(22)  product line -- you know, when you ask me
(23)  when we started with Phat Farm, we did -- I
(24)  had a minimum of $50,000 a year and I
(25)  couldn't achieve it. Not 50,000 in sales,

Page 326

(1)
(2)   but in royalties to Russell Simmons and I
(3)   couldn't achieve it. I couldn't pay him that
(4)   amount and now we're paying a million four in
(5)   one year so what transpired with that was
(6)   that it took a while to build the brand and
(7)   to get customers. You know, initial stages
(8)   they test, they this, they that and it takes
(9)   years to rebuild that business. That's what
(10)  happens.
(11)    Q.    I'm going to -- the next series
(12)  of exhibits are going to be along the lines
(13)  of what we did yesterday with respect to
(14)  different companies that you have approached.
(15)    A.    Okay.
(16)    Q.    I'll show you all of the
(17)  e-mails that we had at least prior to six
(18)  p.m. last night and just ask you what you can
(19)  tell me about the particular contact. The
(20)  first one is Plaintiff's Exhibit 47 and this
(21)  is an e-mail dated May 2nd relating to
(22)  distribution of Joyous & Free in Canada.
(23)  Another copy of this document was apparently
(24)  produced last night as well. What if
(25)  anything can you tell me --

Page 327

(1)
(2)     A.    Nothing ever developed with
(3)   this. .
(4)     Q.    Do you have anything that you
(5)   could expand about about the approach that
(6)   was made or why you approached them or what
(7)   happened?
(8)     A.    I would believe because Claudia
(9)   was at the Coterie show in New York, it's a
(10)  show, it's a fashion show where people come
(11)  and sell their merchandise, a show where in a
(12)  hall let's say at the Piers or at the Jacob
(13)  Javitz and they have a booth and people that
(14)  have a product line like Joyous & Free show
(15)  their wares there. We'll come by, go into
(16)  their show and see their product and say this
(17)  could be a viable product for us in Canada,
(18)  we approach them and we tell them that we're
(19)  a distributor in Canada, we'd like to be the
(20)  exclusive representative of your product in
(21)  Canada. That's the initial contact.
(22)         This is the initial contact
(23)  letter after we give them a business card,
(24)  tell them who we are and if they show any
(25)  interest whatsoever, we send our company

Page 328

(1)
(2)   profile document to them and that leads to
(3)   the next stage if they have an interest.
(4)   These are the initial contact stuff.
(5)     Q.    If you got a call today during
(6)   this deposition from someone up at Tyfoon who
(7)   said we have this great new potential
(8)   licensee and you said to that person send
(9)   them the company profile, where would they
(10)  get that from?
(11)    A.    We would, you know, to every
(12)  company we send a different kind of profile.
(13)  The profile either we send them a CD or we
(14)  send them a document that states that these
(15)  are the lines that we represent, how long
(16)  we've been in business, who our bankers are,
(17)  how financially adequate we are, how we would
(18)  work with them vis-a-vis royalties and stuff
(19)  like that and that's the company profile, but
(20)  there is a standard type letter that we have,
(21)  an introduction type letter that we have
(22)  developed and we change it for every
(23)  different account that we approach.
(24)         In other words, if we're
(25)  approaching an account that sells baby wear,

PHAT FASHIONS, LLC

BSA XMAX(3/3)
ISSIE WISEMAN - 11/16/07

VS. TORNADO IMPORTS

Page 329

(1)
(2) we tell them who we have in baby lines that
(3) we do that's similar so they understand that
(4) we have a knowledge and a market. No use
(5) telling them about our menswear product when
(6) we have -- when they are doing baby stuff or
(7) when they are doing ladies shoes we tell them
(8) about some of the footwear accounts that we
(9) have and some of the footwear products that
(10) we distribute in the country.
(11)    Q.    Would it be accurate to state
(12) that there's a master company profile
(13) document that has all of the information on
(14) it and then as you go to approach a
(15) particular licensor you edit or delete?
(16)    A.    No, that's not accurate. We
(17) have several. We have like an outline and
(18) it's not a question just filling in the
(19) blanks, we use that outline and then just
(20) readjust every time. The person writing the
(21) letter will say okay, we will start by
(22) telling them who we are and what we're all
(23) about and then we adjust the products that we
(24) carry. There's not a master outline.
(25)    MR. BEHA: I want you to

Page 330

(1)
(2)    remember again that you don't give a
(3)    crap about Phil, that's the person you
(4)    care about.
(5)    Q.    Just to clarify a couple of
(6) things, first, the e-mail that I have shown
(7) to you doesn't have your name on it; is that
(8) correct?
(9)    A.    Yes.
(10)    Q.    Who is CC at Tyfoon.com?
(11)    A.    Claudia Michaels.
(12)    Q.    I see so she was copying
(13) herself on this, that's what it appears to
(14) be?
(15)    A.    You see besides the name
(16) Claudia Michaels in brackets it's CC at
(17) Tyfoon.com, that is her e-mail address.
(18)    Q.    Then she CC's CC.
(19)    A.    Perhaps her assistant sent the
(20) e-mail and she was cc.'d to Claudia using
(21) Claudia's name.
(22) RQ    MR. HOFFMAN: The company
(23)    profile, this will be a continuing
(24)    request. We obviously don't have a
(25)    copy of the company profile and in

Page 331

(1)
(2) addition to that document at the very
(3) least if there's a problem in
(4) recovering these that if we could at
(5) least get the outline that the
(6) witness has testified to, I think
(7) that contains basically the
(8) information that we are looking for.
(9)    MR. BEHA: I don't know what
(10) you were sent last night. I know that
(11) the CD which you now have was the
(12) consequence of our recognizing that
(13) there were these materials that we
(14) needed to get and I understand that
(15) people are trying to locate these
(16) things, but obviously I agree with
(17) you, it's something that we should get
(18) you and when I'm not working on the
(19) deposition I'll do what I can.
(20)    MR. HOFFMAN: I'll add
(21) something after the witness does.
(22)    THE WITNESS: I believe you
(23) have it. If you look at the back of
(24) the CD, there's a writing there. That
(25) is probably the outline of what we

Page 332

(1)
(2) send to people.
(3)    MR. HOFFMAN: Just so you know,
(4) the CD that I was given was a copy of
(5) something so it's only a CD. There's
(6) no writing on it at all and it has --
(7) somebody put the Bates number -- the
(8) Toronto number on it. Also with
(9) respect to the documents that were
(10) produced last night, they were
(11) accompanied by e-mails that -- a
(12) couple I had seen before, but the ones
(13) I had not seen are e-mails that
(14) specifically refer to the CD so
(15) there's nothing that had been produced
(16) up until last night that ever
(17) disclosed the existence of the CD so
(18) I'll take a look at the company
(19) profile, but it seemed from what I've
(20) looked at and we'll see some of these
(21) in e-mails later, that when you want
(22) to say look at our company profile,
(23) there is as you can see in this
(24) document here, there's a word document
(25) attached and if you were going to send

Page 333

(1)
(2)     them the disk, it appears it went out
(3)     separately.
(4)         MR. BEHA: Do you want to take
(5)     like a one minute break while I try to
(6)     make the call to deal with the issue
(7)     of the CD?  Let me see if I can get
(8)     someone at Gibson to send us a copy.
(9)     Off the record.
(10)        (Discussion off the record.)
(11)        Q.   We just finished looking at
(12)    Joyous & Free.  The next Exhibit is 48.
(13)    These are a series of e-mails involving a
(14)    company called Prohibit and at least on some
(15)    of them you are copied.  If you turn to the
(16)    last page which would be the last e-mail you
(17)    will see that at least a copy of that was
(18)    sent to you?
(19)        A.   Okay.
(20)        Q.   My question for all of these is
(21)    going to be what do you know about Prohibit,
(22)    were you successful in making a deal going
(23)    forward with them for 2008 and anything you
(24)    want to fill in between that is fine?
(25)        A.   Prohibit is a product line that

Page 334

(1)
(2)     is in the urban area as well and no, we were
(3)     not successful in acquiring it and that's it.
(4)         Q.   Exhibit 49 involves a company
(5)     called Stash House and looking at the e-mails
(6)     I do not see you copied on this.  What if
(7)     anything do you recall about having
(8)     discussions with Stash House and has a deal
(9)     been made going forward for 2008 or is one in
(10)    the works?
(11)        A.   Stash House is a line that's
(12)    associated with a company that we do
(13)    presently called Akademics and Stash House is
(14)    one area of Akademics and we do do the line,
(15)    we did get the line.
(16)        Q.   Was there an agreement entered
(17)    into pursuant to which you got the line?
(18)        A.   No.  Verbally.
(19)        Q.   What is the verbal agreement to
(20)    the extent you recall?
(21)        A.   That we will pay a royalty
(22)    based on FOB purchases of the merchandise,
(23)    the same kind of thing we do with Phat
(24)    Fashions.
(25)        Q.   Do you recall what the royalty

Page 335

(1)
(2)     rate is?
(3)         A.   I'm afraid I don't.
(4)         Q.   To the best of your knowledge,
(5)     are there any further communications between
(6)     Tyfoon and either Akademics or Stash House
(7)     after June 14th of 2007 which is the most
(8)     recent e-mail I have subject to what I see
(9)     that came last night?
(10)        A.   Yes, I believe there is.
(11)    RQ      MR. HOFFMAN: To the extent that
(12)        there are such documents we call for
(13)        their production, but I think, Jim,
(14)        that you and I maybe moving forward
(15)        can talk about getting just what we
(16)        need and not getting everything.
(17)    It's probably worth a --
(18)            MR. BEHA: I'm not sure we can
(19)        always fathom what you would need.
(20)            MR. HOFFMAN: That's why we'll
(21)        have the discussion.
(22)            MR. BEHA: Can I have one
(23)        second off the record?
(24)            MR. HOFFMAN: Sure.
(25)            (Discussion off the record.)

Page 336

(1)
(2)         Q.   Next is an e-mail involving a
(3)     company Trebbianno, this is Plaintiff's
(4)     Exhibit 50.  What do you know about the
(5)     company Trebbianno?
(6)         A.   Claudia told me that they do
(7)     handbags.  I don't recall what exact label it
(8)     is, but I believe she has arranged a meeting
(9)     with them for some time next year to doing
(10)    their product lines in Canada.
(11)        Q.   There's a possibility at least
(12)    that that may go forward?
(13)        A.   Yes, maybe.
(14)        Q.   Plaintiff's Exhibit 51 involves
(15)    a company called Scotch & Soda and you are
(16)    not copied on any of these e-mails.  What can
(17)    you tell me about Scotch & Soda the company?
(18)        A.   We met them at a show in
(19)    Barcelona.
(20)        Q.   Did you actually meet them
(21)    there?
(22)        A.   Yeah, we saw the line at a show
(23)    in Barcelona called the Bread & Butter Show.
(24)        Q.   Was Claudia at that show?
(25)        A.   Yes.

Page 341

(1)
(2)    Q.    Did you -- it says in the
(3) second paragraph I must advise you that as of
(4) July 15th we will be bringing the sales for
(5) the brand in-house for the final six months.
(6) Is that what you have done?
(7)    A.    I believe so.  I don't know.
(8)    Q.    Plaintiff's 53, now we are back
(9) to other potential licensors.  This is one
(10) involving a company called IKKS and I do not
(11) see you copied on this e-mail.  What if
(12) anything can you tell me about IKKS?
(13)    A.    IKKS is a French line, you
(14) know, based in France, Paris, France and they
(15) have big retail operations in Europe and we
(16) tried to speak to them, but again, there was
(17) -- I know particularly well about this, but
(18) there's no way we'll make a deal with them.
(19) They don't understand how to work with the
(20) North American way of doing business so we
(21) had to take a pass.
(22)    Q.    Plaintiff's Exhibit 54 is a
(23) company called Rock Scene Brand and looking
(24) at this I do not see you copied on this
(25) e-mail.  What if anything can you tell me

Page 342

(1)
(2) about Rock Scene Brand?
(3)    A.    These are all companies that
(4) our executives are trying to get in touch
(5) with to perhaps discuss a deal to do their
(6) lines in Canada going forward.  I know
(7) nothing about this brand.
(8)    Q.    If a deal had been made with
(9) them --
(10)    A.    I would know about it.
(11)    Q.    You would know.
(12)    A.    These are all introduction
(13) letters to see if there's any interest on any
(14) of these people's parts because I have given
(15) my executives instructions to go out and get
(16) new product line because now 60 percent of
(17) our business is lost and we need to recoup
(18) that business so we're attending more shows
(19) and more fairs where we can encounter new
(20) product lines to hopefully do for Canada, but
(21) an introduction, a letter like this is just
(22) the preliminary step.  We probably will end
(23) up talking to maybe 20 percent of the people
(24) that we introduce ourselves to and if we're
(25) lucky we will do one or two deals going

Page 343

(1)
(2) forward with any of them because that's where
(3) the problem comes in to make things work.
(4)    Q.    The reason I continue to show
(5) them to you is just in case you look at one
(6) and I only have an introductory letter, but
(7) it turns out there was a lot more than that
(8) and as I already found from some documents
(9) yesterday there were follow-ups that until I
(10) saw the documents I didn't know so having
(11) said that let me show you Plaintiff's Exhibit
(12) 55 which involves a company called Parish.
(13) What can you tell me about Parish?
(14)    A.    I can tell you that we have
(15) just met with them recently and we will start
(16) doing business with them in a small way going
(17) forward.
(18)    Q.    What could you tell me about
(19) the business that you will be doing going
(20) forward with Parish?
(21)    A.    I think we will make a small
(22) buy from them to introduce the line in
(23) Canada, small buy being maybe 1,000 to 1,800
(24) pieces because they are extensive pieces for
(25) the urban area.  Premium urban is what they

Page 344

(1)
(2) do and we will see if there is a possibility
(3) of making it work in Canada like test the
(4) market.
(5)    Q.    Do you have a written agreement
(6) with them?
(7)    A.    No.
(8)    Q.    Is it fair to say that there's
(9) likely correspondence after September 11th
(10) and that your entire correspondence with
(11) Parish does not consist of one e-mail?
(12)    A.    I would have to say no, this is
(13) it.  The rest is all verbal dialogue because
(14) I know Josh was here last week to go in to
(15) see them to book the line to buy the pieces
(16) for next spring delivery which would be April
(17) and May.
(18)    Q.    Josh was here in New York?
(19)    A.    Yes.
(20)    Q.    I was told he could not have
(21) his deposition taken because he didn't want
(22) to leave Canada.
(23)    A.    Last week.
(24)    Q.    That's when his deposition was
(25) scheduled for.



Page 349

(1)
(2) ever met him.
(3)     Q.    Anything further on that?
(4)     A.    In what way?
(5)     Q.    Just general expanding upon
(6) what you just told me?
(7)     A.    No. I'm aggravated that they
(8) raided us and tried to steal our employees,
(9) that's about it.
(10)     Q.    Did you ever send any
(11) correspondence to them objecting to what they
(12) were doing?
(13)     A.    I have had dialogue with Mark
(14) Kakon and Dan Elituv, those two guys telling
(15) them that you -- the wording was that you
(16) have the line, good for you, good luck to
(17) you, but don't steal any of my people was the
(18) wording I used.  They did and I will never
(19) speak to those guys ever again.  It's a small
(20) community Montreal.
(21)     Q.    Did you have your conversations
(22) with those two gentlemen before they took the
(23) employees?
(24)     A.    Yes.
(25)     Q.    Why did you call them if they

Page 350

(1)
(2) had not taken them yet?
(3)     A.    Because my executives Claudia
(4) and Mitchell advised me that they had been
(5) called.
(6)     Q.    Do you know when this took
(7) place, when the calls took place to Claudia
(8) and Mitchell and when your call took place to
(9) Mark and Dan?
(10)     A.    I can't remember when they
(11) were, but some time ago.  It would have to
(12) have been some time in July of '07.
(13)     Q.    Anything further you remember
(14) about those phone calls?
(15)     A.    No.  They assured me that they
(16) wouldn't because I was socially -- we knew
(17) each other socially Mark Kakon and Dan
(18) Elituv.
(19)     Q.    When you refer to in the Answer
(20) Salvatore Cutrona and Vanessa Ferrara,
(21) important Tornado and Vis-A-Vis employees, do
(22) you know the company that they were actually
(23) employed by?
(24)     A.    By those two companies I
(25) believe.

Page 351

(1)
(2)     Q.    In other words --
(3)         MR. BEHA: Are you asking him
(4) what entity was on the payroll check?
(5)         MR. HOFFMAN: That was going to
(6) be my next question.
(7)         MR. BEHA: Sorry, it would have
(8) been faster if I let you do that.
(9)     Q.    Do you know that?
(10)     A.    I don't know.
(11)     Q.    In general do you know if the
(12) employees that work for your various
(13) companies are employed by the Tyfoon Group or
(14) by specific entities?
(15)     A.    I don't know.
(16)     Q.    Barry Segal likely will?
(17)     A.    Yes.
(18)     Q.    In your Answer at paragraph 40
(19) you state that in 2005 Tornado sold
(20) $18,888,597 worth of product.  Does that
(21) sound like an accurate statement to you?
(22)     A.    Yes.
(23)     Q.    Then you state in paragraph 40
(24) that in 2006 Tornado actually sold
(25) $15,456,579 worth of product.  Does that

Page 352

(1)
(2) sound accurate?
(3)     A.    Yes.
(4)     Q.    When you say that Tornado sold,
(5) are you also including sales made by
(6) Vis-A-Vis?
(7)     A.    Yes.
(8)     Q.    Do you know why there was a
(9) decrease in sales of about 3.4 million
(10) between 2005 and 2006?
(11)     A.    Yes.
(12)     Q.    Could you tell me why, please?
(13)     A.    Yes, the menswear product of
(14) Phat Farm clothing really over the last
(15) couple of years has been going backwards.  By
(16) that I mean that sales have plummeted.  In
(17) the United States of America a lot worse than
(18) in Canada because we went to the meetings, we
(19) spoke to the people and I know that Bernt and
(20) the rest of the design team and the important
(21) individuals in the company have been doing --
(22) have been scrambling to right the ship as we
(23) would say, but it's been going backwards and
(24) I think if you check the sales in the United
(25) States of America they were a lot worse than

Page 365

(1)
(2) Actually, this is two different documents for
(3) the years, one is for the year ending January
(4) 31, 2006 and the other is January 31, 2007.
(5) Have you ever seen these documents before?
(6)     A.  Perhaps.
(7)     Q.  Do you have any knowledge as to
(8) how or why they were prepared?
(9)     A.  No.
(10)    Q.  Do you know when they were
(11) prepared?
(12)    A.  Well, I guess they were
(13) prepared for the year ended 2006, year ended
(14) 2007.  Probably for an analysis.
(15)    Q.  Do you know if they were
(16) prepared for purposes of this litigation?
(17)    A.  That I don't know.  I don't
(18) think so, but I don't know.
(19)    Q.  Do you know what documents the
(20) data contained in Plaintiff's Exhibit 64
(21) would be derived from?  In other words, if I
(22) wanted to see what my total sales were for
(23) the Phat Farm store and then I wanted to see
(24) how much Phat Fashion product I sold, where
(25) would I go to get those numbers?

Page 366

(1)
(2)     A.  I don't know.  I get a report
(3) of the daily sales of our stores from one of
(4) our secretaries in the accounts -- in the
(5) office, but I don't know where you would get
(6) what reports.
(7)     Q.  Are these the four stores that
(8) are owned by Tyfoon?
(9)     A.  Yes, sir.
(10)    Q.  Those are the company names of
(11) the stores in parenthesis under each store?
(12)    A.  I believe so.
(13)    Q.  To the best of your knowledge,
(14) do you believe that these documents are
(15) accurate?
(16)    A.  Yes.
(17)    MR. BEHA:  Let me insert an
(18) objection to foundation since he has
(19) not established whether he has any way
(20) of knowing one way or another, but he
(21) believes it.
(22)    Q.  Is it fair to say there are no
(23) contracts between any of these stores and
(24) their corporate entities on the one hand and
(25) Phat Fashions on the other?

Page 367

(1)
(2)     A.  I don't believe so.
(3)     Q.  What other products do the
(4) Illicit stores sell in addition to Phat Farm
(5) or Baby Phat?
(6)     A.  Other brands that we have that
(7) we distribute.  That's about it.
(8)     Q.  Plaintiff's Exhibit 66 is a
(9) document that says commissions on Baby Phat
(10) sales under the name Vis-A-Vis.  Have you
(11) ever seen this document or a document like
(12) this before?
(13)    A.  Probably.
(14)    Q.  When it says rate of
(15) commission, what does that mean?
(16)    A.  To me it seems like it would
(17) mean royalty.
(18)    Q.  These are royalties that were
(19) being paid by Vis-A-Vis to Phat Fashions?
(20)    MR. BEHA:  I have the same
(21) objection to foundation until you lay
(22) one, but tell him what you think.
(23)    A.  I believe so.
(24)    Q.  Do you have any reason to
(25) believe that's not the case?

Page 368

(1)
(2)     A.  No.
(3)     Q.  If you turn to the second page
(4) where it says actual net sales, are those the
(5) -- there are five BP categories listed there,
(6) but there only appear to be sales under four
(7) with no sales being made for BP leathers.
(8) Did the Tyfoon Group distribute or sell BP
(9) leathers?
(10)    A.  Yes.
(11)    Q.  Why aren't any sales listed
(12) there?
(13)    A.  This probably is a report that
(14) during that course of time leather sales
(15) aren't there.  We sell leathers in September
(16) onwards.  The manufacturer in this case
(17) Mirage, Elliot, we probably didn't have any
(18) leathers to sell for the months of July 1 to
(19) September 30th at that time.
(20)    Q.  Plaintiff's Exhibit 67 is a
(21) similar document except this one has up at
(22) the top Tornado Imports and it says
(23) commissions on Phat Farm sales.
(24)    MR. BEHA:  In part as a mea
(25) culpa for my prior objection, I just

PHAT FASHIONS, LLC

BSA XMAX(13/13)
ISSIE WISEMAN - 11/16/07

VS. TORNADO IMPORTS

---

Page 369

(1)
(2)　note that on this one as well as the
(3)　prior one the third page since we
(4)　didn't talk about it is actually a
(5)　check paying a commission which we
(6)　didn't talk about.
(7)　Q.　Right.
(8)　A.　I would have to preface this,
(9)　but in our particular instance commissions is
(10)　the royalty. He uses the word commission
(11)　here, but, you know, commission, royalties,
(12)　probably the same words for us as for your
(13)　benefit.
(14)　Q.　Do these reflect sales made by
(15)　Tornado of Phat Farm products?
(16)　A.　I believe so.
(17)　Q.　Looking at the second page
(18)　actual net sales there appear to be 6
(19)　categories for Phat Farm sales, is that
(20)　accurate?
(21)　A.　Yes.
(22)　Q.　What are PF leathers?
(23)　A.　Phat Farm leathers, men's
(24)　leather jackets.
(25)　Q.　Is there a reason there would

---

Page 370

(1)
(2)　be sales of men's Phat Farm leathers during
(3)　the same period of time July to September
(4)　2007 and not ladies?
(5)　A.　Yeah.
(6)　Q.　What?
(7)　A.　Probably in ladies there was
(8)　not a leather line produced. In men's we had
(9)　a couple of jackets from the leather supplier
(10)　to us. The leather licensee.
(11)　Q.　I showed you a document earlier
(12)　on --
(13)　A.　I didn't mean there wasn't a
(14)　line, there were no sales from us of leather
(15)　products in that period of time. That's why
(16)　it was not recorded there.
(17)　Q.　Plaintiff's Exhibit 68. This
(18)　one says Baby Phat royalties up on the top.
(19)　This appears to be although it says pages 1
(20)　of 2 and 2 of 2 appears to be printed out on
(21)　separate dates for whatever reason. Have you
(22)　ever seen this document before?
(23)　A.　Possibly.
(24)　Q.　Do you know what it is?
(25)　A.　I think so.

---

Page 371

(1)
(2)　Q.　Could you tell me?
(3)　A.　I think these are our sales
(4)　recorded by month on the Baby Phat product.
(5)　Q.　These are sales made by
(6)　Vis-A-Vis?
(7)　A.　Yes.
(8)　Q.　Plaintiff's Exhibit 69 appears
(9)　to be a --
(10)　MR. BEHA: Can we stop a
(11)　second. I clearly got distracted.
(12)　Let me just catch up. Off the record.
(13)　(Discussion off the record.)
(14)　Q.　I've handed you Plaintiff's
(15)　Exhibit 69 which appears to be a payroll
(16)　record for Alicia Salvatore. Who is Alicia
(17)　Salvatore?
(18)　A.　I guess an employee.
(19)　Q.　Do you have any knowledge as to
(20)　why we've been given a copy of her payroll
(21)　record?
(22)　A.　I would have to say that it
(23)　probably slipped into the papers by mistake.
(24)　I don't know. I cannot tell you why.
(25)　Q.　Is she perhaps one of the

---

Page 372

(1)
(2)　employees that you claimed Gaby Bitton or any
(3)　of those companies was soliciting?
(4)　A.　No.
(5)　Q.　Maybe Barry will know?
(6)　A.　It's a mistake, I can tell you
(7)　that. I don't know. I know all the
(8)　employees that were taken.
(9)　Q.　Plaintiff's Exhibit 70 is a
(10)　schedule of net sales for Tornado Imports for
(11)　September 30, 2006. Have you seen this
(12)　document before?
(13)　A.　Perhaps.
(14)　Q.　Who is RSM Richter?
(15)　A.　RSM Richter is one of the
(16)　largest accounting firms in Canada, auditing
(17)　firms.
(18)　Q.　If you turn three pages in, the
(19)　page that has 896 at the bottom, the first
(20)　paragraph begins at the request of Tornado
(21)　Imports. Do you know whether or not RSM
(22)　Richter was given a copy of the trademark
(23)　license agreement?
(24)　A.　I do not.
(25)　Q.　Does this document include Baby

---

Page 381

(1)
(2) somebody other than Steve Feiner?
(3)     A.   Correct.
(4)     Q.   So whatever year that Steve
(5) Feiner came in, that gives us the farthest
(6) out date for when this document was created
(7) and the 30 percent document gives us the most
(8) recent date?
(9)     A.   Whatever you say.
(10)    Q.   Okay.
(11)        (Recess taken.)
(12)    I'm handing you Plaintiff's
(13) Exhibit 74 and once again all the documents
(14) I'm going to give you from this point forward
(15) are documents that were produced a couple of
(16) days ago and that's why I'm giving them to
(17) you out of order because before we went
(18) chronologically.
(19)    A.   Not a problem.
(20)    Q.   This was a document produced in
(21) exactly this form without the attachment.
(22) You see it's a fax sent from Barry Segal to
(23) Bill Eng on February 14th of 2005. Yesterday
(24) I asked you some questions and we looked at
(25) documents to Sun Trust and a man by the same

Page 382

(1)
(2) name. Looking at this document which is in
(3) 2005, does this help refresh your
(4) recollection in any way as to why Vis-A-Vis
(5) financial statements were being sent by Barry
(6) Segal to Bill Eng?
(7)     A.   I don't know who Bill Eng is.
(8) I really don't know.
(9)     Q.   That makes the questions fairly
(10) easy.
(11)    A.   Maybe I do know, but it escapes
(12) my mind. It doesn't ring a bell.
(13)    Q.   We dealt with Exhibit 75
(14) yesterday so now we're going to go to Exhibit
(15) 76 which is some documents clipped together.
(16) At the top it's from Steve Feiner to Scott
(17) London. It's an e-mail. The re on it is
(18) Baby Phat Canada. This is a letter addressed
(19) from Steve Feiner to Issie Wiseman. We'll
(20) take these in the order I've given them to
(21) you. First is the e-mail on top. Have you
(22) seen this document before?
(23)    A.   Yes.
(24)    Q.   What if anything do you recall
(25) about this document and the statements

Page 383

(1)
(2) contained therein?
(3)     A.   This is what we discussed
(4) earlier. During the course of the time that
(5) we were doing Baby Phat Clothing, I had
(6) explained to you before that we had numerous
(7) times that Steve would get in touch with us
(8) and tell us that he wasn't happy with the way
(9) the business was going and he wanted to see
(10) some improvement in the business and this
(11) pertains to that.
(12)    Q.   Was this the first time that
(13) you recall that he ever sent you a list like
(14) this of items that apparently were concerning
(15) him?
(16)    A.   Perhaps.
(17)    Q.   If you turn to the third page,
(18) what's attached there is this appears to be a
(19) marked up copy of the document. Looking at
(20) the page with 1610 at the bottom, does that
(21) help -- do you recognize that handwriting?
(22)    A.   Yeah, that's me.
(23)    Q.   That's you?
(24)    A.   You got it.
(25)    Q.   Up at the top it says -- does

Page 384

(1)
(2) that say call Thursday, July 6th?
(3)     A.   Yeah.
(4)     Q.   When you wrote on page 1610
(5) okay next to the first three bullet pointed
(6) items, do you know what your okay was
(7) signifying?
(8)     A.   Things that I felt that were
(9) doable.
(10)    Q.   When we go to the second page,
(11) the last page of the exhibit, there are three
(12) more okays. Is your answer the same as to
(13) what those meant?
(14)    A.   Yes.
(15)    Q.   Could you tell me what you
(16) wrote if that's your handwriting starting
(17) with the bullet point that begins with
(18) although you have doubled your business?
(19)    A.   What about that?
(20)        MR. BEHA: What you wrote over
(21)    there?
(22)    A.   I wrote going in right
(23) direction and will continue.
(24)    Q.   Then to the bullet point
(25) underneath that it says based on feedback you

Page 389

(1)

(2) a phone call in between?

(3)    A.   Highly unlikely.

(4)    Q.   Do you have a recollection of

(5) speaking with Steve Feiner immediately after

(6) this July 25, 2006 e-mail was sent?

(7)    A.   I don't have a recollection,

(8) but I would believe I have -- I believe I

(9) spoke to him at some time from a boat

(10) concerning these matters so I would have to

(11) go back and check when I was on that cruise,

(12) but I believe I addressed these matters from

(13) the cruise after Claudia had answered them.

(14)    Q.   Were you able to get e-mails on

(15) the cruise?

(16)    A.   No, so it was by phone I think.

(17)    Q.   Do you have a recollection of

(18) somebody from Tyfoon, Claudia or whomever,

(19) calling you up while you were on the cruise

(20) and reading a letter to you?

(21)    A.   I do recall addressing this

(22) matter and setting up a conference call with

(23) Steve from the boat to address these matters.

(24)    Q.   Let me show you Plaintiff's

(25) Exhibit 78 which is an e-mail from Lorraine

Page 390

(1)

(2) Carlson to you dated July 26th of 2006 which

(3) would be the day after the deposition Exhibit

(4) 77 which we just looked at?

(5)    A.   Right.

(6)    Q.   Have you ever seen this e-mail

(7) before?

(8)    A.   I believe so.

(9)    Q.   What was your reaction to the

(10) statements that were made in the e-mail and

(11) please feel free to read them?

(12)    A.   This again refers to Steve's

(13) being not satisfied with the business we're

(14) doing in Canada and I wasn't very happy about

(15) it so I addressed it and we set up a

(16) conference call pertaining to this letter and

(17) the other previous document and we

(18) straightened it out I felt at that time, but

(19) I have to tell you in the back of my mind it

(20) was just there's no pleasing this guy.

(21)    Q.   Plaintiff's Exhibit 79 is an

(22) e-mail dated July 27th from Claudia Michaels

(23) to Steve Feiner.  Have you ever seen this

(24) e-mail before?

(25)    A.   I believe so.

Page 391

(1)

(2)    Q.   Look at the first line and see

(3) if that helps refresh your recollection as to

(4) what conference call you mentioned?

(5)    A.   Yes.

(6)    Q.   Do you believe that that may be

(7) the conference call that took place when you

(8) were on the ship?

(9)    A.   Yes.

(10)    Q.   With respect to the information

(11) that's here that's in bold in this e-mail

(12) that begins in the second paragraph to date,

(13) do you know where that information came from?

(14)    A.   That information came from

(15) Claudia from our sales.

(16)    Q.   Is there any reason why Claudia

(17) would be addressing these issues with Steve

(18) Feiner rather than Barry Segal?

(19)    A.   Claudia is only the liaison,

(20) Barry is the guy that gives her the numbers.

(21) She would have asked Barry for how to address

(22) this and what numbers were and she was just

(23) the liaison to Lorraine or Steven.

(24)    Q.   Plaintiff's Exhibit 80 is an

(25) e-mail dated November 2nd from you to Steve

Page 392

(1)

(2) Feiner, subject is Canada transition.  Do you

(3) recognize this e-mail?

(4)    A.   Yes.

(5)    Q.   What is the transition that's

(6) being referred to there?

(7)    A.   Transitioning from Steven

(8) Feiner taking over the sales for Baby Phat

(9) Clothing in Canada.

(10)    Q.   As of November 2, 2006 had it

(11) been decided that that was going to happen?

(12)    A.   I don't recall, but it must

(13) have because here I say I tried calling you

(14) yesterday to finalize the transition.

(15)    Q.   I asked you some questions

(16) about this yesterday and I'm just going to go

(17) back to see now looking at this e-mail

(18) whether your recollection is refreshed.  We

(19) looked at a Complaint that was filed by BP

(20) against Vis-A-Vis in which they allege that

(21) on October 26th of 2006 that you were given

(22) notice of the termination and we explored

(23) yesterday whether or not that notice was in

(24) writing.  I still haven't seen anything in

(25) writing.  Looking at this November 2, 2006

Page 397

(1)
(2) with that.
(3)     Q.   I'm telling you we already did
(4) Exhibits 81, 82 and 83 so we're moving to 84.
(5)     MR. BEHA: I'm in the program.
(6)     Q.   84 is a December 12, 2006
(7) letter from Steve Feiner to you and you will
(8) let me know when you get the chance and
(9) you've read it if you have seen this document
(10) before?
(11)     A.   Okay, yes.
(12)     Q.   Did this letter come as a
(13) surprise to you?
(14)     MR. BEHA: I think we discussed
(15)     this subject yesterday.
(16)     A.   I don't recall.  At this point
(17) in time we knew we had -- we were through and
(18) yes, it's not a surprise to me because he
(19) agreed to cancel our February 15th and March
(20) 15th collections as we discussed previously
(21) the reason why.
(22)     Q.   Do you know why a writing was
(23) sent to you setting forth the termination?
(24)     A.   No.
(25)     Q.   Plaintiff's Exhibit 85 is a

Page 398

(1)
(2) document that we just glanced at yesterday so
(3) you could put a date in perspective if you
(4) recall as to when your lawyer sent something
(5) off to Baby Phat LLC?
(6)     A.   Yeah.
(7)     Q.   Have you seen this document
(8) before?
(9)     A.   Yes, I believe so.
(10)     MR. BEHA: In addition to
(11)     yesterday?
(12)     MR. HOFFMAN: Right.
(13)     Q.   Did you approve this document
(14) before it was sent out by your attorney?
(15)     A.   Yes, I believe so.
(16)     Q.   Who is Richard Hines?
(17)     A.   He's one of our attorneys in
(18) Canada.
(19)     Q.   What types of matter do you use
(20) his firm for?
(21)     A.   Litigation.
(22)     Q.   Had you used his firm for
(23) litigation prior to December 21st of 2006?
(24)     A.   Yes.
(25)     Q.   If you take a look in the

Page 399

(1)
(2) second paragraph, we now go back to the
(3) October 26th date, it says on or about
(4) October 26th of 2006 Baby Phat terminated
(5) without notice the longstanding distribution
(6) agreement between the parties.  Would it be
(7) accurate to state that the termination we
(8) have been discussing took place on or about
(9) October 26th of 2006?
(10)     A.   Yes.
(11)     Q.   If you turn to the next page,
(12) at the very top it says at the time of
(13) termination of the distribution agreement,
(14) what is the distribution agreement that's
(15) being referred to there if you know?
(16)     A.   I don't know.  I know what it
(17) refers to.  It refers to the agreement that
(18) we have with Baby Phat Clothing to distribute
(19) the merchandise in Canada.
(20)     Q.   That we've been discussing here
(21) for the past day-and-a-half?
(22)     A.   Yes.
(23)     Q.   In the third paragraph up from
(24) the bottom Vis-A-Vis claims from Baby Phat
(25) the amount of $1 million in compensation.  Do

Page 400

(1)
(2) you have any knowledge as to how that figure
(3) was arrived at?
(4)     A.   No.
(5)     Q.   Do you have any knowledge as to
(6) how the $1.5 million figure in the next to
(7) last paragraph was arrived at?
(8)     A.   No, I can't recall.
(9)     Q.   Plaintiff's Exhibit 86 is a
(10) December 29, 2006 letter from Randy Friedberg
(11) to Richard Hines with an attachment behind
(12) it.  The attachment was not part of the
(13) letter, but they were produced consecutively.
(14) I'll ask you about each of them separately.
(15)     A.   Okay.
(16)     Q.   Have you seen the letter before
(17) that Mr. Friedberg sent to Mr. Hines?
(18)     A.   I believe so.
(19)     MR. BEHA: Off the record.
(20)     (Discussion off the record.)
(21)     Q.   Just to clarify a discussion we
(22) had off the record, do you have any knowledge
(23) as to whether or not the two documents that
(24) we've marked as Exhibit 86 which have the
(25) numbers 1471 and 1472 go together?

## Page 401

(1)
(2)     A.   No, I do not.
(3)     Q.   I believe you testified before
(4)   we went off the record that you have seen the
(5)   December 29, 2006 letter; is that correct?
(6)     A.   I believe so.
(7)     Q.   Turn the page now, please.
(8)   Have you ever seen that document?
(9)     A.   I don't recall.
(10)    Q.   Are the statements there
(11)  accurate, for instance, we have had Baby Phat
(12)  Clothing since holiday 2000?
(13)    A.   I would believe so.
(14)    Q.   Was it true as of December 29th
(15)  of 2006 that we have presently purchased all
(16)  of spring 2007 up to and including March 15th
(17)  delivery?
(18)    A.   Yes.
(19)    Q.   In number three was it true
(20)  that you had done all the things that are
(21)  mentioned there since our discussions in
(22)  August?
(23)    A.   Yes.
(24)    Q.   Does the reference to August
(25)  help refresh your recollection as to perhaps

## Page 402

(1)
(2)   when you had the call with Feiner that you
(3)   testified about?
(4)     A.   Correct.
(5)     Q.   It does?
(6)     A.   Yes.
(7)     Q.   In three after A through E
(8)   somebody wrote in an F which I think says
(9)   increased our purchases from you; is that
(10)  correct?
(11)    A.   Yes.
(12)    Q.   Is that your handwriting?
(13)    A.   I don't believe so, but could
(14)  be.
(15)    Q.   In four where it says we have
(16)  to give notification to sales people and
(17)  employees for termination, do you know what
(18)  that's a reference to?
(19)    A.   Yes.
(20)    Q.   What is that?
(21)    A.   It's a reference to the reasons
(22)  why we didn't get enough notification from
(23)  Steven Feiner why we were going to argue with
(24)  him about the correct amount of notification.
(25)    Q.   As a result of the termination

## Page 403

(1)
(2)   of Vis-A-Vis by BP Clothing, did you have to
(3)   lay off employees?
(4)     A.   Yes, I believe so.
(5)     Q.   Do you recall how many?
(6)     A.   No, I don't recall.
(7)     Q.   Did you have to lay off any
(8)   sales people or terminate relationships with
(9)   sales people?
(10)    A.   Yes.
(11)    Q.   Any idea of how many?
(12)    A.   No.
(13)    Q.   Plaintiff's Exhibit 87 is a
(14)  January 22, 2007 letter from Mr. Hines to Mr.
(15)  Friedberg.  Have you seen this document
(16)  before?
(17)    A.   I believe so.
(18)    Q.   It says in the third paragraph
(19)  we have received instructions from Vis-A-Vis.
(20)  Would those be instructions that had been
(21)  received from you?
(22)    A.   Yes.
(23)    Q.   It says that at the end legal
(24)  proceedings required in the circumstances
(25)  will be instituted against Baby Phat and all

## Page 404

(1)
(2)   those legally responsible for the termination
(3)   of the wrongful acts without further notice
(4)   or delay, do you see that?
(5)     A.   Yes.
(6)     Q.   Who in your mind were the
(7)   people other than Baby Phat that were legally
(8)   responsible for the termination and wrongful
(9)   acts as of January 22, 2007?
(10)    A.   I don't know.
(11)    Q.   Would it have been Phat
(12)  Fashions?
(13)    A.   I couldn't say.
(14)    Q.   Would it have been --
(15)    A.   This is all legal ease to me.
(16)    Q.   I understand, but I'm just
(17)  asking if there was anybody in your -- when
(18)  Feiner terminated you, did you ever think in
(19)  your mind that Phat Fashions, LLC was
(20)  responsible for that?
(21)    A.   No.
(22)    Q.   Plaintiff's Exhibit 88 is a
(23)  January 24th --
(24)    A.   But then again, Counselor, I
(25)  wouldn't know what was going on internally

PHAT FASHIONS, LLC

BSA XMAX(23/23)
ISSIE WISEMAN – 11/16/07

VS. TORNADO IMPORTS

Page 409

(1)
(2) Segal and go from there. This is the very
(3) next numbered document which is another copy
(4) of the January 24, 2007 letter. Have you
(5) ever seen this document with these
(6) handwritten notations on it?
(7)    A.  I don't know. I don't know.
(8)    Q.  It's not your handwriting?
(9)    A.  I don't believe so.
(10)    Q.  Go to the final page and do you
(11) have any idea what this document is?
(12)    A.  What about this?
(13)    Q.  Have you ever seen that
(14) document before?
(15)    A.  I don't recall.
(16)    Q.  It appears to me if you look at
(17) it that where it says for instance up at the
(18) top re paragraph three that the paragraph
(19) three that it's referring to is the paragraph
(20) three of the January 24, 2007 letter, they
(21) all do appear to match up?
(22)    A.  Okay.
(23)    Q.  Does that help refresh your
(24) recollection as to whether or not you have
(25) ever seen the document that has 1550 at the

Page 410

(1)
(2) bottom?
(3)    A.  I don't know.
(4)    Q.  Is the handwriting yours?
(5)    A.  I don't believe so.
(6) I believe it to be Barry Segal's.
(7)    Q.  Let me move on. Exhibit 89 is
(8) a February 1, 2007 e-mail. Have you ever
(9) seen this document before? It's from Pierre
(10) to Barry. You do not appear to be copied on
(11) it.
(12)    A.  Okay.
(13)    Q.  Have you ever seen it before?
(14)    A.  I don't believe so.
(15)    Q.  Do you have an understanding as
(16) to what it was that was going to be sent to
(17) Richard?
(18)    A.  A request for settlement. I
(19) don't know.
(20)    Q.  Did you ever have any
(21) discussions with Barry or Pierre or anyone
(22) else at Tyfoon about how much money if any
(23) you were going to demand from BP Clothing?
(24)    A.  I believe so.
(25)    Q.  Is this document that we just

Page 411

(1)
(2) marked as Plaintiff's Exhibit 89 part of the
(3) figures that were at least being discussed?
(4)    A.  I don't know, perhaps.
(5)    Q.  Plaintiff's Exhibit 90 is the
(6) settlement agreement and release. Have you
(7) seen that document before?
(8)    A.  I'm not sure.
(9)    Q.  If you take a look at page 6 it
(10) appears to have been signed by Barry Segal?
(11)    A.  Yes.
(12)    Q.  Would Barry Segal have been
(13) allowed to sign this document without your
(14) approval on it?
(15)    A.  I doubt that. He would not
(16) sign it without conferring with me.
(17)    Q.  In the first page of the
(18) document there are several whereas clauses
(19) starting with whereas BP has the exclusive
(20) worldwide rights including without limitation
(21) in Canada to use the registered Baby Phat
(22) trademark on and in connection with women's
(23) clothing. Was that an accurate statement to
(24) the best of your knowledge?
(25)    A.  I wouldn't know what their

Page 412

(1)
(2) rights were.
(3)    Q.  Just if you take a look at the
(4) -- read to yourself, please, all the whereas
(5) clauses, actually the first five or so will
(6) be fine and after you have done that tell me
(7) and I'm just going to ask you if the
(8) statements contained in them are accurate?
(9)    A.  They are not accurate.
(10)    Q.  What's not accurate?
(11)    A.  Whereas Vis-a-Vis was a
(12) distributor of Baby Phat Clothing in Canada
(13) and whereas Baby Phat terminated that
(14) distribution relationship. Whereas Vis-A-Vis
(15) was a distributor, that's the wrong wording,
(16) we were an exclusive distributor in Canada of
(17) Baby Phat Clothing.
(18)    Q.  What else is inaccurate about
(19) the whereas clauses?
(20)    A.  I don't understand this part
(21) whereas Vis-A-Vis made claims that Baby Phat
(22) improperly terminated the relationship and as
(23) a result was liable to Vis-A-Vis, I don't
(24) understand that.
(25)    MR. BEHA:  BP therefore owed

Page 413

(2) something to Vis-A-Vis, is that your
(3) claims, that they should pay you?
(4)    A.    Okay, and whereas the parties
(5) have mutually agreed to terminate their
(6) relationship effective as of February 15,
(7) 2007, okay.
(8)    Q.    Are those statements accurate,
(9) for instance, the statement about mutually
(10) agreeing to terminate the relationship?
(11)    A.    Yes.
(12)    Q.    Was it also accurate that at
(13) the time Vis-A-Vis owed BP $403,124.05?
(14)    A.    I believe so.
(15)    Q.    Pursuant to this agreement it
(16) appears that $403,124.05 was being paid by
(17) Vis-A-Vis to BP and that coming back to BP
(18) from Vis-A-Vis?
(19)       MR. BEHA: No.
(20)    Q.    Coming back to Vis-A-Vis from
(21) BP was $125,000; is that correct?
(22)    A.    I believe so. I don't know.
(23)    Q.    Do you know how it came to pass
(24) that Vis-A-Vis admitted owing $403,000 and
(25) yet received back of that amount $125,000?

Page 414

(2)    A.    I believe that to be the
(3) settlement for the unfair termination from
(4) Baby Phat to us.
(5)    Q.    In paragraph 5 there is a
(6) release by Vis-A-Vis, do you see that, it's
(7) on the third page of the agreement?
(8)    A.    Yes.
(9)    Q.    Did you read that release
(10) before allowing Barry Segal to sign this
(11) document?
(12)    A.    I don't believe so.
(13)    Q.    I think we're done with that
(14) one. Plaintiff's Exhibit 91, does this
(15) evidence the transfer of $200,000 from
(16) Vis-A-Vis to BP Clothing as the initial
(17) payment?
(18)    A.    I believe so.
(19)    Q.    Does Plaintiff's Exhibit 92
(20) indicate the transfer of $78,124.05?
(21)       MR. BEHA: Here you are asking
(22)    him to characterize the document.
(23)       MR. HOFFMAN: That's right.
(24)    A.    I believe so.
(25)    Q.    With respect to the $125,000

Page 415

(2) that was paid to Vis-A-Vis by BP, how did
(3) that money get transferred?
(4)    A.    I don't know.
(5)       MR. BEHA: Off the record.
(6)       (Discussion off the record.)
(7)    Q.    Based upon the discussion that
(8) we just had off the record, does it appear at
(9) least possible to you that rather than BP
(10) transferring $125,000 to Vis-A-Vis, that
(11) Vis-A-Vis was allowed to make the second
(12) settlement payment that was due less
(13) $125,000?
(14)    A.    I believe so.
(15)       MR. HOFFMAN: Thank you,
(16)    Counselor.
(17)    Q.    Plaintiff's Exhibit 93, have
(18) you seen this document before?
(19)    A.    I believe so.
(20)    Q.    Is this the agreement with
(21) Coogi?
(22)    A.    I believe so.
(23)    Q.    Was it entered into on or
(24) around April 1st of 2007?
(25)    A.    I believe so.

Page 416

(2)    Q.    Does this provide for a one
(3) three year term and a renewal potentially
(4) through 2013 to the best of your knowledge?
(5)    A.    I think so.
(6)    Q.    At the end of this document it
(7) appears that it's guaranteed by Vis-A-Vis
(8) that starts at page 37. Do you know why that
(9) is?
(10)    A.    I do not.
(11)    Q.    Do you have any idea what the
(12) company 4107675 Canada Inc. is?
(13)    A.    No.
(14)    Q.    Was that a company that was
(15) created to the best of your knowledge to be
(16) the Tyfoon Group party to the Coogi
(17) agreement?
(18)    A.    Perhaps.
(19)    Q.    Would Barry Segal perhaps know
(20) that?
(21)    A.    Yes.
(22)    Q.    Plaintiff's Exhibit 94, these
(23) are three documents that came to us together.
(24) Whether or not they belong together we will
(25) now try to find out. The first page which

Page 417

(1)
(2) has 1708 on the bottom talks about Coogi
(3) sales commission 2007 cumulative. Have you
(4) ever seen this document before which appears
(5) to have been printed out although we're not
(6) sure from where on November 14, 2007?
(7)     A.   I'm not sure.
(8)     Q.   Is it accurate to state based
(9) on this document at least that the Tyfoon
(10) Group Company started making sales of Coogi
(11) as of May of 2007?
(12)     A.   Yes.
(13)     Q.   Turn if you would to the second
(14) page, do you know what Heatherette
(15) commissions are?
(16)     A.   Yes.
(17)     Q.   What?
(18)     A.   Heatherette is a company that's
(19) associated with Coogi. It's a ladies wear
(20) company that's associated with Coogi which
(21) doesn't constitute part of our agreement, I
(22) don't know, and we sold some of that product
(23) as well in Canada.
(24)     Q.   The next page Crown Holder
(25) commissions, what is that?

Page 418

(1)
(2)     A.   Same thing as Heatherette, it's
(3) a part of the Coogi group of companies and we
(4) sold some of that product as well.
(5)     Q.   Just going back for a second to
(6) 93, trademark license and distribution
(7) agreement, did you enter into any other
(8) written agreements, license or distribution
(9) agreements with any other entity in writing
(10) in 2007 that you recall?
(11)     A.   In writing?
(12)     Q.   Yes, sir, in writing?
(13)     A.   No, I don't recall. As you can
(14) see, we don't have an agreement with
(15) Heatherette, we don't have a Crown Holder
(16) agreement, that's strictly a verbal
(17) agreement.
(18)     Q.   Although it might be covered in
(19) the coming agreement under related products?
(20)     A.   I don't believe so. It's not
(21) covered. I know for a fact it's not covered.
(22)     Q.   You have no recollection of
(23) having any trademark license and distribution
(24) type agreements in writing from 2007 other
(25) than the Coogi agreement?

Page 419

(1)
(2)     A.   No recollection, just we have
(3) agreements, verbal agreements with
(4) Heatherette, Crown Holder, Parish, those kind
(5) of things.
(6)     Q.   Plaintiff's Exhibit 95 and I
(7) have done this just for time purposes is a
(8) whole series of different handwritten notes
(9) that came in the production that we just
(10) received so they don't necessarily belong
(11) together. I'll represent to you that they
(12) are at the bottom in numerical order at
(13) least. I believe looking at this first one
(14) now that this was a document that we actually
(15) looked at earlier today, but it's blown up.
(16) Is that a fair characterization the one that
(17) says up at the top faux furs and it has 1461
(18) at the bottom and we discussed this one
(19) already?
(20)     A.   Yes.
(21)     Q.   Looking at the second page
(22) which is number 1470, in each case if you
(23) could tell me whether or not you recognize
(24) the handwriting and then whether or not you
(25) do, what you could tell me about the

Page 420

(1)
(2) substance of the document if anything?
(3)     A.   This is my writing. Has
(4) nothing to do with anything. I think I'm
(5) looking for something on -- there's a problem
(6) with my computer here.
(7)     Q.   I see you can't find or load
(8) the file and you are getting some kind of
(9) note from the computer that you are writing
(10) down here?
(11)     A.   Yeah. I have this Bergman
(12) who's a friend of mine that I know in Florida
(13) I play golf with, that's his phone number I
(14) believe.
(15)     Q.   Does the case number up on the
(16) top help you?
(17)     A.   No. I don't know what this is.
(18) This is just scribbling I think that just got
(19) mixed in with files.
(20)     Q.   Let's turn to the next page
(21) which is 1473 is on Issie Wiseman note pad.
(22) It looks to say S. Feiner, BP Jeans. Is that
(23) your handwriting?
(24)     A.   I think so. I'm not sure.
(25)     Q.   1543 is the next page. Looking

Page 425

(1)
(2)        A.   I have a recollection of having
(3)    a conversation with Bernt Ullmann about
(4)    Coogi, if he thought it was a good idea for
(5)    -- not if it was a good idea, if he knew the
(6)    people because I remembered that he used to
(7)    work for these people.  Bernt Ullmann used to
(8)    work for Coogi and Fubu, remember as I
(9)    explained to you before when he entertained
(10)    the thought of giving us the line for Canada
(11)    years back so I had asked him at the time I
(12)    believe we had a conversation concerning
(13)    Coogi and I had asked him at the time if he
(14)    knew the people, were they nice people or
(15)    good to deal with, are they honorable people,
(16)    something of that nature.
(17)        Q.   This document would appear to
(18)    indicate that you were actually having some
(19)    type of contact with someone from Alliance
(20)    Worldwide, I'm assuming, maybe it's Willie
(21)    Esco or maybe Willie Esco is a brand for all
(22)    I know?
(23)        A.   It is a brand.
(24)        Q.   Does that help refresh your
(25)    recollection as to whether there were any

Page 426

(1)
(2)    writings between Coogi on the one hand and
(3)    Tyfoon on the other in January of 2007?
(4)        A.   No.
(5)        Q.   97 is just a document with some
(6)    numbers on it trans royalty selling gross.
(7)    Have you ever seen this document before?
(8)        A.   I don't believe so.
(9)        Q.   98 is the documents that were
(10)    given to us last night after the deposition
(11)    and because I didn't have time to get them
(12)    all marked separately I'll show them to you
(13)    now and I have included the cover letter on
(14)    there.
(15)        MR. HOFFMAN: Is this a good
(16)        time to take a ten minute break?
(17)        MR. HOFFMAN: It is a very good
(18)        time.
(19)        (Recess taken.)
(20)        Q.   I think I described before we
(21)    took a break what these documents are.  They
(22)    are a series of documents that have been
(23)    produced to us last night.  There is separate
(24)    documents.  You can feel free to unclip them
(25)    if it makes it easier to look at.  Let's

Page 427

(1)
(2)    begin with the documents in the front that
(3)    are marked 1714, 1715 and 1716 and I think
(4)    it's probably correct that the 1716 document
(5)    should be on the top of the 1714, 1715
(6)    because it says hello, John, please see
(7)    attached for more detailed proposal and this
(8)    is an e-mail to Blac Label and the proposal
(9)    is to Blac Label?
(10)        A.   Yes.
(11)        Q.   Do you think these three
(12)    documents at least belong together?
(13)        A.   Yes.
(14)        Q.   Blac Label was a company that
(15)    we discussed earlier this morning, correct?
(16)        A.   Correct.
(17)        Q.   When you go to the pages with
(18)    the 1714 and 1715, that appears to be a
(19)    document from you to John Ackerman I assume
(20)    at Blac Label; is that correct?
(21)        A.   Yes.
(22)        Q.   Are the statements that are
(23)    contained in the September 24, 2007 letter
(24)    accurate?
(25)        A.   Yes.

Page 428

(1)
(2)        Q.   Did your lines at the time as
(3)    of September 24, 2007 include Coogi, Crown
(4)    Holder, Heatherette, Akademics men's and
(5)    ladies, Stash House, Miskeen Originals and
(6)    Ink Slingers?
(7)        A.   Yes.  There was more below it.
(8)        MR. BEHA: He thought you were
(9)        going to keep reading.
(10)        Q.   I'm sorry, I stopped at Ink
(11)    Slingers because after Ink Slingers it says
(12)    to name a few so my question now is what are
(13)    the ones if any that you didn't name?
(14)        A.   Some German product and some
(15)    other lines.  When we write this letter to
(16)    somebody who we feel would like us -- would
(17)    like his product line to be associated with
(18)    other product lines, we mention some of the
(19)    other product lines that would fit in with
(20)    this particular product, that he would be
(21)    happy to have this particular product sitting
(22)    beside the other kind of product, that we
(23)    understand his market place, that's why I say
(24)    to you we changed those our lines include
(25)    area of our format letter.

Page 429

(1)
(2)    **Q.** Would it be accurate to state
(3)    that as of September 24, 2007 that Tyfoon had
(4)    many product lines, but in this letter they
(5)    are just mentioning the ones that are
(6)    relevant to Blac Label?
(7)    **A.** There's not many more than that
(8)    though. There's a few more than that, but,
(9)    yeah, those are the ones.
(10)   **Q.** It says we also carry footwear
(11)   for Azzure, Pastry, Shmack, Black Sheep and
(12)   Levi's?
(13)   **A.** Yes.
(14)   **Q.** That's an accurate statement?
(15)   **A.** Yes.
(16)   **Q.** Any other companies that you
(17)   carry footwear for?
(18)   **A.** I don't think so.
(19)   **Q.** This letterhead says Tyfoon
(20)   International Inc. up at the top?
(21)   **A.** Yes.
(22)   **Q.** As of September 24, 2007, was
(23)   Tyfoon International Inc. its own
(24)   corporation?
(25)   **A.** I believe so.

Page 430

(1)
(2)    **Q.** Do you know when that happened
(3)    because we talked earlier in your deposition
(4)    yesterday about the Tyfoon Group?
(5)    **A.** Yes.
(6)    **Q.** But now we have Tyfoon
(7)    International Inc.?
(8)    **A.** Same thing.
(9)    **Q.** But this is an incorporated
(10)   entity in Canada to the best of your
(11)   knowledge?
(12)   **A.** I believe so.
(13)   **Q.** The information in the next
(14)   paragraph each individual line represented by
(15)   this firm is led by its own division head,
(16)   etc., etc., are all of those accurate
(17)   statements?
(18)   **A.** Somewhat.
(19)   **Q.** When you say somewhat, what do
(20)   you mean, a little puffery perhaps?
(21)   **A.** The usual, yeah, led by its own
(22)   division head and staffed.
(23)   **Q.** Supported by sufficient staff
(24)   to fully operate and monitor the
(25)   merchandising, selling, marketing and

Page 431

(1)
(2)    eventual shipping of the collection in Canada
(3)    and it does go on beyond that?
(4)    **A.** It's a letter to sort of
(5)    influence the people we're writing to that
(6)    we're organized properly.
(7)    **Q.** Let's move on in this exhibit
(8)    to the pages that are marked 1717 and 1718
(9)    which appears to be an e-mail that's been
(10)   forwarded, but the main one is an Earl
(11)   Veinish e-mail dated August 17, 2007 to P.
(12)   Hartman at Isabellefashion.com. I believe
(13)   this is the only document that we have from
(14)   Isabelle Fashion relating to
(15)   Isabellefashion.com. What could you tell me
(16)   about Isabelle Fashion?
(17)   **A.** I can't tell you much. I don't
(18)   know who they are. It's one of our
(19)   executives an associate in my company Earl
(20)   Veinish who is writing a letter to try to
(21)   obtain a product line for the Canadian
(22)   market.
(23)   **Q.** In the letter there's a
(24)   reference to the Tyfoon CD and I have the CD
(25)   set up here to play. I marked the folder

Page 432

(1)
(2)    which is the way it came to us by the way
(3)    with nothing on it as Plaintiff's Exhibit 99.
(4)    I'll get you a photocopy of this, but I
(5)    didn't have one yet. It runs a minute and 32
(6)    seconds.
(7)    **MR. BEHA:** Why don't you mark
(8)    the other stuff that goes with the
(9)    document we gave you that goes with
(10)   the document with the CD.
(11)   **MR. HOFFMAN:** What we have just
(12)   done is we are going to mark as
(13)   Plaintiff's Exhibit 101 which I will
(14)   give to the reporter to initial. This
(15)   is a document that was sent over to us
(16)   today.
(17)   **Q.** Showing you this document and I
(18)   do have copies for everybody, you see there's
(19)   a photograph on the front there, Mr. Wiseman?
(20)   **A.** Yes.
(21)   **Q.** Is that the photograph that's
(22)   on the front of the package of the DVD that
(23)   we're about to look at?
(24)   **A.** Yes.
(25)   **Q.** Is it your testimony because

PHAT FASHIONS, LLC

BSA XMAX(29/29)
ISSIE WISEMAN – 11/16/07

VS. TORNADO IMPORTS

## Page 433

(1)
(2) I'm not sure this is on the record or off
(3) from before that you also believe that there
(4) may have been writing on the back of the
(5) package of the DVD?
(6)     **A.  I believe so.**
(7)     Q.  That's what we're going to try
(8) to get.
(9)     **A.  The writing on the back is**
(10) **similar to the writing of these letters.**
(11)     Q.  When you say these letters, you
(12) are referring to the document that was part
(13) of 98 and marked at the bottom 1714 and 1715?
(14)     **A.  Yes, a version of.**
(15)         (Whereupon a video was played.)
(16)     Q.  We just watched a minute and 32
(17) second DVD.  What can you tell me about the
(18) DVD that we just watched?  When to the best
(19) of your knowledge was it created?
(20)     **A.  I would say about eight months**
(21) **ago in March or April of 2007.**
(22)     Q.  It was created after the
(23) dispute arose between Phat Fashions and
(24) Tornado about the non extension of the
(25) agreement?

## Page 434

(1)
(2)     **A.  I believe so.**
(3)     Q.  Do you know who created it?
(4)     **A.  Yes, we have a production**
(5) **company in Canada.  I don't know the name.**
(6)     Q.  Are there any other DVDs like
(7) this that have been created by Tyfoon?
(8)     **A.  This is the only one.  Copies**
(9) **of this we have.**
(10)     Q.  But this is -- there's no other
(11) DVD that's out there?
(12)     **A.  No.**
(13)     Q.  Any time we look or as we look
(14) at documents that says here's the Tyfoon CD
(15) --
(16)     **A.  We're referring to this.**
(17)     Q.  In the video that we just
(18) looked at they showed a lot of different
(19) clothing and the like.  Were those photos
(20) taken in your showroom?
(21)     **A.  Yes.**
(22)     Q.  Where is the showroom?
(23)     **A.  The address?**
(24)     Q.  Yes.
(25)     **A.  In Montreal.  Our head office**

## Page 435

(1)
(2) **is in Montreal.**
(3)     Q.  Do you know how many of these
(4) DVDs or CDs were made up?
(5)     **A.  No, but it was not in the**
(6) **hundreds or thousands.**
(7)     Q.  Having looked at that now let's
(8) go back to the document that has to do with
(9) Isabelle Fashion.  I believe you testified
(10) before we looked at the DVD that Tyfoon has
(11) not reached any agreement with Isabelle?
(12)     **A.  Correct.**
(13)     Q.  Let's move on then to the next
(14) document which is from Earl Veinish to Chanel
(15) Crevier.  Have you seen this document before?
(16)     **A.  I don't believe so.**
(17)     Q.  You are not copied on it?
(18)     **A.  No.**
(19)     Q.  Do you know of a company with
(20) the name Chanel Crevier?
(21)     **A.  No.**
(22)     Q.  Do you know what CPD is where
(23) it says I visited your booth at CPD?
(24)     **A.  CPD is a show in Europe in**
(25) **Germany for a different entity of merchandise**

## Page 436

(1)
(2) mostly what we call missy.
(3)     Q.  M-I-S-S-Y?
(4)     **A.  Yes, missy type merchandise.**
(5)     Q.  Is Brandtex the licensor that
(6) was being contacted by Earl here?
(7)     **A.  Yes.**
(8)     Q.  Has any type of arrangement
(9) been made between Tyfoon and Brandtex going
(10) forward do you know?
(11)     **A.  I believe so.**
(12)     Q.  What is that arrangement?
(13)     **A.  It's a verbal arrangement for**
(14) **us to -- I believe we are presently selling**
(15) **the merchandise for delivery in spring of**
(16) **'08.**
(17)     Q.  This is an agreement, a verbal
(18) agreement that was reached some time in 2007
(19) I assume after March 21st; is that correct?
(20)     **A.  Correct.  Excuse me, this is**
(21) **after March 21st.**
(22)     Q.  You were looking at the date on
(23) the bottom when it was printed out, right?
(24)     **A.  Yeah.**
(25)     Q.  Moving on to the next document

Page 437

(2) 1720 to 1721 at the bottom looks like from
(3) Earl Veinish to Stefano?
(4)     A.  Yes.
(5)     Q.  Although there's a little bit
(6) of confusion here because Stefano is not
(7) mentioned as being part of the e-mail.  Do
(8) you know who Stefano is?  Actually let's just
(9) clear this up. The date at the top appears to
(10) be the date that this may have been sent to
(11) counsel November 14th.  We don't have a date
(12) for the e-mail from Earl Veinish to Stefano,
(13) but underneath it it looks like there was
(14) some type of contact around July 4th of 2007
(15) by a company called Tristano Onofri.  What if
(16) anything can you tell me about that company
(17) or any contact between it and Tyfoon?
(18)     A.  Again, this is a European line
(19) that Earl visited with at CPD in Dusseldorf,
(20) that's where it is, in Dusseldorf and we
(21) never ended up doing a deal with these
(22) people.
(23)     Q.  If you turn to page 1722 we
(24) already dealt with, that had to do with
(25) Sisters Knit, Canadian distribution of

Page 438

(2) Sisters.  Then the e-mail at the bottom says
(3) 1723, this looks to be a series of e-mails,
(4) October 12, 2007 being the most recent and
(5) September 24, 2007 being the oldest from
(6) Claudia Michaels to Nathalie Brochard.  What
(7) can you tell me about the company that was
(8) involved here?
(9)     A.  The company name is IKKS.
(10)     Q.  Which we discussed earlier?
(11)     A.  Correct and we are not going
(12) forward with them.
(13)     Q.  The last document 1724 we
(14) already discussed?
(15)     A.  Yes.
(16)     Q.  I think at this point we are
(17) down to one exhibit which is Exhibit 100 and
(18) this was the one that came in during the
(19) course of this morning's deposition.
(20)     MR. BEHA: This is the --
(21)     Q.  This is an e-mail that says May
(22) 2, 2007 from Claudia Michaels to Cary re
(23) distribution of Joyous & Free in Canada.
(24) We've seen this e-mail before, but we have
(25) not seen the attachment before?

Page 439

(2)     A.  Correct.
(3)     Q.  Taking a look at this
(4) attachment and if you would just read it to
(5) yourself if you haven't already.  Are the
(6) statements that are contained in this working
(7) proposal for Joyous & Free accurate to the
(8) best of your knowledge and what I'm primarily
(9) concerned with is on the first page where it
(10) says May 2, 2007, that third paragraph which
(11) says our lines include and remember it's
(12) accurate as of May 2, 2007?
(13)     A.  There is a mistake here.
(14)     Q.  Which is?
(15)     A.  I can see here that Prohibit,
(16) we never did it Prohibit.  I don't think we
(17) had any merchandise of Prohibit merchandise
(18) so I guess maybe we were in dialogue with
(19) them then and we used the name, but I don't
(20) think we ever brought in anything on
(21) Prohibit.
(22)     Q.  I'm just now comparing this to
(23) Plaintiff's Exhibit 98.  Akademics appears in
(24) both of them?
(25)     A.  Correct.

Page 440

(2)     Q.  G1 doesn't.  What was G1?
(3)     A.  G1 is a company that we have an
(4) interest in that makes pants, ladies pants so
(5) as I said before, we use different names for
(6) different entities when we are trying to
(7) influence somebody to do business with us, we
(8) try to get them to understand that we
(9) understand their market place so we put in
(10) the names of certain product lines that we
(11) feel that they would associate with.
(12)     Q.  Kinross Cashmere is another
(13) company?
(14)     A.  That's a missy sweater line
(15) that Earl does in our organization.
(16)     Q.  ABS dresses by Allen Schwartz,
(17) what's that?
(18)     A.  ABS is a dress line.
(19)     Q.  What is UBU?
(20)     A.  That's the name of our small
(21) little thing that Earl has as well in his
(22) organization as part of a missy thing.
(23)     Q.  And Cezar?
(24)     A.  That's a little tee shirt line
(25) of premium tee shirts.

Page 441

(1)
(2)    Q.    I believe your testimony is
(3) that proposals like this were sent out to
(4) various potential licensors and each proposal
(5) was tailored to the best of your ability to
(6) meet that potential licensor's needs; is that
(7) correct?
(8)    A.    Correct. These are, you know,
(9) like gone fishing, you throw in the lines and
(10) if you get a bite, it goes to the next level.
(11)    Q.    Do you have somewhere in your
(12) possession at Tyfoon a list of all of the
(13) different companies that you currently
(14) represent in one way or another?
(15)    A.    I don't. Maybe Barry does. I
(16) don't.
(17) RQ       MR. HOFFMAN: If there is such a
(18)    document and we could get it prior to
(19)    Tuesday that would be great.
(20)       With that, sir, I believe that
(21)    we are finished and I thank you very
(22)    much for your attendance here.
(23)       THE WITNESS: Thank you.
(24)       MR. BEHA: You now have at
(25) least a version of the profile, in

Page 442

(1)
(2) fact, you have two because the Blac
(3) Label letter was sort of the same
(4) thing. Do you really feel it's
(5) necessary to make us go back and try
(6) to find every variety of the profile
(7) that was an attachment to any one of
(8) these e-mails, just tell me?
(9)       MR. HOFFMAN: No, but that's
(10) not what I was asking. This is what
(11) I'm asking.
(12)       MR. BEHA: The list is
(13) different. About this issue are we
(14) okay on this or is there something
(15) more you want?
(16)       MR. HOFFMAN: I believe that
(17) we're okay on this. If by chance in
(18) the searches that have been going on
(19) while we're doing our questioning more
(20) of these documents come up then I
(21) would like to see them, but I believe
(22) now the fact that you have given me
(23) two, if I get that list that will take
(24) care of the need for all of the other
(25) ones.

Page 443

(1)
(2)       MR. BEHA: Okay.
(3)       THE WITNESS: The list of
(4) lines we presently represent that we
(5) have deals with, is that what you are
(6) referring to?
(7)       MR. HOFFMAN: And if there's
(8) some way I could get that list, I
(9) don't know if you have a list like
(10) that, that says well, in January 2007
(11) here's the lines we had, in March 2007
(12) here's the lines we had, something
(13) like that because it changes.
(14)       MR. BEHA: Or today?
(15)       THE WITNESS: It changes every
(16) five minutes.
(17)       MR. BEHA: Or today here's the
(18) lines we had?
(19)       MR. HOFFMAN: I'm not looking
(20) for just one document.
(21)       MR. BEHA: You are looking for
(22) documents that exist, not documents
(23) that are specially created to meet
(24) your purpose?
(25)       MR. HOFFMAN: Correct.

Page 444

(1)
(2)       THE WITNESS: What dates, in
(3) January?
(4)       MR. BEHA: I'll talk to you
(5) outside.
(6)       MR. HOFFMAN: If I could find
(7) out the licenses you had as of January
(8) 1st, March 1st and the present.
(9)       MR. BEHA: In 2007?
(10)       MR. HOFFMAN: In 2007, that
(11) would be fine.
(12)       THE WITNESS: Licenses
(13) meaning?
(14)       MR. BEHA: Any kind of
(15) distribution.
(16)       THE WITNESS: Deals?
(17)       MR. HOFFMAN: Oral or written.
(18)       (Time noted: 1:00 p.m.)
(19)
(20)
(21)
(22)
(23)
(24)
(25)