# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 53

PHAT FASHIONS VS. TORNADO IMPORTS

BARRY SEGAL - 11/20/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
**COURT REPORTING** Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

PLAINTIFF'S
EXHIBIT
53

## Page 1

(1)  IN THE UNITED STATES DISTRICT COURT
(2)  SOUTHERN DISTRICT OF NEW YORK
     ------------------------------------X
(3)  PHAT FASHIONS, LLC,
(4)                     Plaintiff,
(5)        - against -
(6)  TORNADO IMPORTS (CANADA), INC.,
(7)                     Defendant.
(8)  Case No. 1:07 cv 03278 (PAC)
     ------------------------------------X
(9)
(10)              410 Park Avenue
                  New York, New York
(11)
(12)
(13)              November 20, 2007
                  10:00 a.m.
(14)
(15)
(16)      Deposition of Defendant by BARRY SEGAL,
(17) before Rita Persichetty, a Notary Public of the
(18) State of New York.
(19)
(20)
(21)
(22)
(23)    ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
(24)      New York, New York 10022
              212-750-6434
(25)          REF: 85936

## Page 2

(1)  A P P E A R A N C E S :
(2)
(3)  PRYOR CASHMAN LLP
(4)  Attorneys for Plaintiffs
(5)      410 Park Avenue
(6)      New York, New York  10022
(7)  BY:  PHILIP R. HOFFMAN, ESQ.
(8)    PHONE:  212.326.0192
(9)    EMAIL:  Phoffman@pryorcashman.com
(10)
(11)
(12) ALLEGAERT BERGER & VOGEL LLP
(13) Attorneys for Defendant
(14)     111 Broadway
(15)     New York, New York  10006
(16) BY:  RONALD BUSLOFF, ESQ.
(17)     - and -
(18) JAMES A. BENA II, ESQ.
(19)   PHONE:  212.571.0550
(20)   EMAIL:  Jbeha@abv.com
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)  ----------------- I N D E X -----------------
(2)  WITNESS          EXAMINATION BY          PAGE
(3)  BARRY SEGAL      MR. HOFFMAN               5
(4)
(5)
(6)  --------------- E X H I B I T S ---------------
(7)  PLTF'S  DESCRIPTION                    FOR I.D.
(8)  102     A document                        146
(9)
(10)    (Exhibits maintained by Mr. Hoffman)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 4

(1)  S T I P U L A T I O N S
(2)
(3)      IT IS STIPULATED AND AGREED by and
(4)  between the attorneys for the respective parties
(5)  herein that the filing, sealing, and certification
(6)  of the within deposition be waived.
(7)      IT IS FURTHER STIPULATED AND AGREED that
(8)  all objections, except as to the form of the
(9)  question, shall be reserved to the time of the
(10) trial.
(11)     IT IS FURTHER STIPULATED AND AGREED that
(12) the within deposition may be sworn to and signed
(13) before any officer authorized to administer an
(14) oath, with the same force and effect as if signed
(15) to before the court.
(16)
(17)
(18)              - oOo -
(19)
(20)
(21)
(22)
(23)
(24)
(25)

### Page 5

(1) B A R R Y   S E G A L,
(2)    called as a witness, having been sworn
(3)    by the Notary Public, was examined and
(4)    testified as follows:
(5)
(6) EXAMINATION BY
(7) MR. HOFFMAN:
(8)    Q.   Good morning.
(9)    A.   Good morning.
(10)   Q.   Can you state your home address for
(11) the record?
(12)   A.   My full name is Barry Segal, I live
(13) at 8 Colchester Road in Hempstead, Montreal.
(14)   Q.   Have you ever been deposed before?
(15)   A.   I do not believe so, no.
(16)   Q.   What did you do to prepare for this
(17) deposition?
(18)   A.   Not a lot.
(19)   Q.   Did you meet with your attorneys?
(20)   A.   I met with my attorneys, yes.
(21)   Q.   For about how long?
(22)   A.   Couple of hours.
(23)   Q.   And when was that?
(24)   A.   That was yesterday.
(25)   Q.   Is that here in New York?

### Page 6

(1)
(2)    A.   Yes, it was.
(3)    Q.   What business are you in?
(4)    A.   We are in the garment business,
(5) garment and ancillary products.
(6)    Q.   When you say "we're," who is your
(7) employer?
(8)    A.   My employer is Tyfoon International.
(9)    Q.   And that's a separate company?
(10)   A.   That is a separate corporation.
(11)   Q.   How long have you been employed by
(12) Tyfoon International or as we'll call them
(13) sometimes today, Tyfoon?
(14)   A.   Twenty-four years.
(15)   Q.   And when did you start -- what job
(16) did you have immediately before Tyfoon, if any?
(17)   A.   I was working in an accounting
(18) office.
(19)   Q.   And where was that?
(20)   A.   Richter, Usher, & Vineberg in
(21) Montreal.
(22)   Q.   Would that be the same firm that is
(23) now the accountants for Tyfoon?
(24)   A.   That is correct.
(25)   Q.   When did you graduate college?

### Page 7

(1)
(2)    A.   In 1975.
(3)    Q.   And from what school did you
(4) graduate?
(5)    A.   McGill University.
(6)    Q.   What was your degree?
(7)    A.   BA in American history.
(8)    Q.   And did you have any jobs between
(9) graduating from McGill in '75 and starting with
(10) the Richter company?
(11)   A.   I did not.
(12)   Q.   So your whole career after college
(13) has been the Richter firm and then Tyfoon?
(14)   A.   That is correct.
(15)   Q.   Let me just go through some
(16) preliminaries here that I didn't do beforehand.
(17) If at any time during the deposition I ask you
(18) a question that you don't understand it, please
(19) let me know and I'll try to rephrase it for
(20) you.
(21)       If at any time you need to take a
(22) break, just say so and we'll do that.  If
(23) anything else is unclear, just let me know and
(24) we'll move along.
(25)   A.   I will.

### Page 8

(1)
(2)    Q.   What is your position at Tyfoon?
(3)    A.   I'm vice president of finance.
(4)    Q.   And for how long have you been the
(5) vice president of finance?
(6)    A.   Since I began my career at Tyfoon
(7) International.
(8)    Q.   Do you have people who directly
(9) report to you?
(10)   A.   Yes, I do.
(11)   Q.   Who are those people?
(12)   A.   Directly I have Pierre so, I have
(13) Susan Mayo, I have Bernie Liebowitz, Henry
(14) Zingerman (phonetics).  These are people who
(15) head up certain departments in my organization.
(16)   Q.   And what -- are they finance
(17) departments that those people head up?
(18)   A.   Yes, Pierre Brosseau was the
(19) controller, Bernie Liebowitz is the credit
(20) manger, Susan Mayo is the office manager, Henry
(21) Zingerman is the traffic manager.
(22)   Q.   And whom do you report to?
(23)   A.   I report to Issie Wiseman.
(24)   Q.   Anyone else?
(25)   A.   Well, there's other -- there's Josh

### Page 9

(2) Wiseman and Earl Veinish, I discussed it with
(3) them when it concerns them, I discuss certain
(4) things with them as well, but the main person I
(5) am reporting to is Issie Wiseman.
(6)    Q. And your paycheck is a Tyfoon
(7) paycheck?
(8)    A. The paycheck for everyone is Tyfoon
(9) International.
(10)    Q. How many companies, if any, comprise
(11) the Tyfoon Group of companies?
(12)    A. There's quite a few, there's 10 or 11
(13) active corporations, 12 corporations that are
(14) active. There are some incorporations that are
(15) there but not active.
(16)    Q. Can you name for me -- I'll take them
(17) one at a time, and I have a list here that may
(18) help if you happen to forget any.
(19)      The 10 or 11 companies, active
(20) companies, and when I say active, let's talk
(21) about active as of 2006, that are under the
(22) Tyfoon umbrella.
(23)    A. Okay. You have Via Satellite.
(24)    Q. And what does Via Satellite do?
(25)    A. It carries brands and lines of

### Page 10

(2) ladies' clothing and men's clothing.
(3)    Q. And of the Tyfoon Group's business,
(4) what percentage would you say is done by Via
(5) Satellite?
(6)    MR. BUSLOFF: What time period are
(7) you talking about?
(8)    A. In what year?
(9)    Q. Sure. Let's talk about 2006 and
(10) 2007. If there's a difference, you can let me
(11) know.
(12)    A. 2006 as a percentage of the total
(13) business?
(14)    Q. Of Tyfoon.
(15)    A. It could be 5 percent, I'm just --
(16) I'd have to sit down and really take a look.
(17) There's a lot of companies, a lot of numbers,
(18) but I'm just giving you a ballpark.
(19)    Q. What is the next company you recall?
(20)    A. There's Tornado Imports.
(21)    Q. And --
(22)    A. And Vis-a-Vis and --
(23)    Q. Let's just stop on Tornado and
(24) Vis-a-Vis.
(25)    A. Okay.

### Page 11

(2)    Q. What portion of the business of the
(3) Tyfoon Group in 2006 and 2007 would you say
(4) that Tornado accounted for?
(5)    A. Probably about 60 percent.
(6)    Q. And what about Vis-a-Vis?
(7)    A. Those combined, Vis-a-Vis and
(8) Tornado, represent 60 percent.
(9)    Q. Okay. If you were to break them up,
(10) though, how much would be Tornado and how much
(11) would be Vis-a-Vis?
(12)    A. In 2006, again, I'd have to start
(13) calculating because I grouped the two together.
(14) Maybe 40 percent, one did 20 percent, you know,
(15) if you give me a calculator, I can calculate.
(16)    Q. Would you like me to get you a
(17) calculator?
(18)    A. Sure, if you give me a calculator,
(19) you know, there is a lot of different
(20) calculations.
(21)    MR. HOFFMAN: Off the record.
(22)    (Discussion held off the record.)
(23)    MR. HOFFMAN: I'm going to hand the
(24) witness a calculator.
(25)    A. What time, '06?

### Page 12

(2)    Q. '06 and '07, if there's a difference.
(3)    A. Let me give you '06.
(4)    Q. Okay.
(5)    A. In '06, it's probably just about
(6) even, 30 percent give or take.
(7)    Q. Okay. And would it be accurate to
(8) state that Vis-a-Vis primarily sells ladies'
(9) garments and Tornado primarily sells men's?
(10)    A. That is correct.
(11)    Q. And that Vis-a-Vis's primary product
(12) is Baby Phat product and Tornado's is Phat Farm
(13) product?
(14)    A. Correct.
(15)    Q. Would it also be accurate to state
(16) that the sales of Phat Farm product have
(17) decreased from 2006 to 2007?
(18)    A. Yes, that is correct.
(19)    Q. And that the Baby Phat product sales
(20) have either stayed steady or have increased?
(21)    A. That is correct.
(22)    Q. So then for the year 2007, would it
(23) be fair to say that the percentages that you
(24) just gave for '06, approximately 70 percent
(25) Tornado, 30 percent Vis-a-Vis, have likely been

## Page 13

(1)
(2) adjusted in a way that the Vis-a-Vis number is
(3) now greater and the Tornado number is lower?
(4)    **A. That is correct.**
(5)    Q. And with 40/20, 40 Vis-a-Vis, 20
(6) Tornado, which is I believe what you had
(7) indicated before I went and got you the
(8) calculator might be the number; would that be
(9) accurate?
(10)    **A. Yeah, I think probably in 2007,**
(11) **probably 35 percent would be in 2007 for a**
(12) **period ending September 30th -- could probably**
(13) **be 45 percent for Vis-a-Vis.**
(14)    Q. Now, just so we have a clear record,
(15) as you were working on your calculator and
(16) doing the percentages, you were writing down
(17) some numbers.
(18)    What were the numbers that you were
(19) writing down to help you arrive at the
(20) percentages that you gave us?
(21)    **A. I'm just trying to think of -- you're**
(22) **asking about overall global sales and it's a**
(23) **percentage of Vis-a-Vis and Tornado over global**
(24) **sales, are you not?**
(25)    Q. Yes.

## Page 14

(1)
(2)    **A. Yes, so that's what I'm trying to**
(3) **calculate in my mind.**
(4)    Q. Does Tyfoon International do any
(5) business separately other than the business of
(6) the different companies that are under the
(7) Tyfoon Group?
(8)    **A. Tyfoon doesn't sell or buy any**
(9) **merchandise. Basically Tyfoon International is**
(10) **like a management company where all the common**
(11) **overhead is attributed to, takes care of all**
(12) **the other companies.**
(13)    Q. So I think we've discussed Tornado,
(14) Vis-a-Vis and Via Satellite. Are there other
(15) companies you can tell me about?
(16)    **A. Yes, there's Tour de Force Fashions.**
(17)    Q. What do they sell?
(18)    **A. They sell ladies' garments.**
(19)    Q. And what percentage of the business
(20) would you say they accounted for Tyfoon 2006 or
(21) 2007?
(22)    **A. 2006, 3 or 4 percent. I will have to**
(23) **check all these numbers.**
(24)    Q. Sure, I would appreciate that.
(25)    What's the next company?

## Page 15

(1)
(2)    **A. Issie Fashions.**
(3)    Q. I S S E?
(4)    **A. I S S I E.**
(5)    Q. What kind of product do they sell?
(6)    **A. Also garments, ladies' and men's**
(7) **garments.**
(8)    Q. What percentage of the business would
(9) they have done in 2006 or 2007?
(10)    **A. 2006, they could have been 8 percent,**
(11) **even 9 percent. In 2007, again, I will have to**
(12) **check the numbers.**
(13)    Q. The next company, please?
(14)    **A. Marketplace Clothing.**
(15)    Q. What is Marketplace Clothing?
(16)    **A. Sells clothing.**
(17)    Q. And what percentage of the business
(18) do they account for in 2006 and 2007?
(19)    **A. Seventeen percent in 2006, probably**
(20) **the same thing in 2007.**
(21)    Q. The next company you recall?
(22)    **A. Studio One Fashions. It's small, I**
(23) **can't even begin to tell you what the**
(24) **percentages are?**
(25)    Q. One percent?

## Page 16

(1)
(2)    **A. It's smaller percentages, smaller**
(3) **percentages.**
(4)    Q. Next company?
(5)    **A. 3892387 Canada, Inc., clothing again.**
(6)    Q. And was Studio clothing as well?
(7)    **A. Yes, it is.**
(8)    Q. And what would be the percentage
(9) there?
(10)    **A. 2007, 3 percent.**
(11)    Q. What about Basis Femmes Inc.?
(12)    **A. Basis Femmes, that has ladies'**
(13) **clothing.**
(14)    Q. Right.
(15)    **A. In 2006, 1 and a half percent.**
(16)    Q. And just so -- I'm sorry, go ahead.
(17)    **A. It's okay.**
(18)    Q. Just so it's reflected in the record,
(19) from time to time when I've been asking
(20) Mr. Segal these questions, he has been
(21) utilizing a calculator; is that fair?
(22)    **A. That is correct. That is correct.**
(23)    Q. Basis Hommes Inc.?
(24)    **A. No.**
(25)    Q. When you say nothing?

PHAT FASHIONS

BSA XMAX(5/5)
BARRY SEGAL - 11/20/07

VS. TORNADO IMPORTS

Page 17

(1)
(2)    A.  There was really no sales, it's
(3)  really inactive, just minimal sales.
(4)    Q.  What other companies do you recall?
(5)  I still have a few on my list.
(6)    A.  Who we have in there?
(7)    Q.  I still have Items Unlimited.
(8)    A.  Items Unlimited is an inactive
(9)  corporation.
(10)    Q.  Dot.com Style?
(11)    A.  Inactive corporations.  Which other
(12)  ones do you have?
(13)    Q.  I have 41076 --
(14)    A.  4107675 is an active corporation.
(15)    Q.  What is that?
(16)    A.  Also garments.
(17)    Q.  And what percentage of the business
(18)  do they account for?
(19)    A.  Again, very, very small.  We just
(20)  started utilizing that company recently, very
(21)  small.  In 2007, half a percent.
(22)    Q.  Is that the company that does work
(23)  with Coogi?
(24)    A.  That is correct.
(25)    Q.  3702669 Canada Inc., I believe it's

Page 18

(1)
(2)  the stores?
(3)    A.  That's the Phat Farm store.
(4)    Q.  And what percentage of the business
(5)  would that account for?
(6)    A.  I don't know.  You're asking me about
(7)  the Tyfoon Group, I don't add the stores as
(8)  part of the group, that's a separate
(9)  corporation.  That is if you want, I'd have to
(10)  add the 600 in my calculation to add those
(11)  sales to the group Tyfoon sales and then take
(12)  that percentage again.
(13)    But it's small, it's small
(14)  percentages.  You would have to take all the
(15)  store sales together, add all the sales, add
(16)  that to the total number of the Tyfoon
(17)  companies and then divide that to get a proper
(18)  percentage.
(19)    Q.  Which would cause a reduction in the
(20)  lower percentages you've already given me?
(21)    A.  Yes.
(22)    MR. BEHA:  Off the record.
(23)    (Discussion held off the record.)
(24)    Q.  We just had a conversation off the
(25)  record where your counsel asked some questions

Page 19

(1)
(2)  of you.  Is there anything you want to clarify
(3)  about what he just testified to?
(4)    A.  The only thing I can tell you is when
(5)  I say the sales of the group Tyfoon sales,
(6)  those sales do not include the sales that the
(7)  retail stores made to the public because the
(8)  sales -- the wholesale sales that the group of
(9)  Tyfoon has sold already reflects the sales to
(10)  the individual stores.
(11)    Q.  So, for instance, if there was going
(12)  to be Phat Farm products sold in one of the
(13)  stores, the sale of the product from Tornado --
(14)    A.  Correct.
(15)    Q.  -- to that store would be reflected
(16)  in Tornado's sales?
(17)    A.  That is correct.
(18)    Q.  In determining the profits that the
(19)  company -- the Tyfoon Group companies make, do
(20)  you come up with -- let's just assume, for
(21)  example, that the number of profits made by
(22)  Tornado is X, do you look at each of these
(23)  different corporations that we have discussed
(24)  and arrive with, well, this company accounted
(25)  for Y percent of that profit and this one

Page 20

(1)
(2)  accounted for Z percent of that profit?
(3)    A.  Can you repeat the last part, please?
(4)    Q.  Sure.  What I'm trying to figure out
(5)  is at the end of the year, do you come up with
(6)  a figure for this is the amount of profit that
(7)  the Tyfoon Group earned?
(8)    A.  I have both figures.  So I know what
(9)  the total dollar value of the profit for the
(10)  total group of companies excluding the stores
(11)  and as well I have individual financial
(12)  statements for every corporation which will
(13)  give me the profits for each individual
(14)  corporation.
(15)    Q.  Okay.  But when you're looking at the
(16)  profits -- when you're looking at the profits
(17)  of the store and you are looking at the profits
(18)  of, let's say, Tornado, those profits would not
(19)  be duplicative, correct?
(20)    A.  The profits of the stores are not
(21)  included in the profits of Tornado.
(22)    Q.  Right.  So if -- let me ask you the
(23)  question, in terms of the overall profits of
(24)  the Tyfoon Group, do you know what percentage
(25)  the stores would make up?

## Page 21

(1)
(2) MR. BUSLOFF: What year are we
(3) talking about?
(4) Q. These are all 2006, 2007.
(5) A. The stores were not profitable.
(6) Q. How long has that been the case that
(7) the stores are not profitable?
(8) A. The last few years so -- last couple
(9) of years. In the beginning, Phat Farm store
(10) was profitable, but, you would -- would still
(11) carry on the store because it's our storefront
(12) on the street, so it doesn't make a difference
(13) for us, it's the appearance that we have to be
(14) out there and we have to show our products and
(15) we have to on the corporate level, the Phat
(16) form is like a corporate store.
(17) Q. When you talk about Phat Farm being
(18) the corporate store, are you talking about the
(19) store in Montreal?
(20) A. Yes, I am.
(21) Q. And that store has recently changed
(22) its name, correct?
(23) A. Yes, we have changed it, we changed
(24) it to Illicit.
(25) Q. So that store was unprofitable in

## Page 22

(1)
(2) 2006?
(3) A. Yes, it was.
(4) Q. Was it unprofitable in 2005?
(5) A. To a small degree, 2005, yes.
(6) Q. And would that be the case with the
(7) other three stores as well, were they
(8) unprofitable?
(9) A. No, not all the stores were
(10) unprofitable, some stores were unprofitable.
(11) Q. Were some profitable in 2006?
(12) A. I'd have to check my records. I
(13) don't believe so in 2006.
(14) Q. In 2005, maybe some were and some
(15) weren't.
(16) A. Correct.
(17) Q. Are there any other companies that
(18) come to mind right now that we haven't
(19) discussed that were doing business in 2006 or
(20) 2007?
(21) A. Confriers Imports that sells shoes.
(22) Q. And what would the percentages be for
(23) them?
(24) A. Small, 3 percent, 4 percent.
(25) Q. And that's over 2006 and 2007?

## Page 23

(1)
(2) A. That is correct.
(3) Q. What other stores come to mind, if
(4) any -- not stores, what other companies, sorry?
(5) A. Well, I have other corporations, but
(6) again, they're inactive --
(7) Q. I am just worried about the active
(8) ones.
(9) A. The active ones? I've given you most
(10) of the active stores, I believe you have most
(11) of the major active ones.
(12) Q. If at any time you think of
(13) additional ones during the deposition, and to
(14) me, it doesn't matter if they're major, even a
(15) minor one I'd like to hear about as long as
(16) it's active in those years.
(17) A. Uh-huh.
(18) MR. BEHA: Off the record.
(19) (Discussion held off the record.)
(20) Q. Do you know why there are companies
(21) with names that have all the numbers in the
(22) front in Canada, like the one we just asked
(23) about off the record, 3702669 Canada Inc.?
(24) A. In Canada, it's always very difficult
(25) to get a name for a corporation, it can cost

## Page 24

(1)
(2) you thousands of dollars to try to pick out
(3) names and give it in to the proper governmental
(4) authorities. So in Canada, it's very easy to
(5) get a corporation under a numbered company, and
(6) in many instances, a lot of companies operate
(7) under numbered companies.
(8) Q. And then they trade under a full
(9) name?
(10) A. They can trade under a name or down
(11) the road they can think of a name and they
(12) change the numbered company into a name
(13) company. But most people know normally the
(14) lines that you carry within the company whether
(15) it's a named corporation or whether it's a
(16) numbered corporation.
(17) Q. Do all of these companies that we
(18) discussed today file separate tax returns?
(19) A. Yes, they do.
(20) Q. Does the Tyfoon -- does Tyfoon
(21) International also file a tax return?
(22) A. Yes, they do.
(23) Q. And what does that tax return consist
(24) of, in other words, are each of the stores
(25) covered by their tax return?

PHAT FASHIONS

BSA XMAX(7/7)
BARRY SEGAL - 11/20/07

VS. TORNADO IMPORTS

Page 25

(1)
(2)       A.  No, the individual retail stores file
(3)  their own tax returns as well.
(4)       Q.  I am going to show you some exhibits
(5)  that were marked.  I assume you have your set
(6)  of copies with you.
(7)       First is Plaintiff's Exhibit 1, which
(8)  is the trademark license agreement.  Have you
(9)  seen that document before?
(10)      A.  Yes, I have.
(11)      Q.  And would it be accurate to state
(12)  that you were employed by Tyfoon at the time
(13)  that this contract was entered into in 1998?
(14)      A.  Yes, I was.
(15)      Q.  Do you know how it was decided that
(16)  the Tyfoon party to this agreement would be
(17)  Tornado Imports?
(18)      A.  I believe at the time we -- when we
(19)  set this up, Tornado Imports, I do not remember
(20)  exactly if it was in place or if it wasn't in
(21)  place, but I think amongst ourselves, we
(22)  decided that this would be the vehicle to house
(23)  this particular agreement and to make our sales
(24)  through this particular corporation.
(25)      Q.  Was there any discussion at all of

Page 26

(1)
(2)  making the party to this agreement Vis-a-Vis
(3)  '97?
(4)      A.  At this point in time?
(5)      Q.  Yes.
(6)      A.  In 1998, I do not believe so.
(7)      Q.  Do you know why that was?
(8)      A.  I do not recall.
(9)      Q.  Is it your understanding that this is
(10)  the agreement that currently governs the
(11)  relationship between Phat Fashions and Tornado?
(12)      A.  Correct, this is the agreement.
(13)      Q.  Take a look, if you would, at
(14)  Paragraph 3 which is at the bottom of Page 4.
(15)      A.  Uh-huh.
(16)      Q.  After you take a look at that, I'll
(17)  ask if you -- if you agree that there was no
(18)  option on the part of Tornado or you understood
(19)  that there was no option on the part of Tornado
(20)  to extend this agreement beyond December 31,
(21)  2007?
(22)      A.  Correct, until we negotiated a new
(23)  agreement, that is correct.
(24)      Q.  If you take a look at Paragraph 17
(25)  which you'll find on Page 21.

Page 27

(1)
(2)      A.  Page 21?
(3)      Q.  Sorry, 22.
(4)      Have you seen that paragraph before?
(5)      A.  Yes, I have.
(6)      Q.  Were you aware of the first sentence
(7)  of that paragraph which provides, quote, this
(8)  agreement can only be extended, waived or
(9)  modified by a writing signed by both parties,
(10)  period, close quote.
(11)      MR. BUSLOFF:  Sorry, can you repeat
(12)  the question?
(13)      (Record read.)
(14)      MR. BUSLOFF:  Objection to form.
(15)  What time period are we talking about?
(16)      MR. HOFFMAN:  That's a good
(17)  objection.
(18)      Q.  When, if ever, did you first become
(19)  aware of Paragraph 17?
(20)      A.  That's a good question.  I don't
(21)  exactly recall if it was before or if it was
(22)  after, not that I know it would make a
(23)  difference one way or the other.  I don't
(24)  recall exactly -- obviously I must have read it
(25)  if -- when I read the original agreement, but

Page 28

(1)
(2)  if you ask me did I know six months ago or
(3)  three years ago or two years ago, I can't
(4)  exactly tell you the exact time frame.
(5)      Q.  Now, what we do have to do, though,
(6)  is you've used the terms before and after, and
(7)  what we don't have is what the before and after
(8)  is you're talking about.
(9)      When you're saying before the lawsuit
(10)  or before what?
(11)      A.  Maybe before the lawsuit, yeah, or
(12)  before when we first did the agreement or now
(13)  that you're showing it to me now, but I don't
(14)  remember exactly the time frame that I knew
(15)  about this paragraph, but obviously I do know
(16)  about the paragraph.
(17)      Q.  And you knew about the paragraph
(18)  before my asking you about it here today?
(19)      A.  That is correct.
(20)      Q.  Did you play any role in the
(21)  negotiation of the trademark license agreement?
(22)      A.  Yes, I did.
(23)      Q.  And what was the role that you
(24)  played?
(25)      A.  Well, I originally -- I guess the

Page 29

(2) agreement was sent to Issie Wiseman and I
(3) received it, I probably reviewed it, I probably
(4) gave them bullet points of what I saw in the
(5) contract, I probably would have given it to my
(6) lawyers for them to review it as well.
(7)        That was my -- that was part of my
(8) involvement, what points I would have objected
(9) to, what points I would have thought that could
(10) have been changed or altered.
(11)     Q.   Would it be fair to say that you
(12) didn't object to Paragraph 17?
(13)     A.   At the time I obviously didn't object
(14) to it.
(15)     Q.   Take a look at paragraph --
(16)     MR. BEHA:  Off the record.
(17)     (Discussion held off the record.)
(18)     Q.   Did you see drafts of this agreement
(19) before it was signed?
(20)     A.   Yes.
(21)     Q.   And sitting here today, do you know
(22) whether or not any of those drafts contained
(23) Paragraph 17 of this agreement or for that
(24) matter, the paragraph that has to do with term,
(25) Paragraph 3?

Page 30

(2)     A.   This was in the -- these paragraphs I
(3) have seen before.
(4)     Q.   In drafts of the agreement?
(5)     A.   I don't know if this was a draft or
(6) if this is what was sent and this was the
(7) final. I don't know if there was a lot of
(8) drafts of this that were altered.
(9)     Q.   The document I've handed you is the
(10) final agreement that was signed --
(11)     A.   Correct.
(12)     Q.   -- by the parties?
(13)     A.   Correct.
(14)     Q.   Do you recall any discussion or
(15) negotiation prior to the signing of this
(16) agreement about either Paragraphs 3 or 17?
(17)     A.   No, I do not think so. Of those
(18) particular paragraphs, I do not believe so.
(19)     Q.   And taking a look at Paragraph 18,
(20) which is back on Page 22, the last sentence of
(21) that paragraph which begins, in any action or
(22) proceeding, if you can just read that to
(23) yourself and let me know when you're done.
(24)     A.   Any action or proceeding?
(25)     Q.   Correct.

Page 31

(2)     A.   Uh-huh.
(3)     Q.   That's a yes?
(4)     A.   Yes, I finished reading it.
(5)     Q.   Do you understand having read that
(6) paragraph and that sentence, that there is a
(7) possibility that Tornado could be liable for
(8) Phat Fashions' attorneys' fees and
(9) disbursements in this litigation?
(10)     A.   Yes, I am.
(11)     Q.   Do you also have an understanding
(12) that there is not a similar provision in this
(13) agreement with respect to Tornado's attorneys'
(14) fees?
(15)     MR. BUSLOFF:  If you know.
(16)     A.   I do not know. I believe I did, I
(17) believe I did, that is correct.
(18)     Q.   I hand you Exhibit 5, which is the
(19) amended answer.
(20)     A.   Uh-huh.
(21)     Q.   Have you seen this document before?
(22)     A.   Yes, I have.
(23)     Q.   Did you approve of it before it was
(24) filed?
(25)     A.   I read it, yes.

Page 32

(2)     Q.   And did you approve of the document
(3) and the filing of the document?
(4)     A.   My parts, whatever I was -- whatever
(5) I was privy to or whatever I knew, yes.
(6)     Q.   Is it accurate to the best of your
(7) knowledge, at least your parts?
(8)     A.   To the best of my knowledge, I
(9) believe it's accurate.
(10)     Q.   In Paragraph 28 of this answer, which
(11) is on Page 8, there's a statement that Phat
(12) Fashions' claims are barred because the
(13) parties' conduct manifested an intent to
(14) regularly modify the agreement through oral
(15) representations.
(16)        Is that an accurate statement to the
(17) best of your knowledge?
(18)     MR. BUSLOFF:  I'm going to object to
(19) form. He testified, I believe, to his
(20) portions, the factual portions he
(21) approved. He didn't say anything about --
(22) you didn't ask him which sections there
(23) were sections that he considered his
(24) sections.
(25)     MR. HOFFMAN:  Nor do I think I have

Page 33

(1)
(2) to because this was a document that was
(3) filed on behalf of Tornado. He's here as
(4) a representative of the company and I'm
(5) asking him simply if that's an accurate
(6) statement.
(7)     MR. BEHA:  I don't have any problems
(8) you're asking about modifications.  I
(9) think the way you asked it sounds like
(10) you're asking whether he knows about
(11) whether or not the claims are barred, and
(12) that's a legal conclusion.  Just phrase it
(13) a little bit differently, Phil, and I
(14) think there's no problem.
(15)     Q.  Looking at the second part of
(16) Paragraph 28.
(17)     A.  Uh-huh.
(18)     Q.  When you say uh-huh --
(19)     MR. BEHA:  You can say okay or I will
(20) or something like that.
(21)     Q.  Is it your position that the parties'
(22) conduct manifested an intent to regularly
(23) modify the agreement through oral
(24) representations?
(25)     A.  We constantly altered and modified

Page 34

(1)
(2) this agreement through oral representations,
(3) most things orally.
(4)     Q.  When you say you did most things
(5) orally?
(6)     A.  Yeah.
(7)     Q.  Were there things that you didn't do
(8) orally?
(9)     A.  Well, we would -- I sent letters for
(10) continuations, I believe maybe Issie Wiseman
(11) had discussed orally with Phat Fashions
(12) representatives, then I would have sent a
(13) document of that nature, but there was many,
(14) many instances where everything was done
(15) orally.  I can think of many instances.
(16)     Q.  Can you give me some examples?
(17)     A.  Well, the Baby Phat -- doing all the
(18) Baby Phat product by itself was done orally in
(19) conversations between Issie Wiseman and
(20) representatives.
(21)     Q.  And the Baby Phat product was product
(22) that was being sold by Vis-a-Vis; is that
(23) correct?
(24)     A.  That is correct.  The fact that we
(25) sold the Baby Phat products through Vis-a-Vis

Page 35

(1)
(2) was another example through conversations that
(3) were held between Issie and representatives.
(4)     Q.  Let me just stop you for a second.
(5) Why wasn't that a separate agreement between
(6) Vis-a-Vis and Phat Fashions?
(7)     A.  You know what, I believe Issie spoke
(8) with them and discussed the Baby Phat -- when
(9) Baby Phat products started to come into the
(10) fold, and he said we would like to put it into
(11) another -- into another company called
(12) Vis-a-Vis for accounting reasons, and they had
(13) no objections, and that's what we -- that's
(14) exactly what we did.
(15)     Q.  Was there ever any discussion of
(16) amending the agreement to make Vis-a-Vis a
(17) party?
(18)     A.  No, it was the intent that everything
(19) would be based -- that it was part of the
(20) Tornado Imports and that everything would
(21) follow under the same points and the same
(22) manner and the same royalties.  It was that --
(23) we had done other things with Rich Slomovitz
(24) and the counterfeiting, we did that orally,
(25) there was a lot of things that were done orally

Page 36

(1)
(2) that we just -- listen, we were running a
(3) business, it was Issie Wiseman's relationship
(4) between the parties.
(5)     Q.  Now, when it came time to extend the
(6) agreement for an additional period covering the
(7) years 2002 through 2004 --
(8)     A.  Uh-huh.
(9)     MR. BEHA:  You actually don't have to
(10) say anything there, he's just talking, and
(11) if you don't say something, it makes it a
(12) little easier because the reporter doesn't
(13) have to make a judgment about whether or
(14) not to include it.  Just let him finish
(15) his whole question and then take it on.
(16)     (Record read.)
(17)     Q.  That was something that you did in
(18) writing, correct?
(19)     A.  Correct.
(20)     Q.  Why?
(21)     A.  Because I had to do it, it's part of
(22) my job that I would have to send something in
(23) writing.  I read the agreement and I sent it
(24) out, but had it not been done -- that's just
(25) what I get paid for, but that's part of my job

## Page 37

(1)
(2) but it was -- had it not been sent, everything
(3) would have probably been going on just the same
(4) one way or the other.
(5)     Q.   When you say probably going on, why
(6) was it part of your job to send out a written
(7) exercise option?
(8)     A.   Well, I remember reading it in the
(9) license agreement at some point in time when it
(10) came time for renewal, it was at our option and
(11) that I would exercise -- or that we would
(12) exercise our option, which was -- which we did.
(13)     Q.   But why didn't you do it orally, I
(14) guess is my question?
(15)     A.   It may well have been orally or it
(16) could have been done orally, that's just the
(17) way I am, I just saw it and I just took care of
(18) it.
(19)     Q.   Because that's what the contract
(20) required?
(21)     A.   That's what the contract said, but
(22) also because, you know, that's the way I
(23) normally operate because if there was something
(24) that I had seen, then I would take
(25) care of it in that manner.

## Page 38

(1)
(2)     Q.   Would it be your responsibility, and
(3) I'm going back now specifically to 2001, to
(4) bring it to the attention of Issie Wiseman that
(5) right now it's time, we have to exercise this
(6) option, or would you just do it on your own?
(7)     A.   I probably just would have done it on
(8) my own and brought it to him for signature.
(9)     Q.   You also did a written exercise of
(10) the option in 2004, I guess to cover the years
(11) 2005, '6 and '7?
(12)     A.   Yes, I did.
(13)     Q.   Do you have a recollection of doing
(14) that?
(15)     A.   Yes, I did.
(16)     Q.   And why did you do that in writing?
(17)     A.   For the same reason as I did the
(18) previous one.
(19)     Q.   Would it be fair to state that you
(20) were concerned that if you didn't do it in
(21) writing, and it being exercising the options in
(22) writing, that someone might be able to claim
(23) that the option had not been exercised?
(24)     A.   I don't believe so in this instance.
(25) There was a particular -- there was a

## Page 39

(1)
(2) relationship between us and them, as I said
(3) earlier, there was so many things that were
(4) done in an oral manner that there was not any
(5) writings for or any amendments done. Had I
(6) forgotten to do something of that nature, I
(7) don't think it really would have mattered.
(8)     Q.   But we don't know that because you
(9) did do it in writing?
(10)     A.   I did do it, yes.
(11)     Q.   Would it be fair to state that
(12) between 1998 and 2001 --
(13)     A.   Uh-huh.
(14)     Q.   -- that as far as you're concerned,
(15) that there were oral modifications to the
(16) agreement?
(17)     A.   Correct.
(18)     Q.   And it would also be fair to state
(19) that after those oral modifications were made
(20) in 2001, you did exercise the option in
(21) writing?
(22)     A.   Yes.
(23)     Q.   And would it be fair to state that
(24) there were oral modifications that took place
(25) between 2001 and 2004 as far as you're

## Page 40

(1)
(2) concerned?
(3)     A.   I'm not particularly sure about the
(4) time frame, but I believe that there was
(5) modifications right through. Whether it was in
(6) 2000 -- in 2004, in 2005, I think it was
(7) constant modifications that would have been
(8) done in an oral manner.
(9)     Q.   But with all these oral modifications
(10) going on --
(11)     A.   Uh-huh.
(12)     Q.   -- in 2004, when it came time to
(13) exercise the option, that was still something
(14) that you did in a writing signed by Issie
(15) Wiseman; is that correct?
(16)     A.   That is correct.
(17)     Q.   And in 2007 --
(18)     A.   Uh-huh.
(19)     Q.   -- when there was a discussion of the
(20) amendment, do you recall that?
(21)     A.   Uh-huh.
(22)     Q.   That's a yes?
(23)     A.   Yes.
(24)     Q.   That was also something that was in
(25) writing and that Issie Wiseman actually signed,

## Page 41

(1)
(2) correct?
(3)   A.  That is correct, that was sent by
(4) Phat Fashions to us, yes.
(5)   Q.  Were any of the oral modifications
(6) that you've referred to ever confirmed in
(7) writing?
(8)   A.  I don't believe so.  I believe
(9) everything was done on an oral basis, and
(10) that's the way it was maintained, and business
(11) kept flowing as if it was written or oral.
(12)   Q.  Let's take a look at Defendant's
(13) Exhibit 7.
(14)       Have you seen this document before?
(15)   A.  Yes, I have.
(16)   Q.  What is it?
(17)   A.  This document is dated March the
(18) 20th, 2001, and it's the letter that serves to
(19) confirm our election of the license agreement
(20) for another three years.
(21)   Q.  And actually there's multiple copies
(22) of this document attached, I think if you look
(23) at the second and third pages, you'll see the
(24) same document just with different numbers; is
(25) that accurate?

## Page 42

(1)
(2)   A.  That is correct.
(3)       MR. BUSLOFF:  I just want to correct
(4)   something, I think on the second document,
(5)   there seems to be some writing above the
(6)   name there, seems to be some different
(7)   text.
(8)       MR. BEHA:  There are multiple
(9)   versions of the document as opposed to
(10)   copies of the same document.
(11)       MR. HOFFMAN:  Hold on a second.  When
(12)   you say that there appears to be some
(13)   different text?
(14)       MR. BUSLOFF:  Sorry, written text
(15)   above Mr. Rich Slomovitz --
(16)       MR. HOFFMAN:  There's a handwritten
(17)   note, but the text of the documents are
(18)   all the same.
(19)       MR. BUSLOFF:  The typewritten text is
(20)   the same, correct.
(21)   Q.  Well, since this has been
(22) highlighted, let's go to that second page.
(23)       Do you recognize whose handwriting
(24) that is?
(25)   A.  Above Rick, that is my handwriting.

## Page 43

(1)
(2)   Q.  Any recollection of making that
(3) notation?
(4)   A.  Not really, no.
(5)   Q.  So now, let's go back to the
(6) document, I wasn't sure if I had asked this
(7) question, who drafted this document?
(8)   A.  I did.
(9)   Q.  Do you have a recollection of
(10) drafting it?
(11)   A.  Yes, I do.
(12)   Q.  Where did you get the language that
(13) was used in this document?
(14)   A.  Where did I get the language to write
(15) this exact sentence?
(16)   Q.  Yes.
(17)   A.  From me, from my head.
(18)   Q.  Did you take any of the language from
(19) the agreement itself?
(20)   A.  I don't remember, to be honest with
(21) you.  This is my writing, this is the way I
(22) wrote it.
(23)   Q.  Was there any reason why when you
(24) referred in the first sentence to as required
(25) by our licensing agreement dated August 1,

## Page 44

(1)
(2) 1998, you didn't add the words -- maybe not
(3) these exact words but words to the effect, as
(4) amended or as modified?
(5)       MR. BUSLOFF:  You're asking him why
(6)   he did use words he didn't use?
(7)       MR. HOFFMAN:  Right.
(8)       MR. BUSLOFF:  If you know, obviously.
(9)   A.  I don't remember why I didn't use
(10) those particular words.  To me, it was all part
(11) and parcel of the same agreement, so I really
(12) didn't -- I didn't believe that I had to add
(13) anything.  It was already working as if it was
(14) already there, that it was there.
(15)   Q.  When you say it was there, what was
(16) there?
(17)   A.  What date is this, March 20, 2001?
(18)   Q.  That's the date on the letter.
(19)   A.  Yeah, okay.  Had we already begun
(20) selling Baby Phat through Vis-a-Vis, it was
(21) already orally agreed to that we could do it,
(22) so I didn't have to put anything in, it was
(23) already agreed to, it was already part of this.
(24)   Q.  When I said put anything in, I am not
(25) referring to specifically in that it was agreed

Page 45

(1)
(2) that you could sell Baby Phat or that Vis-a-Vis
(3) could do X, Y or Z. All I'm simply saying is
(4) that, correct me if I'm wrong, it's your
(5) position that the trademark license agreement
(6) that was entered into on August 1st of 1998 had
(7) been amended as of March 20, 2001 orally?
(8)     A. I believe so. I believe so.
(9)     Q. So my question was simply, why didn't
(10) you make reference to the fact that what was
(11) being extended, the option that was being
(12) exercised, was covering an agreement that had
(13) been amended?
(14)    A. To me, by my writing over here, I was
(15) covering all bases, I was covering everything
(16) in what I was saying over here.
(17)    Q. Did you give any thought at all to
(18) that in the drafting process, of making a
(19) reference to the amendments?
(20)    A. It was something I did seven years
(21) ago.
(22)    MR. BUSLOFF: If you remember.
(23)    A. No, I don't recall that.
(24)    Q. And all of the questions that I'm
(25) going to ask you, it's always if you remember.

Page 46

(1)
(2) If you don't recall, you don't recall.
(3)     A. Yeah.
(4)     Q. Do you have a recollection as to when
(5) you sent this document to Slomovitz? And the
(6) reason I'm asking the question is, I'm going to
(7) hand you Exhibit 8, which appears to be some
(8) documents from Federal Express which shows a
(9) date of delivery of what we believe is
(10) Exhibit 7 on April 11th of 2001.
(11)    A. What I see here is that this proof of
(12) delivery is for Neil Goldstein, not for --
(13)    Q. The one in the front, did it actually
(14) go to the -- second page, you will see proof of
(15) delivery as well to Mr. Slomovitz.
(16)    A. I see, okay.
(17)    MR. BUSLOFF: Is there a question
(18) pending?
(19)    MR. HOFFMAN: Yeah.
(20)    A. I don't know why it was dated March
(21) the 20th, then only sent out April the 11th.
(22) It could be that I did it on March, I was
(23) waiting for -- maybe Issie Wiseman was away on
(24) holiday and I was waiting for him to come back
(25) and sign, I don't recall exactly.

Page 47

(1)
(2)     Q. Do you have any specific
(3) recollection?
(4)     A. No, there's no specific, no.
(5)     Q. Is there a reason why the FedEx
(6) documents that we are looking at which have
(7) been marked as Defendant's Exhibit 8 would have
(8) been maintained in your files for all these
(9) years?
(10)    A. You know what, many years ago, I
(11) remember sending something out to someone by
(12) FedEx and I had a problem and they didn't
(13) receive it and I only found about it later on.
(14) So a lot of times on documents, I will always
(15) ask for a proof of delivery, and that's the
(16) only reason.
(17)    Q. Do you only do that on important
(18) documents?
(19)    A. No, I do it on -- in many cases for
(20) many types of documents, whether it's something
(21) I feel I want to have. It's really
(22) inconsequential to really anything, but I do it
(23) on occasions, on many occasions, for many
(24) different things.
(25)    Q. Did you consider Plaintiff's

Page 48

(1)
(2) Exhibit 7 to be an important document?
(3)     A. Well, as far as being important --
(4)     MR. BUSLOFF: You're talking about a
(5)     specific copy of Plaintiff's 7?
(6)     Q. The letter -- the letter exercising
(7) the option.
(8)     A. I felt that it was part of something
(9) that I had to do in my everyday -- part of my
(10) everyday job with any other kind of document.
(11) I knew that things were going very well with
(12) all the parties concerned. Did I think of it of
(13) great importance, anything is great importance,
(14) I just knew it had to get done and one of the
(15) things I just had to do.
(16)    Q. In all your time at Tyfoon, have you
(17) ever exercised an option orally?
(18)    A. Have we ever -- yes, we have.
(19)    Q. Can you give me some examples of when
(20) you did that?
(21)    A. Well, to be honest with you, there's
(22) a lot of agreements that we have that are oral
(23) in nature with other parties and a lot of times
(24) I know that there will be a conversation, you
(25) know, whether we are taking on another line or

Page 49

(1)
(2) whether we are extending it, and they'll say,
(3) yeah, okay, sure, you know, let's go and, you
(4) know, it's business as usual, we have wonderful
(5) relations with all our people. So there are
(6) cases where many things are done orally and I
(7) have no contracts, no writings.
(8)     Q.  I'm not -- my question was more
(9) specific. My question is talking about the
(10) specific agreement that you have that provides
(11) that an option has to be exercised by a given
(12) date, whether that's an oral contract or a
(13) written contract.
(14)     A.  In other cases, you're asking with
(15) other licensees?
(16)     Q.  Yes.
(17)     A.  There may be one or two -- may be one
(18) or two that that's happened.
(19)     Q.  You said may be?
(20)     A.  I'd have to think about it because
(21) I'm just thinking about certain lines we are
(22) doing, and there's nobody with an extension,
(23) I'd have to think about it further. I know
(24) there are many cases where it is oral, but if
(25) you're asking whether there is a particular

Page 50

(1)
(2) written option that has to be exercised, I
(3) can't remember offhand.
(4)     MR. BUSLOFF: I don't think that's
(5) what he asked. I think what he asked --
(6)     Q.  Let me ask this a few different ways
(7) so you're clear. If you want to make --
(8)     MR. BUSLOFF: I think what he's
(9) asking, correct me if I'm wrong, is that
(10) is there any time that an option extension
(11) was done orally, not whether the original
(12) license agreement was written or not,
(13) whether an extension of the exercise of an
(14) option extending a license agreement was
(15) done orally.
(16)     THE WITNESS: You're talking any
(17) license agreement?
(18)     MR. HOFFMAN: Yes.
(19)     A.  Not that I'm aware of, but in many
(20) instances, we don't have written agreements so
(21) we just keep on going.
(22)     Q.  But in those situations where you
(23) don't have a written agreement, you have an
(24) oral agreement with a party where you're going
(25) to be distributing or whatever their goods.

Page 51

(1)
(2)     Do you have a recollection of having
(3) an oral agreement where a party -- where part
(4) of that oral agreement includes an option to be
(5) exercised?
(6)     A.  I'm just trying to think of, you
(7) know, do I have any agreements where it says
(8) that particular wording, and I can't think of
(9) it.
(10)     Q.  Please take a look at Plaintiff's
(11) Exhibit 9 which on the first page, and there's
(12) multiple copies of this, there are two here,
(13) one with information, some filled in, one
(14) without.
(15)     A.  Uh-huh.
(16)     Q.  Have you seen this document before?
(17)     A.  Well, it's to Barry Segal, so I must
(18) have seen it.
(19)     Q.  Your lawyers will tell you never
(20) assume.
(21)     MR. BUSLOFF: Take a moment and read
(22) through the document, see if you have a
(23) specific recollection of seeing the
(24) document.
(25)     A.  Yeah, I do kind of remember seeing

Page 52

(1)
(2) this document. It must have been a long
(3) time -- yeah, 2001, yeah, I have a recollection
(4) of seeing it.
(5)     Q.  What is it?
(6)     A.  I'd have to go through it. To me,
(7) it's looking from Stern Fragrances which was I
(8) guess was the party that was doing the
(9) fragrance business. Are these two together?
(10)     MR. BUSLOFF: I see some of them
(11) have -- hold on, I am just wondering if --
(12) for example, if this is -- if this was a
(13) continuous document because I see fax
(14) slugs on some of the -- tops of some of
(15) these different pages and then different
(16) fax slugs on the top of other pages.
(17)     MR. HOFFMAN: The way it was produced
(18) to us is pretty much -- the only change
(19) that I made was document 1246 which is the
(20) last page of the first document there. I
(21) put that where it is because it seemed out
(22) of order. These pages seem to match up,
(23) if you'll see document No. 1 begins 1247.
(24)     MR. BUSLOFF: I mean, I don't see any
(25) fax slug on the top of this page is the

Page 57

(1)
(2)      Q.   Well, in answer to that question, is
(3)  it possible that that's the information that
(4)  was being requested of you by Mimi Reisner?
(5)      A.   Maybe she sent this along, that she
(6)  got this -- part of the fax that she sent to me
(7)  and she already got -- had this information
(8)  from Phat Fashions.
(9)      Q.   Do you believe Phat Fashions would
(10)  have known that Josh Wiseman is the son of
(11)  Barry -- sorry, of Issie Wiseman and Barry
(12)  Segal is the vice president of finance?
(13)      A.   I think so. I don't think -- I don't
(14)  see any reason why they wouldn't know Issie
(15)  Wiseman and Josh Wiseman there all the
(16)  time, they knew it was a father and son.
(17)      Q.   Take a look at the next page, 1246.
(18)  Do you recognize that handwriting?
(19)      A.   That handwriting is mine. To me, it
(20)  looks like some sort of form questionnaire
(21)  emanating from their office. I did not put
(22)  this -- put this together.
(23)      Q.   But that's your handwriting starting
(24)  to fill in some of the numbers?
(25)      A.   Yes, it is.

Page 58

(1)
(2)      Q.   Having seen that, does that perhaps
(3)  refresh your recollection as to where the
(4)  information on Page 1251 came from?
(5)      A.   1251?
(6)      Q.   The one right before.
(7)      A.   No, it does not.
(8)      Q.   The next document I'm going to hand
(9)  to you is Plaintiff's Exhibit 12, this is a
(10)  document that has some handwriting on the front
(11)  and it has a note attached behind it which may
(12)  or may not belong with it, but they were
(13)  produced to us sequentially.
(14)      A.   Uh-huh.
(15)      Q.   Taking a look at Plaintiff's
(16)  Exhibit 12, can you identify this document?
(17)      A.   Yes, I can.
(18)      Q.   What is it?
(19)      MR. BUSLOFF: Sorry, just be careful
(20)  you're talking about the documents, he's
(21)  talking about both pages, if you only
(22)  describe the letter on top --
(23)      A.   No, I recognize both documents.
(24)      MR. BUSLOFF: Okay, great.
(25)      Q.   Go ahead.

Page 59

(1)
(2)      A.   The document is a continuation for
(3)  the licensing agreement to extend it from 2005
(4)  to 2007, and the second -- and the second page
(5)  is, I guess, Neil Goldstein had moved firms, I
(6)  guess I was told to send it to him at this new
(7)  address or somebody had given me the new
(8)  address for Neil S. Goldstein.
(9)      Q.   Do you know why somebody would have
(10)  given you a new address for Neil Goldstein?
(11)      A.   I do not recall.
(12)      Q.   Is that your handwriting on the front
(13)  page of the document?
(14)      A.   Yes, it is.
(15)      Q.   And is that your markup on the
(16)  document?
(17)      A.   Yes, it is.
(18)      Q.   Now, the address there that you wrote
(19)  for Neil Goldstein on that page appears to be
(20)  the very same address that was on the March 20,
(21)  2001 Plaintiff's Exhibit 7?
(22)      A.   Yeah, because this is a copy of that.
(23)      Q.   Right, but the note that we were just
(24)  looking at, that Page 1130?
(25)      A.   Uh-huh.

Page 60

(1)
(2)      Q.   I believe you testified that you
(3)  thought that perhaps Neil had changed his
(4)  address and they were telling you that, which
(5)  was why you had the separate note; is that
(6)  correct?
(7)      A.   That is correct.
(8)      Q.   But does it appear that --
(9)      A.   Not the address, but the name of the
(10)  firm or something.
(11)      Q.   Is that what it was?
(12)      A.   The name of the firm, Robinson Brog
(13)  et al, instead of Neil S. Goldstein -- instead
(14)  of Shecter Riscky Goldstein (phonetic), sorry.
(15)      Q.   What do you recall, if anything,
(16)  about your marking up this first page here,
(17)  1129?
(18)      A.   I don't recall the particular day
(19)  that I would have done this, but it's my
(20)  handwriting. I probably would have done it
(21)  for -- I knew it was for the next extension, I
(22)  probably took out from my files the one I had
(23)  done previously so I wouldn't have to rack my
(24)  brains on how to write it and just altered it
(25)  to reflect the new year.

Page 61

(1)

(2)   **Q.** Do you recall how it was you came to
(3) know that Goldstein had changed firms?
(4)   **A. I do not recall.**
(5)   **Q.** Plaintiff's Exhibit 13 -- well, after
(6) you drafted the document, what did you do with
(7) it?
(8)   **A. After the markup of this one? I**
(9) **probably gave it to my secretary to retype it**
(10) **up.**
(11)   **Q.** Would 13 be the typed version of 12,
(12) to the best of your knowledge?
(13)   **A. Uh-huh, looks like it.**
(14)   **Q.** Now, is there any reason why when you
(15) were drafting this document, in that first line
(16) where it says as required by our licensing
(17) agreement dated August 1, 1998, you didn't put
(18) the words -- words or substance "as amended" or
(19) "as modified"?
(20)   **A. To me -- again, I'll answer as the**
(21) **same time as the first one. To me, all the**
(22) **modifications had been done and all included in**
(23) **here. I didn't believe that I had to write**
(24) **that for any particular purpose, it was all**
(25) **covered, and we had orally amended that**

Page 62

(1)

(2) **licensing agreement to include all these**
(3) **things. So to me, it was already done, there**
(4) **was nothing else for me to add or to alter.**
(5)   **Q.** Would it be fair to say that as far
(6) as you were concerned, orally modifying the
(7) agreement to include products that hadn't been
(8) covered was fine but that when you wanted to
(9) extend the agreement by exercising an option,
(10) that that was something that you didn't want to
(11) do orally, that you wanted to do in writing?
(12)   **A. This as well could have been done**
(13) **orally; however, there was a particular, in my**
(14) **head, that I -- just something that I had to**
(15) **do, okay, and -- but, however, again, you know,**
(16) **there was always discussions between Issie and**
(17) **Phat Fashions people, you know, they're going**
(18) **ahead or whatever, I just followed it up, I**
(19) **just wrote it up as part of my tasks.**
(20)   **Q.** Is Plaintiff's Exhibit 14, which I've
(21) just put in front of you, the signed copy of
(22) the document that was sent to Phat Fashions by
(23) Issie Wiseman?
(24)   **A. It appears to be.**
(25)   **Q.** This is a document, although it

Page 63

(1)

(2) doesn't appear to indicate it on the actual
(3) Exhibit 14, do you recall this document,
(4) Plaintiff's Exhibit 14, being sent via FedEx?
(5)   **A. I would have probably just gave it in**
(6) **to be sent, yes. I don't recall exactly giving**
(7) **it to the party to get it done, but I know I**
(8) **would have sent it FedEx, that is normally how**
(9) **I send documents.**
(10)   **Q.** You normally send documents by FedEx?
(11)   **A. FedEx, Purolator, you know, UPS,**
(12) **sometimes regular mail, all different ways.**
(13)   **Q.** Were you anxious to confirm that the
(14) document -- the exercise of the option,
(15) Plaintiff's 14, had actually been received by
(16) Rick Slomovitz?
(17)   **A. I always want to ensure that whatever**
(18) **I send out gets to where it is supposed to get.**
(19)   **Q.** Plaintiff's Exhibit 16 is an E-mail
(20) from Slomovitz to you, hi Barry, I received
(21) your letter re the renewal, thanks, Rich.
(22)   **A. Uh-huh.**
(23)   **Q.** Do you recall whether or not this
(24) E-mail was preceded by a telephone call?
(25)   **MR. BUSLOFF:** Can you be a little bit

Page 64

(1)

(2) more specific about what exactly, like any
(3) phone call at any point in time, ever?
(4)   **MR. HOFFMAN:** No.
(5)   **Q.** We have a March 10, 2004 option
(6) exercise, Plaintiff's 14, that you sent out via
(7) Federal Express.
(8)   **A. Uh-huh.**
(9)   **Q.** And that -- we have a document that
(10) shows it arrived on March 11, 2004.
(11)     Do you have a recollection of having
(12) a telephone conversation on either March 10th
(13) or March 11th with Rich Slomovitz prior to your
(14) receiving this E-mail?
(15)   **A. No, I do not.**
(16)   **Q.** Did you -- do you have any
(17) recollection of having comments with Rich
(18) Slomovitz about the exercise of the option in
(19) general in either 2001, 2004 or any other time?
(20)   **A. No, I do not recall. I don't believe**
(21) **so.**
(22)     (Discussion held off the record.)
(23)   **Q.** Plaintiff's Exhibit 17.
(24)   **A. Okay.**
(25)   **Q.** A document sent by you to TJ Johnson

Page 77

(1)

(2)    Q.    -- such as the counterfeiting problem
(3)  that we are talking about now or any other
(4)  problems in Canada having to do with the
(5)  products that were being sold by the Tyfoon
(6)  Group that they were getting from Phat Fashions
(7)  or whomever --
(8)         MR. BUSLOFF:  Sorry, are we talking
(9)      about Phat Fashion product or we talking
(10)     any product whatsoever?
(11)    Q.    Phat Fashions, Baby Phat -- let me go
(12)  back.
(13)        If ever there was a problem --
(14)        MR. BEHA:  Let him finish the
(15)     question, Barry.
(16)    Q.    -- with respect to the sale or
(17)  distribution of Phat Farm or Baby Phat goods in
(18)  Canada, be it as a result of counterfeiting or
(19)  whatever, was there ever any difficulty in
(20)  contacting Bernt Ullmann via E-mail to tell him
(21)  about those problems?
(22)    A.    There was no problem.
(23)    Q.    Did you ever contact Bernt Ullmann,
(24)  yourself directly?
(25)    A.    No, I did not.

Page 78

(1)

(2)    Q.    Why not?
(3)    A.    I did not have a relationship with
(4)  Bernt Ullmann.  I had never spoken to Bernt
(5)  Ullmann.  All dealings and all discussions with
(6)  Bernt Ullmann are done by Issie Wiseman and
(7)  Josh Wiseman.
(8)    Q.    Take a look at Plaintiff's Exhibit
(9)  22, this is a preconference letter that was
(10)  sent to the court and it was drafted by me and
(11)  by Adam Offenhartz, and there's a section in
(12)  here that begins on Page 4 called Description
(13)  by Defendant Tornado.
(14)    A.    Uh-huh.
(15)    Q.    That runs for a couple of pages and
(16)  ends on Page 6.  Have you ever seen this letter
(17)  before?
(18)    A.    Yes, I have.
(19)    Q.    Did you approve of the description of
(20)  the case by Defendant Tornado in the letter
(21)  prior to the time that it was filed?
(22)    A.    Yes, yes, we did.
(23)    Q.    To the best of your knowledge, is the
(24)  description there accurate?
(25)    A.    Yes.

Page 79

(1)

(2)         MR. BUSLOFF:  He's asking -- make
(3)     sure you read through the section, he's
(4)     asking you about --
(5)    A.    The entire --
(6)    Q.    No, well, the description by
(7)  Defendant Tornado.
(8)         MR. BUSLOFF:  Before you answer, read
(9)     through it carefully because he's asking
(10)     you about two pages of text, whether you
(11)     agree with everything in there.
(12)        THE WITNESS:  Four pages of text.
(13)    Q.    No, you'll stop at Page 6.
(14)    A.    Let me read the entire thing.
(15)        I agree with it.
(16)    Q.    In the description by Tornado, starts
(17)  at Page 4 there at the bottom where it says,
(18)  Tornado approximately -- sold approximately
(19)  153,402 worth of lingerie in 2005.
(20)        Is that including sales by Vis-a-Vis
(21)  as well?
(22)    A.    That is correct.
(23)    Q.    The other references, for instance,
(24)  when you turn to Page 5, Tornado sold 640,498
(25)  worth of outerwear, is that referring to sales

Page 80

(1)

(2)  by Tornado or by Vis-a-Vis?
(3)         MR. BEHA:  Or both.
(4)    A.    It's for both.
(5)    Q.    Is there any reference why Vis-a-Vis
(6)  is not mentioned?
(7)         MR. BUSLOFF:  Excuse me?
(8)    Q.    Is there any reason why Vis-a-Vis is
(9)  not mentioned in this paragraph as being one of
(10)  the parties that was actually making those
(11)  sales?
(12)    A.    It was all part and parcel all --
(13)  everything fell under the Tornado scheme of
(14)  events, fell under the auspices of the Tornado
(15)  agreement.  So when you're asking did we sell
(16)  under the -- we sold goods under Vis-a-Vis,
(17)  yes, the goods were sold under Vis-a-Vis but
(18)  through the auspices of the overall amendments
(19)  which created under the Tornado agreement which
(20)  allowed us to do that.
(21)    Q.    But the party that was actually
(22)  making the sales?
(23)    A.    The actual party that made the sales
(24)  was Vis-a-Vis.
(25)    Q.    When it says Tornado sold

PHAT FASHIONS

BSA XMAX(21/21)

BARRY SEGAL - 11/20/07

VS. TORNADO IMPORTS

## Page 81

(1)
(2)    approximately 105,402 worth of lingerie --
(3)    A.    It's really Vis-a-Vis.
(4)    Q.    Right.
(5)    MR. HOFFMAN:  Take a break?
(6)    MR. BEHA:  Actually, before we go off
(7)    the record, but unrelated to you, just so
(8)    we have it memorialized somewhere, and let
(9)    me see if I get this right, Phil, we have
(10)    a preliminary injunction hearing scheduled
(11)    for the 13th of December and a briefing
(12)    scheduled with respect thereto, and I've
(13)    had some discussions with Mr. Hoffman
(14)    about the deposition of Josh Wiseman.
(15)    I have told him that as I presently
(16)    conceive of Defendant's papers for the
(17)    motion, I would not expect to use an
(18)    affidavit or something of that sort for
(19)    Mr. Wiseman and from Josh Wiseman, and he
(20)    has told me that so long as that is the
(21)    case, he does not need the deposition of
(22)    Mr. Wiseman before the hearing, but if I
(23)    change my mind with respect to that, I
(24)    will give him immediate notice and we will
(25)    arrange a deposition.  Is that more or

## Page 82

(1)
(2)    less right?
(3)    MR. HOFFMAN:  No, no.  Everything you
(4)    said was right, but you've left out an
(5)    important point.
(6)    MR. BEHA:  Sure.
(7)    MR. HOFFMAN:  Which is the discussion
(8)    that we had that as of now, the witnesses
(9)    at the hearing from the Tornado side of
(10)    the table were going to be Mr. Segal and
(11)    Mr. Issie Wiseman, and that Josh was not
(12)    going to be a witness at this time.  So if
(13)    that changes, then obviously I would want
(14)    to take his testimony beforehand.
(15)    MR. BEHA:  I think that's absolutely
(16)    correct that was the understanding.
(17)    Neither an affidavit nor an intention of
(18)    calling him at trial with the
(19)    understanding that if either of those
(20)    things changes, I will let you know as
(21)    soon as it changes and we will arrange a
(22)    deposition.
(23)    MR. HOFFMAN:  Good enough.
(24)    (Short recess taken.)
(25)    Q.    When is the first time prior to

## Page 83

(1)
(2)    March 1st of 2006 that you had any discussions
(3)    with anyone from Phat Fashions about extending
(4)    the trademark license agreement beyond
(5)    December 31st of 2007?
(6)    A.    Probably September 2005.
(7)    Q.    And what do you recall about that
(8)    conversation, who were the parties to it?
(9)    A.    Issie Wiseman -- well, I have to back
(10)    up a little bit, I don't want to give a whole
(11)    story, but they have to deal with, very briefly
(12)    there was a problem with a European distributor
(13)    somehow who sold the shoes to somebody and got
(14)    into our marketplace and was creating --
(15)    MR. HOFFMAN:  Off the record.
(16)    (Discussion held off the record.)
(17)    A.    There was an issue with a European
(18)    distributor who had sold to another party who
(19)    somehow had gotten a large amount of shoes of
(20)    Baby Phat and Phat Farm into our Canadian
(21)    marketplace and basically was creating havoc
(22)    within our market.
(23)    I -- at the time, I was on vacation
(24)    on a boat and Issie was on another boat, and I
(25)    know there was E-mails going back and forth

## Page 84

(1)
(2)    with Bernt and what -- we were going to stem
(3)    the tide and what kind of retribution against
(4)    the European supplier, et cetera, et cetera,
(5)    and, you know, I guess Bernt was having all
(6)    kinds of difficulty and whatever, so he said,
(7)    well, maybe I can try to get you $25,000.
(8)    So, you know, Issie discussed it and
(9)    Josh and myself, $25,000, what's that going to
(10)    do?  And I think Issie came up with the idea,
(11)    let's ask him for an extension of the contract,
(12)    you know, and we know -- we knew that was up in
(13)    a couple of years, this was a good time, let's
(14)    forego all this stuff with the shoe business
(15)    and let's do an extension.  And I don't know,
(16)    in a matter of days later, Issie came to me,
(17)    and I spoke to Bernt, I told him about
(18)    extending the contract, he said, he says -- and
(19)    I remember he says, great, why would we even
(20)    think about going with anybody else.  Sure, you
(21)    know, and then he said, Issie told me, we'll
(22)    talk about it in a few months to firm up
(23)    numbers or whatever, but it's a go, it's a
(24)    deal.
(25)    Q.    So the thing that was a deal was to

Page 85

(1)
(2)  talk about extending the agreement beyond 2007?
(3)     A. That is correct.
(4)     Q. There were no terms discussed such as
(5)  minimum royalties or minimum sales?
(6)     A. At that point in time, he did not
(7)  tell me anything about that, no.
(8)     Q. And the licensee that you are
(9)  referring to was Unioncon?
(10)    A. The European license that was
(11)  creating this problem with the shoes, I
(12)  believe, is Unioncon, yes.
(13)       MR. BUSLOFF: He is talking about
(14)    extending the licenses to the Phat
(15)    Fashion.
(16)    A. The license is with Phat Fashions.
(17)    Q. That's what I meant, but the licensee
(18)  that you talked about before --
(19)    A. Yes, the European licensee that we
(20)  were having the problems with was, I believe,
(21)  Unioncon.
(22)    Q. And this was a discussion that Bernt
(23)  Ullmann had with Issie Wiseman about extending
(24)  the agreement?
(25)    A. This was a conversation, I wasn't in

Page 86

(1)
(2)  the conversation, that Issie Wiseman had with
(3)  Bernt asking him -- saying, hey, listen, let's
(4)  forego this problem, let's get rid of it, you
(5)  know, 25,000, it's creating problems all over
(6)  the place. I'd like to get an extension of the
(7)  contract post December the 31st, 2007.
(8)       And Issie Wiseman came back to Josh
(9)  and myself and said, hey, listen, we are going
(10)  ahead, we got the extension, and far as numbers
(11)  and particular terms, that wasn't this -- at
(12)  that point in time, there was no discussion.
(13)    Q. And all your information about this
(14)  conversation comes from what you were told by
(15)  Issie Wiseman about it?
(16)    A. Correct.
(17)    Q. What was your reaction to hearing
(18)  this information from Issie Wiseman about going
(19)  forward?
(20)    A. Great, terrific --
(21)    Q. Did you --
(22)    A. -- absolutely.
(23)    Q. Did you suggest at that time that
(24)  anything be put in writing?
(25)    A. No, he had mentioned to me that --

Page 87

(1)
(2)     Q. Who is he?
(3)     A. Issie had mentioned to me that as far
(4)  as the numbers, we would discuss it later in
(5)  the year.
(6)     Q. And was it your anticipation that
(7)  once the numbers were discussed and agreed
(8)  upon, that at that point something would be put
(9)  in writing?
(10)    A. At that point in time, I didn't know
(11)  if it was going to be put in writing or not put
(12)  in writing, but at that point in time, as far
(13)  as I understood, to me, a deal had been
(14)  contemplated, it had been agreed to as opposed
(15)  to putting it in, dotting the I's -- to me, the
(16)  numbers as the minimum royalty amount, we were
(17)  doing so much business, you know, so what did
(18)  it mean another few hundred thousand dollars in
(19)  minimum royalty, it is of no consequence. The
(20)  fact of the matter was at that point in time,
(21)  in our minds, a deal has been struck.
(22)    Q. Were you aware at that point in time
(23)  that the trademark license agreement expired as
(24)  of December 31, 2007 without any option to
(25)  renew on behalf of Tornado?

Page 88

(1)
(2)     A. I believe so, yes.
(3)     Q. Did you have any discussions directly
(4)  with Bernt Ullmann at any time about extending
(5)  the trademark license agreement beyond
(6)  December 31, 2007?
(7)     A. I personally did not have any
(8)  discussions with Bernt Ullmann.
(9)     Q. Any with Bob Skinner?
(10)    A. I personally don't have any
(11)  discussions with Bob Skinner.
(12)    Q. Peter Morris?
(13)    A. I don't even believe I had a
(14)  discussion with Peter Morris concerning it.
(15)    Q. There is one conversation -- at least
(16)  one conversation with Eli Nathanson, correct?
(17)    A. I had a conversation with Eli
(18)  Nathanson, correct.
(19)    Q. After the conversation that you just
(20)  testified about, not with Eli Nathanson but
(21)  with Josh and Issie back in the fall of 2005,
(22)  what is the next conversation, if any, you
(23)  remember having with them about extending the
(24)  agreement?
(25)    A. The fact that we knew that we had the

PHAT FASHIONS                                                              VS. TORNADO IMPORTS

BSA XMAX(23/23)

BARRY SEGAL - 11/20/07

Page 89

(1)
(2) agreement going forward and he had said, well,
(3) we are -- we'll discuss the numbers and to get
(4) the minimums down, probably would have been a
(5) few months later, maybe in December or January
(6) would have been another conversation, you know,
(7) saying -- or Josh saying or Issie saying, don't
(8) forget, we have to get some numbers together
(9) and we'll have to get a -- have a discussion
(10) with Bernt about the numbers.
(11)     Q.  Is this a specific memory you have or
(12) just --
(13)     A.  No, no, this is a specific memory.
(14)     Q.  When is the -- what is the first
(15) conversation you remember where numbers were
(16) discussed?
(17)     A.  The first conversation concerning the
(18) actual numbers probably was in January of '06.
(19)     Q.  What do you recall about that, who
(20) were the parties to it?
(21)     A.  The parties were myself, were Issie
(22) Wiseman and Josh, and he said to me, he said,
(23) you know, give me some options of, you know,
(24) minimums.
(25)     MR. BUSLOFF:  When you say he?

Page 90

(1)
(2)     A.  Issie Wiseman asked me, being the
(3) financial officer, give me some numbers as to
(4) what I have to discuss with Bernt concerning
(5) going forward, the minimums.
(6)     Q.  And did you do that?
(7)     A.  Yes, I did.
(8)     Q.  And what form did you do that?
(9)     A.  I gave it to him in a typed up or
(10) maybe my secretary typed up because my
(11) handwriting is not the best, so I gave him -- I
(12) remember doing a little format, gave him option
(13) A, an option B with these minimums and option B
(14) with another set of minimums basing it on the
(15) same 7 percent royalty basis.
(16)     Q.  And are these discussions that took
(17) place prior to MAGIC that you're referring to
(18) now?
(19)     A.  Yes, I am.
(20)     Q.  And MAGIC took place in February of
(21) 2006?
(22)     A.  It's always -- I believe it's always
(23) in February.
(24)     Q.  Do you recall when in February it is?
(25)     A.  I -- probably the -- I would think

Page 91

(1)
(2) the latter half.  I don't know why, but I
(3) believe it's in the latter half.
(4)     Q.  Did you go to MAGIC?
(5)     A.  No, I did not, I was not there.
(6)     Q.  Do you generally go to MAGIC?
(7)     A.  Generally, no.
(8)     Q.  So if any conversations took place at
(9) MAGIC between Bernt Ullmann and Issie and Josh
(10) Wiseman, the only way you would have learned
(11) about those conversations was from whatever
(12) they told you about them, that being Issie and
(13) Josh?
(14)     A.  That is correct.
(15)     Q.  Do you recall having discussions with
(16) Issie or Josh about extending the agreement
(17) after the MAGIC show?
(18)     A.  Yes.
(19)     Q.  What do you recall about that?
(20)     A.  Issie Wiseman called me and said the
(21) numbers were -- we settled on the numbers.  He
(22) called me, I believe he was in Florida, it was
(23) after the MAGIC show, and he read me out what
(24) the minimum numbers were decided upon between
(25) him and Bernt Ullmann, and he said Bernt wants

Page 92

(1)
(2) something -- to put something together in
(3) writing, so when I come back, have it ready and
(4) so I can send it out.
(5)     Q.  When he says, come back, have it
(6) ready, you were going to be the one to have
(7) something ready in writing?
(8)     A.  Yeah, I believe I proposed something,
(9) I put something together, you know, a little
(10) piece of paper, you know, what we are going to
(11) write and I guess he went over it too with a
(12) secretary at the end, and then it was typed up
(13) and it was sent out.
(14)     Q.  You testified a few minutes ago about
(15) having written down some numbers?
(16)     A.  The numbers that he told me, sorry,
(17) go ahead.
(18)     Q.  But prior to that time, I thought
(19) that you had testified that Bernt had asked you
(20) to sketch out some numbers for him?
(21)     A.  Not Bernt, not Bernt, Issie Wiseman.
(22)     Q.  Issie?
(23)     A.  Gave him my opinion as to what sorts
(24) of minimums that he should go and discuss with
(25) Bernt --

Page 93

(1)
(2)    Q.  So that --
(3)    A.  -- for the extension of the contract.
(4)    Q.  So --
(5)    A.  That was done, I believe, sometime in
(6)  January, sometime --
(7)        MR. BUSLOFF:  He testified that was
(8)    his January conversation.
(9)        MR. HOFFMAN:  Just checking.
(10)   A.  Yeah, yeah.
(11)   Q.  Plaintiff's 23, these are documents
(12)  that are marked 914 through 916.  They may or
(13)  may not belong together, this is the way --
(14)       MR. BUSLOFF:  For the record, 916 is
(15)   on top followed by 914.
(16)   A.  Basically if you want to go in a
(17)  particular order, 915 probably would have been
(18)  the first sheet, 916 the second sheet and 914
(19)  is the last sheet.
(20)   Q.  Can you just describe for us what
(21)  these documents are now that you have been kind
(22)  enough to give us the proper order?
(23)   A.  Yeah, okay, in the first --
(24)       MR. BUSLOFF:  Why don't you start
(25)   with 915.

Page 94

(1)
(2)    A.  915 is my -- after Issie Wiseman had
(3)  requested of me that I give him some options as
(4)  to what kind of minimum royalty payments he
(5)  should go back with to -- and discuss with
(6)  Ullmann for the forthcoming -- for the
(7)  extension, I prepared this document, and
(8)  knowing that my handwriting is not the best, I
(9)  asked our secretary if she could type it up and
(10)  so that I could go over with Issie and when he
(11)  was discussing on the telephone with him, he
(12)  would have something that he could actually
(13)  read.
(14)   Q.  Where did you get these numbers from?
(15)   A.  Where did I get the numbers on 915?
(16)   Q.  On 915, and they're the same numbers
(17)  on 916?
(18)   A.  Right, these are numbers that I
(19)  prepared.
(20)   Q.  And what led you to put those numbers
(21)  down?
(22)   A.  Basically just looking at the
(23)  contract, where we had ended with the contract
(24)  and, you know, knowing that we were doing so
(25)  much in business, really the minimum was why

Page 95

(1)
(2)  would I need -- in my mind, why would I need
(3)  such huge minimums, we had already been in
(4)  business for, you know, six years, he knows
(5)  what our ability is to do sales, he knew what
(6)  kind of job we were doing.  He only wanted to
(7)  do more numbers, more money or to earn more
(8)  money than they wanted to earn, that's our
(9)  business, and I just -- in my mind, these are
(10)  initial numbers that I came up for discussion
(11)  purposes.
(12)   Q.  In your notes, both handwritten and
(13)  in the typed version A, it says, the above
(14)  assumes the royalty rate will be maintained at
(15)  7 percent, question mark.
(16)   A.  Uh-huh.
(17)   Q.  Why is there a question mark there?
(18)   A.  Just maybe it was an -- I don't know.
(19)  I just asked Issie is this 7 percent royalty
(20)  rate going to be maintained, he said yes, and
(21)  there was no question about that.  I did that,
(22)  the numbers based on that, and when I saw -- he
(23)  said, yeah, that's going to be the same and
(24)  there would be no minimum advertising, that was
(25)  just advising him that there had not been and

Page 96

(1)
(2)  the last one I just told him where the last
(3)  royalty payments were for the previous year.
(4)    Q.  Are the sales figures that are in
(5)  this agreement that you wrote down, was it
(6)  contemplated that those would be sales by just
(7)  Tornado or by Vis-a-Vis and Tornado?
(8)    A.  No, these are minimums for the entire
(9)  operation of Baby Phat sales and Phat Farm
(10)  sales.
(11)   Q.  In the past, would it be accurate to
(12)  state that the sales made by Tornado alone over
(13)  the course of the license agreement from 1998
(14)  through 2006, that those sales alone met the
(15)  minimums that were set forth in the license
(16)  agreement?
(17)   A.  I believe so, the minimums were
(18)  pretty low in these agreements, yes.
(19)   Q.  Plaintiff's Exhibit 24 is the next
(20)  document.
(21)       Have you seen this before?
(22)   A.  Yes, I have.
(23)   Q.  What is it?
(24)   A.  This is an E-mail that Issie sent to
(25)  Bernt on March the 1st, which I kind of helped

### Page 97

(2) prepare because these are the numbers that
(3) Issie Wiseman told me that had been agreed upon
(4) with Bernt at the MAGIC show, 350, 450, 550,
(5) and the next option period, 600, 650 and 7, so
(6) I just -- I just -- what I did is I had it with
(7) Issie or by myself or whatever, we had it typed
(8) up and given to my secretary who went over with
(9) Issie and changed some spelling or whatever and
(10) we sent it off to Bernt.
(11)     Q.  Taking a look at 23 again.
(12)     A.  Yeah.
(13)     Q.  There are options A and option B?
(14)     A.  Uh-huh.
(15)     Q.  And then there are some handwritten
(16) numbers in the middle, do you see that in the
(17) page?
(18)     A.  Yes, I do.
(19)     Q.  Is that your handwriting?
(20)     A.  Is this my handwriting?
(21)     Q.  Yes, sir.
(22)     A.  That is not my handwriting.
(23)     Q.  The first two pages of this document
(24) which is the typed version and then the
(25) handwritten notes with the numbers on it.

### Page 98

(2)     MR. BUSLOFF:  That's 916 and 914.
(3)     Q.  Were those the documents that you
(4) created back in January of 2006?
(5)     A.  Yeah, 915 and 916 are documents that
(6) I created.
(7)     Q.  914 -- but in January of 2006?
(8)     A.  Yes, yes.
(9)     Q.  And 914 is probably one you created
(10) closer to the date of the March 1, 2006 letter?
(11)     A.  That is correct.  This is something
(12) that was created subsequent to the numbers
(13) being agreed upon between Issie and Bernt at
(14) MAGIC.
(15)     Q.  And the language and the numbers that
(16) are in 914 come close to tracking at least
(17) what's in Exhibit 24 there in the attachment?
(18)     A.  In --
(19)     Q.  That is 24 in your hand right now.
(20)     A.  Yeah, that correlates, those numbers
(21) correlate what this is, the same numbers that
(22) were created.
(23)     Q.  Did you have any conversation that
(24) you recalled with either Issie or Josh Wiseman
(25) about this E-mail at or about the time it was

### Page 99

(2) send out on March 1st to Bernt Ullmann?
(3)     A.  I do not recall other than the fact
(4) that we prepared the documents and we advised
(5) him that was what was agreed and he signed it
(6) and he sent it off.
(7)     Q.  Take a look at Plaintiff's 25.
(8)     A.  Uh-huh.
(9)     Q.  Let me just back up for a second.
(10)     Do you have a recollection of ever
(11) being on any telephone conversations between
(12) Bernt Ullmann and Issie Wiseman?
(13)     A.  I do.
(14)     Q.  When is the first such conversation
(15) you remember?
(16)     A.  The first conversation I believe
(17) could have been some time in March of -- either
(18) it was March or April of '06.  April '06 for
(19) sure I remember a conversation that I have a
(20) 100 percent recollection.
(21)     Q.  What do you recall about that
(22) conversation?
(23)     A.  The conversation that I don't -- the
(24) conversation was, I'm just trying to think of
(25) my timing here, March the 1st, we had sent it

### Page 100

(2) out -- in April after -- on March the 30th,
(3) this was sent back to Mr. Nathanson, I believe,
(4) with your firm.
(5)     Q.  When you say this, being the
(6) Amendment No. 1?
(7)     A.  Yes, what you call Amendment No. 1.
(8) I remember that this was sent back on March the
(9) 30th, and I believe that two weeks later, we
(10) called Bernt where I was present at -- with
(11) Issie, and I said, why don't we give Bernt a
(12) call because we got this amendment and, you
(13) know, I had signed it -- you had signed it off
(14) and, you know, and the lawyers sometimes, you
(15) know, used to tell me to send it to me, it gets
(16) way late, so let's make sure that Bernt had
(17) received it from Mr. Nathanson the agreements.
(18)     Q.  Why did that matter to you?
(19)     A.  Only to the fact like everything
(20) else, when I signed something, when something
(21) emanates from me, you know, I like to -- I'd
(22) just like to follow up, you know, even though I
(23) knew there was -- the agreement had been
(24) reached, but I had seen a piece of paper, I had
(25) sent it out, so I wanted to see what -- where

Page 101

(1)
(2) it was.
(3)     Q.  Would it be fair to say that what you
(4) were looking to do is find out whether or not
(5) Bernt Ullmann or anyone from Phat Fashions had
(6) signed it and if they were going to be
(7) returning it to you?
(8)     A.  I just wanted to make sure he
(9) received.  That was the only reason for my
(10) calling, was to make sure that he -- that, A,
(11) that he had received it at that point in time.
(12)     Q.  And the call was made by Issie
(13) Wiseman, and you were there on the phone as
(14) well, on the speakerphone?
(15)     A.  It was on a speakerphone.
(16)     Q.  Did you ask any questions or say
(17) anything?
(18)     A.  No, no, I did not say a word, I was
(19) just sitting there and listening.  Issie was
(20) doing the talking.
(21)     Q.  What did Bernt Ullmann -- tell me, as
(22) best as you can recall, exactly what was said
(23) in that conversation.
(24)     A.  Issie had called sometime in April
(25) and spoke with Bernt and said, you know, we

Page 102

(1)
(2) sent out, you know, we got -- we sent out the
(3) amendment to Nathanson and I just want to make
(4) sure that you received it and everything is
(5) okay, and he said, yeah, everything is great,
(6) it's a deal, we are just going to get it signed
(7) off.
(8)     Q.  And that was all you remember?
(9)     A.  That's all I remember.  They may have
(10) had, you know, another discussion concerning
(11) the goods or, you know, how the sales were
(12) going or whatever because, you know, after we
(13) broke MAGIC, they got the line for fall or
(14) whatever, how the sales were going, but that
(15) was basically in essence the conversation.
(16)     Q.  Were there any other phone calls that
(17) you were a party to between Bernt Ullmann and
(18) Issie Wiseman about the amendment?
(19)     A.  Yes, yes, I was.
(20)     Q.  Tell me about those.
(21)     A.  There was another case in point
(22) whereby Issie had called Bernt, I may have
(23) asked him, you know, it was my regular tasks or
(24) whatever having to do this, you know, something
(25) went out, you know, I'd like to get it back and

Page 103

(1)
(2) whatever, and I think this was, I believe, in
(3) August, I said, you know, the MAGIC show is
(4) coming up or whatever, speak to Bernt, maybe
(5) he'll bring the agreement with him, okay, to
(6) the MAGIC show.
(7)     He called him up, and I believe it
(8) was that conversation where he said everything
(9) is okay, there's no problem, and he said,
(10) unfortunately, I have to tell you, something
(11) terrible happened, the lawyer who was working
(12) on it committed suicide.  Okay.  But don't
(13) worry, it's in the works, you know, it's a done
(14) deal, there's no problems with it.
(15)     Q.  Did you -- what else do you remember
(16) about that conversation?
(17)     A.  Well, then they discussed, I guess
(18) they were going to see each other at MAGIC, and
(19) I don't know that's it -- let's go over the
(20) line, let's go over the next season's lines,
(21) that's basically what I remember.
(22)     Q.  That conversation was sometime in
(23) August of '06?
(24)     A.  I believe it was in August, yes.
(25)     Q.  And the first one is April of '06?

Page 104

(1)
(2)     A.  Yes, the first one I believe was in
(3) April.
(4)     Q.  Do you have a recollection of any
(5) other conversations that you were a part of
(6) where the amendment was discussed?
(7)     A.  Yeah, I believe there was another one
(8) in December.  I remember I think I had
(9) mentioned to Issie on another occasion, I may
(10) not have been at that conversation, but that he
(11) had told me, that basically I mentioned to him
(12) again, again, in October maybe or September or
(13) October about it, and I think he gave him a
(14) call.
(15)     And he told me afterwards, I don't
(16) believe I was at that one, he said, well, what
(17) do you keep bugging me about this business
(18) about, I said, I know it's a done deal, I'm
(19) just telling you, you know, it's part of my
(20) tasks, I have it on my to-do list, it's a time
(21) line, I go through my to-do list, I see that, I
(22) said, okay, let's, you know, whatever.  He told
(23) me, he said, hey, listen, you know, it's --
(24) this is big, it's corporate, it's, you know,
(25) sitting on somebody's desk, but don't worry,

### Page 105

(1)
(2) it's a done deal, and that was what he told me
(3) on that occasion.
(4)         And I believe in December I was at
(5) another conversation and that, again,
(6) everything was, hey, why would we. Everything
(7) was perfect and maybe we'll have everything
(8) done by, you know, we'll see you at MAGIC,
(9) we'll have everything done but everything is
(10) perfect.
(11)     Q.   And you were on that conversation or
(12) not?
(13)     A.   I believe I was on that conversation
(14) in December.
(15)     Q.   When you were on the conversations in
(16) April, the one that took place around August
(17) and December, was Bernt Ullmann aware that you
(18) were in the room at the time?
(19)     MR. BUSLOFF:  If you know.
(20)     A.   You know what, I don't think so
(21) because I didn't do any talking.  I'm there --
(22) I was there to listen and that is basically it.
(23)     Q.   Do you have any recollection of Issie
(24) Wiseman saying, you know, I'm here with Barry,
(25) we have some questions?

### Page 106

(1)
(2)     A.   I don't recall that, to be honest.
(3)     Q.   Is it fair to say that this item,
(4) getting back to the signed amendment, was on
(5) your to-do list for several months?
(6)     A.   Yeah, like I have to mention other
(7) things that are on my to-do list, until I get
(8) around to things and to my follow-up because
(9) I'm busy on a daily basis with many things, but
(10) it was on my to-do list but not that -- I
(11) didn't have any really major concerns because
(12) we were going forward and I was at
(13) conversations where I heard Mr. Ullmann say no
(14) problem, et cetera, et cetera, it was done.
(15)     Q.   Did you ever contemplate calling up
(16) Eli Nathanson and asking him when you were
(17) going to get this signed agreement back?
(18)     A.   No, I did not.
(19)     Q.   Was there ever any discussion of
(20) putting in writing in an E-mail to Bernt -- let
(21) me finish the question, to Bernt Ullmann a
(22) confirmation that, you know, we understand that
(23) everything is okay and that you're going to be
(24) signing the agreement, but it's just not going
(25) to happen yet?

### Page 107

(1)
(2)     A.   No, because -- I wasn't really
(3) worried about it in that kind of context that I
(4) would have thought to have told Mr. Wiseman,
(5) hey, listen, we better get something in
(6) writing, we had done so much in oral that it
(7) really -- didn't really matter to me the signed
(8) agreement or not, I knew it was a deal, it was
(9) going forward, it was a done deal.
(10)     Q.   But it is fair to state that after
(11) Issie Wiseman signed the document, that on a
(12) fairly routine basis, you would ask Issie
(13) Wiseman when -- where is the signed document,
(14) when are we getting it back?
(15)     A.   Correct.  I did make a mention to him
(16) about three or four times over the six months,
(17) or the year, yeah, basically almost a year,
(18) where is the document, yes.
(19)     Q.   Well, actually it would be between
(20) April and December of '06, right?
(21)     A.   Yeah, so nine months.
(22)     Q.   Nine months.  So you asked him --
(23)     A.   Three times maybe, three maybe,
(24) possibly four, but I would think probably
(25) around three times.  Well, the first time was

### Page 108

(1)
(2) only to make sure that he got the document.
(3)     Q.   That's April?
(4)     A.   Yeah, so I may have said to him, in
(5) August, I know maybe in December, and October
(6) maybe he took it upon himself to call him up by
(7) himself and whatever and just discussing other
(8) topics that came up into his mind, maybe Bernt
(9) said something, but I don't know, but I wasn't
(10) at that conversation, only to the fact that
(11) Bernt told me, hey, everything is okay, the
(12) contract is okay, it's on somebody's desk, it's
(13) corporate and everything is a go.
(14)     Q.   Let's take a look at Plaintiff's 25
(15) which is in front of you.
(16)     A.   Uh-huh.
(17)     Q.   Have you seen this document before?
(18)     A.   Yes, I have.
(19)     Q.   When did you first see it?
(20)     A.   I probably -- I probably saw it.
(21)     MR. BUSLOFF:  Sorry, are we talking
(22) about the E-mail or the attachment?
(23)     MR. HOFFMAN:  Well, to me, that's all
(24) one document.
(25)     MR. BUSLOFF:  Okay, I just want to

Page 109

(1)   make sure he understands.
(2)
(3)   BY MR. HOFFMAN:
(4)       Q.   Just so this isn't a trick question.
(5)       A.   Are there any trick questions?
(6)       Q.   Sometimes people think there are at
(7)   depositions, but I'm asking when you first saw
(8)   it, and I have -- my next E-mail is Issie
(9)   Wiseman, it looks like Plaintiff's 26,
(10)  forwarding you the document on March 24th.
(11)      So having looked at that, do you know
(12)  whether or not you first saw it on the 24th?
(13)      A.   I could have seen it on the 20th, I
(14)  could have seen it on the 21st, I could have
(15)  taken it on a hard copy that I have seen of and
(16)  then he sent me or would have sent you, better
(17)  send it over to me, so I did see it obviously
(18)  between the 20th and the 24th.  Whether it was
(19)  the 20th is the first time I saw it and maybe I
(20)  went around his computer to take a look at it,
(21)  but no later than the 24th, that's for sure.
(22)      Q.   Whose responsibility was it at
(23)  Tyfoon, if anyone's, to review a document such
(24)  as this, an Amendment No. 1 to trademark
(25)  license agreement and to make sure that it was

Page 110

(1)
(2)   acceptable?
(3)       A.   It would be myself.
(4)       Q.   Did you -- you're not an attorney,
(5)   right?
(6)       A.   No, I'm not.
(7)       Q.   But did you kind of act like the
(8)   in-house counsel?
(9)       A.   In some cases, yes.  In some cases, I
(10)  sent things to my lawyers.  In some cases, I
(11)  take care of it myself.
(12)      Q.   But this was one that -- this being
(13)  Amendment No. 1, that you didn't send to
(14)  lawyers; is that correct?
(15)      A.   I don't believe I sent that.  I
(16)  believe we did this ourselves because it was --
(17)  everything was okay, everything was agreed to,
(18)  it was nothing really with anything, and we had
(19)  already had an agreement in place.  I didn't
(20)  feel it was necessary to go any further than
(21)  this.
(22)      Q.   When you received this E-mail with
(23)  its attachment, did you understand that what
(24)  was being transmitted was a draft amendment?
(25)      A.   I don't know if I understood it to

Page 111

(1)
(2)   mean a draft, that it was going to change if
(3)   there was changes made or this was their final,
(4)   but to me, if there was no changes, it was the
(5)   final -- it was the final agreement, that's the
(6)   way in actuality that I did take it.
(7)       Q.   Well, take a look at the E-mail.
(8)       A.   Uh-huh.
(9)       Q.   Where it says in the first paragraph,
(10)  I'm attaching for your review a draft amendment
(11)  to the license agreement among the above
(12)  referenced parties.
(13)      Did that tell you anything about
(14)  whether or not this was a draft?
(15)      A.   I believe all it does is tell me that
(16)  this is the first time that he is sending out
(17)  the Amendment No. 1 to us, that's what I
(18)  understood.
(19)      Q.   What did you understand the second
(20)  line of this E-mail to mean, the one that says,
(21)  I am simultaneously transmitting the attached
(22)  to our client and must therefore reserve the
(23)  right to modify same as directed?
(24)      A.   Okay.  I'm taking it that here's an
(25)  agreement that I'm doing, I'm sending it to

Page 112

(1)
(2)   you, if there's any problem by you or Ullmann,
(3)   tell me and I'll change it.  That's what I
(4)   meant that to understand.
(5)       Q.   And when you looked at the attachment
(6)   and it said Amendment No. 1, did you understand
(7)   this -- that this document would have been
(8)   Amendment No. 1 to the trademark license
(9)   agreement?
(10)      A.   I don't understand your question.
(11)      Q.   You testified earlier, I believe,
(12)  that it was your understanding that the
(13)  trademark license agreement had been previously
(14)  modified and amended orally, that's correct?
(15)      A.   Uh-huh, correct.
(16)      Q.   So this document that you get that
(17)  has a heading on it Amendment No. 1 to
(18)  Trademark License Agreement, was it your
(19)  position that this really wasn't Amendment
(20)  No. 1 and that there had been previous
(21)  amendments?
(22)      A.   You know what, I didn't, you're
(23)  asking me now what I thought back then and I
(24)  probably would have thought nothing of it.  I
(25)  would not have thought, you know, what about

### Page 113

(1)
(2) all the oral amendments that had taken place.
(3) If you asked that question, it wouldn't even
(4) have dawned on me. To me, it was all part and
(5) parcel.
(6)     Q.  Is it fair to say, looking for your
(7) actual recollection now, that you have no
(8) recollection of noticing or -- that said
(9) Amendment No. 1?
(10)     A.  Yeah, I remember seeing amendment --
(11) reading Amendment No. 1 the Trademark Licensing
(12) Agreement, but to me, this is the first one
(13) that was in a written form in that particular
(14) time, and to me, the other parts were all part
(15) and parcel of this.
(16)     Q.  When you received this amendment, did
(17) it concern you that there was no reference to
(18) Vis-a-Vis in it?
(19)     A.  No, not in the least.
(20)     Q.  How about the fact that there was no
(21) reference to Baby Phat products?
(22)     A.  Not in the least.
(23)     Q.  Were you concerned that there was no
(24) amendment to Schedule C of the trademark
(25) license agreement that had the list of excluded

### Page 114

(1)
(2) products?
(3)     A.  Did not bother me whatsoever as well.
(4)     Q.  Did you see on the last page that
(5) there were two signature lines for Phat
(6) Fashions, LLC?
(7)     A.  Yes.
(8)     Q.  What was your reaction, if any, to
(9) that?
(10)     A.  No reaction whatsoever. Nothing -- I
(11) didn't have any feeling one way or the other
(12) that there were two lines on it, whatsoever.
(13)     Q.  Did you even notice it at the time?
(14)     A.  I may have, I may not have. I don't
(15) recall 100 percent if I said it to myself, oh,
(16) there's two lines over there, but no.
(17)     Q.  Did you have any discussions about
(18) this with anyone at Tyfoon about this amendment
(19) before it was actually signed by Issie Wiseman?
(20)     A.  Aside from Issie Wiseman?
(21)     MR. BUSLOFF:  Are you saying between
(22)     the time that he received it and Issie
(23)     signed it?
(24)     Q.  Right.
(25)     A.  I spoke to Issie Wiseman.

### Page 115

(1)
(2)     Q.  Okay. Anyone else?
(3)     A.  I may have spoken to Josh and said
(4) that I got the amendment for Baby Phat and Phat
(5) Farm and said everything was okay. I may have
(6) said that and I probably would have said that.
(7)     Q.  What do you recall about the
(8) conversation you had with Issie Wiseman?
(9)     A.  The same thing, I got the amendment,
(10) from my side, everything is exactly as it
(11) should be.
(12)     Q.  Did -- were any of the provisions of
(13) this document, the amendment, Plaintiff's 25,
(14) discussed between yourself and Issie Wiseman?
(15)     A.  The only provision that may have been
(16) discussed, something to do with share sales or
(17) something, yeah, 6D, okay, that's the only
(18) thing I said, I said, there's one little thing
(19) in here about -- that I had no recollection
(20) about discussing, but I said, hey, it's
(21) nothing, it's not a problem, it doesn't impact
(22) on anything. Everything else is the way it
(23) should be.
(24)     There's no change to the royalty
(25) rate, there's no anything add on about

### Page 116

(1)
(2) advertising, everything is exactly as you told
(3) me when you came back and when you discussed on
(4) the phone with me at -- subsequent to MAGIC.
(5)     Q.  Would you agree that there was
(6) nothing being changed by this amendment with
(7) respect to the requirement that signatures of
(8) both sides were necessary to amend or extend
(9) the agreement as provided originally in
(10) Paragraph 17?
(11)     A.  You know what, that, to me, was
(12) neither here nor there because there were so
(13) many things that we had been doing on an oral
(14) basis between Phat Fashions and ourselves,
(15) don't forget, this was an ongoing relationship
(16) that was going on between, basically it's Issie
(17) Wiseman's relationship and the people of Baby
(18) Phat and Phat Farm and people at Phat Fashions
(19) and, you know, you get an agreement, you take
(20) it and you put it away and you never take it
(21) out again.
(22)     And as far as we were concerning and
(23) as far as how we were working, we were always
(24) working under the auspices that we had an
(25) agreement -- an ongoing agreement, end of

Page 117

(1)
(2) story.
(3)     Q.   Is it fair to say that with respect
(4) to this amendment, you were aware that this was
(5) a document that Phat Fashions wanted Tyfoon or
(6) Tornado to sign?
(7)     A.   That is correct, that's correct.
(8)     Q.   That was why you signed it?
(9)     A.   That's why we signed it, because you
(10) guys sent it to -- Phat Fashions sent the
(11) document to us.
(12)     Q.   What, if anything, do you recall
(13) about Issie Wiseman actually signing the
(14) document, do you recall where it happened,
(15) where you were, were you together in the room?
(16)     A.   I would think I would probably
(17) brought the --
(18)     MR. BUSLOFF:  No probably, whatever
(19)     specific recollection you have.
(20)     A.   I would have -- the only thing I
(21) remember is bringing the document in to see
(22) Issie Wiseman with the document, you know, did
(23) he sign it when I was in the room or when I
(24) went to the bathroom, I don't know, but I
(25) believe he signed it in my presence.

Page 118

(1)
(2)     Q.   So he signs it, you believe, in your
(3) presence, what is the next thing that happens
(4) with that physical document?
(5)     A.   The next physical thing with the
(6) document is I speak to Mr. Nathanson.
(7)     Q.   When is that?
(8)     A.   I believe on the latter part of
(9) March, when he gave it to me on the 24th, we
(10) discussed it, I gave it back -- I gave it back
(11) to him, sorry, I gave it back to him, I would
(12) have called him around the 29th, I believe.
(13)     Q.   Let me show you 27.
(14)     A.   27?
(15)     Q.   Plaintiff's Exhibit 27.
(16)     A.   Okay.
(17)     Q.   Which is a letter from you to
(18) Mr. Nathanson, this appears to be a draft,
(19) there are these couple of signed copies of the
(20) attachments later, but looking at that, does
(21) that help refresh your recollection as to when
(22) you spoke?
(23)     A.   Yeah, March the 29th, because this is
(24) dated March -- speaking with you, yes.
(25)     Q.   Tell me everything you recall about

Page 119

(1)
(2) the conversation with Eli Nathanson.
(3)     A.   Okay.  I called up Mr. Nathanson, I
(4) introduced myself, I advised him of that --
(5) that the agreement had -- the agreement that
(6) you had sent had been agreed between the
(7) parties and what would you like me to do.
(8)     He said to me, he says, make another
(9) copy and sign two originals and send it back to
(10) my office.  That's the extent basically of the
(11) conversation.
(12)     Q.   Is there anything else you recall
(13) about the conversation?
(14)     A.   No, basically that was the
(15) conversation.
(16)     Q.   About how long did the conversation
(17) take?
(18)     A.   A minute, two minutes, it wasn't a
(19) long conversation.
(20)     Q.   If I told you the phone records that
(21) have been produced to us show a conversation
(22) that took place on March 9 at 3:57 p.m. from
(23) your office to Eli Nathanson's office and that
(24) the length of time was 1.3 minutes, does that
(25) sound about right to you?

Page 120

(1)
(2)     A.   Yes, it does.
(3)     Q.   The document that I've just given
(4) you, Plaintiff's 27.
(5)     A.   Uh-huh.
(6)     Q.   You'll note there that the draft
(7) amendment is not signed.
(8)     A.   Uh-huh.
(9)     Q.   And Plaintiff's Exhibit 28, which I'm
(10) going to hand to you -- that's a yes when you
(11) said uh-huh?
(12)     A.   Yes.
(13)     Q.   The document is signed, if you take a
(14) look at that.
(15)     A.   Correct.
(16)     Q.   The document being the amendment?
(17)     A.   Correct, this is what was actually
(18) sent.
(19)     Q.   Okay.  Was there any reason why you
(20) never signed the letter that you sent to Eli
(21) Nathanson, because we do not have a copy with
(22) your signature on it?
(23)     A.   You're talking about --
(24)     Q.   Your letter, right.
(25)     A.   She may -- the girl may have -- I

Page 121

(1)
(2) don't know, maybe --
(3)    MR. BUSLOFF: Don't guess.
(4)    A. I don't know. I don't know. I don't
(5) know. I don't know. I don't know. I don't
(6) remember offhand.
(7)    Q. Do you know the date that Issie
(8) Wiseman signed the Amendment No. 1?
(9)    A. The exact date, sometime between the
(10) 24th and the -- between the 24th and the 29th,
(11) that's for sure.
(12)    Q. Do you believe he had signed it prior
(13) to your conversation with Nathanson?
(14)    A. I don't recall 100 percent, but very
(15) possible.
(16)    Q. Was that the first time you had ever
(17) spoken with Eli Nathanson?
(18)    A. Yes, it was. I never spoke before.
(19)    Q. Have you ever spoken to him
(20) afterwards?
(21)    A. I have never spoken to him
(22) afterwards. Maybe I signed it right after
(23) Issie spoke to him. It was just all taking
(24) place at the exact same time because I got the
(25) agreement, I called him, whether he signed it

Page 122

(1)
(2) before or after, we had to make you sign one
(3) copy and I went to make another copy.
(4)    (Discussion held off the record.)
(5)    Q. I show you Plaintiff's Exhibit 81.
(6)    A. Correct.
(7)    Q. And this is lease renewal?
(8)    A. Uh-huh.
(9)    Q. Were you involved at all in the lease
(10) renewal for 484 St. Catherine's Street on -- in
(11) or about November 28, 2006?
(12)    A. Yes, I was.
(13)    Q. Tell me what your involvement was.
(14)    A. My involvement was I had earlier --
(15) we are on -- our store is located on
(16) St. Catherine's Street just east of a street
(17) called Phillips -- just east of Phillips
(18) Square, so the main part of downtown, okay, the
(19) busier part of downtown, not to say the other
(20) part is not busy, is further west of where we
(21) are, okay.
(22)    It came to our knowledge that the
(23) City of Montreal was trying to reinvigorate the
(24) entire area from just west of where we were all
(25) the way going east, okay, and when I say that,

Page 123

(1)
(2) I say that they were going to make it into a
(3) pedestrian mall.
(4)    In Montreal the bulk of our business
(5) is done in the summer and fall when the weather
(6) is nicer, and we -- Montreal is a city of
(7) festivals in the summertime. We had the jazz
(8) festival, we have the comedy festival and
(9) whatever, and that whole area, even though it's
(10) busy, it could be a lot busier because there is
(11) a lot of cars and a lot of noise.
(12)    So what the city was thinking of
(13) doing, and this is what we were told, is they
(14) were going to do that whole area into a
(15) pedestrian mall area, which would increase the
(16) traffic tremendously in the summer months, and
(17) right behind where we are is a large parking
(18) area, so basically they would park and have to
(19) go around, really right by our store. So it
(20) was going to increase the traffic tremendously.
(21)    Anyway, I am hearing this, you know,
(22) I mention to Issie, knowing that we had a deal
(23) going forward, I said, go speak to the
(24) landlord, see what you can do. I mean, that's
(25) when I talked to the landlord and that's where

Page 124

(1)
(2) this November 28th letter came in to being
(3) sent.
(4)    Q. Now, do you recall there came a time
(5) when BP Clothing terminated its relationship
(6)    A. Uh-huh.
(7)    Q. Let me finish the question. With
(8) Vis-a-Vis?
(9)    A. Yes.
(10)    Q. And that happened prior to
(11) November 28th of 2006; is that correct?
(12)    A. That is correct.
(13)    Q. Did that have any impact on the
(14) decision that was made to eventually go forward
(15) with this lease situation?
(16)    A. Absolutely not.
(17)    Q. Why not?
(18)    A. Well, the lines, you know, Baby Phat
(19) and Phat Farm is made up of many different
(20) divisions that you could put together, you
(21) could have three stores worth of merchandise,
(22) you could just do a Baby Phat store if you so
(23) desired of the Baby Phat merchandise with or
(24) without Baby Phat clothing. You could just
(25) have a store with shoes and accessories.

Page 125

(1)
(2)       So the impact of the one -- of the
(3)  one division being Baby Phat clothing would not
(4)  have impacted our decision of not having a
(5)  particular corporate Phat Farm store, and the
(6)  store, you know, was very important, you know,
(7)  it was important to us, but it was also
(8)  important, I know, to Phat Fashions, to
(9)  Russell, you --
(10)      Q.   When you say Russell, you mean
(11)  Russell Simmons?
(12)      A.   You know, you guys always have to
(13)  have that store, you know, it's your street
(14)  corporate, you know, symbol or whatever, and
(15)  knowing that and knowing we can get a good deal
(16)  going forward, it didn't have that part of it,
(17)  the Baby Phat had no impact.
(18)      Q.   This document actually renewing the
(19)  lease, the lease amendment is Plaintiff's
(20)  Exhibit 83, appears to have been signed on or
(21)  after December 11th.  We know that Glen Feldman
(22)  likely signed it December 11th.
(23)      Do you have any idea when Issie
(24)  Wiseman signed it?
(25)      A.   I assume it was probably around the

Page 126

(1)
(2)  same date, probably on the 11th as well.
(3)      Q.   Is it fair to say that you did not
(4)  have a signed copy of Amendment No. 1 to the
(5)  trademark license agreement back from Phat
(6)  Fashions by this time?
(7)      A.   No, we did not.
(8)      Q.   Were you concerned about the fact
(9)  that you didn't have that document back and now
(10)  you were entering into a lease amendment?
(11)      A.   Absolutely not, absolutely not.
(12)      Q.   Did you give any thought to in having
(13)  Issie call Bernt Ullmann or having you,
(14)  yourself, call Eli Nathanson and telling them,
(15)  look, we are about to enter into this lease
(16)  agreement, what is the situation with the
(17)  signed amendment?
(18)      A.   Had I, you know, I didn't really
(19)  think there was any -- at that time I didn't
(20)  think there was any problem whatsoever, and I
(21)  would have broached Issie Wiseman, he would
(22)  have said the exact same thing, listen, we have
(23)  a deal, what am I going to call for, what am I
(24)  bothering anybody for.
(25)      Q.   If this lease amendment, rather than

Page 127

(1)
(2)  coming up in December 11th of 2006, was coming
(3)  up in December 11th of 2007 and circumstances
(4)  were as they are now, so that, you know, at
(5)  least as far as Phat Fashions is concerned, the
(6)  agreement is not going forward, would Tyfoon
(7)  still have entered into this lease?
(8)      A.   It's a hypothetical.  That's a
(9)  hypothetical question.
(10)      MR. BUSLOFF:  Sorry, objection to
(11)  form.  I'm not exactly sure what you're
(12)  asking -- what point in 2007, you're
(13)  talking about the after the preliminary
(14)  injunction hearing or December 1st, are
(15)  you talking about before there is any sort
(16)  of results here?
(17)      Q.   Yes, I am talking about before
(18)  there's any result here.  In fact, what I want
(19)  you to assume is this:  Assume that you knew
(20)  that you were not going to be going forward
(21)  with Phat Fashions and Baby Phat and that this
(22)  opportunity came up to have this store in the
(23)  newly developed St. Catherine's Street.
(24)  Sitting here today, do you know whether or not
(25)  you still would have amended the lease if this

Page 128

(1)
(2)  came up now rather than a year before?
(3)      A.   I'd have to really reflect on that
(4)  because, you know, even as we sit here today, I
(5)  still feel we should we have it, I would really
(6)  have to --
(7)      MR. BUSLOFF:  He's saying assume that
(8)  you don't have those -- you do not have
(9)  them, would you still extend the lease?
(10)      A.   I would probably not have extended
(11)  the lease or else I would have asked for some
(12)  sort of adjournment, probably not at this point
(13)  in time.
(14)      Q.   But you can't say for certain?
(15)      A.   No, but I don't think -- I don't
(16)  think that we would have extended the lease had
(17)  we not had, you know, the Phat Farm and the
(18)  Baby Phat.
(19)      Q.   With respect to the items that were
(20)  being sold in the store in Montreal and that
(21)  are being sold there now --
(22)      A.   Uh-huh.
(23)      Q.   -- is there anything at all that
(24)  prohibits you from buying those items from the
(25)  new Canadian distributor from Phat Farm?

Page 129

(2)  A.  You want us to buy from them?
(3)  Q.  I'm asking if there is anything that
(4)  prohibits that?
(5)  A.  Yeah.
(6)  Q.  Which would be what?
(7)  A.  Probably personal preference at this
(8)  point in time for these particular group of
(9)  people.
(10) Q.  But in terms of the ability to get --
(11) there's nothing stopping you other than
(12) personal preference?
(13) A.  I don't know if they would sell to
(14) us, but on our part, after you try and rape and
(15) pillage us, this new company, trying to take
(16) away all our people, it would be very hard for
(17) us to even contemplate to purchase merchandise
(18) from them. I have to, you know, you're asking
(19) me a question, I don't think it would be
(20) possible for us to purchase merchandise from
(21) them.
(22) Q.  Based on your answer, would it be
(23) fair to say that you haven't asked them --
(24) A.  We have not.
(25) Q.  -- if you can purchase?

Page 130

(2)  A.  We have not asked them, that is
(3)  correct.
(4)  Q.  I'll show you Plaintiff's Exhibit 89.
(5)  This appears to be two copies of the same
(6)  E-mail except one has some handwriting on it.
(7)      Have you seen that document before?
(8)  A.  Yes.
(9)  Q.  What is that?
(10) A.  This is when we were having
(11) difficulties with Baby Phat Clothing.
(12) Q.  BP Clothing?
(13) A.  BP Clothing, and this is what I had
(14) asked them, my controller, to prepare some
(15) numbers for myself and to see what our
(16) sustained losses could be from not having the
(17) Baby Phat Clothing line for the spring season.
(18) Q.  When you say your controller, is that
(19) Pierre Brosseau?
(20) A.  B R O S S E A U. Pierre Brosseau.
(21) Q.  And this is what he gave to you?
(22) A.  That is what he gave to me, yes.
(23) Q.  Was he basically suggesting that you
(24) should try to get between 200,000 to $310,000
(25) from BP Clothing?

Page 131

(2)  A.  I don't believe so. I don't believe
(3)  so. Can I just reread the document?
(4)  Q.  Absolutely.
(5)  A.  Okay. This was only for the period
(6)  from November through April, through April.
(7)  Q.  November 2006 through April 2007?
(8)  A.  That is correct, because our sales
(9)  were going to be limited because they were
(10) starting -- they were already starting to sell
(11) merchandise the day after, they kind of called
(12) us up and told us they were giving a six-month
(13) notice, so we were contemplating giving back a
(14) certain portion because we couldn't sell the
(15) merchandise anymore.
(16)     So we figured on that particular
(17) amount of merchandise that just for that period
(18) of time, we would be out this amount of money
(19) on those particular sales.
(20) Q.  Did there come a time when you
(21) learned that Phat Fashions had made other
(22) arrangements for Canadian distribution for
(23) 2008?
(24) A.  Yes.
(25) Q.  When did you first learn that and

Page 132

(2)  what did you learn?
(3)  A.  The first time I learned about it was
(4)  in February 2007.
(5)  Q.  And what did you learn?
(6)  A.  Issie Wiseman -- I remember, Issie
(7)  Wiseman called me into his office, and he's a
(8)  little bit ashen, a little bit kind of upset
(9)  that he had just spoken to Bernt and Bernt told
(10) him that he was discussing then going with --
(11) taking Baby Phat and Phat Farm to another
(12) possible distributor.
(13) Q.  Did he identify the distributor?
(14) A.  No, I do not believe he mentioned who
(15) the distributor was at that time.
(16) Q.  Did you have any reason to believe
(17) that Issie Wiseman knew who was the
(18) distributor?
(19) A.  I think I asked him to who and he
(20) didn't know.
(21) Q.  What else do you recall about that
(22) conversation?
(23) A.  Well, I remember saying, what do you
(24) mean. I was also getting crazy. He said, what
(25) are you talking about, we have a deal here, you

Page 133

(1)
(2) know, the deal has been consummated, what do
(3) you mean he's going to go with somebody else.
(4) And he said that -- Issie told me, he said,
(5) listen, the deal is not -- the deal hasn't been
(6) signed, he says -- he says he's talking to
(7) somebody about doing the deal, but it's not
(8) signed and, you know, doesn't sound maybe if it
(9) is going to be signed, you know, it was like
(10) evasive, but he did say to me that he was
(11) contemplating going with somebody else.
(12)    Q.  Did he indicate that there was any
(13) discussion about whether or not the draft, the
(14) Amendment No. 1 to the agreement was going to
(15) be signed by Phat Fashions?
(16)    MR. BUSLOFF:  Are you talking about
(17) conversations between Bernt and Issie?
(18)    A.  Can you repeat the question, please?
(19)    Q.  Yes.  When Issie came to you and told
(20) you about his conversation with Bernt --
(21)    A.  Uh-huh.
(22)    Q.  -- in February of 2007 --
(23)    A.  Uh-huh.
(24)    Q.  -- did -- was there any discussion at
(25) that time either between you and Issie -- well,

Page 134

(1)
(2) let's start first, between you and Issie about
(3) Amendment No. 1 to the trademark license
(4) agreement and whether or not that was going to
(5) be signed?
(6)    A.  All I remember saying to him, I said,
(7) what are you talking about, we have a deal.
(8) The deal is done, what's -- what are we talking
(9) about here, that's what I remember saying.  I
(10) don't remember if I remember saying anything
(11) about Amendment No. 1, I don't believe so.  I
(12) said, hey, listen, we are working under the
(13) auspices, we have a deal, the deal was struck.
(14)    Q.  Do you know when, if ever, Tyfoon
(15) learned with finality that Phat Fashions was
(16) not going to sign the amendment?
(17)    A.  Well, there was a letter that was
(18) sent from your office, I believe, saying
(19) that -- in big, black, bold letters, that you
(20) were not -- I believe there -- I believe
(21) sometime in March, the latter part of March,
(22) that Phat Fashions was not going to be going
(23) ahead with us and Baby Phat and Phat Farm.
(24)    Q.  Let me show you a letter that
(25) predates that one which is marked Plaintiff's

Page 135

(1)
(2) Exhibit 36.
(3)    A.  Okay.
(4)    Q.  It is a letter dated March 19th.
(5)    A.  That is correct.
(6)    Q.  Have you ever seen this letter
(7) before?
(8)    A.  Yes, it is.
(9)    Q.  Do you know who drafted this letter?
(10)    A.  My Montreal lawyers helped me draft
(11) this letter.
(12)    Q.  And it was you working with your
(13) Montreal lawyers?
(14)    A.  Yup.
(15)    Q.  And without telling me what you
(16) discussed with your Montreal lawyers, how is it
(17) that this letter came to be drafted?
(18)    A.  Well, as far as we were concerned, we
(19) had a deal.  By terms of our contract, the same
(20) as I had done in previous ones in 2001 and
(21) 2004, I signed therefore this particular paper
(22) that we were still going -- that we were still
(23) going ahead.
(24)    Q.  Is it accurate to state that by
(25) March 19th of 2007, that Bernt Ullmann had

Page 136

(1)
(2) already told Issie Wiseman that Phat had
(3) decided to go in another direction?
(4)    A.  I don't know if he had told him.  I
(5) believe he told me he was way down the road
(6) with them and that it looked very probable that
(7) he was going -- that he was going with them.
(8) He kept on saying that, you know, it was well
(9) down the road and, you know, it's not really
(10) me, it's Mr. Skinner or whatever, but he said
(11) it was well down the road.
(12)    Q.  As far as you were concerned, you had
(13) an extension agreed to?
(14)    A.  Absolutely.
(15)    Q.  Was there any reason why you didn't
(16) exercise that option to formally extend the
(17) agreement into 2010 orally?
(18)    A.  Well, this one -- this is the way it
(19) was always done in previous -- in previous
(20) times when it came for this particular
(21) scenario, but in all other scenarios, it could
(22) well have just been done orally as well.
(23)    Q.  Would it be accurate to state that as
(24) of March 19, 2007 when this document was sent,
(25) that Tyfoon was aware that they were not going

PHAT FASHIONS

BSA XMAX(35/35)
BARRY SEGAL - 11/20/07

VS. TORNADO IMPORTS

Page 137

(1)
(2) to be extended by Phat Fashions beyond the end
(3) of 2007?
(4)    A.  When I sent this document?
(5)    Q.  Yes.
(6)    A.  No.
(7)    Q.  This document is 36?
(8)    A.  No, I did not know at that time.
(9)    Q.  Why was it that you had your lawyers
(10) involved in sending this document?
(11)    A.  Well, I felt that there was
(12) definitely some unease at this point in time,
(13) you know, Issie Wiseman had a conversation with
(14) Skinner on -- earlier than this, and he had
(15) said -- and Mr. Bernt had said, you know, it
(16) doesn't look -- it doesn't look favorably, it
(17) looks like we are going to go, even though, you
(18) know, he said we have a deal, whatever.  So at
(19) this point in time we decided to, you know, to
(20) start for this particular paper, get my lawyer
(21) involved to help me word it up.
(22)    Q.  I'll show you Plaintiff's 37.
(23)        Is this a document that you were
(24) referring to before?
(25)    A.  That is correct.

Page 138

(1)
(2)    Q.  The one that came from --
(3)    A.  That is correct.
(4)    Q.  So I'm clear, the one that came from
(5) our firm to you where you now knew with
(6) certainty that Phat Fashions was not going
(7) forward beyond 2007?
(8)    A.  That is correct.
(9)    Q.  What did you do when you first saw a
(10) copy of the letter?
(11)    A.  We were -- again, we were still
(12) dumbfounded over this whole incident.  You
(13) know, we were, I guess, contemplating, you
(14) know, back and forth.  I think maybe Issie
(15) Wiseman, I don't even believe was in town when
(16) this letter came in, and I think we were
(17) talking on the telephone.  He may have even
(18) tried to call, maybe he even called Bernt even
(19) after -- even after this one, but then we were
(20) starting to contemplate, you know, we knew
(21) there was definitely a miscarriage going on
(22) here and we were contemplating what our options
(23) or what we could do.
(24)        You know, Issie had been talking to
(25) Bernt, you know, listen, it is an ongoing

Page 139

(1)
(2) relationship, you want to keep the family type
(3) of relationship that we've had all these years
(4) before you go to the next step.
(5)    Q.  Do you have a specific recollection
(6) that Bernt Ullmann actually had a conversation
(7) with Issie Wiseman after this March 21st of
(8) 2007 letter?
(9)    A.  No, because I don't believe Issie was
(10) in town, so if he had spoken to him, I wouldn't
(11) be present in any case.
(12)    Q.  Do you recall when it was that Tyfoon
(13) responded to the March 21, 2007 letter?
(14)    A.  I believe it was sometime in April.
(15)    Q.  I'll show you Plaintiff's Exhibit 39.
(16) It is a letter dated April 18th of 2007.
(17)        Have you seen this document before?
(18)    A.  Yes, I have.
(19)    Q.  Is that the response?
(20)    A.  Uh-huh, yes, this is the response.
(21)    Q.  Do you recall reviewing this letter
(22) before --
(23)    A.  Yes, I agree --
(24)        MR. BUSLOFF:  Let him finish the
(25)    question.

Page 140

(1)
(2)    Q.  Do you recall reviewing this letter
(3) before it went out?
(4)    A.  Yes.
(5)    Q.  To the best of your understanding,
(6) was what was written in the letter accurate?
(7)    A.  Yes.
(8)        MR. BUSLOFF:  I just want to caution
(9)    you here not to reveal in your answer any
(10)    discussions with your attorneys as to
(11)    what -- any edits to make to the letter.
(12)    Q.  Were there edits made to the letter?
(13)    A.  Well, this is the letter, is it not?
(14)    Q.  Right, but were there drafts of this
(15) letter that you saw that were subsequently
(16) changed in the final version that you recall?
(17)    A.  I don't recall.  I don't recall.
(18)    Q.  Do you know why it took until
(19) April 18th to send a response to a March 21st
(20) letter?
(21)    A.  Well, the only -- there's a couple of
(22) reasons.  I guess, A, first of all, it's not
(23) that long.  It's, I guess, three weeks, three
(24) and a half weeks.  I guess we were
(25) contemplating thinking what we could do to go

## Page 141

(2) into some legal letters or whatever is not
(3) always the nicest thing to do as well. Issie
(4) Wiseman was not in town also.
(5)     Q. Do you know where he was?
(6)     A. I don't know, but I know he wasn't --
(7) he could have been in Florida, he could have
(8) been in Europe for a few weeks in between, but
(9) I know he was not in the city of Montreal,
(10) that's for sure. I'd have to find out where he
(11) was in that period because I'm sure.
(12)     Q. Do you have any knowledge as to why,
(13) without telling me what you discussed with your
(14) attorneys, there's no reference in this letter
(15) to Vis-a-Vis, Baby Phat or any prior amendments
(16) or modifications to the agreement?
(17)     A. To me, it's all covered, it was, you
(18) know, I would have stipulated -- I'm sure I
(19) would have told him that, you know, the same
(20) lawyer knows about Vis-a-Vis, knows about Baby
(21) Phat, but even at that time, I told him
(22) everything was covered under -- it was my
(23) representation that everything was covered
(24) under our licensing agreement.
(25)     Q. Was there any reason why your lawyers

## Page 142

(2) didn't include that in the letter that they
(3) sent?
(4)     MR. BUSLOFF: You're asking him why
(5)     somebody who drafted the letter didn't
(6)     include something?
(7)     MR. HOFFMAN: If he knows.
(8)     MR. BUSLOFF: If you know.
(9)     A. I don't know. It's all
(10) representative under the one licensing
(11) agreement.
(12)     Q. To the best of your knowledge, what
(13) actions, if any, did Tyfoon or Tornado take in
(14) reliance upon these oral assurances that you
(15) testified about that you say that Bernt Ullmann
(16) gave to Issie Wiseman that the agreement would
(17) eventually be signed?
(18)     A. Well, everything was going on
(19) basically to the status quo. We had
(20) extended -- we extended our lease agreement,
(21) our people -- you see, Baby Phat and Phat Farm
(22) was a very important asset to our group of
(23) companies, represented a large percentage of
(24) our sales, a large percentage of our profits.
(25) We forewent opportunities, we didn't go looking

## Page 143

(2) out for -- if something came to us, I know
(3) there were times that we said, listen, we
(4) didn't want to be bothered with it because we
(5) were too busy with these lines, Baby Phat and
(6) Phat Farm.
(7)     There were times when the people were
(8) too busy, even if we brought on more product or
(9) whatever, that the people who were handling
(10) this particular product were too busy in their
(11) workload with this particular product lines to
(12) be busy with other product lines, so all that
(13) was -- all that went by the wayside.
(14)     Q. Was there a limit to the amount of
(15) products that Tyfoon could distribute or sell?
(16)     A. By license, there were stipulations
(17) in the contract as to -- not to what line, as
(18) to how other lines, I believe, had to be sold.
(19)     Q. So with respect to -- you're talking
(20) about the trademark license agreement at issue
(21) here?
(22)     A. Yeah, yeah, there was a lot of times
(23) that Issie would call up and say, listen, I
(24) want to, you know, there's this line that we
(25) are planning on doing, such as the Coogi line,

## Page 144

(2) and he wanted to make sure that everything was
(3) okay, they didn't want to cause any problems
(4) with Phat Fashions that we were doing another
(5) line.
(6)     He would ask to make sure about that,
(7) but we could do lines as long as we had the
(8) proper, you know, you have to find proper
(9) personnel and cultivate personnel. The people
(10) who were in charge of the Baby Phat and the
(11) Phat Farm product were making their living
(12) from -- basically from those product and were
(13) indoctrinated into those particular products
(14) and making sure that the sales and the profits
(15) were there, and we were always on top, saying,
(16) listen, this is our importance is that Baby
(17) Phat and Phat Farm, that's what drives this
(18) place.
(19)     Q. Do you have a recollection of Bernt
(20) Ullmann assisting Issie Wiseman in getting the
(21) Coogi license?
(22)     A. In assisting, I know there was a
(23) conversation between Issie and Bernt where the
(24) Coogi license came up, and I remember Issie
(25) telling me that Bernt had previously worked for

Page 145

(1)
(2) **Coogi or part of that family and that he knew**
(3) **the people and, you know, it was a good**
(4) **company, and yeah, he said, you know,**
(5) **absolutely, that's a good line to have.**
(6) Q. What actions has Tyfoon or Tornado
(7) taken in terms of moving forward with finding
(8) new licenses to replace Phat Fashions and Phat
(9) Fashions lines?
(10) A. Well, we're going out -- we are
(11) actively going out to trade shows, you know,
(12) it's a hard nut to crack when you're losing,
(13) you know, when there's 15 or $18 million in
(14) business to cultivate lines, but they're
(15) actively going to Europe, they're actively
(16) going to shows in New York and Los Angeles and
(17) making phone calls to prospective -- to
(18) prospects who they feel, you know, whose line
(19) they feel can generate some revenues and some
(20) profits for the company.
(21) Q. Are you personally involved in that
(22) process?
(23) A. No, no, I am not personally, I do not
(24) go to Europe and search out lines or go to
(25) trade shows, that is not my forte.

Page 146

(1)
(2) Q. That saved you about thirty exhibits.
(3) MR. HOFFMAN: Let's mark as Exhibit,
(4) I believe, 101.
(5) MR. BUSLOFF: I think we have a 101.
(6) MR. HOFFMAN: We do. Let's mark as
(7) Exhibit 102.
(8) (Plaintiff's Exhibit 102, A document,
(9) marked for identification.)
(10) Q. I've handed you Exhibit 102 now, but
(11) before I ask you about this, just a couple of
(12) questions that I want to touch on.
(13) In terms of instructing the people at
(14) Tyfoon as to which accounts they'll be working
(15) on or as to how they should be devoting their
(16) time or selling efforts, are those directions
(17) that come from you at any time or do they come
(18) from other people?
(19) A. Well, normally they would -- the head
(20) person, again, is Issie Wiseman, but as well
(21) from time to time, I would have to say, listen,
(22) this would be an important aspect, make sure
(23) that you're concentrating on that. We would
(24) try to take in a small line here or small line
(25) there, but they didn't usually work because

Page 147

(1)
(2) they were so indoctrinated into the Baby Phat
(3) and Phat Farm areas.
(4) Q. Can you tell me what Exhibit 102 is?
(5) A. Yes, I was asked to prepare documents
(6) of a listing of lines that we had as of January
(7) the 1st, '07 and as of March the 1st, '07, I
(8) believe, and as of the present -- the present
(9) date, I believe, was around November -- yeah.
(10) Q. But they were somewhere around those
(11) dates?
(12) A. Exactly.
(13) Q. And you mentioned, which was going to
(14) be my next question, that you worked from a
(15) document. Where did you go to get this
(16) information?
(17) A. Someone -- I asked one of my office
(18) girls to get me the information as to what she
(19) could see that we had -- that we had bookings
(20) or we had sales or we were contemplating having
(21) bookings and sales for product as of
(22) approximately March the 1st, January the 1st
(23) and the present.
(24) Q. And who was that person?
(25) A. Angie, Angela, I don't know her last

Page 148

(1)
(2) name.
(3) Q. And do you know what documents that
(4) she would have gone to look at?
(5) A. No, I did not ask her.
(6) Q. How long has she been working with
(7) you?
(8) A. Quite a while. More than five years.
(9) Q. And you don't know her last name?
(10) A. Dinti, I think. Angela Dinti, I
(11) think.
(12) Q. We'll seal that part of the record.
(13) So is this an accurate
(14) representation, looking at the first page, of
(15) the different licenses that Tyfoon had as of,
(16) you know, in January of '07?
(17) A. It appears to be.
(18) Q. And as we turn the page, it looks
(19) like some of them -- we are looking at March
(20) '07 now, that some of them have dropped out,
(21) for instance, Tag?
(22) A. Uh-huh.
(23) Q. Do you know what happened with
(24) respect to Tag?
(25) A. Tag was -- is a line, it wasn't

Page 149

(1)
(2) performing, and we had just tried it on the
(3) speculation it wasn't working and we dropped
(4) the line.
(5)     Q.    And Inkslinger products also seems to
(6) be gone?
(7)     A.    I believe in that case they -- it was
(8) on their side, they couldn't produce properly
(9) or they couldn't get their act together to deal
(10) with us as a licensee.
(11)    Q.    And what happened to Soundgirl?
(12)    A.    Soundgirl was a line of clothing that
(13) was being looked after in part by Claudia
(14) Michaels who also heads up a lot of the Baby
(15) Phat area, Baby Phat coats she oversees.
(16)         And basically Soundgirl, they didn't
(17) feel that they were getting the proper, how
(18) should I say it, that she wasn't looking after
(19) it proper, she wasn't devoting enough time to
(20) the Soundgirl product line, too much time was
(21) being spent with the Baby Phat lines.
(22)    Q.    J4 is listed on January 5th, and for
(23) March 2nd it's J41?
(24)    A.    It's J41, it's just a misprint, it
(25) should be J41.

Page 150

(1)
(2)    Q.    And I think -- and I think the rest
(3) are the same and then there are some additional
(4) ones that you have.
(5)         Are these -- are there new licenses
(6) that you were able to obtain between January
(7) and March of '07?  For instance, I look at
(8) Marissa Christina.
(9)    A.    No, I believe these came in
(10) subsequent to that because these are ones that
(11) she's looking at in November the 16th --
(12)    Q.    No, go to March.
(13)    A.    Sorry.
(14)    Q.    We are looking at the difference
(15) between January and March.
(16)    A.    Yes.  Marissa Christina was for a day
(17) and a half, nothing came of it really.
(18)    Q.    Why not?
(19)    A.    It just didn't perform.  That one
(20) didn't perform, we weren't performing with it,
(21) but I don't believe -- I believe it didn't
(22) perform or I think it was owned by Lerner who
(23) sold the company to somebody else, but in that
(24) particular case, maybe it was a one-season
(25) thing, small quantity, and that was looked

Page 151

(1)
(2) after by Earl Veinish.
(3)    Q.    What about Al a carte?
(4)    A.    Al a cart.
(5)    Q.    Sorry, that seems to be there
(6) already, just combined.
(7)    A.    Yeah.
(8)    Q.    So then we move to November.
(9)    A.    That's correct.
(10)    Q.    And the licensee list, you would
(11) agree, now goes to two pages?
(12)    A.    That is correct.
(13)    Q.    And there's one that's handwritten in
(14) at the bottom, which is Parrish?
(15)    A.    Correct.
(16)    Q.    And which ones -- I mean there appear
(17) to be several new licensees here, is that the
(18) case?
(19)    A.    Yes, it is the case, there are new
(20) licensees.
(21)    Q.    Do you know how many new licensees
(22) that you've been able to obtain between
(23) March 2, 2007 and November 16th of 2007?
(24)    A.    I'd have to add them up and subtract,
(25) you know, I don't know, could be seven, eight.

Page 152

(1)
(2)    Q.    Are these licensees, do they have
(3) contractual relationships, whether oral or in
(4) writing, with the different companies that we
(5) discussed at the very beginning of the
(6) deposition today?
(7)    A.    That is correct.
(8)    Q.    Would you agree that there's a
(9) written trademark license agreement with Coogi
(10) products?
(11)    A.    Yes, I will say that, yes.
(12)    Q.    Are there written agreements with any
(13) of the other licensees that are listed for
(14) November 16th here?
(15)    A.    J41, no -- Allen Schwartz, you're
(16) talking about the new product lines?
(17)    Q.    Actually any of these.
(18)    A.    Okay.  South Pole, no, there may be a
(19) couple, Heatherrip (phonetic) there was
(20) nothing, Coogi there is nothing, Academics
(21) there's nothing, Inkslingers there's nothing,
(22) Parrish there's nothing, Stash House there's
(23) nothing.  It's all oral.
(24)         David Brooks there's a contract from
(25) way back, U B U I don't believe is anything,

PHAT FASHIONS                          BSA XMAX(39/39)                          VS. TORNADO IMPORTS
                                    BARRY SEGAL - 11/20/07

Page 153

(1)
(2)    J1, no, Paperboy Paper, no, Pelle Pelle, I
(3)    don't believe at the present time there is an
(4)    agreement in force.  King Ross I'm not sure,
(5)    Design Option, no.  South Pole bags and shoes,
(6)    I do not believe there's a written contract.
(7)    For Frank Walder, I believe there is one.  For
(8)    Allen Schwartz, I believe there is one.  I'd
(9)    have to go through my files.
(10)       Q.   Are any of these licensees licensees
(11)   that sell the same products as Baby Phat or
(12)   Phat Farm?
(13)       A.   What do you mean the same products?
(14)       Q.   The same type products, that they
(15)   would be in the same market, let's say?
(16)       A.   Uh-huh.
(17)       Q.   Competitors may be a better word.
(18)       A.   Coogi, I don't know if it's a
(19)   competitor, it's a higher-end classification of
(20)   product.  Pelle Pelle, I guess that would be
(21)   one that would be like Baby Phat, Phat Farm.
(22)       Q.   Are there any licensees listed here
(23)   that you would not have been able to enter into
(24)   agreements with if you were going to be selling
(25)   Phat Farm and Baby Phat products in 2008?

Page 154

(1)
(2)        A.   I don't believe so.
(3)        Q.   Did you ever have any discussions
(4)    with Issie Wiseman about suing the European
(5)    licensee Unioncon that we talked about earlier?
(6)        A.   Yes.
(7)        Q.   What do you recall about those
(8)    discussions?
(9)        A.   Well, we were discussing what --
(10)   should we be suing the European if it doesn't
(11)   get worked out, that's basically all there was.
(12)   There wasn't anything that really went very
(13)   much further than that.
(14)            It was just maybe a fast
(15)   conversation, but it -- we did it -- we did not
(16)   sue them or we did not go forward with suing
(17)   them because we -- who needed the aggravation
(18)   with dealing with another, you know, licensee
(19)   of Phat Farm and Baby Phat, and the fact that
(20)   basically, you know, they were offering $25,000
(21)   and we said, no, we said, listen, give us, you
(22)   know, talk about the extension, as soon as the
(23)   extension was in place, figured I'm not going
(24)   to be bothered about suing them at this point,
(25)   whatever there's going to be in loss --

Page 155

(1)
(2)    whatever we lost in lost profit and market
(3)    share, whatever, we'll make up down the road
(4)    with this extension.
(5)        Q.   Now that you know that at least Phat
(6)    Fashions is taking the position that the
(7)    extension is not going forward, have you had
(8)    any discussions with anybody now about suing
(9)    Unioncon for the events that occurred in 2005?
(10)       A.   Well, we -- I think the answer to
(11)   that question is we already forewent that
(12)   particular item because we felt that we were
(13)   going ahead together with Phat Farm and Baby
(14)   Phat.  At this juncture in time now -- to go
(15)   back at the time had we not known, maybe we
(16)   would have gone after -- gone after that, but
(17)   at this point in time to go start suing them
(18)   now, I don't think that's what we want to do at
(19)   this point in time.
(20)       Q.   But why not?
(21)       A.   We already -- well, we really -- we
(22)   gave that kind of an option, we were going to
(23)   sue them, I don't know if you're talking about
(24)   seven months ago or eight months ago.  I feel
(25)   that there's just not a necessity.  We are

Page 156

(1)
(2)    going along with -- we are trying to get along
(3)    with Baby Phat and Phat Farm at the time.  From
(4)    this point in time, I really haven't had any
(5)    discussions with Issie Wiseman as to if he has
(6)    a feeling to go and sue them.
(7)        Q.   Was there any reason why Phat
(8)    Fashions wasn't sued as a result of the
(9)    situation with Unioncon by Tornado?
(10)       A.   I don't think we ever -- I don't know
(11)   if we have had a conversation with him
(12)   concerning that.
(13)       Q.   When you say with him?
(14)       A.   With Issie.
(15)            (Luncheon recess taken at 12:55 p.m.)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 157

(1)
(2) A F T E R N O O N   S E S S I O N
(3)    (Time noted: 1:25 p.m.)
(4)    B A R R Y   S E G A L,  resumed and
(5) testified as follows:
(6) CONTINUED EXAMINATION
(7) BY MR. HOFFMAN:
(8)    Q.  You mentioned earlier this morning, I
(9) believe, something about a raping and pillaging
(10) taking place by the new Canada licensee of
(11) Tyfoon.
(12)    Do you recall that?
(13)    A.  Yes, I do.
(14)    Q.  What did you mean by that?
(15)    A.  Well, they've taken -- they've taken
(16) three employees from our group.
(17)    Q.  Who are the three?
(18)    A.  The three were Sal Cattrone, Nancy, I
(19) don't remember her last name, and Vanessa, I
(20) don't remember their last names, those three.
(21)    Q.  Vanessa Ferrara?
(22)    A.  Vanessa Ferrara.
(23)    Q.  Who actually has taken them?
(24)    A.  The company that is presently, for
(25) spring, doing -- selling Phat Fashions.  They

Page 158

(1)
(2) also tried to take away from us two of our head
(3) people, Mitchell Mason who heads up our
(4) footwear division, basically our Baby Phat and
(5) Phat Farm foot division, and Claudia Michaels
(6) who basically heads up our Baby Phat area in
(7) ladies.  Those two attempts were not
(8) successful, but they did take three employees
(9) from us.
(10)    Q.  Were any objections made to that
(11) company in writing?
(12)    A.  In writing?
(13)    Q.  In writing.
(14)    A.  No.  No, there was a phone call, but
(15) there was no follow-up in writing.
(16)    Q.  Tell me what you remember about the
(17) phone call.
(18)    A.  The phone call I know was at lunch
(19) hour because we happened to be in the kitchen
(20) and there was a phone call made -- there was a
(21) phone call received by Issie Wiseman.  I had
(22) two representatives of the other firm, I
(23) believe it was Mark Caccone (phonetic) and Dan
(24) Elitov (phonetic), you know, they said, yeah,
(25) they didn't know, they're not going to take,

Page 159

(1)
(2) they're not going to do, yeah, we shouldn't
(3) have, whatever, and they continued to take
(4) people anyways.
(5)    Subsequent to that phone call, other
(6) people also as well left, that was some time, I
(7) believe, in June.
(8)    Q.  When you say other people, do you
(9) know what prompted the phone call, was anybody
(10) in particular -- had anyone in particular left
(11) or did you find --
(12)    A.  I believe, yeah, it was because one
(13) of the people had left and then I believe we
(14) heard that there was a second one.  You know,
(15) the first one, okay, listen, I guess it
(16) happens, but then we heard that our head of
(17) shoes, we heard they were trying to take him, I
(18) guess that is what actually really prompted the
(19) phone call because they were taking away our
(20) key people, so even to go out and get new
(21) lines, what are you going to do?  Now you have
(22) new lines, now you need your key people, now
(23) you don't even have your key people or your
(24) second tier, so that's why the phone call.
(25)    Q.  Has litigation been contemplated

Page 160

(1)
(2) against the new licensee?
(3)    A.  We called our attorneys on this
(4) particular --
(5)    Q.  Don't say anything further about that
(6) discussion.
(7)    Do you know if legal action is going
(8) to be brought?
(9)    A.  I don't know at this present time.  I
(10) don't know if it's available in Quebec under
(11) Quebec laws, I don't know that, we'll wait for
(12) the lawyers.
(13)    Q.  You mentioned that this new licensee
(14) has been out selling the spring line for 2008?
(15)    A.  Correct.
(16)    Q.  And when would -- in the business as
(17) you know it, when would deliveries for 2008
(18) normally be made?
(19)    A.  Deliveries?
(20)    Q.  Deliveries.
(21)    A.  For the period probably January
(22) through March or January through April, not
(23) even January.  Today probably February through
(24) April, February, March is the big months.
(25)    Q.  And when are those orders generally

### Page 161

(1)
(2)  taken?
(3)     A.  Oh, they're probably taken --
(4)  probably started taking in September, October.
(5)     Q.  When do they end?
(6)     A.  It's still going on probably up until
(7)  Christmas sometime.  In this type of market,
(8)  you can even get some orders in January as
(9)  well, January, February, off-the-floor sales,
(10)  but the bulk of the business is obviously done
(11)  with your main people, it's normally done at
(12)  the beginning rather than the end, but there's
(13)  still sales going on, there's October,
(14)  November, December, January, you can still get
(15)  sales.
(16)     Q.  Has --
(17)     A.  If you know what to do, you can still
(18)  get sales.
(19)     Q.  Has Tyfoon taken any orders for
(20)  spring 2008 for Phat Farm or Baby Phat?
(21)     A.  No, for 2008.
(22)     Q.  For spring 2008?
(23)     A.  For spring, no.
(24)     Q.  Why not?
(25)     A.  We are not -- right now we were not

### Page 162

(1)
(2)  given the tools of Baby Phat and Phat Farm to
(3)  sell spring 2008, no samples were sent to us we
(4)  tried to get, we don't have any samples, they
(5)  were all sent to the other people.
(6)     Q.  Would you say that at this point in
(7)  time, being November 20th of 2007, that it's
(8)  pretty much too late for Tyfoon to make sales
(9)  for spring 2008?
(10)     A.  Absolutely not for us, absolutely
(11)  not.
(12)     Q.  What's the latest you could go when
(13)  you could make sales?
(14)     A.  You could make sales in January.  I
(15)  said before you can still make sales in
(16)  January, we make sales in February for spring
(17)  merchandise, don't forget we are also in the
(18)  speculation business, we are in the importation
(19)  business, you look way up in advance and you
(20)  buy goods, you sell throughout the season as
(21)  well, that's what we do, that's our know-how.
(22)     Q.  Do you have an inventory of goods?
(23)     A.  Do we have an inventory of goods of
(24)  what?
(25)     Q.  Phat Farm and Baby Phat.

### Page 163

(1)
(2)     A.  We have some merchandise left of Phat
(3)  Farm and Baby Phat, yes.
(4)     Q.  How much would you say?
(5)     A.  I'd have to check my records to see
(6)  what we actually have left in Baby Phat.
(7)     Q.  And you're aware that you can still
(8)  sell those goods?
(9)     A.  Yes.
(10)     Q.  When would you start selling --
(11)  taking orders for fall 2008?
(12)     A.  For which?
(13)        MR. BUSLOFF:  For which line, any
(14)     line?
(15)     A.  Any line.
(16)     A.  It depends on the lines, but normally
(17)  for a lot of these urban brands, probably
(18)  breaks the time of MAGIC that samples are given
(19)  or CADS were given to start selling February,
(20)  March for delivery, you know, in July, August,
(21)  September.
(22)     Q.  And in the event that Phat Fashions
(23)  or -- withdrawn.
(24)        In the event that Tyfoon was to
(25)  recapture the Phat Fashions license for 2008,

### Page 164

(1)
(2)  what is your expectation that would happen in
(3)  the marketplace with respect to the sales that
(4)  have been made by the new licensee?
(5)     A.  Can you explain your question again?
(6)     Q.  Sure, let me rephrase it.
(7)     A.  Yeah.
(8)     Q.  At the moment, there's been another
(9)  licensee out there selling Phat Fashion and
(10)  Baby Phat products for the spring 2008; is that
(11)  accurate?
(12)     A.  Uh-huh, yes, it is.
(13)     Q.  If now Tyfoon were to go into the
(14)  marketplace after the preliminary injunction
(15)  hearing and to start selling, what would you
(16)  start to sell if you were successful in the
(17)  preliminary injunction hearing?
(18)     A.  If we were successful?
(19)     Q.  Right.
(20)     A.  We would start selling -- if we had
(21)  the availability to start selling it for
(22)  spring, we would start selling in the spring.
(23)  If we were given, you know, I don't know what
(24)  they've sold or not sold, if we were given the
(25)  orders or whatever, but we would go into the

Page 165

(1)
(2) marketplace and we were able to get good
(3) merchandise, we would start selling again.
(4)    Q.  What do you expect to happen to the
(5) orders that had already been taken?
(6)    A.  To the orders that were already
(7) taken?
(8)    Q.  Right, by the new licensee.
(9)    A.  I would hope that we would be able to
(10) take those orders, to get those orders and we
(11) would pay the salesman and we would take over
(12) and we would ship merchandise against it, plus
(13) we'd go along and sell more goods.  People have
(14) an expectation to get merchandise and, you
(15) know, our shipping facilities are more than
(16) adequate to handle.
(17)    Q.  Do you believe that there's been any
(18) confusion caused in the marketplace now by the
(19) fact that there's a new Canadian licensee out
(20) there who has been taking orders?
(21)    A.  Confusion?  I don't know about
(22) confusion, maybe there is confusion.  I don't
(23) know.  I know that it's become -- I've heard
(24) rumors about us, you know, that we don't have
(25) it and why we don't have it and all that kind

Page 166

(1)
(2) of stuff, but I would think that there's some
(3) confusion that people know that -- people who
(4) were in the city of Montreal or Toronto come to
(5) our facilities, yeah, they know there's another
(6) entity selling merchandise.
(7)    I'm sure there's some confusion as
(8) to, hey, why are those guys selling Baby Phat
(9) and Phat Farm, are those guys Wiseman's, you
(10) know, who are these guys.
(11)    Q.  Have you had any customers of Tyfoon
(12) actually make statements to you about the new
(13) licensee?
(14)    A.  I've heard -- I may have heard --
(15) I've heard rumors, you know, of people talking
(16) or whatever, but I have heard rumors.
(17)    Q.  What have you heard?
(18)    A.  I've heard that if they're doing well
(19) or not doing well, you know, things of that
(20) nature, more than -- more rumors are, you know,
(21) against -- it hurt our reputation kind of when
(22) this happened that somebody else took the line,
(23) you know, you guys are, you know, how come you
(24) guys don't have the line anymore?  You know,
(25) what did you do wrong that you don't after ten

Page 167

(1)
(2) years, you know, because it's synonymous, Baby
(3) Phat, Phat Farm is synonymous with us, with the
(4) Wiseman group of companies.
(5)    Q.  Has there been any reaction to the
(6) change in the name of the store from Phat Farm
(7) to Illicit?
(8)    A.  Yes.
(9)    Q.  What has that been?
(10)    A.  I know I've had my managers told me
(11) that customers say, hey, what's going on, why
(12) are you now Illicit and why did you change from
(13) Phat Farm to Illicit.
(14)    Q.  What have they told those customers?
(15)    A.  I don't know.
(16)    Q.  Is that store still selling Phat Farm
(17) and Baby Phat products?
(18)    A.  Yes, it is.
(19)    Q.  Is there an expectation that it will
(20) continue selling such products after 2008?
(21)    MR. BUSLOFF:  Are we still talking
(22) about --
(23)    A.  With them doing the --
(24)    Q.  No, I'm talking about the store as a
(25) separate entity, a separate corporate entity,

Page 168

(1)
(2) correct?
(3)    A.  That is correct.
(4)    Q.  And the store has items that it sells
(5) that are at the moment, among other things,
(6) Phat Farm and Baby Phat items, correct?
(7)    A.  Correct.
(8)    Q.  Is it your anticipation that the
(9) store will continue to sell Phat Farm and Baby
(10) Phat items after December 31st of 2007?
(11)    MR. BUSLOFF:  I just want to stop for
(12) one second.  You've been going back and
(13) forth to a scenario where we are -- we,
(14) Tyfoon Group, gets everything back so --
(15)    MR. HOFFMAN:  That's a good point.
(16)    A.  If we get the license, if we get the
(17) opportunity to sell goods again for spring
(18) 2008?
(19)    Q.  My question is, if things remain as
(20) they are now and that the license ends on
(21) December 31st of 2007 and is not renewed, what
(22) is your expectation as to whether the store --
(23) the Montreal store will continue to sell Phat
(24) Farm and Baby Phat product?
(25)    A.  First of all, I have to see what is

## Page 169

(1)
(2) left in the store as of December 31, 2007. I
(3) don't know exactly how much inventory is left,
(4) you know, in the store of that particular
(5) commodity. As you know, we've changed -- we've
(6) had to change the store -- the store name in
(7) the last few weeks, and we've put in other
(8) product -- other products at this time. We may
(9) take the merchandise back, we do have until, I
(10) believe, four months we have the availability
(11) to sell.
(12)    Q.  I think it's at least that.
(13)    A.  I don't think -- I think it's -- the
(14) max I believe is 120 days or whatever. At that
(15) time, we'll see what's left in the store,
(16) Christmas is coming up, Boxing Day sales, I'm
(17) sure there will be some product left. I can't
(18) think of every single piece, but there may be a
(19) few single pieces left.
(20)    Q.  I'm going to show you some exhibits
(21) now.
(22)        Plaintiff's 59 is Vis-a-Vis balance
(23) sheet; would you agree with that?
(24)    A.  Yes.
(25)    Q.  We received in the production a

## Page 170

(1)
(2) couple of Vis-a-Vis Fashions balance sheets but
(3) we did not receive any balance sheets, as far
(4) as I know, from Tornado.
(5)        Do you know why that would be?
(6)    A.  It depends on what happened to what
(7) was in my files, this happened to be in my
(8) file, that's what I guess they produced.
(9)    Q.  What was your role in the document
(10) production?
(11)    A.  Somebody from their office came out,
(12) they wanted to see my files, whatever files I
(13) had I gave over.
(14)    Q.  Handing you Plaintiff's Exhibit 60,
(15) it says up at the top, Phat Farm commissions,
(16) then underneath that, sales.
(17)    A.  Uh-huh.
(18)    Q.  Can you tell me what this document
(19) is?
(20)    A.  This is just a summary document done
(21) by my office staff which keeps track of
(22) clothing and the shoes and just a summary of
(23) how much we are paying by year and how much
(24) sales by year.
(25)    Q.  If you take a look at the last page,

## Page 171

(1)
(2) you will see there is some handwriting there.
(3)        Do you recognize that handwriting?
(4)    A.  Above the 177,000, the U.S. Tornado?
(5)    Q.  Is that what that is?
(6)    A.  Yes, it says Tornado.
(7)    Q.  Is that yours?
(8)    A.  That could be mine.
(9)    Q.  Is it accurate to say that the sales
(10) that are reflected on this document were sales
(11) of Phat Farm product made by Tornado?
(12)    A.  These are sales for Phat Farm product
(13) for Tornado, yes.
(14)    Q.  What is Plaintiff's Exhibit 61?
(15)    A.  This is strictly a summary of the
(16) salespeople who are commission salespeople for
(17) Baby Phat and sold other particular lines, and
(18) this is what sales they made and commissions
(19) they earned based on their sales.
(20)    Q.  Is this document prepared in the
(21) ordinary course of business?
(22)    A.  Yes, it is, it's prepared monthly.
(23)    Q.  It is prepared monthly?
(24)    A.  Uh-huh.
(25)    Q.  Plaintiff's 62 are some notes?

## Page 172

(1)
(2)    A.  Just the recap of sales for the years
(3) 1998 to 2005, just a summary sheet that I must
(4) have prepared for my own interest.
(5)    Q.  This is prepared by you?
(6)    A.  This is prepared by me.
(7)    Q.  Do you know when it was prepared?
(8)    A.  Well, sometime after 2005.
(9)    Q.  Was it prepared for purposes of this
(10) litigation?
(11)    A.  No, it was not.
(12)    Q.  And can you just read what the
(13) columns, not the numbers, seems to say
(14) Vis-a-Vis --
(15)    A.  Vis-a-Vis Fashions, Baby Phat
(16) product, Phat Farm product.
(17)    Q.  That's the second column?
(18)    A.  Tornado Imports, Phat Farm product,
(19) sales on top.
(20)    Q.  So one column is for Vis-a-Vis, the
(21) other is for Tornado?
(22)    A.  Correct.
(23)    Q.  And that is pretty much the way that
(24) you always kept track of the numbers, one set
(25) for Vis-a-Vis --

Page 173

(1)

(2)    A.  For accounting purposes, yeah, it was

(3)  easy for me to see what was going on by Baby

(4)  Phat and...

(5)    Q.  Plaintiff's Exhibit 63 is a note on

(6)  Issie Wiseman's stationery, but he claims that

(7)  you routinely come into his office and take his

(8)  pad?

(9)    A.  This is correct.  It's probably he

(10)  was -- I think I must have taken his pad

(11)  because he was telling me of some arrangement,

(12)  and this is an oral arrangement that he had

(13)  with Elliot from Mirage Leather that there

(14)  would be a 15 percent commission paid on FOB

(15)  plus we would pay 7 percent on sales to Phat

(16)  Fashions.

(17)    Q.  And that is your handwriting?

(18)    A.  That is my handwriting, all the

(19)  scribble.

(20)    Q.  Plaintiff's Exhibit 64, another set

(21)  of handwritten notes.

(22)    If you can tell me what those are?

(23)    A.  Yeah, this is, again, my handwriting,

(24)  this is a note that I must have made for

(25)  Pierre, the controller, who actually pays the

Page 174

(1)

(2)  bills on an ongoing basis and what the terms of

(3)  a particular oral arrangement that Issie had

(4)  made with Baby Phat, maybe the previous people

(5)  who were doing Baby Phat.

(6)    Q.  Can you explain what is written here

(7)  and what it means?

(8)    A.  It says, for goods made locally by

(9)  Mitchell and sold to accounts, we will pay

(10)  3 percent on wholesale to owner of Baby Phat,

(11)  7 percent on wholesale to Russell Simmons,

(12)  meaning you made a T -- at that time we had

(13)  a little company, one of them that doesn't

(14)  exist anymore, that if we got an okay to

(15)  manufacture a T-shirt, the Baby Phat license,

(16)  we would pay the Baby Phat person in the states

(17)  who had maybe 3 percent and, of course, we

(18)  would pay our 7 percent on wholesale, and it

(19)  says our merchandise from U.S., we pay U.S.

(20)  wholesale less 20 percent and no payment of

(21)  7 percent or 15 percent to anyone else.

(22)    That's basically the same arrangement

(23)  we had as with Baby Phat LLC, that we would

(24)  just get a percentage off of wholesale and we

(25)  don't pay the 7 percent or 15 percent.

Page 175

(1)

(2)    Q.  Can you identify Plaintiff's

(3)  Exhibit 65, which is two pages, for 2006 and

(4)  2007.

(5)    A.  Correct.

(6)    Q.  Did you prepare this document?

(7)    A.  Yes, I did.  Well, my people prepared

(8)  it.

(9)    Q.  And what was it prepared from, where

(10)  did the data come from?

(11)    A.  Data came from our retail sales

(12)  divisions, our computer programming.

(13)    Q.  Is this a document that was prepared

(14)  for purposes of the litigation?

(15)    A.  Yes and no, because at times, I get

(16)  in different format as to what percentage of

(17)  sales that we do in a store for different

(18)  divisions, this was something that was

(19)  requested.

(20)    Q.  Is it accurate to state that each of

(21)  the stores are -- the four stores are

(22)  separately incorporated?

(23)    A.  That is correct.

(24)    Q.  And it's also accurate to state that

(25)  there are no contracts between each of these

Page 176

(1)

(2)  stores and Phat Fashions?

(3)    A.  That is correct.

(4)    Q.  What other products do these stores

(5)  sell other than Phat Fashions or Baby Phat?

(6)    A.  For the most part, the stores sell

(7)  products that --

(8)    MR. BUSLOFF:  I want to know what

(9)  time period are we talking about.

(10)    Q.  The years we are looking at here,

(11)  2006, 2007.  Actually I think really what we

(12)  are looking at as --

(13)    MR. BUSLOFF:  2005 --

(14)    Q.  -- 2005/2006 and the first months of

(15)  2007.

(16)    A.  The products that the store carries,

(17)  aside from the first one being the Phat Farm

(18)  store, is they basically carry Phat Farm, Phat

(19)  Farm fashion product as well as some other

(20)  products, for the most part, other products

(21)  that are sold through our companies.

(22)    Q.  Would you agree that the sales of all

(23)  the stores at least combined substantially

(24)  decreased between 2005 and 2006?

(25)    A.  The store -- the sales have

Page 177

(1)
(2) decreased, correct. I don't know
(3) substantially, Scarborough has gone down
(4) 40,000, you know.
(5)    Q.  I'm looking at total number at the
(6) bottom, it went from 3.28 million to 2.78
(7) million.
(8)    A.  Correct, there was a drop in sales.
(9)    Q.  Is that a substantial drop to you?
(10)    A.  Well, listen, any times we lose
(11) sales, to me, is a substantial drop. I'm only
(12) interested in sales going the other way, you
(13) know. In some of these locales, you know,
(14) Scarborough, they changed their -- you are
(15) going to see also where the sales are dropping.
(16) I know they sold -- I know they dropped, you
(17) know, in many places but, you know, they
(18) dropped almost $200,000 in the Scarborough
(19) Illicit because there was a major renovation
(20) going on in the store, they changed management
(21) companies and that has brought down the sales
(22) for that one.
(23)    Q.  Do you have any explanation as to why
(24) the sales dropped other than the one that you
(25) just told us, for instance, the Phat Farm store

Page 178

(1)
(2) looks like it went from 741,000 to 616,000?
(3)    A.  Yup, sales were off, traffic in that
(4) area was off a little bit this year compared to
(5) the previous years. Listen, some years when
(6) sales go up and some years go down. This year,
(7) you know, we've updated our store a little bit
(8) to make it fresher looking, you know, to bring
(9) the customers back in. That's the only reason
(10) I can say. We thought maybe we have enough
(11) advertising out there, we had kids on the
(12) street, that kind of merchandising, the fliers
(13) at the night clubs, whatever, which we are
(14) doing again.
(15)    Q.  Plaintiff's Exhibit 66, Vis-a-Vis
(16) Fashions commissions on Baby Phat sales?
(17)    A.  Uh-huh.
(18)    Q.  Can you tell me what that document
(19) is?
(20)    A.  This is a document that is
(21) prepared -- this one here is prepared quarterly
(22) for Phat Fashions giving the sales for the
(23) previous quarter, what the exchange rate was to
(24) bring it back into U.S. and the calculation of
(25) the royalty on those sales, and lastly,

Page 179

(1)
(2) withholding tax which corresponds to what we
(3) pay them on a quarterly basis.
(4)    Q.  Is the same true for 67 which refers
(5) to Tornado?
(6)    A.  That is correct.
(7)    Q.  And where this refers to commissions
(8) on Baby Phat sales --
(9)    A.  Commissions?  It's royalties on
(10) sales, yeah. I say a little bit reversed,
(11) royalties are really the 7 percent, the
(12) commissions is what we pay on FOB, but
(13) everybody understands it to be like that.
(14)    Q.  These documents get sent to Phat
(15) Fashions?
(16)    A.  Well, these are sent quarterly, plus
(17) there's reports that are sent on a monthly
(18) basis as well. But these are done every
(19) quarter, by the 15th of the following quarter.
(20)    Q.  Please take a look at Plaintiff's
(21) Exhibit 68 and if you can tell me what that is.
(22)    A.  This is very similar to the previous
(23) document that you showed me.
(24)    Q.  That said Baby Phat commissions on
(25) it?

Page 180

(1)
(2)    A.  No, that you gave it to me on --
(3) about Phat Farm royalties and what they were
(4) year by year.
(5)    Q.  That would have been Plaintiff's
(6) Exhibit 60?
(7)    A.  You'd have to show me to confirm that
(8) number. Yeah, yes.
(9)    Q.  And are these all internal documents,
(10) these being 60 and 68?
(11)    A.  Yes, they are all internal documents.
(12)    Q.  Who is Alicia Salvador?
(13)    A.  This is a piece of paper gone in
(14) there, it's nothing to do -- absolutely nothing
(15) to do, it's just an employee of the place, it
(16) has nothing to do with any of this.
(17)    Q.  So Plaintiff's Exhibit 69 --
(18)       MR. BUSLOFF:  Mistaken production.
(19)    A.  Mistaken production, happened to be
(20) in my file.
(21)    Q.  Plaintiff's Exhibit 70 is a schedule
(22) of net sales?
(23)    A.  Correct.
(24)    Q.  Can you tell me what this document
(25) is?

Page 193

(1)
(2) want to give us supposedly this six-month
(3) business or whatever, but on November the 10th
(4) or November the 3rd, they're going out and
(5) telling all their customers that they are going
(6) to be -- the new people are telling the
(7) customers that are doing the Baby Phat, their
(8) salespeople or whoever they are, the same
(9) customers that we deal with, that we are going
(10) to be 30 percent of what we are selling. So
(11) there's no -- that was obviously hurting us, so
(12) I was just writing up notes for myself for
(13) future, I guess.
(14)     Q.  What is the next page, which is 1612?
(15)     A.  Isn't that a repeat of a previous
(16) one, the one we just saw, 16 --
(17)     Q.  Actually it looks like it could be a
(18) repeat of 1660, the difference though is that I
(19) can tell you, just from my quick skim of it, it
(20) looks like there was one extra handwritten note
(21) on 1560 that was not on this document and that
(22) there's different circling and things like
(23) that, but is your description of the document
(24) as to what it was pretty much the same?
(25)     A.  It's the same, it's the same

Page 194

(1)
(2) document.
(3)     Q.  Take a look at 1613.
(4)     Do you know what that is?
(5)     A.  No, I do not know.  It is my
(6) handwriting, but obviously I must have been
(7) sitting in Issie's office and did some -- ran
(8) some numbers or calculations, I just took his
(9) piece of paper, pad, whatever.
(10)     Q.  Take a look at the last document
(11) that's part of this exhibit, 1619 and 1620,
(12) they both say from the desk of Barry Segal, but
(13) that doesn't necessarily mean that they were
(14) from the same time.
(15)     A.  I do not know if they are from the
(16) same time, they were both my pads and it's all
(17) my handwriting in both instances.
(18)     Q.  And what was it that you were writing
(19) down on 1619?
(20)     A.  1619, I was just listing some of the
(21) product categories that we had of Baby Phat and
(22) what our deals were.
(23)     Q.  All right.  And the second page?
(24)     A.  Trademark -- I'm just reading now --
(25) I don't know what I am -- I was writing.  I can

Page 195

(1)
(2) tell you what it was, but I can't tell you
(3) under what context I was utilizing this.
(4)     MR. BUSLOFF:  Off the record.
(5)     (Short recess taken.)
(6)     Q.  Exhibit 85 is a letter from Richard
(7) Hinse, H I N S E, to Steve Feiner.
(8)     Have you seen that document before?
(9)     A.  Yes, I have.
(10)     Q.  Did you see it before it went out?
(11)     A.  Yes, I did.
(12)     Q.  Did you approve of its content?
(13)     A.  Yes, I did.
(14)     Q.  If you take a look in the second
(15) paragraph, it says, on or about October 26th of
(16) 2006, Baby Phat terminated, without notice, the
(17) long-standing distribution agreement between
(18) the parties.
(19)     Was that an accurate statement, to
(20) the best of your knowledge?
(21)     A.  Well, we had a papered up sort of
(22) agreement where we were the distributor for the
(23) product, and in that sense, you know, yes.
(24)     Q.  And the "we" was Vis-a-Vis?
(25)     A.  The "we" was Vis-a-Vis.

Page 196

(1)
(2)     Q.  And Mr. Hinse, I believe you
(3) mentioned earlier, has done work for Vis-a-Vis
(4) and for Tornado?
(5)     A.  A little bit, yes, not really for --
(6) very small for Tornado, just a little bit.
(7)     Q.  In that same paragraph it says, the
(8) termination comes as a serious financial blow
(9) and disrupts the good will relationship
(10) Vis-a-Vis has created in the industry and
(11) Canada over the years for the Baby Phat apparel
(12) line.
(13)     Was that an accurate statement, to
(14) the best of your knowledge?
(15)     A.  Uh-huh, yes.
(16)     Q.  And in terms of a serious financial
(17) blow, can you give me a dollar figure for that?
(18)     A.  I'd have to go back and check my
(19) records, you know, it represents X percent of
(20) our business, we were making obviously income
(21) from it, so to -- again, as I reiterated
(22) before, I only like sales to go one way, and I
(23) only like profits to go one way.  I don't like
(24) to lose anything, so any amount of money that
(25) we lose, to me, is meaningful to me.

## Page 201

(1)
(2) here's a copy of the letter that is in the
(3) front, except this one has some handwritten
(4) notes on it.
(5)    A. Uh-huh.
(6)    Q. Do you recognize any of those notes?
(7)    A. That's my handwriting, that's my
(8) handwriting.
(9)    Q. Do you recall making these notes?
(10)    A. I remember writing them, I don't
(11) remember -- I don't remember writing them, but
(12) it's my handwriting, I have to see what we did.
(13)    Q. Go back to the first page of this
(14) exhibit, if you would, 1324.
(15)    A. Yup.
(16)    Q. In the third paragraph -- fourth
(17) paragraph, sorry, it says, it could hardly
(18) thereafter have come as a surprise to your
(19) client when it received the, initial caps,
(20) Termination Notice in October of 2006. This
(21) notice granted your client a six-month period
(22) in which to properly adapt its business and
(23) manage the transition.
(24)      Sitting here today, do you have a
(25) recollection of ever seeing a written

## Page 202

(1)
(2) termination notice from October 2006 with
(3) respect to BP Clothing?
(4)    A. You're asking me if we received a
(5) notice of termination in October 2006?
(6)    Q. Yes.
(7)    A. Absent -- no, we did not receive a
(8) notice of termination in 2006 from Baby Phat
(9) Clothing.
(10)    Q. Do you recall receiving a notice of
(11) termination notice after that?
(12)    A. I believe there was some sort of
(13) documentation subsequent to that, but this was
(14) done when Steve Feiner called, I believe he
(15) called Issie Wiseman by phone, not by -- there
(16) was no letter.
(17)    Q. I show you Exhibit 86, it's a letter
(18) dated December 29, 2006 from U.S. counsel to
(19) Baby -- for Baby Phat to Modes Vis-a-Vis. What
(20) I'm more concerned with is what that second
(21) page is, which appears to be some typed and
(22) potentially handwritten notes.
(23)      Do you recognize that?
(24)    A. Maybe this is from a conversation, I
(25) don't know if this is -- who did this? I don't

## Page 203

(1)
(2) recall exactly. I don't remember me writing
(3) this up.
(4)    Q. Well, the first line there, we have
(5) had Baby Phat Clothing since holiday 2000.
(6)      Was that accurate, to the best of
(7) your knowledge?
(8)    A. Yes, it is.
(9)    Q. Was it accurate that we have
(10) presently purchased all of spring 2007 up to
(11) and including March 15th delivery?
(12)    A. That's correct.
(13)    Q. If you go to Item 3, since our
(14) discussions in August, any idea what those
(15) discussions are?
(16)    A. I think what this has to do was there
(17) was Steve Feiner in discussions with Issie
(18) Wiseman, you know, he was always complaining
(19) about our service weren't high enough, and
(20) listen, I want, you know, I want to see some
(21) sort of changes and what are you going to do,
(22) et cetera, et cetera, and this is some of
(23) the -- excuse me, this is some of the things
(24) that Issie Wiseman had done since I believe
(25) their discussion, his and Steven Feiner's

## Page 204

(1)
(2) discussion in adding new life he thought or we
(3) thought to help with the sales of Baby Phat
(4) product, that's all.
(5)    Q. What is the reference there on No. 4,
(6) we have to give notification to salespeople and
(7) employees for termination?
(8)    A. I do not recall.
(9)    Q. Do you recall whether because of the
(10) fact that the agreement between BP Clothing and
(11) Vis-a-Vis was being terminated, that Tyfoon was
(12) going to have to give notification to
(13) salespeople and employees --
(14)    A. Could very well be --
(15)    Q. -- for termination?
(16)    A. Yes.
(17)    Q. Do you recall doing that?
(18)    A. There -- I believe there was one or
(19) two -- two persons to have left.
(20)    Q. Any specific recollection as to --
(21)    A. I would have to check our payroll
(22) records.
(23)    Q. I don't think it would be necessary
(24) here.
(25)      Plaintiff's Exhibit 90 is a

Page 205

(1)
(2)  settlement agreement and release.
(3)      **A.  Uh-huh.**
(4)      Q.  Have you seen this document before?
(5)      **A.  Yes, I have.**
(6)      Q.  Do you recall reviewing this
(7)  document?
(8)      **A.  Yes, I do.**
(9)      Q.  And, in fact, you actually signed
(10)  this agreement?
(11)      **A.  I signed the agreement as vice**
(12)  **president of finance, correct.**
(13)      Q.  And you, I take it, have the
(14)  authority to sign agreements for the various
(15)  companies?
(16)      **A.  Yes.**
(17)      Q.  If you take a look in the settlement
(18)  agreement and release on the first page, the
(19)  second line says, whereas BP has the exclusive
(20)  worldwide rights including, without limitation,
(21)  in Canada to use the Baby Phat registered
(22)  trademark on and in connection with women's
(23)  clothing.
(24)          Was that an accurate statement, to
(25)  the best of your knowledge?

Page 206

(1)
(2)      **A.  I believe, I know it today, yeah, I**
(3)  **didn't ask them for their -- at the time, I**
(4)  **didn't ask them for their trademark license,**
(5)  **but I took it as, you know, if there was a**
(6)  **settlement agreement and they were bringing**
(7)  **that in, I would assume that their lawyers**
(8)  **would ensure that it would have the correct**
(9)  **information.**
(10)      Q.  Was it also accurate to state, as it
(11)  did in the second line, that Vis-a-Vis was a
(12)  distributor of BP's, Baby Phat clothing in
(13)  Canada?
(14)      **A.  Yes.**
(15)      MR. BUSLOFF:  Which paragraph?
(16)      MR. HOFFMAN:  The whereas right after
(17)  the one we just read, the second whereas
(18)  paragraph.
(19)      MR. BUSLOFF:  In the first --
(20)  previous was the first whereas paragraph,
(21)  I think you said second line.
(22)      MR. HOFFMAN:  Gotcha, the second
(23)  paragraph but the first whereas paragraph.
(24)      **A.  Yes.  Vis-a-Vis was importing, was**
(25)  **licensing and distributing the Baby Phat**

Page 207

(1)
(2)  **Clothing product in Canada.**
(3)      Q.  At the bottom of Page 1, there's
(4)  reference to payments of 403,000 and change to
(5)  be made by Vis-a-Vis to Baby Phat, to BP, and
(6)  then on the second page, there's a reference to
(7)  a payment to be made by BP to Vis-a-Vis of
(8)  $125,000?
(9)      **A.  Correct.**
(10)      Q.  Do you have any knowledge as to how
(11)  those figures were arrived at?
(12)      **A.  This was a settlement agreement, this**
(13)  **was what was settled -- was settled on.  This**
(14)  **was an ongoing thing with Baby Phat.  It was --**
(15)  **we had been released or terminated without any**
(16)  **sort of proper notification whatever, and this**
(17)  **was the amount that was settled on.**
(18)      **Also the fact that I guess at some**
(19)  **point in time, maybe early to this, that Bernt**
(20)  **Ullmann had mentioned to Issie that this**
(21)  **business of a problem with Feiner was, you**
(22)  **know, better to get rid of it than to have it**
(23)  **sticking around.**
(24)      Q.  Of Vis-a-Vis's sales of Baby Phat
(25)  products, what percentage of those sales were

Page 208

(1)
(2)  of products that were obtained from BP
(3)  Clothing?
(4)      **A.  Could be between 20 and 25 percent.**
(5)      Q.  And how, if at all, did Vis-a-Vis
(6)  expect to replace that product if -- even if
(7)  our license -- the license between Phat and
(8)  Tornado went forward, if BP was not going to be
(9)  selling goods to them?
(10)      **A.  We have -- forget about BP, but we**
(11)  **have all the other licenses that we do.  We do**
(12)  **the outerwear, we do the shoes, we are doing**
(13)  **lingerie, we were doing leathers, you know, you**
(14)  **go out and we were selling more of the same,**
(15)  **the other divisions amongst the Baby Phat, you**
(16)  **know, in large quotations, was still doing**
(17)  **extremely well, and we were going to go out and**
(18)  **just sell more product.**
(19)      **We had enough product to sell.  This**
(20)  **is one aspect of the total group of Baby Phat**
(21)  **and Phat Farm area, we had more Phat Farm to**
(22)  **sell, we had more Baby Phat to sell.**
(23)      Q.  Did you expect there to be a total
(24)  loss of sales at the end of the year as a
(25)  result of having the BP product to sell?