# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
### Case No.:  07 Civ. 3278 (PAC)

# EXHIBIT 54

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------------------ x

4   PHAT FASHIONS,LLC,

5

6                          Plaintiff,

7        -against-

8   TORNADO IMPORTS (CANADA), INC.,

9

                        Defendants.

10

    ------------------------------------------------ x

11

12          DEPOSITION of the Plaintiff, PHAT FASHIONS,

13   LLC, by BERNT ULLMANN, taken by the Defendant

14   pursuant to Notice, held at the offices of Gibson

15   Dunn & Crutcher, 202 Park Avenue, New York, New

16   York 10166, on November 1, 2007, at 9:23 a.m.,

17   before a Notary Public of the State of New York.

18

19

20

21   *********************************************

              BARRISTER REPORTING SERVICE, INC.

22                    120 Broadway

                 New York, N.Y. 10271

23                  212-732-8066

24

25

PLAINTIFF'S
EXHIBIT
54

2

```
1
2   A P P E A R A N C E S:
3
4       PRYOR CASHMAN, LLP
            Attorneys for Plaintiff
5           410 Park Avenue
            New York, New York 10022
6
7       BY:  PHILIP R. HOFFMAN, ESQ.
8
9
10      GIBSON DUNN & CRUTCHER
            Attorneys for Defendant
11          202 Park Avenue
            New York, New York 10166
12
        BY:  ADAM H. OFFENHARTZ, ESQ.
13          -and-
            LAURA M. LEITNER, ESQ.
14
15
            xxxxx
16
17
18
19
20
21
22
23
24
25
```

3

```
1
2
3       S T I P U L A T I O N S
4
5       IT IS HEREBY STIPULATED AND AGREED by and
6   between the attorneys for the respective parties
7   herein, that filing, sealing and certification, and
8   the same are, hereby waived.
9
10      IT IS FURTHER STIPULATED AND AGREED that
11  all objections except as to the form of the
12  question, shall be reserved to the time of the
13  trial.
14
15      IT IS FURTHER STIPULATED AND AGREED that
16  the within deposition may be signed and sworn to by
17  an officer authorized to administer an oath, with
18  the same force and effect as if signed and sworn to
19  before the Court.
20      xxxxx
21
22
23
24
25
```

4

```
1               B. Ullmann
2   BERNT ULLMANN,
3       Having been first duly sworn before a Notary
4       Public of the State of New York, was
5       examined and testified as follows:
6
7   EXAMINATION BY
8   MR. OFFENHARTZ:
9   Q.   What is your name?
10  A.   Bernt Ullmann.
11  Q.   What is your address?
12  A.   512 Seventh Avenue, New York, New
13  York 10018.
14  Q.   Mr. Ullmann, good morning.
15  A.   Good morning.
16  Q.   As I suspect you already known by
17  now, I'm Adam Offenhartz. I'm a litigator
18  with Gibson Dunn & Crutcher. With me, is
19  my colleague Laura Leitner. We represent
20  Tornado in the litigation that you and
21  your company brought.
22      Thank you for scheduling this
23  today, for getting here. I'm going to ask
24  you a series of questions. If you don't
25  understand my questions, if you need
```

5

```
1               B. Ullmann
2   anything amplified, clarified, please let
3   me know.
4       If you need to take a break, please
5   let me know. We'll take periodic breaks
6   throughout the day. The only thing I'd
7   ask is: Please let's not take a break
8   while a question is pending. That's
9   really about it for any beginning issues.
10      If you have any questions along the
11  way or if there is a time you need to
12  leave by or anything of that nature, we
13  can discuss that during the break. We'll
14  do our best to accommodate you. I know
15  you're scheduled as needed for today and
16  tomorrow.
17      MR. HOFFMAN:  Do we have an
18      agreement as to the stipulations;
19      usual stips on the record, all
20      objections except as to form are
21      reserved?
22      MR. OFFENHARTZ:  Yes.
23  Q.   Mr. Ullmann, what is your current
24  position?
25  A.   I'm president of Phat Fashions, a
```

6

1          B. Ullmann
2  company that is owned by Kellwood.
3  Q.      How long have you been at Phat
4  Fashions?
5  A.      Since February 2004.
6  Q.      Did you become the president in
7  February '04?
8  A.      Yes.
9  Q.      Before that, where were you?
10 A.      At a different company, called
11 GTFM.
12 Q.      I'm sorry?
13 A.      GTFM.
14 Q.      Did GTFM have any connection with
15 Phat Fashions?
16 A.      Only indirectly as a licensee for
17 Phat Farm products in Europe.
18 Q.      Did GTFM have any connections with
19 Kellwood?
20 A.      They did not.
21 Q.      How long were you at GTFM?
22 A.      Five years.
23 Q.      Prior to that, where did you work?
24 A.      Prior to that, Donna Karan.
25 Q.      By the way, what titles did you

7

1          B. Ullmann
2  have at GTFM?
3  A.      President FUBU International. And
4  for last year and-a-half, managing
5  director, Coogi. That's C-O-O-G-I.
6  Q.      Can you briefly describe your
7  education?
8  A.      I have an MBA from Copenhagen
9  School of Economics. That's in Denmark.
10 Q.      What year did you get the MBA?
11 A.      1985, I want to say.
12 Q.      Did you receive an undergraduate
13 degree sometime before that?
14 A.      That is normally the requirements,
15 yes, I did.
16 Q.      What year and where did you get
17 that?
18 A.      Also I have, I guess the public
19 would be a PS and I believe it must have
20 been in '83, two years. Yes.
21 Q.      When did Phat Fashions become owned
22 by Kellwood?
23 A.      February 2004.
24 Q.      At the same time as you came in to
25 become the president of Phat Fashions?

8

1          B. Ullmann
2  A.      That is correct.
3  Q.      Were you hired, in effect, by
4  Kellwood to become the president of Phat
5  Fashions or were you the president of Phat
6  Fashions and then Kellwood showed up,
7  oddly enough, a day later and bought the
8  company?
9  A.      I was hired by Kellwood.
10 Q.      What was the process by which you
11 were hired?
12 A.      It was done through, firstly, a
13 recommendation from someone I trust as
14 Steven Russo, who was president of
15 womenswear for Kellwood at the time. He
16 placed a phone call.
17       It was followed up by Kellwood's
18 in-house -- what should we call him --
19 he's an in-house recruiter. His name is
20 Barry Ansell, A-N-S-E-L-L.
21 Q.      Can you tell me at the time you
22 joined Phat Fashions, what the management
23 structure of Phat Fashions was?
24 A.      Could you restate the question,
25 please?

9

1          B. Ullmann
2  Q.      Certainly. When you became the
3  president of Phat Fashions in
4  February 2004, who were the other
5  officers?
6  A.      Russell Simmons was the CEO of Phat
7  Fashions. I reported to Russell and to
8  Bob Skinner, who is now chairman of
9  Kellwood.
10 Q.      In February of 2004, Russell
11 Simmons was the CEO you said you reported
12 to, correct?
13 A.      Yes.
14 Q.      Did Bob Skinner have a role at Phat
15 Fashions?
16 A.      Yes.
17 Q.      What was his role at Phat Fashions?
18 A.      He was Russell's boss.
19 Q.      At Phat Fashions or at Kellwood?
20 A.      My view, but only my view -- I am
21 not certain how it is formally
22 structured -- is that Bob, in his capacity
23 at Kellwood, was the most senior officer
24 of Phat Fashions.
25 Q.      What was Bob Skinner's capacity at

10

B. Ullmann
1
2    Kellwood?
3    A.    Back then, he was the president --
4    I want to say president of Kellwood.
5    Q.    Is Russell Simmons still the CEO of
6    Phat Fashions today?
7    A.    He is not.
8    Q.    Who is the CEO of Phat Fashions
9    today?
10   A.    No one is formally holding the CEO
11   title.
12   Q.    Is there someone that acts as the
13   CEO of Phat Fashions?
14   A.    I report to the company and I
15   report to Bob Skinner.
16   Q.    When did Russell Simmons leave the
17   company?
18   A.    August of this year.
19   Q.    Immediately prior to Russell
20   Simmons' departure from the company, was
21   he still the CEO of the company?
22   A.    He held the title of a CEO. He was
23   not the CEO in your traditional
24   understanding of the title.
25   Q.    What is your traditional

11

B. Ullmann
1
2    understanding of the title?
3    A.    My view of a CEO is someone that is
4    hands-on and shows up for work every day.
5    And is executing leadership. He was not
6    leading the company.
7    Q.    You felt he wasn't doing a good
8    job?
9         MR. HOFFMAN: Objection to
10        the form. You can answer.
11   A.    Ask me again.
12   Q.    Did you think Mr. Simmons was doing
13   a good job as CEO prior to his departure?
14   A.    My view is that the CEO was the CEO
15   title. By traditional standards of CEO,
16   no, he was not. As a brand visionary -- a
17   founder, brand visionary and had celebrity
18   endorsement of the brand for many years,
19   he did.
20   Q.    What are the traditional functions
21   of a CEO that you thought he wasn't
22   fulfilling?
23   A.    As I said, I think one of the
24   requirements is a presence in the office.
25   Q.    You're saying he didn't come to

12

B. Ullmann
1
2    work?
3    A.    That's one of the things I'm
4    saying, yes, sir.
5    Q.    What are the other things you're
6    saying?
7    A.    I think if you're going to fulfill
8    your functions as a CEO, you would need to
9    have a clear understanding of the
10   financial performance of the organization.
11   And I am not certain that Mr. Simmons was
12   focusing on that. As I did say, he was a
13   great brand visionary.
14   Q.    When you joined Phat Fashions in
15   February 2004, were there other senior
16   officers?
17   A.    How do you define senior officers?
18   Q.    How do you define senior officers?
19   You're running the company; who are your
20   senior officers today?
21   A.    There is a CFE, chief financial
22   executive. We had a president of
23   licensing. I would say that probably
24   qualifies as a senior officer. But define
25   officer for me.

13

B. Ullmann
1
2    Q.    How do you use the word officer?
3    You're running this company; how do you
4    use the word officer?
5    A.    To me, an officer is someone that
6    has the ability to bind or oblige the
7    company and as such, there were only two
8    individuals that filled that role fully
9    and that was Russell Simmons and Bob.
10   Thirdly, would be myself, but I would not
11   bind the company to the extent at all over
12   Russell Simmons or Bob Skinner.
13   Q.    Mr. Ullmann, can you tell me who
14   Jan Wotton is?
15   A.    An individual that works at
16   Kellwood legal.
17   Q.    Is Jan Wotton a man or a woman?
18   A.    I'm not certain.
19   Q.    Is Jan Wotton a lawyer?
20   A.    I'm not certain.
21        MR. HOFFMAN: I can help you
22        if you want it or not.
23        MR. OFFENHARTZ: Please.
24        MR. HOFFMAN: I believe I
25        understand that Jan Wooten is a

Sminscript Copy:  PHAT FASHIONS VS. TORNADO IMPORTS:B. ULLMANN, 11/1/2007

---

14

B. Ullmann

2  female and is a paralegal.
3  Q.    I take it you do not have a lot of
4  contact with Ms. Wotton?
5  A.    I do not.
6  Q.    By the way, what is the office of
7  Phat Fashions, please?
8        MR. HOFFMAN:  Location?
9        MR. OFFENHARTZ:  The
10  location.
11  Q.    The address of the office of Phat
12  Fashions.
13  A.    512 Seventh Avenue.
14  Q.    What's your phone number at Phat
15  Fashions?
16  A.    (212)798-3100.
17  Q.    Do you have a direct dial?
18  A.    I do.   3101.
19  Q.    Where is Kellwood located?
20  A.    420 Fifth Avenue.
21  Q.    Here in Manhattan?
22  A.    Yes.. That would be their -- let me
23  be more specific.
24  Q.    Please.
25  A.    Kellwood is headquartered in St.

---

15

B. Ullmann

2  Louis, but their corporate office in New
3  York, the office that Bob works out of
4  most of the time is 420 Fifth Avenue.
5  Q.    Can you tell me, please, who Cathy
6  McGuiness is?
7  A.    She is my assistant.
8  Q.    How long has she been your
9  assistant?
10  A.    Maybe two years.
11  Q.    Who was your assistant prior to
12  that?
13  A.    Judith Parker.
14  Q.    Can you please tell me who Cory
15  Isom is?
16  A.    I believe Cory Isom is an
17  individual that either works or worked at
18  Kellwood legal.
19  Q.    Do you know in what capacity they
20  worked or work at Kellwood legal?
21  A.    I do not.
22  Q.    You don't know if they were a .
23  lawyer or paralegal?
24  A.    I do not.
25        MR. HOFFMAN:  I believe,

---

16

B. Ullmann

2  once again, we're talking about a
3  paralegal.
4        MR. OFFENHARTZ:  Thank you.
5  Q.    Can you please tell me who Annie
6  Walker is?
7  A.    I'm not familiar with the name.
8  Q.    Mr. Ullmann, can you tell me who
9  Gaby Bitton is?
10  A.    He's the owner of a company called
11  Buffalo Jeans.
12  Q.    When did you first become aware of
13  Gaby Bitton?
14  A.    I think in the fall of 2006.
15  Q.    Under what circumstances did you
16  become aware of Mr. Bitton, Buffalo Jeans?
17  A.    Bob Skinner introduced him to me.
18  Q.    Was this introduce by phone, in
19  person?
20  A.    By phone.
21  Q.    Do you know what Mr. Skinner told
22  you about Mr. Bitton and Buffalo Jeans in
23  advance of this phone introduction?
24  A.    My understanding was that Bob
25  Skinner had had an exploratory meeting

---

17

B. Ullmann

2  with Gaby Bitton in Canada and at the time
3  he had been impressed by Mr. Bitton's
4  operation and infrastructure and he
5  brought Mr. Bitton to my attention.
6  Q.    Do you recall when Mr. Skinner had
7  that meeting with Mr. Bitton?
8  A.    I don't know when that meeting took
9  place.
10  Q.    Obviously sometime prior to your
11  introductory call in February of 2006?
12  A.    I don't believe the call took place
13  in February of 2006.
14        MR. HOFFMAN:  I think he
15  said the fall.
16  Q.    I stand corrected, you did say fall
17  2006.
18  A.    It stands to reason, as you said,
19  sometime before fall, but I don't know.
20  Q.    Do you keep a calendar; do you jot
21  down in a calendar, either paper or
22  electronic, your schedules of phone calls?
23  A.    I do not.
24  Q.    Do you take notes when you're on
25  the phone usually?

---

18

B. Ullmann
1
2  A.    I do not.
3  Q.    As a practice or sometimes you do
4  and sometimes you don't?
5  A.    Very rarely, I do.
6  Q.    Do you recall taking any notes of
7  your meetings with Mr. Skinner regarding
8  Mr. Bitton?
9  A.    No.
10  Q.    Do you know how long that
11  conversation took?
12  A.    I do not.
13  Q.    In the fall of 2006, did you have a
14  licensee in Canada?
15  A.    Yes.
16  Q.    Who was that licensee?
17          MR. HOFFMAN:  Objection to
18          the form.
19  Q.    You can answer.
20  A.    It was Tornado.
21  Q.    How long was that introductory
22  phone call you had with Mr. Bitton in the
23  fall of 2006?
24  A.    I think I need to clarify
25  something:  I cannot recall that there was

19

B. Ullmann
1
2  an actual introductory phone call.  I
3  think maybe Bob, when I said introduced, I
4  meant introduced as a concept.  As a
5  party, as an individual; not a formal
6  introduction.
7          More along the lines, there is a
8  fellow named Gaby Bitton, he owns a
9  company called Buffalo Jeans, this is his
10  number.  I do not recall a formal
11  introduction on the phone.
12  Q.    Thank you for that clarification.
13  This first call that you had with
14  Mr. Bitton, should I take it then that
15  Mr. Skinner was not on the call?
16  A.    Correct.
17  Q.    Do you recall how long that first
18  conversation you had with Mr. Bitton was?
19  A.    I don't.
20  Q.    Was it an hour discussion?
21  A.    Clearly not.
22  Q.    If it clearly wasn't an hour, how
23  clearly long was it?
24  A.    It was clearly a brief
25  conversation.  It was a brief

20

B. Ullmann
1
2  conversation; I don't recall how long.
3  Q.    What was the follow-up after that
4  initial call?
5  A.    I want to say probably just saying
6  in touch, phone calls back and forth
7  informally.  At one point, we met in New
8  York; I do not recall when that was.
9  Q.    Do you recall the substance of the
10  initial phone call you had with
11  Mr. Bitton?
12  A.    The first phone call was simply
13  introductory.  Bob Skinner, my boss, said,
14  There is someone in Canada that I would
15  like you to introduce yourself to, so
16  that's what I did.
17  Q.    Do you recall what the next phone
18  calls covered?
19  A.    The phone calls evolved into two
20  conversations.  One about the state of our
21  business in Canada and Mr. Bitton's view
22  of how it ran was poorly managed and
23  represented.
24          And another conversation about a
25  possible retail collaboration for the

21

B. Ullmann
1
2  United States.
3  Q.    At what point did you begin
4  discussing a licensing agreement with Mr.
5  Bitton in Canada?
6  A.    I don't recall.
7  Q.    At what point did you begin
8  discussing the possible retail
9  collaboration in the U.S.?
10  A.    Again, I don't recall.  Other than
11  these conversations were more or less
12  concurrent because it appears that
13  proprietary retail is an integral part of
14  how Mr. Bitton is growing the Buffalo
15  Jeans brand.
16  Q.    What do you mean by proprietary
17  retail?
18  A.    I mean monomark or flagship-type of
19  stores that only carry one brand.  In this
20  case, they have Buffalo Jeans stores; they
21  only carry Buffalo Jeans.  I was
22  interested in getting the world of Phat
23  represented in its own retail environment.
24  Q.    You wanted the world of Phat, as
25  you put it, to have its own world of Phat

22

1            B. Ullmann
2   stores, if you will?
3   A.    Correct.
4   Q.    How many conversations did you have
5   with Mr. Bitton from the fall of 2006
6   through January 1, 2007?
7   A.    I don't recall how many, but I
8   would say there are several.  So it's not
9   one or two; there's more than one or two.
10  Q.    Less than 50?
11  A.    Clearly.
12  Q.    You entered into a licensing
13  agreement with Mr. Bitton and Buffalo
14  Jeans of Canada, haven't you?
15          MR. HOFFMAN:  Objection to
16      the form.
17  Q.    You can answer.
18  A.    Yes.
19  Q.    Do you know when you executed that
20  agreement?
21  A.    It was executed over the last
22  couple of months.
23  Q.    Can you be more specific?
24  A.    No.
25  Q.    Did you also execute an agreement

23

1            B. Ullmann
2   regarding a retail collaboration in the
3   U.S.?
4   A.    Yes.
5   Q.    Was that executed contemporaneously
6   with the licensing agreement?
7   A.    It was intended to, but no.  And
8   that agreement, I want to say, was
9   executed maybe a month ago.
10  Q.    Who is Marc Kakon?
11  A.    He works at the company called
12  Algo.
13  Q.    Can you tell me what Algo does?
14  A.    My understanding is that Algo is a
15  multi-brand publicly-trading company in
16  Canada.  They were introduced through Gaby
17  Bitton.
18  Q.    They were introduced to Gaby
19  Bitton?
20  A.    No, they were introduced to us
21  through Gaby Bitton.
22  Q.    Are you doing any business with
23  Algo at this time?
24  A.    I believe Algo is a part-owner of
25  the entity that now holds the license that

24

1            B. Ullmann
2   will commence January 1, '08.
3   Q.    What is the name of the entity that
4   you executed an agreement with for the
5   license in Canada?
6   A.    Without checking my reports, I
7   don't know.
8   Q.    It is a company owned or controlled
9   by Gaby Bitton?
10          MR. HOFFMAN:  Objection to
11      the form.
12  Q.    You can answer.
13  A.    I cannot say if it's controlled by
14  Gaby Bitton.  He is a part-owner.
15  Q.    Who runs the company that you just
16  signed a licensing agreement with for
17  Canada?
18  A.    My understanding is that the
19  current CEO is Isaac Stern.
20  Q.    You kind of chuckled and said
21  "current CEO."  Are you expecting a change
22  eminently?
23  A.    No.
24  Q.    Was Mr. Stern just recently
25  appointed in that position?

25

1            B. Ullmann
2   A.    My understanding is that Mr. Stern
3   was not involved in the early
4   negotiations, but have come in forcefully
5   and assumed control of the leadership of
6   that company.
7   Q.    If you need to talk with someone at
8   this entity with which you entered a
9   licensing agreement in Canada because you
10  have a concern or an issue that you'd like
11  to discuss, who do you call?
12  A.    Isaac or Gaby.
13  Q.    Who is Rosa Costa?
14  A.    I don't know.
15  Q.    Do you know a Dan Elituv?
16  A.    I have met a Dan during some of my
17  meetings with our new licensee; I don't
18  know if his last name is Elituv.
19  Q.    You understand that Dan works at
20  your licensee?
21  A.    I have met a Dan that works at the
22  licensee.
23  Q.    Do you know where Russell Simmons
24  is now?
25          MR. HOFFMAN:  At this

34

B. Ullmann

1
2  Tornado, didn't you?
3  A.  Yes.
4  Q.  You, of course, I mean Phat
5  Fashions?
6  A.  Correct.
7  Q.  Why did you file that lawsuit?
8  A.  Simply to receive a clarification
9  of what we believe to be the facts of our
10 relationship.
11 Q.  What are those facts, as you
12 understand them, in your perspective?
13 A.  Understood.  The fact, in my view,
14 is that Tornado has a licensing agreement
15 for certain Phat Farm products and this
16 agreement is set to expire at the end of
17 2007.  Those are the facts as I see them.
18 Q.  You mentioned that you think the
19 claims and defenses brought by my client
20 are, and we can check it, was either
21 insincere or insignificant?
22     MR. HOFFMAN:  Objection to
23     the form.  I don't think that the
24     words "claims" and "defenses" and
25     the like; he said whatever it was

35

B. Ullmann

1
2  that he said.
3     MR. OFFENHARTZ:  Let me
4     rephrase.
5  Q.  I think you said Mr. Wiseman's case
6  is insignificant or insincere?
7  A.  Right.
8     MR. HOFFMAN:  Same objection
9     to form.  He said what he said.
10 Q.  Can you please elaborate on that?
11 A.  My view, based upon my
12 conversations with Issie Wiseman, is that
13 he full-well recognizes that his agreement
14 expires.  On a number of occasions, he
15 recognized it.  On a number of occasions
16 he said, "Well, if there's something those
17 guys don't really do a lot in handbags,
18 maybe I can continue with the handbags;
19 what do you think?"
20     Conversations like that clearly
21 have led me to know, for a fact, that he
22 agrees and recognizes that his agreement
23 expires.
24 Q.  How many conversations are we
25 talking about here?

36

B. Ullmann

1
2  A.  Several.  Again, more than two;
3  less than ten.
4  Q.  When did these several
5  conversations take place?
6  A.  I want to say that they started
7  either at or right at the MAGIC trade show
8  in February of 2007.
9  Q.  At or before the MAGIC trade show
10 Issie Wiseman indicated to you that he
11 understood you weren't renewing the
12 licensing agreement?
13     MR. HOFFMAN:  In 2007,
14     because we have two MAGIC shows, we
15     should be clear about which one
16     we're talking about.
17     MR. OFFENHARTZ:  Fair point.
18     Thank you.
19 Q.  Mr. Ullmann, which MAGIC show were
20 you referring to in your last answer?
21 A.  The one in February 2007.
22 Q.  The several conversations you're
23 talking about, when do you think they
24 began?
25 A.  Either end of January or beginning

37

B. Ullmann

1
2  of February 2007, I believe.
3  Q.  When did you first inform, to your
4  recollection, Mr. Wiseman that you would
5  not be extending the licensing agreement?
6  A.  I cannot recall this fully, but I
7  believe, again, it was around the same
8  time.  Some weeks prior to the MAGIC show
9  in February of '07.
10 Q.  Your recollection is that late
11 January or early February, you informed
12 Mr. Wiseman that you were not renewing the
13 extension?
14     MR. HOFFMAN:  Objection to
15     the form.
16 A.  Yes, and it's not -- you said
17 reviewing the extension?  I never viewed
18 it as renewing any extension.  It was, we
19 were not amending the agreement.  The
20 agreement was set to expire at the end of
21 December of 2007.  There were no renewals
22 left; it could not be renewed.
23 Q.  You had agreed to the form of an
24 amendment extending the agreement, hadn't
25 you?

46

B. Ullmann

1  issue. That didn't happen.
2  
3  Furthermore, in order for this to
4  be a binding document, not only did an
5  agreement have to be signed by both
6  Russell Simmons and Bob Skinner, it also
7  had to be delivered back to the licensee,
8  Tornado. None of which happened. And
9  there was no legal amendment. I was free
10  to proceed.
11  Q.    You recall Mr. Rollins telling you
12  that it had to be executed and returned,
13  or do you recall discussing that with
14  Counsel in preparation for this
15  deposition?
16  A.    I do recall discussing this with
17  Counsel in preparation. I cannot recall
18  if it's independent recollection.
19  Q.    You said it was highly unusual for
20  Mr. Wiseman to sign the agreement?
21  A.    No, I didn't say that.
22  Q.    Please tell me what you said.
23  A.    I said it's highly unusual for any
24  licensee to sign a draft amendment as
25  opposed to an execution agreement.

47

B. Ullmann

1  
2  Q.    You viewed the document that
3  Mr. Wiseman signed as simply a draft that
4  was something the parties would continue
5  to negotiate, work on, play with and move
6  forward with or not, correct?
7  A.    That is correct.
8  Q.    At the time you were the president
9  of Phat Fashions, right?
10  A.    Correct.
11  Q.    Clearly your understanding is that
12  your law firm, your colleagues would have
13  had the same understanding that this
14  document that Issie Wiseman signed was
15  just a draft, has no meaning, has no
16  bearing; it's nothing, right?
17     MR. HOFFMAN: Objection to
18     the form. How can he testify about
19     other people's understandings?
20  Q.    Mr. Ullmann, you testified that
21  Mr. Simmons didn't show up for work. You
22  testified that Mr. Simmons, in many
23  respects, was not a good CEO. You
24  testified that Mr. Simmons violated the
25  Kellwood code of conduct. You testified

48

B. Ullmann

1  
2  that it's important for a CEO, for a
3  leader of a company, to be present and to
4  be involved.
5     I'm trying to understanding if you,
6  as the president of Phat Fashions, if your
7  understanding was the company's
8  understanding?
9     MR. HOFFMAN: Objection to
10     the form. That question is --
11     wait.
12     MR. OFFENHARTZ: You stated
13     your objection. No speaking
14     objections.
15     MR. HOFFMAN: I'm not giving
16     a speaking objection, but I'm not
17     finished with my objection to form.
18     There is a question pending,
19     but the entire prologue to the
20     question, I'm objecting to.
21     Whatever he's testified to, he has
22     testified to. If he understands
23     the question you just asked that
24     was actually the question, that's
25     fine.

49

B. Ullmann

1  
2     I have an objection to form,
3  but he can answer. Can we have
4  just the question read back.
5     MR. OFFENHARTZ: Let me move
6  on to another version.
7  Q.    Given that you were the president
8  of Phat Fashions, wouldn't it be your
9  understanding, or your expectation, that
10  your Counsel would agree with you that it
11  was highly unusual for Issie Wiseman to
12  sign a draft and would consider it a
13  document still very much open to further
14  negotiation?
15     MR. HOFFMAN: Objection to
16     the form.
17  A.    I can't speak to how Counsel felt
18  or thought my view was; it the was very
19  much open to continue dialogue.
20  Q.    Given your perspective that it was
21  very unusual for Mr. Wiseman to sign this
22  document, wouldn't you expect that your
23  colleagues at Phat Fashions would have a
24  similar view?
25     MR. HOFFMAN: Objection to

50

```
1            B. Ullmann
2       the form.
3   A.    Again, I have no opinion about what
4   my colleagues thought or didn't think.  I
5   cannot comment on their thoughts.  I can't
6   speculate on what they thought.
7   Q.    During the period with which you
8   were having, what you call, a dialogue
9   over the draft -- your language -- that
10  Mr. Wiseman signed; what conversations did
11  you have with Counsel regarding that?
12          MR. HOFFMAN:  "That" being?
13  Q.    That draft, as you describe it?
14  A.    Not a lot.
15  Q.    Tell me about the ones you did
16  have.
17  A.    I cannot recall any individual
18  dialogue referring to the draft.  I can
19  only recall some of the dialogue with
20  Mr. Wiseman.
21  Q.    Who led the dialogue, as you
22  described it, with Mr. Wiseman regarding a
23  possible -- your language -- renewal of
24  the license agreement with Tornado?
25          MR. HOFFMAN:  Objection to
```

51

```
1            B. Ullmann
2       the form on "renewal".
3   A.    I did.
4           MR. OFFENHARTZ:  If I said
5       amendment?
6           MR. HOFFMAN:  Yes, because
7       when you said renewal --
8   Q.    You led that effort?
9   A.    Correct.
10          MR. HOFFMAN:  Objection to
11      the form.  I don't think effort was
12      the word.
13          MR. OFFENHARTZ:  Can you
14      read back the last couple of
15      questions and answers.
16          (Whereupon the record was
17      read back by the reporter.)
18          (Brief recess taken.)
19  Q.    Mr. Ullmann, did you meet with
20  Counsel to prepare for this deposition?
21  A.    I did.
22  Q.    How many times?
23  A.    Once.
24  Q.    When?
25  A.    Tuesday.
```

52

```
1            B. Ullmann
2   Q.    Of this week?
3   A.    Yes.
4   Q.    For how long?
5   A.    Maybe a couple of hours.
6   Q.    Two days ago?
7   A.    Yes, a couple of hours.
8   Q.    Two hours?
9   A.    Two hours.
10  Q.    Two to three hours, one to two
11  hours?
12  A.    Two to three hours.
13  Q.    Which documents did you review, if
14  any?
15          MR. HOFFMAN:  I'm going to
16      object to that.
17  Q.    Did you review documents?
18  A.    Some.
19  Q.    Can you give me a sense of the --
20  A.    I don't recall reviewing a lot of
21  documents in their entirety, but we
22  certainly reviewed a few.  More than two
23  or three, less than ten.
24  Q.    Which documents did you review?
25          MR. HOFFMAN:  I'm going to
```

53

```
1            B. Ullmann
2       object on the grounds of
3       attorney-client privilege and work
4       product, but if you can remember
5       the ones that you reviewed, you can
6       tell him.
7           MR. OFFENHARTZ:  I asked him
8       which he remembers reviewing.
9           MR. HOFFMAN:  Since I'm not
10      objecting, it's not going to be a
11      big deal.
12  A.    I remember reviewing the licensing
13  agreement.  We looked at --I don't
14  remember looked at -- talked about the
15  draft amendments.  We obviously
16  discussed --
17          MR. HOFFMAN:  You're not
18      supposed to go into what we
19      discussed.  His question is only
20      about documents.
21  Q.    Got it.  That's what?
22  A.    Sorry.  No problem.  Thank you.  My
23  apologies.
24      And the last -- I want to say a
25  couple of e-mails.
```

66

1              B. Ullmann
2    company and he had the title of CEO.
3    Q.    Do you know how the agreement got
4    to Mr. Simmons for his execution?
5    A.    I don't.
6    Q.    Who was involved in handling the
7    Tornado relationship within Phat Fashions?
8    A.    Can you clarify the question?
9    Q.    If someone asked you who, at Phat
10   Fashions, dealt with Tornado in 2006, who
11   would you include on that list?
12   A.    In any capacity?
13   Q.    Please tell me -- sure.
14   A.    I would say contractually, it would
15   be myself on the business end; it would be
16   a number of individuals.  So it can be
17   someone from licensing, it could be
18   someone working in product, it could be
19   someone in marketing.
20   Q.    Thank you.  That's a responsive
21   answer.
22        In terms of a dialogue, as you put
23   it, with Tornado, who would have been
24   involved in the dialogue process?
25   A.    Myself.

67

1              B. Ullmann
2    Q.    Anyone else?
3    A.    No.
4    Q.    Who would have handled, either your
5    outside Counsel, in-house; who else would
6    have been involved with any paperwork?
7    A.    Paperwork could be Eli Nathanson
8    from Pryor Cashman.  I would say at the
9    time, either Don Gramke of Kellwood legal
10   and later, Luther Rollins of Kellwood
11   legal and lastly, Peter Morris, our CFE.
12   Q.    Do you recall who handled the
13   document that Mr. Wiseman executed and
14   returned to Phat Fashions?
15        MR. HOFFMAN:  Objection to
16        the form.
17   A.    I honestly don't know.
18   Q.    Your-understanding is it would have
19   been, perhaps, Mr. Morris, Mr. Gramke,
20   Mr. Rollins or Mr. Nathanson?
21        MR. HOFFMAN:  Objection to
22        the form.
23   A.    It would have been one of those
24   three and I would say I think it's more
25   likely -- could you restate the question.

68

1              B. Ullmann
2        MR. OFFENHARTZ:  Sure.  Can
3    you read back the question, please.
4        (Whereupon the record was
5        read back by the reporter.)
6    A.    Then the answer is correct.  One of
7    those three.
8    Q.    Mr. Gramke had died at some point
9    during this story; is that correct?
10   A.    Yes.
11   Q.    Do you recall when?
12   A.    No.
13   Q.    Do you recall the circumstances of
14   his death?
15   A.    He committed suicide.
16   Q.    He was, you mentioned, an in-house
17   lawyer at Kellwood?
18   A.    Yes, of course.
19   Q.    You trust and think Mr. Nathanson a
20   competent lawyer?
21   A.    I trust him.  I have no opinion
22   about his competency as a lawyer.  I think
23   he's -- in all my dealings, he's very
24   competent and I do trust him fully.
25   Q.    You rely on Mr. Nathanson's advice?

69

1              B. Ullmann
2    A.    Yes.
3    Q.    Do you think Mr. Rollins is a
4    competent professional?
5    A.    To the best of my knowledge.
6    Q.    You rely on his advice?
7    A.    I do.
8    Q.    You have no reason to not trust his
9    abilities?
10   A.    No reason not to trust anyone's
11   abilities.
12   Q.    Regarding Mr. Morris, you trust his
13   advice?
14        MR. HOFFMAN:  I think you
15        may want to make that past tense.
16   Q.    Can you answer the question?
17   A.    Do I trust his advice?  Mr. Morris
18   is not typically providing me, or did not
19   typically provide me with advice.
20   Q.    Mr. Morris is no longer with the
21   company?
22   A.    He's not.
23   Q.    Where does he work now?
24   A.    Something called Active Apparel, I
25   believe.

**70**

B. Ullmann

2 Q.   What was Mr. Morris' role?
3 A.   CFE.
4 Q.   Do you think him a competent CFE?
5 A.   I liked him a lot.
6 Q.   Did you think of him a competent
7 CFE?
8 A.   I think he worked hard and did the
9 best that he could.
10 Q.   Did you think him competent?
11       MR. HOFFMAN:  I think that
12       question has been asked and
13       answered.
14       MR. OFFENHARTZ:  It's clear
15       from the witness' facial expression
16       he wants to answer it and he can't
17       quite bring himself to answer it.
18       MR. HOFFMAN:  I object to
19       the characterization --
20       MR. OFFENHARTZ:  I'm sure
21       you could --
22       MR. HOFFMAN:  You're
23       constantly interrupting me and it's
24       very rude.
25       MR. OFFENHARTZ:  There is a

**71**

B. Ullmann

2 question pending.
3       MR. HOFFMAN:  No, there is
4 not a question pending.  There is
5 an objection pending.  I'm asking
6 you, Adam, as a courtesy to let me
7 get a whole sentence out.  The
8 sentence is -- maybe it's more than
9 one sentence.
10       You're characterizing his
11 facial expressions.  I'm not
12 agreeing with you about what his
13 facial expressions state.  When you
14 say that it's clear to you what
15 he's thinking, then we really don't
16 have to do a deposition because we
17 can just let the reporter write
18 down what these thoughts are.
19       MR. OFFENHARTZ:  If you'll
20 stipulate to that, I'll be happy to
21 do that.
22       MR. HOFFMAN:  Whatever he's
23 thinking, he's thinking.  Please
24 don't put words into his mouth.
25 Q.   Mr. Ullmann, would you agree with

**72**

B. Ullmann

2 me that in answering these questions, you
3 have been making a facial expression that
4 would lend one to think that you are
5 trying very hard to, perhaps with the best
6 of intentions, avoid saying that you don't
7 think Mr. Morris was competent?
8 A.   If the question is very well-put
9 and it's a little unfair to say that.
10 Mr. Morris is, to a large extent,
11 competent.  He was not really involved in
12 the business dealings and that's the
13 accurate -- so he's a good guy, he's an
14 overall competent guy; he wasn't really
15 involved in the transactions of the
16 business negotiations.  He wasn't really
17 involved in them.
18       So I didn't take his advice.  He
19 wasn't involved.  His function was
20 mechanical in the negotiations.  He moved
21 the paper around.
22 Q.   Mr. Nathanson, Gramke and Rollins,
23 those people you counted on and you relied
24 on?
25 A.   Yes.

**73**

B. Ullmann

2 Q.   Mr. Ullmann, when did you and Issie
3 Wiseman first discuss the possibility of
4 amending the licensing agreement to extend
5 it?
6 A.   I cannot recall the first time; it
7 was sometime in the spring of '06 -- oh,
8 boy.  Wait.  Let me take that back.
9       It may have been as early as
10 towards the end of '05.  I believe it came
11 up the first time at MAGIC -- at the MAGIC
12 show in February of '06.  But I'm not
13 certain.  This is what I think could have
14 happened.
15 Q.   Can you tell me what you recall of
16 that first discussion?
17 A.   Very casual, very fleeting.  Just
18 Issie saying something along the lines of,
19 Hey, I'd like to renew our agreement and
20 me, just as easily and casually, saying,
21 Sure, why not.  And then I believe we had
22 a brief conversation about it at the MAGIC
23 show.  So I think maybe there was one
24 phone conversation prior and then a very
25 casual conversation at the show.

74

B. Ullmann

1
2  Q.   Do you recall if Mr. Wiseman called
3  you or you called Mr. Wiseman, the
4  pre-MAGIC show conversation?
5  A.   I don't recall.
6  Q.   Can you tell me what you recall of
7  the discussions at the MAGIC show?
8  A.   I don't recall a lot; the shows are
9  very, very hectic. There is never any
10  time to sit down and have formal
11  conversations. I do recall having said
12  something about him needing to increase
13  minimums, but I can't recall if it's a
14  free memory from the actual conversation
15  or something that has been brought up
16  later.
17  Q.   When you say "later," you mean
18  perhaps in preparation for this deposition
19  or the litigation?
20  A.   Prior to that, but I don't remember
21  when.
22  Q.   Why did you want to raise the
23  minimums?
24  A.   Well, I didn't. I was perfectly
25  happy minding my own business when Issie

75

B. Ullmann

1
2  brought up renewal. It was not on my mind
3  at all. As a knee-jerk reaction, I
4  said -- whatever I said; I don't know what
5  I said.
6       But it was something along the
7  lines of, If we are to even consider it,
8  you're going to need to bring up your
9  minimums.
10  Q.   What was the next contact you had
11  with Issie following the MAGIC show?
12  A.   I don't recall.
13  Q.   You may have already spoken of
14  this: The MAGIC show occurred when in
15  2006?
16  A.   February of 2006.
17  Q.   Do you recall in the early part of
18  the month, the latter part of the month?
19  A.   I want to say it's the latter part
20  of the month, but again --
21       MR. HOFFMAN: Before or
22       after President's Day?
23       THE WITNESS: I honestly
24       don't remember.
25  Q.   Where was the MAGIC show held?

76

B. Ullmann

1
2  A.   In Las Vegas. Well, actually, when
3  is Valentine's Day?
4       MR. HOFFMAN: The 14th.
5  A.   Typically, I end up running afoul
6  around Valentine's Day, so that should
7  help us.
8  Q.   You think it was probably around
9  Valentine's Day?
10  A.   As I said, I am typically running
11  afoul on Valentine's Day.
12       MR. OFFENHARTZ: Can you
13       mark this as Defendant's Exhibit 1,
14       please.
15       (Whereupon Two-page exhibit
16       bearing Bates stamp TOR899 and
17       TOR900 was marked Defendant's
18       Exhibit 1 for identification as of
19       this date.)
20  Q.   Mr. Ullmann, I'm going to hand you
21  a document that's been marked as
22  Defendant's Exhibit 1. Could you take a
23  moment, please, and review this?
24  A.   Yes. Okay.
25       MR. OFFENHARTZ: First of

77

B. Ullmann

1
2  all, for the record, this is a
3  two-page exhibit bearing Bates
4  stamp TOR899 and TOR900.
5  Q.   Mr. Ullmann, can you identify this
6  exhibit, please?
7  A.   It's an e-mail from Issie to Barry.
8  And then further down, I guess these are
9  two e-mails, I guess because further down
10  it says from Issie to Bernt.
11       So it's an e-mail to me and
12  attached to the e-mail appears to be some
13  proposed minimums for the amended
14  agreement.
15  Q.   Do you recall receiving the e-mail
16  from Mr. Wiseman on or about March 1,
17  2006?
18  A.   Honestly, I don't recall. I don't
19  recall.
20  Q.   Do you recall, at some point in
21  March 2006, looking at these minimums and
22  having a reaction to these minimums?
23  A.   I don't.
24  Q.   Would you have discussed these
25  minimums with anyone at Phat Fashions?

78

B. Ullmann

2 A.    No.

3 Q.    You were the decision maker on
4 minimums?

5 A.    No, the way it would work is that I
6 would handle the dialogue. Once we had
7 reached a meeting of the minds, I would
8 then have to turn around and take, in this
9 case, the document, the numbers, whatever
10 it was and I make a presentation to Bob
11 Skinner and he was the final decision
12 maker.

13 Q.    Do you recall a discussion with
14 Mr. Wiseman following receipt of what's
15 been marked as Exhibit No. 1?

16 A.    I don't recall in this specific
17 conversation. If you can frame the
18 question differently, maybe.

19 Q.    Do you recall generally having
20 discussions with Mr. Wiseman or anyone
21 else from Tornado about an amendment?

22 A.    I don't recall having conversations
23 with anyone but Issie. I do recall having
24 some conversations with Issie; I don't
25 specifically recall the line of detail.

79

B. Ullmann

2 Q.    Why don't you tell me about the
3 next conversation that you do recall and
4 tell me as much about that conversation as
5 you are able.

6         MR. HOFFMAN: I just object
7     to the form on "next" because he
8     may not remember that it's the next
9     conversation. You've asked him
10     about conversations he remembers.
11     If he could put it in a context,
12     fine.

13 A.    If you can ask specific questions,
14 it would be helpful. I have no specific
15 recollection that I can sit here and
16 testify to.

17 Q.    From March of 2006 on, what is the
18 next conversation that you can recall any
19 substance of with Mr. Wiseman?

20         MR. HOFFMAN: Objection to
21     the form. You can answer.

22 A.    The next conversation that I can
23 recall in any great detail -- in detail,
24 is a conversation that takes place much
25 later in the fall and that -- it does not

80

B. Ullmann

2 have to do with this, but has to do with
3 our Baby Phat licensee terminating the
4 contract with a designated company that
5 Issie is affiliated with or an owner of or
6 part-owner of and thus causing them to
7 lose Baby Phat for Canada and he was
8 distraught. I do recall that. But I
9 don't recall exactly when that was.

10         I understand your line of
11 questioning was what do I recall about
12 this process and I apologize. I don't
13 recall in great detail.

14         MR. HOFFMAN: Off the
15     record.

16         (Whereupon a discussion was
17     held off the record.)

18 Q.    Just so we're clear, you don't
19 recall any detail whatsoever about any
20 conversations between March of 2006 and a
21 conversation you had in fall of '06
22 regarding a Baby Phat licensee dispute
23 involving Issie?

24         I'm simply trying to get a
25 chronology, if you will.

81

B. Ullmann

2         MR. HOFFMAN: I object to
3     the form. You can answer if you
4     understand it.

5 A.    I do recall having some
6 conversations, but I can't materially
7 recall any type of detail. I really
8 cannot.

9 Q.    Can you generally recall any
10 detail?

11 A.    No.

12 Q.    Did you discuss baseball?

13 A.    Probably not.

14 Q.    Did you discuss the amendment?

15 A.    I would say it's likely.

16 Q.    What did you discuss about the
17 amendment?

18         MR. HOFFMAN: Objection to
19     the form on "amendment." It is
20     what it is.

21 A.    I truly cannot recall specific
22 details. If you ask specific questions,
23 I'm happy to try, to the best of my
24 ability, to answer.

25 Q.    Can you recall general details?

82

B. Ullmann

1  B. Ullmann
2  A.   No, I don't.
3  Q.   You have no recollection of
4  discussing the amendment with Mr. Wiseman?
5       MR. HOFFMAN:  Objection to
6       form.  He said without being
7       refreshed.  If you want to show him
8       documents or ask him questions, he
9       might be able to do so.
10 A.   Right --
11      MR. OFFENHARTZ:  You're
12      answering for the witness and now
13      he's going to repeat your answer.
14      MR. HOFFMAN:  I'm actually
15      repeating his answer that he has
16      given now on two occasions.
17 Q.   Mr. Ullmann, would you please
18 answer my question.
19 A.   Can you repeat the question.
20      MR. OFFENHARTZ:  Read my
21      question back, please.
22      (Whereupon the record was
23      read back by the reporter.)
24 A.   I have no specific recollection.
25 But it speaks to, at the time -- just to

83

B. Ullmann

1  clarify, it was still just a dialogue.  I
2  wasn't in a serious negotiation at the
3  time, which is why I didn't emerge myself
4  in it.
5  Q.   You keep saying "no specific
6  recollection"; I'm just asking what your
7  general recollection is.
8  A.   Okay, I have no --
9  Q.   If you have no general
10 recollection, then I won't keep asking.
11 Do you see the distinction I'm drawing?
12 A.   Yes, I do I see it.  I'm sorry
13 then, I think I need to say I have no
14 general recollection.  I remember talking
15 to him.
16 Q.   Mr. Ullmann, do you recall any
17 conversations with Mr. Wiseman after the
18 conversation you had in the fall of '06
19 about the Baby Phat licensee dispute?
20 A.   I recall helping him getting a new
21 license with a different company.  I
22 helped him obtain a license for a company
23 called Coogi.  It is my understanding he
24 operates that license today.

84

B. Ullmann

1  B. Ullmann
2  Q.   Do you recall when that was?
3  A.   It was either the end of '06 or the
4  beginning of '07.  Somewhere -- I want to
5  say somewhere between December of '06 and
6  mid-February of '07.  Prior, I think, to
7  the MAGIC show of '07.
8  Q.   Do you recall other discussions
9  with Mr. Wiseman regarding the potential
10 amendment, in your perspective?
11 A.   Can you read the question or ask it
12 again?
13 Q.   I'll re-ask it.  I'm trying to kind
14 of fill in the boxes on the chronology.
15 A.   I understand.
16 Q.   You mentioned a conversation end of
17 '06, beginning of '07 with Mr. Wiseman
18 regarding a license for Coogi.
19      I'm asking you if you recall other
20 conversations with Mr. Wiseman, of any
21 nature, from the fall of '06 forward?
22 A.   Yes, that I do.  I do recall
23 additional conversation about the Baby
24 Phat situation.  I wasn't particularly
25 close to it, but he asked for my

85

B. Ullmann

1  assistance and I believe that in the end,
2  that dispute was settled with some
3  financial settlement.
4       I also recall, at one point,
5  advising him that we would not be going
6  forward and when his license expired,
7  there would be no amendments going forward
8  and I remember a couple of conversations
9  where Issie first was trying to argue and
10 then plead and, ultimately, there were
11 conversations where he recognized it -- he
12 shared with me his views of the potential
13 new licensee, some negative views; he
14 shared with me that there was some history
15 between Mr. Wiseman and Mr. Gaby Bitton.
16      I was obviously unaware of all of
17 that.  And there were some conversations
18 where he said, Hey, you know, if there's
19 something you can throw me, maybe I can
20 continue to do the shoes and do a good job
21 with the shoes.  I don't think Gaby is big
22 in shoes; something like that.  So those
23 type of conversations.
24 Q.   I'm now going to ask you a few

86

B. Ullmann

1
2    questions just to try to put these
3    recollections you have in some sort of
4    time frame.
5        When did you inform Mr. Wiseman
6    that you would not be going forward with
7    an amendment?
8    A.    I don't recall exactly, but I know
9    it was prior to MAGIC in February of '07.
10   Q.    Do you recall how long that
11   conversation was?
12   A.    No.
13   Q.    I'm assuming, from your description
14   of the other conversations, they would
15   have occurred after you informed that you
16   weren't going forward?
17   A.    Yes.
18   Q.    Roughly how many of the
19   conversations would you say there were of
20   that nature?
21           MR. HOFFMAN: Which nature?
22           MR. OFFENHARTZ: Of the ones
23       he described -- fair point. Let me
24       ask that again.
25   Q.    How many conversations have you had

87

B. Ullmann

1
2    with Mr. Wiseman after you informed him
3    there would be no amendment or that you
4    were not going to go forward with the
5    amendment that you fully executed?
6           MR. HOFFMAN: Objection to
7        the form.
8    A.    Numerous, without being able to say
9    exactly how many.
10   Q.    Again, numerous?
11   A.    More than three or four, but
12   probably less than ten.
13   Q.    I understand that you don't
14   recall -- you have no general recollection
15   of any conversations with Mr. Wiseman from
16   March of '06 through the fall when you
17   discussed with him the Baby Phat licensee
18   dispute.
19        Do you recall how many
20   conversations you had with him, if any?
21           MR. HOFFMAN: Objection to
22       the form on the prologue to that
23       question.
24   A.    Can you please restate?
25   Q.    Let me ask it another way: Did you

88

B. Ullmann

1
2    have any discussions with Mr. Wiseman from
3    March of '06 through to December of '06,
4    other than the one you described dealing
5    with the Baby Phat licensee issue?
6    A.    Yes, I believe so.
7    Q.    How many would you say you had?
8    A.    At least a few.
9    Q.    A few being three to five, four to
10   six, five to seven?
11   A.    Two to four; something like that.
12   Q.    Those two to four conversations are
13   the ones you have no general recollection
14   of?
15   A.    Correct.
16           (Brief recess taken.)
17   Q.    Mr. Ullmann, do you recall
18   Mr. Wiseman reaching out to you at any
19   time from March of 2006 through February
20   of 2007 and asking you where things were
21   regarding the amendment to the license
22   agreement?
23   A.    I don't recall the exact wording.
24   I do recall having conversations. I mean,
25   I do recall him reaching out to me and

89

B. Ullmann

1
2    inquiring, in general, the status maybe.
3    Q.    How many of those conversations do
4    you recall taking place?
5    A.    I don't recall an exact number.
6    I'm thinking it's a few conversations.
7    Q.    Three to five, two to four?
8    A.    Two, three.
9    Q.    Do you recall when these
10   conversations were?
11   A.    No.
12   Q.    Do you recall, generally, what was
13   discussed?
14   A.    I do recall speaking to
15   Mr. Wiseman; I don't recall specifically
16   or generally.
17   Q.    I'm teaching you how to be a
18   witness. This is very frustrating for me.
19   I'm sorry.
20   A.    That's okay.
21   Q.    You do recall, in a time period
22   from March of 2006 through February of
23   2007, that Mr. Wiseman and you spoke about
24   the status of the amendment?
25   A.    I remember speaking to him.

90

B. Ullmann
1
2    Q.    The answer is yes?
3    A.    I do remember speaking to him.
4    Q.    About the status of the amendment?
5    A.    I do remember speaking to him. I
6    do not recall what was discussed.
7    Q.    Do you recall discussing the status
8    of the amendment, generally, specifically
9    or otherwise?
10   A.    I don't recall it.
11   Q.    Do you recall any discussions where
12   Mr. Wiseman said words to the effect of,
13   "Bernt, when are you sending me the signed
14   amendment"?
15   A.    I don't recall having a
16   conversation along those lines.
17        MR. OFFENHARTZ: Can you
18        mark this as Defendant's Exhibit 2,
19        please.
20        (Whereupon Three-page
21        exhibit, bearing the Bates numbers
22        PF0130 through 0132 was marked
23        Defendant's Exhibit 2 for
24        identification as of this date.)
25   Q.    Mr. Ullmann, would you please take

91

B. Ullmann
1
2    a moment to review this document.
3    A.    Thank you.
4        MR. OFFENHARTZ: I'll
5        identify it somewhat for the
6        record.
7        It's a three-page exhibit,
8        bearing the Bates numbers PF0130
9        through 0132.
10   Q.    Have you had a chance to review it?
11   A.    I have.
12   Q.    Can you identify this document,
13   please.
14   A.    It's a string of e-mails attached
15   to the proposal that Issie Wiseman had
16   forwarded in regards to the draft
17   amendment of the agreement. And the
18   proposal that was previously discussed,
19   that is also attached.
20        MR. HOFFMAN: Meaning DX1?
21        THE WITNESS: Correct.
22   Q.    You mentioned that Cathy McGuiness
23   was your secretary?
24   A.    Yes.
25   Q.    Do you recall asking her to forward

92

B. Ullmann
1
2    this to Don Gramke with a cc to Peter
3    Morris?
4    A.    I don't, but I'm going to have to
5    think that I did.
6    Q.    I misspoke; it's forwarded to Don
7    Gramke and Eli Nathanson. You'll see on
8    the bottom of 0130.
9        MR. HOFFMAN: Peter Morris,
10       you said?
11       MR. OFFENHARTZ: Cc'd to
12       Peter Morris.
13   A.    Yes.
14   Q.    Why would you have forwarded this
15   on to Don Gramke, Eli Nathanson with a cc
16   to Peter Morris?
17   A.    Pretty standard operating procedure
18   in the process of any type of negotiation
19   or discussion. I don't want to be an
20   island all to myself; I always want legal
21   to be apprised of what is going on, as
22   kind of like a cc, so I know that someone
23   else is looking at it as well.
24   Q.    You received a question from
25   Mr. Gramke; isn't that true?

93

B. Ullmann
1
2    A.    I can see that I did.
3    Q.    You answered his question?
4    A.    Correct.
5    Q.    Do you recall any discussions you
6    had with Mr. Gramke about the status of
7    the discussions with Tornado around this
8    time?
9    A.    I do not.
10   Q.    I know I asked you this before, but
11   I do not recall the answer. Do you recall
12   when Mr. Gramke passed away?
13   A.    I do not. I'm sorry. —
14   Q.    Do you recall any discussions with
15   Mr. Nathanson regarding this process at
16   this time?
17       MR. HOFFMAN: Object to the
18       form, but you can answer that.
19       It's a little vague.
20   A.    Again, if there is a specific
21   question, I'm very happy to try to answer
22   it. I cannot recall, in general, any
23   conversation regarding --
24   Q.    Can you recall anything specific?
25   A.    Can you ask a specific question --

94

B. Ullmann

1
2  no, I can't. I'm sorry. I wish I could.
3  Many years ago, I would, but no, I don't.
4      Q.    Was there anyone on your team who
5  you were seeking input from on whether the
6  numbers provided by Mr. Wiseman made sense
7  or worked from Phat Fashions' perspective?
8      A.    I don't think so. I could expand
9  upon the last question.
10     Q.    Please.
11     A.    And just as a clarification at this
12 stage, I don't believe it would be
13 anyone's Counsel I would be seeking at one
14 point. I would be presenting the numbers
15 to Bob Skinner and he was the ultimate
16 decision maker as to whether any deal made
17 sense to us.
18     Q.    Mr. Ullmann, the document that
19 Mr. Wiseman prepared and sent to you, that
20 is in Defendant's Exhibit 1, it's -- I
21 don't know what you call it -- two
22 paragraphs -- it's a short little letter
23 format; is that correct?
24     A.    Yes, sir.
25     Q.    This is the one you had your

95

B. Ullmann

1
2  assistant forward on to some of your
3  colleagues?
4      A.    Yes.
5      Q.    Again, it's a two, three-paragraph
6  letter.
7          MR. OFFENHARTZ:  Can you
8      mark this as Defendant's Exhibit 3,
9      please.
10         (Whereupon Four-page
11     document, bearing the Bates numbers
12     PF0141 through 0144 was marked
13     Defendant's Exhibit 3 for
14     identification as of this date.)
15     A.    Thank you very much.
16     Q.    Would you please take a moment and
17 review what's been marked as Defendant's
18 Exhibit 3?
19     A.    Yes.
20     Q.    Have you had a chance to review the
21 document?
22     A.    I have.
23     Q.    Have you seen this document before?
24     A.    I have.
25     Q.    When did you last see this

96

B. Ullmann

1
2  document?
3      A.    I can't, to say that we briefly
4  glanced at this document during the review
5  in preparation for today's deposition.
6      Q.    On Tuesday?
7      A.    On Tuesday, correct.
8      Q.    Can you identify the three-page --
9  I'm sorry, the four-page document, bearing
10 the Bates numbers PF0141 through 0144?
11     A.    Yes. It's the draft amendment to
12 the licensing agreement with Tornado.
13 There is a cover letter from Eli
14 Nathanson --
15     Q.    We'll get to that, don't worry. I
16 know you're --
17         MR. OFFENHARTZ:  Off the
18     record.
19         (Whereupon a discussion was
20     held off the record.)
21     Q.    Who prepared the four-page document
22 that is attached to the cover e-mail?
23     A.    I don't know, but my expectation is
24 that it's Eli Nathanson.
25     Q.    Who directed Mr. Nathanson to

97

B. Ullmann

1
2  prepare this document?
3      A.    I did.
4      Q.    Can you tell us, please, why you
5  asked Mr. Nathanson to prepare this
6  document?
7      A.    It was in an attempt to continue to
8  advance the dialogue with Issie. I would
9  say fairly standard operating procedure.
10 And I might add, we have a number of draft
11 agreements that never get executed into a
12 final agreement.
13     Q.    In fact, you would draw a sharp
14 distinction between agreements that are in
15 execution phase versus agreements that are
16 still awaiting comments; is that correct?
17         MR. HOFFMAN:  Objection to
18     the form.
19     A.    No, that's not the distinction. I
20 would draw a distinction between drafts
21 where we are having either dialogue or not
22 a final decision as to whether or not we
23 intend to excuse any documents that are
24 actually executed.
25     Q.    I'm sorry, you're putting three

98

```
 1              B. Ullmann
 2  categories, if I understand correctly?
 3  A.    No.
 4  Q.    Let me lay them out; you can tell
 5  me if I understand correctly or not -- you
 6  know, I'll come back to that.
 7  A.    I'm happy to clarify it.
 8          MR. HOFFMAN: Let him come
 9  back to it.
10  Q.    I'll come back to it.
11          MR. HOFFMAN: It's not like
12  he's going to forget.
13          THE WITNESS: But it's not
14  like it's going to change.
15  Q.    Would you look at the second page
16  of the amendment, which is the third page
17  of the exhibit?
18  A.    Yes.
19  Q.    Would you compare the numbers on
20  that page, which is PF0142, with the
21  numbers on the second page of what's been
22  marked as Exhibit 1?
23  A.    Yes. They appear to be identical,
24  other than in this document, there is a
25  minimum net sales provision that seems to
```

99

```
 1              B. Ullmann
 2  be missing from the proposal that was
 3  received from Tornado.
 4          MR. HOFFMAN: When you say
 5  "this document," you're referring
 6  to the attachment to DX3?
 7  A.    Did I answer it correctly?
 8  Q.    Yes. Mr. Ullmann, which document,
 9  Exhibit 1 or Exhibit 3, has the minimum
10  net sales?
11  A.    Exhibit 3 has the minimum net
12  sales.
13  Q.    Mr. Ullmann, Issie Wiseman did not
14  include minimum net sales figures in his
15  version of this writing that he sent you
16  on March 1st; did he?
17  A.    It appears that he didn't.
18  Q.    I'm sorry, I couldn't hear you.
19  A.    It appears that he did not.
20  Q.    Mr. Nathanson included minimum net
21  sales in his version; is that correct?
22  A.    That's correct.
23  Q.    Do you recall upon whose direction
24  Mr. Nathanson was relying for including
25  the minimum net sales?
```

100

```
 1              B. Ullmann
 2  A.    No direction. All -- again, all
 3  agreements state minimum net sales and
 4  minimum royalties. So it's automatic.
 5  Q.    Do you recall upon whose direction
 6  Mr. Nathanson added in all of the other
 7  paragraphs and elements of this four-page
 8  document that were not present in
 9  Mr. Wiseman's half-page document?
10  A.    Each and every paragraph are
11  standard paragraphs, except there is one,
12  and I don't know where it is, but I know
13  for a fact that since I was still in the
14  early stages of this process, I reserved
15  all rights to amend the amendment.
16  Q.    That's in this four-page amendment?
17  A.    I am thinking that it may not be in
18  the amendment, but I am thinking that -- I
19  thought I just saw it. Yes, here I saw
20  it. So it is not in the amendment; it's
21  in the cover letter, actually.
22  Q.    Mr. Ullmann, you asked
23  Mr. Nathanson to take Mr. Wiseman's form
24  in Defendant's 1 and turn it into this
25  four-page document, correct?
```

101

```
 1              B. Ullmann
 2  A.    Yes.
 3          MR. HOFFMAN: Objection to
 4  the form.
 5  A.    It is correct.
 6  Q.    Do you recall what Mr. Nathanson
 7  asked you that should be included in the
 8  four-page document?
 9  A.    I don't have a recollection of what
10  specifically he may have asked. I assume
11  he must have had some questions, but I
12  don't recall. It would be normal that he
13  had some questions.
14  Q.    Do you recall any discussions with
15  Mr. Wiseman in the days following Monday,
16  March 20th when Eli Nathanson sent him
17  this amendment?
18  A.    Can you repeat that.
19          MR. OFFENHARTZ: Can you
20  read the question back, please.
21          (Whereupon the record was
22  read back by the reporter.)
23          MR. HOFFMAN: Do we know
24  that March 20th was a Monday?
25          MR. OFFENHARTZ: Did I say
```

102

1          B. Ullmann
2     Monday?
3          MR. HOFFMAN: Yes.
4          MR. OFFENHARTZ: Actually,
5     it does indeed say Monday, March
6     20th.
7     Q.     Let me ask it again: Does this
8     refresh your recollection that you had any
9     discussions with Mr. Wiseman in March or
10    April regarding the amendment of the
11    license agreement?
12    A.     I recall having conversations with
13    Issie, but I do not recall what we
14    discussed.
15          MR. OFFENHARTZ: Can you
16    mark this as Defendant's Exhibit 4,
17    please.
18          (Whereupon Six-page
19    document, bearing the Bates numbers
20    PF0147 through 0152, was marked
21    Defendant's Exhibit 4 for
22    identification as of this date.)
23    Q.     Mr. Ullmann, I've handed you a
24    six-page document, bearing the Bates
25    numbers PF0147 through 0152.

103

1          B. Ullmann
2          Will you take a moment to review
3     it, please?
4     A.     Sure.
5     Q.     Have you had a chance to look at
6     it?
7     A.     Yes.
8     Q.     Can you identify this document,
9     please.
10    A.     It's a copy of what appears to be
11    the draft amendments with the signature by
12    Issie Wiseman. There is a brief cover
13    letter on top to Mr. Nathanson and there
14    is a FedEx slip at the back, I guess,
15    documenting that something -- presumably
16    this document -- was delivered to Pryor
17    Cashman.
18    Q.     Would you turn to PF0149, please?
19    A.     Yes.
20    Q.     Would you look at page PF0142 of
21    Exhibit 3?
22    A.     Yes.
23    Q.     The numbers do match up, don't
24    they?
25    A.     They do.

104

1          B. Ullmann
2     Q.     Do you recall having a discussion
3     with Mr. Nathanson at the end of March,
4     March 29th or March 30th, regarding a
5     discussion that Barry Segal had with
6     Mr. Nathanson?
7     A.     No, I don't recall it.
8     Q.     It's true, isn't it, that Mr. Segal
9     of Tornado says in his letter, "Dear
10    Mr. Nathanson: It was a pleasure speaking
11    with you yesterday"?
12    A.     It does say that.
13    Q.     Do you have any knowledge of that
14    conversation that took place between
15    Mr. Segal and Mr. Nathanson?
16    A.     I cannot recall that there was such
17    a conversation. I see it, it must have
18    taken place. I don't recall.
19    Q.     Do you recall Mr. Nathanson calling
20    you up and saying, Hey, I just spoke to
21    Barry Segal of Tornado, he said "X"?
22    A.     No, I don't recall.
23    Q.     You indicated that you rely on
24    Mr. Nathanson, correct?
25          MR. HOFFMAN: Objection to

105

1          B. Ullmann
2     the form.
3     A.     He is outside Counsel.
4     Q.     You rely on him?
5          MR. HOFFMAN: Objection to
6     the form. For what?
7     Q.     Can you answer the question? If
8     you can't answer the question, tell me you
9     can't answer it; that's okay.
10    A.     I do rely upon -- it's a very
11    open-ended question. I do rely upon him
12    in legal matters, yes.
13    Q.     You were relying on him regarding
14    the discussions with Tornado to prepare
15    documents?
16    A.     Exactly, to prepare documents, yes.
17    Q.     At your instructions, Mr. Nathanson
18    prepared the document that was sent to
19    Issie Wiseman and Barry Segal, correct?
20    A.     Correct.
21    Q.     Mr. Nathanson had a discussion with
22    Mr. Segal and a day later, Mr. Segal
23    returned an executed copy of that
24    amendment?
25          MR. HOFFMAN: I object to

110

1          B. Ullmann
2    Q.    As well as Mr. Nathanson?
3    A.    Or instead of Mr. Nathanson.
4    Q.    Another person cc'd on this is Don
5    Gramke?
6    A.    Yes.
7    Q.    Just to clarify the record, prior
8    to his death, Mr. Gramke was an in-house
9    lawyer at Kellwood, correct?
10   A.    That is correct.
11   Q.    You thought Mr. Gramke was a
12   capable lawyer?
13        MR. HOFFMAN:  Asked and
14        answered.
15   A.    Yes.
16   Q.    Turning back to Defendant's Exhibit
17   No. 4.  In March of 2006, who would have
18   been giving Mr. Nathanson instructions on
19   how to deal with Tornado?
20   A.    That question is too open.  If you
21   mean business-wise, I would.  I do not
22   know if Mr. Nathanson was getting legal
23   direction from within the firm.
24   Q.    Who would have been giving
25   Mr. Nathanson instruction on the status of

111

1          B. Ullmann
2    your discussions with Mr. Wiseman
3    regarding the amendment?
4    A.    I would.
5    Q.    Who would have been giving
6    Mr. Nathanson instructions on who needs to
7    sign an amendment or review an amendment
8    within your company?
9    A.    No instruction needed.  Standard
10   operating procedure would be that every
11   single agreement, amendment, renewal
12   required two signatures at the time; the
13   signatures of Bob Skinner and Russell
14   Simmons.
15   Q.    Mr. Ullmann, can you please tell me
16   where, in this four-page document, PF0148
17   through 0151, it indicates that two
18   signatures are required?
19   A.    Well, I would say if one goes to
20   PF0151 and you look under Phat Fashions,
21   LLC, there are clearly two signature lines
22   and only one for Tornado.
23   Q.    Is there any writing or a part of
24   this agreement that indicates there must
25   be two signatures for Phat Fashions?

112

1          B. Ullmann
2        MR. HOFFMAN:  Objection to
3        the form.  He just answered that
4        question.
5          MR. OFFENHARTZ:  No, that is
6        a signature block.  I'm asking
7        other than a signature block?
8          MR. HOFFMAN:  Now you're
9        asking other than a signature
10       block.
11   Q.    Mr. Ullmann, other than a signature
12   block, can you identify where, in this
13   agreement, it requires two signatures for
14   Phat Fashions?
15   A.    This document stipulates the
16   business terms and I do not think that it
17   would need to address -- that's one of our
18   requirements; one of Phat Fashions'
19   requirements were two signatures.
20   Q.    What are your bases for saying Phat
21   Fashions had a requirement for two
22   signatures?
23   A.    Question not understood.
24   Q.    How did you come to know that -- is
25   there anything in Phat Fashions' bylaws

113

1          B. Ullmann
2    that requires two signatures for an
3    amendment to a license agreement?
4    A.    I have not seen our bylaws, so I
5    wouldn't know.  I will know or I do know
6    that Phat Fashions is a Kellwood company
7    and it's a requirement that is in every
8    legal document, is signed both by or at
9    this time as the -- Russell Simmons as the
10   CEO of Phat Fashions or Bob Skinner in his
11   capacity as our highest officer and, of
12   course, now also chairman of a Kellwood
13   company.
14   Q.    Can you identify the writing that
15   requires two signatures?
16   A.    Oh, I think I can; the signature,
17   please.
18   Q.    Can you identify the Kellwood
19   procedure manual that requires two
20   signatures?
21   A.    No.
22   Q.    Have you ever seen a Kellwood
23   document that mandates that Phat Fashions
24   must have two signatures on an amendment?
25   A.    I know it as a fact that we require

114

B. Ullmann

1 two signatures.

2 Q.    Mr. Ullmann, my question was

3 directed to:  Can you identify a writing

4 of Kellwood, a procedures manual, a

5 contract governance manual, a rules for

6 contracting a Kellwood memorandum, that

7 would state that there must be two

8 signatures?

9 A.    It's entirely possible that this

10 exists.  I haven't seen it, but relied

11 upon the words of my colleagues.

12 Q.    Which colleagues told you that this

13 was required?

14 A.    That would be Bob Skinner, my boss,

15 and most senior executive of Kellwood.

16 Q.    In this four-page document, PF0148

17 through PF0151, can you point out to me

18 who the parties to this amendment are?

19        MR. HOFFMAN:  The object

20        speaks for itself, but he can

21        answer.

22 A.    Yes.  The parties are Phat

23 Fashions, LLC and Tornado Imports.

24 Q.    Would you turn to the signature

115

B. Ullmann

1 block on PF0151.  The signature block; can

2 you please tell me who the parties are per

3 this signature block?

4 A.    Phat Fashions, LLC and then two

5 legally-binding signatures.

6 Q.    The two parties to this agreement

7 per the signature block are?

8        Mr. Ullmann, you do just have to

9 answer the question.

10 A.    Per the signature block, it's not

11 clear.

12        MR. HOFFMAN:  Can I help?

13        MR. OFFENHARTZ:  No.

14 Q.    Mr. Ullmann, as you read the

15 signature block and I really do want this

16 to be clear, there is -- one last

17 question.

18        Mr. Ullmann, as you read this

19 document, it is not clear to you who the

20 parties are?

21        MR. HOFFMAN:  Objection to

22        the form.

23 A.    It's clear to me who the parties

24 are.

116

B. Ullmann

1 Q.    Then please tell me who the parties

2 are?

3 A.    Bob Skinner, Russell Simmons.

4 Q.    They are parties to this agreement?

5 A.    Let's back up.  Several questions

6 ago, you asked who were the parties; I

7 believe it was answered, it's answered by

8 the document.  I thought we were focusing

9 on the signature block.

10 Q.    I'm asking you:  In the signature

11 block --

12 A.    If you asked me if it is clear to

13 me, and it is clear to me, that the

14 signatures on behalf of Phat Fashions is

15 Bob Skinner and Russell Simmons.

16        MR. OFFENHARTZ:  Move to

17        strike as not responsive.

18 Q.    Mr. Ullmann, as this case

19 progresses, you'll have many opportunities

20 to answer questions directly from your

21 Counsel, but the way a deposition works is

22 you should answer the questions I ask.

23 A.    I apologize.  I misunderstood.

24        MR. HOFFMAN:  I think that

117

B. Ullmann

1 is really what happened.

2 A.    I fully misunderstood.

3 Q.    Looking at this signature block,

4 who do you understand the parties to this

5 agreement to be?

6 A.    Phat Fashions, LLC and Tornado

7 Imports.  I apologize, I most definitely

8 misunderstood.  I apologize.

9 Q.    Mr. Ullmann, given that, in your

10 perspective -- well, Mr. Ullmann, do you

11 recall seeing this document signed by

12 Issie on March 30, 2006? --

13        MR. HOFFMAN:  DX4?

14        MR. OFFENHARTZ:  Yes.

15 A.    I don't recall actually having seen

16 it.  I'm not certain if I've seen it ever

17 with a signature.

18 Q.    Including on Tuesday?

19 A.    Including on Tuesday.  I don't

20 recall seeing it.

21 Q.    Do you recall telling Mr. Nathanson

22 what he should do with this document;

23 Defendant's Exhibit 4?

24 A.    No, I don't recall.

118

B. Ullmann

1
2   Q.    Do you know what Mr. Nathanson did
3   with this document?
4   A.    I don't know, but I have an
5   expectation of what he should have done.
6   Q.    Please tell me what he should have
7   done with it?
8   A.    My expectation is that he would
9   have forwarded it to Peter Morris.
10  Q.    What would he have asked Mr. Morris
11  to do?
12         MR. HOFFMAN:  Objection to
13      the form.  What should he have
14      asked Mr. Morris to do?
15         I object to the form.  It's
16      a hypothetical question.
17         THE WITNESS:  Everything is
18      hypothetical because I don't know
19      it.
20         MR. OFFENHARTZ:  Can you
21      read back the witness' answer.  I
22      was simply asking you to elaborate
23      on your answer.
24         (Whereupon the record was
25      read back by the reporter.)

119

B. Ullmann

1
2   Q.    My question to you is:  Why is that
3   your expectation?
4   A.    Well, that would be typically how
5   we treat the paper flow.
6   Q.    What would you expect Mr. Nathanson
7   to ask Mr. Morris to do?
8   A.    Well, Nathanson is not really in a
9   position to ask Peter Morris to do
10  anything.  But my expectation is, again,
11  that Peter Morris, upon receipt of such a
12  document, would typically start a
13  processing.  He would circulate it.
14         And what would -- well -- but in
15  the hypothetical, I don't know that this
16  happened, so I have to be very clear.
17         MR. HOFFMAN:  Since there
18      are documents covering all this,
19      why do we have to play the guessing
20      games?  Really.
21         THE WITNESS:  You know what
22      happened?  I'm the only one that
23      doesn't.
24  Q.    Don't worry, you will soon.  You
25  would never expect one of your lawyers to

120

B. Ullmann

1
2   have documents executed without your
3   permission, would you?
4         MR. HOFFMAN:  Objection to
5      the form.  By whom?
6         MR. OFFENHARTZ:  Let me ask
7      the question again.
8         MR. HOFFMAN:  That would be
9      good.
10         MR. OFFENHARTZ:  Why don't
11      you mark this as Defendant's
12      Exhibit No. 5 -- I withdraw the
13      question.
14  Q.    This is Defendant's Exhibit No. 5.
15  A.    Thank you.
16  Q.    Take a moment please to review this
17  document.
18  A.    Yes.
19         MR. OFFENHARTZ:  This is a
20      document bearing the Bates number
21      PF0153 through 0157.
22         MR. HOFFMAN:  They were not
23      produced to you attached this way.
24      The document that is 154 through
25      157 was produced separately, as was

121

B. Ullmann

1
2   page 153 and you're giving it to
3   him stapled and they were not
4   produced to you that way, and I
5   know that because I did the
6   production and these documents have
7   never been attached together.  So
8   this really should be two separate
9   exhibits.
10         MR. OFFENHARTZ:  What we're
11      going to do is turn these into two
12      exhibits.  Let me have it back.
13         We'll start with Defendant's
14      Exhibit 5, which remains as, now, a
15      one-page document.  Defendant's
16      Exhibit 5 is PF0153, a one-page
17      document.
18         (Whereupon PF0153, a
19      one-page document was marked
20      Defendant's Exhibit 5 for
21      identification as of this date.)
22  Q.    Can you identify this document,
23  please?
24  A.    It appears to be a letter from Eli
25  Nathanson to Peter Morris and it's

122

B. Ullmann

2 regarding the receipt of a signed
3 amendment and Eli's expectation of us
4 following standard operating procedures in
5 processing.
6 Q.    You just mentioned standard
7 operating procedures in processing; what
8 is the standard operating procedures in
9 processing?
10 A.    Peter would physically be
11 responsible for getting the first
12 signature, which is Russell Simmons.
13 Q.    It was Eli's expectation, on
14 April 5th, that apparently that's what
15 Peter would do; is that correct?
16       MR. HOFFMAN:  Objection to
17       the form.
18 A.    Looking at this exhibit, it appears
19 to be his expectation.
20 Q.    You're cc'd on this letter, aren't
21 you?
22 A.    I am.
23 Q.    Do you recall reviewing or
24 receiving this letter?
25 A.    I don't recall.

123

B. Ullmann

2 Q.    You mentioned that Mr. Morris would
3 get Mr. Simmons' signature.  Mr. Nathanson
4 appears, through this letter, to be
5 expecting Mr. Morris to get whatever
6 signatures might be required.
7       If you look at the second
8 paragraph, would you agree?
9 A.    I agree, but it's not accurate.
10       MR. HOFFMAN:  Objection to
11       the form as well.
12 A.    His expectation is incorrect.
13 Q.    Can you explain to me how his
14 expectation is incorrect?
15 A.    Whenever we are preparing to fully
16 execute an agreement, Kellwood legal would
17 prepare an executive summary.  The
18 executive summary is then prepared back to
19 me.  I initial it to say that it's okay
20 and then I will have to, after an
21 executive summary is done, present the
22 full set of circumstances to Bob Skinner
23 and, most likely, then Kellwood legal
24 would present the document to Bob for
25 signature thereafter.

124

B. Ullmann

2       So there are many steps between
3 this cover letter and a fully-executed
4 agreement.  But Eli wouldn't necessarily
5 know because he was not part of that
6 process.
7 Q.    Per this letter, Mr. Nathanson
8 certainly expected that the amendment
9 would be executed; isn't that correct?
10       MR. HOFFMAN:  Objection to
11       the form.
12 A.    I can't speak to Mr. Nathanson's
13 expectation.
14 Q.    Can you read into the record what
15 the second paragraph states?
16 A.    "Please arrange to have
17 countersigned where indicated and return
18 one fully-executed original to me.  Please
19 keep one original for your records.
20 Thanks."
21 Q.    How long have you been in business?
22 A.    Overall?
23 Q.    Since you graduated in '85, right?
24 A.    That would be accurate.
25 Q.    It's a lot of years?

125

B. Ullmann

2 A.    Yes.
3 Q.    I graduated from college in that
4 year, I know.
5       MR. HOFFMAN:  He had to say
6       that.
7 A.    Exactly, thank you.  Point
8 well-taken.
9 Q.    As you sit here right now reading
10 this, is there really any doubt in your
11 mind that Eli's expectation in writing
12 this letter was to have the amendment
13 fully executed? —
14       MR. HOFFMAN:  Objection to
15       the form.
16 A.    I'm happy to answer.  Eli Nathanson
17 is an outside Counsel.  I can't speak to
18 his expectation, but it doesn't matter.
19 Q.    I understand your position.  What
20 I'm asking you is:  Reading that second
21 paragraph, is there any doubt in your mind
22 that the person who wrote that fully
23 anticipated that the amendment would be
24 executed and returned to them?
25       MR. HOFFMAN:  Same

**134**

B. Ullmann

1 required two signatures and since I hadn't
2 presented anything to Bob Skinner, Bob
3 Skinner obviously hadn't executed
4 anything; hence, it's not a
5 legally-binding document.
6 Q.    Can you think of any other example
7 of Mr. Simmons executing a document on
8 behalf of Phat Fashions where, in your
9 opinion, the document was never -- never
10 received any additional signatures that,
11 in your view, were required?
12            MR. HOFFMAN:  Objection to
13       the form.
14 A.    I wasn't even aware of the fact
15 that he signed this one.
16 Q.    You became aware of it in the fall
17 of 2006, which is almost a year ago?
18            MR. HOFFMAN:  Objection to
19       the form.
20 A.    Yes.
21 Q.    You've been the president of Phat
22 Fashions since February of 2004, correct?
23 A.    Yes.
24 Q.    In your time at Phat Fashions, are

*(lines renumbered 1–25 above as printed)*

**135**

B. Ullmann

1 you aware of any other instance in which
2 the CEO of Phat Fashions, Russell Simmons,
3 executed a document that, in your view,
4 still required an additional signature to
5 be fully executed?
6            MR. HOFFMAN:  Objection to
7       the form.
8 A.    You need to restate the last part
9 of the question; am I aware of -- can you
10 restate it?
11            MR. OFFENHARTZ:  Can you
12       read the question back, please.
13            (Whereupon the record was
14       read back by the reporter.)
15 A.    The answer is yes.
16 Q.    Can you tell me what those examples
17 are?
18 A.    It would be every single agreement
19 that we ever signed.  There wasn't one
20 single agreement that didn't require more
21 than Russell Simmons' signature.
22            MR. HOFFMAN:  That was the
23       way you asked the question.
24 Q.    Are there any instances that you

**136**

B. Ullmann

1 are aware of, like this one, where you
2 contend Mr. Simmons signed an agreement
3 that he should not have signed?
4            MR. HOFFMAN:  Objection to
5       the form.
6            MR. OFFENHARTZ:  Let me
7       start over.
8 Q.    Can you think of any other
9 situation in which Phat Fashions took the
10 position that it did not have a contract
11 with a party because Mr. Simmons signed
12 the amendment or contract, but Mr. Skinner
13 did not?
14            MR. HOFFMAN:  Objection to
15       the form.  You can answer.
16 A.    I can think of a number of
17 instances where Russell Simmons would have
18 signed an agreement, an amendment and
19 there would be a long time that passed
20 between when Russell Simmons signed and it
21 was presented to Bob Skinner for
22 signature.
23            In that period, these agreements --
24 that would be all the agreements would

**137**

B. Ullmann

1 have one signature on it, just like this
2 agreement, Russell Simmons, and it
3 wouldn't have a second.  Whether or not
4 any of those documents ultimately were not
5 signed by Bob Skinner, I cannot recall.
6 Q.    Do you think that ever happened?
7            MR. HOFFMAN:  Objection to
8       the form.
9 A.    It's possible.
10 Q.    You can't think of an example?
11 A.    It's possible.
12 Q.    You cannot think of an example?
13 A.    I cannot think of an example right
14 here without reviewing records.  As I
15 said, every single contract is at one
16 stage, at the stage that this was on.
17 Q.    Who, at the company, would know the
18 answer to that question?
19            MR. HOFFMAN:  The question
20       about examples?
21            MR. OFFENHARTZ:  Yes.
22 A.    I don't know that anyone would know
23 offhand, but upon review of records, I
24 would say maybe possibly Luther Rollins,

158

```
1              B. Ullmann
2         MR. OFFENHARTZ: Let's talk
3    protective order a little later in
4    the day.  I'll come back to this
5    question after we talk about it.
6    No reason to --
7         MR. HOFFMAN: I think you
8    got the gist of where he was going
9    with it anyway.
10   Q.    You don't recall receiving this
11   Saturday, April 22nd e-mail, do you?
12        MR. HOFFMAN: Exhibit 8?
13        MR. OFFENHARTZ:  Exhibit 8.
14   Q.    You need to answer audibly.
15   A.    At this point, I'm still talking to
16   myself.  I don't recall it.
17   Q.    Mr. Ullmann, was it your practice
18   to correct your colleagues when they did
19   not understand the status of a given
20   project?
21        MR. HOFFMAN: Objection to
22        the form.
23   A.    Not really because the process was
24   such that any misunderstandings, errors or
25   unclarities would be cleared up in the
```

159

```
1              B. Ullmann
2    final stage, which involved executive
3    summary initially and then, ultimately,
4    Bob Skinner's signature.
5    Q.    To the best of your recollection,
6    on Saturday, April 22, 2006, did you
7    believe that the Tornado licensee
8    agreement amendment was completely done
9    and all it needed was Bob's signature?
10        MR. HOFFMAN: Objection to
11        the form.
12   A.    I don't recall.
13   Q.    Let me ask you this way:  Had you
14   read this e-mail on April 22nd, would you
15   have thought that Mr. Morris had made a
16   mistake?
17        MR. HOFFMAN: Objection to
18        the form.  Mistake about what?
19   Q.    Mr. Ullmann, you can answer the
20   question.
21        MR. HOFFMAN: Objection to
22        the form.
23   A.    No.  No, it doesn't look like a
24   mistake.
25   Q.    Do you recall any discussions with
```

160

```
1              B. Ullmann
2    Issie Wiseman in April or May regarding
3    the status of the licensee amendment
4    agreement?
5         MR. HOFFMAN: Objection.
6    Asked and answered.
7         MR. OFFENHARTZ: I'm seeing
8    if perhaps, as time passes --
9         MR. HOFFMAN: I know, I'm
10   putting my objection on.  He can
11   answer.
12   A.    No, I do recall having had
13   conversations; I cannot recall,
14   specifically or generally, what was
15   discussed.
16   Q.    Was the amendment discussed in
17   April or May?
18   A.    It's possible.
19   Q.    Do you remember what that
20   conversation was?
21   A.    I'm sorry, I don't.
22   Q.    Do you recall Issie asking you
23   words to the effect of, Bernt, where are
24   we?  Waiting on the signature page; what's
25   going on?
```

161

```
1              B. Ullmann
2    A.    I don't recall that.
3    Q.    When I say "words to the effect,"
4    please don't -- do us all a favor:  Don't
5    be thinking, All right, I never heard him
6    use those exact words.  I'm trying to get
7    your testimony.
8    A.    I understand.  I understand the
9    nature of the question and I'm trying to
10   give you a truthful response.  The
11   truthful response is I don't recall.  It
12   doesn't mean it didn't happen; it means I
13   don't recall.
14   Q.    Mr. Ullmann, what was your
15   understanding, say on April 22, 2006, of
16   the status of the licensee agreement
17   amendment?
18   A.    Again, I don't recall.
19        MR. OFFENHARTZ: Can you
20   mark this, please, as Exhibit 9.
21        (Whereupon E-mail from
22   witness to Mr. Gramke was marked
23   Defendant's Exhibit 9 for
24   identification as of this date.)
25   Q.    Mr. Ullmann, I'm handing you what's
```

162

B. Ullmann

1  B. Ullmann
2  been marked as Exhibit 9.
3  A.     Thank you.
4  Q.     You're welcome.  Can you please
5  take a moment to review the document.
6         MR. HOFFMAN:  When I
7         produced it, it did have the
8         attachments with it.  The
9         attachments are numbered, if you
10        need them, 169 to 175.  I'm not
11        saying that's for the question; I'm
12        just pointing it out.
13  A.    I'm done reviewing it.
14  Q.    The top part of this e-mail is an
15  e-mail from you to Mr. Gramke; is that
16  correct?
17  A.    Yes, it is.
18  Q.    You cc Peter Morris and Annie
19  Walker?
20  A.    I can see I am doing that.
21  Q.    You write that, "Don:  Bob has
22  asked me to hold off on Canada," in the
23  first sentence of the e-mail; do you see
24  that?
25  A.    Yes.

163

B. Ullmann

1  B. Ullmann
2  Q.     I've read that correctly?
3  A.     Yes.
4  Q.     Do you recall a discussion with Bob
5  Skinner to which you were referring in
6  this e-mail?
7  A.     I don't.
8  Q.     Do you recall writing this e-mail?
9  A.     I don't.
10  Q.    Do you recall anything about the
11  discussion you had with Mr. Skinner that
12  led you to write this e-mail?
13  A.    I do not recall our conversation.
14  Q.    Do you recall why Mr. Skinner asked
15  you to hold off on Canada?
16  A.    I don't know why.
17  Q.    Let me clarify.  You just said you
18  don't know why; does that mean you don't
19  remember why or he never told you why?
20        MR. HOFFMAN:  With respect
21        to this e-mail?
22  A.    With respect to this e-mail.
23  A.    With respect to this e-mail, I
24  don't know why.
25  Q.    What is the basis for that answer?

164

B. Ullmann

1  B. Ullmann
2         MR. HOFFMAN:  Objection to
3         the form.
4  Q.     You can answer.
5  A.     I'm thinking, to make sure I'm
6  giving an accurate answer.  I truly --
7  he's the chairman of the company.  I don't
8  believe that he shared it with me; I think
9  simply he said hold off.
10  Q.    Is that a recollection of yours or
11  is that less than a recollection, but it's
12  a -- you earlier said you just don't
13  recall the conversation that led you to
14  write this.  I'm trying to get the basis
15  for what you just said.  Help me out,
16  please.
17  A.    It's true.  My belief, which is the
18  best I can say, is that Bob didn't share
19  with me, at the time, his thoughts or
20  reasons for wanting to hold off.
21  Q.    Prior to Bob Skinner asking you to
22  hold off on Canada, you were prepared to
23  move forward on Canada; were you not?
24        MR. HOFFMAN:  Objection to
25        the form.

165

B. Ullmann

1  B. Ullmann
2  A.     I had been engaging in a dialogue
3  in good faith with Issie Wiseman and
4  Tornado and I was preparing to move
5  forward.  I think I want to -- I need to
6  kind of clarify some process here.
7         I hadn't, at this point, fully
8  wrapped my hands around it yet.  So it's
9  true that I had advanced it to this stage
10  in good faith.  I was now going to prepare
11  to actually take on all the facts and go
12  and present it to Bob Skinner, my boss,
13  the chairman of the company.
14        I hadn't fully done that yet. So I
15  would say that through this process, I
16  acted in good faith; I advanced the
17  process through.  I can't say that I had
18  full ownership yet because I hadn't gone
19  in front of him to present it.
20  Q.    Prior to Mr. Skinner informing you
21  to hold off on Canada, you were preparing
22  to continue the process and move forward
23  on Canada with Tornado; is that correct?
24        MR. HOFFMAN:  Objection to
25        the form.

166

B. Ullmann

A.   The process is such that it is
taken to an executive summary and then
it's presented to Bob and then a decision
is made as to how we proceed.  So I was,
indeed, proceeding toward that stage,
knowing full-well that at that stage, the
final decision regarding how we would be
proceeding would be made.  It could be
that we proceeded and concluded or we had
to go back and revisit or it could be
rejected.

Q.   What was your expectation on
April 22, 2006, about where this process
would end up?

   MR. HOFFMAN:  April 22nd?

   MR. OFFENHARTZ:  I can ask
   about April 22nd.  Fair point.
   Fair point.

Q.   On May 23rd of 2006, to the extent
you recall, your expectation was that you
would be renewing with Tornado; wasn't it?

   MR. HOFFMAN:  Objection to
   the form.

A.   No, I had no such expectations.

---

167

B. Ullmann

No, that is not accurate.  I knew exactly
what the process was.  My expectation was
simply to advance this so I can present it
to Bob and that was my only expectation.
I could not speak to what Bob Skinner
might decide to do and hence, I didn't
have expectation as to how anything would
end up.

   I mean, I presented deals to him
that were executed, completely unchanged.
I have had deals where I had to go back
and revisit numbers and I have had deals,
at this stage, that were outright rejected
and never moved forward.  All three
happened.

Q.   You said you brought him executed
deals; deals executed by Russell Simmons
that he rejected?

A.   No, I didn't say that I brought him
executed deals.

   MR. OFFENHARTZ:  Let's hear
   the answer.

   (Whereupon the record was
   read back by the reporter.)

---

168

B. Ullmann

   MR. HOFFMAN:  It's only
where you put the comma.  He's
given the testimony, you had
changed it and now he's going to go
and explain it.

   MR. OFFENHARTZ:  Mr. Hoff
man, please don't speak for your
witness.

   MR. HOFFMAN:  I'm not
speaking for my witness, but you
are and you're not supposed to be
either.

   MR. OFFENHARTZ:  Please,
it's very unprofessional.

   MR. HOFFMAN:  Adam -- Adam,
don't pull that stuff with me
again.

   MR. OFFENHARTZ:  Mr. Hoff
man, lower your voice and if you
point your finger at me one more
time, I'm going to call the Court
and say you're behaving like a
child.

   MR. HOFFMAN:  Don't you dare

---

169

B. Ullmann

call me unprofessional the way
you've acted in this case.  Don't
you dare.

   MR. OFFENHARTZ:  Don't point
your finger at me.  Don't point
your finger at me; it's very
unprofessional.

   MR. HOFFMAN:  Act
professional.

   MR. OFFENHARTZ:  Mr. Hoff
man, it's very unprofessional to
point your finger at your
adversary.

   MR. HOFFMAN:  Ask your
questions.  I'll play your game.

Q.   Do you know the address of Rush
Communications?

A.   I do.

Q.   What is the address of Rush
Communications?

A.   It's 512 Seventh Avenue.

Q.   Do you know who represented
Mr. Simmons in his negotiations departing
from Kellwood or Phat Fashions; do you

170

B. Ullmann

1    know which law firm?
2    A.    Offhand, I don't.
3    Q.    You mentioned that he violated
4    Kellwood guidelines by using abusive
5    language?
6          MR. HOFFMAN: Objection.
7    Direct the witness not to answer.
8          MR. OFFENHARTZ: You're
9    directing the witness not to
10   answer?
11         MR. HOFFMAN: Yes.
12         MR. OFFENHARTZ: On what
13   grounds?
14         MR. HOFFMAN: On grounds
15   that it's confidential. It has
16   nothing to do with this case.
17         MR. OFFENHARTZ: You're
18   instructing a witness not to answer
19   a question on grounds other than
20   privilege?
21         MR. HOFFMAN: In this
22   particular instance --
23         MR. OFFENHARTZ: Thank you.
24   Q.    Mr. Ullmann, are you going to

171

B. Ullmann

1    answer the question?
2    A.    I'm at a loss.
3    Q.    You answered the same question
4    earlier today.
5          MR. HOFFMAN: Exactly. So
6    you've got the answer.
7          MR. OFFENHARTZ: Put your
8    hand down.
9          MR. HOFFMAN: Stop it. I'll
10   point my fingers where I want to
11   point. It's not pointing at you;
12   it's a figure of speech. People
13   talk with their hands.
14         MR. OFFENHARTZ: People also
15   generally don't point fingers at
16   other people.
17   Q.    Mr. Ullmann, what exact behavior
18   did Mr. Simmons engage in that constituted
19   a breach of Kellwood's guidelines?
20         MR. HOFFMAN: I direct the
21   witness not to answer.
22   Q.    Are you going to listen to your
23   client's instructions?
24         MR. HOFFMAN: I'm not his

172

B. Ullmann

1    client; I'm his lawyer.
2    Q.    Are you going to listen to your
3    lawyer's instructions?
4    A.    I assume I should.
5          MR. HOFFMAN: Do you want to
6    answer the question without my
7    instruction?
8          THE WITNESS: You're
9    Counsel; you're here to direct me.
10         MR. HOFFMAN: You have
11   already received answers to
12   questions about it and we said we
13   will discuss it later on.
14         MR. OFFENHARTZ: No --
15         MR. HOFFMAN: You're
16   interrupting me again.
17   Q.    Mr. Ullmann, what was the language
18   that Mr. Simmons used that was considered
19   abusive?
20         MR. HOFFMAN: I direct the
21   witness not to answer. Objection.
22   Now you're harassing the witness.
23   Q.    Mr. Ullmann, do you understand that
24   you may well have to come back after these

173

B. Ullmann

1    two days are up to answer questions that
2    you've been instructed not to answer?
3          MR. HOFFMAN: Only if you're
4    right, Adam.
5          MR. OFFENHARTZ: I said
6    "may". May have to come back.
7    Q.    Do you understand that?
8    A.    I do now.
9    Q.    Mr. Ullmann, on May 23, 2006, Bob
10   Skinner tells you to hold off on Canada;
11   that's correct, right?
12   A.    Correct.
13   Q.    Did Bob Skinner later tell you to
14   proceed with Tornado?
15   A.    Not to the best of my recollection.
16   Q.    On May 23, 2006, from your
17   perspective, Tornado, the Tornado
18   negotiations were over; is that correct?
19         MR. HOFFMAN: Objection to
20   the form.
21   A.    No. Hold off is not the same as
22   rejected.
23   Q.    Please tell me: What did you mean
24   by "hold off"?

174

B. Ullmann

2  A.    It seems to me that hold off means
3  let's not move this forward now. It's
4  holds the possibility of it possibly being
5  moved forward later.
6  Q.    Even on May 23, 2006, you still
7  wanted the possibility of having an
8  amendment with Tornado; is that correct?
9        MR. HOFFMAN: Objection to
10      the form.
11  A.    No, that's not correct. I had no
12  particular desires; I wasn't looking for a
13  particular result. The whole dialogue
14  that led to the draft amendment was
15  prompted by Issie Wiseman contacting me.
16  I went through the motions of advancing
17  that dialogue. When I was instructed to
18  hold off, I held off.
19  Q.    If I've gotten this wrong, tell me,
20  but your testimony is -- well, let me ask
21  you the question again.
22      By holding off, that did not mean
23  it was no longer a possibility; is that
24  correct?
25      MR. HOFFMAN: Objection to

175

B. Ullmann

2  the form. Asked and answered.
3  A.    My view is I couldn't proceed with
4  it then. Maybe we would get back to it
5  later and maybe we wouldn't.
6  Q.    What would be the deciding factor
7  whether or not you would get back to it
8  later?
9  A.    It would be Bob Skinner.
10  Q.    Did Bob Skinner ever come back to
11  you and say, or explain to you why he
12  wanted to hold off with Tornado?
13  A.    I have no recollection that he ever
14  explained it, but he did make an
15  introduction, as we have discussed, to
16  Gaby Bitton; the incidence could be
17  related, but I don't know that they are.
18  Q.    Did you discuss your dealings with
19  Mr. Bitton or with Mr. Skinner?
20  A.    Yes.
21  Q.    In any of the discussions that you
22  had with Mr. Skinner regarding Mr. Bitton,
23  was Tornado discussed?
24  A.    Only in the context of having
25  received guidance from Counsel that it was

176

B. Ullmann

2  prudent and proper to proceed with
3  Mr. Bitton.
4  Q.    Mr. Ullmann, why did you wait until
5  February of 2007 to inform Issie Wiseman
6  that there would be no amendment from your
7  perspective?
8        MR. HOFFMAN: Objection to
9      the form.
10  A.    I don't recall exactly when I did
11  advise him the first time, even though I
12  believe it was towards the end of January
13  or beginning of February '07. And from my
14  vantage point, I wasn't necessarily so
15  much away as it was -- it was not a
16  priority for me to get back to him. As
17  you see, this was a status report.
18      I think we counted, on that
19  particular report, that there were eleven
20  entries. This was just one conversation
21  of very many conversations.
22  Q.    Mr. Ullmann, looking at Exhibit 9
23  for a moment, on May 23rd, you write that
24  Bob Skinner has asked you to hold off on
25  Canada?

177

B. Ullmann

2  A.    Correct.
3  Q.    Did you inform Issie Wiseman on May
4  23rd that things were on hold; yes or no
5  or you don't recall?
6  A.    I don't recall.
7  Q.    Did you inform Issie Wiseman that
8  things were on hold in June 2006?
9  A.    I don't recall.
10  Q.    July of 2006?
11  A.    I don't recall.
12  Q.    August of 2006?
13  A.    I don't recall.
14  Q.    September of 2006?
15  A.    I don't recall.
16  Q.    October of 2006?
17  A.    I don't recall.
18  Q.    November of 2006?
19  A.    I don't recall.
20  Q.    December of 2006?
21  A.    I don't recall.
22      MR. HOFFMAN: Careful now.
23  Q.    In January of 2007 or in February
24  of 2007, what did you inform Mr. Wiseman
25  of?

178

1          B. Ullmann
2  A.    While I cannot recall the exact
3  language, I do recall that we had a
4  conversation that I did not expect us to
5  be able to conclude the transaction; there
6  will be no amendment.
7  Q.    That conversation took place after
8  you had reached terms and principal with
9  Buffalo Jeans; isn't that the case?
10         MR. HOFFMAN:  Objection to
11       the form.
12  A.    Again, I can't recall that they are
13  related.  They could be.
14  Q.    Let me ask you this:  If Buffalo
15  Jeans, on January 1st of 2007, had said to
16  you, Mr. Ullmann, sorry, we cannot do
17  business with you, it's never happening;
18  what would you have done?
19  A.    I would likely have come back to
20  Bob Skinner to revisit the executive
21  summary for Tornado and re-present it and
22  see if we were in a position to take it
23  off hold or if he desired to move in some
24  other direction, either directing me to
25  another potential licensee or whatever

179

1          B. Ullmann
2  else he may choose to do.
3  Q.    Basically, you needed to keep
4  Tornado on hold so that they would
5  continue to be an option until you
6  finalized another deal; isn't that the
7  case?
8         MR. HOFFMAN:  Objection to
9       the form.
10  A.    No, I disagree.  I don't think
11  that's accurate at all.  Tornado has an
12  agreement that still is in effect today.
13  It runs all the way to the end of this
14  year.  The notice period in that
15  agreement, each and every time when it was
16  reviewed, I believe, and it's our standard
17  language, any licensee that is renewing --
18  and it's different than amending -- has to
19  give notice not sooner than nine months
20  before expiration and not later than six
21  months prior to expiration.
22         So if I'm having a conversation
23  with Issie Wiseman in January or February,
24  I'm well outside of that window providing
25  ample time either way and I don't think

180

1          B. Ullmann
2  it's particularly linked to anything.
3  Q.    Your decision to inform Issie
4  Wiseman in late January, February of 2007
5  that you are not proceeding with the
6  amendment had no linkage whatsoever with
7  your negotiations with Bitton; is that the
8  case?
9         MR. HOFFMAN:  Objection to
10       the form.
11  A.    No, I'm not saying that either.
12  There's -- obviously, we were in
13  conversations with Bitton.  The terms were
14  still being negotiated.  And this, I know
15  for a fact, what triggered my conversation
16  with Issie was not the status of the
17  Bitton negotiation regardless of there
18  being a link; yes, I would say they're
19  related.
20         But what triggered it is that there
21  was a show coming up, the MAGIC show and
22  it didn't seem right with the information
23  available to me at the time to go out
24  there and see him in person, knowing at
25  this point and feeling rather strongly,

181

1          B. Ullmann
2  that we wouldn't be proceeding.  I felt it
3  was proper to tell him and tell him in
4  advance of him going out there.
5  Q.    If there had been no MAGIC show,
6  you would have felt no reason to tell him;
7  is that your testimony?
8         MR. HOFFMAN:  Objection to
9       the form.
10  A.    I would say I had no legal nor
11  morale obligation to say anything until we
12  were in the window.  However, as a
13  courtesy and because of our relationship,
14  I shared it with him at the time when I
15  felt it was proper and prudent in the
16  context of our internal dealings.
17  Q.    Some eight or nine months after you
18  made the decision to put it on hold; is
19  that correct?
20         MR. HOFFMAN:  Objection to
21       the form.
22  Q.    Did you decide to inform
23  Mr. Wiseman you were not proceeding nine
24  months after Mr. Skinner advised you to
25  put it on hold; it's a yes or no answer --

182

1           B. Ullmann
2       MR. HOFFMAN:  It's not yes
3   or no.
4       MR. OFFENHARTZ:  You know
5       something --
6   Q.    Mr. Ullmann, will you please look
7   at Exhibit No. 9?
8   A.    Yes.
9   Q.    What is the date on Exhibit No. 9;
10  we can do it this way.
11      MR. HOFFMAN:  I was
12      objecting to -- he was answering a
13      question and you stopped him from
14      answering; that's what I was
15      objecting to, not the question.
16      You didn't let him answer.
17  Q.    What is the date on Exhibit No. 9?
18  A.    5/23/2006.
19  Q.    That's when you first learned that
20  Bob Skinner wanted you to put Tornado on
21  hold, correct?
22      MR. HOFFMAN:  Objection to
23      the form.
24  A.    And as already testified, it was
25  true, it was on hold; which is different

183

1           B. Ullmann
2   than being rejected.
3   Q.    You never told Mr. Wiseman that the
4   deal was on hold, did you?
5       MR. HOFFMAN:  Objection to
6       the form.  Asked and answered.
7   A.    I don't recall all the way up to
8   January or February, when I do recall.
9   Q.    How long had you been in business
10  with Mr. Wiseman?
11  A.    Personally, since February of 2004.
12  Q.    When exactly did the decision --
13  who made the decision to go from holding
14  off on Tornado to being done with Tornado?
15  A.    Ultimately, I made the
16  recommendation.
17  Q.    To whom did you make the
18  recommendation?
19  A.    Bob Skinner.
20  Q.    When did you make the
21  recommendation that Tornado go from being
22  on hold to being over?
23  A.    No recollection.
24  Q.    Was it in June of 2006?
25  A.    I seriously doubt it.

184

1           B. Ullmann
2   Q.    Why do you seriously doubt it?
3   A.    Because we were still just on hold.
4   Q.    When did you go from being on hold
5   to recommending to Mr. Skinner that you
6   were done with Tornado?
7   A.    I cannot recall.
8   Q.    Was it in July of 2006?
9   A.    I think it was more in January,
10  February of 2007; that would be my guess.
11  It's a guess; it's not a recollection.
12  Q.    What were the factors that led you
13  to guess that that's when you decided to
14  be done with Tornado?
15  A.    Rephrase the question, please.
16      MR. OFFENHARTZ:  Can you
17      read the question back, please.
18      (Whereupon the record was
19      read back by the reporter.)
20  A.    You want me -- the factors that led
21  me to guess or do you want me to guess
22  what the factors were?
23  Q.    Mr. Ullmann, you testified that you
24  guess you made a recommendation to
25  Mr. Skinner to terminate Tornado in

185

1           B. Ullmann
2   January or February; what makes you guess
3   it was January or February?
4   A.    Well, I am thinking so because
5   that's when we know that I notified Issie.
6   Q.    What were the reasons that prompted
7   you to go from on hold to terminate;
8   something had to prompt the change?
9       MR. HOFFMAN:  Objection to
10      the form.
11  Q.    What prompted the change?
12      MR. HOFFMAN:  Objection to
13      the form.
14  A.    I cannot recall the specific
15  reasons.  I will say we had, by then,
16  received a lot of information about how
17  our brand was being managed in the
18  territory and it was unfavorable
19  information.  The proposed minimums in the
20  agreement, while higher than what had
21  previously been done, are not impressive
22  at all by any business standard.  All our
23  standard agreements go off at a royalty of
24  8 percent; this agreement was
25  grandfathering 7 percent.

186

B. Ullmann

2    By then, there had been a
3  falling-out with our Baby Phat licensee
4  and there was a major feud going on
5  between Baby Phat, our largest licensee
6  bar none -- it's our largest licensee by
7  far and there is, at this point, a vicious
8  feud between Baby Phat and Issie and some
9  separate entity that he's involved with.
10  So there were a number of reasons that
11  were unfavorable and it changed the
12  climate.
13  Q.    How did your discussions with
14  Bitton fit into that climate?
15       MR. HOFFMAN:  Objection to
16    the form.
17  A.    Restate the question, please.
18  Q.    What don't you understand about the
19  question?
20  A.    I'm not sure if I understand it.
21       MR. HOFFMAN:  He asked you
22    to restate it.
23       MR. OFFENHARTZ:  I'm
24    asking -- it will help me restate
25    it if he can explain what he

187

1       B. Ullmann
2    doesn't understand about it.
3  A.    I said restate.  I didn't
4  understand it, but maybe re-read it and
5  I'll understand it.
6       MR. OFFENHARTZ:  Please read
7    back the question.
8       (Whereupon the record was
9    read back by the reporter.)
10  A.    Fit into the climate?
11  Q.    Climate was a phrase you used.
12  A.    I know, but I still don't
13  understand it.
14  Q.    Mr. Ullmann, please tell me the
15  role that your negotiations with Bitton
16  played in deciding to terminate Tornado?
17  A.    I think that was one out of a
18  number of factors.
19  Q.    Am I to understand that you would
20  have terminated Tornado even without
21  finalizing your deals with Bitton?
22       MR. HOFFMAN:  Objection to
23    the form.  You can answer.
24  A.    It wasn't my ultimate decision.  At
25  the time, I was relying upon Bob Skinner's

188

1       B. Ullmann
2  guidance.
3  Q.    Mr. Ullmann, you recommended, or
4  you've testified that you recommended to
5  Mr. Skinner to terminate Tornado; is that
6  correct?
7  A.    Yes.
8       MR. HOFFMAN:  Objection to
9    the form.  I don't believe that's
10    the testimony.
11  A.    Oh, then, I didn't.
12  Q.    You testified that you did, but if
13  your lawyer tells you that you didn't, if
14  you want to change your testimony based on
15  what Mr. Hoffman said, that's fine.
16       MR. HOFFMAN:  Can we have it
17    read back.  Please let me finish
18    and not talk over me.  You're
19    making these statements; let's have
20    the reporter go back.
21       I do not believe that he
22    said he recommended they terminate
23    Tornado.  They were talking about
24    discussions.  Do a search for the
25    word.

189

1       B. Ullmann
2       (Whereupon the record was
3    read back by the reporter.)
4  A.    Can I clarify something, please.
5  Under no circumstance would I have
6  recommended that Tornado be terminated.
7  If I said that, I want it stricken or
8  rephrased because the agreement is
9  expiring and there are no new renewals.
10  Q.    Just for clarity sake, and that is
11  a fair point, did there come a time when
12  you recommended to Mr. Skinner that there
13  be no amendment with Tornado?
14  A.    I believe that is true.
15  Q.    You may recall, just a few minutes
16  ago we went around and around on when you
17  thought that recommendation had been made
18  to Mr. Skinner?
19  A.    Yes.
20  Q.    I think just maybe two minutes ago,
21  I asked you whether you indeed had
22  recommended to Mr. Skinner that Phat
23  Fashions not proceed with Tornado and I
24  think that's what drew your lawyer's ire?
25       MR. HOFFMAN:  No, you asked

194

B. Ullmann

1
2　Q.　Did you do that?
3　A.　I don't know. I don't recall.
4　　　　MR. OFFENHARTZ: Can you
5　read back the last question and
6　answer.
7　　　　(Whereupon the record was
8　read back by the reporter.)
9　Q.　This is marked as Exhibit 10. Have
10　you seen this document before, Mr.
11　Ullmann?
12　A.　I have.
13　Q.　How recently have you seen this
14　document?
15　A.　I would say I saw it on Tuesday.
16　Q.　Who showed this document to you on
17　Tuesday?
18　A.　My Counsel.
19　Q.　By your Counselor, you're referring
20　to whom?
21　A.　Mr. Phil Hoffman.
22　Q.　How long did you spend talking with
23　Mr. Hoffman about this document?
24　　　　MR. HOFFMAN: I'm going to
25　　　object. Attorney work product.

195

B. Ullmann

1
2　It's privilege. That's an
3　objection. You don't have to
4　answer that. It's privileged.
5　　　　MR. OFFENHARTZ: I'm not
6　sure I agree with you, but I'll
7　think about it.
8　　　　MR. HOFFMAN: You know what
9　Adam, honestly, it's not really a
10　big deal to me. If you want to ask
11　him and he wants to answer and if
12　he remembers, it's fine.
13　　　　Go ahead, why don't you
14　answer.
15　　　　MR. OFFENHARTZ: If it's not
16　a big deal -- that's fine. I can
17　agree with you, but you objected.
18　I don't agree with your objection,
19　but I agree with why you objected.
20　A.　It was brief. To the best of my
21　recollection, a minute, something like
22　that; not more.
23　Q.　Do you recall writing this e-mail
24　to Mr. Bitton on or about January 24,
25　2007?

196

B. Ullmann

1
2　A.　I don't recall.
3　Q.　What was the state of negotiations
4　with Mr. Bitton in January of 2007?
5　A.　Again, I don't recall. I can infer
6　based upon the e-mail.
7　Q.　What do you infer based upon this
8　e-mail?
9　A.　I infer that there were dialogues
10　that hadn't been concluded.
11　Q.　What do you mean by dialogues had
12　not been concluded?
13　A.　I mean that there were discussions
14　about Gaby Bitton taking over the
15　stewardship of our brand in Canada. There
16　was also a dialogue about the role at our
17　retail stores in the United States and it
18　seems to me, while we must have had good
19　negotiations, good conversations, they
20　were, at this stage, inconclusive.
21　Q.　When did they become conclusive
22　following January 24, 2007?
23　A.　I don't recall.
24　Q.　Ballpark? A month ago, February of
25　2007, September of 2007?

197

B. Ullmann

1
2　A.　I don't know. In terms of
3　conclusive, I can say the retail deal
4　remained inconclusive well into August,
5　September of 2007. And actually, the
6　reality is -- I do recall now -- the
7　Canadian deal, as well, remained opened
8　for a very long time; at least until June,
9　maybe even July of this year.
10　Q.　What do you mean by remained open?
11　A.　I mean there were unnegotiated
12　points that were open points.
13　Q.　Would you say you were 95 percent
14　of the way there by February 1, 2007?
15　A.　I don't think there is any such
16　thing as being 95 percent anywhere in the
17　contract. It's either completely done and
18　it's only done when it's signed or it's
19　not. I can't speculate to you. In my
20　mind, it could have been there and they
21　could have been somewhere else.
22　Q.　In your mind, where were you on
23　February 1, 2007?
24　A.　I do not recall that accurately.
25　It seems to me that I'm trying to push, at

218

B. Ullmann

1        Do you see that?

2  A.   Yes.

3  Q.   Who were you waiting for further

4  info from on the retail deal?

5  A.   From Gaby.

6  Q.   When did you have those discussions

7  with Mr. Bitton?

8  A.   I don't recall. It could be, from

9  all I know, going back to Exhibit 10.

10  Where I'm saying we're still looking to

11  fully negotiate the term sheets and that's

12  on January 24th. I don't know from

13  October to January, it's possible.

14  Q.   When did Mr. Bitton finally provide

15  you whatever information you were waiting

16  on from him?

17  A.   I don't recall. It appears clear

18  that on January 24, 2007, I still did not

19  have all the information that I was

20  looking for.

21        MR. OFFENHARTZ: Can you

22      mark this as 12, please.

23      (Whereupon Document that

24      bears Bates numbers PF0203 through

219

B. Ullmann

1  PF0207 was marked Defendant's

2  Exhibit 12 for identification as of

3  this date.)

4  Q.   Number 12. Please take a moment to

5  review it. This is a document that bears

6  Bates numbers PF0203 through PF0207.

7        On the first page of this exhibit,

8  in the middle, Mr. Nathanson is sending to

9  you a draft agreement for the new Canadian

10  licensee. He's asking you to please

11  review and let him know if you have any

12  comments.

13        Your response, which you sent later

14  that day is, you will review tomorrow and

15  advise accordingly. Do you recall what

16  comments you had?

17  A.   I don't.

18  Q.   Do you recall how you conveyed your

19  comments to Mr. Nathanson?

20  A.   I don't.

21  Q.   Did you send them by e-mail?

22  A.   I don't know.

23  Q.   Did you send them by telephone?

24  A.   I don't recall.

220

B. Ullmann

1  Q.   Did you write them down by hand and

2  have your assistant fax them?

3  A.   Definitely not.

4  Q.   Did you send him comments?

5  A.   Specifically on this deal or in

6  general?

7  Q.   On October 31st, you indicated to

8  Mr. Nathanson that you would review the

9  draft agreement he sent you and advise

10  accordingly.

11        Do you recall how you advised

12  Mr. Nathanson accordingly?

13  A.   I don't.

14  Q.   You don't recall if you marked the

15  document up and e-mailed it back to him?

16  A.   I don't.

17  Q.   You don't recall if you picked up

18  the phone and discussed it with him?

19  A.   I don't.

20  Q.   Do you recall what he meant by --

21  did you ask him to forward it on to anyone

22  else?

23  A.   Not to the best of my recollection.

24        MR. OFFENHARTZ: If you can

221

B. Ullmann

1  mark that as Exhibit 13.

2      (Whereupon Document

3      Bates-stamped PF0208 through PF0212

4      was marked Defendant's Exhibit 13

5      for identification as of this

6      date.)

7      MR. OFFENHARTZ: This

8      document is Bates-stamped PF0208

9      through PF0212.

10  Q.   Have you had a chance to review

11  this?

12  A.   I have.

13  Q.   Mr. Ullmann, do you recall on

14  Thursday, November 2, 2006, sending what

15  you describe as a first draft of our

16  agreement for Canada to Marc Kakon at

17  Algo, Gaby at Buffalo Jeans and perhaps

18  Don Elituv at rogers.blackberry.net?

19  A.   No, I don't recall doing it, but I

20  can see from the e-mail that I obviously

21  did.

22  Q.   It appears that you sent the first

23  draft of your Canada agreement to Algo on

24  November 2nd, correct?

222

B. Ullmann

1
2  A.    Yes.
3  Q.    Does this refresh your recollection
4  whether you provided any comments to Eli
5  Nathanson, looking at this document?
6        MR. HOFFMAN:  On the draft
7  that he had sent?
8        MR. OFFENHARTZ:  Yes.
9  A.    I don't recall, but I'm going to
10  have to assume that I did.
11  Q.    Why do you assume you did?
12  A.    Based upon my comments from Exhibit
13  12 that says I will review tomorrow and
14  advise accordingly.
15        At the very least, I would have
16  advised -- it may be no comments, but I
17  would advise it's okay, please proceed;
18  something like that.
19  Q.    You don't recall what, if any, your
20  comments were?
21  A.    No, no.
22  Q.    Mr. Ullmann, did you advise Issie
23  Wiseman that you had provided a draft of a
24  license agreement for a competitor in
25  Canada on November 2, 2006?

223

B. Ullmann

1
2  A.    Why would I?
3  Q.    I'm simply asking if you did.  Your
4  lawyer and I can argue and probably will
5  for quite some time over whether or not
6  you should have.
7        I'm simply asking:  Did you advise
8  Mr. Wiseman, on November 2nd, that you had
9  provided a draft agreement for a license
10  agreement to Gaby Bitton and his
11  colleagues?
12  A.    I don't recall, but it's quite
13  certain that I wouldn't.  I would say at
14  this point, it had nothing to do with him.
15  Q.    It would have nothing to do with
16  Issie Wiseman that you were not going to
17  amend the agreement; is that your
18  testimony?
19        MR. HOFFMAN:  Objection to
20  the form.
21  A.    That is not my testimony.  My
22  testimony is that at this point, we were
23  engaged in exploratory dialogue with
24  potential other licensees and at that
25  stage, there was no way of knowing where

224

B. Ullmann

1
2  we would end up in the conversation.
3        And as I had indicated and
4  testified to you earlier, there were a
5  number of other things going on in our
6  relationship with Mr. Wiseman.
7  Q.    At any time from November on
8  through late January or early February,
9  when you informed Mr. Wiseman that you
10  would not be proceeding with the executed
11  amendment, did you ever inform him that
12  you'd entered into and exchanged proposals
13  with any other possible licensee?
14        MR. HOFFMAN:  Objection to
15  the form.  An executed amendment?
16  A.    Can you please re-ask the question.
17        MR. OFFENHARTZ:  Can you
18  repeat the question, please.
19        (Whereupon the record was
20  read back by the reporter.)
21  A.    I don't recall, but don't believe
22  that I had.
23  Q.    Is there any doubt in your mind
24  that you didn't tell Mr. Wiseman anything
25  of that nature?

225

B. Ullmann

1
2        MR. HOFFMAN:  Objection to
3  the form.
4  A.    I testified that I don't recall.
5  So the first time I recall having a
6  dialogue with Mr. Wiseman about this is
7  late January or early February.  It does
8  not necessarily mean that it is, indeed,
9  the first time it takes place.  It's the
10  first time I can recall that it took
11  place.
12  Q.    Mr. Ullmann, would you turn to
13  Exhibit 10, please.  You have Exhibit 10
14  in front of you?
15  A.    I do.
16  Q.    Do you recall what Mr. Bitton's
17  response to this e-mail was, or
18  Mr. Kakon's response?
19  A.    I don't.
20  Q.    Do you recall when they responded,
21  if at all, to this e-mail?
22  A.    I don't.
23  Q.    Did they get back to you right
24  away; did you have to send them another
25  e-mail a month later?  I'm just trying to

226

B. Ullmann

1  help you refresh your recollection.
2  A.   But I don't recall.
3  Q.   Your recollection is that you
4  didn't finalize a deal for some time after
5  January 24th; is that correct?
6  A.   My recollection is that neither the
7  Canadian deal nor the U.S. retail rollout
8  deal were finalized and executed until
9  after, I want to say June of this year.
10  The U.S. retail deal even later, much
11  later.
12       MR. OFFENHARTZ:  Would you
13       mark this as Exhibit 14, please.
14       (Whereupon One-page
15       document, bearing Bates number
16       PF0222 was marked Plaintiff's
17       Exhibit 14 for identification as of
18       this date.)
19  Q.   I'm handing you what has been
20  marked as Exhibit 14.
21  A.   Yes.
22  Q.   Exhibit 14 is a one-page document,
23  bearing Bates number PF0222.
24       Can you take a moment to review it,

227

B. Ullmann

1  please?
2  A.   Yes.
3  Q.   Does this refresh your recollection
4  of when either Mr. Bitton or Mr. Kakon
5  responded to your e-mail of Wednesday,
6  January 24th?
7  A.   To the extent that this one
8  and-a-half lines constitute a response, we
9  have that in front of us here.
10  Q.   Is this not a response?
11  A.   Yes, it's a response.
12  Q.   Does this refresh your recollection
13  of when they responded?
14  A.   They responded promptly the same
15  day.
16  Q.   What did they say or who actually
17  responded?
18  A.   Gaby Bitton.
19  Q.   What did he write?
20  A.   He's suggesting that Marc will be
21  getting back to me via telephone.  So he
22  speaks to an intent of Marc Kakon to call
23  me.
24  Q.   What does Mr. Bitton write about

228

B. Ullmann

1  when he would like to put closure on this?
2  A.   Well, he's talking about his
3  intention of closing by the end of the
4  week.
5  Q.   In fact, what he writes -- would
6  you read the last sentence that he writes,
7  please.
8  A.   "We would also like to put closure
9  to this by the end of the week."
10  Q.   Do you recall if Marc Kakon called
11  you Thursday or Friday, January 25 or 26,
12  2007?
13  A.   I don't, but it would not be
14  surprising if he did not call back that
15  week.
16  Q.   You don't recall either way?
17  A.   I don't recall either way.
18  Q.   When do you recall next speaking to
19  either Mr. Bitton or Mr. Kakon after
20  January 24, 2007?
21  A.   The next time I really recall
22  speaking to them is at the MAGIC show in
23  Las Vegas in February.  That's not to say
24  we didn't speak prior, but I recall seeing

229

B. Ullmann

1  them there.
2  Q.   You have no recollection either way
3  whether you spoke or didn't speak?
4  A.   I don't.
5  Q.   Did you come to understand what
6  Mr. Bitton meant by, "We would also like
7  to put closure to this by the end of the
8  week"?
9  A.   I think he's simply speaking to an
10  intent of having a meeting of the minds on
11  business terms.
12  Q.   When did you have a meeting of the
13  minds on business terms; not a
14  fully-executed document, but the phrase
15  you used, "a meeting of the minds of
16  business terms"?
17       MR. HOFFMAN:  Objection to
18       the form.
19  A.   Sometime significantly later in the
20  spring.
21  Q.   Do you recall any other e-mails
22  exchanged with Marc Kakon or Gaby Bitton
23  and you or your colleagues?
24  A.   I don't recall, but I expect that

242

B. Ullmann

1
2  Q.    Rush Communications is on?
3  A.    43.
4  Q.    Mr. Ullmann, do you recall a
5  dispute that Issie Wiseman had with one of
6  Phat Fashions' licensees in Europe?
7  A.    Yes.
8  Q.    What do you recall about that
9  dispute?
10  A.    I recall that a footwear licensee
11  of ours in Europe had sold off a smaller
12  partial of old inventory to a distributor
13  in eastern Europe and at least part of
14  that partial made it into the Canadian
15  market through its transshipment. It was
16  sold from one market and transshipped into
17  another market where it was not supposed
18  to go.
19  Q.    When did this take place?
20  A.    Sometime in 2005. Fall of 2005.
21  Q.    Do you recall how this was brought
22  to your attention?
23  A.    Yes, Issie told me about it.
24  Q.    Do you recall how it got resolved?
25  A.    Well, Issie was insisting that he

243

B. Ullmann

1
2  had been wronged. I attempted to actually
3  get some type of monetary compensation for
4  him from the European licensee, but came
5  to agree with the European licensee that
6  they hadn't shipped their side of the
7  territory.
8       They delivered the goods and could
9  provide evidence that they shipped the
10  goods inside of their territory. The
11  goods ended up in Canada through an
12  illegal transshipment and our European
13  licensee immediately terminated their
14  relationship with said distributor. So no
15  monetary damage was ever offered.
16  Q.    What monetary amount were you
17  contemplating?
18  A.    You know, I seem to recall, and
19  this I believe has to do with more recent
20  review of documents, I don't think I would
21  have had any independent recollection, to
22  be honest.
23  Q.    What has your recent review of the
24  documents indicated to you that the
25  monetary value was?

244

B. Ullmann

1
2  A.    $25,000.
3  Q.    When did you have this recent
4  review of the documents?
5  A.    On Tuesday.
6  Q.    Prior to Tuesday, would you have
7  had any recollection about these events?
8  A.    I would have recollected the
9  events, but not the specific amount.
10       MR. OFFENHARTZ: Please mark
11       this as Defendant's Exhibit 15.
12       (Whereupon E-mail regarding
13       Unioncon was marked Defendant's
14       Exhibit 15 for identification as of
15       this date.)
16  Q.    I'm handing you what has been
17  marked as Defendant's Exhibit 15. Take a
18  moment to review this document, please.
19  A.    I'm ready.
20  Q.    Is this a document you reviewed on
21  Tuesday?
22  A.    I believe so.
23  Q.    Did you review other documents on
24  this issue on Tuesday?
25  A.    I don't think so. I don't even

245

B. Ullmann

1
2  know if I reviewed the bottom half of the
3  page; I only recall the top.
4  Q.    How did you go about attempting to
5  institute a modest financial penalty of
6  $25,000 on Unioncon?
7  A.    By having a dialogue with Unioncon,
8  their principals.
9  Q.    Do you recall if that was by e-mail
10  or by telephone?
11  A.    I don't recall, but believe that --
12  I don't recall. I do recall speaking with
13  them at least at one point, so for sure --
14  if not fully -- partially by phone.
15  Q.    The recollection you have of the
16  discussion with Unioncon, is that before
17  or after August 11, 2005?
18       MR. HOFFMAN: Objection to
19       form.
20  A.    I don't recall.
21  Q.    Do you recall any discussions with
22  Unioncon after August 11, 2005?
23  A.    No.
24  Q.    You don't recall any efforts that
25  you may or may not have made with Unioncon

Simscript Copy: PHAT FASHIONS VS. TORNADO IMPORTS:B. ULLMANN, 11/1/2007

246

B. Ullmann

2 to institute a modest financial penalty of
3 $25,000, do you?
4 A.    I don't. It says "stay tuned," so
5 it indicates that my intentions were to
6 follow up with Unioncon, but I don't
7 recall specifically when. You're asking
8 about dates. I don't recall dates.
9 Q.    Do you recall that you did
10 follow-up with Unioncon?
11 A.    I recall having at least one
12 conversation with Unioncon, where they
13 specifically explained the point that's
14 stated here. Namely that they sold a
15 legitimate account within their legitimate
16 territory and hence felt that no penalty
17 or financial compensation was due. But
18 whether or not there were subsequent
19 conversations to this, I don't know. I
20 don't recall.
21 Q.    Indeed, one can infer that since
22 you're recalling a discussion where
23 Unioncon told you what you conveyed in
24 this e-mail, that the one conversation you
25 recall occurred prior to August 11th?

247

B. Ullmann

2        MR. HOFFMAN: Objection to
3    form.
4 A.    It's possible.
5 Q.    It's likely?
6 A.    It's possible.
7        MR. HOFFMAN: Objection to
8    the form.
9 Q.    Is it likely?
10 A.    I can't comment on whether it's
11 likely or not. I don't know.
12 Q.    Mr. Ullmann, you write to
13 Mr. Wiseman, "Unioncon is resisting
14 arguing that it's unfair as they sold the
15 goods to a legitimate account who, again,
16 sold to a legitimate account"; is that
17 correct?
18 A.    Yes.
19 Q.    Would you have any way of knowing
20 that Unioncon is resisting and arguing
21 certain things without having had a
22 communication with Unioncon?
23 A.    No.
24 Q.    Is it fair to assume, as you sit
25 here today, that when you wrote this

248

B. Ullmann

2 e-mail, you had already spoken to
3 Unioncon?
4 A.    Yes.
5 Q.    You've also testified today that
6 you only recall one conversation with
7 Unioncon, correct?
8        MR. HOFFMAN: Objection to
9    the form.
10 A.    If I have testified that I only
11 recall one conversation, what I should be
12 specific about is: Yes, I only recall one
13 conversation, which would be this. It
14 does not mean that I'm only recalling or,
15 rather, that I was recalling that it was
16 only one call. This I don't know because
17 there have been five calls; I can only
18 remember these contents.
19 Q.    The one call you recall took place
20 before August 11th?
21 A.    In looking at the e-mail, I think
22 that is a reasonable conclusion.
23 Q.    Do you recall any e-mails with
24 Unioncon following up on this e-mail?
25 A.    I don't recall.

249

B. Ullmann

2 Q.    You write, "stay tuned"?
3 A.    Yes.
4 Q.    I'm simply trying to understand
5 what you did to attempt to institute a
6 modest financial penalty of $25,000; do
7 you recall anything that you did to
8 attempt to institute a modest financial
9 penalty?
10 A.    Above and beyond engaging in a
11 conversation that was rebuffed, no.
12 Q.    What conversation are you referring
13 to?
14 A.    The conversation with Unioncon.
15 Q.    That led to you stating Unioncon is
16 resisting, arguing that -- that it's
17 unfair?
18 A.    Yes.
19 Q.    Where is Unioncon based?
20 A.    In Holland.
21 Q.    What do they do?
22 A.    They sell footwear.
23 Q.    Who are you dealing with at
24 Unioncon?
25 A.    His name is Joop, J-O-O-P, and

250

```
 1          B. Ullmann
 2   right now his last name eludes me.
 3          MR. HOFFMAN:  Simons.
 4   A.    S-I-M-O-N-S.  No relations.
 5   Q.    What was your next communication
 6   after August 11th with Issie Wiseman
 7   regarding this issue?
 8   A.    I don't recall.
 9   Q.    Do you recall having a
10   communication with Issie Wiseman after you
11   sent this e-mail about the modest
12   financial penalty?
13   A.    I don't.  I don't.
14   Q.    You don't recall having any
15   conversations; do you recall any e-mails?
16   A.    I don't.
17   Q.    Any discussion whatsoever?
18   A.    I don't recall.
19   Q.    Do you recall indicating to
20   Mr. Wiseman that he shouldn't worry about
21   the $25,000 because he would more than
22   make that up by amending the agreement to
23   extend the renewal period?
24   A.    I absolutely do not recall that and
25   clearly could not have said it because, as
```

251

```
 1          B. Ullmann
 2   we have discussed, the agreements need to
 3   be signed by Russell Simmons, by Bob
 4   Skinner.
 5          There is no way, ever, that I would
 6   know how they would ultimately act and if
 7   they were both going to sign, so I
 8   couldn't have made such statements.
 9   Q.    Mr. Ullmann, have you ever, in the
10   course of your business dealings, ever
11   stretched the truth or used words a little
12   bit out of context as part of your
13   negotiations?
14          MR. HOFFMAN:  Objection to
15          the form.
16   A.    We have previously, today, seen one
17   example in the e-mail where I wish I had
18   been more specific with my use of
19   language.  I'm never deliberately
20   untruthful.
21
22
23
24
25
```

252

```
 1          B. Ullmann
 2   Q.    Never deliberately?
 3   A.    Untruthful.
 4   Q.    I understand that's your testimony.
 5          MR. OFFENHARTZ:  Off the
 6   record.
 7          (Time noted:  4:52 p.m.)
 8
 9          ----------------------
10          BERNT ULLMANN
11
12   Subscribed and Sworn to before me
13   this      day of      2007
14
15   ------------------------------
16   NOTARY PUBLIC
17
18
19
20
21
22
23
24
25
```

253

```
 1                 EXHIBITS
 2
 3   DEFENDANT'S
     FOR IDENTIFICATION    DESCRIPTION      PAGE
 4
 5        1    Two-page exhibit bearing    76
 6             Bates TOR899 and TOR900
          2    Three-page exhibit          90
 7             Bates PF0130 through 0132
 8        3    Four-page document          95
             Bates PF0141 through 0144
 9        4    Six-page document,         102
             Bates PF0147 through 0152
10
11        5    PF0153, one-page document  121
12        6    Four-page document         129
             Bates-stamped PF0154
13           through 0157               —
14        7    Two-page document,         138
             Bates PF0164 through 165
15        8    One-page document,         148
             Bates PF0162
16
17        9    E-mail from witness to     161
             Mr. Gramke
18       10    E-mail to Mr. Bitton,      191
             dated January 24, 2007
19
20       11    PF0194 through 0198        209
21       12    Document Bates             218
             PF0203 through PF0207
22       13    Document Bates-stamped     221
             PF0208 through PF0212
23
24
25
```

278

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------------ x

4    PHAT FASHIONS, LLC,

5

6                           Plaintiff,

                                        1:070103278***

7          -against-

8    TORNADO IMPORTS (CANADA), INC.,

9

                           Defendants.

10

     ------------------------------------------------ x

11

12       CONTINUED DEPOSITION of the Plaintiff, PHAT

13    FASHIONS, LLC, by BERNT ULLMANN, taken by the

14    Defendant pursuant to Notice, held at the offices

15    of Gibson Dunn & Crutcher, 202 Park Avenue, New

16    York, New York 10166, on November 2, 2007, at

17    9:10 a.m., before a Notary Public of the State of

18    New York.

19

20

21    ************************************************

          - BARRISTER REPORTING SERVICE, INC.

22                  120 Broadway

              New York, N.Y. 10271

23                212-732-8066

24

25

279

1
2       A P P E A R A N C E S:
3
4           PRYOR CASHMAN, LLP
                Attorneys for Plaintiffs
5               410 Park Avenue
                New York, New York 10022
6
            BY:   PHILIP R. HOFFMAN, ESQ.
7
8
9
10          GIBSON DUNN & CRUTCHER
                Attorneys for Defendants
11              202 Park Avenue
                New York, New York 10166
12
            BY:   ADAM H. OFFENHARTZ, ESQ.
13                  -and-
                LAURA M. LEITNER, ESQ.
14
15
                    xxxxx
16
17
18
19
20
21
22
23
24
25

280

1               B. Ullmann
2    B E R N T   U L L M A N N,
3        Having been duly re-sworn before a Notary
4    Public of the State of New York, was
5    examined and testified as follows:
6
7    CONTINUED EXAMINATION
8    BY MR. OFFENHARTZ:
9    Q.    Good morning, Mr. Ullmann.
10   A.    Good morning.
11   Q.    Mr. Ullmann, would you please -- I
12   would like to direct your attention to
13   Defendant's Exhibit No. 3 for a moment.
14       Do you recall looking at this
15   document yesterday?
16   A.    I do.
17   Q.    Would you turn to the third page of
18   Defendant's Exhibit No. 3, which bears the
19   Bates number PF0142?
20   A.    Yes.
21   Q.    Eli Nathanson of the Pryor Cashman
22   firm is the person who prepared this
23   document, correct?
24   A.    I believe that to be true.
25   Q.    Do you know who provided

281

1               B. Ullmann
2    Mr. Nathanson with the minimum net sales
3    numbers?
4    A.    No one did.
5    Q.    I'm sorry?
6    A.    No one did.
7    Q.    No one did.  How did he get the
8    minimum net sales figures?
9    A.    He probably worked backwards from
10   the royalty numbers.
11   Q.    What do you mean by that; could you
12   explain that further, please?
13   A.    Yes.  The GMRs, guaranteed minimum
14   royalties, are a function, in this case,
15   7 percent of the net sales number.  We
16   provided the GMRs and thus he did the math
17   to get the minimum net sales, which is
18   something he very often does.
19       Ultimately, when we are negotiating
20   these deals, we're looking at what our
21   revenue stream is or what our revenue
22   stream will be.  The revenue stream is
23   really the GMR and not the net sales, so
24   that's often what's negotiated.  And then
25   the net sales become a function of that.

282

1               B. Ullmann
2    Q.    In this instance, the GMR, the
3    guaranteed minimum royalties, is what
4    percent?
5    A.    7.
6    Q.    Is 7 percent a standard royalty
7    figure for Phat Fashions?
8    A.    It is not.  It is lower than our
9    standard.
10   Q.    What is your standard?
11   A.    8 percent.
12   Q.    I'd like to now direct your
13   attention to Defendant's Exhibit No. 10.
14   A.    Thank you.
15   Q.    You're welcome.
16       Do you recall reviewing this
17   document yesterday?
18   A.    I do.
19   Q.    Would you take a moment to look at
20   it again, please?
21   A.    Okay.
22   Q.    I direct your attention to the
23   second and third paragraphs where you
24   write, "We are getting very close to a
25   situation where you would not be able to

295

B. Ullmann

1
2  seen the documents either. It
3  sounds to me from what he said and
4  what she read, is that they may not
5  have any mention of Tornado or
6  Vis-a-Vis, but I will under
7  undertake to look at those
8  documents and find out what they
9  contain and if they're responsive,
10  with the appropriate redactions,
11  whatever, produce them to you.
12  Absolutely.
13  REQUEST NOTED:
14  Q.    Do you know what royalties Tornado
15  paid to Phat Fashions in 2006?
16  A.    Without looking, no.
17  Q.    What would you look at?
18  A.    I would ask our CFE to pull the
19  numbers.
20  Q.    Did you ever find yourself doing
21  that?
22  A.    Did I ever? I would assume I did.
23  Q.    He would have provided you the
24  numbers?
25  A.    Again, yes, I would assume he did.

296

B. Ullmann

1
2  Q.    When you were considering whether
3  or not to continue your relationship with
4  Tornado, did you ask the CFE to give you
5  royalty information regarding Tornado?
6  A.    I think that he provided -- I don't
7  know because I'm not sure that I would
8  have, and I'll tell you why I wasn't
9  looking originally at this situation at
10  all when the dialogue started.
11      The contract was expiring at the
12  end of '07. Through our proceedings, I've
13  heard that, I guess, this amendment
14  conversation came to a head early in '06;
15  significantly earlier than when I was
16  prepared to look at it. When it did come
17  to a head, however, it came with a
18  proposal from Issie Wiseman.
19      So there wasn't so much an issue of
20  what the past performance had been. I had
21  the numbers in front of me of what Tornado
22  was proposing the numbers would be going
23  forward.
24  Q.    Did those numbers seem sufficient
25  to you?

297

B. Ullmann

1
2  MR. HOFFMAN: Objection to
3  the form.
4  A.    I seem to recall that the first
5  round of numbers that we discussed seemed
6  very low and, hence, there was a very
7  casual conversation; if we're going to
8  even consider it, you better up your
9  numbers, and that was the end of it. He
10  upped the number hand; that was it.
11  Q.    Do you recall ever asking your CFE
12  to provide you with royalty figures or
13  other sales figures regarding Tornado?
14  A.    Specifically, no.
15  Q.    You said "specifically." Do you
16  think you would have generally?
17  A.    I specifically was referring to --
18  I don't think I would have singled out
19  Tornado, but obviously, in the course of
20  business dealings, I would have total
21  revenue conversations with my CFE and the
22  Tornado revenues would be part of our
23  total. But I wouldn't be looking at them
24  specifically.
25  Q.    When you recommended to Mr. Skinner

298

B. Ullmann

1
2  that Phat Fashions not proceed with
3  Tornado in Canada, was the amount of sales
4  Tornado was making one of the factors that
5  went into your decision?
6  MR. HOFFMAN: Objection to
7  form. You can answer.
8  A.    It could have been one factor and
9  that would be the future promised sales,
10  the guaranteed minimum net sales and the
11  guaranteed minimum net royalties could
12  have been a factor. A factor could have
13  been that Tornado's royalty percentage was
14  7; Bitton royalty percentage is 8. A
15  factor could have been that Bitton, along
16  with the distribution, or rather the
17  wholesale agreement, also offered the
18  opening of three flagship stores in
19  Canada.
20      A factor could have been that there
21  was a conversation with Bitton about
22  opening of a number of freestanding stores
23  in the United States. But factors would
24  probably also have been that we were
25  having increasingly difficult relations

Slimscript Copy: PHAT FASHIONS VS. TORNADO IMPORTS:B. ULLMANN, 11/2/2007

299

B. Ullmann

1  B. Ullmann
2  with Tornado; he's had a major falling out
3  with BP Clothing, our largest licensee.
4      During Bitton's due diligence
5  process, they went out to every single one
6  of Tornado's customers, they have a huge
7  report available, very unfavorable to Mr.
8  Wiseman and Tornado and their conduct in
9  the market.
10     I had also received independently,
11 because I do recognize that Mr. Bitton and
12 his group was obviously a party in the
13 process, that they're not necessarily at
14 neutral in the business, but there were
15 also independent conversations from other
16 operators in the market that were not
17 favorable towards Tornado.
18     So there are a lot of things that
19 come into play and I can't recall to which
20 extent either one of them, and maybe more
21 that I'm not mentioning now, played into
22 the final decision.
23 Q.    Mr. Ullmann, who would have the
24 most knowledge on Tornado sales of Baby
25 Phat products?

300

B. Ullmann

1  B. Ullmann
2      MR. HOFFMAN: Objection to
3      the form.  Assumes facts not in
4      evidence.
5  A.   Run that past me again.
6  Q.   Mr. Ullmann, would the CFE be the
7  person who would have the -- the person
8  most knowledgeable regarding Tornado sales
9  of any products under the Phat Fashions
10 rubric?
11 A.   Under the Phat Fashions what?
12 Q.   Under the Phat Fashions products?
13     MR. HOFFMAN: Under the Phat
14     Fashions rubric, is what he said.
15 Q.   Let me give you the question again.
16     Mr. Ullmann, do you know the amount
17 of sales and royalties generated by
18 Tornado in 2006?
19 A.   I do not.
20 Q.   Who would know that information?
21 A.   Probably the Tornado executives
22 would be the closest to know that
23 information accurately.
24 Q.   Who, at Phat Fashions, would have
25 that information?

301

B. Ullmann

1  B. Ullmann
2  A.   I don't think anyone at Phat
3  Fashions would have that information in
4  totality because our agreement covered
5  only certain part of the Phat Fashions
6  products.  The reality is there was a
7  separate agreement, to the best of my
8  understanding, with BP Clothing and I
9  don't know that we would know exactly -- I
10 don't believe we ever saw it.  I don't
11 think it's part of our files and we were
12 not involved in that relationship.
13 Q.   Mr. Ullmann, is what you're telling
14 me, that there's no one at Phat Fashions
15 who would know the amount of royalties
16 Tornado sent to Phat Fashions in 2006; is
17 that your testimony?
18     MR. HOFFMAN: Objection to
19     the form.
20 A.   That wasn't your question, so
21 that's not my testimony.
22 Q.   Actually, I think it was my
23 question, but let me ask you again.
24     MR. HOFFMAN: There have
25     been a couple so clear it up.

302

B. Ullmann

1  B. Ullmann
2  Q.   Mr. Ullmann, who, at Phat Fashions,
3  would know what royalties Tornado sent in
4  2006?
5  A.   Our CFE.
6  Q.   Certainly, you would consider
7  knowing the amount of royalties you
8  received to be an important data point in
9  a business relationship, wouldn't you?
10     MR. HOFFMAN: Objection to
11     the form.
12 A.   Knowing the amount of royalties is
13 an important business point?
14 Q.   Yes.
15 A.   I concur, yes.  But knowing it
16 offhand at any time when you're talking
17 about one out of 30 licensees, I don't
18 know that I agree that that is a springing
19 business point.
20 Q.   Do you know what Tornado paid in
21 royalties to Phat Fashions in 2005?
22 A.   I don't.
23 Q.   In 2004?
24 A.   I don't.
25 Q.   Do you know what they paid to date

307

1          B. Ullmann
2    underwear and loungewear.  They have
3    underwear and loungewear sold in the
4    Canadian market right now through a
5    third-party not affiliated with Tornado
6    and they're paying us royalties on those
7    sales.
8          We also have a company called GHG;
9    it's an international bag licensee.  They
10   currently have sales in Canada.  They are
11   paying us royalties on sales from Canada
12   and, of course, from the rest of the world
13   and the Check Group is paying royalties,
14   of course, on sales also from the U.S.
15         So I believe that was your
16   question; the answer is:  Yes, we are.
17   And there may be more; these are the ones
18   I remember.
19   Q.     BP Clothing, the royalty rate they
20   provide to Phat Fashions, I assume, is
21   8 percent?
22   A.     Yes, that's correct.
23             MR. OFFENHARTZ:  Can you
24         read back the last answer.
25             (Whereupon the record was

308

1          B. Ullmann
2         read back by the reporter.)
3    Q.     The Check Group pays a royalty rate
4    of 8 percent to Phat Fashions?
5    A.     I honestly don't recall.  The
6    reason I'm saying that is I'm thinking
7    they're not.  They are one of our first
8    licensees.  The principal at the time was
9    a partner of Russell's and I have, at
10   least sitting here, a sense that he has a
11   favorable royalty rate.
12   Q.     When you say "favorable," do you
13   know how favorable?
14   A.     I don't know for a fact.  I want to
15   say also because underwear and loungewear
16   is typically not something that's sold a
17   lot on the floors of Macy's.  I want to
18   say 6 percent, but it's only an educated
19   guess.
20   Q.     GHG had a royalty rate of 8 percent
21   with Phat Fashions?
22   A.     No, GHG has a different type
23   arrangement.  They pay royalties on FOB
24   sales.  I believe the rate is 20 percent.
25   Q.     Mr. Ullmann, you testified earlier

309

1          B. Ullmann
2    today that you first became aware of
3    Vis-a-Vis on Tuesday of this week; is that
4    correct?
5    A.     I believe that is correct.  If I've
6    seen it before, I can't recall.
7    Q.     Your testimony today regarding
8    Vis-a-Vis having a relationship with BP
9    Clothing, is that something you also
10   learned of Tuesday of this week?
11   A.     No, no.  I was aware of there being
12   some type of a relationship and of a
13   company -- and I'm not certain how Issie
14   Wiseman is involved, but I certainly was
15   aware that he was involved on some level
16   and that this company had distribution
17   rights for BP in Canada.
18   Q.     Which company?  You said "this
19   company"; which company?
20   A.     Vis-a-Vis, I guess.
21   Q.     When were you aware of that?
22   A.     I wasn't aware of it being
23   Vis-a-Vis.  I was aware of there being a
24   company in Canada where Issie Wiseman had
25   some type of involvement and I was aware

310

1          B. Ullmann
2    of this company, that we now know is
3    Vis-a-Vis, they had distribution rights.
4    Q.     Mr. Ullmann, you discussed a report
5    by Gaby Bitton on his discussions with
6    customers of Tornado earlier today?
7    A.     Yes.  Actually -- go ahead.
8    Q.     I was going to ask you to elaborate
9    on that.
10            MR. HOFFMAN:  I'm going to
11        object to the form.  Go ahead.
12   A.     What I was going to say is:  I
13   don't think that the report was actually
14   compiled by Gaby; I think it was compiled
15   by Isaac.  And I believe I misstated his
16   last name yesterday when I referred to
17   Isaac.  His correct name is Mimran,
18   M-I-M-R-A-N.  It's funny, I just recalled
19   that on the train in this morning.  It's
20   weird, I have no idea why or how.
21   Q.     Can you elaborate further on this
22   report?
23            MR. HOFFMAN:  Objection to
24        the form.
25   A.     Well, I've never seen the report so

311

B. Ullmann

1  I want to say that, but Isaac has stated
2  that this report is very damaging to Issie
3  and Tornado and speaks to a certain level
4  of negligent, poor service, lack of
5  customer follow-through, lack of delivery,
6  focus or consolidation on sales only to a
7  limited number of retailers that were not
8  necessarily strong or good for the image
9  of the brand.  Statements of that nature.
10  Q.    Did you ask to see a copy of this
11  report?
12  A.    I didn't.
13  Q.    Did you ask how Mr. Mimran prepared
14  this report?
15  A.    He volunteered that they have been
16  out having customer meetings with all key
17  accounts in Canada.  But the reality is, I
18  don't know how this was done, I don't know
19  when this was done and consequently, I
20  never asked to see the documents.
21  Q.    Did he ever send you a summary of
22  this report?
23  A.    He did not.
24  Q.    Did he tell you how many customers

---

312

B. Ullmann

1  he spoke with?
2  A.    He did not.
3  Q.    Do you recall when you had this
4  discussion?
5  A.    We talked about it briefly within
6  the last ten days.  He had brought it to
7  me -- to my attention early, but I can't
8  recall exactly when he brought it to my
9  attention the first time.
10  Q.    In what context did you speak with
11  Mr. Mimran in the last ten days?
12  A.    In the context of Mr. Mimran not
13  being particularly happy with the state of
14  affairs in Canada.
15  Q.    What do you mean by that?
16  A.    We had a discussion over the phone
17  where he was basically alluding to being
18  uncertain about the direction of the
19  company.  As we have talked about, Russell
20  Simmons has recently stepped down as the
21  CEO of Phat Fashions.
22         We had a few new product
23  initiatives linked to his name; Russell
24  Simmons Argyle Culture, Atman.  These

---

313

B. Ullmann

1  properties will not be Phat Fashions
2  properties going forward, but I believe
3  Isaac Mimran had envisioned that they
4  would be representing these properties, as
5  well as Phat Farm and another property
6  called XV.
7         And thus, Isaac is, in general,
8  uncertain about what's happening and, as
9  such, I think uncomfortable at this
10  particular juncture of time and wanted
11  some assurances and wanted to kind of go
12  on the record with me that he is not
13  pleased.
14  Q.    When you mentioned concerned about
15  the company in your answer, you were
16  referring to Phat Fashions?
17  A.    Yes, concerned about what was going
18  on, yes.
19  Q.    How did the report that Mr. Mimran
20  and/or his colleagues put together
21  regarding Tornado come up in your
22  discussion in the last ten days about his
23  concerns regarding Phat Fashions?
24  A.    As I said, I do recall that he has

---

314

B. Ullmann

1  brought it up to me on a couple of
2  occasions previously.  I think he brought
3  it up again in the context that I may, in
4  frustration, have said something along the
5  lines of, Canada is really proving to be a
6  great territory for us, and saying, I'm
7  here on the phone with you, you're unhappy
8  and now while we have a clear ruling from
9  our lawyers that the contract terminates,
10  nevertheless, I find myself still
11  embroiled in a conflict with Mr. Wiseman.
12         And I believe he offered-up,
13  Conflict with Mr. Wiseman, how dare he?
14  We have this huge report, he should be
15  happy that -- and so on and so forth.
16  Q.    Did Mr. Mimran describe to you how
17  he prepared the report?
18  A.    He did not.
19  Q.    Do you know if Mr. Mimran went to
20  these meetings or was it Mr. Bitton or
21  someone else?
22         MR. HOFFMAN:  Objection to
23  the form.
24  A.    I don't know.  I don't know.

---

315

1          B. Ullmann
2    Q.    He didn't tell you or you don't
3    recall?
4    A.    No, he didn't tell me. I don't
5    know.
6    Q.    What did you tell Mr. Mimran in
7    response to the concerns he raised about
8    Phat Fashions, your conversations over the
9    last ten days?
10   A.    I said that I would get back to
11   him, which I haven't as yet.
12          MR. OFFENHARTZ:  Off the
13   record.
14          (Whereupon a discussion was
15   held off the record.)
16   Q.    What is Gaby Bitton's full name?
17   A.    If that's not his full name, I
18   don't know.
19   Q.    Do you know if his first name is
20   Gabriel?
21   A.    I don't know.
22          MR. OFFENHARTZ:  Do you?
23          MR. HOFFMAN:  Yes, it's
24   Gabriel.
25   Q.    You testified that you also had

316

1          B. Ullmann
2    independent conversations after learning
3    of the report pulled together by Mr.
4    Bitton or Mr. Mimran.
5          Do you recall that?
6    A.    Can you please restate your
7    question; I'm not understanding.
8          MR. OFFENHARTZ:  Certainly.
9    Strike that. I'll ask it again.
10   Q.    Did Mr. Bitton provide you with the
11   information from the report that was
12   prepared or did Mr. Mimran?
13          MR. HOFFMAN:  Objection to
14   the form.  Objection to form.
15   A.    Mr. Mimran did.
16   Q.    Did you take any independent steps
17   following that conversation with
18   Mr. Mimran to assess the information
19   Tornado was having with its customers?
20   A.    I did not.
21   Q.    Did you instruct anyone at Phat
22   Fashions to reach out to customers of
23   Tornado?
24   A.    I don't believe so.
25   Q.    Did you have any concerns that

317

1          B. Ullmann
2    Mr. Mimran's report may have been colored
3    by history between Mr. Bitton and
4    Mr. Wiseman?
5          MR. HOFFMAN:  Objection to
6    the form.  You can answer.
7    A.    I haven't seen the report, so
8    there's no way for me to have an opinion
9    about the report.  But I felt that knowing
10   that the agreement was set to expire at
11   the end of this year anyway, I felt that
12   it was less pertinent to follow up on that
13   information.
14   Q.    Did you inform Mr. Wiseman of the
15   conclusions that Mr. Mimran shared with
16   you regarding Mr. Mimran's report?
17          MR. HOFFMAN:  Objection to
18   the form.
19   A.    I don't recall.  I could have, but
20   I don't recall.
21   Q.    As you sit here today, do you
22   recall any discussions with Mr. Wiseman
23   where you expressed dissatisfaction on the
24   part of Phat Fashions with the
25   relationship between Phat Fashions and

318

1          B. Ullmann
2    Tornado?
3    A.    I believe we had a conversation
4    about an oversaturation of product in one
5    particular account.  This is a while back.
6    I want to say the account is either called
7    Foot Action or Action Footwear; something
8    along those lines.  I can't recall the
9    exact name.
10          This was specifically after someone
11   brought to my attention that the product
12   didn't look good there and was
13   oversaturated.  We did also have a
14   conversation after Steven Feiner of BP
15   Clothing decided to terminate their
16   relationship and the conversation was
17   centering around the fact that
18   Mr. Feiner's expectation was that he could
19   more than double the turnover for his
20   brand -- for their brand, Baby Phat in
21   Canada, while actually improving the
22   presentation and integrity of the brand in
23   the market.  And we did talk about that.
24          MR. OFFENHARTZ:  Can you
25   read that answer back.

319

```
1              B. Ullmann
2         (Whereupon the record was
3     read back by the reporter.)
4    Q.    When did you have that discussion
5    with Mr. Feiner?
6    A.    I can't recall exactly, but I want
7    to say that it's approximately a year ago,
8    so it takes us back some time to maybe
9    September, October, November of '06.
10   Q.    Other than these two conversations,
11   do you recall any other conversation you
12   had with anyone at Tornado where you
13   expressed concern or dissatisfaction with
14   the way Tornado was operating as a
15   licensee of Phat Fashions?
16   A.    The only person I would have had
17   conversations with would have been Issie
18   Wiseman.  So there would have been no one
19   else.  There may have been other
20   conversations.
21       I recall a conversation with him
22   about a Randa; she's an owner of a company
23   called Vibe or Vibes in Montreal, Canada.
24   Q.    What was the nature of that
25   conversation?
```

320

```
1              B. Ullmann
2    A.    This is, again, going far back.  I
3    can only recall very broad strokes.
4    Something about oversaturation of the
5    brand, the brand not looking good in the
6    market.
7    Q.    You mentioned this is going far
8    back; do you know if this is 2004?
9    A.    I don't recall.
10   Q.    2005?
11   A.    I don't know.
12   Q.    You said far back?
13   A.    Yes.
14   Q.    I'm just trying to --
15   A.    It was not in 2007.  I would say
16   the very earliest it could have been would
17   be early 2006.  Probably more likely 2005
18   to try, but I don't recall it.  Sorry.
19   Q.    Do you recall any other discussions
20   with Mr. Wiseman where you expressed
21   concern regarding the manner in which
22   Tornado was operating as a licensee of
23   Phat Fashions in Canada?
24   A.    No, not as I sit here now.
25   Q.    Did you keep a file of concerns
```

321

```
1              B. Ullmann
2    regarding licensees?
3    A.    No.
4    Q.    Is there anyone at Phat Fashions
5    who might have additional information
6    regarding such concerns?
7    A.    I believe that's unlikely.
8    Q.    Mr. Ullmann, can you explain to me
9    your understanding of the relationship
10   between BP Clothing and Vis-a-Vis?
11       MR. HOFFMAN:  Objection to
12     the form.
13   A.    My understanding is that
14   Vis-a-Vis -- and I've only come to learn
15   very recently that the name of the company
16   was Vis-a-Vis -- that this company was a
17   distributor for BP Clothing.
18   Q.    Have you seen any agreements
19   between BP Clothing and Vis-a-Vis?
20   A.    I have not.
21   Q.    Did BP Clothing pay Phat Fashions
22   royalties on the sale of goods BP Clothing
23   made to Vis-a-Vis?
24   A.    I don't know.
25   Q.    Who at the company would know?
```

322

```
1              B. Ullmann
2    A.    Maybe our CFE, but only if those
3    sales are broken out.
4    Q.    If you were to ask your CFE for a
5    run of royalties received from BP
6    Clothing, can he provide those to you?
7    A.    Yes.
8    Q.    If you asked your CFE to provide
9    you with a run of royalties paid by BP
10   clothing based on territory, could he do
11   that?
12   A.    Probably not.
13   Q.    Could he provide you a run on
14   royalties made by BP Clothing broken down
15   by product line?
16   A.    Run that past me again.
17       MR. OFFENHARTZ:  Can you
18     read the question, please.
19       (Whereupon the record was
20     read back by the reporter.)
21   A.    If by "product line," you mean
22   jeans, T-shirts, the answer is no, he
23   couldn't.
24   Q.    How could he break it down?
25       MR. HOFFMAN:  Objection to
```

323

1           B. Ullmann
2      the form.
3   A.    It's a total.
4   Q.    A total for Baby Phat?
5   A.    A total for Baby Phat grants that
6   they have, yes.
7   Q.    Who is the current CFE?
8           MR. HOFFMAN:  Of which
9      company?
10  Q.    Who is the current CFE of Phat
11  Fashions?
12  A.    Bob Bruno.
13  Q.    Who is the current CFE of Kellwood?
14  A.    Craig Kleffner, K-L-E-F-F-N-E-R.
15  Q.    Over recent series of questions I
16  have asked you and in your answers, we've
17  both been referring to the CFE.
18      Were you referring to the CFE of
19  Phat Fashions or the CFE of Kellwood or
20  both?
21  A.    I was referring to the CFE of Phat
22  Fashions, but not Bob Bruno.
23  Q.    Why is that?
24  A.    Because Bob Bruno is new in his
25  position and our old CFE, Peter Morris, is

324

1           B. Ullmann
2   no longer with the company.
3           MR. HOFFMAN:  As I've
4      represented to you, Adam, I will
5      reach out to find Peter Morris and
6      set up a date for a deposition.
7           MR. OFFENHARTZ:  Thank you.
8           THE WITNESS:  He'll love
9      that, now that he's not with the
10     company anymore.
11          MR. HOFFMAN:  I will
12     endeavor with him to set up a date
13     and we'll go from there.
14  Q.    Does Phat Fashions provide annual
15  evaluations of its licensees?
16  A.    No.
17  Q.    Does Phat Fashions provide
18  quarterly evaluations of its licensees?
19  A.    No.
20  Q.    Does Phat Fashions have any
21  internal process whereby it reviews its
22  licensees on a regular basis?
23  A.    No.
24  Q.    How do you go about determining
25  which of your licensees you're pleased

325

1           B. Ullmann
2   with or that you're displeased with?
3   A.    Based upon personal interaction.
4   Q.    Personal interaction with whom?
5   A.    The licensee.
6   Q.    Can you tell me about your personal
7   interaction with Issie Wiseman?
8           MR. HOFFMAN:  Objection to
9      the form.  Go ahead.
10  A.    I can, it's very open-ended.  Do
11  you want to know from the beginning of our
12  relationship?
13  Q.    Why don't you tell me about the
14  communications you've had with Mr. Wiseman
15  in 2006?
16          MR. HOFFMAN:  Other than
17     what was testified to yesterday?
18          MR. OFFENHARTZ:  No,
19     actually --
20  Q.    Mr. Ullmann, please tell me about
21  your communications with Mr. Wiseman in
22  2006.
23          MR. HOFFMAN:  I object on
24     the ground of asked and answered.
25     He can answer it again.

326

1           B. Ullmann
2   A.    I can't recall, obviously, the full
3   nature of all conversations, but as
4   discussed yesterday, there was
5   communication back and forth in '06 about
6   Issie Wiseman attempting to renew a
7   license that was expiring and didn't
8   provide for an option to renew.  He
9   attempted to do this very early and
10  outside the customary window.  As you
11  heard yesterday, I, therefore, didn't
12  necessarily immerse myself in this
13  dialogue, but moved it forward internally.
14      We had some dialogue surrounding
15  him losing the Baby Phat products and we
16  had dialogue when I assisted him in
17  obtaining the license for Coogi and I
18  specifically assisted him, and I have come
19  to understand that he is now a licensee of
20  the Coogi brand.  That's some of the
21  dialogue that I can recall.
22  Q.    Are there any dialogues that you
23  can recall that you have not included in
24  your answer?
25  A.    Not deliberately.

Slimscript Copy: PHAT FASHIONS VS. TORNADO IMPORTS:B. ULLMANN, 11/2/2007

339

B. Ullmann

1
2  agreement in place and clearly any payment
3  is a royalty payment. It's not a
4  commission. There are no net commissions;
5  they're royalty payments.
6  Q.    What is the royalty rate indicated
7  on this document?
8  A.    7 percent.
9          MR. HOFFMAN:  Objection to
10        the form.
11  Q.    The 7 percent royalty rate for
12  Tornado was established by the license
13  agreement; is that your understanding?
14        MR. HOFFMAN:  Objection to
15        the form.
16  A.    That is my understanding.
17  Q.    The 7 percent rate that Vis-a-Vis
18  was paying was established by that license
19  agreement as well?
20        MR. HOFFMAN:  Objection to
21        the form.
22  A.    Phat Fashions does not have a
23  licensing agreement with Vis-a-Vis, so no,
24  that is not correct. I'm going to assume
25  that the term "commission" is probably

340

B. Ullmann

1
2  accurate on the Vis-a-Vis statement
3  because there is no licensing agreement in
4  place; hence, there are no royalties.
5  Q.    Not accurate on the PF0085
6  document?
7  A.    Correct.
8  Q.    Do you know why the word "Tornado"
9  is written on top of Vis-a-Vis Fashions?
10  A.    I don't know who wrote it, so I
11  obviously don't know why it's written
12  here.
13  Q.    Can you explain to me how the
14  royalty rate of 7 percent was established
15  for Vis-a-Vis?
16        MR. HOFFMAN:  Objection to
17        the form. That's not what it says.
18  A.    I'm sure you meant to say how the
19  rate of commission was established at
20  7 percent and I don't know how that rate
21  was established.
22  Q.    Do you understand that you, Phat
23  Fashions, was receiving a stream of
24  payments from a company called Vis-a-Vis
25  over several years?

341

B. Ullmann

1
2          MR. HOFFMAN:  Objection to
3        the form.
4  A.    I understand that we were receiving
5  some payments. I did not know they were
6  from a company called Vis-a-Vis and I have
7  always assumed that they were tying back
8  to the relationship that this entity had
9  with some of our licensors in the
10  territory.
11  Q.    Which licensor?
12  A.    BP Clothing, for example, would be
13  probably the biggest one.
14  Q.    This company that you have now
15  learned is Vis-a-Vis, Phat Fashions had
16  been receiving payments from them for
17  several years; isn't that the case?
18        MR. HOFFMAN:  Objection to
19        the form. Asked and answered.
20        Isn't that the identical
21        question you just asked?
22  Q.    Can you answer the question?
23        THE WITNESS:  Can you please
24        read it back to me.
25        (Whereupon the record was

342

B. Ullmann

1
2        read back by the reporter.)
3  A.    I am under the impression that we
4  have received payments from an entity in
5  Canada from Baby Phat sales.
6  Q.    You now understand that entity is
7  called Vis-a-Vis?
8  A.    Yes.
9  Q.    Can you tell me what your
10  understanding is of the relationship
11  between Vis-a-Vis and Issie Wiseman?
12        MR. HOFFMAN: ¬Objection to
13        the form. You can answer.
14  A.    I believe Issie Wiseman is a
15  partner or a part-owner involved in some
16  type of principal capacity.
17  Q.    When did you come to that
18  understanding?
19  A.    When he called me sometime in the
20  fall of 2006 to share with me that he was
21  in the process of losing the rights to
22  Baby Phat products in Canada.
23  Q.    Over the years that you were
24  receiving payment from the company that
25  you then came to learn was known as

Slimscript Copy:  PHAT FASHIONS VS. TORNADO IMPORTS:B. ULLMANN, 11/2/2007

395

1                 B. Ullmann
2 but certainly it would have been a
3 discussion point then and, again, there
4 was a discussion point when I, in the fall
5 of 2006, was reviewing the options that we
6 had for Canada and we reviewed the
7 relationship with Tornado and Issie
8 Wiseman.
9 Q.     Which Counsel provided you the
10 advice, the information -- whichever word
11 you'd like to use -- in 2004?
12 A.     That would probably have been done
13 Gramke, possibly also with Eli Nathanson.
14 Q.     In fall of 2006?
15 A.     I want to say that it was Eli
16 Nathanson and Luther Rollins.
17 Q.     Independent of your discussions
18 with Counsel, do you have any
19 understanding of the nature of the
20 relationship between Vis-a-Vis and Phat
21 Fashions?
22         MR. HOFFMAN: Objection to
23     the form.  Asked and answered.  You
24     can answer.
25 A.     I don't consider there to be any

396

1                 B. Ullmann
2 relationship between Vis-a-Vis and Phat
3 Fashions.
4 Q.     Do you know how much money
5 Vis-a-Vis has sent to Phat Fashions over
6 the years?
7 A.     I don't.
8 Q.     Do you think it's more than $50?
9 A.     I do believe that.
10 Q.     Do you think it's more than
11 $100,000?
12 A.     Based upon the documents I have
13 reviewed here, I think it's more than
14 that.
15 Q.     Do you think it's more than $1
16 million?
17 A.     I don't know.
18 Q.     You would consider receiving
19 regular payments from a company that may
20 well total hundreds of thousands of
21 dollars, if not more than a million
22 dollars, to, in no way, constitute a
23 relationship?
24         MR. HOFFMAN: Objection to
25     the form.

397

1                 B. Ullmann
2 A.     I am not familiar with the nature
3 that has led to the payments.  We have a
4 number of licensees that controlled
5 product that is being sold in Canada and
6 it appears that Vis-a-Vis has struck
7 relationships, distribution agreements,
8 sub-agreements -- I don't know what they
9 are -- with several of these licensees and
10 engaged in sales of Baby Phat products.
11 Q.     Independent of your discussions
12 with Counsel, do you have any
13 understanding of the basis by which
14 Vis-a-Vis sends money to Phat Fashions?
15         MR. HOFFMAN: Objection to
16     the form.  Asked and answered.  You
17     can answer it again.
18 A.     I don't and I would think that
19 there is no such relationship.  As I've
20 testified to earlier, Issie Wiseman
21 initiated this renewal conversation, which
22 was an amendment unsolicited.  I think if
23 he felt that there was a formal
24 relationship that was unclear or needed
25 clarification or there was a type of

398

1                 B. Ullmann
2 relationship, he would have included in
3 that process all the products that he was
4 representing, but he didn't.  I have
5 absolutely no reason to think that there
6 was a need for any different type of
7 relationship.
8         MR. OFFENHARTZ: Move to
9     strike as not responsive.
10         MR. HOFFMAN: I think it was
11     very responsive.
12 Q.     You seem now to have a recollection
13 of Mr. Wiseman's discussions with you -- a
14 further recollection of one of your
15 discussions with Mr. Wiseman about
16 renewal?
17         MR. HOFFMAN: Objection.
18 Q.     Do you recall any additional
19 information about any discussions you had
20 with Mr. Wiseman regarding renewal?
21         MR. HOFFMAN: Object to the
22     form.  Part of the first question
23     and form.
24 A.     I do recall speaking to Mr. Wiseman
25 in February of 2007, after he had been

399

```
1              B. Ullmann
2   advised that the amendment would not be
3   executed.
4   Q.    Prior to that?
5   A.    And I remember, at that time, he
6   did not once, during our four-day stay in
7   Las Vegas, bring up the fact that he was
8   under the impression that he had already
9   renewed the agreement back in 2006. I do
10  recall that.
11          I also recall, if I could expand,
12  he did ask, and I think I mentioned this
13  before, if I thought there was a
14  possibility that he could have footwear
15  going forward. It was his opinion that
16  the Gaby Bitton Group was not particularly
17  strong in footwear. I know we had a
18  footwear conversation and that was also in
19  February of 2007.
20  Q.    Did you ever tell Mr. Wiseman that
21  Russell Simmons executed the amendment
22  renewing the license agreement for two- or
23  three-year periods?
24          MR. HOFFMAN: Objection to
25      the form.
```

401

```
1              B. Ullmann
2   Mr. Simmons executed the agreement, shall
3   we?
4   A.    I'm ready.
5   Q.    You have what's been marked as
6   Defendant's Exhibit 6 in front of you?
7   A.    Yes.
8   Q.    You see that Russell Simmons did
9   sign this document on page 0157?
10  A.    That is correct.
11  Q.    Did you ever tell Mr. Wiseman that
12  Russell Simmons signed this document?
13  A.    I was not aware that Russell
14  Simmons had signed this document, so
15  consequently, I never advised Issie
16  Wiseman that he had signed it.
17  Q.    Do you know if anyone else at Phat
18  Fashions advised Mr. Wiseman that Russell
19  Simmons had signed this document?
20  A.    I don't know.
21  Q.    Do you know if anyone at Pryor
22  Cashman informed Issie Wiseman that
23  Russell Simmons signed this document?
24  A.    I don't know, but the complete
25  advisement would then have to include that
```

400

```
1              B. Ullmann
2   Q.    Did you; yes or no? Did you?
3          THE WITNESS: Can you please
4      read the question back.
5          (Whereupon the record was
6      read back by the reporter.)
7   A.    I am not clear to the question.
8   Are you asking if Issie Wiseman knew that
9   Russell Simmons was one of the people
10  signing, or are you asking if I told Issie
11  Wiseman that Russell Simmons had signed
12  the amendments extending the agreement --
13  or rather providing for a new amendment
14  commencing in '08?
15  Q.    It seems to be when the court
16  reporter read back the question, she said
17  the question was: "Did you ever tell
18  Mr. Wiseman that Russell Simmons executed
19  the amendment renewing the license
20  agreement for two- or three-year periods."
21  A.    It's the periods I'm not
22  understanding. It sounds like it's a
23  general --
24  Q.    I very much welcome your follow-up
25  question. Let's look at the exhibit when
```

402

```
1              B. Ullmann
2   Mr. Skinner had not signed the contract.
3   Q.    Mr. Ullmann, was my question at all
4   unclear to you; did you not understand
5   when I said that Russell Simmons had
6   signed it?
7          Maybe it would be helpful if I
8   could learn if when I said, "Did anyone
9   tell him that Mr. Simmons signed the
10  contract," I don't know why that was
11  unclear and I think it will help me in the
12  future times, when I get to ask you
13  questions in this case, if you could
14  explain to me why, when I ask you, did
15  Russell Simmons sign that, you seem so
16  unable to understand that.
17          The question is: Did you tell
18  someone Russell Simmons signed?
19          MR. HOFFMAN: I object to
20      the form. It's argumentative.
21  A.    Okay. I wasn't clear and maybe
22  it's a simple thing as the language
23  barrier. I was not clear if your question
24  earlier was general or it was specific.
25  When you pulled out the exhibit, I
```