# EXHIBIT TO DECEMBER 10, 2007 DECLARATION OF PHILIP R. HOFFMAN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

## PHAT FASHIONS LLC V. TORNADO IMPORTS (CANADA), INC.
Case No.: 07 Civ. 3278 (PAC)

# EXHIBIT 55

```
                                                              1

 1    UNITED STATES DISTRICT COURT
 2    SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------------------- x
 4    PHAT FASHIONS, LLC.,
 5                         Plaintiff,
 6         -against-
 7    TORNADO IMPORTS (CANADA), INC.,
 8
                           Defendants.
 9
      ------------------------------------------- x
10
11
12              DEPOSITION of the Non-Party Witness,
13    PRYOR CASHMAN, by ELI NATHANSON, taken pursuant
14    to Subpoena, held at the offices of Gibson Dunn &
15    Crutcher, 202 Park Avenue, New York, New York
16    10166, on November 8, 2007, at 10:02 a.m., before
17    a Notary Public of the State of New York.
18
19
20
21    **********************************************
             BARRISTER REPORTING SERVICE, INC.
22                    120 Broadway
                 New York, N.Y. 10271
23                  212-732-8066
24
25
```

PLAINTIFF'S EXHIBIT 55

```
                                    6
 1                Nathanson
 2   background, starting with your
 3   undergraduate.
 4   A.    BA from SUNY Stony Brook.
 5   Q.    When did you graduate from SUNY Stony
 6   Brook?
 7   A.    In '93.
 8   Q.    After you graduated from SUNY Stony
 9   Brook, did you go immediately to law school?
10   A.    Yes.
11   Q.    Where did you go to law school?
12   A.    Brooklyn Law School.
13   Q.    When did you graduate?
14   A.    1996.
15   Q.    Where did you start working after
16   your graduation in 1996?
17   A.    I did several temp jobs leading up to
18   my job at Pryor Cashman.
19   Q.    When you say "several temp jobs," can
20   you explain that further?
21   A.    I worked for an agency and I did
22   several assignments that they sent me on.
23   Q.    What kind of assignments did you do?
24   A.    Law -- law-related jobs.
25   Q.    Such as?
```

```
                                    7
 1                Nathanson
 2   A.    For example, I worked in this
 3   building for MetLife working on a big
 4   demutualization project.
 5   Q.    What kind of work did you actually
 6   do?
 7   A.    For MetLife?
 8   Q.    For example?
 9   A.    It's been so long. Certain contract
10   administration. Actually, some of it was
11   actually data entry.
12   Q.    When did you join Pryor Cashman?
13   A.    That was in '99, I think.
14   Q.    You joined Pryor Cashman in 1999?
15   A.    Yes.
16   Q.    What year did you make partner?
17   A.    Last year, 2006.
18   Q.    Did you make partner at the end of -
19   2006?
20   A.    Yes.
21   Q.    Were you a partner effective
22   January 2007?
23   A.    Yes.
24         MS. SAMANTA: I'd like to mark
25         as Defendant's Exhibit 24, a document
```

```
                                    8
 1                Nathanson
 2   containing the bio of Eli Nathanson.
 3         (Whereupon Bio of Eli
 4   Nathanson was marked Defendant's
 5   Exhibit 24 for identification as of
 6   this date.)
 7   Q.    Can you describe what Defendant's
 8   Exhibit 24 is?
 9   A.    It's my bio.
10   Q.    Did you draft that biography?
11   A.    I think I did the initial draft. It
12   might have been worked on by others as well.
13   Q.    Can you review it for a minute and
14   let me know if all the information contained
15   in it is accurate?
16   A.    It looks good -- actually, New York
17   State Bar Association I know I was, but I'm
18   not sure if I kept up with my dues, but
19   other than that, it looks accurate.
20   Q.    Let me make sure I understand.
21   You're not sure that you are affiliated with
22   the New York State Bar Association?
23   A.    I was, but -- I think, but I'm not
24   sure if I kept up with my dues.
25         MR. HOFFMAN: If you haven't,
```

```
                                    9
 1                Nathanson
 2         you'll let me know so that I can make
 3         the change on the website?
 4         THE WITNESS: Sure.
 5   Q.    Other than the portion listing
 6   professional affiliations on your biography,
 7   is everything else contained in Exhibit 24
 8   accurate?
 9   A.    Yes.
10   Q.    Mr. Nathanson, how did you come to be
11   involved with Phat Fashions as a client?
12   A.    I started working with one of the
13   partners in the firm who did a lot of work
14   for them and that's how it began.
15   Q.    Which partner did you start working
16   with?
17   A.    Brad Rose.
18   Q.    What time was that?
19   A.    Oh, that might have been back in, I
20   guess '01, '02. 2001, 2002; around that
21   time.
22   Q.    When you say it might have been, what
23   is your best recollection of the time that
24   you started working with Mr. Rose on Phat
25   Fashions matters?
```

Page 10

```
1                    Nathanson
2    A.    Yes, that's my best recollection.
3    Q.    2001 to 2002?
4    A.    Yes, around that time.
5    Q.    In that 2001 to 2002 time frame, what
6    matters did you work on for Phat Fashions?
7    A.    Oh, it was -- at that time, it was
8    minimal. I think just a license agreement
9    here or there.
10   Q.    Did you work on Tornado-related
11   matters for Phat Fashions at that time, 2001
12   to 2002?
13   A.    No.
14   Q.    Can you name some of the transactions
15   that you did work on at that time?
16   A.    There were other license agreements.
17   I think one of the early ones was with a
18   company called Paul Lavitt, L-A-V-I-T-T.
19   That's one of the early ones that I can
20   remember.
21   Q.    Pryor Cashman, was there a general
22   team in place that worked on Phat Fashions
23   matters?
24         MR. HOFFMAN: Objection to the
25      form. You can answer.
```

Page 11

```
1                    Nathanson
2    A.    I think Brad was the point person and
3    I was one of the folks that was helping out.
4    I don't know how many other people were
5    involved at that time.
6    Q.    Over the course of time, this is
7    beyond the 2001/2002 time period, was there
8    a team in place that worked on Phat Fashions
9    matters?
10   A.    I think that there was not. I don't
11   know if there was a regular set team, I
12   mean, because there are a lot of aspects,
13   you know. But, you know, there were several
14   people working on it throughout the period.
15   You know, I don't know exactly who and when.
16   Q.    I didn't mean to imply anything by my
17   use of the word "team".
18         Was there a group of people that
19   regularly worked for matters for Phat
20   Fashions at Pryor Cashman?
21   A.    There was Brad and then I, you know,
22   did transactional work, which obviously grew
23   from the '01 period to now. And then there
24   were other people working on other aspects.
25   Q.    Was Brad the most senior person of
```

Page 12

```
1                    Nathanson
2    the group of people that you just described?
3    A.    Yes.
4    Q.    Were you the next most senior person?
5    A.    Not in the beginning and not even
6    now. I think there are other people working
7    that are more senior.
8    Q.    Who is senior to you that works on
9    Phat Fashions matters?
10   A.    My partner, Teresa Lee.
11   Q.    When did you begin to work on Phat
12   Fashions matters involving Tornado?
13   A.    You know, I think any real work
14   started with that recent draft amendment
15   that we put together.
16   Q.    What time period would you estimate
17   that to be?
18   A.    I don't remember exactly, but if I
19   could see the document, it would probably be
20   around that time.
21   Q.    We'll look through documents, but I
22   want to get your recollection that you have
23   now before you look at the documents.
24         Do you have any estimate of when you
25   first started working in Tornado matters?
```

Page 13

```
1                    Nathanson
2    A.    It was sometime in '06.
3    Q.    In '06?
4    A.    Yes, I think.
5    Q.    Was there a group of people at Pryor
6    Cashman that worked on Tornado-related
7    matters for Phat Fashions?
8    A.    Well, I think there might have been.
9    There is no one else who worked on the
10   amendment.
11   Q.    When you say "the amendment," what
12   are you referring to?
13   A.    The draft amendment that we prepared
14   for Tornado.
15   Q.    When you say there was no one else
16   working on the amendment, do you mean that
17   you were the only attorney at Pryor Cashman
18   working on the amendment for Tornado?
19         MR. HOFFMAN: Objection to the
20      form.
21   Q.    You can answer.
22   A.    I believe so, yes.
23   Q.    Is it correct to say that you were
24   the attorney at Pryor Cashman that had
25   primary responsibility for the amendment
```

14

1 Nathanson
2 regarding Tornado?
3 A. Yes.
4      MS. SAMANTA: I'd like to
5 mark, as Defendant's Exhibit 25, a
6 document bearing the Bates numbers
7 PF1 through 36.
8      (Whereupon Document bearing
9 the Bates numbers PF1 through 36 was
10 marked Defendant's Exhibit 25 for
11 identification as of this date.)
12 Q. I ask that you just take a look at
13 the front cover for now.
14      Did you draft that agreement,
15 Mr. Nathanson?
16 A. No.
17 Q. Do you know who drafted the
18 agreement?
19 A. No.
20 Q. Are you familiar with the agreement?
21 A. Pretty much. I mean, I'd have to
22 read it again; it's been awhile since I
23 looked at it.
24 Q. Was that a document that you
25 maintained in your files when you were —

15

1 Nathanson
2 and, actually, I would ask that you not flip
3 through it right now if you don't mind.
4      Was that a document that you
5 maintained in your files while you were at
6 Pryor Cashman?
7      MR. HOFFMAN: Objection to the
8 form. When you say "your files," do
9 you mean the firm's files or his,
10 personally?
11      MS. SAMANTA: I'll ask it both
12 ways.
13 Q. Was that a document that you
14 maintained in your personal files at Pryor
15 Cashman when you were at the firm?
16 A. I don't know if I actually had this
17 in my file before I started working on the
18 draft amendment.
19 Q. Did you have it in your file at some
20 point?
21 A. Yes.
22 Q. Do you recall when that was?
23 A. When I was working on the draft
24 amendment.
25 Q. How did you receive the document?

16

1 Nathanson
2 A. I don't know exactly. I probably got
3 a copy from someone who had it.
4 Q. Do you remember who that was?
5 A. Not exactly, no.
6 Q. Your best recollection is that you
7 received this document, the August 1, 1998
8 licensing agreement, around 2006?
9 A. Yes, I mean that would be the first
10 time I looked at it carefully in order to
11 draft the amendment.
12 Q. You don't recall exactly when you
13 received it or how?
14 A. It was around that time.
15 Q. Do you recall, before going through
16 the agreement, who signed this agreement on
17 behalf of Phat Fashions?
18 A. Do I recall? Not exactly. I have to
19 look at it.
20 Q. Go ahead and take a look at the
21 document.
22      Who signed the agreement on behalf of
23 Phat Fashions?
24 A. It looks like Russell Simmons.
25 Q. Is that a fact that you were aware of

17

1 Nathanson
2 at the time that you received the document
3 and were drafting the amendment?
4 A. Yes.
5 Q. You just don't recall it now?
6      MR. HOFFMAN: Objection to the
7 form.
8 Q. You weren't able to recall it without
9 looking through the document now?
10 A. I would have assumed that.
11 Q. When you say "I would have assumed
12 that," what do you mean?
13 A. Well, at that time Russell was the
14 one who signed on behalf of Phat Fashions,
15 at that time.
16 Q. Let me clarify one thing about the
17 procedure in this deposition: When I ask
18 you a question, you should give me your best
19 recollection or your best guess or whatever
20 you have in your mind.
21      So if there is an answer that you
22 would have assumed something, you should
23 answer that and I can follow up and ask
24 whether it's speculation or an assumption,
25 but I ask that you let me know whatever you

18

1  Nathanson
2  have in your mind.
3  A.  Okay.
4  Q.  When I asked you: Do you know,
5  without looking at that document, who signed
6  it; what is your answer to that?
7  A.  Russell Simmons.
8  Q.  If I can draw your attention to
9  Section 17 of the document. Are you
10 familiar with that section?
11 A.  Yes.
12 Q.  What did you understand Section 17 to
13 mean?
14 A.  The agreement can only be extended,
15 waived or modified by writing signed by both
16 parties.
17 Q.  What did you understand a writing
18 signed by both parties to mean?
19 A.  A written amendment signature duly
20 authorized by both parties. Meaning Phat
21 Fashions and Tornado.
22 Q.  Did you ever have any
23 conversations -- actually, let me direct
24 your attention to Schedule C of the
25 agreement. It's on PF29.

19

1  Nathanson
2  A.  Schedule C?
3  Q.  Right. Can you explain what the
4  purpose of Schedule C is?
5      MR. HOFFMAN: Objection to the
6      form. I think he said he didn't
7      draft it.
8  Q.  Can you explain what your
9  understanding of Schedule C is?
10 A.  This is to set forth the definition
11 of licensed products.
12 Q.  Specifically, what does Schedule C
13 contain?
14 A.  You want me to read this?
15 Q.  No. What is your understanding of
16 what Schedule C reflects, in terms of
17 licensed products?
18 A.  These are the licensed products and
19 the brands that the licensee is permitted to
20 sell, among other things.
21 Q.  Let me draw your attention to the
22 language stating, "All Phat Farm products
23 excluding," and then there's a list of
24 products.
25     Is it your understanding that

20

1  Nathanson
2  Schedule C contains the products that
3  Tornado is not licensed to sell under this
4  agreement?
5      MR. HOFFMAN: Objection to the
6      form.
7  A.  It says what they can do and excludes
8  certain other things that they can't do.
9  Q.  Are some of the certain other things
10 that are excluded, lingerie, loungewear,
11 women's and girl's dresses; is that
12 accurate?
13 A.  Those are some of the exclusions,
14 yes.
15 Q.  Do you know if any of these products
16 were ever sold by Tornado?
17 A.  No.
18 Q.  When you say no, is that you don't
19 know or they weren't sold by them?
20 A.  I don't know.
21 Q.  Did you ever have any conversations
22 regarding the sale of Baby Phat products by
23 Tornado?
24 A.  Any conversations?
25 Q.  Yes.

21

1  Nathanson
2  A.  With whom?
3  Q.  With anyone?
4  A.  Baby Phat products?
5  Q.  By Tornado?
6  A.  I don't really recall, sitting here,
7  about a specific conversation about that,
8  although it's possible.
9  Q.  Do you recall general conversations
10 regarding the sale of Baby Phat products by
11 Tornado?
12 A.  I don't recall. You know, generally,
13 I don't recall, though it's possible.
14 Q.  When you say it's possible, is that
15 based on a recollection or --
16 A.  No, just based on the fact that I
17 might not remember.
18 Q.  Do you have any knowledge of this
19 agreement being extended by renewals?
20     MR. HOFFMAN: Objection to the
21     form.
22 A.  Are you referring to the renewals
23 contained in here beyond the initial term?
24 Q.  Yes.
25 A.  Yes, I believe it had been extended.

---

**Page 30**

1                 Nathanson
2 they were not paying their royalties always
3 on time?
4   A.    No. This is just a general comment,
5 it looks like, that I was relaying. But,
6 you know, I wouldn't draw -- I mean, I don't
7 think that I was drawing any specific
8 conclusions.
9   Q.    There's no basis for your speculation
10 earlier that maybe they were not paying all
11 their royalties on time?
12         MR. HOFFMAN: Objection to the
13     form. You can answer.
14   A.    No.
15   Q.    If you look further in this e-mail,
16 it reflects a discussion about accounting
17 for BP sales. Do you know what that refers
18 to?
19   A.    Accounting for BP sales?
20   Q.    Right.
21   A.    Yes, it looks like Peter must have
22 told me that Tornado was reporting to Peter
23 about certain BP sales.
24   Q.    Apart from looking at this e-mail
25 now, do you have any independent

---

**Page 31**

1                 Nathanson
2 recollection of that?
3   A.    No.
4   Q.    The second to last sentence here
5 discusses, "nailing down exactly what
6 Tornado is doing and the rights they have so
7 that we, at least, have the paperwork in
8 order."
9         Do you remember writing that?
10   A.    Yes.
11   Q.    What paperwork, if any, did you get
12 in order regarding Tornado that is referred
13 to in this e-mail?
14         MR. HOFFMAN: Objection to the
15     form.
16   A.    I didn't receive anything.
17   Q.    Did you follow up?
18         MR. HOFFMAN: Objection to the
19     form.
20   A.    This is -- no.
21         MS. SAMANTA: I'd like to show
22     you a document that's previously been
23     marked as Defendant's Exhibit 2.
24   Q.    This is an e-mail. The top e-mail is
25 an e-mail from Bernt Ullmann to a number of

---

**Page 32**

1                 Nathanson
2 individuals, including you as a cc.
3         Do you recall receiving this e-mail
4 in or around March 2006?
5   A.    Looking at it now, yes.
6   Q.    Please take your time to flip through
7 the document and the attachment.
8         Do you recall any conversations with
9 your client regarding this e-mail or the
10 attachment?
11   A.    No phone conversations.
12   Q.    Do you recall any other
13 conversations, not by phone, with your
14 client regarding this e-mail or attachment?
15   A.    I think after I drafted the amendment
16 and sent it to him, I might have had
17 questions about the terms.
18         MR. HOFFMAN: Who is "him"?
19   A.    I'm sorry, Bernt Ullmann.
20   Q.    I'm talking about the time period
21 right around receiving this e-mail. Do you
22 recall any conversations with Mr. Ullmann
23 regarding this e-mail or terms or anything
24 else?
25   A.    No.

---

**Page 33**

1                 Nathanson
2         MS. SAMANTA: I'd like to show
3     you a document that's been marked as
4     Defendant's Exhibit 3.
5   Q.    Is this document, Exhibit 3, the
6 amendment that you were referring to
7 earlier?
8         MR. HOFFMAN: I have an
9 objection to form. I think, just for
10 purposes of the deposition, when we
11 talk about "amendment," it is our
12 position that it is a draft.
13         You have your position that it
14 is not, but when we use the term
15 "amendment," I guess we should figure
16 out exactly what it is we mean.
17         MS. SAMANTA: When I use the
18 term "amendment," I'm referring to
19 this document, Defendant's 3, and
20 various permutations of that document
21 and, later, if there are objections
22 to form, we can state them on the
23 record and we'll go from there.
24         MR. HOFFMAN: Great.
25         MS. SAMANTA: Can you read

Page 34

1  Nathanson
2  back the question.
3  (Whereupon the record was read
4  back by the reporter.)
5  A.  This is a draft of the draft
6  amendment that I was referring to earlier.
7  Q.  When you say "draft of the draft
8  amendment," what do you mean?
9  A.  Meaning this was a first draft of the
10 amendment that I put together based on
11 proposed terms forwarded to me by Bernt
12 Ullmann.
13 Q.  Did this draft that you put together,
14 to your knowledge, change?
15 A.  Change?
16 Q.  Right. You described it as a draft
17 of a draft, which leads me to believe that
18 the terms in this document, Exhibit 3,
19 changed; to your knowledge, is that the
20 case?
21 A.  Well, I don't recall ever working on
22 it beyond this first draft.
23 Q.  You don't know whether it changed or
24 not?
25 A.  The draft or the terms?

Page 35

1  Nathanson
2  Q.  I'm talking about Exhibit 3. The
3  attachment to Exhibit 3?
4  A.  This draft, yes.
5  Q.  Do you know if there was ever another
6  version of this attachment to Exhibit 3?
7  A.  I've never prepared another version,
8  I don't believe.
9  Q.  You've never seen another version?
10 A.  Correct.
11 Q.  You're not aware of another version?
12 A.  Correct.
13 Q.  Who asked you to prepare the
14 attachment to Exhibit 3?
15 A.  Bernt Ullmann forwarded to me the
16 terms and, that is -- you know, usually
17 means for me to start working on a draft
18 based on the terms.
19 Q.  When you say Bernt Ullmann forwarded
20 you the terms, are you referring to the
21 e-mail that we saw as Exhibit 2?
22 A.  Yes.
23 Q.  Did you have any discussion with
24 Mr. Ullmann about the terms of this
25 agreement?

Page 36

1  Nathanson
2  A.  I might have sent him some questions
3  about it, but I just don't remember, sitting
4  here, exactly what those were or if I did.
5  Q.  Did Mr. Ullmann ever relay to you any
6  conversations that he had with Tornado?
7  A.  No.
8  Q.  How did you decide what to include in
9  the draft agreement that's attached to
10 Exhibit No. 3?
11 A.  Well, I looked at the proposed terms
12 forwarded to me.
13 Q.  That's Exhibit 2?
14 A.  Yes.
15 Q.  Did you discuss the agreement with
16 anybody else at Pryor Cashman?
17     MR. HOFFMAN: Objection to the
18   form. You're saying "agreement"; do
19   you mean amendment?
20     MS. SAMANTA: Strike that.
21   Let me restate the question.
22 Q.  Did you discuss the amendment with
23 anyone else at Pryor Cashman?
24 A.  I don't recall ever doing that.
25 Q.  Let me direct your attention to the

Page 37

1  Nathanson
2  amendment itself, the page Bates number
3  PF142.
4  A.  Okay.
5  Q.  How did you come up with the minimum
6  net sales numbers that are indicated here in
7  this amendment?
8  A.  I believe we were given guaranteed
9  minimum royalties and, by using the royalty
10 rate, backed out and extrapolated the
11 amendment net sales figures.
12 Q.  When you say the royalty rate, where
13 did you get the royalty rate from?
14 A.  It must have been the original
15 agreement.
16 Q.  Did you have any discussions with
17 anyone about using the same royalty rate as
18 in the original agreement for the amendment?
19 A.  I don't remember. I don't recall
20 that, sitting here, although it's possible I
21 might have.
22 Q.  You have no recollection either way?
23 A.  Right. Correct.
24 Q.  Did you receive any response from
25 anyone at Tornado regarding this draft

**Page 38**

1 Nathanson
2 amendment -- this amendment?
3 A. I didn't receive any comments to it.
4 Q. I'd like to direct your attention to
5 the time of your cover e-mail, that's
6 8:27 p.m., correct, on March 20, 2006?
7 A. Yes, I was working late.
8 Q. Not a unique instance of that, I'm
9 sure.
10    MS. SAMANTA: I'd like to
11 mark, as Defendant's Exhibit 28, a
12 document which bears the Bates
13 numbers PF133 to 124.
14    (Whereupon Document which
15 bears the Bates numbers PF133 to 124
16 was marked Defendant's Exhibit 28 for
17 identification as of this date.)
18 Q. If you can take a minute to review
19 that.
20    Do you recall sending this e-mail on
21 or around March 20, 2006 to Issie Wiseman,
22 attaching the amendment that we've been
23 discussing?
24    MR. HOFFMAN: Objection to the
25 form. Does he have 28 in front of

**Page 39**

1 Nathanson
2 him?
3    MS. SAMANTA: Oh, I'm sorry.
4 I'm mischaracterizing it. Strike
5 that.
6 Q. Do you recall receiving an e-mail on
7 or around March 20, 2006 from Bernt Ullmann,
8 asking you to send this e-mail directly to
9 Issie Wiseman?
10 A. Yes.
11 Q. What time is the e-mail from
12 Mr. Ullmann?
13 A. 7:43 p.m.
14 Q. Is the e-mail below an e-mail from
15 you to Mr. Ullmann describing the amendment?
16 A. Yes. Well, it doesn't describe the
17 amendment -- I'm sorry to interrupt you.
18    It has certain points that I wanted
19 to talk to him about, that I wanted to let
20 him know about.
21 Q. Did Mr. Ullmann comment on these
22 points?
23 A. No, it's sent from his Blackberry,
24 which usually means he didn't have a chance
25 to review it. Other times, he'll do that.

**Page 40**

1 Nathanson
2 Q. Apart from his e-mail from his
3 Blackberry, did he later comment on the
4 points in your e-mail?
5 A. No, he just told me to send it out
6 reserving rights; probably because he hasn't
7 reviewed it.
8 Q. Is that document, sending it out, the
9 document that we were previously looking at,
10 Defendant's Exhibit 3?
11    MR. HOFFMAN: Objection to the
12 form.
13 A. I believe so. Yes.
14 Q. Is it correct that after receiving
15 your client's go-ahead to send out the
16 document on March 20th at 7:43, you then
17 sent it on to Issie Wiseman, which is
18 reflected in Defendant's Exhibit 3?
19 A. I sent it out, yes, pursuant to his
20 instructions with -- obviously, with the
21 standard disclaimer.
22 Q. I'd like to draw your attention to
23 the wording of Defendant's Exhibit 3. It
24 says, "I am simultaneously transmitting the
25 attached to our client and must, therefore,

**Page 41**

1 Nathanson
2 reserve the right to modify same as
3 directed."
4 A. Yes.
5 Q. You had actually sent this to your
6 client before?
7    MR. HOFFMAN: Objection to the
8 form.
9 A. I had, but in this e-mail, I was also
10 simultaneously transmitting it to him. To
11 our client.
12 Q. You say, "I'm simultaneously
13 transmitting the attached and, therefore,
14 reserve the right to modify as directed,"
15 but your client had seen the e-mail before?
16    MR. HOFFMAN: Objection to the
17 form.
18 A. He had seen the e-mail, but I am
19 assuming that he did not review the
20 amendment on his Blackberry. And that's why
21 we reserved rights.
22 Q. Again, did he ever subsequently send
23 you comments to the agreement?
24    MR. HOFFMAN: Objection to the
25 form. You mean amendment?

Page 42

```
 1                Nathanson
 2        MS. SAMANTA: Either way.
 3   A.   I don't recall him ever doing that.
 4        MS. SAMANTA: Can we take a
 5   ten-minute break?
 6        MR. HOFFMAN: Sure.
 7        (Brief recess taken.)
 8   Q.   I'd like to show you a document
 9   that's been marked as Exhibit 4. This
10   document is a letter to you from Barry
11   Siegel, dated March 30, 2006.
12        Do you remember receiving this
13   document?
14   A.   Yes, after looking at this, I do.
15   Q.   Prior to receiving this document, do
16   you recall any conversations that you had
17   with anyone from Tornado?
18   A.   Until yesterday, I didn't
19   specifically recall that, but then after
20   looking at this, I did.
21        MR. HOFFMAN: "This" being?
22   Defendant's Exhibit 4?
23        THE WITNESS: Defendant's
24   Exhibit 4.
25   Q.   When you say until yesterday, what do
```

Page 43

```
 1                Nathanson
 2   you mean?
 3   A.   From the period before yesterday.
 4   Q.   I mean, did you meet with your
 5   Counsel to discuss this deposition?
 6   A.   Yes.
 7   Q.   Was it during that meeting that you
 8   remembered having a conversation with
 9   someone from Tornado prior to receiving this
10   document?
11   A.   Yes.
12   Q.   What refreshed your recollection, at
13   that meeting yesterday with your Counsel, of
14   a conversation with Tornado?
15   A.   I believe it was this document.
16   Q.   Was there anything other than the
17   document itself that refreshed your
18   recollection of a meeting with Tornado -- of
19   a phone call with someone from Tornado?
20   A.   Well, this triggered it, I believe.
21   Q.   When you say "I believe," is there
22   anything else that triggered it; was there a
23   conversation with your Counsel that
24   triggered that recollection?
25   A.   No, it was when I saw this document.
```

Page 44

```
 1                Nathanson
 2   Q.   What do you recall now, after meeting
 3   with your Counsel, about that conversation
 4   that you had with someone from Tornado?
 5        MR. HOFFMAN: Objection to the
 6   form.
 7   A.   Well, after looking at this document,
 8   I remember a phone call with Barry Siegel.
 9   Q.   When you say after looking at this
10   document, is it because the document says,
11   "It was a pleasure speaking with you
12   yesterday"?
13   A.   Yes.
14   Q.   What do you recall of the
15   conversation with Mr. Siegel?
16   A.   I believe he said, you know, Where do
17   I send this document that I signed.
18   Q.   When you say "this document," you're
19   referring to the attachment in Defendant's
20   Exhibit 4?
21   A.   Correct.
22   Q.   What did you tell Mr. Siegel?
23   A.   That signed documents go through me.
24   Send it to me.
25   Q.   Did you tell Mr. Siegel anything else
```

Page 45

```
 1                Nathanson
 2   during that phone conversation?
 3   A.   Not that I recall.
 4   Q.   Did Mr. Siegel tell you anything else
 5   during this conversation?
 6   A.   No, not that I recall.
 7   Q.   You didn't tell Mr. Siegel that this
 8   was a draft that he was signing and
 9   returning to you?
10        MR. HOFFMAN: Objection to the
11   form.
12   A.   No. I mean, he just said, Where do I
13   send this.
14   Q.   You said to send it to you?
15   A.   I said, you know, these sort of
16   things go through me.
17   Q.   When you said "these sort of things,"
18   what were you referring to?
19   A.   Signatures.
20   Q.   Did you relay the conversation that
21   you had with Mr. Siegel to your clients?
22   A.   No.
23   Q.   Did you relay that conversation to
24   any senior attorneys in the firm?
25   A.   No.
```

Page 46

1 Nathanson
2 Q. Did you tell anyone that you received
3 the signed document from Mr. Siegel
4 reflected in Exhibit 4?
5 A. No, I think I just sent it to Peter
6 Morris for processing.
7 Q. Did you maintain a copy of it in your
8 files?
9 A. I thought I had, but then it turns
10 out I did not, in my paper files.
11 Q. When you say you thought you had,
12 what time period is that referring to?
13   MR. HOFFMAN: Objection to the
14   form. Can we just clarify which
15   document we're talking about, whether
16   it's 4?
17   MS. SAMANTA: We're talking
18   about 4.
19 Q. Did you maintain a copy of Exhibit 4
20 in your files?
21 A. This document -- I don't think so.
22 Q. Did you maintain a copy of the
23 attachment to Exhibit 4 in your files?
24 A. I did have -- a copy of it was made,
25 but it probably was misfiled or misplaced --

Page 47

1 Nathanson
2 but a copy of that and a transmittal letter
3 to Peter Morris was made. I remember not
4 finding it and then finding out later
5 that --
6 Q. When you say you remember not finding
7 it, what time period is that recollection
8 from?
9 A. Oh, I think it was this year.
10 Q. Do you have any more specific
11 recollection of what time this year?
12 A. Earlier this year.
13 Q. January, February, March?
14 A. I don't remember exactly.
15 Q. First six months?
16 A. Probably.
17 Q. First three months?
18 A. I don't know.
19 Q. What was the standard operating
20 procedure at Pryor Cashman when you received
21 signed documents?
22   MR. HOFFMAN: Objection to the
23   form.
24 A. I don't know if there is a standard
25 procedure at Pryor Cashman.

Page 48

1 Nathanson
2 Q. Do you usually maintain copies of
3 signed documents?
4   MR. HOFFMAN: "You" being him
5   or the firm?
6 Q. You, Mr. Nathanson. I'll ask it
7 again: Do you, Mr. Nathanson, usually
8 retain copies of signed documents that you
9 receive?
10 A. Yes.
11 Q. I'd like to show you a document
12 that's been marked as Defendant's Exhibit 5.
13 This is a letter from you to Peter Morris.
14   Do you recall sending this letter on
15 or about April 5, 2006?
16 A. Yes.
17 Q. Do you recall having conversations
18 with anyone at Phat Fashions prior to
19 sending this letter?
20 A. No.
21 Q. Did anybody specifically request that
22 you send this letter?
23 A. No, this is just what -- it's
24 standard for me to send these sort of things
25 to Peter Morris for handling.

Page 49

1 Nathanson
2 Q. When you say "these sort of things,"
3 what do you mean?
4 A. Signatures. Partially-signed
5 documents.
6 Q. Is the signed document that you're
7 referring to, that you sent on to Peter
8 Morris, the attachment to Exhibit 4?
9 A. Yes.
10 Q. Why did you send these documents to
11 Mr. Morris?
12 A. Whenever I get partially-signed
13 documents, I send them to Peter Morris for
14 internal review and handling.
15 Q. By "internal review and handling,"
16 what do you mean?
17 A. Meaning he starts the process
18 internally at Kellwood of reviewing,
19 approving any documents before Kellwood
20 signs.
21 Q. Your letter to Mr. Morris states, and
22 this is Exhibit 5, "Please arrange to have
23 countersigned where indicated and return one
24 fully-executed original to me. Please keep
25 one original for your records."

50

1   Nathanson
2   Did I read this correctly?
3   A. Yes.
4   Q. Was it your expectation that
5   Mr. Morris would have the documents
6   countersigned and returned to you?
7   A. It was reviewed and approved in
8   accordance with the typical policy.
9   Q. Did you ask him to have it reviewed
10  and approved in accordance with the typical
11  policy?
12  A. There is no reason to; that was done
13  every time.
14  Q. Did you have a conversation with
15  Mr. Morris when you transmitted this letter
16  to him?
17  A. No need to. The policy was the same
18  every time.
19  Q. Did Mr. Morris respond to you in any
20  way upon receiving this letter from you?
21  A. Not that I recall.
22  Q. Did anyone else from Phat Fashions
23  respond to you upon receiving Mr. Morris'
24  receipt of this letter?
25  A. That day?

51

1   Nathanson
2   Q. In response to this letter, at any
3   time?
4   A. Not that I recall, specifically, in
5   response to this letter.
6   Q. Do you generally recall a
7   conversation with someone at Phat Fashions;
8   does this letter refresh your recollection
9   of a general conversation with someone at
10  Phat Fashions?
11  A. About?
12  Q. It seemed that in your prior answer,
13  you were thinking of a conversation with
14  someone at Phat Fashions that didn't
15  specifically deal with this letter and I'm
16  trying to understand what that conversation
17  was?
18       MR. HOFFMAN: Objection to the
19  form. You can answer.
20  A. I believe long after, we might have
21  talked about the status of this draft.
22  Q. When you say "we," who are you
23  referring to?
24  A. I don't know specifically, but, you
25  know, probably someone from Kellwood; either

52

1   Nathanson
2   Bernt Ullmann or Counsel or their
3   assistants.
4   Q. When you say Counsel, who would that
5   have been?
6   A. In-house Counsel at Kellwood.
7   Q. Who was in-house Counsel at Kellwood?
8   A. Well, there was first, Don Gramke and
9   then later on, Luther Rollins.
10  Q. I'm going to show you a document
11  that's been marked as Defendant's Exhibit 6.
12       Can you take a minute to review
13  Exhibit 6?
14  A. Okay.
15  Q. Is this a copy of the agreement that
16  you received from Mr. Siegel at Tornado?
17       MR. HOFFMAN: Objection to the
18  form.
19  A. No. No, it's not.
20  Q. How is it different from the
21  agreement that you received from Mr. Siegel
22  at Tornado, and what I'm referring to is the
23  attachment to Exhibit 4?
24       MR. HOFFMAN: Objection to the
25  form. You can answer.

53

1   Nathanson
2   A. The document I received from
3   Mr. Siegel only had signatures from Tornado.
4   Q. How is this document different?
5   A. This one has a signature from Russell
6   Simmons.
7   Q. The terms of this document, to your
8   knowledge, are they different from the
9   document attached to Exhibit 4, which is the
10  document you received from Mr. Siegel?
11  A. I have to confirm 100 percent, read
12  both and compare, but I'm assuming they are.
13  Q. What is that assumption based on?
14  A. That no one changed it in the
15  interim.
16  Q. Did you know that this agreement was
17  signed by Russell Simmons?
18  A. No.
19  Q. You were not aware, prior to right
20  now, that this agreement was signed by
21  Russell Simmons?
22  A. Correct.
23  Q. This is the first you're learning of
24  this document --
25  A. Let me correct. It might have been

Page 58

```
 1              Nathanson
 2   because anything is possible?
 3   A.    Yes.
 4   Q.    I'd like to direct your attention to
 5   the e-mail.
 6   A.    Okay.
 7   Q.    There are three items referred to;
 8   the first one is Tornado, two sets for
 9   signature.
10         What was your understanding of what
11   Mr. Morris was doing by this e-mail?
12   A.    When Peter gets signatures for me, he
13   typically then sends it to general Counsel
14   who starts the review process, the legal
15   review process, which is summarizing terms
16   for the people who need to approve and sign.
17   Q.    Would you expect, after that process
18   was finished, to receive copies of these
19   agreements?
20         MR. HOFFMAN:  Objection to the
21      form.
22   A.    Not in all cases; only if it was
23   properly reviewed and approved internally.
24   Q.    If the agreement was signed
25   internally, would you expect to get a copy
```

Page 59

```
 1              Nathanson
 2   of it back?
 3   A.    If it was reviewed, approved and
 4   signed by all of the required parties and
 5   they released it to me, I don't have an
 6   expectation until they give it to me fully
 7   signed.
 8   Q.    I'd like to show you a document
 9   that's been marked as Exhibit 7, if you
10   could take a minute to review.
11         The bottom portion of this document
12   is an e-mail from you to Bernt Ullmann,
13   cc'ing Brad Rose of your firm, listing
14   various deals; is that a correct
15   characterization?
16   A.    Yes.
17   Q.    Are these deals that you were working
18   on for Phat Fashions?
19   A.    Yes.
20   Q.    When you say, next to certain of
21   these deals, that they were in the execution
22   phase, what did you mean?
23   A.    It means that I've sent them on to
24   Peter for processing.
25   Q.    Was your protocol to follow up with
```

Page 60

```
 1              Nathanson
 2   Peter on these deals?
 3   A.    No, when I send it to Peter, it
 4   usually goes through their normal channels
 5   and procedures, so I just wait.
 6   Q.    You don't follow up with your client
 7   to find out if a deal has been done or in
 8   what stage the deal is at?
 9   A.    I usually either get a fully-signed
10   document back or I don't.
11   Q.    I'm going to go through the deals
12   listed here.
13         Career license.  Did you get a
14   fully-signed document back?
15   A.    Not at that point.  I mean,
16   eventually I did.
17   Q.    Japan Distribution Agreement; did you
18   get a fully-signed document back,
19   eventually?
20   A.    I don't believe that that one closed.
21   Q.    Strategic Partners; did you get a
22   fully-signed agreement back, eventually?
23   A.    Yes.
24   Q.    Elite Industries; did you get a
25   fully-signed agreement back, eventually?
```

Page 61

```
 1              Nathanson
 2   A.    You know, I can't remember what deal
 3   that was, to tell you the truth.  I don't
 4   think it ended up being that entity, so I
 5   can't even place what deal that was.
 6   Q.    Vichen; do you recall getting a
 7   fully-signed agreement back, eventually?
 8   A.    Yes, that deal closed eventually.
 9   Q.    Grupo Eliat; do you recall getting a
10   fully-signed agreement back, eventually?
11   A.    Yes.
12   Q.    Strech-O-Rama; do you recall getting
13   back a fully-signed agreement, eventually?
14   A.    Maybe.  I think we did a few deals
15   with them and I don't know specifically what
16   this one relates to, so it's possible, but I
17   don't know if every single deal that we did
18   with them closed.
19   Q.    Millennium; do you recall getting a
20   fully-signed agreement back, eventually?
21   A.    Yes, I believe we did.
22   Q.    Noho; do you recall getting back a
23   fully-signed agreement eventually?
24   A.    That was an amendment and I don't
25   remember if that was ever consummated.
```

Page 62

1    Nathanson
2  Q.  The final document or the final deal
3  listed, Modo; do you recall getting back a
4  fully-signed amendment eventually?
5  A.  I don't recall if that amendment was
6  ever consummated, although it's possible. I
7  just don't remember.
8  Q.  Are there any of these that you
9  specifically recall not getting back a
10 fully-signed agreement or amendment?
11 A.  Yes.
12 Q.  Which ones?
13 A.  The Japan Distribution Agreement.
14 And Tornado.
15 Q.  Is it correct to say that Tornado is
16 the only agreement listed on here in
17 execution phase for which you have no
18 recollection of getting back a fully-signed
19 amendment or agreement?
20     MR. HOFFMAN:  Objection to the
21 form.
22 A.  Well, can you repeat that question?
23     MS. SAMANTA:  Can you read it
24 back.
25     (Whereupon the record was read

Page 63

1    Nathanson
2  back by the reporter.)
3  A.  It's clear that in the Strech-O-Rama
4  example, we did not get it back when it was
5  in execution phase.  We had to make changes.
6  So that one I would say would be -- and
7  Tornado as well.  Those would look like the
8  specific exceptions.
9  Q.  Let me specify with Strech-O-Rama:
10 You said that it is possible that you got
11 something back, but you don't know what deal
12 this is referring to?
13     MR. HOFFMAN:  Objection to the
14 form.  I don't think that was his
15 testimony.
16 Q.  You can go ahead and respond.
17     (Whereupon the record was read
18 back by the reporter.)
19 A.  Correct, later on, we may have
20 ultimately closed it.  I just can't be sure
21 because there are a few deals with this
22 entity and I would have to look and see.
23 Q.  Right.  Is Tornado the only deal
24 listed on here that you remember
25 specifically not getting back a

Page 64

1    Nathanson
2  fully-executed agreement or amendment?
3      MR. HOFFMAN:  Objection to the
4  form.
5  A.  No.  No, we didn't get back the Japan
6  Distribution Agreement either.
7  Q.  Let me ask that question again:  Is
8  Tornado the only deal listed on here in
9  execution phase that you remember
10 specifically not getting back a
11 fully-executed agreement or amendment?
12     MR. HOFFMAN:  Objection to the
13 form.
14 A.  I guess that is the same question as
15 I answered before, but again, Strech-O-Rama
16 was in execution phase and then we didn't
17 get back a signed agreement until we made
18 changes, but other than that, yes.
19     MS. SAMANTA:  I'd like to
20 mark, as Defendant's Exhibit 29, a
21 document bearing the Bates numbers
22 PF174 to 175.
23     (Whereupon Document bearing
24 the Bates numbers PF174 to 175 was
25 marked Defendant's Exhibit 29 for

Page 65

1    Nathanson
2  identification as of this date.)
3  Q.  The top portion of this document is
4  an e-mail from you to Don Gramke, dated May
5  23, 2006, stating, "Bernt is holding off on
6  this extension for now."
7     Is that an accurate characterization?
8  A.  No, this was from Don to me.
9  Q.  Let me restate that, thank you.
10   The top portion of this document is
11 an e-mail from Don Gramke to you, dated May
12 23, 2006; is that correct?
13 A.  Correct.
14 Q.  Do you recall receiving this document
15 on or around May 23, 2006?
16 A.  Yes, looking at it now, yes.
17 Q.  Did you have any conversations with
18 Mr. Gramke upon receiving this e-mail?
19 A.  No.
20 Q.  Did you have any conversations with
21 anyone at Phat Fashions after receiving this
22 e-mail?
23 A.  No.
24 Q.  Did you inquire as to why this e-mail
25 was sent?

Page 78

1    Nathanson
2    Defendant's Exhibit 11?
3    A.    Oh, no.
4    Q.    I'd like to show you a document
5    that's been marked as Defendant's Exhibit
6    12. If you could take a minute to review
7    this document?
8    A.    Okay.
9    Q.    The first page of this document
10   contains e-mails between you and Bernt
11   Ullmann, including an e-mail where you
12   say -- where you attach an agreement for
13   "the new Canadian licensee"; is that a
14   correct characterization?
15   A.    Yes.
16   Q.    Do you recall drafting an agreement
17   in or around this time as we've been
18   discussing?
19   A.    Yes.
20   Q.    You don't recall what the terms of
21   that agreement were?
22   A.    No.
23   Q.    Do you recall who was to sign that
24   agreement?
25   A.    On behalf of?

Page 79

1    Nathanson
2    Q.    On behalf of the Canadian licensee?
3    A.    The first draft, I don't recall. I
4    have to look at it.
5    Q.    Do you recall who was to sign on
6    behalf of Phat Fashions?
7    A.    Yes, at that time it would have
8    been -- who was to sign on behalf of Phat
9    Fashions?
10   Q.    Correct.
11   A.    It would have been Bob Skinner and
12   Russell Simmons.
13   Q.    When you say "it would have been,"
14   what is that based on?
15   A.    Based on the policy; ever since the
16   purchase by Phat Fashions from Kellwood that
17   Bob Skinner and Russell Simmons were both
18   required to sign any agreements for them to
19   be effective, among other requirements.
20   Q.    That's not based on your specific
21   recollection of these documents that you
22   drafted?
23        MR. HOFFMAN:    Objection to the
24   form.
25   A.    This was in every single deal, every

Page 80

1    Nathanson
2    single license that was done that had
3    material terms or changes in numbers, but
4    which is virtually every deal.
5    Q.    Your e-mail to Ullmann, on the first
6    page of Defendant's Exhibit 12, asks him to
7    review and let you know if he has any
8    comments.
9        Then there is an e-mail from him
10   saying he will review tomorrow and advise
11   accordingly; is that correct?
12   A.    Yes.
13   Q.    Do you recall receiving any comments
14   from Mr. Ullmann in response to this e-mail?
15   A.    I don't remember, sitting here,
16   although it's possible.
17   Q.    You have no recollection either way?
18   A.    Sitting here right now, I don't
19   recall. This was a long time ago.
20   Q.    What is the distinction you're trying
21   to make; sitting here right now, is there
22   any distinction that you're trying to make?
23   A.    No, I'm saying it was a long time ago
24   and without looking at further
25   correspondence or docs, I couldn't say.

Page 81

1    Nathanson
2    Q.    The answer to the question is that
3    you have no recollection either way as to
4    whether you received comments from
5    Mr. Ullmann to this e-mail?
6    A.    That's correct.
7    Q.    I'd like to show you a document that
8    has been marked as Defendant's Exhibit 13.
9    Have you had a chance to review it?
10   A.    Yes.
11   Q.    Is it correct to say that this is an
12   e-mail from Bernt Ullmann, in part,
13   forwarding your e-mail of October 31, 2006
14   on November 2, 2006 and attaching the
15   agreement that you had drafted?
16   A.    Yes.
17   Q.    Does this refresh your recollection
18   in any way as to whether you had a
19   conversation with Mr. Ullmann or anyone else
20   at Phat Fashions about the agreement?
21   A.    Any conversations? Not one way or
22   the other, no.
23   Q.    Do you recall seeing any responses
24   from Marc Kakon to this e-mail?
25   A.    I don't recall.

## Page 82

```
 1                Nathanson
 2   Q.   Do you recall seeing any responses
 3   from Gaby Bitton to this e-mail?
 4   A.   I don't recall.
 5   Q.   Do you recall seeing any responses
 6   from anyone to this e-mail?
 7   A.   To this specific e-mail, I don't
 8   recall.
 9   Q.   Do you recall seeing any comments
10   from any of the individuals cc'd, other than
11   the top portion of Defendant's Exhibit 13,
12   to this agreement?
13   A.   No, I don't recall receiving comments
14   from them, although we did receive comments.
15   Q.   How do you know that you did receive
16   comments?
17   A.   At some point in the process, we
18   started to negotiate the draft with Counsel.
19   Q.   Who did you negotiate the draft with?
20   A.   I believe his name was Clifford.
21   Q.   Clifford --
22   A.   Halickman, H-A-L-I-C-K-M-A-N.
23   Q.   When you say "we" started to
24   negotiate the draft; first of all, you're
25   referring to the agreement attached to
```

## Page 83

```
 1                Nathanson
 2   Defendant's Exhibit 13, among other
 3   exhibits?
 4   A.   The agreement is not here, but I'm
 5   assuming, yes.
 6   Q.   When you say "we" started to
 7   negotiate the draft, who is the "we"?
 8   A.   Sorry, I did, as part of the firm.
 9   Q.   What comments did Mr. Halickman have
10   on your draft?
11   A.   There were several.  I don't
12   remember.  I mean there were several rounds
13   or comments.
14   Q.   You don't remember what any of the
15   comments were?
16   A.   I'd have to look at the documents and
17   we also had phone calls.
18   Q.   Do you remember anything that you
19   discussed in those phone calls with
20   Mr. Halickman?
21   A.   They were comments to the draft
22   agreement and I believe further drafts down
23   the line.
24   Q.   Did you ever, in your negotiations
25   with Mr. Halickman, discuss Tornado?
```

## Page 84

```
 1                Nathanson
 2   A.   No.
 3   Q.   Did Mr. Halickman ever mention
 4   Tornado?
 5   A.   No.
 6   Q.   Is Mr. Halickman the only person that
 7   you dealt with in negotiating this
 8   agreement?
 9   A.   I believe so, yes.
10   Q.   Again, you don't recall the substance
11   of any of your conversations with
12   Mr. Halickman?
13   A.   Not right now.  I'd have to see
14   documents and drafts to see the exact
15   comments and, you know, there were several
16   rounds.  I remember it was a long
17   negotiation.
18        MS. SAMANTA:  I want to put
19   this on the record.  I don't believe
20   that we received any documents
21   between Mr. Nathanson and
22   Mr. Halickman.
23        I'd like to call for the
24   production of those documents.
25        MR. HOFFMAN:  Until this
```

## Page 85

```
 1                Nathanson
 2   testimony just now, I wasn't aware of
 3   the existence of Mr. Halickman.  What
 4   I said to Adam at the last deposition
 5   is that we had produced all of the
 6   documents that I was aware of,
 7   certainly between our client or our
 8   firm and representatives of Gaby
 9   Bitton, up until the time that this
10   case went to litigation.
11        I'm going to go back and make
12   sure that that's the case because
13   beyond the time of this litigation,
14   this commenced, I don't see what the
15   relevance is.  We know from the
16   documents that the parties are
17   clearly talking, but I can go back
18   and look.
19        MS. SAMANTA:  I just want to
20   state that I don't necessarily agree
21   with the time cutoff that you've
22   stated, but I believe, at least some
23   of the documents that Mr. Nathanson
24   is referring to, are prior to the
25   commencement of this litigation.
```