UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

PHAT FASHIONS LLC,                          :          07 Civ. 03278 (PAC)

                       Plaintiff,          :

     - against -                              :

TORNADO IMPORTS (CANADA), INC.,             :

                  Defendant.          :

------------------------------------------------------------------x


## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION


PRYOR CASHMAN LLP
Attorneys for Plaintiff
410 Park Avenue
New York, New York  10022
(212) 421-4100
phhoffman@pryorcashman.com

# TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| **PRELIMINARY STATEMENT** | | 1 |
| **STATEMENT OF FACTS** | | 4 |
| A. | The Trademark License Agreement (PH dec. ¶¶ 11-15) | 4 |
| B. | Tornado Exercises And Delivers Both Options In Writing (PH dec. ¶¶ 16-23) | 4 |
| C. | Tornado's Claim Of An Oral Extension Is Belied By Its Actions (PH dec. ¶¶ 32-36) | 5 |
| D. | Phat Fashions Sends Tornado A Draft Amendment To Review (PH dec. ¶¶ 37-43) | 5 |
| E. | Wiseman Signs The Draft Amendment And Delivers It To Phat Fashions, Where Skinner Does Not Sign It And Directs That It Be Put On Hold (PH dec. ¶¶ 44-55) | 6 |
| F. | Tornado, Understanding That Phat Fashions Had To Sign And Deliver The Amendment Back To It, Never Follows Up In Writing On The Status (PH dec. ¶¶ 56-64) | 7 |
| G. | BP Clothing's Termination Of Its Oral Agreement With VIS In Late 2006 Causes The Tyfoon Group To Lose 7.63% Of Its Baby Phat Business (PH dec. ¶¶ 65-69) | 8 |
| H. | Phat Fashions Informs Tornado In February 2007 That It Will Not Be Extending The Agreement And Makes Alternative Canadian Arrangements (PH dec. ¶¶ 77-85) | 9 |
| I. | Tornado, Aware That Phat Fashions Is Not Extending The Agreement, Seeks To Exercise The Option, Forcing Phat Fashions To Sue (PH dec. ¶¶ 86-91) | 9 |
| J. | Phat Fashions Continues To Negotiate With Algo While Tornado Takes Over Five Months To Serve Its Current Answer And Does Not Move For Preliminary Relief | 10 |
| **ARGUMENT** | | 11 |
| I. | **TORNADO CANNOT SHOW A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS** | 11 |

(i)

<u>Page</u>

A.    The Alleged Amendment Is Barred By N.Y.G.O.L. §15-301            11

B.    The Amendment Was Never Delivered By Phat Fashions To Tornado    12

C.    Any Oral Agreement Which May Have Been Reached Is Invalid        14

D.    Tornado Did Not Rely On Any Alleged Assurances By Phat Fashions  15

    1.    The Extension Of The Lease By A Non-Party
          (PH dec. ¶¶ 70-76, 96-98)                                    16

    2.    No Instructions Were Given To The Management Team
          (PH dec. ¶¶ 99-100)                                          17

    3.    Tornado Can Still Sue The Foreign Licensee
          (PH dec. ¶¶ 29-31, 102-03)                                   17

    4.    Tornado Has Successfully Pursued New Licenses  (PH dec. ¶101) 18

    5.    Any Reliance By Tornado Was Unreasonable (PH dec. ¶¶ 104-05)  18

II.   **TORNADO HAS FAILED TO DEMONSTRATE
      A REAL THREAT OF IRREPARABLE INJURY**                            18

A.    Tornado's Claims Are Speculative Or Monetarily Compensable
      (PH dec. ¶¶ 106-17)                                              20

B.    Tornado Has Replaced Phat Fashions And Obtained 16 New Licenses  21

C.    The Destructions Of Business Cases Cited By Tornado Are Inapposite 22

D.    Tornado Cannot Recover For Harm To Non-Party VIS (PH dec. ¶¶ 7-11) 23

E.    Tornado's Laches Belie Its Claim Of Irreparable Injury (PH dec. ¶¶ 118-22) 24

III.  **TORNADO SHOULD BE REQUIRED TO POST A
      SUBSTANTIAL BOND**                                               25

**CONCLUSION**                                                        25

Plaintiff Phat Fashions LLC ("Phat Fashions") submits this memorandum of law in opposition to the motion of defendant Tornado Imports (Canada), Inc. ("Tornado") for a preliminary injunction pursuant to Fed R. Civ. P. 65(a).  For the reasons set forth herein and in the accompanying declaration of Philip R. Hoffman ("PH dec."), Tornado's motion should be denied.

## PRELIMINARY STATEMENT

On December 31, 2007, the Trademark License Agreement ("Agreement") entered into between Phat Fashions and Tornado on August 1, 1998 expires.  The only way it could have been extended was by a writing executed and delivered by both parties, an event which, Tornado concedes, never occurred.  Instead, Tornado seeks (by way of a mandatory injunction) to extend the Agreement for six years on the basis of a draft amendment which:  (a) was sent to Tornado by Phat Fashions with a cover e-mail reserving its right to modify it; (b) specifically stated that it was to be "executed and delivered" and contained two signature lines for Phat Fashions; (c) although a draft, was signed by Tornado and delivered to Phat Fashions; (d) was subsequently signed by only one of the two necessary Phat Fashions officers; and (e) was never delivered by Phat Fashions to Tornado.  Perhaps realizing how preposterous this sounds, Tornado's fallback position is that, despite the Agreement's specific requirement that it can only be extended by a signed writing, the parties reached an oral agreement.  As Tornado's alternative positions are supported by neither the facts nor the law, it cannot demonstrate a clear or substantial showing of success on the merits and, for this reason alone, its motion for injunctive relief must be denied.

Tornado has also failed to demonstrate a real threat of irreparable injury absent an injunction, the second necessary requirement for mandatory injunctive relief.  Issie Wiseman ("Wiseman"), President of both Tornado and the 19 different corporations which comprise the "Tyfoon Group," admitted at his deposition that Tornado will be able to replace the Phat Fashions line,

has made substantial progress in doing so, and "we are going to be in business going forward."

The cases relied upon by Tornado involve situations where a plaintiff distributorship (a) whose business was entirely (or at least 90%) dependent upon defendant's products (b) was suddenly terminated by defendant and (c) sought immediate preliminary injunctive relief to restrain the termination. In Tornado, this Court has before it a distributorship (a) whose sales of Phat Fashions products comprises only 17.69% of the Tyfoon Group's business; (b) which has known since February 2007 that the Agreement was not going to be extended beyond December 31, 2007; and (c) waited until November 30, 2007 to seek preliminary injunctive relief which, rather than restraining a termination, will mandate a six year renewal of the Agreement. Under these circumstances, Tornado's motion should be denied.

Tornado's motion for preliminary injunctive relief is it has been made <u>after</u> the bulk of discovery has been completed, with the parties having exchanged documents and deposed four key witnesses: (a) Wiseman; (b) Tornado V.P. of Finance Barry Segal ("Segal"); (c) Phat Fashions President Bernt Ullmann ("Ullmann"); and (d) its outside counsel, Eli Nathanson ("Nathanson"). Tornado, in support of its motion, chose to submit declarations from Wiseman and Segal which contradict their deposition testimony. Although Tornado faults Ullmann for being unable to recall 4 short conversations he allegedly had with Wiseman in 2006 (D.Mem. 13), Ullmann, rather than rewriting his deposition testimony as Wiseman and Segal have in their declarations, stands upon his testimony. The relevant facts on this motion, all based upon deposition testimony and documentary evidence, are set forth in detail in the accompanying PH dec. which, for the Court's convenience, is cross-referenced in the section headings contained herein.[1]

---

[1] All exhibits referred to herein ("PX") are included in Plaintiff's Binder of Exhibits to Hoffman Declaration. The facts are derived exclusively from: (a) documents produced in discovery; (b) admissions made by Tornado at the depositions of Wiseman ("Wiseman dep.") [PX 52] and Segal ("Segal dep.") [PX 53], as well as in their declarations ("Wiseman dec." and "Segal dec."); (c) testimony given at their depositions by Ullmann ("Ullmann dep.") [PX 54]

What stands out most about Tornado's moving papers is that the new story it has chosen to put before this Court defies both common and business sense. In their declarations, Wiseman and Segal state that without Phat Fashions products, the Tyfoon Group (which they constantly refer to as a "family" business but actually consists of at least 19 corporations) will be destroyed, and that was why it was and is critical to obtain an extension of the Agreement beyond December 31, 2007. If that were true, however:

(1)     How can Tornado claim that, in the face of an Agreement which requires a signed writing to be extended, it reasonably relied for over nine months on alleged oral assurances given by Ullmann that the amendment would be signed and returned? If the Tyfoon Group's survival were truly dependent upon getting the amendment signed and returned by Phat Fashions, should it not have done everything in its power to get that done? Should it not have at the very least sent an e-mail, letter or other note to Ullmann confirming the assurances he had allegedly given?

(2)     How can Tornado, which admits that it knew with absolute certainty by March 21, 2007 that Phat Fashions was not going to extend the Agreement, have sat back for eight months and not sought preliminary injunctive relief if the Tyfoon Group's very existence was at stake and it believed that an oral agreement had been reached? Remarkably, Tornado seeks to excuse its lengthy delay by claiming that until it learned in discovery (which it did not even seek until mid-September 2007) that Russell Simmons (one of two necessary signatures) had signed the amendment, it "recognized that it had very much an uphill battle in enforcing the agreement," but the partially-signed amendment and Ullmann's deposition "sufficiently changed the calculus for obtaining preliminary injunctive relief." (D.Mem. 9, n. 10). We submit that this is nonsense. If the business upon which your entire family allegedly depends upon for survival is about to be

---

and Nathanson ("Nathanson dep.") [PX 55]; and (d) admissions contained in Tornado's Amended Answer, Defenses, and Counterclaims ("Answer") [PX 49], the September 12, 2007 Pre-Conference Letter ("Pre-Conference Letter") [PX 50], Tornado's Initial Disclosures [PX 51], and its Memorandum of Law ("D.Mem.").

3

destroyed, you move for a preliminary injunction first and deal with the niceties of contract law later. You do not sit back, watch the company which is going to be replacing you come in and take orders for 2008, and hope that you will find something interesting in discovery.

For these reasons and based on the law set forth herein, Tornado's belated motion for an all-encompassing mandatory preliminary injunction impacting two countries should be denied.

## STATEMENT OF FACTS

**A.      The Trademark License Agreement (PH dec. ¶¶ 11-15)**

On August 1, 1998, the parties entered into a Trademark License Agreement pursuant to which Phat Fashions granted Tornado an exclusive license in Canada to distribute "all Phat Farm products" with the exception of certain limited categories. (PX 1). The Agreement provided for an initial term ending on December 31, 2001, and two option terms, ending on December 31, 2004 and December 31, 2007, respectively. The options were to "be exercised in writing in the same manner as notices hereunder" and received by Phat Fashions no earlier than March 1st and no later than June 30th of the year of the expiring term. (¶3). The "Agreement can only be extended, waived or modified by a writing signed by both parties." (¶17).(emphasis supplied).

**B.      Tornado Exercises And Delivers Both Options In Writing (PH dec. ¶¶ 16-23)**

Although Tornado's papers are replete with allegations that the Agreement was orally modified on numerous occasions as early as 2000 to allow Tornado or Modes Vis-a-Vis Fashions 1997, Inc. ("VIS"), to sell additional products, Wiseman and Segal know that "everything" was not handled on a verbal "handshake" or "oral agreement" and there was one thing that was al-ways handled in writing and never "went ahead" without a writing that, following the "techni-calities of the License document," was both signed and delivered, and that was the extension of the Agreement. (Wiseman dep. 90-94, 109; Segal dep. 33-3-43, 46-51, 58-63). When it came

4

time to extend the Agreement by the exercise of the options in 2001 and 2004, Tornado knew

that the only way the Agreement could be extended was in a writing signed by Tornado and de-

livered to Phat Fashions and it followed the Agreement to the letter each time, sending written

option exercises "[a]s required by our licensing agreement dated August 1, 1998." (PX 2-4).

**C.     Tornado's Claim Of An Oral Extension Is Belied By Its Actions (PH dec. ¶¶ 32-36)**

Although Tornado claims that Wiseman and Ullmann reached an oral agreement to ex-

tend the Agreement at MAGIC in February 2006, Wiseman's testimony and subsequent actions

belie that claim.  Wiseman admits that:  (a) Ullmann told him at the end of the conversations to

"send me your proposal;" (b) he knew that for the agreement to be extended, it had to be in

writing; (c) on March 1, 2006, Wiseman, rather than sending a draft agreement, prepared a

"proposal" which Ullmann was asked to "review," not sign; and (d) after Ullmann received it, he

told Wiseman that a formal amendment would be necessary.  (PX 10; Wiseman dec. ¶¶ 23-27;

Wiseman dep. 65, 132-34, 138-42, 158-62; Segal dec. ¶¶ 12-13; Segal dep. 91-92, 96-99).[2]

**D.     Phat Fashions Sends Tornado A Draft Amendment To Review (PH dec. ¶¶ 37-43)**

Ullmann received Wiseman's e-mailed proposal and forwarded it on March 3, 2006 to,

inter alia, outside counsel Nathanson to draft an amendment, which would eventually have to be

approved and executed by Robert Skinner ("Skinner"), Phat Fashions' Chairman of the Board.

(PX 11; Ullmann dep. 78, 90-94).  Nathanson prepared the draft amendment and forwarded it on

March 20, 2006 to Ullmann who, prior to reviewing it, instructed Nathanson to send the draft to

Wiseman "with the standard disclaimer that the contract has yet to be reviewed by your client."

(PX 12-13; Ullmann dep. 47, 96-101, 105; Nathanson dep. 33-41).  Nathanson did so that same

---

[2] Although Tornado states that "[a]t no time during their discussions did either party mention License ¶ 17, and at no point did Mr. Ullman indicate in any way that the assent he had given was conditioned either on approval from others or upon the signing of a formal document" (D.Mem. 7, 14 n. 16), there is also no evidence that the parties said that ¶17 did not apply and or that any amendment would not have to be duly executed by both sides.

day, sending Wiseman the draft amendment with a cover e-mail which stated, in full:

> Issie – at the request of Bernt Ullmann, I am attaching for your review a <u>draft Amendment No. 1 to the License Agreement</u> among the above referenced parties. I am simultaneously transmitting the attached to our client and <u>must therefore reserve the right to modify same as directed</u>. Please contact us to discuss any comments you have. Best regards. (PX 14) (emphasis supplied).

<u>In accordance with strict Phat Fashions policy, the signature page of the draft amendment contained two signature blocks for Phat Fashions</u> and one for Tornado. In 2004, after Kellwood Company ("Kellwood") purchased Phat Fashions, a policy was instituted that all license agreements and amendments going forward would contain two signature lines for Phat Fashions and would, in order to be effective, have to be signed first by CEO Simmons and then, after going through a formal review process, by COB Skinner. The policy was followed without exception, including by Nathanson in drafting the amendment. (PH dec. ¶¶ 24-28; PX 5-8; Ullmann dep. 5-13, 111-14, 121-24, 134-35; Nathanson dep. 12-18, 46, 48-50, 58-59, 79-80).

The draft amendment also made it clear that it had to be <u>delivered</u>, stating, right above the three signature blocks: "IN WITNESS WHEREOF, <u>this Amendment has been executed and delivered by the parties hereto</u> as of the date first above written." (emphasis supplied).

**E.    Wiseman Signs The Draft Amendment And Delivers It To Phat Fashions, Where Skinner Does Not Sign It And Directs That It Be Put On Hold (PH dec. ¶¶ 44-55)**

Although Nathanson's e-mail was clear that he was providing a "draft" amendment for Wiseman's "review" and that Phat Fashions reserved "the right to modify" the draft, Wiseman received the draft amendment, discussed it with Segal, printed out and signed two copies (so that Phat Fashion could sign and return one to Tornado), and, after Segal had a discussion with Nathanson, delivered them to Nathanson on March 29, 2006. (PX 16; Wiseman dep. 164-65, 168, 173-78, 183-84; Wiseman dec. ¶¶ 29-30; Segal dec. ¶13; Segal dep. 108-20).

Upon receiving the signed amendments back from Tornado, Nathanson forwarded them

on April 5, 2006 to Phat Fashions to begin the formal review process. (PX 17). At some point between April 6-12, 2006, the documents were given to Simmons, who provided <u>one</u> of the two necessary Phat Fashions signatures. (PX 18). The amendment now had to go through legal review and be presented to Skinner for signature. (PX 19-21). However, on or about May 23, 2006, Skinner directed Ullmann to hold off on entering into any agreements with respect to Canada, and Ullmann complied. (PX 22-23; Ullmann dep. 161-67, 173-75, 182-83).

F.    **Tornado, Understanding That Phat Fashions Had To Sign And Deliver The Amendment Back To It, Never Follows Up In Writing On The Status (PH dec. ¶¶ 56-64)**

At no time after March 30, 2006, when Segal sent the signed documents to Nathanson, did Tornado ever make any written inquiries to Phat Fashions as to whether Phat Fashions had executed the draft amendment or give any indication to Phat Fashions that Tornado considered the Agreement to have been validly extended by the partially-executed draft amendment which had neither been fully signed by Phat Fashions nor delivered back to Tornado. Instead, Tornado claims that on four occasions in 2006, Wiseman telephoned Ullmann, who assured him that the amendment would be signed and sent back. Ullmann has no recollection of Wiseman ever inquiring about the status of the proposed amendment and states that he could never have committed to Wiseman that Skinner would sign the amendment. (Ullmann dep. 82-84, 87-90, 159-61, 250-51). <u>What is not disputed is that there is not a single writing in existence evidencing that these conversations actually took place. Tornado never sent any e-mails or other correspondence to Phat Fashions confirming these conversations and there are no notes of them in existence.</u>

What is also clear is that Segal, who functions like an "in-house counsel" and is responsible for reviewing contracts for the Tyfoon Group (Segal dep. 109-10), knew that it was critical to get Phat Fashions to sign and return the executed amendment back to Tornado and that oral assurances were not enough. Wiseman and Segal testified extensively about how Segal would

constantly remind Wiseman that the documents had neither been signed nor returned and that he needed to follow up with Ullmann to get them back. (Wiseman dep. 193-98, 203, 208-10; Wiseman dec. ¶¶ 31-36, 46; Segal dep. 99-108; Segal dec. ¶¶ 14-17).

**G.     BP Clothing's Termination Of Its Oral Agreement With VIS In Late 2006 Causes The Tyfoon Group To Lose 7.63% Of Its Baby Phat Business (PH dec. ¶¶ 65-69)**

Although relegated to footnotes, Tornado admits that "[t]here was one significant exception to the way Baby Phat lines were handled," which involved the fact that: (a) Phat Fashions had granted worldwide rights for certain Baby Phat clothing lines to BP Clothing LLC ("BP Clothing"); (b) BP Clothing made VIS its exclusive sublicensee for Canada; and (c) VIS did <u>not</u> pay royalties to Phat Fashions on these sales. (Wiseman dec. ¶5, n. 1; Segal dec. ¶4, n. 2; D.Mem. n. 4). Tornado's claim that the "sub-license … is not at issue here" (D.Mem. 4, n. 4) is untrue.

Wiseman claims that VIS's agreement ended in late 2006 "because BP Clothing decided to handle their Canadian marketing themselves, and our 'oral handshake' arrangement had never had a set term." (Wiseman dec. ¶5, n. 1). In fact: (a) BP Clothing terminated VIS due to poor sales and sued it to recover $403,000 in unpaid royalties; (b) in 2006 alone, VIS sold $2,831,874 of BP Clothing products, accounting for 24% of VIS's sales and 7.63% of the Tyfoon Group's sales; (c) the termination caused the Tyfoon Group to lay off employees; and (d) VIS, which disputed the termination, did <u>not</u> seek an injunction and instead accepted $125,000 from BP Clothing and cancelled its orders going forward. (PX 24-29, 48; Wiseman dep. 83-89, 217-23, 226-27, 249-58, 382-83, 389-90, 397-99, 402-03, 411-13; Segal dep. 195, 204-08).

Amazingly, <u>Wiseman conceded that BP Clothing "has every right to take over and do it on his own, I don't know how well they're doing, but he's got that right, that's okay, we didn't have an agreement, we had a verbal agreement."</u> (Wiseman dep. 255-56) (emphasis supplied). Of course, that is precisely what Tornado is alleging in this case – a verbal agreement.

**H.    Phat Fashions Informs Tornado In February 2007 That It Will Not Be Extending The Agreement And Makes Alternative Canadian Arrangements (PH dec. ¶¶ 77-85)**

At the same time as VIS was fighting with BP Clothing, which was Phat Fashions' major licensee, Phat Fashions decided to consider new arrangements for Canada and began negotiating with a subsidiary of Algo Corporation ("Algo") in October 2006.  (PX 33; Ullmann dep. 16-22, 221-22; Nathanson dep. 78, 82-84).  In early 2007, Ullmann, for a variety of reasons, recommended to Skinner that Phat Fashions <u>not</u> go forward with Tornado beyond 2007, which decision Skinner concurred with.  (Ullmann dep. 183-86, 189, 297-99, 310-11).

Tornado concedes that it was in mid-February 2007 that Ullmann told Wiseman that Phat Fashions was making alternate arrangements for Canada and informed Wiseman that Phat Fashions would not be extending the Agreement.  <u>It is undisputed that when Wiseman learned this, Wiseman did not bring up the alleged amendment</u>; instead, he sought to convince Ullmann to "split the lines" and allow Tornado to carry lines that Algo might not be equipped to distribute.  (Wiseman dec. ¶¶ 37-39; Wiseman dep. 231-38, 270-73, 278-79; Ullmann dep. 35-37, 84-87, 398-99).  According to Wiseman, he pressed Ullmann about the competing proposal and remarkably <u>claims that he took comfort from Ullmann's statement that, with respect to the other potential licensee, "nothing has been signed."</u>  (Wiseman dec. ¶38) (emphasis supplied).

**I.    Tornado, Aware That Phat Fashions Is Not Extending The Agreement, Seeks To Exercise The Option, Forcing Phat Fashions To Sue (PH dec. ¶¶ 86-91)**

Wiseman claims that after mid-March 2007 conversations with Skinner and Ullmann, and then discussions with the Tyfoon Group's lawyers, "we decided that we had to advise Phat Fashions of our intention to stand on our rights – <u>our business survival was now at stake and the time for pre-selling (booking) orders for early 2008 was only a few months away</u>."  (Wiseman dec. ¶¶ 44, 40-43) (emphasis supplied).  Rather than sue or seek injunctive relief, Wiseman sent a letter

to Ullmann on March 19, 2007 in which he purported to exercise the option in the amendment. (PX 35). The letter contained no references to any: (a) February 2007 oral agreement; (b) assurances made by Ullmann or any reliance thereon by Wiseman; or (c) harm which Tornado or the Tyfoon Group would suffer if Phat Fashions did not go forward with the amendment.

Phat Fashions' counsel, Brad Rose, responded to Wiseman's letter on March 21, 2007, rejecting Tornado's attempt to exercise the non-existent option. (PX 36). Tornado admits that once it received this letter, it knew with certainty that Phat Fashions was not moving forward with the extension. Nevertheless, it was not until April 18, 2007 that Tornado's counsel responded to Rose in a letter contending that the Agreement had been extended. (PX 37). As was the case with Wiseman's March 19th letter, the letter contained no references to any: (a) oral agreement; (b) assurances by Ullmann or reliance by Wiseman; or (c) irreparable harm. What it did contain were admissions that the amendment was not valid until "executed and delivered by Phat Fashions, stating that "[t]he two originals signed by Tornado Imports were to be signed by Phat Fashions and one returned to Tornado Imports" and closing by requesting that Phat Fashions "return one signed original" to Tornado. (PX 37)(emphasis supplied). Wiseman and Segal read and approved this letter before it was sent. (Wiseman dep. 226; Segal dep. 139-40).

On April 24, 2007, Phat Fashions' counsel responded to the letter from Tornado's counsel (PX 38) and simultaneously filed this declaratory judgment action.

## J.  Phat Fashions Continues To Negotiate With Algo While Tornado Takes Over Five Months To Serve Its Current Answer And Does Not Move For Preliminary Relief

It was not until June 26, 2007 that Tornado filed its Answer, which it amended on September 6, 2007. Tornado did not move for a preliminary injunction and the claims of possible devastating harm made by it on this motion are nowhere to be found in its Answer.

During this period, Phat Fashions continued to negotiate with Algo. On May 23, 2007,

Algo sent executed copies of the license agreements to Phat Fashions for counter-signature. (PX 39). On September 28, 2007, Phat Fashions counter-signed [both Skinner and Simmons] and returned the agreements to Algo. (PX 41). In Nathanson's October 4, 2007 status e-mail to Phat Fashions, the Algo license was noted as "signed and delivered back to Algo. Closed." (PX 42).

## ARGUMENT

Tornado admits that it is seeking a mandatory injunction and that to obtain such relief in a preliminary injunction context, it must show: (a) a "clear" or "substantial" likelihood of success on the merits; and (b) the real threat of irreparable injury absent an injunction. (D.Mem. 11, citing Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 33-35 (2d Cir. 1995)). This "higher standard" must be met where, as here, "an injunction will alter, rather than maintain, the status quo ... by commanding some positive act." Id. at 33-34. See also GPA Inc. v. Liggett Group, Inc., 862 F. Supp. 1062, 1070 (S.D.N.Y. 1994). Tornado cannot meet either prong of this test and therefore must be denied the drastic, sweeping and belated mandatory relief it seeks.

## I.     TORNADO CANNOT SHOW A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.     The Alleged Amendment Is Barred By N.Y.G.O.L. §15-301

Paragraph 17 of the Agreement unequivocally provides that "[t]his Agreement can only be extended, waived or modified by a writing signed by both parties." As Phat Fashions never fully executed the draft amendment, Tornado's claims are barred by N.Y. General Obligations Law §15-301(1) (hereafter "§15-301"), which provides:

> A written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent. (emphasis supplied).

See, e.g., Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 121-24 (2d Cir. 1998);

Longo v. Shore & Reich, Ltd., 25 F.3d 94, 96-97 (2d Cir. 1994); Scheck v. Francis, 26 N.Y.2d

466, 469-72, 311 N.Y.S.2d 841, 843-45 (1970).

Tornado argues that it has satisfied §15-301 because Simmons signed the amendment

(D.Mem. 15-16) and cites Transit Advertisers, Inc. v. New York, New Haven & Hartford R.R.

Co., 194 F.2d 907 (2d Cir. 1952).  However, the critical difference between Transit and this case

is the party who signed the agreements at issue.  In Transit, the Vice President who signed (and

later tried to cross out his signature) did so "with complete understanding of the nature and

contents of the document being signed, as a memorandum of the previous oral agreement."  Id. at

910.  This should be contrasted with the signature by Simmons, who indisputably had nothing at

all to do with any of the negotiations and was only one of two signatures that were required to

bind Phat Fashions.  Even the Transit Court noted that "if the memorandum had been signed by

mistake cancellation of the signature would present a different situation."  (Id.).

**B.      The Amendment Was Never Delivered By Phat Fashions To Tornado**

Even if the single signature of Simmons on the amendment, which clearly required two

signatures for Phat Fashions, was sufficient to avoid §15-301, the amendment clearly did require

delivery, providing, right above the signature blocks that it was to be "executed and delivered." [3]

Under New York law, where the parties specifically acknowledge delivery as a requirement for

contract formation, the contract will not become enforceable until delivery has taken place.

Brois v. DeLuca, 154 A.D.2d 417, 418, 546 N.Y.S.2d 3, 4 (2d Dep't 1989); Prestige Foods, Inc.

---

[3] Although Tornado claims the draft amendment "did not say continuation of the license would only take effect when a signed copy was delivered back to defendant (compare License ¶13)" [D.Mem. 7, n. 6; 9, n. 9; 17-18], the fact is that amendment made it absolutely clear that it was to be "executed and delivered."  As for Tornado's reference to ¶13 of the Agreement (PX 1), what Tornado fails to note is that, perhaps because of that provision, the signature page to the Agreement merely stated "IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written," i.e., there was no reference to delivery.  This should be contrasted with the draft amendment, which, right on the signature page, specified that it was to be "executed and delivered." As for Tornado's final contention that ¶17 of the Agreement did not specifically require delivery (D.Mem. 9, n.9; 17-18), the simple fact is that the amendment required that it be "executed and delivered."

v. Whale Secs. Co., L.P., 243 A.D.2d 281, 281-82, 663 N.Y.S.2d 14, 15 (1st Dep't 1997).

Even in cases where a contract is not <u>expressly</u> conditioned upon delivery, if the parties'

actions indicate that they intended for the contract to be delivered in order for it to be effective,

then the absence of such delivery is fatal.  In <u>Intercontinental Monetary Corp. v. Performance</u>

<u>Guarantees</u>, 705 F. Supp. 144, 148-49 (S.D.N.Y. 1989), this Court stated that "the general rule in

New York, applicable to most written agreements, is that the intent of the parties determines

whether they are enforceable immediately upon their execution or only upon delivery [citations

omitted]" and noted that "[e]ven where delivery is not absolutely required as a matter of law,

<u>there are situations where the absence of delivery may provide conclusive evidence that the pro-</u>

<u>cess of contract formation is incomplete.  Such may be the case, for example, where the parties</u>

<u>to a written agreement sign the instrument out of the presence of each other and then withhold</u>

<u>delivery of the signed document</u>," which is the case here.  (emphasis supplied).[4]

One of the leading cases where both parties signed a contract but one failed to deliver it is

the New York Court of Appeals decision in <u>Schwartz v. Greenberg</u>, 304 N.Y. 250 (1952), where

the parties met at an attorneys office to enter into a contract to purchase stock at which point:

> <u>the plaintiff's attorney produced duplicate typewritten originals of such a contract</u>
> <u>and the plaintiff signed one while the defendant signed another</u>.  The purchase
> price was stated to be $28,688.35. ... A check for that sum was tendered by the
> defendant but was refused by the plaintiff who demanded a certified check.  In
> that state of the matter, <u>the parties agreed to postpone completion of the transact-</u>
> <u>ion until the next day and thereupon each party picked up the writing that had</u>
> <u>been signed by him and went away.  When they met again the next day, the defen-</u>
> <u>dant said he had changed his mind and would not execute any contract.  The attor-</u>

---

[4] Similarly, this Court in <u>Krofft Entertainment, Inc. v. CBS Songs</u>, 653 F. Supp. 1530, 1532-33 (S.D.N.Y. 1987) stated that "New York contract law requires that any relevant evidence of the parties' intent be examined when determining whether a contract requires delivery" and noted that "each time that the courts have agreed to enforce a contract which was never delivered, the decision was based upon a finding that the parties manifested no intent to establish delivery as a condition precedent to the contract's effectiveness.  Here, not only did the amendment include the "executed and delivered" language, but:  (a) Segal and Wiseman were clear in their testimony that they wanted Phat Fashions to sign and return the amendment; and (b) Tornado's attorney admitted that the amendments were to be signed and returned to Tornado.

ney for the plaintiff then requested return of the typewritten instrument which had been delivered to the defendant the day before and that document was handed over by the defendant's attorney after he had torn off the signature of his client. (Id. at 253) (emphasis supplied)

On the above facts, the Court of Appeals found that "[i]t is entirely plain, then, that the parties did not intend to be bound until a written agreement had been signed and delivered." Id. at 254 (emphasis supplied).  We submit that the same is true here.[5]

## C.    Any Oral Agreement Which May Have Been Reached Is Invalid

Realizing that the amendment was neither fully-signed nor delivered, Tornado argues that the parties reached an oral agreement.  (D.Mem. 12-14).  In doing so, Tornado cites a case which demonstrates precisely why the oral agreement which Tornado claims exists should not be enforced.  In R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 70-71 (2d Cir. 1984) (D.Mem. 12), the Second Circuit, after upholding a grant of summary judgment for defendants based on this Court's finding that provisions requiring "that the entire agreement, and any modifications, be in writing and signed by the parties" demonstrated that "the parties had intended to be bound only by a written contract, and that no written contract was ever executed," stated:

Under our law of contracts parties are free, within certain limits, to set the conditions under which their agreements will become binding. Sometimes an oral promise or handshake is all that is needed, but when substantial sums of money are at stake it is neither unreasonable nor unusual for parties to require that their contract be entirely in writing and signed before binding obligations will attach. In the present case the parties set exactly that requirement, and they did so in such a forthright, plain manner that there is no issue left to be tried. The case does not even present much of a cautionary tale: its lesson is simply that when experienced

---

[5] Two cases relied upon by Tornado (at (D.Mem. 12, n. 14), i.e., Municipal Consultants & Publishers, Inc. v. Town of Ramapo, 47 N.Y.2d 144, 148, 417 N.Y.S.2d 218, 220 (1979)), and Church of God v. Fourth Church of Christ, Scientist, 76 A.D.2d 712, 715, 431 N.Y.S.2d 834, 837 (2d Dep't 1980), aff'd, 54 N.Y.2d 742, 442 N.Y.S.2d 986 (1981), cite Schwartz and contain the identical quote: "Generally, where the parties contemplate that a signed writing is required there is no contract until one is delivered (Scheck v Francis, 26 NY2d 466; Schwartz v Greenberg, 304 NY 250)." (emphasis supplied).  The only other case cited by Tornado on the delivery point is Transit, 194 F.2d at 910 (D.Mem. 16), with Tornado pointing to language stating that "[d]elivery of the signed memorandum is not necessary to make it effective as evidence of the previous oral contract unless, by its terms, the oral contract is not to be consummated until a memorandum has been delivered."  In the amendment at issue here, however, the signature page made it absolutely clear that the document was to be "executed and delivered."  It never was.

<u>businessmen and lawyers are told explicitly and clearly that a major and complex</u> <u>agreement will be binding only when put in writing, then they should be rather</u> <u>cautious about assuming anything different.</u>  (<u>Id</u>. at 71) (emphasis supplied).

The Court noted that "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent" and then stated:

> [I]t is not surprising that considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed. Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement. Just recently, in <u>Reprosystem, B.V. v. SCM Corp.</u>, 727 F.2d 257, 262 (2d Cir. 1984), <u>cert. denied</u>, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984), we decided that a mutual intent not to be bound prior to execution of formal documents was "conclusively establish[ed]" when neither party took exception, over the course of bargaining, to provisions in the drafts of the proposed contracts which stated that "*when executed and delivered*, this * * * Agreement and each of the Purchase Agreements will be a valid and binding agreement" (emphasis added).  (<u>Id</u>. at 75).

The Second Circuit expressly noted that the statement of defendant's officer "over the telephone on December 3rd that the parties had a handshake agreement" was not enough to either establish a contract or defeat summary judgment because, <u>inter alia</u>, "even that statement made no explicit reference to a waiver of the requirement that the contract be in writing" and "neither party had ever, as far as the record before us shows, even discussed dropping the writing requirement." (<u>Id</u>. at 76).  That is precisely the case before this Court.

**D.    <u>Tornado Did Not Rely On Any Alleged Assurances By Phat Fashions</u>**

Tornado claims that on four occasions, Wiseman telephoned Ullmann, assured him that the amendment was valid and that Phat Fashions intended to sign and deliver it, and that:

> Tornado and Vis-à-Vis detrimentally relied on Phat Fashions' assurances that the Agreement had been extended by the Extension by:  (a) not canceling a lease for a store dedicated to selling Phat Fashions products; (b) instructing several members of its management team to devote nearly all of their time to Phat Fashions products at the expense of developing potential non-Phat Fashions product lines; (c) choosing not to sue the European Phat Farm shoe licensee for damages for territorial infringement for the sale of Phat Farm shoes in Canada; and (d) not pursu-

ing efforts to replace Phat Fashions so Tornado's and Vis-à-Vis' businesses would not be hurt dramatically on December 31, 2007, when the Agreement would have terminated absent the Extension. (Answer ¶¶ 33, 73, 104).

Tornado argues that "New York law applies the doctrines of equitable and promissory estoppel to protect the interests of a party that has been induced to rely on the assurances of the other party. (D.Mem. 18, citing Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516 (2d Cir. 1990)). The Second Circuit in Towers set forth the difficult test which a party must meet to demonstrate an estoppel which will allow it to escape the requirements of §15-301:

> [W]hen one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing. Here, too, the conduct claimed to have been perform- ed in reliance on the oral modification must be unequivocally referable to the modification ... [and] must be conduct that is inconsistent with the agreement as written. (Id. at 522) (emphasis supplied).

In addition, and as made clear in another case cited by Tornado, Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996) (D.Mem. 18, n. 21), there must be "reasonable and fore- seeable reliance by the promisee" and "unconscionable injury to the relying party as a result of the reliance." See also R.G. Group, 751 F.2d at 78, 78-79 (D.Mem. 12).

As demonstrated in great detail in the PH dec. and summarized here: (a) Tornado's conduct, rather than being unequivocally referable to the amendment, is compatible with the Agreement prior to any amendment; (b) any reliance by Tornado was unreasonable; and (c) Tornado has not suffered any injury as a result of such reliance.

1.    **The Extension Of The Lease By A Non-Party (PH dec. ¶¶ 70-76, 96-98)**

Although Tornado claims that it extended the lease on the Montreal store for several years in reliance upon Ullmann's assurances (Answer ¶¶ 74, 79; Wiseman dec. ¶35; Segal dec. ¶19), the truth is that: (a) the lease is held by another Tyfoon Group corporation, 3702669 Canada Inc. ("3702669"), which is neither a party to the Agreement nor this litigation; (b) in

16

November 2004, before the second renewal term of the Agreement had even commenced, 3702669 renewed the lease through 2010 with the right to cancel effective March 1, 2008; (c) in November 2006, Wiseman and Segal learned that the city was going convert the area in which the store was located into a pedestrian mall and that the landlord was willing to extend the current lease for three years from 2010 to 2003 at a very "attractive rate;" (d) although they had not received the signed amendment back from Phat Fashions and had just been terminated by BP Clothing, they decided to extend the lease and did not tell Ullmann that they were doing so; and (e) the Tyfoon Group has the ability to stock the Montreal store, which has not been profitable, with Phat Fashions products from other distributors, but has voluntarily chosen not to do so.  (PX 30-32; Wiseman dep. 36, 50-52, 200, 284-88, 291-300, 324, 366-67; Wiseman dec. ¶¶ 35-36; Segal dep. 17-25, 122-30, 162-63, 167-69, 175-78; Segal dec. ¶¶ 2, 16, 19-20; Answer ¶39).

### 2.  No Instructions Were Given To The Management Team (PH dec. ¶¶ 99-100)

Although Tornado claims that "[i]n reliance on Phat Fashions' repeated assurances that the Agreement had been extended, Tornado instructed its management team ... to spend nearly all of their time and efforts focusing on Phat Fashions products" (Answer ¶¶ 75, 33), Wiseman admitted at his deposition that no such instructions had been given and that "we didn't change the modus operandi of how we worked with Phat Farm and Baby Phat."  (Wiseman dep. 300-03).

### 3.  Tornado Can Still Sue The Foreign Licensee  (PH dec. ¶¶ 29-31, 102-03)

Tornado claims that "[i]n reliance on Phat Fashions' assurance in August 2005 that the Agreement would be extended, Tornado decided not to sue the European Phat Farm shoe licensee for damages for territorial infringement." (Answer ¶77).  In fact, Wiseman and Segal admit that there is nothing stopping Tornado from instituting an action today or any time before the expiration of any applicable statutes of limitation. (Wiseman dep. 281-82; Segal dep. 154-56).

4.    <u>Tornado Has Successfully Pursued New Licenses  (PH dec. ¶101)</u>

Finally, Tornado alleges that "[i]n reliance on Phat Fashions' repeated assurances that the

Agreement had been extended, Tornado and Vis-à-Vis did not pursue efforts to replace Phat

Fashions by researching other companies and product lines or engaging in negotiations with

other companies." (Answer ¶76).  In fact, and as demonstrated <u>infra</u>, the Tyfoon Group had

more than enough time in 2007 to pursue such efforts and successfully did so, nearly doubling its

amount of licensors (from 17 to 33) and picking up at least one major new license.  (PX 43).w

5.    <u>Any Reliance By Tornado Was Unreasonable (PH dec. ¶¶ 104-05)</u>

In their declarations (as opposed to their depositions), Wiseman and Segal claim that it

was absolutely critical to the survival of the Tyfoon Group that it extend the Agreement beyond

2007 and into the future.  (Wiseman dec. ¶¶ 8, 10-11, 13, 25, 47-57; Segal dec. ¶¶ 5-9, 18-25;

D.Mem. 20-24).  For Tornado, in the face of an Agreement which unequivocally provides that

"[t]his Agreement can only be extended, waived or modified by a writing signed by both parties"

(PX 1, ¶17) and an amendment which refers to it being both "executed and delivered," to say

that, rather than getting back the signed amendment from Phat Fashions, it instead relied upon

Ullmann's alleged oral (and entirely undocumented) assurances for ten months is entirely unreas-

onable and cannot provide a basis to bind Phat Fashions to an amendment which it has rejected.

## II.    TORNADO HAS FAILED TO DEMONSTRATE
## A REAL THREAT OF IRREPARABLE INJURY

In <u>Helios & Matheson North America, Inc. v. Vegasoft OY</u>, No. 07 Civ. 3600 (PAC)

2007 WL 1541204, at *2 (S.D.N.Y. May 24, 2007), this Court, in denying a motion for a

preliminary injunction similar to the mandatory injunction requested here by Tornado, stated:

> A showing of irreparable injury is "the single most important prerequisite for the
> issuance of preliminary injunction," … and <u>the injury must be both probable and
> imminent, not speculative or remote.  An essential component of an "irreparable"</u>

injury is that it is "incapable of being fully remedied by money damages."
[citations and quotations omitted]. Id. (emphasis supplied).

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation." Doherty, 60 F.3d at 37. As stated in USA Network v. Jones Intercable, Inc., 704 F.Supp. 488, 491 (S.D.N.Y. 1989):

[A] preliminary injunction is an extraordinary remedy not to be routinely granted. [citation omitted]. It should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury. (emphasis supplied).

The Court noted that "[i]n the contract setting, injunctive relief, both interlocutory and final, is the exception and not the rule. 'Ordinarily, the innocent party to a breached contract is entitled only to compensatory damages obtainable in an action at law'" and "[s]pecific performance is particularly undesirable and impractical where it would force essentially hostile parties into an ongoing, active business relationship." Id. (emphasis supplied). Further, while the "[o]ne exceptional circumstance warranting injunctive relief in a contract action exists where the prospective breach, if unrestrained, threatens the destruction or catastrophic impairment of an ongoing business" and "[m]ere disruptions in business, however, though perhaps substantial, do not fall within this exception. [citations omitted]." Id. at 491-92.

This Court's decision in Advanced Global Tech., LLC v. XM Satellite Radio, Inc., No. 07 Civ. 3654 (JSR) 2007 WL 3196208 (S.D.N.Y 2007 Oct. 29, 2007) in instructive. There, like here, plaintiff sought a preliminary and mandatory injunction against the termination of a license agreement to distribute digital satellite radio receivers and argued, similar to Tornado, that

its remedies at law are inadequate because "(i) the licensing agreement involves a unique relationship; (ii) monetary damages cannot be determined with any reasonable certainty; and (iii) absent an award of specific performance, AGT will be out of the satellite radio business entirely." (Id. at *2).

In rejecting these arguments, this Court noted that "nothing in the complaint would sup-

19

port a reasonable inference that AGT's business is under imminent threat of destruction or cat-
astrophic impairment." Id., citing USA Network, 704 F. Supp. at 491. The same is true of
Tornado's September 2007 Answer which, unlike the declarations submitted on November 30,
2007, does not even hint that Tornado or the Tyfoon Group may be destroyed. The Court also
found, as is true here, that "nothing in the Complaint supports the argument that money damages
to remedy the alleged breaches could not be calculated with certainty" and "the bare and conclu-
sory statement that the licensing agreement involves a 'unique relationship' is nothing but win-
dow dressing and does not, of itself, give rise to any equitable relief." Id. at *3.

 In GPA Inc., 862 F. Supp. at 1067, plaintiff's motion for a preliminary injunction
restraining the termination of it distributor, where the products at issue "account for 56% of
GPA's revenues and 46% of its gross profits," was denied where the Court found that vague
allegations of irreparable injury, i.e., references to a "distinct possibility" that plaintiff might not
survive or that loss of the products "could" result in insolvency, "fail to persuade the Court of the
likelihood of irreparable injury." Id. at 1067. "In this Circuit, a party seeking preliminary in-
junctive relief must show a *likelihood* of irreparable injury, not a *possibility* of irreparable injury,
and '[l]ikelihood sets, of course, a higher standard than 'possibility'." Id. at 1067.

**A.    Tornado's Claims Are Speculative Or Monetarily Compensable (PH dec. ¶¶ 106-17)**

 Tornado's [and non-party VIS's] claims of irreparable harm are replete with admissions
that such harm is either compensable in money damages and/or speculative. Thus, Wiseman
states that "it may take years – years of financial losses – before we find a brand that develops
the market presence (and sales volume) that Phat Farm and Baby Phat have commanded."
(Wiseman dec. ¶50) (emphasis supplied). Wiseman also claims that without Phat-label products,
the Tyfoon Group's customers might not purchase other product from it (Wiseman dec. ¶¶ 48-

49, 52-53), although <u>no customer affidavits are submitted by Tornado on this motion</u>.  Tornado's

other claims of irreparable harm are similarly speculative or compensable in money damages.[6]

**B.**     <u>**Tornado Has Replaced Phat Fashions And Obtained 16 New Licenses**</u>

Contrary to the claims of imminent doom contained in his declaration, Wiseman admitted

at his deposition that he can replace the Phat Fashions business and has already started to do so.

Wiseman admits that "<u>we are going to be in business going forward</u>."  (Wiseman dep. 258-59)

(emphasis supplied). [7]  Wiseman and Segal both testified about the aggressive, immediate and

successful steps that Tyfoon took to replace the Phat Fashions line and the chart set forth at PX

43 shows that the Tyfoon Group is thriving and has nearly twice as many licensees as of Novem-

ber 2007 (33) than it did in March 2007 (16), with many of these lines having products similar to

Phat Fashions and Baby Phat products.  (Wiseman dep. 258-63, 334-35, 343-44, 436; Segal dep.

---

[6] Segal, rather than denying that the Tyfoon Group will be able to "make headway with" customers who are now buying Phat Fashions and Baby Phat product from other sources," admits that it is "<u>anybody's guess</u>" as to whether it will be able to do so and, rather than stating with certainty that such customers will not buy from Tyfoon, merely says that they "<u>may not</u> have room in their budget or on their shelves for the new lines we can offer." (Segal dec. ¶23) (emphasis supplied).  He refers only to "<u>potential</u> losses and layoffs of staff" (Segal dec. ¶7) and states that "the loss of Phat Fashion business … <u>may</u> permanently and severely damage the Tyfoon Group as a whole" and "without the Phat revenues we <u>could</u> run out of money for overhead before we develop the new lines of business that could keep us solvent." (Segal dec. ¶25) (emphasis supplied).  Similarly, Tornado in its memorandum states that: "<u>per-haps</u>" the existence of the Tyfoon Group is at stake; its business "<u>may</u> disappear;" and its damages "<u>may</u> accrue over a period of time" and "<u>may</u> prove difficult to quantify." (D.Mem. 3, 21, n. 23).

[7] Wiseman also testified:

| | |
|---|---|
| Q. | <u>What is your expectation if any that you will be able to replace going forward the Phat Farm and Baby Phat business that you have done through 2007?</u> |
| A. | I don't understand the gist of the question.  <u>Do you mean do I think we'll be able to replace it</u>? |
| Q. | Yes. |
| A. | <u>I think eventually we will. We're going out there to get other products.  We're putting all our energy into trying to get products that replace that business.</u> |
| Q. | Have you been successful so far? |
| A. | <u>We've had some success, yes.  We've achieved getting a couple of new products on line</u> … (Wiseman dep. 325-26) (emphasis supplied). |

145-48, 151-53).  In its literature, the Tyfoon Group trumps these new licenses, referring to itself as "<u>a multi-brand distributor</u> for Canada," with many lines and "<u>all of our various products</u>" and noting that "<u>our financial statement bears out a profitable and constantly expanding operation</u>." (PX 45-47; Wiseman dep. 274-75, 328-29, 428-35, 438-41) (emphasis supplied).

Tornado fails to mention the major new Trademark License and Distribution Agreement between COOGI Partners LLC and 4107675 Canada Inc (another Tyfoon Group corporation) dated as of April 1, 2007, running through 2010 with a three-year renewal term through 2013, and covering urban goods substantially similar to those that Phat Fashions carries.  (PX 44; Wiseman dep. 244, 415-16).  Tyfoon clearly anticipated that its sales of Coogi products would eventually exceed those of Phat Fashions over the initial term of the agreement because, while the ineffective amendment at issue in this case called for Tornado to make minimum net sales of $7.9 million in Phat Fashions products in 2010 (the last year of the first 3-year term), the Coogi agreement calls for Tyfoon to make minimum net sales of $12 million for the same year.[8]  The Tyfoon Group has already started making sales of Coogi products and Wiseman admits that he expects the Coogi deal to be profitable.  (Wiseman dep. 244-45, 417-18).

**C.    <u>The Destructions Of Business Cases Cited By Tornado Are Inapposite</u>**

Tornado concedes that some of its alleged damages are "financial in nature," but claims that injunctive relief is warranted because the Tyfoon Group's "survival" is threatened and "calculation of such damages is difficult because they depend on future events."  (D.Mem. 21). Although the Court in <u>Doherty</u> noted that there have been instances where "[w]e have found irreparable harm where a party is threatened with the loss of a business," which is <u>not</u> the case here, it noted that the Court has generally not found irreparable harm where:

---

[8] Wiseman admits that "[i]f you look specifically at the licensee Tornado," which we submit is all the Court should be looking at here, Tornado's sales dropped from over $14 million in 2004 to over $8 million in 2006, partly due to the fact that "the Phat Farm label has had some market and design problems in recent years."  (Wiseman dec. ¶9).

the alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions. (Id. at 37-38) (emphasis supplied).

None of the destruction of cases cited by Tornado are applicable here. [9]

Tornado claims that "[w]here unique goods and licenses are involved, mandatory preliminary relief is appropriate when the case shows substantial merit." (D.Mem. 11). Here, however, we are not dealing with unique goods. Phat Fashions clearly has competitors and there other companies, such as Coogi, that sell products similar to those of Phat Fashions. In addition the Tyfoon Group does a substantial amount of non-Phat business, conceding that the present figure is well over 40% and growing. Unlike in Doherty, supra, 60 F.3d at 38 (D.Mem. 21, n. 3; 22), the availability of Phat Fashions products is not "essential to the life of the business."

## D.    Tornado Cannot Recover For Harm To Non-Party VIS (PH dec. ¶¶ 7-11)

Although Phat Fashions and Tornado are the only two parties to this litigation and the Agreement, Tornado in this litigation and in its moving papers, and clearly for purposes of attempting to bolster its irreparable harm argument and to expand the scope of the license granted to Tornado, has sought to treat VIS as a party to both. VIS, however, is an entirely separate company and any oral agreements which it may have had with Phat Fashions are irrelevant here. (PH dec. ¶¶ 7-10). Thus, while Tornado combines the sales of the two companies and repeatedly states that sales of Phat products account for 60% of the Tyfoon Group's business, the only rele-

---

[9] With only one exception, all of the cases cited by Tornado (D.Mem. 11, 21) involve situations where the products being distributed made up all or 90% of the moving party's business. See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970) (Ford franchise could not survive without Ford cars); Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir. 1984) (Coca-Cola distributor could not survive without Coca-Cola products); Travellers Int'l AG v. Trans World Airlines, Inc., 684 F. Supp. 1206, 1216-17 (S.D.N.Y. 1988) ("90-95% of Travelers' business is with TWA" and it "has no viable alternative to the TWA business"); Givenchy, S.A. v. William Stuart Indus., 1986 WL 3358 at *6 (S.D.N.Y. Mar. 10, 1986) (business was "built exclusively around its relationship with Givenchy"). The other case cited by Tornado, Janmort Leasing, Inc. v. Econo-Car Int'l, Inc., 475 F. Supp. 1282, 1295-96 (E.D.N.Y. 1979) (D.Mem. 21), is not applicable because there defendant conceded plaintiff's "precarious fiscal state" and did not dispute "that Janmort will likely flounder if its Econo-Car franchises are terminated."

vant sales figure here Tornado's, which is 17.69%. (PX 48). As noted by this Court in <u>Helios</u>: "Helios seems to suggest at times that harm to its clients alone is sufficient to support an injunction, yet <u>it has presented no authority for basing a preliminary injunction on a prospective injury to third parties</u>." (<u>Id.</u> at *2, n. 3). The same is true here of Tornado with respect to VIS.

**E.     Tornado's Laches Belie Its Claim Of Irreparable Injury (PH dec. ¶¶ 118-22)**

The Court in <u>Doherty</u>, 60 F.3d at 39, stated that "[a] district court should generally consider delay in assessing irreparable harm. [citations omitted]." Here, there has been considerable delay.   Although Tornado admits that it was absolutely certain by March 21, 2007 that Phat Fashions was not going to extend the Agreement, it failed to move for preliminary relief:  (a) at that time; (b) when Phat Fashions sued it on April 24, 2007; or (c) when it filed its Answers on June 26, 2007 and September 6, 2007.  It was not until September 12, 2007, in the Pre-Conference Letter, that it indicated that "<u>[a]s discovery proceeds, Tornado will contemplate making a motion for a preliminary injunction maintaining the status quo</u> (i.e., allowing the Agreement to remain operative past December 31, 2007) <u>based in part on §21 of the Agreement, i.e.,</u> the acknowledgment of irreparable damage clause." (PX 50).  No mention was made of any <u>actual</u> irreparable harm being suffered by Tornado or the Tyfoon Group.[10]

It was not until November 19, 2007 at the pre-trial conference, <u>over eight months after Tornado knew with certainty that Phat Fashions was not going forward with Tornado in 2008</u>, that Tornado announced that it was actually going to move for a preliminary injunction.  This substantial delay by Tornado to seek equitable relief when it knew that Phat Fashions was going forward with Algo, which was out selling the Spring 2008 Phat Fashions line (Segal dep. 160-61; Wiseman dec. ¶48; Wiseman dep. 245), is unconscionable and requires the denial of the drastic

---

[10] In its October 1, 2007Initial Disclosures , Tornado stated again that it was "contemplating making a motion for interim injunctive relief/specific performance ... <u>based in part on §21 of the Agreement</u>" (emphasis supplied), but no motion was made and no <u>actual</u> irreparable harm being suffered by Tornado was alleged. (PX 51).

relief sought by Tornado.  See <u>Klauber Brothers, Inc. v. Lady Marlene Brassiere Corp.</u>, 285 F.

Supp. 806, 808 (S.D.N.Y. 1968) ("delay of one year negates claim of irreparable harm).

## III.    TORNADO SHOULD BE REQUIRED TO POST A SUBSTANTIAL BOND

Fed R. Civ. P. 65(c) requires the posting of a proper bond by movant "for the payment of

such costs and damages as may be incurred or suffered by any party who is found to have been

wrongfully enjoined or restrained."  <u>See</u>, <u>e.g.</u>, <u>Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.</u>,

16 F.3d 1032, 1036 (9th Cir. 1994) (party wrongfully enjoined was entitled to recover full

amount of $15 million bond).  The failure to require a bond is reversible error.  <u>Hoechst Diafoil</u>

<u>Co. v. Nan Ya Plastics Corp.</u>, 174 F.3d 411, 421 (4th Cir. 1999).  While Phat Fashions submits

that Tornado's motion is marked by a singular failure to satisfy the requirements for preliminary

and mandatory injunctive relief, should the Court grant Tornado's motion, a substantial bond

should be required in an amount the Court deems appropriate.

## CONCLUSION

For the reasons stated herein and in the accompanying Hoffman declaration, Tornado's

motion should be denied in its entirety, and Phat Fashions, in accordance with the Agreement,

should be awarded its costs and attorney's fees on this motion.

Dated:  New York, New York
          December 10, 2007

                                        PRYOR CASHMAN LLP

                                        By: _____
                                             Philip R. Hoffman
                                             Attorneys for Defendants
                                             410 Park Avenue
                                             New York, New York  10022
                                             (212) 421-4100
                                             phoffman@pryorcashman.com